# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**UNITED STATES OF AMERICA**

**v.**

**JOHN THOMAS BURNETTE**

_____/

**SEALED**
**SECOND SUPERSEDING**
**INDICTMENT**
Case No: 4:18-cr-76-RH

**THE GRAND JURY CHARGES:**

## COUNT ONE
### Racketeering Conspiracy
### 18 U.S.C. § 1962(d)

### I. Introduction

Unless stated otherwise, at all times relevant to this Indictment:

1.     Governance, Incorporated ("Governance") was a government consulting and lobbying S-corporation based in Tallahassee, Florida. Governance was incorporated in the State of Florida on or about May 14, 1999, by Scott Charles Maddox ("Maddox"). On or about March 12, 2010, Maddox sold Governance to Janice Paige Carter-Smith ("Carter-Smith"). In or about April 2010, Carter-Smith replaced Maddox as Governance's president and registered agent.


FILED USDC FLND TL
OCT 2 '19 PM 1:24

2.     Governance Services LLC ("Gov. Services") was a government consulting and lobbying limited liability company based in Tallahassee, Florida. Gov. Services was registered with the State of Florida on or about November 21, 2007, listing Carter-Smith as the sole managing member and registered agent.

3.     Although Governance and Gov. Services were two separate legal entities, Maddox and Carter-Smith operated them and presented them to the public and their clients as a single entity that they and their clients commonly referred to as simply "Governance." Maddox and Carter-Smith treated Governance and Gov. Services' finances as their own by, among other things, causing payments from the companies' bank accounts to be made directly to their personal bank accounts and moving money to, from, and between the companies' bank accounts to pay for personal, campaign-related, and business expenses.

## II. The Participants in the Criminal Scheme

### A. Maddox

4.     In or about 1993, Maddox was elected as one of five Tallahassee City Commissioners. In or about 1997, Maddox was elected as the Mayor of Tallahassee, and served in that position until in or about 2003. Maddox was a government consultant and lobbyist beginning no later than in or about 1999, when he created Governance. Between in or about 2003 and in or about November

2012, Maddox worked as a lobbyist and ran unsuccessfully for several political offices in Florida.

5.    In 2012, Maddox once again ran for and won a seat on the Tallahassee City Commission. Prior to the election, Maddox consulted with the then-City Attorney about clearing any conflicts of interest relating to Maddox's lobbying business. Maddox stated that he had sold Governance and was in the process of divesting himself of the business. In fact, Maddox continued to control and profit from Governance throughout the subsequent six years while he was a City Commissioner.

6.    As a Tallahassee City Commissioner, Maddox was an agent of the City of Tallahassee, and he had a fiduciary duty to act in the best interests of Tallahassee and its citizens.

7.    The Community Redevelopment Agency ("CRA") was a joint City of Tallahassee and Leon County entity that was established by the Tallahassee City Commission in 1998. The CRA was comprised of a Board of Directors, whose members included all five Tallahassee City Commissioners, including Maddox. From time to time, the Board of Directors held public meetings and voted on whether to fund redevelopment projects using City and County funds.

8. As a member of the CRA Board of Directors, Maddox was an agent of the CRA, and he had a fiduciary duty to act in the best interests of Tallahassee and its citizens.

## B. Carter-Smith

9. Carter-Smith worked with Maddox at Governance beginning no later than in or about 2003. Carter-Smith had previously been Maddox's chief of staff when he was the Mayor of Tallahassee. As stated above, Carter-Smith formed Gov. Services in or about 2007. In 2010, Carter-Smith became the owner and registered agent of Governance. From that point forward, she managed Governance and Gov. Services' operations, finances, and client relations with Maddox and at his direction.

## C. Defendant JOHN THOMAS BURNETTE

10. **JOHN THOMAS BURNETTE** ("**BURNETTE**") was a businessman and real estate developer in the City of Tallahassee and was an associate of Maddox and Carter-Smith. **BURNETTE** bribed Maddox to take official actions favorable to **BURNETTE**'s business interests, and assisted Governance with obtaining bribes from a new client that sought to develop projects in the City of Tallahassee.

### III. The Enterprise

11.    Governance and Gov. Services, together with Maddox, Carter-Smith, **BURNETTE**, and others known and unknown, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), that is, a group of entities and individuals associated in fact, hereafter referred to as the "Enterprise."

12.    The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.  The Enterprise was engaged in, and its activities affected, interstate commerce.

13.    Maddox and Carter-Smith controlled and operated the Enterprise. Maddox was the leader of the Enterprise, and directed other members and associates of the Enterprise in carrying out the unlawful activities and other activities in furtherance of the Enterprise's affairs.  Under the direction of Maddox, Carter-Smith was a member of the Enterprise and also directed associates of the Enterprise in carrying out the unlawful activities and other activities in furtherance of the Enterprise's affairs.  **BURNETTE** associated with the Enterprise and participated in the operation of its affairs, including bribing Maddox and convincing other individuals to make bribe payments to the

Enterprise for projects needing approval in the City of Tallahassee or Leon County.

## IV. Purposes of the Enterprise

14. The purposes of the Enterprise included the following, among others:

    a.    Enriching the members and associates of the Enterprise through, among other things, bribery, extortion, and honest services mail fraud. More specifically, a purpose of the Enterprise was to expand and preserve Governance and Gov. Services' client base and increase the companies' revenue, and to likewise advance **BURNETTE**'s business interests through bribery.

    b.    Advancing the Enterprise's crimes through deception by concealing and protecting the activities of the Enterprise from detection by law enforcement, the public, the City, and others.

    c.    Promoting and enhancing the Enterprise and its members' and associates' activities.

## V. The Racketeering Conspiracy

15. Between in or about December 2013 and on or about May 8, 2019, in the Northern District of Florida and elsewhere, the defendant,

**JOHN THOMAS BURNETTE,**

together with Maddox and Carter-Smith, being persons employed by and associated with the Enterprise, which engaged in, and the activities of which affected, interstate commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5). The pattern of racketeering activity through which the conspirators agreed to conduct the affairs of the Enterprise consisted of multiple acts that are indictable under the following federal statutes:

a. Title 18, United States Code, Section 1951 (Interference with Commerce by Extortion)

b. Title 18, United States Code, Sections 1341, 1346 (Honest Services Mail Fraud)

and multiple acts involving bribery that are chargeable under Florida State Statute 838.015.

16. It was further part of the conspiracy that each conspirator agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the Enterprise's affairs.

## VI. Manner and Means

17. The conspirators and their associates agreed to conduct the affairs of the Enterprise through the following manner and means, among others:

18. The conspirators sent and caused to be sent numerous interstate mailings.

19. The conspirators used Maddox's official position as a City Commissioner to solicit and offer bribes, and extort money from, companies with business interests in Tallahassee. The conspirator demanded, sought, and received the money and bribes with the intent that Maddox would be influenced in the performance of official acts, as opportunities arose.

20. Maddox used his position as a City Commissioner to take official action favorable to Governance and Gov. Services clients, including pressuring and advising City officials and voting or declining to vote on measures before the City Commission.

### A. The Hotel Vote Abstention

21. On or about March 26, 2008, the City Commission voted to approve a three-year option agreement ("the option agreement") for the sale of a City-owned parcel ("the parcel") to a real estate developer ("the Hotel Developer") who sought to build on the parcel.

22. In or about 2011 and 2013, the City Commission approved extensions of the option agreement, which were requested by the Hotel Developer.

23. On or about June 24, 2013, the Hotel Developer paid $25,000, by check, to a company owned by a lobbyist who worked for Governance. On the same day, Gov. Services deposited into its own bank account a $25,000 check from the lobbyist's company.

24. The Hotel Developer's proposed project would have created competition with **BURNETTE's** real estate interests, including a nearby commercial real estate building and the planned purchase of a nearby hotel.

25. In or about December 2013, **BURNETTE** and Maddox agreed that **BURNETTE** would cause Company A to pay Gov. Services $100,000 in exchange for Maddox's recusal from any upcoming Commission vote regarding an extension of the option agreement. Maddox, in turn, informed Carter-Smith of his agreement with **BURNETTE** to pay $100,000 to Governance. **BURNETTE** then instructed Company A employees to engage Carter-Smith as a consultant.

26. In or about December, 2013, after she learned of Maddox and **BURNETTE's** agreement, Carter-Smith met with two Company A employees concerning Company A's efforts to obtain contracts with the United States General Services Administration ("GSA").

27. On or about January 8, 2014, at 9:52 p.m., Carter-Smith sent **BURNETTE** an email entitled, "Letter to [Company A employee]." A letter attached to the email proposed "an upfront retainer of $10,000 to cover 90 days of representation," and an additional "project management fee of 2% of the project amount due six months after the award of the contract." At approximately 10:55 p.m., **BURNETTE** replied to Carter-Smith's email. **BURNETTE'S** email stated, "Changes attached." The attached letter, in redline format, revised Carter-Smith's letter such that the "project management fee of 2% of the project amount" would be "due 30 days after you receive payment."

28. On or about January 9, 2014, at 9:46 a.m., Carter-Smith emailed the Company A employee, attaching the letter as revised by **BURNETTE**.

29. On or about January 10, 2014, a Company A employee sent Carter-Smith an email stating, "Paige, please find attached executed agreement." The attachment contained a signed contract stating that Company A was to pay Governance, as its "Consultant," "an up front fee of $10,000 . . . payable upon execution of this agreement," and a "success fee of any total project amount resulting from a negotiated or sole source project that Consultant assists in acquiring." The contract further provided for a success fee of either one or two percent of the total project amount based on the region where the project occurred,

and further stated that the "success fee shall be due and payable thirty (30) days after [Company A] receives project payment."

30. On or about January 13, 2014, at 3:35 p.m., Carter-Smith emailed to a Company A employee a $10,000 invoice pursuant to the consulting agreement. At approximately 3:37 p.m., the Company A employee forwarded the invoice to Company A's accountants. This forwarded email from the Company A employee email stated, "These are the consultants that JT [**BURNETTE**] wanted to hire to get more business with GSA."

31. On or about January 14, 2014, the $10,000 check from Company A was deposited into Gov. Services' bank account.

32. On or about February 12, 2014, the City Commission considered the Hotel Developer's request for a fourth extension of the option agreement. With Maddox formally abstaining, the City Commission voted to a 2-2 tie, which resulted in a rejection of the Hotel Developer's extension request. As a result, the previously-approved option agreement was scheduled to, and did, expire on March 1, 2014, without a sale of the parcel to the Hotel Developer.

33. On or about February 16, 2014, Carter-Smith sent a Company A employee an email stating that she "had a very productive conversation with GSA," and requesting written background information about Company A.

34. On or about February 26, 2014, a bookkeeper for Gov. Services sent Carter-Smith an email attaching a $100,000 invoice to Company A for "Consulting Services."

35. On or about February 27, 2014, Maddox submitted to the City of Tallahassee a "Memorandum of Voting Conflict" stating, in relation to the February 12,2014, vote on the option agreement, that "there is an appearance of conflict of interests since I previously represented the same developer [i.e., the Hotel Developer] involving the same property."

36. On or about March 31, 2014, Company A wired approximately $2.2 million to another company, Company B, for which **BURNETTE** was the registered agent. On or about April 3, 2014, Company B purchased the DoubleTree Hotel, which was located several blocks from the parcel.

37. On or about April 10, 2014, Carter-Smith sent an email to a GSA liaison who had previously worked at Governance, stating that a Company A employee would like to meet with someone at GSA on various dates in late April or early May.

38. On or about April 14, 2014, a Company A employee sent an email to one of Company A's accountants, stating, with regard to the February 26, 2014, invoice, "per [**BURNETTE**'s] instructions, please pay the above referenced invoice from [Company A] and code to professional fees (do not job cost)."

39. On or about April 16, 2014, Carter-Smith and Maddox caused a $100,000 check from Company A to be deposited into Gov. Services' bank account.

40. Company A did not secure any project award from GSA based on any assistance from Carter-Smith or Gov. Services pursuant to the consulting contract.

## B. Company C

41. Between in or about July 2016 and on or about May 24, 2017, Company C served as a front for undercover Federal Bureau of Investigation agents who were investigating allegations of criminal activity in Tallahassee. The agents posed as representatives of Company C who were real estate and medical marijuana entrepreneurs. Among the projects Company C was pursuing were real estate developments in the Tallahassee area. Each project required or would benefit from the Tallahassee City Commission taking official action, such as rezoning property or annexing certain property into the City's limits. The CRA could also provide grant funding for the projects.

42. On or about July 21, 2016, **BURNETTE** spoke to a Company C representative about a potential real estate deal in the Tallahassee area and identified Maddox as the most powerful member of the CRA.

43. On or about September 21, 2016, **BURNETTE** met with a Company C representative and other individuals. During this meeting, **BURNETTE** agreed

to secure Maddox's support for a potential project by Company C in exchange for Company C paying **BURNETTE** a percentage of the deal. **BURNETTE** said that Maddox would be able to support the project by committing official acts such as convincing other Commissioners to support the project. **BURNETTE** stated that Maddox "effectively gets paid through the lobbying firm." **BURNETTE** explained that the amount that Company C would need to pay Maddox through the lobbying firm would increase based on the political difficulty of authorizing the project. **BURNETTE** gave the example that Company C may need to pay Maddox's lobbying firm $10,000 per month for as long as three years if the value of the benefit to be obtained by Company C from a Tallahassee-area governmental agency was $3 million.

44. On or about October 1, 2016, a Company C representative met with Maddox. Another individual present stated that the Company C representative was seeking to do several real estate deals in Tallahassee. The Company C representative then told Maddox that **BURNETTE** recommended that he meet Maddox. Maddox responded, "[**BURNETTE**] is my guy."

45. On or about October 4, 2016, a Company C representative met with Maddox in Tallahassee. During the conversation, the representative asked, "So can we hire you as, like, a consultant? Like you have a business, right?" Maddox replied, "Not me. I can tell you somebody that you can hire. But not me." The

representative asked if he could pay Maddox's law firm to consult on the project. Maddox replied, "You wouldn't want to do that. You wanna pay the consulting firm that I told you, so that I would not be conflicted out . . . You'd wanna hire Governance Incorporated." The representative then asked, "[**BURNETTE**] will tell me that, right?" Maddox replied, "[**BURNETTE**] will tell you who it is." Later on in the conversation, the representative asked, "What would I need to pay you, uh, not you, but your, what would I need to put in the coffers a month to start the ball rolling?" Maddox replied, "Twenty." The representative asked, "Twenty a month?" Maddox replied, "Yeah." The representative said to Maddox, "That's a lot of money." Maddox replied, "No it's not."

46. On or about October 19, 2016, **BURNETTE** and a Company C representative agreed that Company C would pay Maddox $10,000 per month, and that **BURNETTE** would follow up with further logistics as to how to make the payments.

47. On or about October 24, 2016, **BURNETTE** confirmed that the payments should be made to Governance and that such payments were "definitely for Maddox . . . , there's nobody else in Governance other than Paige, which is Maddox, effectively." **BURNETTE** stated that Maddox wanted "to keep his conversations narrowed to one person." **BURNETTE** further advised with regard to getting payments to Maddox, "Governance is the answer," and that

**BURNETTE** would have a discussion with Maddox about how Maddox wished to "receive those funds . . . into Governance."

48. On or about October 29, 2016, **BURNETTE** told a Company C representative that Maddox wanted to deal only with **BURNETTE**, because Maddox did not "want any more friends" and did not want to have "inappropriate conversations" with anyone but **BURNETTE**.

49. On or about October 29, 2016, Maddox met with a Company C representative and confirmed that Company C's $10,000 payment should be made to Governance; in exchange, Maddox, implicitly and explicitly, agreed to perform official acts to benefit Company C. Maddox further advised that Carter-Smith was on board with how and why these payments were being made to Governance and that Maddox had no secrets from Carter-Smith. Maddox reiterated that if **BURNETTE** was involved, Maddox was on board.

50. On or about November 16, 2016, Company C mailed a check via U.S. Postal Service for $10,000 to Governance, and on or about January 23, 2017, Company C mailed a check via U.S. Postal Service to Gov. Services for $10,000.

51. On or about December 18, 2016, and on or about February 22, 2017, Company C sent checks for $10,000 each to Gov. Services via the United Parcel Service.

52. On or about December 16, 2016, Carter-Smith sent Company C a "Consulting Agreement." The agreement stipulated that Gov. Services would provide "marketing" and "government consulting services" to Company C for $10,000 per month for twelve months.

53. In or about December 2016, Maddox and **BURNETTE** traveled to Las Vegas, Nevada, with Company C representatives. Maddox accepted a flight to Las Vegas on a chartered jet from Company C. Maddox also accepted a hotel room and meal expenses paid by Company C representatives. During this trip, Maddox told an anecdote about threatening to destroy a former client's business deals if the former client did not pay Maddox his fee. The client then called **BURNETTE** to discuss, and **BURNETTE** advised Maddox that the client would be paying.

54. On or about January 9, 2017, **BURNETTE** told a representative of Company C not to stop sending checks to Maddox, as Maddox can kill deals. **BURNETTE** further stated that "Maddox has got to be in the mafia. If you think he isn't, shame on you." In response to a Company C representative's statements that he could not "close that door" once he had started paying Maddox, and that he would "f--- [Company C] just out of spite," **BURNETTE** replied, "Out of spite. Absolutely." **BURNETTE** further stated that Maddox's retribution would be "served cold."

55. On or about March 13, 2017, a Company C representative asked Burnette, in regards to the bribe payments to Maddox, "Does [Maddox] change votes? I mean, how-how does that work?" **BURNETTE** replied, "Really, what you're buying is the no vote." The Company C representative then asked, "The no – so he doesn't vote at all?" **BURNETTE** replied, "No, he doesn't vote against you," then further explained, "Put it this way. . . . The problem is if you started something, if you stop it, it's going to kill you." **BURNETTE** later told Company C representatives that Maddox "is a vengeful motherf-----," and further advised, "Feed a dog for a year, okay? If you stop feeding that dog . . . he might bite your f------ hand."

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO
### Extortion Under Color of Official Right – Company C
### 18 U.S.C. §§ 1951 and 2

1. Paragraphs 1 through 13, 17 through 20, and 41 through 55 of Count One are realleged and incorporated by reference as if fully set forth herein.

2. Between in or about October 2016 and in or about March 2017, in the Northern District of Florida, and elsewhere, the defendant,

**JOHN THOMAS BURNETTE,**

together with Maddox and Carter-Smith, did knowingly obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, and did

attempt to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, the defendant attempted to obtain and did obtain property not due Maddox or his office as a City Commissioner, from Company C, with the consent of Company C's representatives, under color of official right.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNTS THREE THROUGH SIX
### Honest Services Mail Fraud – Company C
### 18 U.S.C. §§ 1341, 1346, and 2

### I. Introduction

1.     Paragraphs 1 through 13 of Count One are realleged and incorporated by reference as if fully set forth herein.

### II. The Charge

2.     Between in or about July 2016 and in or about July 2017, in the Northern District of Florida, and elsewhere, the defendant,

### JOHN THOMAS BURNETTE,

together with Maddox and Carter-Smith, did knowingly and willfully devise and intend to devise a scheme to defraud and deprive the City of Tallahassee and its citizens of their right to the honest services of Maddox, a Tallahassee City Commissioner, through bribery.

### III. The Fraudulent Scheme

3.    The fraudulent scheme is summarized in paragraphs 17 through 55 of Count One, which are realleged and incorporated by reference as if fully set forth herein.

### IV. Mailings

4.    On or about the following dates, in the Northern District of Florida, and elsewhere, the defendant,

### JOHN THOMAS BURNETTE,

together with Maddox and Carter-Smith, for the purpose of executing the fraudulent scheme and attempting to do so, caused to be transmitted by United States mail and private and commercial carrier the following matter:

| COUNT | DATE | MAILING |
|-------|------|---------|
| THREE | November 16, 2016 | $10,000 check sent through the U.S. Postal Service. |
| FOUR | December 18, 2016 | $10,000 check sent through the United Parcel Service. |
| FIVE | January 23, 2017 | $10,000 check sent through the U.S. Postal Service. |
| SIX | February 22, 2017 | $10,000 check sent through the United Parcel Service. |

In violation of Title 18, United States Code, Sections 1341, 1346, and 2.

### COUNTS SEVEN AND EIGHT
### 18 U.S.C. §§ 1952(a)(3) and 2
### Travel Act

1. Paragraphs 1 through 13, 17 through 20, and 41 through 55 of Count One are realleged and incorporated as if fully set forth herein.

2. On or about the dates set forth below, in the Northern District of Florida and elsewhere, the defendant,

**JOHN THOMAS BURNETTE,**

knowingly and willfully did use, and cause to be used, a facility in interstate and foreign commerce with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, namely bribery, contrary to Florida Statute Section 838.015, and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity.

| COUNT | DATE | FACILITY | DESCRIPTION |
|-------|------|----------|-------------|
| SEVEN | October 19, 2016 | Cell Phone | Call from representative of Company C to **BURNETTE** |
| EIGHT | October 24, 2016 | Cell Phone | Call from representative of Company C to **BURNETTE** |

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT NINE
### False Statements
### 18 U.S.C. § 1001(a)(2)

On or about May 24, 2017, in the Northern District of Florida, the defendant,

**JOHN THOMAS BURNETTE,**

did knowingly and willfully make materially false, fictitious, and fraudulent

statements and representations in a matter within the executive branch of the

Government of the United States, that is, the defendant falsely stated that:

    a.    He didn't know who the Company C representatives

wrote checks to;

    b.    He didn't know the name of the firm that Carter-Smith had;

    c.    He did not know who Company C had retained;

    d.    He did not know the content of conversations that Company C

representatives had with Maddox; and

    e.    He did not know that Company C representatives had paid

Maddox.

These statements and representations were false because, as **BURNETTE**

then well knew:

    a.    **BURNETTE** knew that Company C representatives

wrote checks to Governance;

b. **BURNETTE** did know the name of Carter-Smith's firm -- Governance;

c. **BURNETTE** did know that Company C had retained Governance, as directed by **BURNETTE** and Maddox;

d. **BURNETTE** did know the content of conversations that Southern Pines representatives had with Maddox; and

e. **BURNETTE** did know that Company C representatives had paid—and indeed, he directed them to pay—Maddox, through Maddox and Carter-Smith's firm, Governance.

In violation of Title 18, United States Code, Section 1001(a)(2).

## RACKETEERING FORFEITURE

The allegations contained in Count One of this Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963, and Title 28, United States Code, Section 2461(c). Upon conviction of the offense charged in Count One of this Indictment, the defendant,

**JOHN THOMAS BURNETTE,**

shall forfeit to the United States of America,

a. Any interest acquired or maintained in violation of section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b. Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant[s] established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(2); and

c. Any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

If any of the property subject to forfeiture pursuant to Title 18, United States Code Section 1963(a)(1), (2), and (3), as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred, sold to, or deposited with a third party;

c. has been placed beyond the jurisdiction of this Court;

d. has been substantially diminished in value; or

e.      has been commingled with other property that cannot be

subdivided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property,

pursuant to Title 18, United States Code Section 1963(m).

## CRIMINAL FORFEITURE

The allegations contained in Counts Two through Eight of this Indictment

are hereby realleged and incorporated by reference for the purpose of alleging

forfeiture. From his engagement in the violations alleged in Counts Two through

Eight of this Indictment, the defendant,

## JOHN THOMAS BURNETTE,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections

981(a)(1)(C) and 982(a)(2), and Title 28, United States Code, Section 2461(c), any

and all of the defendant's right, title, and interest in any property, real and

personal, constituting, and derived from, proceeds, obtained directly and indirectly,

traceable to such offenses.

If any of the property described above as being subject to forfeiture, as a

result of acts or omissions of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred, sold to, or deposited with a third party;

c.      has been placed beyond the jurisdiction of this Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property that cannot be

subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 18, United States Code, Sections 982, and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of said defendant up to the value of the forfeitable property.

A TRUE BILL:

_____

FOREPERSON

_____10 /02 /2019_____

DATE

LAWRENCE KEEFE
United States Attorney

STEPHEN M. KUNZ
Assistant United States Attorney

GARY K. MILLIGAN
Assistant United States Attorney

ANDREW J. GROGAN
Assistant United States Attorney


COREY AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice


SIMON J. CATALDO
Trial Attorney
U.S. Department of Justice


ROSALEEN O'GARA
Trial Attorney
U.S. Department of Justice


PETER M. NOTHSTEIN
Trial Attorney
U.S. Department of Justice