*United States v. Burnette*, 18-CR-0076

Government's Exhibit 92(f)

Transcript of Government's Exhibit 92(e)

September 11, 2013

**GOVERNMENT
EXHIBIT
92(f)**

Gov. Ex. 92(f)

MARKS:              All right.  Next --

MADDOX:             Mr. Mayor?

THOMPSON:           The next item --

MADDOX:             Before Introduction of Ordinances, it goes without saying that Mr.
                    Jackson's comments, as always, were completely wrong, and not factual,
                    and slander and defamation.  But I have already spoken to the city
                    attorney.  I've represented in the past -- not currently, but in the past -- one
                    of the entities that is involved in 12.01 and, as such, will not be voting on
                    anything that comes forward with that.  We have the introduction of the
                    ordinance today, but I wanted to make that clear.

MARKS:              All right.  Well, we're just at the point where we're introducing these
                    things into -- introducing these things, these ordinances.  So no vote will
                    be taken tonight.  This is not a matter which we will vote on this evening.

GILLUM:             Mr. Mayor?

MARKS:              Yes, sir?

GILLUM:             On the introduction that will go forward, can I also ask that the agenda
                    item didn't identify -- I remember this item well from when we considered
                    it last time.  But the agenda item didn't include the incentives that were
                    given at the time.  It gives a record and a history of the building itself, but
                    it will be helpful because I think a number -- I'm not sure who was on the
                    commission at that time or who wasn't, frankly.

                    But I don't believe all of us were on the commission at that time, but it
                    would be helpful to resurface what the conditions were and the incentives
                    that were given and what was expected at that time so that we can consider
                    it in its fullness.

MARKS:              All right.  Let's introduce the ordinance.  Those comments are very well
                    taken.  Let's introduce the ordinances at this point in time.  Thank you.

SHELLEY:            Mayor, Commissioners, we have two ordinances to be introduced tonight.
                    Agenda Item 12.01 is Introduction of Ordinance Number 13-Z-26,
                    Proposed Amendments to the Floridan Downtown Tallahassee Urban
                    Development -- Unit Development Concept Plan.  The public hearing is
                    scheduled for September 13th on that.

Gov. Ex. 92(f)

The title of the ordinance reads, "An Ordinance of the City of Tallahassee Amending the Floridan Downtown Tallahassee Urban Planned Unit Development Concept Plan on the Official Zoning Map of the City of Tallahassee," adopted and established by the City Commission providing for conflicts, severability, and effective date.

This is Ordinance Number 13-Z-26.  The first and only public hearing will be held on September 25, 2013.

If I could have -- move to have that introduced, please?

MARKS:     All right.  It's introduced --

* * * * * * * *

3

STATE OF FLORIDA,

COUNTY OF LEON,


I, James O. Cooke, IV, City Treasurer-Clerk of the City of Tallahassee, Florida, hereby

certify that the enclosed constitutes a true and correct copy of the September 25, 2013

Tallahassee City Commission Meeting Summary as the same appears on file among records of

the City of Tallahassee.

      **IN TESTIMONY WHEREOF**, I have hereunto set my hand and affixed the official seal

of the City of Tallahassee, Florida, this 11th day of February, 2021, A.D.





    James O. Cooke, IV
    City Treasurer-Clerk

**GOVERNMENT
EXHIBIT
93(a)**

## MEETING SUMMARY

### September 25, 2013

The City Commission met in regular session on September 25, 2013 in the Commission Chambers in City Hall with Commissioners Marks, Miller, Ziffer, Gillum, and Maddox present. Mayor Marks called the meeting to order at 4:04 p.m.

**Item 8.01** - Mayor Marks inquired if anyone desired to address the Commission relative to any items on the published agenda.   The following persons appeared and addressed the Commission:

1. Curtis Baynes, 1323 East Tennessee Street, appeared in regards to **Item 10.02**.   Mr. Baynes expressed support for increased opportunities for the public to speak at meetings.

2. Julia Osagie, 3013 Jim Lee Road, appeared in regards to **Item 9.03**.   Ms. Osagie expressed that she was a student at Rickards High School and a representative of SWAT.   Ms. Osagie requested the Commission's support for discouraging the marketing of tobacco products to youth.

**Voted 5-0** to approve the staff's recommendation presented in Items 9.01 – 9.05 and Item 9.08 on the Consent Agenda taking the following action:

**Item 9.01** – Appointed Ms. Kara Palmer and reappointed Mdmes. Regina Davis and Dazzree Thomas to the Affordable Housing Advisory Committee (AHAC); terms to expire in June, 2016. (*Option 1 as recommended by the Mayor*)

**Item 9.02** – Approved a $150,000 settlement agreement to resolve the wrongful death claim of Carl Leath Revell, III, as the personal representative of the Estate of James Anthony Revell and on behalf of the beneficiaries, Pam Hodges and Carl Leath Revell Jr. (Case No. 2013 CA 716); to be paid from the Risk Management Fund.   (*Option 1 as recommended by the City Attorney*)

**Item 9.03** – Adopted Resolution No. 13-R-28, urging local tobacco retailers to exercise vigilance during the sale and marketing of all flavored tobacco products *(Option 1 as recommended by the City Attorney)*

**Item 9.04** - Adopted Resolution No. 13-R-40; designating Dawn P. Whitehurst, Esq. and Mutaqee N. Akbar, Esq. as hearing officers for the Traffic Infraction Detection Program. (*Option 1 as recommended by the City Attorney*)

**Item 9.05** - Adopted Resolution No. 13-R-39, allowing the City to be reimbursed from the proceeds of a planned future bond sale for a variety of approved capital projects including FAMU Way, since it is reasonably expected that a portion of the total estimated $45 million in project costs will be incurred prior to the bond sale.  *(Option 1 as recommended by the Treasurer-Clerk)*

**Item 9.06** – pulled from Consent; renumbered as **Item 10.01**.

DOJ_0001249483

**Item 9.07** – pulled from Consent; renumbered as **Item 10.02**.

**Item 9.08** – Approved the minutes of the following meetings:  (*Option 1 as recommended by the Treasurer-Clerk*)

> June 19, 2013 – Workshop (1st Budget Workshop)
> July 8, 2013 – Workshop (2nd Budget Workshop)
> July 10, 2013 – Regular Meeting
> August 21, 2013 – Regular Meeting
> August 28, 2013 – Regular Meeting

**Item 10.01** – (*pulled at the request of Commissioner Maddox*) **Voted 4-1** (Commissioner Maddox opposed) to award 1-year contracts for excess workers' compensation and aviation liability to broker J. Smith Lanier and statutory death benefit coverage to broker LB Bryan; 1-year term to begin October 1, 2013.  (RFP No. 0141-13-RWT-RC) (*Option 1 as recommended by the Treasurer-Clerk*)

Commissioner Maddox commented at length his opposition to the RFP process used to select the insurance broker, opining that the current process heavily favored the incumbent firm(s) and worked to exclude potential bidders.   Commissioner Maddox expressed support for changing to RFP process to enable more companies, especially local companies, to bid on this contract.   Commissioner Maddox requested, and the Mayor seconded, that the City Auditor conduct an audit of the process.  A lengthy discussion ensued.

**Item 10.02** - (*pulled at the request of Commissioner Miller*) Voted 5-0 to adopt City Commission Policy No. 108 – Public Participation at Meetings, with the additional language specified below, and adopted amendments to Commission Policy Nos. 110 (Citizen Advisory Boards Appointment Guidelines), 112 (City Commission Agenda), and 126 (Disclosure of Representation). (*Option 1 as recommended by the Treasurer-Clerk*)

Commissioner Miller suggested that a comprehensive list of committees subject to the new statute be created.

The following additions to sections 108.06 and 108.07 regarding decorum of public speakers were added to the policy:

> **Section 108.06:** (insert at end of section) *"The speaker must adhere to a standard of public decorum and may be interrupted by the Chair if said standard is not met."*

> **Section 108.07:** (insert after first paragraph) *"Speakers must adhere to a standard of public decorum and must speak only to that which relates to the common good of the City, City policy, or City business and refrain from personal attacks."*

**Item 11.01** – Voted 5-0 to authorize the 2013/2014 CHSP grant agreement with the Boys and Girls Club of the Big Bend to include terms which allow for an advance of $24,000 of the grant amount upon execution of the agreement, contingent upon adoption of the FY2014 budget. (*Brought forward by Commissioner Ziffer*).

**Item 13.01** – Voted 5-0 to accept the human service funding recommendations, including the CHSP Citizens' Review Teams recommendations, and authorize staff to negotiate and execute

DOJ_0001249484

contracts for the amounts listed in Attachment 1: 2013/14 Grant Funding Summary. *(Option 1 as recommended by Economic & Community Development)*

Ms. Cecka R. Green and Mr. Louis Dilbert, both being Community Improvement Advisory Council members and Citizen Review Team (CRT) Team Leaders, addressed the Commission relative to this item.

**Item 13.02** – Voted 5-0 to approve the recommended ranking submitted by the selection committee and authorize the City Manager or her designee to negotiate and execute contracts for utility financial and systems consulting services with the top five ranked firms: Science Applications International Corporation (*a/k/a SAIC, Inc.*); Public Resources Management Group, Inc.; nFront Consulting, LLC; Burton & Associates, Inc.; and Raftelis Financial Consultants, Inc.; contracts to have an initial 5-year term with five optional 1-year extensions. (RFP No. 0106-13-RWT-RC) *(Option 1 as recommended by Utility Business & Customer Service).*

**Item 13.03** – Voted 5-0 to authorize the City Manager to execute a 10-year agreement (with two optional 5-year contract extensions) with Marpan Recycling, LLC for single-stream recycling processing; and to adopt Resolution No. 13-R-38 establishing commercial single-stream dumpster recycling service and the rates to be charged for such service. (RFP No. 0054-13-VA-TC) *(Options 1 & 2 as recommended by Utility Business & Customer Service).*

**Item 16.01** was the second and final public hearing relative to the tentative budgets and millage rates for the City of Tallahassee and Downtown Improvement Authority. *(Brought forward by the Department of Management & Administration)*

City Attorney Shelley reviewed the ten required steps as follows:

1. **City Attorney Shelley read into the record "**the tentative millage rate for FY14 is 3.7000 for the City of Tallahassee and 1.000 for the Downtown Improvement Authority, which is less than the aggregate rolled back rate of 3.7834 by 1.64%. This decrease will result in the reduction of general government services throughout the city."

   City Attorney Shelley presented Resolution No. 13-R-36 to state that the percentage by which the tentative millage rate is below the rolled-back rate.

2. **Allowed public input on the City's tentative millage.**

   City Attorney Shelley stated that in compliance with Florida Statute 200.065, this hearing was advertised in the *Tallahassee Democrat* newspaper on Sunday, September 21, 2013, and that the hearing was in compliance with the Truth in Millage (TRIM) notice mailed to property owners by the Leon County Property Appraiser. In addition, the City Attorney confirmed that the public hearing did not conflict with similar budget hearings conducted by the Leon County Board of County Commissioners or the Leon County School Board.

3. **Allowed public input on the City's tentative budget and tentative millage rate.**

   The following person(s) appeared before the Commission relative to this item:

DOJ_0001249485

- Erwin Jackson, 5002 Glenrose Court, to recommend eliminating community budget meetings and expressed opposition to using City funds to support construction of new student housing complexes, the McKibbon Hotel Group/Floridan project, a brew pub at Cascades Park, or funding for the Imagine Tallahassee group.

- Curtis Baynes, 1323 East Tennessee Street, to express thanks to the Commission for not raising the millage rate, resulting in an overall tax decrease to property owners.  However, Mr. Baynes expressed his opinion that the past budgeting practices would not be adequate for future budgets and he expressed that the Commission must begin to make decisions relative to which government programs/initiatives to retain and which to eliminate in order to reduce future budgets.

- Michael Rosenthal, 4045 Kilmartin Drive, to express opposition to pay raises for City employees and to express support for additional cuts to the millage rate in order to decrease property taxes.  Mr. Rosenthal alleged that the Commission had previously cast a vote of 'no confidence' in the City Manager, and he expressed thanks in relation to this.  Mr. Rosenthal called for the privatization of the StarMetro transit service and he implored the Commission to end 'crony capitalism' within City Hall.   Mr. Rosenthal praised the actions of Miami-Dade Mayor Carlos Gimenez for cutting city services in order to lower property taxes.

- Kate MacFall, 2144 Delta Way, President of the Animal Shelter Foundation (ASF), to express support of increased funding for the Animal Shelter / Animal Service Center (ASC). Ms. MacFall requested that the Commission continue efforts to locate additional funding to increase staffing at the ASC, with the goal of increasing the live release rate and achieving a 100% spay & neuter rate in order to prevent unaltered animals leaving the facility.

- Lauren Perlman, 6349 Fitz Lane, Vice President of the ASF, reiterated the comments made by Ms. MacFall and she reiterated her request made at the first public hearing that the ASC's budget review measures include an annual evaluation of the Shelter's release rate. Ms. Perlman stressed that a veterinarian technician was still needed to assist the newly-funded veterinarian position and that said position would have a direct impact at improving the release rate, achieving a 100% spay/neuter goal, and to address medical care for heartworm positive animals.

- Colette Vallee, 311 Starmount Lane, appeared and expressed agreement with the comments made by Mmdes. MacFall and Perlman.  Ms. Vallee expressed that the additional positions would result in an overall savings of both animals' lives and expenditures over the long term.

- Kathleen Cavell, 1453 Pine Street, appeared and expressed agreement with the previous speakers in reference to the Animal Shelter.  Ms. Cavell expressed that having healthy spayed/neutered animals on the adoption floor resulted in higher adoption rates, especially if pets were in healthy condition and expensive treatments for heartworms or the spay/neuter procedure had already been completed by the ASC staff.  Ms. Cavell expressed that such measures would encourage more persons to adopt given that adopters would face fewer up-front costs.

There being no additional speakers, the City Attorney closed the final public hearing relative to the City of Tallahassee millage rate and proposed budget.

DOJ_0001249486

Commissioner Miller responded to comments made by Mr. Rosenthal and she expressed to the public that the City had not raised the millage rate, had not utilized Utility revenues or utilized $6 million in reserve funds to balance the budget, and had not hired additional police officers.

Mayor Marks expressed dismay that some members of the public misrepresent the facts.

Commissioner Gillum strongly rebuked Mr. Rosenthal's assertion that the City Manager had been the subject of a no-confidence vote.

A lengthy discussion relative to staffing at the Animal Shelter ensued and the Commission indicated support for any mid-year funding arrangements that could be made to enable hiring of additional staff.

Commissioner Ziffer issued his reminder encouraging residents to spay or neuter their pets.

**4.   Allowed public input on the Downtown Improvement Authority's (DIA) tentative millage.**

City Attorney Shelley stated that In compliance with Florida Statute 200.065, this hearing was advertised in the *Tallahassee Democrat* newspaper on Sunday, September 21, 2013.

**5. Allowed public input on the Downtown Improvement Authority's tentative budget.**

There were no speakers on this item.  The City Attorney closed the final public hearing relative to the Downtown Improvement Authority millage rate and proposed budget.

**6.**  Voted 5-0 to approve the City's final millage rate of 3.7000 mills and adopt Resolution No. 13-R-36, and publicly announced "the final aggregate millage rate is less than the rolled back rate by 1.64%.  This decrease will result in the reduction of general government services throughout the city."

A brief exchange between Commissioner Maddox and Mayor Marks occurred relative to appropriate parliamentary procedure.

**7.**  Voted 5-0 to approve the City's final FY2014 budget, as amended.

**8.**  Voted 5-0 to approve the Downtown Improvement Authority's final millage rate of 1.000 mill and to adopt Resolution No. 13-R-36.

**9.**  Voted 5-0 to approve the Downtown Improvement Authority's final FY2014 budget.

**10.**  Adoption of Appropriation Ordinance No. 13-O-28AA.

City Attorney Shelley read the title of the ordinance into the record.  The appropriation ordinance reflects all changes to the proposed budget that were approved by the City Commission at the budget workshops held on June 19 and July 8, 2013 and the first public hearing conducted on September 11, 2013, and adjustments for changes as discussed herein.

DOJ_0001249487

Voted 5-0 to adopt Appropriation Ordinance No. 13-O-28AA.

Upon this final step, the FY2014 budget was officially adopted.

**Item 15.02 (deleted from the agenda)** was the first public hearing relative to Ordinance No. 13-Z-26; proposed amendment to the Floridan Downtown Tallahassee Urban Planned Unit Development (UPUD) Concept Plan. (PRZ130013) *(Brought forward by Planning)*

Due to a petition for quasi-judicial proceedings submitted by TM Street, LLC, represented by David Theriaque, Esq., this item was removed from the agenda.   As a result, the rezoning will be sent to the Division of Administrative Hearings for a hearing.

As this item was removed from the agenda, no public speakers were heard.

**Item 15.03** Voted 5-0 to adopt Ordinance No. 13-O-29, Amending Chapter 10 of the Land Development Code to transfer the duties of the Parking Standards Committee to the Growth Management Department Director. *(Recommended by the City Attorney)*

**Item 16.01** - Mayor Marks inquired if anyone desired to address the Commission relative to Unagendaed Business, and the following persons appeared:

1. Erwin Jackson, 5002 Glenrose Court, appeared before the Commission and continued his months-long diatribe against Commission Maddox and he advocated for adoption of ethics policy restrictions governing relationships between commissioners and city contractors or other business interests.

City Attorney Shelley interjected and refuted the assertions made by Mr. Jackson relative to any statutory conflict of interest between Commissioner Maddox and McKibbon Hotel Group.

Commissioner Ziffer, referencing the adoption of a decorum policy as part of Item 9.07, requested that Mr. Jackson, while addressing the governing body from the speaker's podium, address members of the Commission by either "Commissioner" or "Mayor," and not by the official's first name.

Mr. Jackson returned to the podium and attempted to make a rebuttal, but was declared out of order by the Mayor.

Commissioner Maddox responded and indicated that much of what Mr. Jackson professes and purports on a regular basis were intentional misrepresentations or outright falsehoods.  Mayor Marks concurred and expressed regret that the residents of Tallahassee had to endure these types of comments meeting after meeting.

2. Gerladine 'Gerri' Seay, 2014 Chuli Nene, representing B Sharps' Jazz Café, to request that the new Rhythm Trolley route serving Midtown, downtown, and Gaines Street/College Town be amended to include stops in Frenchtown.

3. Mia Shargel, 1515 Seminole Drive, representing the Myers Park and Woodland Drives neighborhoods and the *Concerned Citizens Group*, appeared and expressed to the Commission that a new report relative to the Cascades Park amphitheater had been submitted by the consultant, Siebein Associates, Inc. of Gainesville, Florida, and she requested that the Commission review same and

DOJ_0001249488

schedule a discussion of the final report in the near future. She also requested that the consultant be permitted to present his report during the scheduled discussion.

4. Curtis Baynes, 1323 East Tennessee Street, appeared before the Commission and inquired as to what rules of procedure the Commission adhered to for meetings and he inquired as to who served as parliamentarian during each meeting.

**Item 17.01** – City Commission Sharing of Ideas. The following topics were briefly discussed.

Mayor Marks welcomed Ms. Virginia Shore, mother of Ms. M. Michelle Bono, Assistant to the City Manager. The Mayor noted Ms. Shore recently relocated to Tallahassee from the Wichita, Kansas area. The Commission concurred in welcoming Ms. Shore to the community.

Mayor Marks noted that the unemployment rate for the Tallahassee area fell to 6% and the overall Florida unemployment rate fell to 7.1%, as of July. Mayor Marks expressed that these numbers were down from a high of 8.7% in 2010.

Ms. Bono presented a video presentation promoting the dedication of the Tallahassee Civil Rights Heritage Walk memorial sidewalk on East Jefferson Street, in front of City Hall, which commemorates the 1956 bus boycott and lunch counter sit-ins of the 1960s. The dedication ceremony is scheduled for 6pm on Monday, September 30.

Commissioner Miller requested that the issues of parliamentary procedures be resolved prior to the next meeting.

At Commissioner Miller's request, Mr. Wayne Tedder, Director of PLACE, explained the process of reviewing and responding to the Siebein Associates final report mentioned by Ms. Shargel.

Commissioner Ziffer noted the *Making Strides* walk would occur on October 20th and he suggested that the City Commission Office form a team to participate in the walk and to raise money for said cause.

Commissioner Ziffer stressed the importance of opening Cascades Park during March, 2014 and he expressed that any postponement past this date was not possible.

Commissioner Maddox agreed that briefings on *Roberts Rules of Order* were advisable and that such briefings would resolve any procedural issues.

Commissioner Maddox requested that a local street be named in memory of Police Sergeant Daniel Dale Green, who was fatally shot in the line of duty on November 13, 2002. Commissioner Maddox suggested naming a street close to Officer Ponce Drive, which is named in memory of Officer Earnest Kearns Ponce de Leon who was fatally shot on July 8, 1988. The Commission concurred in pursuing naming a street in memory of Sgt. Green.

Mayor Marks noted he recently attended a Congressional Black Caucus (CBC) weekend event in Washington, D.C. at which he discussed Tallahassee's juvenile civil citation program / restorative justice process. Mayor Marks noted that few other cities represented at said panel

DOJ_0001249489

meetings offer similar programs and the Mayor stated that this demonstrated Tallahassee was far ahead of many other communities.

**Adjournment:** There being no further business to discuss, the meeting adjourned at 7:17p.m.

DOJ_0001249490

**REGULAR COMMISSION MEETING**

**Tallahassee, Florida**
**September 25, 2013**

The City Commission met in regular session on September 25, 2013 in the Commission Chambers in City Hall with Commissioners Marks, Miller, Ziffer, Gillum, and Maddox present. Also present were City Manager Thompson, City Attorney Shelley, and City Treasurer-Clerk Cooke.

Mayor Marks called the meeting to order at 4:04 p.m.

For those who wished to participate, City Manager Thompson offered the invocation and Treasurer-Clerk Cooke led in the Pledge of Allegiance.

**AGENDA MODIFICATIONS**

**Added from the Agenda**
Item 11.01 – Request for advance payment to the Boys & Girls Club; to be funded from FY2014 CHSP funding award.

**Deleted from the Agenda**
Item 15.02 – Public Hearing on Ordinance No. 13-Z-26; Floridan Downtown Tallahassee UPUD Concept Plan.

**Pulled from Consent**
Item 9.06 – Award of contracts for 1-year insurance policies for various coverage

Item 9.07 – Adoption of City Commission Policy No. 108 and approval of amendments to Policy Nos. 110, 112, and 126 in relation to Public Participation at Meetings / Senate Bill 50.

**CITIZEN INPUT ON AGENDA ITEMS**

**Item 8.01** - Mayor Marks inquired if anyone desired to address the Commission relative to any items on the published agenda.  The following persons appeared and addressed the Commission:

1. Mr. Curtis Baynes, 1323 East Tennessee Street, appeared in regards to **Item 10.02**. Mr. Baynes expressed support for increased opportunities for the public to speak at meetings.  Mr. Baynes stated that, in his experience attending meetings conducted by the City, residents are afforded an opportunity to speak.  Mr. Baynes expressed uncertainty as to what the new policy aimed to accomplish and he expressed that persons should not be discouraged or hampered from speaking at meetings.

2. Ms. Julia Osagie, 3013 Jim Lee Road, a Rickards High School student and a representative *of Students Working Against Tobacco* (SWAT), appeared in regards to **Item 9.03**.  Ms. Osagie indicated that SWAT aimed to inform the public about the

DOJ_0001249491

harmful effects of tobacco and tobacco companies.  Ms. Osagie requested the Commission's support for discouraging the marketing of tobacco products to youth. Ms. Osagie displayed an example of a disposable hookah, a type of electronic cigarette or "e-cig", and she called attention to the fact that the device was very colorful.  She asserted that this demonstrated tobacco companies intended to market these products to younger persons.  Ms. Osagie also expressed that e-cigarettes were as harmful as regular cigarettes, in terms of adverse health effects.  Ms. Osagie completed her comments by indicating SWAT's goal was to prevent tobacco companies and other bad organizations from polluting the youth with products of this nature.

## CONSENT AGENDA

Commissioner Miller **moved to approve the staff's recommendation presented in Items 9.01 – 9.05 and Item 9.08 on the Consent Agenda.**  Commissioner Gillum seconded the motion and **the vote was unanimous in favor thereof, taking the following action:**

**Item 9.01** – Appointed Ms. Kara Palmer and reappointed Mdmes. Regina Davis and Dazzree Thomas to the Affordable Housing Advisory Committee (AHAC); terms to expire in June, 2016. (*Option 1 as recommended by the Mayor*)

Ms. Kara Palmer Smith replaces Mr. Warren Jones whose term expired in June, 2011.  Ms. Smith is employed as the Director of Business Development at the Economic Development Council of Tallahassee/Leon County, Inc. (EDC).  Ms. Davis is the Executive Director of the Frenchtown Community Development Corporation (Frenchtown CDC).  Ms. Thomas is employed as an EEO Analyst with the City of Tallahassee.

**Item 9.02** – Approved a $150,000 settlement agreement to resolve the wrongful death claim of Carl Leath Revell, III, as the personal representative of the Estate of James Anthony Revell and on behalf of the beneficiaries, Pam Hodges and Carl Leath Revell Jr. (Case No. 2013 CA 716); to be paid from the Risk Management Fund.  (*Option 1 as recommended by the City Attorney*)

The claim was in relation to a June 29, 2011 fatal motor vehicle accident at the intersection of White Drive and West Tennessee Street involving a City fire truck and Mr. Revell's motorcycle.

### RESOLUTION NO. 13-R-28

**A RESOLUTION OF THE CITY COMMISSION OF THE CITY OF TALLAHASSEE, FLORIDA, URGING LOCAL TOBACCO RETAILERS TO EXERCISE VIGILANCE DURING THE SALE AND MARKETING OF FLAVORED TOBACCO PRODUCTS**

**Item 9.03** – Adopted Resolution No. 13-R-28, urging local tobacco retailers to exercise vigilance during the sale and marketing of all flavored tobacco products (*Option 1 as recommended by the City Attorney*)

Representatives from Students Working Against Tobacco (SWAT), a group which attempts to discourage tobacco usage by young people, and the Tobacco

DOJ_0001249492

Free Partnership of Leon County requested that the City adopt a resolution urging local retailers to exercise vigilance during the sale and marketing of flavored tobacco products as these products are specifically targeting young people.

### RESOLUTION NO. 13-R-40

**A RESOLUTION OF THE CITY COMMISSION OF THE CITY OF TALLAHASSEE, FLORIDA REPLACING THE EXISTING RED LIGHT CAMERA HEARING OFFICERS WITH NEW HEARING OFFICERS**

**Item 9.04** - Adopted Resolution No. 13-R-40; designating Dawn P. Whitehurst, Esq. and Mutaqee N. Akbar, Esq. as hearing officers for the Traffic Infraction Detection Program.  (*Option 1 as recommended by the City Attorney*)

The previous hearing officers, Gary A. Roberts, Esq. and Paula M. Sparkman, Esq. were determined to be ineligible due to the statutory prohibition on dual office-holding.

Ms. Whitehurst received a juris doctorate from the FSU College of Law in 1988 and is currently employed as an attorney with Harold & Knowles, P.A.   Mr. Akbar received a juris doctorate from the University of Miami School of Law and is the owner of the Law Office Of Mutaqee Akbar, P.A. which specializes in criminal defense and personal injury law.

### RESOLUTION NO. 13-R-39

**A RESOLUTION OF THE CITY OF TALLAHASSEE ESTABLISHING ITS INTENT TO REIMBURSE CERTAIN PROJECT COSTS INCURRED WITH PROCEEDS OF FUTURE TAX-EXEMPT FINANCINGS; PROVIDING CERTAIN OTHER MATTERS IN CONNECTION THEREWITH; AND PROVIDING AN EFFECTIVE DATE.**

**Item 9.05** - Adopted Resolution No. 13-R-39, allowing the City to be reimbursed from the proceeds of a planned future bond sale for a variety of approved capital projects including FAMU Way, since it is reasonably expected that a portion of the total estimated $45 million in project costs will be incurred prior to the bond sale.  *(Option 1 as recommended by the Treasurer-Clerk)*

**Item 9.06** – pulled from Consent; renumbered as **Item 10.01**.

**Item 9.07** – pulled from Consent; renumbered as **Item 10.02**.

**Item 9.08** – Approved the minutes of the following meetings:   (*Option 1 as recommended by the Treasurer-Clerk*)

    June 19, 2013 – Workshop (1st Budget Workshop)
    July 8, 2013 – Workshop (2nd Budget Workshop)
    July 10, 2013 – Regular Meeting
    August 21, 2013 – Regular Meeting
    August 28, 2013 – Regular Meeting

DOJ_0001249493

**ITEMS PULLED FROM CONSENT**

**AWARD OF INSURANCE POLICY CONTRACTS**

**Item 10.01** – (*pulled at the request of Commissioner Maddox*) was staff's recommendation **to award 1-year contracts for excess workers' compensation and aviation liability to broker J. Smith Lanier and statutory death benefit coverage to broker LB Bryan; 1-year term to begin October 1, 2013.** (RFP No. 0141-13-RWT-RC) (*Option 1 as recommended by the Treasurer-Clerk*)

Commissioner Maddox confirmed that the Request for Proposals (RFP) advertisement was transmitted to over 110 firms, of which 9 firms downloaded and reviewed the advertisement. Treasurer-Clerk Cooke further explained that of those 9 firms, 6 appeared to be viable providers. Treasurer-Clerk Cooke indicated that the RFP sought bids on three lines of insurance coverage, and that for each of those 3 coverages only 1 broker submitted a response, though with 2 options each for insurance. Commissioner Maddox inquired as to how long the incumbent insurance firms have held the contract. Treasurer-Clerk Cooke indicated that, to his knowledge, incumbent J. Smith Lanier has held a contract between 10 and 15 years.

Commissioner Maddox inquired as to the percentage commission paid to broker J. Smith Lanier; Treasurer-Clerk Cooke replied that a 15% commission on the insurance premium was paid to the broker. Upon further inquiry, Treasurer-Clerk Cooke indicated the total commission paid on all three lines of insurance totaled approximately $30,000 per year and that Lanier's portion was approximately $25,000 for two lines of coverage Lanier would provide and the remaining commission would be payable to LB Bryan. Commissioner Maddox asked if Lanier provided other lines of insurance coverage. Treasurer-Clerk confirmed that Lanier also provided the City's property insurance, but he noted that the property insurance coverage was bid separately in order to stagger the terms so as to avoid having all lines of insurance expiring at one time.

Commissioner Maddox inquired, as to the property insurance, how many firms submitted bids during the previous two contract award cycles. Treasurer-Clerk Cooke indicated that one firm bid in the immediate past cycle and that two firms submitted bids in the cycle prior to that.

Commissioner Maddox expressed that he received complaints concerning the City's award of insurance contracts during his preceding terms of service on the Commission (1993-2003) and that these complaints had resurfaced recently. Commissioner Maddox expressed his belief that the award process was flawed, particularly because of the practice of linking the selection of the insurance broker to the selection of the underlying insurance providers and lines of coverage. Commissioner Maddox expressed his belief that the insurance industry was one of the most competitive markets and he indicated his belief that the City was paying more for insurance coverage as a result of the current RFP process.

Commissioner Maddox stated that according to unconfirmed information, J. Smith Lanier's only public sector customer was the City of Tallahassee. Commissioner Maddox named off several local insurance firms whom he believed serviced many public sector clients, and he inquired as to why these firms declined to submit a bid in response to the City's RFP.

DOJ_0001249494

Commissioner Maddox noted he communicated these concerns to the Treasurer-Clerk previously and Commissioner Maddox commented at length regarding his dissatisfaction that no action was taken in response these inquiries.

Commissioner Maddox suggested that the insurance RFP process needed to be changed and that the City should only select the broker - based upon most favorable price - and then allow the selected broker to obtain the necessary lines of coverage from the open market.  Commissioner Maddox expressed his position that the current process has allowed the incumbent to continuously win the contract and that this was unacceptable given the highly competitive nature of the insurance market.

Commissioner Maddox asked if he had sole power to instruct the City Auditor to conduct a formal audit.  **Commissioner Maddox requested an audit to identify (1) how many years the incumbent firm had received a contract, (2) how many bids were submitted during the past RFP cycles, (3) what the normal quantity of bid responses was per industry standards, and (4) determine what other governments were paying for insurance to determine if the City is paying too much.**  Mayor Marks responded and suggested that this could be added to the City Auditor's annual audit plan.

Commissioner Maddox reiterated his displeasure that no solution had been pursued in response to the concerns he had raised, and that staff's only action was to recommend a 1-year contract in lieu of the customary 5-year contract.

Mayor Marks thanked Commissioner Maddox for raising these concerns.  However, Mayor Marks noted that he had not received any complaints from local insurance firms relative to this issue.

For the record, Commissioner Ziffer also indicated that he had not been contacted by anyone concerning this issue.  However, he agreed that it was concerning that only a single respondent was involved.  Commissioner Ziffer inquired if action on this item could be delayed, to permit the City Auditor to complete the requested audit on the RFP process and to then navigate through the substitute process as described by Commissioner Maddox.

Commissioner Gillum indicated he spoke with the Treasurer-Clerk to seek clarification as to the scoring of bids.  In addition, Commissioner Gillum indicated he had inquired as to why the current process scored the broker versus the underlying insurance provider, and had asked if the practice of coupling the insurance broker to the actual insurance providers was normal in the insurance industry.  Commissioner Gillum indicated that he was concerned that the City may not be getting the best deal by continuing to couple brokers to insurers.  However, Commissioner Gillum expressed support for staff's recommendation in order **to permit staff to analyze the current process and bring forth recommended changes to be considered by the Financial Viability of the Government Target Issue Committee (FVOGTIC).**  Commissioner Gillum supported having the FVOGTIC review the process and bring forth a recommendation to the full Commission during the 1-year term.  To that end, Commissioner Gillum expressed full faith and support in the Treasurer-Clerk and his performance, and Commissioner Gillum stated that he did not want to suggest anything untoward in this regard.  Commissioner Gillum likened the concerns with insurance to earlier concerns he expressed relative to the selection of the City's bond underwriters.  Commissioner Gillum expressed his opinion that the bond underwriter selection process served to exclude smaller firms and women-owned firms who may have been newer to the market than older, more well-established firms.  Commissioner Gillum noted staff resolved the concerns relative to bond

DOJ_0001249495

underwriters and, therefore, he favored permitting staff time to exercise due diligence to examine the concerns expressed with regards to insurance coverage.

Commissioner Gillum moved **to approve staff's recommendation of a 1-year extension, and to instruct staff to conduct a review (audit) of the RFP process, as stated herein.**

Mayor Marks inquired if this motion was acceptable to Commissioner Maddox; Commissioner Maddox responded in the negative.  Commissioner Maddox expressed his position that, in a highly competitive field, a longstanding process by which a single firm remained the sole RFP respondent and repeatedly received the City's insurance contracts was a glaring red flag.  For this reason, Commissioner Maddox indicated he would not vote in favor of extending the contract.

Mayor Marks reiterated that this issue has never been raised before and that the other commissioners were not made award of these concerns.

Commissioner Ziffer inquired if the current insurance policies would automatically renew for one year, or if the policies would expire at midnight on September 30th.  Treasurer-Clerk Cooke indicated that the policies would expire on September 30th and that standard insurance industry practice was to issue policies with a 1-year term.

Responding to the concerns expressed by the Commission, Treasurer-Clerk Cooke explained that he understood the Commissioners' concerns and that in response to these concerns, a review of the RFP process was underway.  The Treasurer-Clerk further explained that since he was appointed in early 2011 and had not personally supervised the insurance RFP process in the past, he wished to proceed with the current process in order to review said process first-hand.  Treasurer-Clerk Cooke acknowledged that only two firms responded and stated that he did contact a number of the firms after the bidding deadline concluded to inquire as to why certain firms declined to submit a bid.  In addition, Treasurer-Clerk Cooke noted he had communications with a consulting firm in regards to performing a more thorough analysis and evaluation of the current insurance RFP process.  Mr. Cooke concurred that, intuitively, one would expect many insurance carriers to bid; however, the Treasurer-Clerk expressed that due to the size and nature of the City's insurance needs, there may only be 4 to 6 insurance firms capable of providing the necessary insurance.

The Treasurer-Clerk agreed that some Florida governments utilized decoupled processes, that multiple processes existed, and that some governments did follow Tallahassee's process.  For these reasons, the Treasurer-Clerk expressed his position that more time was needed to thoroughly analyze the various RFP processes.  Treasurer-Clerk Cooke stated that he knew the current RFP process could be completed in time to ensure that insurance coverage could be secured prior to the September 30th expiration of the existing policies.  With this task complete, the Treasurer-Clerk indicated his plan was to then commence a review of the process and implement changes as deemed necessary.

In addition, the Treasurer-Clerk indicated that the new insurance policies could be cancelled mid-year, subject to a partial penalty, if necessary.

Mayor Marks confirmed the current insurance policies would lapse and expire at midnight on September 30th and that action was needed to approve new insurance coverage

DOJ_0001249496

for the ensuing year.   Mayor Marks commented that a lapse in coverage could not be permitted.

Commissioner Maddox responded and expressed that the 1-year extension proposal was not a recent suggestion.  Commissioner Maddox expressed that he had a lack of trust, due to his belief that no substantive action was taken sooner by staff to locate a remedy for the current process.   In addition, Commissioner Maddox voiced opposition to staff's recommendation of hiring a consultant to examine the RFP process.

Mayor Marks inquired if the insurance in question affected individual employees, or the City as an organization.  The Treasurer-Clerk responded that the coverage was for the City as an entity, not employees.

Commissioner Gillum acknowledged the frustration expressed by Commissioner Maddox.   However, Commissioner Gillum highlighted that this concern could have been resolved if this issue had been presented to the FVOGTIC by either Commissioner Maddox as the Chair of said committee, or by City staff.   Commissioner Gillum expressed support for reviewing the current practice to determine if this process produced the best result for the City overall.

Commissioner Gillum inquired as to the total cost of all 3 lines of coverage; Treasurer-Clerk Cooke responded and indicated the 3 premiums, in total, would cost approximately $200,000 for a 1-year term.  With this information, Commissioner Gillum noted that this was not a huge amount of money and that the underlying RFP process should be the focus of concern, with the goal being to foster increased competition.   Commissioner Gillum reiterated his acknowledgement of Commissioner Maddox's frustration, but he reaffirmed his earlier motion to approve staff's recommendation.

Commissioner Maddox responded and acknowledged the Commission must approve the request, but he expressed that doing so would amount to the Commission voting to approve a measure based upon what he believed to be a flawed process.   Commissioner Maddox indicated he would still vote against the motion, but agreed that the matter should be forwarded to the FVOGTIC for review, and that this would be preferable to the alternative of hiring a consultant and waiting another year to enact a change to the process.

Commissioner Ziffer confirmed that the new 1-year policy could possibly be cancelled mid-year.  Treasurer-Clerk Cooke indicated that this would need to be confirmed by the broker, but he indicated that his initial opinion was in the affirmative.  **Commissioner Ziffer requested that cancellation terms applicable to the new 1-year policies be investigated.** Commissioner Ziffer suggested that a deadline be specified relative to when the proposed audit must be completed and when the matter should be discussed by the FVOGTIC.

Commissioner Miller requested the input of City Auditor Fletcher, to confirm the audit could be completed in such a short timeframe.  City Auditor Fletcher indicated that an audit could be ordered at the request and approval by one Commissioner plus the Mayor.   In addition, the City Auditor indicated that the Annual Audit Plan was scheduled to be presented at the next regular meeting, on October 9th.  Auditor Fletcher expressed that 60 days would be a challenging deadline, but that staff would complete the work if so instructed.  After discussing the matter further, the Mayor expressed willingness to support the audit.   However, he expressed that he could only agree to instruct the Auditor to complete the audit expeditiously,

DOJ_0001249497

and that he could <u>not</u> support a strict 60-day deadline. **By consensus, the Commission recommended that the audit be commenced and completed expeditiously.**

Commissioner Gillum offered an amendment to his earlier motion **to also require the FVOGTIC to review the matter and bring forth a recommendation to the full City Commission, at the Committee's earliest possible convenience.** Commissioner Maddox confirmed the motion, as amended, was to approve staff's recommendation of a 1-year extension, to instruct an audit be performed, and to refer the matter to the FVOGTIC for further review. **By consensus, the Commission accepted the amendments to the motion.** Commissioner Miller seconded the amended motion.

 **The vote on the motion, as amended, was as follows:**

 **AYE:** Commissioners Marks, Miller, Ziffer, and Gillum
 **NAY:** Commissioner Maddox

 The motion carried.


## POLICY REGARDING PUBLIC PARTICIPATION AT MEETINGS
## SENATE BILL 50

**Item 10.02** - (*pulled at the request of Commissioners Miller and Maddox*) was staff's recommendation to **adopt City Commission Policy No. 108 – Public Participation at Meetings and adopted amendments to Commission Policy Nos. 110 (Citizen Advisory Boards Appointment Guidelines), 112 (City Commission Agenda), and 126 (Disclosure of Representation).** *(Option 1 as recommended by the Treasurer-Clerk)*

During the 2013 legislative session, Senate Bill 50 was passed into law as Chapter 2013-227, F.S. Effective October 1, 2013, the new law requires that members of the public be given a reasonable opportunity to be heard by a public board or commission before said body takes official action on a proposition. The above policies were created or amended to implement policies in compliance with SB50.

Commissioner Miller requested that the Treasurer-Clerk provide a short briefing on the changes implemented by Senate Bill 50. Treasurer-Clerk Cooke expressed that SB50 would not have any significant impact upon the City, given that the City already permits members of the public to speak at most meetings.

The Treasurer-Clerk then read and explained key language contained in SB50.

Commissioner Miller expressed concern that the new requirements would place additional burdens on City staff and would result in increased financial impacts upon the city government. Responding to Mr. Baynes' earlier comments, Commissioner Miller clarified that SB50 did <u>not</u> restrict the public's ability to speak at meetings, but rather the bill expanded the public's ability to provide input during meetings.

Commissioner Miller expressed concern with the overall number of City boards and committees, noting that each must be staffed. Commissioner Miller inquired as to how much additional staffing would be needed to comply with the SB50 mandates.

DOJ_0001249498

Noting the list of committees attached to the agenda materials, Commissioner Miller expressed that she was unaware of many of the committees listed, or that the City held appointment powers to appoint members to some of the committees listed.  Treasurer-Clerk Cooke responded that Page No. 1 contained a list of committees solely managed and administered by the City, a list of which is also posted to the www.talgov.com web page.  The remaining pages of the list contain other committees that may be staff committees, may be inactive, or are managed by non-City entities, such as the Leon County Board of County Commissioners.

Commissioner Miller asked if SB50 also applied to "staff committees" comprised solely of employees.  She also inquired if SB50 applied to "technical committees" which review technical data or concepts, or to "search committees" assembled to recruit and review candidates for vacant positions.  Treasurer-Clerk Cooke yielded to the City Attorney to provide a legal opinion, but the Treasurer-Clerk expressed his opinion that SB50 applied to any meeting subject to the Sunshine Law (the open meetings law).

Commissioner Miller suggested **that the Treasurer-Clerk and City Attorney review the list of committees to update the list and identify any inactive committees and to determine which of the listed committees SB50 applied.**  Commissioner Maddox moved to approve Commissioner Miller's suggestion.  Commissioner Miller seconded the motion.  Mayor Marks interjected and indicated a motion was not necessary and that staff could simply be directed to complete the above task.  Commissioner Maddox responded and inquired if the Mayor, hearing no objection from the other Commissioners, was ordering the record to reflect the above motion adopted.

Commissioner Miller inquired if SB50 applied to the Commission's Target Issue Committees.  Mayor Marks responded in the negative.

City Attorney Shelley responded and expressed his opinion that SB50 applied to Target Issue Committee meetings, unless a particular matter being discussed was purely informational in nature and would not rise to the level of being a "proposition" that may eventually be brought to the full City Commission for action.  Mayor Marks requested that this aspect be reexamined, noting that nearly every issued discussed at the Target Issue Committee level would eventually be brought forward to the full City Commission.  Mayor Marks requested additional clarification as to the exact circumstances when public comment must be taken at Target Issue Committee meetings.  Mayor Marks expressed concern that some Target Issue Committee discussions were not designed for public comment, noting some items – such as staff updates – required no formal vote or action by the committee.

City Attorney Shelley responded and reaffirmed that the best practice was to assume that the public had the ability to speak at such meetings.  However, the City Attorney noted that the meeting agendas for said meetings were typically circulated one week in advance.  The City Attorney indicated that staff could review each agenda and alert the appropriate committee chairperson in instances where public comment was not required per SB50.  Mayor Marks supported such a process and he suggested that the staff of each committee forward each meeting agenda to the City Attorney for review and determination of SB50's applicability.

Commissioner Ziffer responded and expressed his position that if any City Commissioner was present in an official capacity, the public should be afforded an opportunity to speak.  Commissioner Ziffer expressed bewilderment as to why public comment would not

DOJ_0001249499

be permitted.  Commissioner Ziffer noted that, by current practice, public comment was usually taken during meetings and that SB50 simply made such commentary an official agenda item on each meeting's agenda.  Commissioner Ziffer opposed the process described by the Mayor and he suggested that the Commission enact a policy dictating that when one or more city commissioners are present, public comment should be taken.

Commissioner Gillum departed the Chambers at 4:50pm and returned at 4:52pm.

City Attorney Shelley clarified that the language contained in Commission Policy 108 specified that public comment would be taken at *every* Target Issue Committee meeting.  City Attorney Shelley expressed that the CP108 may extend broader rights than what is required per SB50, but he expressed that this was permissible.  Mayor Marks concurred.

City Attorney Shelley added that if the amount of time consumed by public comment became too taxing, the policy could be amended to afford less time for speakers.  Mayor Marks responded that he would not support extending less time to speakers.

Commissioner Miller asked if the earlier motion had been adopted.  Commissioner Maddox expressed that the Mayor instructed that the record should reflect said motion adopted, without any objection from the Commission, and that staff would be instructed to complete a review of the list of committees.  Mayor Marks reiterated his position that no motion was necessary.

Commissioner Maddox noted he reviewed the legislative intent of SB50 and the language included therein, and that he located several references to "public decorum" in the new statute.  In the hope of fostering civility and public decorum, **Commissioner Maddox offed the following amendments to Commission Policy 108:**

> Section 108.06: (insert at end of section) *"The speaker must adhere to a standard of public decorum and may be interrupted by the Chair if said standard is not met."*

> Section 108.07: (insert after first paragraph) *"Speakers must adhere to a standard of public decorum and must speak only to that which relates to the common good of the City, City policy, or City business, and refrain from personal attacks."*

Commissioner Maddox **moved to approve staff's recommendation, as amended with the above additions to sections 108.06 and 108.07 of the policy regarding decorum of public speakers.**

Treasurer-Clerk Cooke confirmed **the motion also included approval of the amendments to Policy Nos. 110, 112, and 126**; the Commission concurred.

Upon second by Commissioner Ziffer, **the vote was unanimous in favor thereof.**

## CITY COMMISSION

**Item 11.01** was Commissioner Ziffer's recommendation **to authorize the FY2014 Community Human Services Partnership (CHSP) grant agreement with the Boys and**

DOJ_0001249500

**Girls Club of the Big Bend to include terms which allow for an advance of $24,000 of the grant amount upon execution of the agreement.** (*Brought forward by Commissioner Ziffer*).

Commissioner Ziffer introduced the item and confirmed that approval of this recommendation was contingent upon adoption of the FY2014 CHSP budget, as presented in Item 13.01 of the agenda.

Commissioner Ziffer indicated the Club was currently in the midst of this annual cash flow crisis.  Commissioner Ziffer explained that the each year the Club faced a 90-day period wherein cash flow was problematic due to the fact that the Club's grant cycle was ending, which also coincided with the end of the summer youth programs which resulted in fewer revenues for the Club.

Commissioner Ziffer indicated that the Club recognized this chronic problem and was taking steps to enact business model changes, including placing a cap on the number of children who would be accepted, in an effort to mitigate this longstanding cash flow problem.  Commissioner Ziffer explained that payroll costs were a major component of the Club's expenses and that limiting the number of children would result in the need to hire fewer workers to supervise the youth.  In addition, Commissioner Ziffer expressed that transportation and fuel-related costs were another major cost for the Club, and that steps were being taken to reduce these costs as well.  Commissioner Ziffer noted a group of persons are working with the United Way of the Big Bend and the Boys & Girls Club to develop a suitable business plan that will meet the financial limitations of the Club.

Commissioner Ziffer expressed great confidence that approval of the $24,000 advance would enable the Club to make ends meet in the short term and that the Club would make the necessary long-term changes to get their finances in order.  Commissioner Ziffer noted that both the Leon County Board of County Commissioners and the United Way have approved similar advance payments to the Club.

Commissioner Ziffer **moved to approve Commissioner Ziffer's recommendation**; upon second by Commissioner Maddox, **the vote was unanimous in favor thereof.**

## POLICY FORMATION AND DIRECTION

### FY2014 CHSP RECOMMENDATIONS AND THE HUMAN SERVICES DIVISION MASTER BUDGET

**Item 13.01** was staff's recommendation **to accept the Human Service funding recommendations, including the Community Human Services Partnership (CHSP) Citizens' Review Teams recommendations, and authorize staff to negotiate and execute contracts for the amounts listed in Attachment 1: FY2014 Grant Funding Summary.** (*Option 1 as recommended by Economic & Community Development*)

City Manager Thompson introduced the item.

DOJ_0001249501

Commissioner Maddox **moved to approve staff's recommendation**; the motion was seconded by Commissioner Ziffer.   Mayor Marks interjected and requested that the City Manager be permitted to complete her introductions prior to any motion being made.

City Manager Thompson introduced Ms. Cecka R. Green and Mr. Louis Dilbert, both being Community Improvement Advisory Council members and CHSP Citizen Review Team (CRT) Team Leaders, who addressed the Commission relative to this item.   Ms. Green is an employee of the Florida Housing Finance Corporation and Mr. Dilbert is an employee of Tallahassee Community College.

City Manager Thompson noted the many hours the CHSP committees work each year to complete the review process, and she commended the volunteers for their collective efforts.

The FY2014 CHSP funding awards to local organizations are as follows (only City funding is shown):

DOJ_0001249502

| | ANTICIPATED REVENUES | CDBG | GENERAL | CHANGE | TOTAL |
|---|---|---|---|---|---|
| | | | REVENUE | FOR CHANGE | |
| | | | (001-260902-540010) | | |
| | Anticipated Grant Awards | $    269,411 | $    1,198,200 | $    65,000 | $    1,532,611 |
| | | | | | |
| | | | | | |
| | Total Anticipated Funding Sources | $269,411 | $1,198,200 | $65,000 | $1,532,611 |
| | | | | | |
| | EXPENDITURES | CDBG | GENERAL | CHANGE | TOTAL |
| | TO BE RESERVED | | REVENUE | FOR CHANGE | |
| | | | | | |
| | PUBLIC SERVICES (15% of CDBG=$254,355) | | | | |
| 5.1 | Senior Services Center | $60,487 | | | $60,487 |
| 5.2 | Smith-Williams Service Center | $41,000 | $10,000 | | $51,000 |
| 5.3 | Lincoln Neighborhood Service Center | $28,000 | $40,000 | | $68,000 |
| 5.4 | Kids, Incorporated | | $40,296 | | $40,296 |
| 5.5 | America's Second Harvest | | $42,000 | | $42,000 |
| 5.6 | Brehon Institute | | $30,000 | | $30,000 |
| 5.7 | W.A.V.E. | | $6,238 | | $6,238 |
| 5.8 | Capital Medical Society/We Care Network | $25,000 | | | $25,000 |
| 5.9 | A Life Recovery Center | | $41,000 | | $41,000 |
| 5.10 | Ability 1st | $30,000 | $9,782 | | $39,782 |
| 5.11 | Big Bend Cares | $34,924 | $22,076 | | $57,000 |
| 5.12 | Boys & Girls Clubs of the Big Bend, Inc | | $46,039 | | $46,039 |
| 5.13 | Capital Area Community Action Agency | | $85,239 | $35,500 | $120,739 |
| 5.14 | Distinguished Young Men | | $20,000 | | $20,000 |
| 5.15 | Capital City Youth Services | | $46,000 | | $46,000 |
| 5.16 | Elder Care Services, Inc. | | $53,000 | | $53,000 |
| 5.17 | Habitat for Humanity | | $20,000 | | $20,000 |
| 5.18 | Boys Town of North Florida | | $20,000 | | $20,000 |
| 5.19 | FSU Center for Academic Retention | | $25,000 | | $25,000 |
| 5.20 | TCC CROP | | $14,000 | | $14,000 |
| 5.21 | Neighborhood Health Services | $30,000 | $9,000 | | $39,000 |
| 5.22 | Pace Center for Girls | | $22,500 | | $22,500 |
| 5.23 | Refuge House, Inc. | | $10,000 | | $10,000 |
| 5.24 | Sickle Cell Foundation | | $78,000 | | $78,000 |
| 5.25 | Big Bend Homeless Coalition | (Special Appro.) | $135,575 | $30,000 | $165,575 |
| 5.27 | 211 Big Bend | | $26,655 | | $26,655 |
| 5.28 | Pivotal Point | | $146,000 | | $146,000 |
| 5.29 | Children's Home Society | $20,000 | $35,000 | | $55,000 |
| 5.30 | United Way Whole Child Project | (Special Appro.) | $38,800 | | $38,800 |
| 5.31 | Project Annie | | $6,600 | | $6,600 |
| 5.32 | African Carribean Dance Theatre | | $25,000 | | $25,000 |
| 5.33 | Domestic Violence Coordinating Council | (Special Appro.) | $19,400 | | $19,400 |
| 5.34 | United Partners for Human Services | (Special Appro.) | $40,000 | | $40,000 |
| 5.35 | ECHO | | $35,000 | | $35,000 |
| | | | | | |
| | Subtotal Expenditures | $269,411 | $1,198,200 | $65,500 | $1,533,111 |

Ms. Green indicated the recommendation included CHSP recommendations, in addition to specific projects included in the City's U.S. Department of Housing & Urban Development (HUD) Consolidated Plan.

Ms. Green indicated the CHSP review process was instituted 17 years ago.  Ms. Green indicated that in excess of 100 volunteers staffed the various committees and sub-committees. In addition, Ms. Green indicated that several process changes were instituted for the FY2014 process, which included:

- Updating the application forms & paperwork

DOJ_0001249503

- Requiring organizations to submit all documentation electronically, thereby eliminating nearly all paper from the process

Commissioner Ziffer departed the Chambers and returned several minutes later.

In addition, Ms. Green indicated that additional process amendments were being considered by the CHSP Joint Planning Board.

Ms. Green presented statistics which indicated the following in regards to residents of Leon County:

- 53,000+ residents, or 22.3%, live below the poverty level
- 18,000-20,000 residents access food assistance each month
- 12,000, or nearly 36%, of school children qualify for free or reduced-cost meals

Given these statistics, Ms. Green advocated for increased funding of CHSP programs. Ms. Green then introduced Mr. Dilbert.   Mr. Dilbert provided various statistics of the composition of the CHSP Board and CRTs, and he noted that the volunteers, collectively, worked in excess of 3,300 man-hours to complete the FY2014 review process and to issue their recommendations.   In addition, he explained that the local organizations filed requests which exceeded available funding by nearly $2 million. Mr. Dilbert indicated the past two years were exceedingly difficult, given the limited amount of funding.

Commissioner Maddox thanked the CHSP volunteers for their efforts.   In addition, he recognized former Mayor-Commissioner Steve Meisburg for instituting the CHSP review process.    Commissioner Maddox expressed his belief that the CHSP process was an overwhelming success, preferable to the old method of having each local Human Services agency personally appear and plead their case for funding during the 3-minute public comment period.    Commissioner Maddox expressed that the CHSP process has allowed the Commission to more effectively help local organizations.

Commissioner Ziffer concurred, and noted that the CHSP process was a very difficult task for the volunteers to compete.   Commissioner Ziffer encouraged anyone who believed the process was easy to volunteer and witness first-hand the difficulties involved.

City Manager Thompson recognized and complimented Ms. Pat Holiday, Human Services Manager, Department of Economic & Community Development, and her staff for guiding this annual process.   The City Manager noted that Ms. Holliday executes the CHSP process with great attention to detail, to the point that Ms. Holliday was sometimes referred to a 'Colonel' Holliday.

Mayor Marks concurred in commending Ms. Holliday and the CHSP volunteers for their efforts.

Commissioner Gillum also recognized Ms. Holliday for her involvement in the top-to-bottom review of the overall CHSP process.   Commissioner Gillum concurred in recognizing all of the CHSP volunteers.

Mayor Marks requested a motion relative to the item.   Commissioner Maddox issued his motion, which was re-seconded by Commissioner Ziffer.

DOJ_0001249504

**The vote on the motion was unanimous in favor thereof.**

**CONTRACTS FOR UTILITY FINANCIAL AND SYSTEMS CONSULTING SERVICES**

**Item 13.02** was staff's recommendation **to approve the recommended ranking submitted by the selection committee and authorize the City Manager or her designee to negotiate and execute contracts for utility financial and systems consulting services with the top five ranked firms: Science Applications International Corporation (*a/k/a SAIC, Inc.*); Public Resources Management Group, Inc.; nFront Consulting, LLC; Burton & Associates, Inc.; and Raftelis Financial Consultants, Inc.; contracts to have an initial 5-year term with five optional 1-year extensions. (RFP No. 0106-13-RWT-RC)** *(Option 1 as recommended by Utility Business & Customer Service).*

City Manager Thompson introduced the item and noted that Commissioner Maddox was prepared to make a motion relative thereto. Mayor Marks responded that no motion would be recognized until a motion was requested by the Mayor.

The selected firms will each provide one or more of the following services:

1. Comprehensive electric, natural gas, water, wastewater, solid waste, fire service and storm water rate studies using traditional ratemaking cost of service methodologies and other industry accepted methods;
2. Development of new utility rates, including traditional and innovative offerings;
3. Review and development of other utility fees and charges;
4. Project-specific economic feasibility studies;
5. Utility customer and load forecast studies;
6. Utility systems requirement studies;
7. Analysis of regulatory and legal requirements;
8. Risk and asset management analysis;
9. System appraisal and valuation studies; and
10. Other utility-related consulting services

Mr. Reese Goad, Director, Utility Business & Customer Service, briefly explained the types of services the selected firms would provide. Mr. Goad noted the current contracts for these services would expire in November, 2013 and that staff conducted an RFP for new contracts. Mr. Goad explained that 7 firms responded, of which 5 Florida firms were identified as being heavily qualified – 4 of those firms being from Central Florida and 1 firm from North Florida.

At this point, Mayor Marks requested a motion.

Commissioner Gillum **moved to approve staff's recommendation**; the motion was seconded by Commissioner Miller.

Commissioner Maddox recognized Mr. Goad for revisions made to the RFP process, which Commissioner Maddox indicated resulted in increased competition and that the longtime incumbent firm was challenged.

**The vote on the motion was unanimous in favor thereof.**

DOJ_0001249505

## CONTRACT FOR SINGLE-STREAM RECYCLING
## SOLID WASTE SERVICES

### RESOLUTION NO. 13-R-38

**A RESOLUTION OF THE CITY COMMISSION OF THE CITY OF TALLAHASSEE, FLORIDA, RELATING TO ESTABLISHMENT OF COMMERCIAL SINGLE-STREAM DUMPSTER RECYLING SERVICE; PROVIDING FOR RATES; AND PROVIDING FOR AN EFFECTIVE DATE.**

**Item 13.03** was staff's recommendation to **authorize the City Manager to execute a 10-year agreement (with two optional 5-year contract extensions) with Marpan Recycling, LLC for single-stream recycling processing; and to adopt Resolution No. 13-R-38 establishing commercial single-stream dumpster recycling service and the rates to be charged for such service.** (RFP No. 0054-13-VA-TC) *(Options 1 & 2 as recommended by Utility Business & Customer Service).*

Single-stream service allows customers to deposit all recyclable materials into the same container – without the need to separate items. The contract specifies that Marpan will be the City of Tallahassee's exclusive processor for all single-stream program recyclables collected by the City and its contractors.

The Commission recognized Mr. Kim Williams, President of Marpan Recycling; Mr. Reggie Ofuani, Director of Solid Waste; and Assistant City Manager Rick Fernandez for their efforts. All were in attendance at the meeting.

Mr. Reese Goad, Director, Utility Business & Customer Service, provided a brief history regarding the implementation of recycling efforts by the City. Mr. Goad indicated these efforts began 24 years ago with use of hard plastic bins, akin to a plastic version of a cardboard box, which customers filled with recyclable items and placed at the curb for pickup. Mr. Goad stated these bins were replaced in 1999 with the 64-gallon, upright *SmartCart* rolling container currently in use today.

Mr. Goad indicated that the *SmartCarts* resulted in a 50% increase in the amount of recyclable materials collected. Mr. Goad indicated the newest modification would be to end the need to sort the recyclable materials; under the new process, all recyclables could comingled in one bin, thereby making the entire process easier for the consumer.

Mr. Goad reminded the Commission that recycling was a revenue-generating activity and that Marpan would be issuing payment to the City for the materials collected and deposited to the Marpan facility on Woodville Highway. Mr. Goad noted that the market price for recyclables would be adjusted over the span of the contract's 10-year term and that increases in market price would yield higher revenues for the City.

In addition, Mr. Goad noted that approval of the item also included a new rate schedule for commercial properties, in an effort to increase adoption of recycling by more commercial customers - such as apartment complexes. Mr. Goad explained that the size of earlier recycling dumpsters and the need to sort materials into separate bins were significant barriers that discouraged recycling by commercial clients. Mr. Goad expressed that the new single-stream recycling dumpsters would be very akin to the current refuse dumpsters commonly

DOJ_0001249506

seen in apartment complexes.   Mr. Goad indicated the recommended fee for a recycling dumpster was 50% less than the cost of a regular refuse-type dumpster.  Mr. Goad stated that this would provide both an economic and an environmental incentive to encourage commercial customers to participate.

At this point, Mayor Marks requested a motion.   Commissioner Miller **moved to approve staff's recommendation**; the motion was seconded by Commissioner Gillum.

Commissioner Miller noted the City was under a State mandate to increase recycling rates by a certain deadline and she noted that the City has already achieved a 37% rate, but that this rate had remained steady over the past 5 or more years.   Commissioner Miller indicated that many residents have indicated that making recycling easier for consumers would lead to higher participation in recycling programs.

Mayor Marks confirmed that the motion on the table **was for approval of Options 1 and 2 of staff's recommendation.**  Commissioner Miller concurred.

Commissioner Ziffer recounted that in the early days of the recycling program, he was sent to the Killearn area with a marketing team to drive about the neighborhood in search of households that were recycling.   Commissioner Ziffer indicated that the contents of their recycling bins were counted, and the customer was given a gift certificate commensurate with the number of items contained therein.  Commissioner Ziffer expressed that these monetary rewards successfully encouraged greater participation.

Commissioner Gillum inquired if the existing SmartCarts would be replaced, or if the existing carts would be retrofitted and reused.   Mr. Goad responded that the existing carts would be reused, and that customers could expect that over the course of 2014 that the interior divider would be removed and the gull-wing lid would be replaced with a normal lid.  However, Mr. Goad expressed that both sides of the cart could be filled with any material, and that the need to sort items would cease in December, 2013.

Commissioner Miller noted that this was a competitive bidding process and that the local provider, Marpan, made the City a much better offer than the previous, long-term national provider.

**The vote on the motion was unanimous in favor thereof.**

### BREAK

The meeting recessed at 5:23p.m. and reconvened at 6:01p.m. with Commissioners Marks, Ziffer, Gillum, and Maddox present.

### PUBLIC HEARING

### ADOPTION OF FY2014 BUDGET AND MILLAGE RATE

**Item 16.01** was the second and final public hearing relative to the tentative budgets and millage rates for the City of Tallahassee and Downtown Improvement Authority.  *(Brought forward by the Department of Management & Administration)*

DOJ_0001249507

City Manager Thompson introduced the item and noted that at the first public hearing held on September 11, 2013, the Commission held the tentative millage rate at 3.7000 mills for the City of Tallahassee, which has been in effect since FY2011.  The City Manager indicated the final adjusted operating budget amounted to $689.2 million and the final adjusted capital budget amounted to $163 million.

Commissioner Miller arrived at 6:04p.m.

The City Manager noted that pursuant to the Commission's direction at the September 11th hearing, funding for one veterinarian staff position was restored to the budget to support the Animal Service Center (ASC).

In addition, the City Manager noted that the Downtown Improvement Authority's millage rate was set at 1.0000 and that the Commission would be approving the DIA millage rate and budget as part of the approval process.

Commissioner Gillum inquired as to the total cost of the veterinarian staff position at the ASC.   Mr. Heath Beach, Budget Manager, Office of Policy & Budget, Department of Management & Administration, responded that slightly over $100,000 was added to the budget and that this amount was sufficient for the base salary and benefits associated with the veterinarian.  Mr. Beach added that the ASC currently had two veterinarian technicians, and that the ASC's strategy for the upcoming year would be to assign one veterinarian technician to each of the two veterinarians.  Mr. Beach indicated that the effectiveness of this arrangement would be monitored throughout FY2014 and that staff would bring back a recommendation for changes, if needed, as part of the FY2015 budget process.

Commissioner Gillum noted that the compelling argument for increasing medical staffing at the ASC was to achieve a higher spaying and neutering rate and to increase the general number of surgical procedures.  Commissioner Gillum asked if the one-to-one pairing of veterinarian to veterinarian technical would accomplish this goal.

Mr. Dee Crumpler, Interim Assistant City Manager, responded that the veterinarian was licensed to perform a much broader range of medical tasks and surgeries, whereas the technician was more akin to a nurse.  Assistant City Manager Crumpler expressed that in an ideal arrangement, each veterinarian would be paired with two technicians.  Mr. Crumpler acknowledged the budget constraints and he reiterated Mr. Beach's statements to the effect that staff would be creative over the course of the ensuing years and would experiment with various work schedules and would consider recruiting volunteers to supplement paid staff.  Mr. Crumpler expressed that having a licensed veterinarian who could perform the necessary surgeries was the highest priority as this time.  Mr. Crumpler confirmed that the goal was to ensure animals were spayed or neutered prior to their departure from the ASC facility.

Commissioner Gillum emphasized that the goal was to heavily increase the number of spayed or neutered animals leaving the facility.  Commissioner Gillum inquired if the rate could be expected to double, given that the number of veterinarians was being doubled from one to two positions.  Mr. Crumpler hesitated to forecast a two-fold increase, but he agreed that a 'significant increase' could be expected.  Mr. Crumpler indicated that he and staff were grateful that the new veterinarian position was approved and he reiterated that this position would greatly bolster the facility's spay and neuter rates.

DOJ_0001249508

Mr. Crumpler stated that a study had been performed which indicated that 42% of persons visiting the facility could be expected to adopt a pet within 10 days. Mr. Crumpler emphasized that the goal was to ensure these visitors left with an adopted pet, which would be reentering the community already having been spayed or neutered – thereby eliminating any risk of additional unwanted litters. Mr. Crumpler expressed hope that this process would curtail the cycle of unwanted litters and would address the overall problem.

Mr. Crumpler inquired if Ms. Erika Leckington, Director, ASC, had any additional comments of information to present; Ms. Leckington responded in the negative.

Commissioner Miller inquired if there was sufficient space within the ASC to accommodate the additional veterinarian and corresponding staff and equipment. Mr. Crumpler indicated that floor space was a concern, but he indicated staff would have to be creative and would have to make do with the existing facility. In addition, he indicated that the ASC would continue to work with volunteers and local animal rescue groups to locate additional space. Mr. Crumpler indicated that commitments had been secured from area organizations and he indicated that these groups would be afforded an opportunity to participate in the resolution of this issue.

Mayor Marks yielded the floor to City Attorney Shelley, who proceeded with the step-by-step process of adopting the FY2014 millage rate and budget.

City Attorney Shelley announced this was the final public hearing relative to the tentative FY2014 budget. City Attorney Shelley reviewed the ten required steps as follows:

City Attorney Shelley stated that in compliance with Florida Statute 200.065, this hearing was advertised in the *Tallahassee Democrat* newspaper on Sunday, September 21, 2013. In addition, the City Attorney confirmed that the hearing did not conflict with similar hearings conducted by the Leon County Board of County Commissioners or the Leon County School Board.

1. **City Attorney Shelley read into the record** "the tentative millage rate for FY14 is 3.7000 for the City of Tallahassee and 1.000 for the Downtown Improvement Authority, which is less than the aggregate rolled back rate of 3.7834 by 1.64%. This decrease will result in the reduction of general government services throughout the city."

City Attorney Shelley presented Resolution No. 13-R-36 to state that the percentage by which the tentative millage rate is below the rolled-back rate.

<u>**RESOLUTION NO. 13-R-36**</u>

**A RESOLUTION STATING THE MILLAGE RATE TO BE LEVIED FOR FISCAL YEAR BEGINNING OCTOBER 1, 2013, AND SETTING THE PERCENTAGE BY WHICH THE MILLAGE RATE TO BE LEVIED IS LESS THAN THE ROLLED-BACK RATE.**

2. **Allowed public input on the City's tentative millage.**

3. **Allowed public input on the City's tentative budget and tentative millage rate.**

The following person(s) appeared before the Commission relative to this item:

DOJ_0001249509

- Erwin Jackson, 5002 Glenrose Court, to recommend eliminating community budget meetings and to replace such efforts with surveys similar to a recent "*Tallahassee Voices*" poll.  Mr. Jackson indicated that many of those surveyed in said poll expressed support for cutting government programs in lieu of increasing property taxes or fees.  In an effort to locate additional revenue, Mr. Jackson suggested that Commissioner Maddox return his salary to the City coffers.  Mr. Jackson expressed opposition to using City funds to support construction of new student housing complexes, the McKibbon Hotel Group/Floridan project, or a brew pub at Cascades Park.  Mr. Jackson displayed a copy of Volume No. 1, Edition No. 1 of Mr. Steve Stewart's "*Tallahassee Reports*" newspaper.  Mr. Jackson noted the average family income for local residents was approximately $59,000 and he questioned why raises were being given to City employees whose salary exceeded said figure.  Mr. Jackson indicated his opposition to giving funding to Imagine Tallahassee group.

- Curtis Baynes, 1323 East Tennessee Street, to express gratitude to the Commission for not raising the millage rate resulting in an overall tax <u>decrease</u> to property owners.  However, Mr. Baynes expressed his opinion that the past budgeting practices would not be adequate for future budgets and he expressed that the Commission must begin to set priorities and make decisions relative to which government programs/initiatives to retain and which to eliminate in order to reduce future budgets.  Mr. Baynes expressed his belief that the County Commission was pursuing 'regressive' taxes in the form of higher fees, higher assessments, and other increases versus an ad valorem tax increase.  Mr. Baynes encouraged the Commission to reject this method of increasing revenues.  Mr. Baynes reiterated his forecast that the next 5 years would remain difficult, in terms of budgets.

- Michael Rosenthal, 4045 Kilmartin Drive, to express opposition to pay raises for City employees and express support for additional cuts to the millage rate.  Mr. Rosenthal voiced his displeasure that City employees received pay raises during the recent recession, terming these as "ill-gotten gains."  Mr. Rosenthal requested that the City refund its portion of the gas tax increase via a lowering of the millage rate.  Mr. Rosenthal accused the Commission of utilizing $6 million in reserve funds to balance the budget.  Mr. Rosenthal advocated for terminating City employees as a method of funding pay increases for the remaining staff.  Mr. Rosenthal called for the privatization of the StarMetro transit service and he suggested that the City should support car-sharing services, such as ZipCar, which offered low-cost, hourly car rentals.  Mr. Rosenthal implored the Commission to end 'crony capitalism' within City Hall.  Mr. Rosenthal praised the actions of Miami-Dade Mayor Tomas P. Regalado, who allegedly cut City of Miami spending, salaries, and pensions in order to lower property taxes.  Mr. Rosenthal alleged that the Commission had previously cast a vote of 'no confidence' in the City Manager, and he expressed thanks in relation to this and for the Commission's decision to reject a millage rate increase.  Mr. Rosenthal indicated he was eagerly awaiting the search for a new City Manager and he expressed that he would be subscribing to the newspaper referenced by Mr. Jackson.

- Kate MacFall, 2144 Delta Way, President of the Animal Shelter Foundation (ASF), in support of increased funding for the Animal Shelter / Animal Service Center (ASC).  Ms. MacFall requested that the Commission continue its efforts to

DOJ_0001249510

locate additional funding to increase staffing at the ASC, with the goal of increasing the live release rate and achieving a 100% spay & neuter rate in order to prevent unaltered animals leaving the facility. Ms. MacFall encouraged the Commissioners to make regular visits to the ASC facility and she recommended that Commissioners participate in a ride-along and travel with an animal control officer for a workday.

- Lauren Perlman, 6349 Fitz Lane, Vice President of the ASF, reiterated the comments made by Ms. MacFall and she resubmitted her request made at the first public hearing that the ASC's annual budget review include an annual evaluation of the Shelter's release rate. Ms. Perlman stressed that an additional veterinarian technician was still needed to assist the newly-funded veterinarian position and that said tech. position would have a direct impact at improving the release rate, achieving a 100% spay/neuter goal, and to address medical care for heartworm positive animals. Ms. Perlman indicated that only 72% of pets on the adoption floor were altered and that 28% of dogs on the adoption floor were heartworm-positive. Ms. Perlman stressed that the requested staff positions would work to improve these statistics and the overall live release rate, and she thanked the Commission for its financial support in restoring the veterinarian position. Ms. Perlman completed her comments by encouraging the Commission to keep the ASC as a priority in future budget cycles.

- Colette Vallee, 311 Starmount Lane, appeared and expressed agreement with the comments made by Mmdes. MacFall and Perlman. Ms. Vallee expressed that the additional positions would result in an overall savings of both animals' lives and expenditures over the long term and would make Tallahassee a better place to live. Ms. Vallee vowed that the local volunteers and animal organizations would continue to work with the ASC and staff to locate resources to improve the spay and neuter and live release rates. Ms. Vallee completed her comments by thanking the Commission for its recent efforts and support.

- Kathleen Cavell, 1453 Pine Street, appeared and expressed agreement with the previous speakers in reference to the Animal Shelter. Ms. Cavell expressed that having healthy, spayed/neutered animals on the adoption floor resulted in higher adoption rates, especially if pets were in healthy condition and expensive treatments for heartworms or the spay/neuter procedure had already been completed by the ASC staff. Ms. Cavell expressed that such measures would encourage more persons to adopt, given that adopters would face fewer up-front costs.

There being no additional speakers, the City Attorney closed the final public hearing relative to the City of Tallahassee millage rate and proposed budget.

**4. Allowed public input on the Downtown Improvement Authority's (DIA) tentative millage**.

City Attorney Shelley stated that In compliance with Florida Statute 200.065, this hearing was advertised in the *Tallahassee Democrat* newspaper on Sunday, September 21, 2013.

**5. Allowed public input on the Downtown Improvement Authority's tentative budget.**

DOJ_0001249511

There were no speakers on this item.  The City Attorney closed the final public hearing relative to the Downtown Improvement Authority millage rate and proposed budget.

**6.**  Discussion of the City of Tallahassee FY2014 tentative millage rate and tentative budget and adoption of the final millage rate and final budget.

Commissioner Miller responded to comments made by Mr. Rosenthal.  Commissioner Miller reminded the public that less than 20% of the average landowner's tax bill was for City of Tallahassee services, with the remaining 80% going to Leon County or the School Board.  Furthermore, she expressed to the public that the City had <u>not</u> raised the millage rate, had <u>not</u> utilized Utility revenues or utilized $6 million in reserve funds to balance the budget, and had <u>not</u> hired additional police officers – all contrary to statements made by Mr. Rosenthal.

Mayor Marks expressed that many residents recognized the hard work performed by the City and were satisfied with City services, and he expressed dismay that certain members of the public continued to misrepresent the facts.  The Mayor indicated that the City would continue its efforts to provide first-class services to residents.

Commissioner Gillum strongly rebuked Mr. Rosenthal's assertion that the City Manager had been the subject of a 'no-confidence' vote.  Commissioner Gillum voiced satisfaction for the City Manager's oversight of the city government, including the Airport; Electric, Water, Gas, and Solid Waste Utilities; Police and Fire Departments, in addition to the General Government services.  Commissioner Gillum refuted that there was ever any notion, consideration, or mention of a 'no confidence' vote against the City Manager, and he expressed that he rejected any such allegation as completely false.  Commissioner Gillum extended an apology to the City Manager for the speaker's comments.

Commissioner Gillum commended the ASC staff regarding the cleanliness of the facility and professionalism of the ASC staff.  Commissioner Gillum expressed support for extending the City Manager the flexibility to determine how the $100,000 in additional ASC funding should be implemented, noting that he did not want to restrict the ACS from hiring other staff if it was later determined that hiring an additional veterinarian was not the most effective decision in terms of significantly increasing the spay & neuter or adoption rates.

Commissioner Maddox concurred with the previous comments made by the commissioners.  Commissioner Maddox recognized the ASC supporters for their participation, noting their frequent and high volume of correspondence with the Commission and their level of decorum.

Commissioner Maddox recognized Ms. Elspeth Abbott, age 7, who was in attendance, for her efforts.  Commissioner Maddox noted that young Ms. Abbott wanted her recent birthday party to be a fundraiser to help local animals.

**Commissioner Maddox** expressed support for locating additional funds to increase the staffing at the ASC and he **requested that the City Manager bring to the attention of the Commission any funding sources that may be identified during the course of FY2014 that could be redirected to aid the Animal Shelter.**

DOJ_0001249512

Commissioner Maddox **moved to approve the final millage rate and to adopt the budget resolution**; however, the Mayor interjected and expressed frustration that Commissioner Maddox did not wait for the Mayor to ask for a motion.

Commissioner Ziffer issued his customary remarks encouraging residents to spay or neuter their pets.  Commissioner Ziffer concurred with Commissioner Maddox.  Commissioner Ziffer seconded the motion.

Mayor Marks concurred that the earlier speaker's comments were outlandish and he noted the speaker quickly departed the Chambers and was not present to hear the Commission's rebuttal.  Mayor Marks recognized the contingent of ASC supporters who were in attendance for their efforts.  Mayor Marks noted their civil demeanor and approach was far more effective and fruitful than the approach taken by other members of the public whose comments were often filled with vitriol.

**City Attorney Shelley read into the record** "the final aggregate millage rate is less than the rolled back rate by 1.64%.  This decrease will result in the reduction of general government services throughout the city."  City Attorney Shelley requested a motion to adopt the final millage rate.

Commissioner Gillum **moved to adopted the final millage rate**.  Mayor Marks interjected and announced that he did <u>not</u> request a motion, and the Mayor refused to recognize Commissioner Gillum's motion.

The Mayor then requested that a motion be made.  Out of protest, Commissioner Gillum declined to reissue his earlier motion.  After a short pause, Commissioner Miller **moved to approve the City's final millage rate of 3.7000 mills and adopt Resolution No. 13-R-36**; upon second by Commissioner Gillum, **the vote on the motion was unanimous in favor thereof.**

7. Approval of the final FY2014 budget.  City Attorney Shelley requested a motion to adopt the final FY2014 budget, as amended, and as discussed herein.

   Mayor Marks requested a motion.  After a short pause with no motion being made, Mayor Marks declared that there was no motion and no second.  Therefore, the Mayor **declared the meeting adjourned.**

   Commissioner Ziffer **moved to adopt the Final FY2014 Budget**.  Commissioner Maddox **called a point of order.**  Commissioner Miller seconded Commissioner Ziffer's motion.  Mayor Marks announced there was a motion and second on the floor and he expressed that a vote would occur relative to the motion prior to addressing Commissioner Maddox's point of order.  Commissioner Maddox interjected and expressed opposition, noting that per *Roberts Rules of Order,* a point of order held precedence over a motion.  Mayor Marks yielded the floor to Commissioner Maddox.

   Commissioner Maddox referenced the Mayor's earlier adjournment of the meeting and Commissioner Maddox expressed that such an action was improper and could not unilaterally be declared by the Chair without a vote by the entire body.  Mayor Marks responded that there was a motion and second, and the Mayor **called the question.**

DOJ_0001249513

Commissioner Maddox expressed confusion and requested clarification as to whether the vote would be on a motion to adjourn or a different motion.  City Attorney Shelley interjected and expressed that a motion to approve the final budget, as amended, was needed.  As to the Commissioner Ziffer's earlier motion to adopt the final FY2014 budget, the Mayor called the question **and the vote on the motion was unanimous in favor thereof.**

8.  Commissioner Miller **moved to approve the Downtown Improvement Authority's final millage rate of 1.000 mill, as reflected in Resolution No. 13-R-36;** upon second by Commissioner Gillum **the vote on the motion was unanimous in favor thereof.**

9.  Commissioner Gillum **moved to approve the Downtown Improvement Authority's final FY2014 budget;** upon second by Commissioner Miller, **the vote on the motion was unanimous in favor thereof.**

### ORDINANCE No. 13-O-28AA

**AN ORDINANCE MAKING APPROPRIATIONS FOR THE EXPENDITURES AND OBLIGATIONS OF THE CITY OF TALLAHASSEE FOR THE FISCAL YEAR BEGINNING OCTOBER 1, 2013, AND ENDING SEPTEMBER 30, 2014, DESIGNATING THE SOURCES OF REVENUE AND SAID APPROPRIATIONS; AND PROVIDING AN EFFECTIVE DATE.**

10. Adoption of Appropriation Ordinance No. 13-O-28AA.

City Attorney Shelley read the title of the ordinance into the record.  The appropriation ordinance reflects all changes to the proposed budget that were approved by the City Commission at the budget workshops held on June 19 and July 8, 2013 and the first public hearing conducted on September 11, 2013, and adjustments for changes as discussed herein.

City Attorney Shelley indicated the ordinance include the previous amendments to the budget that were discussed by the Commission during the earlier deliberations.

Commissioner Gillum **moved to adopt Appropriation Ordinance No. 13-O-28AA**; upon second by Commissioner Miller, **the vote on the motion was unanimous in favor thereof.**

With this action, the FY2014 final budgets for the City of Tallahassee and Downtown Improvement Authority were adopted.

## FLORIDAN DOWNTOWN PHASE 2 REZONING

### ORDINANCE NO. 13-Z-26

**AN ORDINANCE OF THE CITY OF TALLAHASSEE, FLORIDA AMENDING THE FLORIDAN DOWTOWN TALLAHASSEE URBAN PLANNED UNIT DEVELOPMENT CONCEPT PLAN ON THE OFFICIAL ZONING MAP OF THE CITY OF TALLAHASSEE ADOPTED AND ESTABLISHED BY THE CITY COMMISSION; PROVIDING FOR CONFLICTS; PROVIDING FOR SEVERABILITY; AND PROVIDING AN EFFECTIVE DATE.**

DOJ_0001249514

**Item 15.02 (deleted from the agenda)** was the first public hearing relative to Ordinance No. 13-Z-26; Proposed amendment to the Floridan Downtown Tallahassee Urban Planned Unit Development (UPUD) Concept Plan.   (PRZ130013) *(Brought forward by Planning)*

The Floridan Downtown Tallahassee Urban Planned Unit Development as originally approved by the City Commission on November 21, 2006 (Ordinance No. 06-Z-64).

Due to a petition for quasi-judicial proceedings submitted by TM Street, LLC, represented by David Theriaque, Esq., this item was removed from the agenda.  As a result, the rezoning will be sent to the Division of Administrative Hearings for a hearing.

As this item was removed from the agenda, no public speakers were heard.

**By consensus, the first and only public hearing relative to this item was continued to December 11, 2013.**


## ALTERATION OF THE PARKING STANDARDS COMMITTEE

### ORDINANCE NO. 13-O-29

AN ORDINANCE OF THE CITY OF TALLAHASSEE, FLORIDA, AMENDING CHAPTER 10 OF THE TALLAHASSEE LAND DEVELOPMENT CODE DELETING THE PARKING STANDARDS COMMITTEE AND TRANSFERRING ITS RESPONSIBILITIES TO THE GROWTH MANAGEMENT DEPARTMENT DIRECTOR; PROVIDING FOR CONFLICTS, SEVERABILITY, AND AN EFFECTIVE DATE.

**Item 15.03** was staff's recommendation **to adopt Ordinance No. 13-O-29, Amending Chapter 10 of the Land Development Code to transfer the duties of the Parking Standards Committee to the Growth Management Department Director.** *(Recommended by the City Attorney)*

City Attorney Shelley read the title of the ordinance into the record.

Mayor Marks inquired if anyone wished to address the Commission relative to this item as no one appeared; there were no speakers.

Commissioner Miller **moved to adopt Ordinance No. 13-O-29**; upon second by Commissioner Ziffer, **the vote on the motion was unanimous in favor thereof.**


## UNAGENDAED BUSINESS/SPEAKERS

**Item 16.01** - Mayor Marks inquired if anyone desired to address the Commission and the following persons appeared:

- Erwin Jackson, 5002 Glenrose Court, appeared before the Commission and continued his comments against Commission Maddox, with Mr. Jackson making comments relative to McKibbon Hotel Group (MHG), Governance, and Mr. Gary Yordon.   Mr. Jackson accused Commissioner Maddox of having a financial

DOJ_0001249515

relationship and a conflict of interest with said firm.  Mr. Jackson advocated for adoption of ethics policy restrictions governing relationships between commissioners and city contractors or other business interests.  Mr. Jackson implored Commissioners Gillum, Ziffer, and Miller to band together and oppose the purported actions of Commissioners Marks and Maddox.

City Attorney Shelley interjected and refuted the assertions made by Mr. Jackson relative to any statutory conflict of interest between Commissioner Maddox and MHG.  The City Attorney disclosed that Commissioner Maddox requested counsel from the City Attorney prior to public statements made during an earlier Commission meeting.  City Attorney Shelley stated that Commissioner Maddox did not have a conflict of interest per Florida Statute, but the City Attorney indicated that he would defend Commissioner Maddox should the commissioner opt to abstain from voting on the MHG measure out of concern there was a mere *appearance of* a conflict of interest.

Commissioner Ziffer, referencing the adoption of a decorum policy as part of Item 9.07, requested that Mr. Jackson, while addressing the governing body from the speaker's podium, address members of the Commission by either "Commissioner" or "Mayor," and not by the official's first name.

Mr. Jackson returned to the podium and attempted to make a rebuttal, but was declared out of order by the Mayor.

Commissioner Maddox responded and indicated that much of what Mr. Jackson professes and purports on a regular basis were intentional misrepresentations or outright falsehoods.  Commissioner Maddox expressed dismay that many of Mr. Jackson's comments have gone far beyond conjecture and have progressed to statements which Mr. Jackson knows to be false.  Commissioner Maddox forecasted that Mr. Jackson would continue to make untruthful statements at future meetings.  Commissioner Maddox encouraged any concerned member of the public to contact his office should they have any concerns regarding the statements made during this meeting.

Mayor Marks concurred and expressed regret that the residents of Tallahassee had to endure these types of comments meeting after meeting.

- Geraldine 'Gerri' Seay, representing B Sharps' Jazz Café, 648 West Brevard Street, to request that the new Rhythm Trolley route be amended to include stops in Frenchtown.  Ms. Seay indicated she contacted StarMetro to determine if she had failed to take notice of a process or advertisement for development of the trolley route.  Ms. Seay indicated she was advised that the Community Redevelopment Agency (CRA) Downtown District received funding, but the Frenchtown District did not.  Ms. Seay expressed that this was concerning to her, and she expressed fear that the staff person responsible for marshaling support for the Frenchtown area was failing in this task.  Ms. Seay communicated that her business did not serve food and that music was the only product; and, her business was currently only open during Friday and Saturday nights - as these were the only nights StarMetro had late night service.  Ms. Seay indicated that StarMetro staff indicated the trolley route could be amended in January, 2014 and Ms. Seay expressed that failure to include Frenchtown initially was "an egregious oversight."  Ms. Seay expressed that the ultimate irony was that the Rhythm trolley already traveled through Frenchtown, along

DOJ_0001249516

Carolina Street, on its way from College Town to Midtown.  Ms. Seay expressed concern that City staff was not being attentive and that staff may not be diligently focusing on carrying out the Commission's wishes in regards to supporting Frenchtown.  Ms. Seay requested prompt revision to the trolley route to provide service to Frenchtown and she expressed her belief that not a single minority-owned business was served by the current trolley route.

**Mayor Marks requested a report from staff as to why the Rhythm route could not make stops in the Frenchtown area.**  Commissioner Gillum seconded this request and also noted that Ms. Seay attended several of the "City Commissioner About Town" forums and that this issue had been raised at several of those meetings and that this was reflected in the minutes of said meetings.  Commissioner Gillum expressed hope that if the trolley was already traversing the neighborhood that stops could be added to the route.

City Manager Thompson also advised Ms. Seay that issues of this nature could likely be resolved by contacting the City Manager directly, versus appearing before the Commission.

Ms. Seay noted that Mr. Marcus Roberts, of the CBS television series *60 Minutes*, had recently visited B Sharps and that an upcoming broadcast of *60 Minutes* would include a segment regarding the café and Frenchtown.

Commissioner Ziffer emphasized that the Rhythm route could be modified when needed, in response to information such as that offered by Ms. Seay or other businesses.  Commissioner Miller concurred, but also noted that it had been a difficult task to simply get the trolley initiated.  Commissioner Miller emphasized that more trolley vehicles would be placed into service in the upcoming months and that more services, distance, and overall stops would be added to the system.

Commissioner Gillum praised Commissioner Miller for her leadership and efforts at establishing the trolley route and he forecasted that the trolley route would ultimately prove to be a success.

Commissioner Miller noted that a press event was scheduled for 3pm on September 26th to formally dedicate the new trolley service, which would be followed by a short trolley ride.

Commissioner Maddox concurred in praising Commissioner Miller for her tenacity at pursuing the trolley implementation.  In addition, he recognized Ms. Roxanne Manning, Director, Community Redevelopment Agency, for obtaining pre-owned trolley vehicles from Palm Beach County at no cost to the City.

- Mia Shargel, 1515 Seminole Drive, representing the Myers Park and Woodland Drives neighborhoods and the *Concerned Citizens Group*, appeared and expressed to the Commission that a new report relative to the Cascades Park amphitheater had been submitted by the consultant, Siebein Associates, Inc. of Gainesville, Florida, and she requested that the Commission review same and schedule a discussion of the final report in the near future. She also requested that the consultant, Mr. Robert M. Lilkendey, be permitted to present his report during the scheduled discussion.  Ms. Shargel indicated a similar request was made to the Leon County Board of County Commissioners, who she indicated had agreed to holding a discussion relative to the matter at its next regular meeting.

DOJ_0001249517

- Curtis Baynes, 1323 East Tennessee Street, appeared before the Commission and inquired as to which rules of procedure the Commission adhered to for meetings and he inquired as to who served as parliamentarian during each meeting. Mr. Baynes expressed that he reviewed the City Charter and City Commission Policies and was unable to locate definitive information regarding the rules of procedure.

## CITY COMMISSIONER INFORMATION AND SHARING OF IDEAS

Mayor Marks welcomed Ms. Virginia Shore, mother of Ms. M. Michelle Bono, Assistant to the City Manager. The Mayor noted Ms. Shore recently relocated to Tallahassee from the Wichita, Kansas area. The Commission concurred in welcoming Ms. Shore to the community.

Mayor Marks noted that the unemployment rate for the Tallahassee area fell to 6% and the overall Florida unemployment rate fell to 7.1%, as of July. Mayor Marks expressed that these numbers were down from a high of 8.7% in 2010.

Ms. Bono presented a video presentation promoting the dedication of the Tallahassee Civil Rights Heritage Walk memorial sidewalk on East Jefferson Street, in front of City Hall, which commemorates the 1956 bus boycott and lunch counter sit-ins of the 1960s. The dedication ceremony was scheduled for 6pm on Monday, September 30th, in the City Hall Commission Chambers. Mayor Marks noted another event recognizing participants in the demonstrations would occur on Saturday, September 28th at the John G. Riley House visitor center.

Mayor Marks confirmed that Tallahassee's demonstrations were the 2nd in the nation, following those occurring in Birmingham, Alabama.

Referencing the earlier debate regarding parliamentary procedure, Mayor Marks expressed to Commissioner Maddox that his intent was not to be rude and that his actions were only an attempt to conduct an orderly meeting. If any offense was taken, Mayor Marks offered his apology to the Commission. **Commissioner Miller requested that the issue of parliamentary procedure be resolved prior to the next meeting.**

At Commissioner Miller's request, Mr. Wayne Tedder, Director of PLACE, explained the process of reviewing and responding to the Siebein Associates final report mentioned by Ms. Shargel. Mr. Tedder expressed his opinion that it was premature to schedule a discussion of the Siebein report, and that staff would need time to review the report. In addition, Mr. Tedder noted that the City and County Commissions agreed to the formation of a committee, including representatives from the two neighborhoods, and Mr. Tedder suggested that the report be present to said committee for review, with the opportunity for both the City's consultant and the Seibein consultant to meet and discuss the various reports. Mr. Tedder advised that plans were underway to conduct a second sound test at the Amphitheater in order to test the effectiveness of changes made subsequent to the first test. Mr. Tedder advised that the Commission would be kept abreast of these issues as the process progressed and that a more formal update would be conducted prior to the park's opening.

DOJ_0001249518

Commissioner Ziffer noted the *Making Strides* walk would occur on October 20th and he suggested that the City Commission Office or the City Hall 4th Floor form a team to participate in the walk and to raise money for said cause.

Commissioner Ziffer stressed the importance of opening Cascades Park during March, 2014 and he expressed that any postponement past this date was not possible.  Commissioner Ziffer emphasized that vendors and other entities needed a firm date and that once a firm date was established, the deadline must be held firm and not delayed.

Commissioner Maddox agreed that individual briefings on *Roberts Rules of Order* were advisable and that such briefings would resolve any procedural issues henceforth.

Commissioner Maddox requested that a local street be named in memory of Police Sergeant Daniel Dale Green, who was fatally shot in the line of duty on November 13, 2002.  Commissioner Maddox suggested naming a street close to Officer Ponce Drive, which is named in memory of Officer Earnest Kearns Ponce de Leon who was fatally shot on July 8, 1988.  Commissioner Maddox indicated that Sgt. Green's mother indicated that he entered law enforcement due to Officer Ponce, and Commissioner Maddox expressed that it would be fitting to have a street in close proximity dedicated to Sgt. Green.  **The Commission concurred in pursuing naming a street in memory of Sgt. Green.**

Mayor Marks noted he recently attended a Congressional Black Caucus (CBC) weekend event in Washington, D.C. at which he discussed Tallahassee's juvenile civil citation program / restorative justice process.  Mayor Marks noted that few other cities represented at said CBC panel meetings offer similar programs and the Mayor stated that this demonstrated Tallahassee was far ahead of many other communities.

## ADJOURNMENT

There being no further business to discuss, the meeting adjourned at 7:17p.m.

_____
JAMES O. COOKE, IV
City Treasurer-Clerk

DOJ_0001249519

*United States v. Burnette*, 18-CR-0076

Government's Exhibit 93(f)

Transcript of Government's Exhibit 93(e)

September 25, 2013

**GOVERNMENT
EXHIBIT
93(f)**

Gov. Ex. 93(f)

| | |
|---|---|
| MARKS: | -- unanimously.  Unagendaed Speakers.  Do we have any unagendaed speakers? |
| COOKE: | Mayor, we have several unagendaed speakers tonight.  First is Erwin Jackson, followed by Gerri Seay. |
| JACKSON: | Dr. Erwin Jackson, 1341 Jackson Bluff.  Mr. Mayor, you talked about individuals who are misrepresenting the truth, and that's exactly what I want to talk about tonight. |

For several years, Scott Maddox has been paid well to represent the McKibbon Hotel Group.  It doesn't matter to me if this money is directed -- paid to him directly; funneled to him through a law firm; funneled through his lobbying firm, Governance; his business partner Gary Yordon.  The practice is wrong and needs to stop.

Two weeks ago, I came up here and I exposed the financial relationship between Scott and McKibbon Hotel Group.  We all listened to Scott's indignation that my facts were simply wrong, I was lying, and his claim that I was attacking his "good character."

Unbelievably, within 15 minutes, Scott admitted that he has a conflict of interest, as I described, with MHG and has promised to recuse himself on all future votes in this area.  Now every word that I said was clearly verified by Scott Maddox's own admission.

Now that's nice, Scott, and the public appreciates your willingness to finally admit that you have a financial relationship with MHG.  The public also wants to know why it took a private citizen publicly embarrassing you regarding your self-serving actions before you decided to simply admit the truth?

Actually, the opportunity for city commissioners to reward themselves are numerous, and the ethics policy now under discussion will do nothing to stop it.  For example, city commissioners can hire city contractors to do work for them.  City contractors can hire city commissioners.  This is a problem.

The public must come forth and demand that the ethics policy prevent elected officials from benefiting from city contracts, prevent them from working for city contractors, and prevent them from directing city contracts to their past employers, like "Governance," or other business interests.

Scott likes to say that he's transferred ownership to Governance to his business partner of 10, 15 years, Gary Yordon.  I'm equally certain that he

2

Gov. Ex. 93(f)

can retain an option to buy this business back for a dollar. It seems the scam is simple, go ahead and direct money to Governance while you're an elected official and then regain control after his time as commissioner is terminated. We need to eliminate that possibility.

Our community needs this commission to show real leadership and clearly state that these self-serving actions must cease, and we can do that through the ethics policy. And it's going to take Commissioners Gillum, Miller, and Ziffer for this to be accomplished.

I do not expect any support on ethics issues from the Mayor or Mr. Maddox.

COOKE:          Excuse me, your time has expired.

JACKSON:        Thank you very much.

SHELLEY:        Mayor, Commissioners, I feel compelled to state the actual facts on some statements that Dr. Jackson has made.

Number one, before the last meeting and Commissioner Maddox made the statement concerning his recusal on the McKibbon Group, he had talked with me at length about a possible conflict. I, in fact, told him and advised him that because of an appearance of a conflict that I would be happy to defend him recusing himself when, in fact, if you look at the current Ethics Commission decisions, he does not have a conflict.

So he made that decision on his own before there was any statements here made by Dr. Jackson, and he made it knowing that there could be someone out there that would file some action against him for not voting. And that, I assured him that I would certainly defend. So that's the actual sequence of what occurred, and it had nothing to do with Commissioner -- it was way before Commissioner Maddox heard your comments at the last City Commission meeting.

MARKS:          Commissioner Maddox, do you want to -- Mr. Ziffer, go ahead.

ZIFFER:         Just a quick comment.

MARKS:          Sure.

ZIFFER:         And it has to do with something we discussed about 2 hours ago and has to do with decorum. I don't know what your relationship is, but when Commissioner Maddox is up here, he's Commissioner Maddox. This is Commissioner Gillum. I'm Commissioner Ziffer. This is Commissioner

3

Gov. Ex. 93(f)

Miller, and that's Mayor Marks.

That's who we are, and I would appreciate it if you would refer to us when we're up here in that fashion because I think it's appropriate.  I think we've earned that right, and it would, I think, serve your purposes for whatever you're trying to do to appear to be at least cordial and respectful to us.

That doesn't require a response.

JACKSON:          I was told --

MARKS:             Please, sir.  Please, sir.  Sit down.

JACKSON:          No, wait.  I was just told by the clerk that no titles were to be used.

MARKS:             Please, sir.  Please, sir.

JACKSON:          We don't refer to people as commissioners.  We don't refer to people as Dr. Jackson.  I'm just following what I've been told by the clerk.  Thank you.

(Gavel sounding.)

MARKS:             Commissioner Maddox, please.

MADDOX:          Thank you, Mr. Mayor.  Just briefly, you know, just for the public at home that is watching this, if you watch more than one meeting, you know that Mr. Jackson just comes up every meeting.  That what the city attorney addressed wasn't the only thing false he said in his comments.  He now makes things up and attributes them to me, that…

\* \* \* \* \* \* \* \*