**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE, FLORIDA**

*UNITED STATES OF AMERICA,*          )
                                     )
              *Plaintiff,*           ) *Case No:  4:18-cr-76*
                                     )
*vs.*                                ) *Tallahassee, Florida*
                                     ) *July 16, 2021*
*JOHN THOMAS BURNETTE,*              ) *8:53 A.M.*
                                     )
              *Defendant.*           )
_____          )

**SEALED**
**VOLUME V**
**(Pages 964 through 1004)**

**TRANSCRIPT OF FIFTH DAY OF TRIAL**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**UNITED STATES DISTRICT JUDGE, and a jury**

APPEARANCES:

| | |
|---|---|
| For the Plaintiff,<br>United States of<br>America: | Jason  R. Coody<br>Acting United States Attorney<br>By:  STEPHEN M. KUNZ<br>      ANDREW J. GROGAN<br>      Assistant U.S. Attorneys<br>      *stephen.Kunz@usdoj.gov*<br>      *andrew.grogan@usdoj.gov*<br>111 North Adams Street, Suite 400<br>Tallahassee, Florida  32301<br><br>Corey R. Amundson, Chief<br>Public Integrity Section<br>Criminal Division<br>U.S. Department of Justice<br>By:  PETER M. NOTHSTEIN<br>      Deputy Chief<br>      ROSALEEN T. O'GARA<br>      Trial Attorney<br>      *peter.nothstein@usdoj.gov*<br>      *rosaleen.o'gara2@usdoj.gov*<br>1301 New York Avenue NW<br>Washington, DC  20005 |



***JUDY A. GAGNON, RMR, FCRR***
*Registered Merit Reporter*
*2616 Hemmingwood Place * Tallahassee, Florida  32312*
*(850) 443-7896*

 2     <u>APPEARANCES</u>:   Cont'd

 3     For the Defendant,      Jansen & Davis, P.A.
        John Thomas Burnette:   By:  R. TIMOTHY JANSEN
 4                              Attorneys at Law
                              *jansen@jansenlawoffice.com*
 5                              *akomisar@jansenanddavis.com*
                        1206 North Duval Street
 6                        Tallahassee, Florida   32303

 7                        Greenberg Traurig, P.A.
                        By:  GREGORY W. KEHOE
 8                              JORDAN BEHLMAN
                              Attorneys at Law
 9                              *kehoeg@gtlaw.com*
                              *behlmanj@gtlaw.com*
10                        101 East Kennedy Boulevard
                        Tampa, Florida   33602
11

12                        Law Office of Adam J. Komisar
                        By:  ADAM J. KOMISAR
13                              Attorney at Law
                              *adam@KomisarSpicola.com*
14                        Post Office Box 664
                        Tallahassee, Florida 32303

15

16

17

18

19

20

21

22

23

24

25

S E A L E D   P R O C E E D I N G S

1                   P R O C E E D I N G S

2        (*Call to Order of the Court.*)

3        (*Defendant present; jury not present.*)

4             THE COURT:  Good morning.  Please be seated.

5             Test the headphones for the attorneys.

6             DEPUTY CLERK:  All of the headphones have been turned

7   off.  Press the middle button one time, you will see a blue

8   light flash, when it stays a steady blue, it's on.

9        (*Conference held at the bench via headphones.*)

10            THE COURT:  Here's the situation:

11            One of the jurors went to the hospital last night

12   to visit her mother in the emergency room.  The mother was not

13   then but has been now diagnosed with COVID and pneumonia.  I

14   haven't gotten full details, but my understanding is that she

15   was 5 or 6 feet from her mother and wasn't there for a long

16   time and apparently hasn't been in close contact for two or

17   three days prior.  It seems clear to me that we don't wish to

18   have a juror who has been that close to a person with COVID.

19   So I think I propose to dismiss the juror.

20            I probably should get the court security officer and

21   the courtroom deputy to find out more details about close

22   contacts over the last few days.  We have had the jurors in

23   two separate rooms during breaks so that we only have seven in

24   each room.  The rooms are big enough that they could stay

25   distant from one another, but we don't monitor them.  I'm not

1    sure how well they've stayed distant or whether they continued

2    to wear their masks.  If she had had more contact with the

3    mother, I'd be a little worried about the whole situation, but

4    I think at this point what I propose to do is simply dismiss

5    that juror.  I welcome your positions.  Let me start with the

6    government.

7            MR. NOTHSTEIN:  Your Honor, I think we may -- I think

8    my only concern is certainly the contact that the juror might

9    have had over the past few days, because if there was prior

10   contact now, it's potential that everyone on the jury because

11   even in here when they are wearing masks, they are close, and

12   as you said, we're not sure what they are doing when they are

13   not in the courtroom.  I certainly agree to not keep the juror

14   here.  I think I may just want to think for a moment about

15   whether there is anything else we need to do for the other

16   jurors' safety, if we need to advise them --

17           THE COURT REPORTER:  I didn't hear him after "if we

18   need to advise them."

19           THE COURT:  That's all he said.

20           MR. NOTHSTEIN:  My apologies, Your Honor.  What I was

21   saying is, it may make sense for us, based on the nature is

22   juror's contact with her mother over the past few days, it may

23   be that we need to advise the other jurors so they can be

24   tested if they choose.  But I think the nature of the contacts

25   are important, because I understand the gestational period of

1 the disease.

2           THE COURT:  Right.  For the defense?

3           MR. JANSEN:  Judge, we would like to know which juror

4 it is.

5           THE COURT:  I particularly not told you, and frankly

6 the positions should not matter based on what you think the

7 juror is good for you or not good for you.  It's just a juror.

8 So I'll tell you eventually.

9           MR. JANSEN:  Okay.

10           THE COURT:  But I deliberately did not taint your

11 views, because I don't want you to take a different position

12 based on whether you think it's a good juror for you or not.

13 It is not an alternate.

14           MR. JANSEN:  Okay.  That's what I --

15           THE COURT:  And it's not the one that I have been

16 watching to try to keep her awake.  I mean I've got one

17 that -- you may have heard me banging around up here some.

18 She wakes up every time I kick the bench.

19           MR. JANSEN:  Judge, that was kind of our concern, if

20 we release her and the one that's sleeping, but whatever is

21 safest for the jury.

22           THE COURT:  All right.  We can't all get together and

23 talk, that's the problem.

24           MR. NOTHSTEIN:  Your Honor, if I may, my apologies.

25 I just want to point out one thing that gives me particular

1 concern.  It's looks as though one of the jurors is pregnant,

2 and I know that the COVID risks are particular for pregnant

3 women.

4   THE COURT:  Yeah.  You know, the possibilities would

5 take a couple of days break and let everybody get tested.  You

6 may know more than I do.  The gestational period for the

7 disease is a couple days.  If you have them tested right now,

8 it won't tell you anything.

9   Let's see if we can get some more information about

10 how close the contact has been.  The other day you wanted all

11 be there when I talked to a juror.  I don't think we all want

12 to go in the same room.  The courtroom next door is empty.  I

13 guess we could all go in there and all spread out.  But

14 frankly I've got her as far away from people in the back

15 hallway as she could be.  She has not been in contact with any

16 of the other jurors this morning.

17   I think that perhaps I propose to send the courtroom

18 deputy back in the hallway, ten feet away and talk to her and

19 find out and come back and report what information she has.

20 Is that acceptable to both sides?

21   MR. NOTHSTEIN:  It is for the government, Your Honor.

22   MR. JANSEN:  Yes, Your Honor.

23   THE COURT:  All right.  Let's do that.  We'll be in

24 recess until we get more information.

25   (*A recess was taken at 9:04 a.m.*)

1          (*The proceedings resumed at 9:14 a.m.*)

2          (*Defendant present; jury not present.*)

3          THE COURT:  You may all be seated.  I'm sorry.  White

4    noise.

5               (*Bench conference held via headphones.*)

6          The juror is not vaccinated, lives in the same house

7    with her mother, checks on her, says she has not had close

8    contact but she's living in the same house.

9          I didn't get more details.  I assume she was asked,

10   maybe Ms. Markley can fill us in, on the contact last night at

11   the hospital.  Actually, I guess that doesn't make any

12   difference.  I need to confirm with the court security

13   officers that she did not get in with the jurors this morning.

14   That was my initial understanding.  Hold your positions for

15   just a second.  Let me go find out for sure.  Everybody just

16   keep your seat and stay right where you are.

17        (*A recess was taken at 9:16 a.m.*)

18        (*The proceedings resumed at 9:18 a.m.*)

19        (*Bench conference resumed.*)

20          THE COURT:  Please be seated.

21          The court security officer assures me that she

22   indicated this at the front desk and she has not been near any

23   of the jurors.  So the extent of contact last night doesn't

24   make any difference at this point.

25          We will -- both sides have agreed that she should be

1   excused.  Obviously, that's correct.  The question then

2   becomes what to do with the other jurors.  You asked me which

3   one.  It's Juror Number 2, the woman who handles

4   adjudications, workers comp.  So she's in the second seat from

5   the right on the front row.  I hope there is an empty seat on

6   the one side.  I think the empty seat is the one to her right,

7   but, of course, she is interior to the one to the left.  I

8   have no way of knowing how close they have been to one another

9   in the jury room.  Here are the options it seems to me:

10        We can just excuse her and go forward this morning

11  with the others.  I think the government is right, probably we

12  should tell the others.  And another option is to not go

13  forward today.  If the juror tested -- I'm not sure how much

14  the test would tell us if she's been with her mother all week,

15  it could tell us something.  She could get both the rapid test

16  and the longer test, whatever it is, and then we would

17  probably know by Monday.  We can stop the trial for the day

18  and start back on Monday morning; or we can even go to Tuesday

19  morning.  But I suspect we can get a report by Monday morning.

20  And if has the PCR test -- I may have the wrong initials --

21  and she was negative today, that would give me some comfort

22  going forward Monday.

23        Tell me what you think.  The government,

24  Mr. Nothstein?

25        MR. NOTHSTEIN:  Your Honor, I think that the court's

S E A L E D   P R O C E E D I N G S

*972*

```
 1   is correct that we can't go forward today.  I think our

 2   primary concern is that the other jurors may not be

 3   vaccinated.

 4          THE COURT:  Mr. Coody, can you hear back there?

 5          MR. COODY:  No, I cannot.

 6          THE COURT:  If you hear what anybody says, give me a

 7   wave.

 8          MR. COODY:  Yes, sir.

 9          THE COURT:  All right.

10          MR. NOTHSTEIN:  I think we need to give the other

11   jurors time to get tested, and I think we ought to look at

12   guidance how soon that test can occur.  I don't know if it's

13   three days, five days.  I believe it's somewhere around there.

14   I think that would take us maybe to Tuesday before she even

15   gets the test before it would be reliable.  I certainly don't

16   want to take a break for that length, but I think for safety

17   sake that's what we need to do.

18          THE COURT:  So you want to adjourn the trial until

19   Tuesday or Wednesday.

20          MR. NOTHSTEIN:  I think until Wednesday, so they can

21   get a test on Tuesday.

22          MR. JANSEN:  Adjourn until Tuesday.

23          THE COURT:  You are welcome to share your

24   conversation with Mr. Burnette, but you'd probably prefer not

25   to.
```

1      MR. NOTHSTEIN:  Your Honor, just to clarify, in terms

2  of today, to take a moment to look at the guidance and that

3  way we can decide when to tell the jurors when we can come

4  back.  But I think it may take a little of time to formulate

5  the plan, but certainly today we can't go forward.

6      THE COURT:  I do think we need to tell the jurors

7  today why we are continuing the case so that they know there

8  is a chance that they have been exposed.

9      MR. NOTHSTEIN:  Agreed, Your Honor.

10      THE COURT:  Probably the best way to do that is to do

11  it here.  Maybe we'll just call things off with the public,

12  get everybody out of the room, and let them come in widely

13  spread out.

14      I'll give some thought to what we say about it.  I

15  don't want to disclose any of the individual juror's medical

16  situation, but I don't know that there is any secret that this

17  is why we've put the trial back.

18      All right.  So the proposal from the government at

19  least is that we adjourn for the moment, bring the jurors into

20  the courtroom, maybe in 15 minutes, when we will have been

21  able to consult the guidance about how long it takes to have a

22  test that's meaningful.  Then adjourn and tell them we will

23  start back maybe Tuesday or Wednesday.  We will check on the

24  guidance and find out how it works, take a break until then.

25      For the defense, Mr. Jansen?

1          MR. JANSEN:  We have no objection to that, Judge.

2          THE COURT:  All right.

3      (*End of bench conference.*)

4          THE COURT:  An issue has arisen that affects

5  scheduling.  The trial is not going to go forward today.

6  We're not certain when we will pick it back up next week.  And

7  I will give some thought to how much more about what should be

8  publicly said.  We're going to stop the proceeding for today

9  so the members of the public won't be here to get that

10  explanation.  I'll try to write it down and post it, the

11  information that can be made public about it so what will be

12  public will be available to everybody as soon as I can get

13  that done.  Probably closer to noon when you get the

14  explanation posted on the record.

15          With that, we are adjourned.

16      (*A recess was taken at 9:24 a.m.*)

17      (*The closed courtroom proceedings resumed at 9:35 a.m.*)

18      (*Defendant present; jury not present.*)

19          THE COURT:  Please be seated.

20          All right.  Tell me what you've learned about the CDC

21  guidance, Mr. Nothstein.

22          MR. NOTHSTEIN:  Your Honor, we've been looking at

23  that.  I think that, as far as exactly what we would like to

24  do regarding the guidance, I think we might need a little more

25  time.  I know that certainly the department has been dealing

1  with this issue for about a year and a half now about how to

2  handle this during jury-trial situations.  So I think we want

3  a little more time on that guidance, Your Honor.

4       I think for today, though, what we propose is

5  certainly, as the court said, to bring the jurors in to advise

6  them there is an issue and why we are breaking for the day.

7       THE COURT:  I'm sorry.  Only --

8       MR. NOTHSTEIN:  That's the case agent, Your Honor.

9       THE COURT:  He's one of yours, got it.

10       MR. NOTHSTEIN:  And then, secondly, I know the court

11  appropriately did not ask about vaccination status during voir

12  dire; however, at this point it might be advisable to maybe

13  bring the jurors in individually, with minimal presence from

14  anyone else, Your Honor, and ask them if they are comfortable

15  in a private setting to let us know if they are vaccinated or

16  not.  It may help guide how we can react.

17       THE COURT:  I don't think I'm worried about asking

18  all 13 of them while they're sitting there to raise their hand

19  if they are vaccinated or not.

20       MR. NOTHSTEIN:  That's fine, Your Honor.  And the

21  reason for that is that, even though I don't know exactly

22  how -- look, I'm no doctor, I'm no epidemiologist, but -- how

23  the guidance would work, I know it does -- is affected by

24  whether you are vaccinated or not.

25       THE COURT:  Exactly.  Give me just a second.

1    (*Pause.*)

2         Anything further from the defense?

3         MR. JANSEN:  Judge, we have no objection to whether

4    the court inquires.

5         THE COURT:  Do you have more information on when a

6    test would be effective?  And, of course, we don't know when

7    the excused juror was exposed.  Apparently, she's been

8    potentially exposed every day for the time that --

9         MR. NOTHSTEIN:  Sure.  And just with the caveat that

10   this is all from a couple of lawyers reading the CDC website.

11   So it's not authoritative and that's why I do want to get a

12   little more information, Your Honor.

13        Our understanding is that for a nonvaccinated

14   person -- I think it's called quarantine reduction strategy --

15   if a negative test is received five days after the exposure,

16   which we have to take as Thursday evening, so if the negative

17   test is received on Tuesday, a nonvaccinated person can be

18   around other people two days after that, which is Thursday.

19   That's our understanding, again, just from reading the website

20   on our phones in the witness room.

21        If it's a vaccinated person, however, Your Honor, I

22   think that there is no concern from just the exposure.  And

23   that's why I think the vaccination status is important.

24        THE COURT:  It is.  That seems of little confident to

25   me since vaccinated people can contract the disease, although

 1   it is far less likely and they are probably far less

 2   contagious themselves.

 3           MR. NOTHSTEIN:  And, Your Honor, I'm just giving the

 4   CDC guidance.  I don't know myself at all.

 5           THE COURT:  I understand.  And it makes sense that

 6   the guidance based on walking-around common knowledge is

 7   precisely the wrong way to do it.

 8           Any other information on that?

 9           MR. KEHOE:  Judge, we just haven't consulted the CDC

10   guidance, there was no need to do that.  I'm not sure we can

11   give you any additional information because we just don't

12   know.

13           THE COURT:  All right.  Bring the jurors, please.  I

14   think I'm going to seat the jurors in the audience.  So those

15   in the public might want to move to the other side of the

16   room, and those on the back row, maybe you can move forward in

17   the room.  Just get the jurors spread out in the back.

18      (*The jury entered the courtroom at 9:40 a.m.*)

19           THE COURT:  Just spread out as far away from each

20   other as you can.

21           All right.  You may all be seated.

22           I told y'all at the beginning of the jury-selection

23   process that we've changed a few things because of the world

24   we live in with the pandemic.  I told you then I had two

25   primary goals:  First, to make sure that both sides got a fair

1  trial; and, second, to make sure that everybody stays safe and

2  that nobody got sick in connection with the trial.  I think we

3  are on track for both of those things, but I need to tell you

4  about a hiccup, at least.

5          One of your number went last night to the hospital to

6  visit her mother in the emergency room.  Her mother, after

7  that, was diagnosed with COVID.  She apparently had gone to

8  the emergency room because she had pneumonia.

9          We have talked with your fellow juror.  She won't be

10  serving any longer in the case, so you won't be around her

11  anymore.  We hope she's not sick.  We have no reason to think

12  she is sick, she certainly doesn't have any symptoms at this

13  point, but she lives in the same house with her mother.  She

14  says she has not been close to her mother other the previous

15  period of time, so we hope that she's not sick, but she has

16  certainly been exposed, and you have been with her this week.

17          Now, as you know, we have put you in two different

18  jury rooms, and I do that to try to give you the ability to

19  stay as far apart from each other as possible.  I don't know,

20  though, when you're back in the jury room, how far apart you

21  actually stay and whether you keep your masks on.

22          Some of you have probably been -- I'm sure some of

23  you have been vaccinated people, and of course the guidance is

24  that vaccinated people don't need to wear masks indoors when

25  you are separated from people, so some of you may not have had

S E A L E D   P R O C E E D I N G S

*979*

1    your masks on.

2         The juror who is in this situation is the one we

3    refer to as Number 2.  She's been sitting on the front row,

4    second from the right.

5         Now, my understanding is that they split you up first

6    row in one jury room, back row in the other jury room, and you

7    know where you were sitting in the room and you know who she

8    is and how closely you have been in contact with her back in

9    that room.  I think there has only been one person sitting

10   next to her.  Juror Number 1 has been sitting next to her

11   right in the room.

12        I respect all of your privacy, but at this point the

13   CDC guidance on how to handle this situation makes some

14   distinctions based on whether you are vaccinated or not

15   vaccinated.  If you really have some strong objection to

16   telling me whether you're vaccinated or not, raise your hand

17   and tell me you would rather not even answer that question.

18        No hands up.

19        Raise your hand if you are vaccinated.  11.  That

20   leaves two.  Raise your hand if you are not vaccinated.  Give

21   me your jurors number so I can track it.

22             JUROR NO. 13:  13.

23             JUROR NO. 5:  5.

24             THE COURT:  We are not going to have any more of the

25   trial today.  We're going to take the weekend off, then we're

1    going to resume.  This has just come up, and we haven't had a

2    chance to go back and study the CDC guidance on exposure and

3    just how far to go from there.

4         I leave to each of you what to do at this point.  As

5    I say, I feel pretty good that you've not been exposed in

6    connection with the trial.  I don't know what you do otherwise

7    when you're not here in the courthouse, but I feel pretty good

8    that you haven't been exposed, but there's no way to know for

9    sure.  You may have been exposed.

10        That juror, as I say, has no symptoms, but the time

11   from exposure to the development of symptoms is at least a few

12   days; and, of course, some people get the disease and never

13   get any symptoms.  And so she could have the disease and you

14   could have been exposed.

15        We're going to try to get her -- I haven't talked to

16   her yet about this, I probably should have before she got away

17   from the building, but we've got a way.  Happily, the court

18   security officer at the front desk -- she was very candid and

19   told the court security officer at the front desk exactly what

20   the situation was, and she immediately got separated from

21   everyone else.  So we're confident she hasn't exposed anybody

22   today and her candor really helped us out.  If she had gotten

23   into the jury room, we would have a whole different situation

24   to talk about.  We will talk to her and try to get her to get

25   tested.

S E A L E D   P R O C E E D I N G S

1       Again, we haven't studied this, but we think that --

2  well, we know that you can't get tested right after the

3  exposure and get any kind of a valid test result.  It takes a

4  little while after the exposure for the test to find the

5  disease.

6       We think it's likely to be early next week before we

7  get a valid result from her that assures that she does not

8  have the disease.  If we get a negative from her and it's far

9  enough down the road, then we will know that you haven't been

10 exposed.

11      In the meantime, I leave it to each of you and your

12 medical professionals to decide when, if at all, you should be

13 tested.  I'm not a doctor, and I'm certainly not one to give

14 you medical advice.  I can tell you my own situation is that

15 in the couple of instances where I know I have been near

16 somebody or had some possible situation, I've gotten tested.

17 Ed.  It's a pretty easy process.  You get the results, back,

18 you don't get them back immediately.  There are people who

19 here that know more than I do.  I can tell you more than I do.

20 I can tell you my experience in town, I have been -- because

21 of circumstances of family members, there have been a couple

22 of times I was tested just to be very sure.  Once was at a --

23 I think it was a drugstore that you can just drive through the

24 line.  It may have been the Minute Clinic kind of thing where

25 you just drive through the line and get it done very easily.

1   One was out at FAMU at Bragg Stadium where they have a very

2   smooth operation.  You can get in and get out.  I don't think

3   it took me a half hour to go out there and get the test.  And

4   they will give you at the same time the rapid test and the PCR

5   test.  The rapid test gives you a result pretty quickly, they

6   don't give it to you on the site, but I think I probably had a

7   text within an hour or two.

8         And the difficulty with that test is that it does

9   produce some false negatives.  So if you get a positive, you

10  know you have a problem.  If you get a negative, you feel

11  better but you're not sure that it's a really a negative.  The

12  PCR test takes two or three days to get the result.  Now they

13  are probably getting them in about two days, my guess, they'll

14  tell you more accurately.  And that's a much more reliable

15  test.  If you get that test at the appropriate time and it

16  comes back negative, you're pretty darn sure you're negative

17  and you're fine.

18        Again, you can read the material, the CDC material

19  yourself, you can talk to your own medical provider and decide

20  when or if you should get tested.

21        I don't think we're going to tell anybody you have to

22  get tested before you come back.  The two of you who are not

23  vaccinated, probably have a stronger reason to do that.

24  Certainly there's no harm in getting tested.

25        We are going to check some more and we're going to

1   let you know when we're going to resume.  You can think about

2   this, but let me just ask at least just tentatively.  You've

3   heard that.  Anybody sitting there saying, oh, my goodness, I

4   don't want to be here anymore, I'm not coming back to sit on

5   this jury?  Anybody already saying that, I don't just want to

6   do it?

7        All right.  I told you from the very beginning how

8   concerned I am how to make sure we do this safely.  We're not

9   going to bring you back until we are confident we can do it

10   safely, and that's why I can't give you a date certain right

11   now.  I need to see what we find out from the other juror what

12   those test results are, read the CDC guidance with a little

13   more care to make sure we know when she can be tested and make

14   it a reliable test to make sure that she hasn't been exposed.

15   I told her, as I told her we were going to discharge her from

16   the jury duty, that I certainly hope she's okay, I know all of

17   you do, and I hope her mother recovers, and that's the best we

18   can do.

19        One of the commentators on one of the national

20   television news networks ends his broadcast every night by

21   saying, please take care of yourself and each other.  We need

22   you for the next couple of weeks, both because I would like

23   everybody to stay safe, especially because I would really like

24   you to stay safe and get through this trial.  Please take care

25   of yourself and each other.

1        Any of you have questions that I may have missed some

2   of this.  Any questions you want to ask me at this time?

3        Yes, sir.

4        JUROR:  How will we know?  Will we be sent an email

5   to let us know when --

6        THE COURT:  I think the jury coordinator, Ms. Kurtz,

7   that you met that dealt with you in this process, she has

8   contact information.  I hope she has an email for everybody.

9   Is there anybody here that thinks she does not have an email

10  where she can get up with you?

11       JUROR:  I filled it out, but is there way to make

12  sure she has it?

13       THE COURT:  I'm sure she has it, if you've given her

14  an email.  I see Juror Number 8, you don't have an email.

15       JUROR:  She don't have my email.

16       THE COURT:  Do you have an email where you regularly

17  get email?

18       JUROR:  Yes, but she don't have it.

19       THE COURT:  I'm going to get the courtroom deputy

20  clerk to get your email so that she has yours, and everybody

21  else have phone numbers.  We will contact you and make sure

22  that you know when to be back.  I think it unlikely but if any

23  of you get a test and it's positive or you have any kind of a

24  problem, if you will be back in touch with Ms. Kurtz, the jury

25  coordinator, let us know.  We'll share that information with

S E A L E D   P R O C E E D I N G S

985

1   everybody, so if we have anybody here that has a problem, I

2   want everybody else to know about it.

3          Yes, sir?

4          JUROR:  If we are around someone, can we discuss this

5   element with them?

6          THE COURT:  You can.  Let me tell you where I left it

7   with the press.  As you'll notice, the public is not in here

8   right now.  I don't think there's anything particularly secret

9   about this.  I, of course, wouldn't give out medical

10  information about any individual juror, but the reason why we

11  are not in trial today is not a secret.  I told them I would

12  get a statement out sometime today saying that.

13         You're welcome to tell folks.  You probably don't

14  know the name of the juror.  If I were you, I don't think I

15  would share the medical information about the particular

16  juror.  But the fact that we're in recess because there was an

17  unlikely put possible exposure, I think is perfectly fine.

18         JUROR:  Okay.

19         THE COURT:  I'll leave to you decisions about

20  quarantining and who you can be around or not be around.  I

21  don't think at this point the CDC guidance is for any of you

22  to quarantine, but I leave to you how you deal with that.

23         If you do go to work or check into work or talk to

24  people at home, please continue to abide by that earlier

25  instructions:  Don't talk about the case with anybody.  The

1    fact that you are on the jury, they obviously know, and

2    there's nothing wrong with that.  Don't discuss even what kind

3    of case it is.  People may have figured out by now that you

4    are on this jury, that's fine, but just don't talk to them

5    about the fact that this is the jury.  You might not even

6    confirm to them that you are on this jury if they know about

7    this case.

8           I can tell you that some people know this trial is

9    going on and a lot people don't know this trial is going on.

10   As you can imagine, it's something of a newsworthy case, but

11   there is lots of people that don't follow the daily news.

12          So don't get into a discussion about what kind of

13   case it is and so forth, and certainly don't talk about the

14   case.  Don't get any information from any other source.

15          Any other questions?

16          I would say this:  I do watch you as you watch the

17   trial.  You have paid close attention, you put in a good

18   week's work.  I would have liked to have been able to say you

19   put in five good full days of work; you've put in four full

20   days of work and then you sat around and been patient with us

21   while we worked through that this morning.  I very much

22   appreciate that.

23          I appreciate your wearing your masks.  You've all

24   worn your masks very conscientiously.  And 11 of you are

25   vaccinated.  I know that you've heard the guidance that you

1  don't need to wear the mask at least in all circumstances, but

2  now you see why I asked everybody to wear their masks from the

3  beginning, and you've all done that without complaint.  I very

4  much appreciate your service in the case.  Thank you very much

5  and we'll be back in touch.

6        Yes, ma'am?

7        JUROR:  Are we required to go back to work or report

8  to work or are we still under the jury summons?

9        THE COURT:  No.  You're in jury service.  Whether you

10 go back to work and how you do it is between you and your

11 employer.  That's not my concern.  That's entirely up to you.

12 You certainly have been here until 10:00 this morning, and I

13 don't know when we call you back.  I leave that entirely up to

14 you.  That's not my business.

15        JUROR:  Okay.

16        THE COURT:  I just don't want you going to work while

17 you're in the jury box, but other than that that's up to you

18 and the employer.

19        Other questions?

20        Thank you all very much.  Please have a safe and

21 happy weekend, and we'll see you at some point next week.

22     (*The jury exited the courtroom at 9:57 a.m.*)

23        THE COURT:  You may be seated.

24        One of the two jurors who is unvaccinated juror is

25 the pregnant juror, and I'm going to guess, did not get

1  vaccinated because she's pregnant, and probably has been as

2  safe as anybody in the city.  Pregnant women during the

3  pandemic have generally been very careful.

4         The other unvaccinated individual was an alternate

5  who now ordinarily would be promoted because, obviously, we

6  have reached at least one alternate.

7         I'll get some brief order entered confirming the

8  status of things.

9         What else, if anything, can we do before we break?

10         MR. NOTHSTEIN:  Your Honor, I think we would like a

11  little time just to, as you said, look at the guidance, look

12  into any experience the department has had with this issue.

13  It might make sense to either reconvene today, meet in here or

14  on the phone, to talk about a proposal, whether we can

15  reconvene sometime next week.

16         THE COURT:  Today is probably not a bad idea, and we

17  can just do it on the phone.

18         MR. NOTHSTEIN:  That's fine, Your Honor.  I know the

19  court has a 12:30 hearing.  I don't know if it would make

20  sense to do it shortly after that.  I don't want to belabor --

21  I don't want to take too much time on this.  I mean, obviously

22  we want an answer on this, but I do want to make sure we take

23  the time to get it right.

24         THE COURT:  The 12:30 hearing is going to be very

25  brief.  It matters not to me whether we do it over the phone

1    or in person.

2              MR. KEHOE:  Phone is fine, Judge.

3              THE COURT:  Does 1:00 work as well as any other time?

4              MR. NOTHSTEIN:  That's fine, Your Honor.

5              THE COURT:  Why don't we say 1:30.  I'm pretty sure

6    my 12:30 will be over, but maybe it won't.  Let's have a phone

7    conference at 1:30.  We'll be in recess until then.

8         (*The proceedings adjourned at 10:00 a.m.*)

9         (*The proceedings resumed at 1:30 p.m. via telephone*

10   *conference.*)

11             THE COURT:  Good afternoon.  This is Judge Hinkle.

12             Let me hear what you have to suggest going forward.

13   I'll start with the government, Mr. Nothstein, or whoever on

14   behalf of the government wants to address the question.

15             MR. NOTHSTEIN:  Thank you, Your Honor.  This is

16   Mr. Nothstein.

17             Your Honor, we have looked.  There are not any

18   Department of Justice specific protocols or recommendations

19   for this, so we have looked closely at the CDC's guidance for

20   people who have been in contact with someone with COVID-19.

21             And I think the way that we understand this -- and,

22   as I mentioned in the court, this is just from a lawyer's

23   reading the CDC website, but I would like to give the court

24   our understanding of sort of what these protocols suggest.

25   It's a little complicated because there are sort of a bunch of

S E A L E D   P R O C E E D I N G S

1  variables and, you know, sort of events statements, but I

2  would like to walk through them for the court.

3       The first, Your Honor, is that the CDC basically

4  starts with whether or not there has been a close contact with

5  someone who has COVID-19.  Obviously, we don't know that just

6  yet, but presuming that was the case.

7       First off, close contact is being within six feet of

8  someone who has COVID-19 for a total of 15 minutes or more.

9  Distinction is not made about whether there are masks being

10 worn.  There are other types of contacts:  Just providing home

11 care to someone with COVID-19, directable contact, sharing

12 eating or drinking utensils, or someone coughing or sneezing

13 on you.

14       So, if there is no physical contact, obviously, Your

15 Honor, the CDC does not recommend quarantine.

16       I think the maybe first question is whether it is

17 possible to divine whether -- and, to back up for a moment.

18 The close contact recommendations do not apply per the CDC to

19 vaccinated individuals.  So I think what we are talking about

20 is Jurors 5 and 13.

21       So I think the first question is if there is a way to

22 determine whether Jurors 5 or 13 had close contact with Juror

23 2, keeping in mind the seating arrangements and the court's

24 separation of the jury into two jury rooms.

25       If we were able to determine that, neither -- if the

S E A L E D   P R O C E E D I N G S

1    court had comfort that neither Jurors 5 or 13 had close

2    contact with Juror 2, besides, of course, what we know with

3    them sitting in the room if that was considered close contact.

4    But if there was no close contact, there is no need for

5    quarantine, we could resume on Monday.

6         Per the guidance, if there is close contact, the CDC

7    recommends quarantining and provides options to reduce the

8    time to quarantine.

9         The first is if there is no testing all -- and this

10   would be of the potentially disposed juror at this point.  If

11   we're premising that there has been a close contact here, it

12   would be ten days from the exposure, or yesterday, that the

13   CDC recommends to quarantine.  But if there is a negative test

14   result of the jurors, the CDC would say seven days is what is

15   required total.  But that would be require that the negative

16   test was -- the test was administered on day 5 or later, day 5

17   being Tuesday.

18        But the other option, Your Honor, is if Juror 2 were

19   to take a test on day 5 or later, as recommended by the CDC,

20   and the test were to come back negative, then we could

21   essentially start the case right away because there would not

22   have been a close contact with anyone with COVID-19.

23        THE COURT:  Let me back up.  This is helpful, but let

24   me start asking questions as we go to kind of sorting through

25   this step by step.

1    First, all of the close contact information means

2    close contact with a person with COVID, right?

3    MR. NOTHSTEIN:  Yes, sir.

4    THE COURT:  So at this point -- and, of course,

5    you're talking about CDC quarantine guidance, and that's at

6    least one place we need to look, so it's appropriate that we

7    talk about this.

8    At this point it seems likely to me that the only

9    known close contact is with the mother in the hospital.  She's

10   the only person we know has COVID.  And I do think that Juror

11   Number 2 had close contact, or at least is likely to have had

12   close contact.

13   We didn't cross-examine her very carefully about how

14   close she was.  I think she told the court security officer or

15   she gave some indication, at least it looks to me, like, three

16   or four or five feet, something like that; but within the six

17   feet.  They were masked.  We didn't specifically ask, or the

18   court security officer didn't specifically ask how long; or at

19   least I didn't ask the court security officer if there was an

20   answer as to how long.  But I think it reasonable to believe

21   that if she went to the emergency room to see her mother, she

22   was there for more than 15 minutes.

23   It seems to me that Juror Number 2 had close contact,

24   and we know that the Juror Number 2 is unvaccinated, so that

25   meets with the CDC the provision about close contact.

S E A L E D   P R O C E E D I N G S

1    Now, from that point, what you are talking about

2  close contact with the jurors, well, we really don't know that

3  any jurors had close contact.  It depends on whether Juror

4  Number 2 has COVID.

5    MR. NOTHSTEIN:  That's correct, Your Honor.

6    THE COURT:  And I'm not clear on what the CDC says

7  when you have a person that has been exposed but you don't

8  know has COVID.  Let's hold that back for just a minute.

9    What I think is clear is that Number 2 was in close

10  contact with Number 1, if nobody else.  I mean, they are

11  sitting there two-and-a-half, three feet apart through the

12  trial.  Now, I think there is an empty place between Number 2

13  and Number 3 on the front row.  I doubt if the people behind

14  Number 2 had real close contact, but a couple of those --

15  numbers, I guess it was, 8 and 9 probably are within six feet

16  of Number 2 during the trial.  The split was that the ones on

17  the front row, 1 through 7, were in one jury room and the ones

18  on the back row, 8 through 14, were in a different jury room.

19  But there were a couple of times when I'm make back into

20  courtroom and the court security officers, who know we are

21  going to start on time, have already gotten the people out of

22  the jury rooms and they are kind of standing out there in the

23  hallway closer than I would have let them stand, so they were

24  fairly close to each other in the hallway, but not for a long

25  period of time.

1          I guess it's clear to me, at least, that Juror

2     Number 2 was within six feet for more than 15 minutes with at

3     least one person, Juror Number 1.  So, if we are treating

4     Juror Number 2 as a person with COVID for purposes of the

5     quarantine analysis, then we would be in quarantine --

6          MR. NOTHSTEIN:  Well, I'm sorry to interrupt, Your

7     Honor.  The CDC guidance does not call for quarantining of

8     vaccinated individuals.  So I think the question is whether 5

9     and 13 have had close contact with the juror.

10          I think we should treat Juror 2 as if she had COVID

11     until we know.  And, per CDC guidelines, Juror 2 would need to

12     wait five days to take a test to have confidence in that test.

13          THE COURT:  All right.  So what we would have to do,

14     then, on this chain of analysis is either get a reliable

15     negative test for Number 2, or determine that she has not had

16     close contact with 5 or 13.  The chance that she has not --

17     she has stated that she has not had close contact with Number

18     13, who is sitting a long way away in the jury box and is in a

19     different jury room.

20          MR. NOTHSTEIN:  Correct.

21          THE COURT:  I went back and looked at the chart just

22     briefly from the jury-selection process, and she wasn't very

23     close to others, and I think she would have plainly been

24     farther away than six feet from the jurors that wound up being

25     5 or 13.

1          So then the jury assembly room wouldn't be a problem,

2    the jury rooms during the break wouldn't have been a problem;

3    lining up in the hallway certainly wouldn't be 15 minutes.  So

4    the question really is:  How close did they get to each other

5    in the jury room?  I think the only way to find that out, I

6    guess, is to ask.

7          MR. NOTHSTEIN:  Agree.

8          THE COURT:  So we can ask Number 2 or Number 5 or

9    both.

10          All right.  So I interrupted you; you were working on

11   through it and you were talking about testing dates.

12          Before you start, let me tell you what I found out,

13   and you may have better information.  But I had somebody call

14   FAMU and ask how long it takes to get results.  I think the

15   courtroom deputy, when she talked to Number 2 and asked did

16   she get tested -- well, actually, I guess it was the jury

17   coordinator who called after our court proceeding this morning

18   and was going to ask did she get tested, and the juror was

19   already online scheduling her test.  I think she was going to

20   go to Bragg Stadium, the site here that is a readily-available

21   public site.

22          I had somebody call Bragg and ask how long it takes

23   to get results, and for the PCR test it's two days.  That's

24   pretty prompt.  So it's likely to get the results within two

25   days, but the longer delay, of course, is how long it takes

1    when she can properly be tested.  I think that's where you

2    were getting to when I interpreted you, so go ahead.

3              MR. NOTHSTEIN:  Your Honor, this is Mr. Nothstein

4    again.  Our understanding from reviewing the CDC guidance is

5    that the test needs to be taken no less than five days after

6    the exposure to be reliable.

7              THE COURT:  Her first exposures was earlier but her

8    last exposure was Thursday.  So, Tuesday.  If she takes the

9    test on Tuesday, she is going to get the results on Thursday.

10             MR. NOTHSTEIN:  Correct.

11             THE COURT:  So where are you, then, with that

12   analysis, is to say:  If we can be confident there was no

13   close contact with 5 or 13 -- which really means no close

14   contact with 5 within the jury room.  If we can be comfortable

15   with that, we can start back.  If we are not comfortable that

16   there was no close contact, then we're going to be waiting

17   until Thursday for test results and starting back on Friday.

18             MR. NOTHSTEIN:  I think that's correct, Your Honor.

19   Potentially, we could -- if the result came early Thursday, we

20   could start that day.  But maybe, I mean, it's obviously

21   unknown what time of day they would come back.

22             THE COURT:  Yeah, I would say it depends on what time

23   of day you get tested and so forth.  But if your exposure was

24   on Thursday night, and substantively early on Tuesday is not

25   really the five days that you would wait.

1        Of course, the other thing that would moot all of

2   this, I guess, if she gets her rapid test results -- which she

3   is probably getting back about now.  If those came back

4   positive, we would no longer be waiting on test results.

5            MR. NOTHSTEIN:  Correct.

6            THE COURT:  And then, what did you say the CDC, close

7   contact, and then you need to quarantined everybody else for

8   ten days?

9            MR. NOTHSTEIN:  Well, the CDC did not recommend ten

10   days, per se.  So if it is positive, then if the other jurors

11   -- they could take a test on Tuesday as well, and the

12   unvaccinated jurors could take a test on Tuesday as well; if

13   that comes back negative, we could start two days after that,

14   Thursday.  If not, then if they can't test or we don't get the

15   results, we would not be able to start until Monday, the 26th.

16            THE COURT:  Or unless they didn't get tested.

17   Presumably, they would all get tested.

18            MR. NOTHSTEIN:  You would have to be tested Thursday,

19   though.  I'm sorry, on Tuesday.

20            THE COURT:  They would get tested on Tuesday?

21            MR. NOTHSTEIN:  Correct.  They need to wait five days

22   from their exposure to Juror 2.

23            THE COURT:  Well, I guess that's the other way to

24   bypass the problem with Juror 2, if they all get tested.  You

25   think the CDC guidance says that the vaccinated individuals

S E A L E D   P R O C E E D I N G S

1    don't need to get tested?

2         MR. NOTHSTEIN:  Per the CDC guidance, the vaccinated

3    individuals do not need to quarantine after a close contact.

4         THE COURT:  In reading the guidance, did you get any

5    indication of why it is that the vaccine, which is an

6    extraordinary vaccine but still 95 percent effective, that

7    still means one out of 20 people who is exposed gets the

8    disease, whatever.

9         MR. NOTHSTEIN:  I don't know, Your Honor.  I'm sorry.

10         THE COURT:  All right.  On the defense side, what

11    would you like to tell me?

12         MR. JANSEN:  Mr. Jansen.  Judge, we would ask that

13    maybe we have a conference call on Monday afternoon.  We are

14    prepared to go to trial Tuesday, Wednesday, whatever, but

15    maybe we would have more information by Monday afternoon.

16         THE COURT:  And what you have looked at so far, do

17    you have anything different than what Mr. Nothstein just ran

18    me through?

19         MR. JANSEN:  No, Your Honor.

20         THE COURT:  Some of that seems coming right off of

21    the guidance.  I've looked at it briefly, not as thoroughly

22    probably as you have, but what Mr. Nothstein has told me is

23    consistent with the part of it that I got, too.

24         MR. NOTHSTEIN:  Your Honor --

25         THE COURT:  Well, tell me what you think about how we

S E A L E D   P R O C E E D I N G S

1  find out about close contact with Juror Number 5.

2          MR. NOTHSTEIN:  Your Honor, on the government's

3  position, Your Honor, we would be comfortable with the jury

4  coordinator contacting Juror Number 5 and asking her,

5  essentially, if she believes she had close contact as defined

6  by the CDC; so, 15 minutes in less than six feet proximity or,

7  you know, sharing utensils.

8          We can send that to the jury coordinator, copy the

9  defense and the court, and ask her to ask those questions of

10 Juror 5 and Juror 2, if we want to be more comfortable that

11 way.

12         I think that if Jurors 2 and 5 answered in negative,

13 we could start on Monday.

14         THE COURT:  Mr. Jansen, what do you think?

15         MR. JANSEN:  Judge, we don't have a problem with the

16 coordinator contacting 5 and Number 2.  We're not sure that

17 Monday is real, when her test probably would not -- I guess,

18 if she comes back positive on the rapid test, that would

19 change things.  But if the real accurate test won't come back

20 until Tuesday, I don't know how we could start on Monday.

21         THE COURT:  The real accurate test in the sense of

22 the better test, the PCR test, will come back probably on

23 Sunday.  But the lab is not open on Sunday and it's not

24 automated, so maybe she won't get it until Monday.

25         The problem is a good test is too soon to run it.

1   You can't run a reliable test until about Tuesday because you

2   need five days after exposure for the test to be able to pick

3   up the disease.

4           Now, worse would be that she got it earlier and she

5   has had it, so then she's exposed.  She said she'd only opened

6   the door, or whatever, but apparently her mother has gotten

7   sick enough to have pneumonia by Thursday.  It just seems to

8   me likely that if she's in the house with a sick mother, she's

9   probably at least had enough exposure for us to be worried

10  about.

11          Let me do this.  I'll get the jury coordinator to

12  check with Number 5.  She is, I thought, pregnant.  Now, I'm

13  smart enough never to ask anybody if they are pregnant and I'm

14  certainly not going to.  But I think you're right, I think

15  she's is pregnant, and she probably has a very good idea how

16  close she was to whom?  Pregnant folks I've known about during

17  the pandemic, I suspect she has been careful.  So we may be

18  lucky there.  She may know where she was and she may have been

19  paying close attention.

20          And then we can also check with Number 13 to make

21  sure, but I think I'm not very worried about her because the

22  only real exposure would have been in the hallway.  And, in

23  fact, maybe I won't even bother with that.  I don't think they

24  had the opportunity to be that close with each other.

25          So I'll just have the jury coordinator call Number 2

S E A L E D   P R O C E E D I N G S

1  and Number 5; she'll get find out if Number 2 has gotten any

2  results yet, and I'll ask her to work out a way that she can

3  get information over the weekend and so that if the rapid

4  result comes back or even the PCR result come back, we'll know

5  it and we'll find out.  If it's a positive, that kind of

6  changes the course a little bit.  If it's a negative, it's

7  better.

8        Much as I don't want to lose another day, it sounds,

9  to me, like trying to wind this back up on Monday might be

10  pushing it.  But let's go back through this and make sure that

11  I have a good grasp.

12        Mr. Nothstein, your analysis is that if 5 and 13 had

13  no close contact with 2, then under CDC guidance we could

14  start back on Monday?

15        MR. NOTHSTEIN:  Yes, Your Honor.

16        One thing I want to note, Your Honor.  I think that

17  if we are going to have the jury coordinator ask these

18  questions, we should do them strictly by the CDC definitions.

19        So looking further at how the CDC defines close

20  contact, it's a total of 15 minutes or more cumulative over a

21  24-hour period.  So not 15 minutes at one time.

22        THE COURT:  Right.  Even on that, I don't think 13

23  could have had 15 minutes in the hallway, maybe a minute at a

24  stretch, and they would have been coming out of the different

25  rooms.  Even if they were that close, it would have been for

1    one minute three times during the day.

2            And, of course, sliding off the time because

3    everybody goes through the ID check at the front desk, and I'm

4    not sure what they are doing with elevators, but I think

5    they're not putting people in elevators that are not within

6    six feet of each other.  I don't know how you all have been

7    doing it.  I hope you all have been able to distance.  Of

8    course, they're your colleagues and you know each other's

9    vaccination status.

10           What's important here is to be safe.  It is also

11   important letting the jurors know they are safe.  I think

12   trying to start back Monday morning might be pushing it.

13   Let's hope for Tuesday, and let's plan to talk again on

14   Monday.

15           Why don't we go at 11:00 on Monday morning; and at

16   11:00 Monday morning, hopefully by then we will have Juror

17   Number 2's test results and we will know the status of

18   contacts.

19           I don't know that I want to write an order providing

20   this information.  I just may have the courtroom deputy call

21   each other and see what we found out and give you a heads-up.

22           MR. NOTHSTEIN:  That would be fine, Your Honor.

23           Your Honor, would you like us to share -- I'm sure

24   the court can find it as well, but we have the information we

25   got from the CDC on the close contact.  I could email that to

1    Ms. Markley and to the defense, if that would be convenient.

2           THE COURT:  That's fine.  If you want to share that

3    stuff that way, that would be just fine.  We will have it

4    available.  It's probably the same from the same website I

5    looked at, but that would be helpful.  So do that.

6           And then I'll either get the courtroom deputy to call

7    you back and tell you what we found out about close contact,

8    or I may just write it down and put it in an order so there is

9    no question that both sides are being told the same thing and

10   everybody is on the same page.

11          Very well.  What else can we accomplish this

12   afternoon?  Mr. Nothstein, anything on your side?

13          MR. NOTHSTEIN:  Nothing from the government, Your

14   Honor.

15          THE COURT:  Mr. Jansen?

16          MR. JANSEN:  Nothing, Your Honor.  We are fine.

17          THE COURT:  All right.  Thank you all.  I'll talk to

18   you Monday morning at 11:00 o'clock.

19          We're adjourned.

20      (*The proceedings adjourned at 1:55 p.m.*)

21                  *   *   *   *   *   *   *   *

22

23

24

25

S E A L E D   P R O C E E D I N G S

1004

1   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.  Any
2   redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy are noted within the
3   transcript.

4

5

6   *Judy A. Gagnon*                          *7/13/2021*
    Judy A. Gagnon, RMR, FCRR                 Date
7   Registered Merit Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25