UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE, FLORIDA

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA,* | ) | |
| | ) | |
| *Plaintiff,* | ) | *Case No:  4:18-cr-76* |
| | ) | |
| *vs.* | ) | *Tallahassee, Florida* |
| | ) | *July 20, 2021* |
| *JOHN THOMAS BURNETTE,* | ) | *8:59 A.M.* |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

VOLUME VI
(Pages 1005 through 1225)

TRANSCRIPT OF SIXTH DAY OF TRIAL
BEFORE THE HONORABLE ROBERT L. HINKLE,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Plaintiff,          Jason  R. Coody
United States of            Acting United States Attorney
America:                    By:  STEPHEN M. KUNZ
                                 ANDREW J. GROGAN
                                 Assistant U.S. Attorneys
                                 stephen.Kunz@usdoj.gov
                                 andrew.grogan@usdoj.gov
                            111 North Adams Street, Suite 400
                            Tallahassee, Florida   32301

                            Corey R. Amundson, Chief
                            Public Integrity Section
                            Criminal Division
                            U.S. Department of Justice
                            By:  PETER M. NOTHSTEIN
                                 Deputy Chief
                                 ROSALEEN T. O'GARA
                                 Trial Attorney
                                 peter.nothstein@usdoj.gov
                                 rosaleen.o'gara2@usdoj.gov
                            1301 New York Avenue NW
                            Washington, DC   20005

<u>APPEARANCES</u>:  Cont'd

For the Defendant,        Jansen & Davis, P.A.
John Thomas Burnette:     By:  R. TIMOTHY JANSEN
                               Attorneys at Law
                               jansen@jansenlawoffice.com
                          1206 North Duval Street
                          Tallahassee, Florida   32303

                          Greenberg Traurig, P.A.
                          By:  GREGORY W. KEHOE
                               JORDAN BEHLMAN
                               KAYLI SMENDEC
                               Attorneys at Law
                               kehoeg@gtlaw.com
                               behlmanj@gtlaw.com
                               smendec@gtlaw.com
                          101 East Kennedy Boulevard
                          Tampa, Florida   33602

                          Law Office of Adam J. Komisar
                          By:  ADAM J. KOMISAR
                               Attorney at Law
                               adam@KomisarSpicola.com
                          Post Office Box 664
                          Tallahassee, Florida 32303

1    <u>P R O C E E D I N G S</u>

2        (*Call to Order of the Court.*)

3        (*Defendant present; jury not present.*)

4        THE COURT:  Good morning.  Please be seated.  Jury

5    in, please.

6        (*The jury entered the courtroom at 9:01 a.m.*)

7        You may be seated.

8        Juror Number 2, I'm sorry, I'm going to ask you to go

9    out this way with the court security officer.  If you would

10   just escort her out this way.  This way, right here.

11       Members of the jury, good morning, welcome back.  We

12   talked with you Friday afternoon, or Friday morning, I guess

13   it was, when we had discontinued court for the day.  As I told

14   you at that time, our intention was to get back with the CDC

15   guidelines, make sure we had all of the facts gathered so that

16   we knew exactly what the situation was.

17       Obviously we had some communications with you, I had

18   excused Juror Number 2 at that time because, as you know, I

19   told you at the time she had been to the hospital the night

20   before where her mother was, and had been later diagnosed with

21   the COVID, so I had excused her; then she came back in the

22   courtroom this morning.  I'm not sure how that happened, so

23   I've excused her again.

24       The guidance provides that a person should quarantine

25   if the person has been in what is defined as close contact

1  with a person who has COVID-19.  It's clear that none of you

2  has been in close contact with such a person.

3         First, even if Juror Number 2 had COVID -- and we

4  have no reason to believe she did.  She appeared this morning

5  and obviously seems to be doing just fine, and she wouldn't be

6  here if she had any symptoms.  I suspect that she is just

7  fine.  She has had a negative test and she told us about that,

8  so we know that she had a test Friday that was negative.

9         Even if she had, in fact, had COVID and we knew that

10  at the time, none of you would have been in close contact, as

11  that phrase is determined by the -- is defined by the Centers

12  for Disease Control and Prevention.  Their guidance defines

13  close contact, for this purpose, as an unvaccinated person

14  being within six feet for at least 15 minutes in a 24-hour

15  period.

16         A couple of you are within six feet but, first, she

17  didn't have COVID and wasn't designated with COVID, so that

18  eliminates it from that standpoint, but the other ones of you

19  who were near her are vaccinated.  So we had nobody in the

20  courtroom who would be in close contact as defined by the CDC.

21         Our juror coordinator was able to talk -- first,

22  Friday when I talked to you, you all voluntarily told me

23  whether you had been vaccinated or not and, as you saw, the

24  overwhelming majority of you had been vaccinated.  There's

25  nobody in the courtroom who was within the six feet had been

1  unvaccinated.

2        The jury coordinator was able to talk to the

3  unvaccinated members of the jury, and determined that, back in

4  the jury room, you had not been within six feet.  And, of

5  course, as you know we have been using two different jury

6  rooms, so you have had room to spread out from each other and

7  y'all have been very conscientious about wearing your masks

8  with no complaints, here in the courtroom.  All the members of

9  the public are to be commended.  We have got people here and

10  the lawyers and the members of the public.  Everybody has been

11  wearing their masks except when speaking and distant from

12  others, so we have followed all of those guidelines and, in

13  fact, gone beyond the guidelines in some respects just to try

14  to make sure that everyone is kept as safe as possible.

15        I asked you Friday afternoon if you were all

16  comfortable with that and nobody indicated to the contrary --

17  I see nodding heads this morning, and nobody indicating to the

18  contrary.  I very much appreciate your conscientious service

19  in the case.  As I said at the end of the week last week, you

20  put in a good week's work and now we have another good week's

21  work to put in.  So I thank you very much for your continued

22  attention and cooperation in the process.  Thanks to all of

23  the lawyers and those in the public for continuing to wear

24  masks and do it conscientiously.

25        With that, we are ready to go forward.

*Paige Carter-Smith - Cross*

1        Ms. Carter-Smith, you are still under oath.

2        Mr. Kehoe, you may proceed.

3        MR. KEHOE:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5   CONTINUED BY MR. KEHOE:

6   Q.  Good morning, Ms. Carter-Smith.

7   A.  Good morning.

8   Q.  It's been a few days since we spoke last.

9   A.  Yes.

10  Q.  Ms. Carter-Smith, we ended off Thursday; and other than

11  conversations with your lawyer, you and your lawyer alone,

12  did you talk about this testimony with anybody else?

13  A.  No.

14  Q.  Did you meet with anyone else?

15  A.  No.

16  Q.  I just wanted to follow up with where we ended up with on

17  Friday.

18      We talked about some meetings -- or, excuse me --

19  introductions that you had with Mr. Miller and Mr. Sweets,

20  both I think at a football game and then at Madison Social,

21  et cetera.  Do you remember that?

22  A.  Yes.

23  Q.  And I think we talked a little bit about some

24  conversations between and among Mr. Miller, Mr. Sweets,

25  Mr. Maddox, and possibly present about him possible taking a

1   trip with these gentlemen, right?

2   A.  Yes, sir.

3   Q.  And did you talk to Mr. Maddox about that as well?

4   A.  Yes, sir.

5   Q.  And during the course of those conversations, did

6   Mr. Maddox tell you that initially there they were supposed

7   it was a trip to Las Vegas; and Mr. Burnette was going to fly

8   to New Orleans and then they were going to fly over to Las

9   Vegas, right?

10  A.  Yes, sir.

11  Q.  And that changed.  Ultimately, Mr. Burnette didn't fly,

12  but in fact Mr. Sweets or Mr. Miller came and picked him up

13  and took him from Tallahassee; is that right?

14  A.  I knew that Mr. Burnette didn't fly, and it was someone

15  else's plane.

16  Q.  I'm sorry?

17  A.  I knew that it was not Mr. Burnette's plane, and someone

18  else took them.  I don't know.

19  Q.  So it was not Mr. Burnette's plane?

20  A.  Correct.

21  Q.  As I talked to you the other day, I'm going to shift

22  around to a couple of topics and not cover everything, so

23  bear with me if it seems to be a bit of a transition.

24  A.  Okay.

25  Q.  So I wanted to talk to you a little bit about some of the

1  questions that you were asked by the government with regard

2  to the indictment that you pleaded to.  Now, this was a

3  47-count indictment, approximately?

4  A.  That I pleaded to?  It was a 47-count.

5  Q.  You pleaded to three counts?

6  A.  Yes.

7  Q.  That was a bad question.  You pleaded to three counts,

8  but there were 47 counts?

9  A.  Yes, sir.

10  Q.  And one of the counts in the 47 counts was a racketeering

11  count, wasn't it?

12  A.  I believe so.

13  Q.  And you didn't plead to that?

14  A.  Correct.

15  Q.  And this is the racketeering conspiracy that alleged that

16  you and Mr. Burnette and Mr. Maddox were part of this

17  racketeering conspiracy; isn't that right?

18  A.  I believe so.  I don't have it in front of me to have the

19  words.

20  Q.  Now, if we may, your plea agreement with the government,

21  the three counts of your plea agreement with the government.

22          MR. KEHOE:  If we can bring that up on the screen.

23  That's Government's Exhibit 293.

24  BY MR. KEHOE:

25  Q.  This is the plea agreement that I think you had talked

1  about with Ms. O'Gara?

2  A.  Yes, sir.

3  Q.  And if we go to the second page of that on the screen; if

4  we go to the top paragraph, the terms.  And one of those is

5  Count 23, an honest services mail fraud; do you see that?

6  A.  Yes, sir.

7       MR. KEHOE:  If we can turn to Government Exhibit

8  294.

9     BY MR. KEHOE:

10  Q.  Now, Government Exhibit 294 is a supplement to your plea

11  agreement that Ms. O'Gara -- well, can you see that okay?

12  A.  Yes, I can.  There we go.

13  Q.  I'm sorry.  If at any point you can't, with the court's

14  permission, just move it back up if need be.

15  A.  Okay.

16  Q.  But this is the plea agreement that you, in fact, signed;

17  is that right?

18  A.  Yes, sir.

19  Q.  And it has a variety of provisions.  And one of those, if

20  you go to page 4, that says anything you tell the government

21  during your discussions with them can't be used against you.

22  A.  Right.

23  Q.  Paragraph 4.

24       MR. KEHOE:  Can you blow that up for

25  Ms. Carter-Smith, make it a little easier?  There you go.

1  Thank you.

2  BY MR. KEHOE:

3  Q.  Now, anything that you can say can't be used against you,

4  right?

5  A.  Yes.

6  Q.  Now, how many times have you met with the government to

7  discuss this case?

8  A.  Four?  I don't remember exactly, but I think it was four.

9  Q.  And in those four meetings, approximately, what's the

10  average time spent with the government?

11  A.  At least two hours, maybe sometimes --

12  Q.  I'm sorry?  Say that again.

13  A.  I'm sorry, at least two hours, maybe four hours on one

14  occasion.

15  Q.  So would the average be about three hours a meeting?

16  A.  Two to three hours a meeting, I think.

17  Q.  And this was four separate meetings?

18  A.  I believe it was four, yes.

19  Q.  And when was --

20  A.  Three or four.

21  Q.  I'm sorry?

22  A.  I'm sorry.  It was, through COVID, there was a break,

23  so --

24  Q.  Okay.  And if I interrupt you when you answer, please

25  tell me.

1   A.  Okay.

2   Q.  I don't mean to do that.

3   A.  Okay.

4   Q.  And the last meeting you had with them, when was that?

5   A.  The last meeting when I came down and sat down with them

6   was a week -- last week, or a week before the trial.

7   Q.  Now, part of this agreement calls for a possible

8   revocation of the agreement if certain conditions aren't met.

9          MR. KEHOE:  And if we go to paragraph 7, just that

10  top paragraph.

11  BY MR. KEHOE:

12  Q.  This notes that:  The parties agree that the United

13  States Attorney or the Public Integrity Section may revoke

14  this agreement, and it has a variety of provisions.

15      And you understand that it is up to the government to

16  revoke this agreement?

17  A.  Yes, I do.

18  Q.  And if they elect to.

19      And that, if they revoke the agreement, they are not

20  going to give you as known as substantial assistance; is that

21  right?

22  A.  Yes, sir.

23  Q.  Now, let us talk for a moment.

24          MR. KEHOE:  If we can go to paragraph 9, if I may.

25  BY MR. KEHOE:

1    Q.   Now, this is the paragraph on substantial assistance.

2    And if you want to take the time to read the whole thing

3    before you answer questions, let me know.  But this note

4    that:  If, in the sole discretion of the United States

5    Attorney's Office and the Public Integrity Section, the

6    defendant is deemed to have provided substantial assistance

7    to the investigation, you understand that the government if,

8    in their sole discretion, decided you provided substantial

9    assistance, that they can make a motion to Judge Hinkle for

10   substantial assistance to reduce your sentence; is that

11   right?

12   A.   Yes, sir.

13   Q.   Now, I want to focus on the sole discretion part.  The

14   sole discretion is that it is completely up to the men and

15   women to my left and your right as seated at this table;

16   isn't that right?

17   A.   Yes, sir.

18   Q.   And you also understand that Judge Hinkle cannot even

19   consider a substantial assistance reduction under the

20   sentencing guidelines unless and until the government files

21   that motion; isn't that right?

22   A.   That's true, I guess.

23   Q.   I'm sorry?

24   A.   I said I guess.  I think.

25   Q.   I don't want you guessing.

1    A.   It's spelled out to me.

2    Q.   That's your understanding; is it not?

3    A.   Yes, sir.

4    Q.   And it is your hope that when you finish testifying here,

5    they will use their discretion, their discretion alone, to

6    ask Judge Hinkle to reduce your sentence; isn't that right?

7    A.   Yes, sir.

8    Q.   So as you sit here, they are the sole arbiters as to

9    whether or not that motion is going to be filed, right?

10   A.   They are the sole arbiters as to whether that motion will

11   be filed.

12   Q.   Yes.  And they, in fact, gave you a plea agreement for

13   you to sign, right?

14   A.   Yes, sir.

15   Q.   And --

16        MR. KEHOE:   If we can go back to 293, paragraph 4.

17   BY MR. KEHOE:

18   Q.   Paragraph 4 -- I'm sorry, my apologies.  It's the terms

19   on top of page 2.  My apologies, that was my mistake.

20        And Count 23 is the count you pleaded guilty to?

21   A.   Yes, sir.

22   Q.   And that is, you pleaded guilty to:  The purposes of

23   executing a fraudulent scheme, and attempting so to do,

24   caused to be transmitted by the United States mail the

25   following matter.  And it notes the $10,000 check dated

1    November 16, 2016.

2            MR. KEHOE:  If I can put that up on the screen, and

3    that is Exhibit 172.

4    BY MR. KEHOE:

5    Q.  Now, Ms. Carter-Smith, this is the first check that you

6    received from the Southern Pines Development individuals, Mr.

7    Miller, right?

8    A.  Yes, sir.

9    Q.  And this is a check that you pleaded guilty to, right?

10   A.  Yes, sir.

11   Q.  And you told us on Thursday that when you were getting

12   and cashing this check, that you were not part of any

13   fraudulent scheme, were you?

14   A.  Not knowingly.

15   Q.  So when you got this check and you deposited this check,

16   you were not part of a knowing intentional scheme to defraud

17   anybody, were you?

18   A.  Not knowingly.

19   Q.  And, in fact, you thought you were getting this check as

20   the beginning part of your retention for Fallschase; is that

21   right?

22   A.  Yes.

23   Q.  Now, did you tell the government that you did not

24   knowingly get this check as part of a fraudulent scheme to

25   defraud anybody?  Did you tell them that?

1  A.  As we discussed later, yes.

2  Q.  But did they insist on you taking a plea to this count?

3        MS. O'GARA:  Objection, Your Honor.

4        THE COURT:  Overruled.

5        THE WITNESS:  I recognized, as all of the evidence

6  was presented to me, that the government would be able to

7  prove that I accepted that.  I did not intentionally -- at the

8  beginning of this, I did not ask enough questions.

9  BY MR. KEHOE:

10  Q.  Putting aside, ma'am, the fact of the matter is you told

11  the government that you did not knowingly and intentionally

12  cause this check to be sent to you as part of any scheme to

13  defraud anybody; isn't that right?

14  A.  Yes.

15  Q.  And that this was, in fact, what you thought was your

16  first retention check to begin to work on the Fallschase

17  matter; isn't that correct?

18  A.  Yes.

19  Q.  Now, we talked a little bit on direct examination about

20  some forfeitures of some properties.  And you do recall that

21  there was a series of forfeitures of properties that you own

22  here in Tallahassee that were listed in the indictment,

23  right?

24  A.  Yes, sir.

25  Q.  And one of those -- and correct if I wrote these down

1  incorrectly.  But one was 209 West Georgia Street and 208

2  West Carolina Street and 502 North Adams Street.

3      Do I have that about right?

4  A.  Yes, sir.

5  Q.  And those were properties that you owned?

6  A.  That I own, yes, sir.

7  Q.  And when the indictment came down, I think Ms. O'Gara

8  told you that what's known as a lis pendens was put on those

9  properties, right?

10 A.  Yes.

11 Q.  Now you understood by the forfeiture count that the

12 government intended to seize that property and forfeit it,

13 and the proceeds were to go to the United States Government;

14 you understand that, do you not?

15 A.  I understood that the government could seize that

16 property.

17 Q.  Understood.  I stand corrected.

18     And to that end, because they could seize the property,

19 they put a lis pendens on it to prevent that property from

20 being sold?

21 A.  Correct.

22 Q.  Now, do you recall that your indictment was approximately

23 May 9, 2019; is that about right?

24 A.  That sounds about right.  Once, again, with COVID --

25 Q.  That's fine.  And the lis pendens was immediately put on

1    the property, right?

2    A.  Yes, sir.

3    Q.  And after you pleaded guilty, you began to cooperate with

4    the government beginning in September of 2019, didn't you?

5    A.  Yes, sir.  The dates are fuzzy for me, so if that's what

6    you --

7    Q.  And you wrote a letter to "To Whom It May Concern" in

8    December of that year.

9          MR. KEHOE:  And that would be Defendant's

10   Exhibit 440 that's stipulated to.  I move Defense Exhibit 440

11   into evidence.

12         THE COURT:  Defense 440 is admitted.

13   (DEFENDANT'S EXHIBIT NO. 440:  Received in evidence.)

14   BY MR. KEHOE:

15   Q.  And this is your letter that you sent to the government

16   to ask that the lis pendens be taken off of that property

17   because you lay out the reason that you have a mounting debt

18   and you can't pay this off.  Is that basically it?

19   A.  Yes, sir.

20   Q.  And this property -- let me show you what has been marked

21   and stipulated to Defense Exhibit 641.

22         This property was initially appraised.  And this is

23   called Governor's Walk; is that right?

24   A.  Governor's Walk is a name that --

25         MS. O'GARA:  Your Honor, I'm sorry.  I'm going for a

1  moment.  This is stipulated to as a business record but not to

2  its admission.

3         MR. KEHOE:  That's not my understanding, Judge.  May

4  I have a moment, Judge?

5         THE COURT:  You may.  Give me just a moment.

6         MR. KEHOE:  Our records reflect differently, but I

7  can proceed and we can tie it up later on, Judge.

8  BY MR. KEHOE:

9  Q.  So when this property was initially appraised, it was

10  appraised at four and a half million dollars, wasn't it?

11  A.  I don't remember the appraisal, but I think that was the

12  asking price.

13  Q.  Okay.  And that appraisal then was reduced, or the asking

14  price was reduced to $2.7 million?

15  A.  That sounds about right; yes, sir.

16  Q.  So when the government -- when you were asking the

17  government to take the lis pendens off this, you were asking

18  them to take any restriction off the sale of property worth

19  $2.7 million, right?

20  A.  Yes.  My lawyer suggested that this is how I proceed.  If

21  you are looking at -- oh, they are not seeing it.  If you are

22  looking the map, I also own other properties in that area and

23  there was additional property that had a lis pendens

24  remaining on it.

25  Q.  But if I may, thereafter -- you made this request in

1    December which is in Defense Exhibit 440.  Thereafter, those

2    lis pendens on three of those properties was removed, right?

3    A.  Yes.

4            MR. KEHOE:  And if I can turn to Defense Exhibit 434,

5    and this is the release on the property.

6    BY MR. KEHOE:

7    Q.  This is partial release on the property that we talked

8    about earlier for 209 West Georgia, correct?

9    A.  Yes, sir.

10   Q.  And if we can turn to what's been stipulated and received

11   into evidence as Defense Exhibit 435.  And this is the

12   release of the lis pendens on 208 West Carolina Street,

13   right?

14   A.  Yes, sir.

15   Q.  And 436, again stipulated and received in evidence.

16           THE COURT:  Are you moving 434 and 435 and 436?

17           MR. KEHOE:  I am, Judge.

18           MS. O'GARA:  No objection, Your Honor.

19           THE COURT:  Those are admitted into evidence.

20       (DEFENDANT'S EXHIBIT NOS. 434, 435, AND 436:  Received in

21   evidence.)

22   BY MR. KEHOE:

23   Q.  436 is the 502 North Adams Street, right?

24   A.  (Nods head.)

25   Q.  You have to -- ma'am, I'm sorry.  You have to say

1  something.

2  A.  I'm sorry.  Yes.  So sorry.

3  Q.  My apologies.

4      Those are the properties that the government gave back to

5  you to allow you to sell to pay off whatever debts you had,

6  right?

7  A.  Yes.

8  Q.  Now, the discussions -- now, you began to talk to the

9  government in September, and these are properties that were

10  released in, I believe -- December?  Excuse me -- January of

11  the following year, right?

12  A.  I believe you've got the dates in front of you; but, yes.

13  Q.  And thereafter you continued to talk to the government,

14  didn't you?

15  A.  Yes.

16  Q.  And the testimony that you gave concerning the McKibbon

17  situation and KaiserKane, that was never part of the initial

18  racketeering indictment that was presented against you, was

19  it?

20  A.  Correct.

21  Q.  You began to talk to the government about that after you

22  were seeking to meet your substantial assistance

23  responsibilities; is that right?

24  A.  Correct.

25  Q.  So that they would make the motion that we talked about

1  before, right?

2  A.  They asked if there was anything I knew that I felt like

3  would be relevant.

4  Q.  And before you came in to discuss that with the

5  government in September, did you discuss that with

6  Mr. Maddox?

7  A.  Before I came in to -- no.

8  Q.  You talked to the government first, on September 9, 2019,

9  right?

10  A.  That's my first conversation with the government?  Yes.

11  Q.  Before your conversation with the government on

12  September the 9th of 2019, did you talk to Mr. Maddox about

13  what you would going to say about this McKibbon/KaiserKane

14  situation?

15  A.  No.

16  Q.  You had no conversations with him at all?

17  A.  I mean, we had general conversations all of time, but not

18  specifically as to that.

19  Q.  And as you were coming in here to talk to the government,

20  did you talk to Mr. Maddox about anything concerning what you

21  were going to tell the government?

22  A.  I honestly do not remember because it's been so long ago.

23  Q.  I mean --

24  A.  But my lawyers were advising me not to have those

25  conversations with him prior to going in to talk to the

1  federal government.

2  Q.  Ms. Carter-Smith, obviously, there have been situations

3  before where you have, while you were under oath, did not

4  tell the truth to certain bodies about possibly what was

5  going on with Mr. Maddox and his relationship to Governance,

6  for instance, did you?

7  A.  There are times when my recollection may have been

8  different, yes.

9  Q.  In fact, there are times when, in fact, you were under

10  oath and you were being questioned by the ethics commission

11  and you lied to the ethics commission, didn't you?

12  A.  I wouldn't reference it as a lie but, in retrospect, it

13  was.

14  Q.  Excuse me?

15  A.  I said, in retrospect it was.

16  Q.  So in retrospect, when you told the ethics commission in

17  July the 9th, 2014, in the midst of all this, that Mr. Maddox

18  is not involved in Governance, that wasn't true, was it?

19  A.  No.

20  Q.  So you, in fact, did lie to them under oath at that time?

21  A.  It was -- yes.

22  Q.  Now, in fact, even during the course of this

23  investigation as it was ongoing, you and Mr. Maddox in fact

24  secretly talked about the entire investigation, didn't you?

25  A.  I mean we've already established we have an intimate

1  relationship, so I'm sure there were conversations that we

2  had about things going on.  But my attorney had directed me

3  not to have detailed conversations with him.

4  Q.  And at his direction not to have detailed conversations

5  prior to the indictment, you bought what was known as burner

6  phones, didn't you?

7  A.  There were phones that we purchased, yes, because I

8  didn't want my personal life listened to by everyone in the

9  world.

10  Q.  So the phones that you got were telephone that you

11  bought.  And where did you buy them?

12  A.  Mostly, Target.

13  Q.  The phones that you bought at Target were so that your

14  conversations with Mr. Maddox couldn't be listened to by the

15  FBI; isn't that right?

16  A.  And my children, and my sister, and my father, and any

17  number of people that I didn't want the FBI to be hearing my

18  conversations.  I felt like they were private, and it was

19  obvious to me that, because everything I was saying was being

20  listened to, was no longer private.

21  Q.  And, ma'am, in fact, you bought mobile phones for only

22  four people, didn't you?

23  A.  I bought mobile phones for three people.

24  Q.  Three people?

25  A.  Uh-huh.

1  Q.  That would have been you, Mr. Maddox, and I believe

2  Mr. Fernandez?

3  A.  No.  I gave him an older phone.

4  Q.  So you bought a burner in phone for yourself, Mr. Maddox,

5  you gave one to Mr. Fernandez; and, what, did you buy the

6  other one for Allie Fleming?

7  A.  Yes.

8  Q.  And Allie Fleming was Mr. Maddox's secretary?

9  A.  Aide.

10 Q.  I'm sorry?

11 A.  His aide.

12 Q.  His aide.  I apologize, I had the terminology incorrect.

13 His aide on the commission, right?

14 A.  Yes.

15 Q.  Now, you didn't buy a burner phone for Mr. Burnette, did

16 you?

17 A.  No.

18 Q.  And you never called Mr. Burnette, on this burner phone,

19 did you?

20 A.  Correct.

21 Q.  Let me shift gears, if I may, to go back to this

22 Governance situation involving the McKibbon Hotel Group.

23      I think you talked about on direct examination that you

24 and Mr. Maddox had worked on the McKibbon initial approach to

25 build the Aloft Hotel back in 2005-2006?

1  A.  Yes, sir.

2  Q.  And they had built several hotels, I think you said?

3  A.  They only had one other one in Tallahassee at the time;

4  but, yes, they were a known entity across the Southeast.

5  Q.  And, in fact, even after that project was done, I mean,

6  you stayed in contact with Wes Townsen; isn't that right?

7  A.  Yes.

8  Q.  And you considered him to be a good client, didn't you?

9  A.  Yes.

10  Q.  And you considered him to be a client that you wanted to

11  keep, especially since the next project was coming down the

12  line, right?

13  A.  Yes.

14  Q.  And, in fact, you even put his project on your website,

15  didn't you?

16  A.  Yes.

17  Q.  Let me show you Defense Exhibit 769.

18         MR. KEHOE:  And just show the witness this on the

19  screen without it being published.

20  BY MR. KEHOE:

21  Q.  Now, this is a portion of your website, is it not?

22  A.  The now defunct website, yes.

23  Q.  I'm sorry?

24  A.  The now defunct website, yes.

25  Q.  I understand.  This website has been taken down, right?

1   A.  Years ago.

2   Q.  And that is, in fact, you on the website?

3   A.  Yes.

4   Q.  And the Floridan Hotel item is the McKibbon Hotel Group

5   item that we have been talking about, right?

6   A.  Yes.

7   Q.  And you were very proud of this, weren't you?

8   A.  Very.

9   Q.  And that's why you put it on your website, correct?

10  A.  Yes, sir.

11  Q.  And you folks on behalf of Governance put this on the

12  website, didn't you?

13  A.  We did.

14       MR. KEHOE:  Your Honor, I move into evidence

15  Defendant's Exhibit 769.

16       MS. O'GARA:  Your Honor, I guess my only objection is

17  the authenticity.  She said the website has been taken down.

18       THE COURT:  Overruled.  769 is admitted into

19  evidence.

20      (DEFENDANT'S EXHIBIT NO. 769:  Received in evidence.)

21       MR. KEHOE:  Thank you, Your Honor.

22  BY MR. KEHOE:

23  Q.  So when Mr. Townsen called you to attempt to begin to

24  begin the endeavor as to what they were going to build next,

25  you wanted to get involved, didn't you?

1  A.  Yes, sir.

2  Q.  And the idea was that you were going to try to first

3  extend the option on the property that they had for another

4  two years, right?

5  A.  To my recollection, yes, that was the next step.

6       MR. KEHOE:  And if I can just put up on the screen

7  Government's Exhibit 331 in evidence.  I do believe you put

8  this into evidence, 331?

9       MS. O'GARA:  (Nods head.)

10       MR. KEHOE:  If it's not, Judge, I would move it in.

11       THE COURT:  Government Exhibit 331 is admitted.

12       (GOVERNMENT EXHIBIT NO. 331:  Received in evidence.)

13  BY MR. KEHOE:

14  Q.  If we can go to the top of the page, this is Wes Townsen

15  sending this to you on February 26, 2013.

16       MR. KEHOE:  And if we may go to the first email on

17  the prior page -- excuse me, not the first email, the email

18  on the prior page, middle email, from February 19, 2013.

19  Thank you.

20  BY MR. KEHOE:

21  Q.  Now, this is Wes Townsen to Rick McCraw.  And Rick was an

22  official in the city at the time?

23  A.  Yes.

24  Q.  And I think he's in the CRA, right?

25  A.  Correct.

1  Q.  And it says:  Rick, we would like to extend the attached

2  option agreement for an additional two years on the same

3  terms and conditions.  Please let us know when this could be

4  up for consideration by the appropriate approval.

5      And he subsequently sends this long --

6          MR. KEHOE:  Go to the top, one more up, please.

7  BY MR. KEHOE:

8  Q.  He asked for more detail; Can we move this along?  And

9  then he sends it on to you.

10     Now, at this point you think he is sending this to you,

11 as you just said, because he is going to bring to you part of

12 the option extension, right?

13 A.  In all likelihood, yes.  He was keeping me appraised of

14 the project.

15 Q.  And the option extension was an option, a two-year

16 extension; and the terms and conditions previously were for

17 the McKibbon Group to build an office building --

18 A.  Correct.

19 Q.  -- with some retail and a hotel?

20 A.  Correct.  It was -- the original plan was for an office

21 building to be built next to the hotel.  There was not a

22 market for it at the time, and they wanted to exercise an

23 option agreement or have an option agreement so they could

24 come back and decide what was going to be best and right of

25 first refusal.

1  Q.  So when Mr. Townsen tells Mr. McCraw and the city that

2  they wanted an additional two years on the same terms and

3  conditions, it wasn't on the same terms and conditions, was

4  it?

5  A.  I don't remember.

6  Q.  Well, you knew, if not now, shortly thereafter that they

7  had no intention of building an office building?

8  A.  An office, yes.

9  Q.  So it was not on the same terms and conditions, was it?

10  A.  True, yes.

11       MR. KEHOE:  If we turn to, stipulated to, Defense

12  Exhibit 711, March 12th.  We move 711 into evidence, Judge.

13       THE COURT:  Defense 711 is admitted.

14  (DEFENDANT'S EXHIBIT NO. 711:  Received in evidence.)

15  BY MR. KEHOE:

16  Q.  And this is approximately, what, three weeks later.

17       MR. KEHOE:  If we go down to the bottom paragraph,

18  that's it.

19  BY MR. KEHOE:

20  Q.  And this is Mr. McCraw sending this to Mr. Townsen, and

21  he notes in the second paragraph:  In 2011, you submitted a

22  formal letter requesting an extension.  It might be

23  worthwhile to do the same again.

24    If we can go one further up, this is the email that he

25  sends to you on March the 12th of 2013:  Paige, FYI, latest

1  from Rick below.  We received word that others were preparing

2  to send HIS applications -- that's Hilton applications, isn't

3  it?

4  A.  I don't remember.  I'm assuming, yes.

5  Q.  -- for downtown, so we went and sent ours last night.

6  Hilton has indicated we will get a positive response;

7  however, of course, we will need to get the UPUD amendment

8  and parking deck done.  There is a potential now that our

9  plan will hit the street because Hilton is required to send

10  notices to other Hilton operators, such as DoubleTree, of our

11  intention.

12      So as of March the 12th of 2013, McKibbon had still not

13  told the city that they wanted to built a hotel and not an

14  office building; isn't that right?

15  A.  That would be my recollection from looking at this, yes.

16  Q.  And you were aware, in Defense Exhibit 710 --

17          MR. KEHOE:  Which is stipulated to, and we would

18  move it into evidence, Judge.

19          THE COURT:  Defense 710 is admitted.

20      (DEFENDANT'S EXHIBIT NO. 710:  Received in evidence.)

21  BY MR. KEHOE:

22  Q.  This is the letter from Mr. Townsen to Mr. Parker and

23  Mr. McCraw.  And go to the second paragraph, "We propose."

24  A.  Do you want me to read it?

25  Q.  No, it's okay.

1   A.   Okay.  Yes, sir.

2   Q.   I just wanted to ask:  So we propose the option agreement

3   to be extended for two years, beginning May 1st, on the same

4   terms and conditions.

5       Again, this is another letter by McKibbon to the city

6   where they are telling them that they want to do an option;

7   that they want an option for the property for the same terms

8   and conditions.  But it's not the same terms and conditions,

9   is it?

10  A.   No.  And I was not a part of the drafting or anything of

11  these, just for the record.

12  Q.   So throughout all of this, the McKibbon folks are

13  contacting you and they are not being truthful with the city,

14  are they, as to what their intentions are?

15  A.   I also don't know what behind-the-scenes conversations

16  they were having with the city, because at that point Wes was

17  doing -- he was having individual conversations with people.

18      So as is reflected here, no.  But I don't know what the

19  behind-the-scenes conversations are.

20  Q.   Well, let me bring you further, and let's go down to the

21  next email in the email chain.

22          MR. KEHOE:  This would be Defendant's Exhibit 708,

23  Judge, and we would stipulate and we move into evidence.

24          THE COURT:  Defendant's 708 is admitted.

25      (DEFENDANT'S EXHIBIT NO. 708:  Received in evidence.)

1  BY MR. KEHOE:

2  Q.  Now, this is an email, of course; it's from Mr. McKibbon

3  to Townsen in March, talking about -- let me go to the second

4  one.

5      Mr. McKibbon notes that:  Based on some comments

6  concerning changes in another city, we need to be ready in

7  Tallahassee.

8      And if we can go one up, again, this is being sent to you

9  at Governance:  We need your feedback ASAP.

10     So let's take care of the next one, too.

11          MR. KEHOE:  If we can go to Defense Exhibit 706.

12          THE COURT:  Are you offering this one?

13          MR. KEHOE:  Yes.  I offer into evidence 706, Judge.

14          THE COURT:  Defendant's 706 is admitted.

15     (DEFENDANT'S EXHIBIT NO. 706:  Received in evidence.)

16  BY MR. KEHOE:

17  Q.  Now, if we can go to the bottom email, and this is from

18  Terry Daniel at the Aloft Hotel.  That's the hotel that you

19  worked on initially with Mr. Maddox years ago, right?

20  A.  Yes.

21  Q.  And it's built and running at this point, right?

22  A.  Yes.

23  Q.  And it notes:  Hi, Wes.  I received a call from a source.

24  You are probably aware, but I wanted to pass on just in case.

25  Jay Revell, who is the new executive director of the Downtown

1 Improvement Authority, asked if we, McKibbon, have talked to

2 Michael Parker with the CRA and the head of the EDC for

3 Tallahassee about the hotel project.  Jay used to be with the

4 county commission office.  He said the original agreement

5 included an office space and parking structure, not a hotel.

6 The original agreement expires at the end of the month.

7     If we can go to the next email where Mr. Townsen sends

8 this back to Mr. Daniel and cc's you:  Yes, we are on it.  We

9 have asked Michael -- and you understood that to mean Michael

10 Parker, right?

11 A.   Yes, sir.

12 Q.   -- for an extension of the option, but we have not shared

13 any plans for the Hilton group with Michael as yet.

14     Right?

15 A.   That's what it says; yes, sir.

16 Q.   So this is days before a commission meeting; yet, they

17 have not told the city what their plans were to change from

18 an office build to a hotel, have they?

19 A.   It does not appear that they did.

20 Q.   Excuse me?

21 A.   I'm sorry.  It does not appear that they did.

22 Q.   And then you understood that they were going ahead with

23 the plans to try to get an option to build another hotel; and

24 they weren't telling the city at the time that they had

25 intended to build another hotel as opposed to an office

1  building, were they?

2  A.  It appears by this that they were not.  I don't have a

3  real clear memory of this because I was not working on it

4  actively at this point.  I was helping.  I was helping.

5     A lot of times when you have a client that has been an

6  old client and you anticipate they are going to be a future

7  client, you keep in touch and help them along the way,

8  shepherd them.  So I was relying on what they were telling

9  us.

10  Q.  But you were helping them?

11  A.  I was helping them.

12  Q.  As a matter of fact, when there was some question about

13  Michael Parker rescinding the 130,000 deposit, you in fact

14  went to the city to try to track it down and try to come up

15  with an answer, didn't you?

16  A.  I believe I did, yes.

17       MR. KEHOE:  Let's go to the Defendant's Exhibit 705.

18     BY MR. KEHOE:

19  Q.  And this is an email to you?

20       MR. KEHOE:  Excuse me, if I may, Judge.  This is

21  stipulated to as 705, and we move it into evidence.

22       THE COURT:  Defendant's 705 is admitted.

23     (DEFENDANT'S EXHIBIT NO. 705:  Received in evidence.)

24  BY MR. KEHOE:

25  Q.  Paige, I see from the agenda -- and they are talking

1    about the agenda on the City of Tallahassee commission

2    meeting, right?

3    A.  Yes, sir.

4    Q.  On the agenda, Michael appears to be grabbing our

5    $130,000 deposit and make it not applicable to the purchase

6    price.  This is not right.  We have been paying rent

7    essentially on this lot during our option extension period,

8    the city is whole on this.  He is trying to rip us off.

9        And you say:  Let me see what I can find out.

10   A.  Yes.

11   Q.  And you did that, didn't you?

12   A.  I did.  I think I followed back up with Michael.

13   Q.  So at this point, this is McKibbon Group has tied up this

14   property for five years but at the same time complaining

15   about the hundred thousand dollars, whether or not it should

16   or should not be applicable to the purchase price.

17       Do I have that right?

18   A.  Yes.  Wes -- I very much like Wes; in fact, this whole

19   thing has made me very sad, because I feel like I owe him a

20   future apology.  But he did have a bit of temper, so a lot of

21   times he would send an email and I would just kind of be,

22   like, yes, I would see what I will do.

23   Q.  But suffice it to say, even now, he still hasn't told the

24   city that he intends to build a hotel as opposed to an office

25   building?

1  A.  Correct.  As it appears here, yes.

2  Q.  I'm sorry?

3  A.  As it appears here, yes.

4  Q.  Okay.  Now, if I may, I just again want to shift gears a

5  little bit.

6  A.  Okay.

7  Q.  To go into some of the matters briefly before the

8  commission.

9      You knew, prior to Mr. Maddox taking office in -- what,

10 November of 2012; is that right?

11 A.  I think so; yes, sir.

12 Q.  Approximately.

13 A.  Approximately.

14 Q.  You knew that he had talked to the then-city attorney,

15 Jim English, about having some clients, that there was a

16 possible conflict with those individuals coming back before

17 the commission, right?

18 A.  Correct.

19 Q.  And one of those was the McKibbon Group?

20 A.  Yes, sir.

21 Q.  And so it was no surprise to you when the first time the

22 McKibbon Group came before the city commission on May 24,

23 2013, that Mr. Maddox walked off of the dais; isn't that

24 right?

25 A.  It was no surprise to me that he did not intend to vote.

1    I don't know what he did.

2    Q.  Well, it wasn't any surprise to you that he did not vote

3    when the option came up on April the 24th, right?

4    A.  Correct.

5    Q.  And, in fact, there was a vote without Mr. Maddox to

6    extend the option, right?

7    A.  Yes, sir.

8    Q.  Now, as we move into -- and I'm not going to go through

9    this in detail.  As we move into this through April and May

10   of 2013, this is the period of time when Erwin Jackson has

11   ratcheted up his criticism of Mr. Maddox, isn't it?

12   A.  Yes.

13   Q.  And he was appearing before county commission meetings,

14   right?

15   A.  City commission meetings.

16   Q.  Excuse me.  My mistake, my apologies.  Please correct me

17   if I'm wrong in anything.

18      He is appearing before city commission meetings

19   complaining about Mr. Maddox, right?

20   A.  And others, yes.

21   Q.  And others on issues.  He was talking to the press about

22   it, right?

23   A.  Yes.

24   Q.  And he was sending emails to members of the city

25   commission about Mr. Maddox, right?

1  A.  And everywhere else, yes.

2  Q.  And the temperature, in fact, is rising throughout this,

3  isn't it?

4  A.  Yes, sir.

5  Q.  And at the same time, you are talking to -- after the

6  extension is granted, you are talking to Mr. Townsen as to

7  what he wants you to do to work on the project to get the

8  updated UPUD and also work with the CRA, right?

9  A.  The conversations were beginning, yes.

10      MR. KEHOE:  Let me turn to the Defendant's

11  Exhibit 704, which is stipulated to and we move it into

12  evidence.

13      THE COURT:  Defendant's 704 is admitted.

14  (DEFENDANT'S EXHIBIT NO. 704:  Received in evidence.)

15  BY MR. KEHOE:

16  Q.  And at the top of the page, this is Mr. Townsen saying to

17  you:  Let's discuss the plan and the role you will play in

18  the process, two concurrent activities, UPUD modification and

19  the second one, CRA approval of the parking deck.

20      And you say:  When is a good time to talk?

21      Is that right?

22  A.  Yes, sir.

23  Q.  And you did, in fact, talk to him, right?

24  A.  Later on, yes.

25  Q.  After this?

*Paige Carter-Smith - Cross*

1    A.   Yes.

2              MR. KEHOE:   Let's move to Government Exhibit 332,

3    which I believe is received and already in evidence, Judge.

4    And if we can go to the top email.

5    BY MR. KEHOE:

6    Q.   This is the 24th of May.  And, again, this is in the

7    midst of the rising tensions coming from Erwin Jackson,

8    right?

9    A.   Definitely.

10   Q.   And he says:  Gary Yordon has down -- excuse me.  Gary

11   Yordon in our office does a lot of growth management work.

12        Essentially, you wanted to bring Gary Yordon into the

13   equation?

14   A.   I did.  And Gary had work at the tail end of this project

15   previously.

16   Q.   So there was a tension coming from Jackson, Mr. Maddox is

17   under attack; Mr. Maddox didn't want you working on the

18   McKibbon project because of Mr. Jackson, right?

19   A.   I think it was a group decision.  I didn't want to hurt

20   McKibbon by having Mr. Jackson shoot at me and Governance and

21   have that ultimately hurt his project, Wes's project.

22   Q.   Isn't it a fact, ma'am, that from the very outset that

23   Mr. Maddox didn't want you working on this project?

24   A.   I think it was kind of understood that I would not be

25   first chair, so to speak.  We wanted Gary to take the lead.

1   Q.  Well, in fact, from the very beginning that Mr. Maddox

2   knew, admittedly -- putting Erwin Jackson aside -- that if

3   you accepted the work on this, he would have a conflict,

4   right?

5   A.  It is my recollection that he felt like he had a conflict

6   anyway.

7   Q.  Okay.  So you then begin the steps to bring Mr. Yordon

8   in; and then you send the document --

9            MR. KEHOE:  And this is also been received in

10  evidence, Government Exhibit 333.

11  BY MR. KEHOE:

12  Q.  And this is the proposal that you send to Mr. Townsen --

13  if we can just go down -- talking about the UPUD, CRA,

14  personnel, and proposing Yordon, Dan Stengle, and yourself as

15  part of the project?

16  A.  Yes, sir.

17  Q.  Now, at this particular point, was it your intention to

18  work on this project at the time?

19  A.  At this particular point, it was my intention to convince

20  McKibbon group that Gary was going to be lead on the project.

21  It was also any intention at this point that I felt that I

22  was going to take a backseat.

23  Q.  At this point, and Mr. Maddox had recused, right?  He

24  didn't vote?

25  A.  On the previous vote.

1  Q.  And he was going to recuse because he wasn't going to

2  vote at all at this point because he had a conflict, right?

3  A.  That was my understanding, yes.

4  Q.  And he also recused because of Erwin Jackson, right?

5  A.  No, he recused because he had had a previous conflict.

6  Erwin just elevated the temperature in the room for everyone.

7  Q.  So he elevated the temperature in the room; he elevated

8  the temperature in the room to make it virtually impossible

9  for you and Governance and Mr. Maddox to work on this

10 project, right?

11 A.  Mr. Maddox would not have worked on this project.  It

12 made it difficult.  My concern was that if I work on this

13 project, Mr. Jackson was going to end up hurting a client

14 that I cared a lot about.

15 Q.  But you and Mr. Maddox decided that the Zachary Group was

16 going to be the entity to represent McKibbon because of

17 Mr. Jackson, right?

18 A.  It's my recollection that that was the part of the

19 motivation.  This has been a long time ago, so I don't

20 remember all of the conversations, but the publicity that

21 Erwin would have brought to Governance representing McKibbon

22 would have hurt McKibbon.  So having an additional step away

23 seemed like a good plan at the time.

24 Q.  When you were asked this on Friday, you were asked --

25 page 836, line 14:  Why would you use Zachary Group instead

1  of Governance to represent McKibbon?

2     At this point, politically, there were a number of people

3  that are taking shots at anything that Governance was doing,

4  specifically, Erwin Jackson.

5  A.  Yes.

6  Q.  And then you went on to say you didn't think it was fair

7  to Wes Townsen.

8  A.  Correct.

9  Q.  But, politically, it was Erwin Jackson, correct?

10  A.  Correct.

11  Q.  And Erwin Jackson -- and Mr. Maddox was part of this

12  discussion, wasn't he?

13  A.  At some point, I'm sure he was, yes.

14  Q.  And the idea was to bring Mr. Yordon in.  The reason to

15  bring Mr. Yordon in was to distance the project from

16  Governance and try to get past the criticism of Mr. Jackson,

17  right?

18  A.  Yes.

19  Q.  Now, if we can --

20       MR. KEHOE:  If we can just look at Exhibit 729.  I

21  think this has been received, Judge.  If it's not, we move

22  into evidence because it's been stipulated to.

23       THE COURT:  Defense 729, is that the number?

24       MR. KEHOE:  Yes, Your Honor, it is the number.

25       THE COURT:  It is admitted.

1    (DEFENDANT'S EXHIBIT NO. 729:  Received in evidence.)

2    BY MR. KEHOE:

3    Q.  And if we could go from the bottom up.  You begin to talk

4    to Mr. Townsen about:  Hi, there.  Just checking in to make

5    sure you've gotten this email.

6        That is the email with your proposal, right?

7    A.  Correct.

8    Q.  And as you move up, if you can go all the way up to the

9    14th, you say:  Just checking in.  Did you receive the

10   contract?

11       You ultimately had a contract -- and that would be

12   Government Exhibit 108.  Now, this is a contract that is

13   dated June the 7th, 2013?

14   A.  Yes.

15   Q.  Is that right, ma'am?

16   A.  Yes, sir.

17   Q.  And this is the ultimate consulting agreement between

18   McKibbon and the Zachary Group?

19   A.  Yes.

20   Q.  McKibbon and the Zachary Group, right?

21   A.  Yes.

22   Q.  Now, it is your position that it was during this period

23   of time, May the 30th of 2013, when you sent the original

24   proposal and the agreement of May the 7th -- excuse me, June

25   the 7th of 2013, that Mr. Maddox told you that -- he told you

1  that Mr. Burnette didn't want you to represent the McKibbon

2  Group, and that Mr. Burnette had a business opportunity for

3  you; is that right?

4  A.  I don't remember the exact timing.

5  Q.  Do you recall giving an interview to the government on

6  May the 20th of 2021?  Do you recall that?

7  A.  I do.

8  Q.  Do you recall telling the FBI that the comment by

9  Mr. Maddox in setting out a chronology, that this comment was

10 between May the 30th of 2013 and June the 7th of 2013?

11 A.  So, I recall that we got a big timeline on the board and

12 I was trying to put pieces together.  So if I said that, that

13 was my recollection at the time with looking at the big

14 timeline, yes.

15 Q.  That's what you told them, wasn't it?

16 A.  If you've got the notes, then that's what I told them,

17 yes.

18 Q.  Well, if I showed you something, it might it refresh your

19 recollection on this?

20 A.  Yes.

21         MR. KEHOE:  May I approach, Judge.

22         THE COURT:  Do you have to?  Do you not have it

23 electronically?

24         MR. KEHOE:  I'm sorry, Judge?

25         THE COURT:  You do not have it electronically?  If

1  you need to put the paper on, put your mask on and then you

2  can approach.

3          MR. KEHOE:  Actually, if I can refresh her

4  recollection electronically, that's fine.

5          THE COURT:  Then do it that way.

6          MR. KEHOE:  I'll be honest with you, I've never

7  refreshed recollection this way.

8          MS. O'GARA:  Your Honor, I'm going to object to the

9  use of this document.  The witness has never seen this

10 document before.

11         THE COURT:  You may show it to her, and you may ask

12 if it refreshes her recollection.

13         Ms. Carter-Smith, he is not going to ask you what the

14 document says.  You may read it, and if it refreshes your

15 memory so that you now remember the fact, you testify to what

16 you now remember.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  You may proceed.

19         MR. KEHOE:  Your Honor, I put this item to refresh

20 recollection on the screen.

21 BY MR. KEHOE:

22 Q.  If I may, I will go to the page to refresh your

23 recollection.

24 A.  Yes.  Okay.  It's helpful to have the dates, it's been so

25 long ago.

1    THE COURT:  Wait.  He's going to ask you a question.

2    BY MR. KEHOE:

3    Q.  Are you finished reading that, ma'am?  Just tell us when

4    you are.

5    A.  Okay.

6    Q.  Now, does that refresh your recollection that you did, in

7    fact, tell the government that after the proposal on May the

8    30th but before the consulting agreement on June 6th, you had

9    a conversation with Mr. Maddox in which you were told by

10   Mr. Maddox, when you were told by Mr. Maddox, not to

11   represent the McKibbon Hotel Group?

12   A.  In so many -- yes, in so many words.  I think the

13   conversation was more in line with there would be something

14   else to keep me busy.

15   Q.  I'm sorry?

16   A.  There would be something else to keep me busy.

17   Q.  So the conversation between May the 30th and June the 7th

18   was:  Don't represent the McKibbon Hotel Group, and

19   Mr. Burnette will give you things to keep you busy; is that

20   right?

21   A.  Basically; yes, sir.

22   Q.  If I may just shift gears, if we could.

23        MR. KEHOE:  Your Honor, may I just have one moment?

24        THE COURT:  You may.

25   BY MR. KEHOE:

1  Q.  If I may, again, shifting gears just a bit.

2  A.  No problem.

3  Q.  Not necessarily following this in a chronological order,

4  but I just want to talk to you a little bit about some of the

5  matters involving GSA, if I may.

6  A.  Okay.

7  Q.  And do you recall, you testified on Thursday that you had

8  a conversation with either Kim Rivers or Mr. Burnette about

9  Mr. Cardozo and GSA; do you remember that?

10  A.  I do.

11  Q.  And you said, I think -- and correct me if I'm wrong --

12  that you wanted to find a way to do business with the GSA,

13  and that's why you were talking with Mike Sweets, Ms. Rivers,

14  and Mr. Burnette, right?

15  A.  Yes.  I -- yes.  And I can't remember if it was like an

16  incidental conversation, like I ran into them somewhere or

17  whatever.  But, yes, it was:  Hey, my friend is now at the

18  GSA.  That's cool, what can we do?

19  Q.  And did you recall first having a meeting with Ms. Rivers

20  about that?

21  A.  I recall having a conversation with her.  I don't know

22  that it was a meeting.  I don't remember.

23  Q.  And if I showed you something, might that refresh your

24  recollection?

25  A.  Yes.

1    MR. KEHOE:  For just refreshing recollection,

2    Defendant's Exhibit 870.

3    THE WITNESS:  Okay.

4    BY MR. KEHOE:

5    Q.  Without telling us what this was, does that refresh your

6    recollection?

7    A.  Not a whole lot.  I mean, it --

8    Q.  Okay.

9    A.  Yeah.

10   Q.  So just going with Ms. Rivers, as we sit here, do you

11   recall whether it was a meeting or how you conveyed this

12   information to her?

13   A.  I remember there was a conversation.  So, I don't

14   remember the details of said conversation, at all.

15   Q.  And would it have been sometime in early October or

16   sometime in October of 2013?

17   A.  Likely.  My recollection is that as soon as we found out

18   that Reggie was in that position -- Mr. Cardozo was in that

19   position, I was very excited and would have looked at

20   opportunities in front of the GSA.

21   Q.  And I think you had previously said that you wanted to

22   modify the situation?

23   A.  Well, as a lobbyist, it's kind of what you do.

24   Q.  There's nothing wrong with that.

25   A.  Yes, you look for opportunities for places where you have

1    access, and that's what you do.

2    Q.  You wanted to see if you generate some business, that's

3    all.

4    A.  I wanted to see if I could generate some business.

5    Q.  And thereafter, did you have a meeting with Mr. Burnette,

6    alone?

7    A.  I don't remember a meeting with Mr. Burnette, alone.

8    Q.  If I showed you something, might it refresh your

9    recollection?

10   A.  It might.

11          MR. KEHOE:  Can we go to 871, just for the witness.

12          THE WITNESS:  I don't remember.  That doesn't mean it

13   didn't happen, I just don't remember.

14   BY MR. KEHOE:

15   Q.  That's fine.  It doesn't refresh your recollection?

16   A.  It doesn't.

17   Q.  So, again, did you have a conversation, if you recall

18   this, around this time with Mr. Burnette about GSA?

19   A.  Likely, I did.

20   Q.  Okay.

21          MR. KEHOE:  So let us go to what has been received

22   in evidence, Judge, as Government's Exhibit 389.

23   BY MR. KEHOE:

24   Q.  And this is the GSA organizational chart that

25   Mr. Burnette sends on to Ms. Rivers and Ms. Rivers sends on

1   to you, right?

2   A.  I know that Ms. Rivers sent it to me, yes.

3   Q.  The bottom email --

4   A.  Okay, sorry, yes.

5   Q.  So they send it on to you in November?

6   A.  Correct.

7   Q.  And you start doing some work on the GSA matter on your

8   own during this period of time, don't you?

9   A.  I don't remember when I reached out to Reggie, but I know

10  that at one point I had had a conversation with him, yes.

11  Q.  Even before that, let me show you --

12        MR. KEHOE:  And this is just for the witness, Judge,

13  not to be published yet, Defendant's Exhibit 69.

14  BY MR. KEHOE:

15  Q.  And this is from you on GSA.  And do you recognize these

16  notes?  Better still, are these your notes, concerning GSA?

17  A.  They appear to be.

18  Q.  And would you have done this as part of your work in

19  trying to get business from GSA during the same time frame

20  you're talking to Ms. Rivers and Mr. Burnette?

21  A.  Yes.

22        MR. KEHOE:  Your Honor, we offer into evidence

23  Defendant's Exhibit 69.

24        THE COURT:  Defendant's Exhibit 69 is admitted.

25        (DEFENDANT'S EXHIBIT NO. 69:  Received in evidence.)

1    MR. KEHOE:  And if we can publish this.

2  BY MR. KEHOE:

3  Q.  And this is GSA, Chuck Jones, Number 2, MidAtlantic

4  Region, Southeast.  Savannah area hasn't done a tremendous

5  amount of construction.

6      Can you tell us, based on your recollection -- and I know

7  it's been a while, back in 2013.  Do you recall what these

8  notes are about?

9  A.  I have no idea.  I don't remember.

10 Q.  But you do recognize they are about GSA during the time

11 frame you're talking to Burnette and -- talking to

12 Mr. Burnette and Ms. Rivers?

13 A.  Yes.  And by the look of the "from" email, I had made

14 them on my phone.  So I was likely talking to somebody and

15 typing.

16 Q.  And taking notes?

17 A.  And taking notes.

18 Q.  Would that have been Reggie Cardozo, for instance?

19 A.  I don't remember.

20 Q.  I'm sorry?

21 A.  I don't remember.

22 Q.  Okay.  So let's move into the next aspect of this as we

23 move forward.

24     Now, you told us on direct examination that you met with

25 Melissa Oglesby and with Trey Gardner, right?

1    A.  Yes, I did.

2    Q.  And prior to that meeting, you didn't know Trey Gardner,

3    right?

4    A.  No.

5    Q.  And you didn't know Melissa Oglesby, right?

6    A.  I did not.

7    Q.  And this was literally the first time you had met him?

8    A.  I may have met Trey incidentally over the years.  I mean,

9    he is from Tallahassee but I think he was a few years behind

10   me in school.

11   Q.  I'm sorry, say that again?

12   A.  I think he was a few years behind me in high school, but

13   don't -- I didn't know him.

14   Q.  Okay.  And then you sat down with them in a meeting.

15           MR. KEHOE:  And let me show Defendant's Exhibit 94,

16   that has been stipulated to and received in evidence.

17           MS. O'GARA:  Your Honor, this is not stipulated to.

18           MR. KEHOE:  I'm sorry?  It's the same one.  With all

19   due respect, Judge, it's the same document that was put in.

20   I'm not sure of the number.

21           THE COURT:  Talk to me.

22           MR. KEHOE:  Judge, this is the same document that the

23   government had put in evidence.  I just don't have the number

24   off the top of my head.  It's Defendant's Exhibit 94; it is

25   the January 9, 2014 proposal sent by Ms. Carter-Smith.

1    THE COURT:  Is that right?  Is it a government

2    exhibit?

3    MS. O'GARA:  Your Honor, I do believe there is a

4    corresponding government exhibit.  The defense exhibit number

5    was not specifically stipulated to.

6    THE COURT:  Give me the number again.

7    MR. KEHOE:  It is Defendant's Exhibit 94.

8    THE COURT:  Defendant's Exhibit 94 is admitted.

9    (DEFENDANT'S EXHIBIT NO. 94:  Received in evidence.)

10   BY MR. KEHOE:

11   Q.  Now, before we go into this exhibit, I think you told us

12   in your examination on Thursday that you sat down with Ms.

13   Oglesby and Mr. Gardner, and at the end of the meeting you

14   said:  Okay, I will send you a proposal.  Right?

15   A.  Yes, that's typically I did things after a first meeting

16   with a potential client.

17   Q.  You send them a proposal?

18   A.  Correct.

19   Q.  And if we look at this document, this document is dated

20   January 9th, 2014; and, if we turn to the next page, top

21   paragraph, please:  Thank you for taking -- Mr. Gardner,

22   thank you for taking the time to meet with me regarding

23   Governance Services, LLC assisting KaiserKane with General

24   Services Administration.  It was a pleasure meeting with

25   Melissa Oglesby.  I am confident a relationship with our firm

1  can be beneficial to KaiserKane.

2  A.  Yes.

3  Q.  Now, this is the proposal that you told Mr. Gardner and

4  Ms. Oglesby that you were going to send at the end of the

5  meeting, right?

6  A.  Yes.

7  Q.  And you usually send that proposal right after the

8  meeting, don't you?

9  A.  I can be a little lazy on that; but, yes.

10  Q.  But the business --

11  A.  After the meeting.

12  Q.  Right.  After the meeting, you want to begin to lock this

13  down, so you send them a proposal right away, as soon as

14  possible?

15  A.  True.  As soon as possible.

16  Q.  So this proposal -- if we can scroll up a little bit.

17  This proposal that is dated January 9, 2004, where you say

18  thank you for taking the time to meet with me and Ms.

19  Oglesby, that indicates that the meeting that you had with

20  KaiserKane was shortly before this, wasn't it?

21  A.  Correct; it was before this, yes.

22  Q.  Shortly before this.  If you go to the meeting and you

23  have a proposal and you go back to your office and put

24  together a proposal, we're talking about a few days prior to

25  this, aren't we?

1  A.  In all likelihood.  But it was also the first part of

2  January, so I don't remember if the end of December during

3  the holidays or the first part of January; but, yes.

4  Q.  Now, you talked a little bit about -- if I may -- some of

5  the notes that you had taken during this period of time.

6        MR. KEHOE:  And if I can go to Defense Exhibit 76,

7  which has been received in evidence.

8        THE COURT:  We don't have this exhibit in evidence.

9        MR. KEHOE:  I'm sorry.  It's the same notes from the

10 government, but if I can stipulate it and receive Defendant's

11 Exhibit 76.

12        THE COURT:  Defense 76 is admitted.

13     (DEFENDANT'S EXHIBIT NO. 76:  Received in evidence.)

14        MS. O'GARA:  And, Your Honor, I just want to note the

15 that this is not actually stipulated to.

16        THE COURT:  Well.

17        MS. O'GARA:  I understand.

18        MR. KEHOE:  If I may, Judge.

19        THE COURT:  Let's do this.  Let's take our morning

20 break and we will straighten out the exhibits and not spend

21 our time with it.

22        Members of the jury, recall my instructions.  Don't

23 talk about the case.  We'll be back with you in a few minutes.

24        Jury out, please.

25     (*The jury exited the courtroom at 10:17 a.m.*)

1    THE COURT:  You may be seated.

2    Thank you, Ms. Carter-Smith.  You may step down.  If

3    you would be back on that stand by 10:35 by that clock, that's

4    18 minutes.

5    THE WITNESS:  Okay.

6    THE COURT:  All right.  We obviously have a different

7    understanding of what it means for something to be stipulated

8    to.  All I really need you to do when you have an exhibit that

9    you want to offer into evidence is offer it into evidence.  If

10   the other side doesn't object, then I'll admit it.

11   It would be help tremendously if you have -- surely

12   you have a list that matches up the Government Exhibits with

13   the Defendant's Exhibits.  The confusion is when the

14   government has admitted the exhibit and you use not the number

15   of the exhibit that is in evidence but your own number, the

16   government doesn't immediately know that it's been admitted.

17   It really would help if you just had

18   cross-references.  And so, if you can get a Government Exhibit

19   number and -- I don't care which copy you show to the jury.

20   So if it's easier for you to put up the Defendant's Exhibit

21   than the Government Exhibit -- and, parenthetically, I don't

22   know why that ought to be easier, but if it's easier, then

23   fine.  I don't care which one you put on the board as long as

24   it's the same exhibit.  But it will help, and it will

25   certainly help the government and it will help the clerk.

*Paige Carter-Smith - Cross*

1    MR. KEHOE:  I understand.

2        THE COURT:  At one point you referred to Defense 94,

3    and the reason it wasn't up on the board, you said it had been

4    admitted but the clerk didn't have it in evidence.  I think I

5    have the right number.  And apparently it was the same as some

6    Government Exhibit that had been admitted.  So it will just

7    help if you can match those up.

8        Defense 94 is admitted.  It was shown, I just hadn't

9    announced that it was admitted.

10   (DEFENDANT'S EXHIBIT NO. 94:  Received in evidence.)

11       THE COURT:  I haven't told the jury what this

12   "stipulated" means and I don't think I need to, it just needs

13   to come into evidence.  But here's what I think the

14   misunderstanding or maybe the disagreement between the two

15   sides is what that means.

16       If I understood, what I was told last week, the

17   stipulation means there's no authenticity objection.  It

18   doesn't necessarily mean an agreement to relevance or that

19   it's not objectionable on some other basis.  I don't care what

20   you stipulated to, you can stipulate to whatever you stipulate

21   to, but I do think it's causing some problem when the defense

22   says this is stipulated to, and the government thinks the

23   government has only stipulated to authenticity, not to

24   admissibility.

25       This stuff generally seems admissible.  It's related.

1  It's pretty far from the meat of coconut, but it's relevant.

2  So generally what I propose to do is just, if the defense says

3  Defense Exhibit X, you offer Defendant's Exhibit X, I kind a

4  hesitant for just a moment to see if the government is going

5  to object, and if there is no objection, I say it's admitted.

6  Anything you can do to help out with the corresponding number

7  would be good.

8       There is a local rule that prohibits reference to the

9  transcript of this proceeding.  If that's the only way to get

10  to something, we can get to it.  There could be an occasion

11  when you really to do that.  The reason for the local rule is

12  this:

13       In most cases there are not transcripts, or if there

14  are, they only to part of the proceeding.  In any event, the

15  quality of justice is better if all of the testimony is put on

16  even footing.  If the jury thinks there are transcripts that

17  will be available to the jury, then instead of relying on

18  memory and notes they may wind up asking for transcripts; then

19  you wind up with a request for part of the proceeding and not

20  other parts of the proceeding.  It's just better if all of the

21  testimony gets treated on the same footing.

22       So unless you really need to refer to the transcript

23  of this proceeding for some reason, do it without referring to

24  it.  And I think you could have gotten there without trying to

25  read the transcript.  Maybe I'm wrong, but I think you read

1    the transcript of Ms. Carter-Smith at one point.

2              MR. KEHOE:  I did, Judge.

3              THE COURT:  That's violative of the local rule.

4              MR. KEHOE:  Yes, sir.

5              THE COURT:  But we'll work it out if we have to.  But

6    if you get to where somewhere you need to, ask to be heard and

7    we'll deal with it, but -- enough said.

8              What else, if anything, do we need to deal with?

9              MR. NOTHSTEIN:  Nothing large, Your Honor.  Just on

10   the court noting that it's taking a beat before a piece of

11   evidence is offered in, I just wanted to note, there's 1100

12   defense exhibits.  It's going to take us a second to get to

13   the right one, so we appreciate that from the court.

14             THE COURT:  I know it does.  And that's why it's

15   somewhat helpful when the defense says this is stipulated to,

16   then I know that it's not an authenticity problem.  And I

17   usually react pretty quickly; if there's not an authenticity

18   issue, it doesn't take long to figure out if this is relevant.

19             MR. NOTHSTEIN:  And just to clarify on what the

20   nature of the stipulation is.  I know the court has a copy,

21   but -- so you're right, it is to the authenticity of a large

22   number of exhibits.  Also, we stipulated that certain exhibits

23   either meet the definition of a public record or a business

24   record, or that certain transcripts are accurate.  But we have

25   specifically reserved objections as to relevance or 403 or

1   other bases.

2         THE COURT:  For the most part, it's gone on pretty

3   smoothly and it hasn't created any problem.

4         Look, here's the other part of that:  I know it takes

5   a minute, and there are a lot of these, and you've got your

6   lists.  Nothing irreparable is likely to happen from the time

7   I say that it's admitted until you've well figured out what we

8   are dealing with and whether there is a problem with it.  And

9   at that point, if there is a problem, you stand up and object

10  and we can straighten it out.  But 99 percent of the time it's

11  coming in without any issue, and it's best just to keep moving

12  and not spend more time on technicalities and so spend the

13  focus on the substance.

14        So I think that's working just fine.  I don't think

15  we've gotten past anything you didn't want in, right?

16        MR. NOTHSTEIN:  No, I think we are fine, Your Honor.

17        THE COURT:  All right.  Good.  Let's start back at

18  10:35 by that clock.

19     (*A recess was taken at 10:24 a.m.*)

20     (*The proceedings resumed at 10:34 a.m.*)

21     (*Defendant present; jury not present.*)

22        THE COURT:  Please be seated.

23        MR. NOTHSTEIN:  Your Honor --

24        THE COURT:  I'm early.  Don't break a leg running.

25  I'm sorry.

1       MR. NOTHSTEIN:  Very briefly, before we come back.  I

2  don't know, obviously, how long the cross or redirect are

3  going to take.  Our next witness is likely to be one of the

4  undercover agents, and the court had ordered they could enter

5  separately.  I didn't know if the court wanted to excuse the

6  jury for a moment so they didn't see that, him coming in from

7  a different door.

8       THE COURT:  How much longer do you think we have

9  here?

10      MR. KEHOE:  It depends.  I mean, an hour or so.

11      THE COURT:  It may take care of it with the lunch

12  break.  If they come in separately, they come in separately.

13  That won't be a problem.

14      MR. NOTHSTEIN:  Very well.

15      Your Honor, just one other thing.  We also have a

16  concern about the sketch artist for those witnesses, too.

17      THE COURT:  In the audience, raise your hand if you

18  are a sketch artist.  No one.  Okay.

19    (*The jury entered the courtroom at 10:35 a.m.*)

20      THE COURT:  All right.  You may be seated.  I think,

21  before we broke, we were at Defense 76.  It's admitted.

22    (DEFENDANT'S EXHIBIT NO. 76:  Received in evidence.)

23      THE COURT:  Ms. Carter-Smith, you are still under

24  oath.

25      Mr. Kehoe, you may proceed.

1          MR. KEHOE:  Thank you, Your Honor.

2    BY MR. KEHOE:

3    Q.  Ms. Carter-Smith, we're going to be talking about some of

4    these notes that you had previously talked about.

5          You had previously told the government that some of these

6    notes were notes that were prepared in a telephone

7    conversation with Mr. Burnette which took place prior to the

8    meeting at KaiserKane, correct?

9    A.  I don't recall that that's what I said.  I think the

10   notes potentially were a telephone conversation.  I do not

11   remember as to when -- the timeline on when they were taken.

12   Q.  Might I show you something to refresh your recollection?

13   A.  Absolutely.

14         Umm --

15         THE COURT:  Wait until he asks a question.

16         THE WITNESS:  I'm sorry.

17   BY MR. KEHOE:

18   Q.  Without testifying on the document, Ms. Carter-Smith,

19   does that refresh your recollection as to whether some of

20   these notes were taken in a conversation with Mr. Burnette

21   prior to the meeting with KaiserKane?

22   A.  Once again, I do believe some of those notes could have

23   been taken in a conversation with Mr. Burnette.  I don't

24   recall saying that it was definitely before the meeting with

25   KaiserKane.

1  Q.  Okay.  Well, let's look at this.  The two documents that

2  are on the screen, this is Defendant's Exhibit 76, if we can

3  look at the two notes.

4      Now, if I may, this is a note paper that you generally

5  keep by your phone in office, right?

6  A.  Correct.  That is a scrap paper that I keep by my phone

7  in the office.  It's also, if I'm running late for meeting, I

8  may shove it in my portfolio.

9  Q.  The first line here on 12/9, you note that, this 12/9,

10  those issues have nothing to do with this matter; is that

11  correct?

12  A.  None whatsoever.

13  Q.  And there is a line across, and then you have:  Very

14  sensitive to paying up front, extremely low, success fee.

15      And then we turn to the next page, 5-10 to give it a try,

16  Runway 10K.

17          THE COURT:  This is not on the jury's screen.

18          MR. KEHOE:  I'm sorry.  This has been admitted into

19  evidence by the Court.  If we can put it on the screen,

20  please.  My apologies, Judge.  If we can put the other, there

21  we go, side by side.

22  BY MR. KEHOE:

23  Q.  So, again, we have the 12/9, the line below:  Very

24  sensitive to paying up front, extremely low.

25      And the next page is -- just go to the right-hand page.

1   The next page is 5-10 to give it a try, Runway 10K?

2   A.   Yes.

3   Q.   So this is information concerning the GSA proposal

4   involving KaiserKane, isn't it?

5   A.   Correct.

6   Q.   Now, the comment -- to your knowledge, Mr. Gardner is not

7   a pilot, is he, to your knowledge?

8   A.   To my knowledge, no.

9   Q.   Mr. Burnette is a pilot, isn't he?

10   A.   I knew he had a plane.  I don't know that he's a pilot.

11   Q.   We talked earlier about the fact that he was going to fly

12   Mr. Maddox out as part of the Las Vegas, trip, right?

13   A.   Yes.

14   Q.   And he was going to do the flying, wasn't he?

15   A.   I didn't know that.

16   Q.   Well.

17   A.   It was his plane.

18   Q.   Based on your knowledge, "Runway" is a runway that is

19   used in airport parlance, isn't it?

20   A.   Based on my knowledge, I -- my recollection of the term

21   runway was from -- it could have been different.  The notes

22   are several years ago and jumbled.

23   Q.   I understand that.  Based on your, just general

24   knowledge, runway is an airport term, isn't it?

25   A.   Runway is an airport term.

1  Q.  And you have the 12/9, and then below that are these

2  notes.  And I think you told us that, to your knowledge, you

3  hadn't had met Ms. Oglesby, and may have known Mr. Gardner in

4  passing in high school; but certainly you didn't have any

5  meeting with them prior to that, did you?

6  A.  Correct.

7  Q.  Now, 12/9, with the next day being 12/10, the person you

8  had a phone call with on 12/10 was, in fact, Mr. Burnette,

9  wasn't it?

10  A.  I believe that's what the records show.

11  Q.  And if we can go to 625(b).

12       MR. KEHOE:  It's in evidence.  Let me check that it

13  is.  This is the one we have to tie up with our next witness,

14  Judge.

15       THE COURT:  Defendant's Exhibit 625(b) is

16  conditionally admitted.

17    (DEFENDANT'S EXHIBIT NO. 625(b):  Received in evidence.)

18  BY MR. KEHOE:

19  Q.  And you see a telephone call, the first phone call on

20  12/10, it's from Mr. Burnette to you.

21  A.  Yes.

22  Q.  Right?  The day after the notes that we had for 12/9?

23  A.  Correct.

24       MR. KEHOE:  If we can turn our attention to 6/25(j),

25  we will offer this tentatively, tying it up, Judge,

1  Defendant's Exhibit 625(j).

2  BY MR. KEHOE:

3  Q.  And these are phone calls between Trey Gardner and you --

4         THE COURT:  This is admitted.

5       (DEFENDANT'S EXHIBIT NO. 625(j):  Received in evidence.)

6         MR. KEHOE:  If we can put 625(j) on the screen and go

7  to the top.

8  BY MR. KEHOE:

9  Q.  So these records reflect that between January 1, 2013 and

10 December 13, 2014, the phone between you and Trey Gardner was

11 on January 9th of 2014; is that right?

12 A.  Yes, sir.

13 Q.  So we have the notes that we refer to in Exhibit 76 that

14 are right, we have 12/9 and the notes right below it that

15 refer to a runway.

16        MR. KEHOE:  And if we can go back to that again.

17 Both sheets, please.

18 BY MR. KEHOE:

19 Q.  And it says the runway, 10K.  That's the part we haven't

20 talked about yet, right, the 10K?

21 A.  Correct.

22 Q.  And I think we've noted, to your knowledge, Mr. Burnette

23 is the pilot, right?

24 A.  Yes.

25 Q.  And the toll records reflect that Mr. Burnette spoke to

1  you on the 10th, and your first conversation with Mr. Gardner

2  is not until January 9th, right?

3  A.  My first phone conversation with Mr. Gardner was not

4  until January 9th.

5  Q.  So looking at this, this would indicate to you that these

6  notes are notes of a conversation with Mr. Burnette, doesn't

7  it?

8  A.  That is possible.  I do not remember.

9  Q.  Now, if I can move ahead, if we can, then we go into

10  January of 2014.  And let me show you Defense Exhibit 91.

11        MR. KEHOE:  If I may, Judge.  I believe this is

12  already in evidence, but we will put it in again.  Defendant's

13  Exhibit 91.

14  BY MR. KEHOE:

15  Q.  This is the first letter to Trey that you send to

16  Mr. Burnette, on January the 8th, right?

17  A.  That's what it appears.  I don't see the attachment.

18  Yes.

19  Q.  Let's go to the attachment.  This is the first one that

20  you send to him, so.

21  A.  Yes.

22  Q.  So before you send this on to Mr. Gardner, you send this

23  on to Mr. Burnette, right?

24  A.  Yes.

25  Q.  And you did that for because, from what you told us

1   previously last week, that you wanted to run this past J.T.

2   because J.T. had the final word at KaiserKane, right?

3   A.  Correct.

4   Q.  And you also reached out to him so that you could get

5   some clarity as to what, in fact, the contract should say?

6   A.  Correct.

7   Q.  So you then sent him what is Government's Exhibit 122.

8   That's been received in evidence.  You send him this draft,

9   and then he sends you -- now, he sends you this back, right?

10  A.  Yes.

11  Q.  With the changes?

12  A.  Correct.

13        MR. KEHOE:  Let's go to the next page.  If I may blow

14  up the second to the last paragraph.

15  BY MR. KEHOE:

16  Q.  Now, the change he makes is between the money that you

17  are going to get at the beginning -- after the award of the

18  contract and the money you you're going to get six months

19  after -- excuse me.

20    If I may, your additional proposal -- pardon me.  Your

21  initial proposal was that you were going to get $10,000 and 2

22  percent due after the award of the contract, right?  That's

23  what you put in here initially?

24  A.  Correct.

25  Q.  And that would be as soon as there was a contract between

1  GSA and KaiserKane.  Six months after that, you were entitled

2  to your 2 percent success fee, right?

3  A.  Correct.

4  Q.  Now, when you sent it to Mr. Burnette, he changed that

5  paragraph, didn't he?

6  A.  He did.

7         MR. KEHOE:  And if we go to Exhibit 90, and we will

8  offer Exhibit 90.

9         THE COURT:  Defense 90 is admitted.

10   (<u>DEFENDANT'S EXHIBIT NO. 90</u>:  Received in evidence.)

11  BY MR. KEHOE:

12  Q.  And if we can go to the second page.

13    Now, that bottom paragraph that's highlighted, he changed

14  to say:  We propose a management fee of 2 percent of the

15  project amount due 30 days after you receive payment.  We

16  propose up front $10,000 as an advance of our future

17  management fees.

18         MR. KEHOE:  So can we compare the two of these

19  demonstratively, and we will compare, Judge, these two

20  documents in evidence, these two exhibits in evidence.

21  BY MR. KEHOE:

22  Q.  So your initial proposal was for getting paid six months

23  after the project, and Mr. Burnette proposes that you're only

24  going to get paid 30 days after they receive payment, right?

25  A.  Yes.

1  Q.  So, the changes that Mr. Burnette made were to the

2  benefit of KaiserKane and not to you, weren't they?

3  A.  I would not know that.

4  Q.  Excuse me?

5  A.  I would not know that.

6  Q.  Well, in the first -- let me rephrase the question.

7      Certainly, in the agreement that you wanted, you would

8  have gotten your 2 percent success fee well before the

9  proposal set forth by Mr. Burnette; isn't that right?

10 A.  Yes.

11 Q.  Okay.  As a matter of fact, by the time the project with

12 GSA is completed and they are paid, that could be months and

13 months and months, if not years; isn't that right?

14 A.  I would assume, yes.

15 Q.  So what Mr. Burnette was proposing to you is you getting

16 any delay in payment for possibly, as I said, months and

17 months and possibly a year, right?

18 A.  Yes.

19 Q.  So, and Mr. Burnette -- you told us that Mr. Burnette had

20 the final say at KaiserKane.  And when this was going back

21 and forth with Mr. Burnette on the 8th of January, there's

22 nothing in this agreement about $100,000, is there?

23 A.  There is not.

24 Q.  And this is even though he is the one who has the final

25 say?

1   A.  That was my understanding, yes.

2   Q.  So, ultimately, you did send the proposal to Mr. Gardner,

3   and that would be Defendant's Exhibit 94.

4        MR. KEHOE:  Move it into evidence, Judge.

5        THE COURT:  Defendant's Exhibit 94 is admitted.

6        (DEFENDANT'S EXHIBIT NO. 94:  Received in evidence.)

7   BY MR. KEHOE:

8   Q.  And this is dated January 9th, which is the first date

9   that you ever spoke to Mr. Gardner, right?

10  A.  It is the first date that I spoke with Mr. Gardner on the

11  phone.

12  Q.  On the phone, excuse me.  You'd already had a meeting

13  prior to this?

14  A.  I had a meeting prior to this.

15  Q.  Right.  And you ultimately sent a draft consultation

16  agreement, which is Government Exhibit 123.

17     This is your draft consultation agreement before the

18  changes and the reasons that you sent.  And in the

19  consultation agreement, there is nothing about the $100,000,

20  is there?

21  A.  There is not.

22  Q.  You had some discussion, I believe; Defense Exhibit 95,

23  emails back and forth with Mr. Gardner.

24        MR. KEHOE:  Move Defendant's Exhibit 95 into

25  evidence, Judge.

1    THE COURT:  Defendant's Exhibit 95 is admitted.

2    (DEFENDANT'S EXHIBIT NO. 95:  Received in evidence.)

3  BY MR. KEHOE:

4  Q.  And Mr. Gardner says:  Can we discuss this?  Looks good,

5  I just need clarification.

6    And you, in fact, talked to him further about some of the

7  items; did you not?

8  A.  I did.

9  Q.  And then let's look at Defendant's Exhibit 124 -- excuse

10  me, Government's Exhibit 124.  My apologies.  This is a

11  government exhibit.

12    Now, this is an email from Scott Maddox to you that you

13  testified this concerns -- his edits on the consultation

14  agreement.  That would be Government's Exhibit 24.  That's

15  right.

16    Now, Mr. Maddox -- excuse me.  Mr. Maddox reviewed this

17  consultation agreement that you had with KaiserKane, didn't

18  he?

19  A.  In all likelihood, he did.

20  Q.  And he in this email on January the 10th, 2004, where he

21  attaches the consultation agreement -- if we can go to the

22  next page.

23    After Mr. Maddox's review of this agreement, there still

24  is nothing in there about any $100,000 payment, is there?

25  A.  Correct.

1  Q.  And if we go to Defendant's Exhibit 125 -- excuse me,

2  Government's Exhibit 125, my apologies.  That was my mistake

3  again.  Government's Exhibit 125.

4      This is the executed agreement which you had with

5  Mr. Gardner signing.  If we go to the next page and, again,

6  we can see his signature at the end.  Go to the second page.

7      So as of the date of this agreement -- if we can go to

8  the top.  January 10th, 2014, you had proposals being sent

9  between you and Mr. Burnette that didn't have the $100,000

10  payment listed in it, right?

11  A.  Correct.

12  Q.  We have proposals that you had sent based on his edits

13  that postponed the time frame when you were going to get paid

14  from 30 days, or right after contract, till the time

15  KaiserKane was going to get paid, right?

16  A.  That's what it reflects.

17  Q.  And then you had draft consultation agreements between

18  you and Mr. Gardner that didn't have the $100,000 payment in

19  it?

20  A.  Correct.

21  Q.  And you even had Scott Maddox review this document; and

22  there is no inclusion of a $100,000 payment in that document,

23  either, right?

24  A.  Correct.

25  Q.  Now, we moved to some government exhibits, and thereafter

1  there was a payment of the invoice of $10,000, which is

2  Government's Exhibit 127.

3        MR. KEHOE:  This has been received.  If we can go to

4  the second page of this.

5  BY MR. KEHOE:

6  Q.  This is, in fact, the invoice.  That's your first invoice

7  of January the 10th, right?

8  A.  Yes.

9  Q.  So you have a proposal, you go back and forth with Trey

10  Gardner, and then as soon as that consulting agreement is

11  signed you send the $10,000 invoice, right?

12  A.  Correct.

13  Q.  And then, just somewhat sequentially, we go to Government

14  Exhibit 137.  And this is -- now, this is the first time that

15  we see a document with $100,000 in it, right?

16  A.  Yes.

17  Q.  And that is 2/26/14, right?

18  A.  Correct.

19  Q.  And in between the first invoice, Government Exhibit 127

20  dated January 10, 2014, and this invoice, Government's

21  Exhibit 1/37, which is 2/26/2014, you learn during this

22  period of time that Mr. Burnette, through his companies, was

23  going to buy the DoubleTree, didn't you?

24  A.  I don't remember when I learned that he was going to buy

25  the DoubleTree.

1   Q.  Let us turn our attention to Defendant's Exhibit 673.

2           MR. KEHOE:  And we would offer it.  We will offer

3   673.

4           THE COURT:  Defendant's Exhibit 673 is admitted.

5       (DEFENDANT'S EXHIBIT NO. 673:  Received in evidence.)

6   BY MR. KEHOE:

7   Q.  Let us go to the second page.

8       By the way -- if we can just stay on the first page

9   first.  My apologies.  If we go to the top there; and I

10  recognize this is an email to Mr. McKibbon, but you are

11  listed on there is as well, cc, right?

12  A.  Correct.

13  Q.  And if we can go to, chronologically, the first email.

14      Now, this is from Terry Daniel.  And this is the same

15  gentleman that we talked about previously in the other email

16  about the Hampton, right?

17  A.  She's a woman.

18  Q.  My apologies.  Mistake number one, probably not my last.

19  I do apologize.

20  A.  That's okay.

21  Q.  I obviously don't know her.  My apologies to Ms. Daniel,

22  wherever you are.

23      In any event, this email is February 4, 2014:  Word is

24  that the DoubleTree will close on March 4th.  Hunter & Harp

25  are the buyers.

1    Now, if we continue on.  And Wes says:  If they truly

2  have a reason to stop any additional Hilton product from

3  coming downtown, Gary, we really need to find out what is

4  going on.

5    If we go to the first page, we go back to the chronology.

6  And this is, in fact, sent to you.

7    Now, this is the first time that you are learning that

8  the DoubleTree is going to be purchased by Mr. Burnette's

9  company, Hunter & Harp; isn't that right?

10 A.  I don't recall when I learned this.  This is the first

11 email that reflects that.  I don't recall when I learned that

12 he was going to be.

13 Q.  Well, you told us on direct examination that you learned

14 about the DoubleTree about the time of invoicing, didn't you?

15 A.  No.  I said on direct examination that I learned -- I'd

16 drilled down in the conversation that Mr. Maddox had with

17 Mr. Burnette on my not participating in to vote.

18 Q.  Around invoicing; is that right?

19 A.  Around the -- yes, around.

20 Q.  Clearly, by the time this email goes out on the 4th, you

21 now know, based on this email chain, that Mr. Burnette

22 through his company, Hunter & Harp, are buying the

23 DoubleTree, right?

24 A.  Correct.

25 Q.  So while this is going on, obviously you are staying in

1   communication with Mr. Burnette -- excuse me -- with

2   Mr. Maddox through the period of time coming around

3   February 11th, when Mr. Maddox again doesn't vote, right?

4   A.  And I don't -- yes.  As far as communication, I don't

5   remember when the votes were.

6   Q.  At the same time, you are continuing to speak with Reggie

7   Cardozo about working on this GSA project, right?

8   A.  Correct.

9   Q.  You know, you have Defendant's Exhibit 131.

10          MR. KEHOE:  I move 131 into evidence.

11          THE COURT:  Defendant's Exhibit 131 is admitted.

12      (DEFENDANT'S EXHIBIT NO. 131:  Received in evidence.)

13  BY MR. KEHOE:

14  Q.  And this is your conversation with Mr. Cardozo about what

15  you spoke to him on the phone -- excuse me.  That you tell to

16  Mr. Gardner that you spoke to Mr. Cardozo on the phone, and

17  money is going to be spent in March, et cetera?

18  A.  Yes.

19  Q.  Okay.  And there comes a time when you are looking for

20  some background information on KaiserKane.

21          MR. KEHOE:  And, if we move to Government's Exhibit

22  132.  We offer 132 into evidence.

23          THE COURT:  Government's Exhibit 132 is admitted.

24  BY MR. KEHOE:

25  Q.  And this is the information that you asked for that Ms.

1  Oglesby sent you, correct?

2  A.  Correct.

3  Q.  And then you sent information on to Mr. Cardozo.

4          MR. KEHOE:  Let's go to Defense Exhibit 142.  And we

5  move Defendant's Exhibit 142 into evidence.

6          THE COURT:  Defendant's 142 is admitted.

7      (DEFENDANT'S EXHIBIT NO. 142:  Received in evidence.)

8  BY MR. KEHOE:

9  Q.  And then you send this on to Mr. Cardozo.

10         MR. KEHOE:  If we can go to the next page.

11         THE WITNESS:  Yes.

12 BY MR. KEHOE:

13 Q.  Which is a list of the projects that KaiserKane did,

14 et cetera, to give some background on it; is that right?

15 A.  Correct.

16 Q.  And then you set up a meeting.

17         MR. KEHOE:  Let's go to Defendant's Exhibit 156, in

18 evidence.

19         THE COURT:  Defendant's Exhibit 156 is admitted.

20     (DEFENDANT'S EXHIBIT NO. 156:  Received in evidence.)

21 BY MR. KEHOE:

22 Q.  After you sent this information back and forth, you send

23 to Reggie Cardozo an item that Trey Gardner with KaiserKane

24 would like to meet with GSA people, right?

25 A.  Correct.

1  Q.  And you are doing your job as a consultant, as a person

2  operating on their behalf to try to get them information,

3  aren't you?

4  A.  Correct.

5  Q.  And, again, you attach to this -- if I may -- another

6  piece of information about KaiserKane.

7      Now, at this point, you supposedly had a contract for 90

8  days; is that right?

9  A.  Yes.

10 Q.  And that 90-day period of time -- if we can go to the

11 first page of Defendant's Exhibit 156.

12     If the first contract with KaiserKane started on

13 January 10th, you would agree with me that this is the last

14 day of the contract, right?

15 A.  Yes.

16 Q.  And so you're still proposing meetings, and still working

17 after the 90-day period of time, because you are telling him

18 he's going to be available April 21st, 25th, 28th, and 29th,

19 and sometime in May, right?

20 A.  Yes.

21 Q.  And you were going to continue to use your best efforts

22 to facilitate these meetings, aren't you?

23 A.  Yes.

24 Q.  And that would have been after the 90-day period of time,

25 wasn't it?

1  A.   It was.  And I have some recollection that there was a

2  discussion of timing on both sides that later would be

3  better; but, yes.

4  Q.   And these were big contracts that we're talking about,

5  potentially big contracts with GSA, weren't they?

6  A.   Potentially.  This was an introductory meeting.

7  Q.   Well, hopefully for you, you hope it was big contracts?

8  A.   Hopefully.

9  Q.   And then sometime after this is when you -- and we can go

10 to Government's Exhibit 159.  You were paid this $100,000

11 right after the 90-day period of time had expired, right?

12 A.   I'm trusting your calculations, yes.

13 Q.   If the 90-day period -- let's just go through it.

14     If the 90-day period of time ended on April the 10th, the

15 day of your contract with Reggie Cardozo, and there is a

16 weekend in between, this is right after that, right?

17 A.   Yes.

18 Q.   And this is the $100,000 that you say was part of the

19 agreement back in May and June of 2013, right?

20 A.   This was the $100,000 that was my understanding would be

21 coming to me back in whenever that conversation was, yes.

22 Q.   But, in fact, you were paid $10,000, and then you had

23 this check for $100,000, right?

24 A.   Correct.

25 Q.   So, with a gap in between, right?

1  A.  Yes.

2  Q.  So, in fact, as opposed to an agreement for $100,000, you

3  actually got paid $110,000, didn't you?

4  A.  I received $110,000 from KaiserKane.

5  Q.  I'm sorry, I didn't mean to cut you off.

6  A.  No, that's fine.

7  Q.  You didn't give the $10,000 back, did you?

8  A.  I did not.

9  Q.  So, obviously, it goes without saying that's $10,000 more

10  than any agreement that you supposedly -- that Burnette

11  supposedly cut with Maddox back between May 30th of 2010 and

12  June, right?

13  A.  Correct.

14  Q.  By the way, by the way, you know, the value of what you

15  do I mean, as a lobbyist, it's a fact that, I mean, I

16  difficult to gauge the value of your services, isn't it?

17  A.  It is.

18  Q.  And you can make one phone call or you can make a hundred

19  thousand phone calls, and you could get to the same spot;

20  isn't that right?

21  A.  Very true.  I would say that $100,000 is unusual up

22  front; but, yes.

23  Q.  Well, let's stay with that.  But you prefer your payments

24  up front, don't you?

25  A.  I prefer -- it depends on the contract, yes.

1   Q.  I think you told the government that you prefer your

2   money up front?

3   A.  On some contracts, yes.

4   Q.  But going back to the value of your particular work, you

5   can do one call or you do a hundred thousand calls, and you

6   can have the same success, right?

7   A.  Correct.  You cultivate relationships so you can do fewer

8   calls.

9   Q.  And you are not going to get any lobbyist that is worth

10  his or her salt without paying some money, correct?

11  A.  Correct.

12  Q.  Let me just change --

13          MR. KEHOE:  If I may, one moment, my client would

14  like to ask me a question.

15  BY MR. KEHOE:

16  Q.  Now, just going back a little bit to your situation in

17  Governance, economically, in 2014.  Obviously, Governance was

18  in a very stressful situation economically, then, weren't

19  they?

20  A.  I don't recall.  I imagine that economics were tight, but

21  I don't -- without books in front of me, I don't recall.

22  Q.  Let me show you what has been received in evidence as

23  Defendant's Exhibit 973.

24          MR. KEHOE:  This has already been received.

25  BY MR. KEHOE:

1  Q.  And this is an email between -- excuse me.  It's some

2  text messages between Mr. Maddox and Mr. Yordon.  And

3  Mr. Maddox says:  Awesome, I borrowed 100K from my mom and

4  two-thirds is gone.  Need to do something.  All the ones

5  Paige and I pitched are possibles but won't be in time.  If

6  we are shutting down, I need to know that.

7      If I can just put the following on there, at 954.

8          MR. KEHOE:  And we would offer Government's

9  Exhibit 954.  Don't put it up before it's published, please.

10         THE COURT:  It's Government 954?

11         MR. KEHOE:  Excuse me.  Defense 954.

12         THE COURT:  Defendant's Exhibit 954 is admitted.

13     (DEFENDANT'S EXHIBIT NO. 954:  Received in evidence.)

14 BY MR. KEHOE:

15 Q.  So, if we look at 954, the comment coming back from

16 Mr. Maddox is:  Don't want to shut down, but we will

17 definitely be skipping paychecks unless we get more coming

18 in.

19     Now this is April of 2014, two months prior to this

20 matter involving the invoice for $100,000, and literally the

21 same month when the invoice is paid, right?

22 A.  Yes.

23 Q.  And this, again, would indicate to you that KaiserKane

24 was having a difficult time financially during this period of

25 time, right?

1   A.  Governance.

2   Q.  I'm sorry, Governance, my apologies.  Governance was

3   having a difficult time financially during this period of

4   time?

5   A.  Yes.

6   Q.  And you were conversing back and forth with Mr. Yordon

7   about cutting his salary, et cetera, weren't you?

8   A.  I was having conversations back and forth with Mr. Yordon

9   about bringing in money, yes.

10  Q.  But did you also have conversations with him where you

11  talked about cutting his salary?

12  A.  I think we all had conversations back and forth about the

13  fact that money was tight, yes.

14  Q.  Let me show you an exhibit, Defendant's Exhibit 953.

15          MR. KEHOE:  Just on the screen, not published.

16  BY MR. KEHOE:

17  Q.  If you could take a look at 953.

18          MR. KEHOE:  If you can blow that up a little bit for

19  Ms. Carter-Smith, if you could?

20  BY MR. KEHOE:

21  Q.  Let me know, Ms. Carter-Smith, if you want it blown up a

22  little bit more to read.

23  A.  A little bit, yes.

24          MR. KEHOE:  If you could blow it up a little bit

25  more.

1        THE WITNESS:  Thank you.

2        MR. KEHOE:  Just let us know when you want us to

3   scroll it down.

4        THE WITNESS:  Okay.  Please scroll.

5        Okay.

6   BY MR. KEHOE:

7   Q.  So, is this an email going back and forth between you and

8   Mr. Yordon in June of 2014 concerning the financial situation

9   at Governance?

10  A.  Yes.

11  Q.  And you were talking about the business of Governance and

12  getting paid; is that right?

13  A.  Correct.

14        MR. KEHOE:  We would offer into evidence Defendant's

15  Exhibit 953.

16        THE COURT:  Defendant's 953 is admitted.

17     (DEFENDANT'S EXHIBIT NO. 953:  Received in evidence.)

18  BY MR. KEHOE:

19  Q.   In this exhibit -- and there is a conversation between

20  you and Mr. Yordon about paychecks, getting cut back on pay,

21  that there is not enough money coming in, and that paychecks

22  have to be cut all the way around, right?

23  A.  Correct.

24  Q.  And that notes that Scott just mentioned these loan

25  situations a month ago, right?

1   A.  Correct.

2   Q.  And that's a loan from his mother, right?

3   A.  Correct.

4   Q.  So throughout all of this, we are talking about a

5   sequence where it demonstrates to you, as you sit here, that

6   Governance had some serious cash flow problems, right?

7   A.  Definitely at that point, yes.

8   Q.  I'm sorry?

9   A.  Yes.  At that point, yes.

10  Q.  At that point.  That's June.

11  A.  Correct.

12  Q.  So we are talking about the payment of $100,000 by

13  KaiserKane in April, the text message by Mr. Maddox in April;

14  and this is June, right?

15  A.  Correct.

16  Q.  And Governance had other debts that were outstanding,

17  too, right --

18  A.  Correct.

19  Q.  -- during this period of time?

20  A.  Yes.

21  Q.  And I think there was a condo loan; is that right?

22  A.  Yes.

23  Q.  And how much was that for?

24  A.  I don't remember.

25  Q.  And I think we just talked about $100,000 that Maddox

1  borrowed from his mother.  And when did he borrow that; do

2  you remember?

3  A.  I don't remember.

4  Q.  Were there other loans from Mr. Maddox and his family

5  members?

6  A.  I believe so, yes.

7  Q.  And who did he have loans with?

8  A.  I think we had one from his dad, or I had one from his

9  dad.

10  Q.  And how much was that?

11  A.  I don't remember.

12  Q.  Plus, obviously during this same period of time, you owed

13  money to Maddox for the purchase of Governance, Incorporated,

14  right?

15  A.  I believe that had been settled.  I owed money for the

16  condos.

17  Q.  Money for the condos?

18  A.  Yes.

19  Q.  But throughout all this, Mr. Maddox was still owed money?

20  A.  Correct.

21  Q.  So with all of these loans and obviously business not

22  coming in, when we move into 2014, would you agree with me

23  that Governance is in significant -- having significant

24  difficulties financially?

25  A.  Cash flow, yes.

1    MR. KEHOE:  If I may have a moment just to chat with

2   my client.

3         THE COURT:  You may.

4         MR. KEHOE:  Ms. Carter-Smith, thank you very much.

5         Your Honor, I have no further questions.

6         THE COURT:  Redirect?

7                    REDIRECT EXAMINATION

8   BY MS. O'GARA:

9   Q.  Good morning.

10  A.  Good morning.

11  Q.  Ms. Carter-Smith, I'm going to go back through some

12  things you were asked, starting with your testimony last

13  week.  So, go back a little bit to what Mr. Kehoe was talking

14  with you about last week and then, again, this morning.

15  A.  Okay.

16  Q.  You were asked questions about how much you knew about

17  the Southern Pines company and Mr. Miller, and what they

18  wanted Governance to do for them.  Do you recall that?

19  A.  Yes.

20  Q.  And you testified that you met them first at a football

21  game, correct?

22  A.  Yes, ma'am.

23  Q.  And, specifically, Mr. Sweets?

24  A.  Yes.

25  Q.  And you also testified that you had another encounter

*Paige Carter-Smith - Redirect*

1  with them at Old School?

2  A.  Yes, ma'am.

3  Q.  Can you just tell us again, what is Old School.

4  A.  It was kind of a pregame tailgate party.  It was a house

5  with a pool and catered food and all of that.

6  Q.  Okay.  And when you met these individuals associated with

7  Southern Pines at Old School, do you recall that you met a

8  number of them?

9  A.  I believe so.

10       MS. O'GARA:  Your Honor, I would like to show

11  Government Exhibit 357 and the corresponding transcript which

12  is 358, and move it in.

13       THE COURT:  Government Exhibits 357 and 358 are

14  admitted.

15    (GOVERNMENT EXHIBIT NOS. 357 AND 358:  Received in

16  evidence.)

17       MR. KEHOE:  Excuse me, Your Honor.  I would just like

18  to know what they are.

19       Yes, Your Honor.  No objection.

20       THE COURT:  Mr. Kehoe?

21       MR. KEHOE:  No objection, Judge.  My apologies.

22       THE COURT:  Put your mask back on.

23       MR. KEHOE:  Sorry.

24  BY MS. O'GARA:

25  Q.  Ms. Carter-Smith, do you remember this meeting at Old

1   School occurring at November of 2016?

2   A.  That's my recollection, yes.

3   Q.  And just to orient us, the first check that you received

4   from Southern Pines and Mr. Kehoe showed you this morning, do

5   you recall the date of that check?

6   A.  It was November, but I believe it was after this.

7   Q.  Okay.

8         MS. O'GARA:  Go ahead and play it.

9         (Audio difficulty.)

10        THE COURT:  Members of the jury, as you may have

11  heard, as a sign of the times, we have had some static and

12  difficulty with one of computers as the other goes back and

13  forth.  The court has tremendous systems people, but they

14  haven't been able to quite locate that.  We may be having a

15  different problem here.  Just bear with us a minute while they

16  try to work this out.

17        Mr. Johansen is on his way.

18        (Government Exhibit published to the jury. )

19  BY MS. O'GARA:

20  Q.  Ms. Carter-Smith, first of all, who are you speaking with

21  here?

22  A.  Mike Sweets.

23  Q.  And is Mike Sweet one of the individuals that you knew

24  was associated with Southern Pines?

25  A.  Yes.

```
 1   Q.  What are you describing to him?

 2   A.  The downtown get-down.  It's an event the Downtown

 3   Improvement Authority puts on before a game.

 4   Q.  The Downtown Improvement Authority, what was your

 5   association with that?

 6   A.  I was the executive director of the Downtown Improvement

 7   Authority.

 8   Q.  Was that your primary job during this time period?

 9   A.  Yes, it was.

10   Q.  And what was happening?  Was Governance sitting idle?

11   What was Governance doing at that time?

12   A.  Governance had some other clients, for the most part

13   outside of the city of Tallahassee.  I mean, like, outside of

14   the area; but, yes.

15   Q.  But your job primarily was with the Downtown Improvement

16   Authority?

17           MR. KEHOE:  Objection, leading.

18           THE COURT:  Overruled.

19           THE WITNESS:  Yes, ma'am.  My job was primarily with

20   the Downtown Improvement Authority.

21   BY MS. O'GARA:

22   Q.  Ms. Carter-Smith, do you see where it says "UC Butler" on

23   that transcript?

24   A.  Yes.

25   Q.  Do you know who that is?
```

1    A.   Yeah, it was the other -- the third person in the group

2    that I met.

3    Q.   When you say "in the group," is this the Southern Pines

4    group?

5    A.   Yes.

6    Q.   Was he associated with Mr. Sweet and Mr. Miller?

7    A.   Yes.

8              MS. O'GARA:   Okay.   Go ahead.

9              (Audio continues.)

10   BY MS. O'GARA:

11   Q.   That reference Mr. Sweets makes right there to, I saw you

12   in the hallway, do you recall that?

13   A.   I do.

14   Q.   And what was he referring to?

15   A.   I believe I met him for the first time -- I don't

16   remember exactly where.   But there was a hallway outside of

17   the Old School box, which is the skybox, versus the Old

18   School event place, and it was quiet enough to actually sort

19   of have a conversation in the hallway.

20   Q.   So is that the first meeting that you referred to where

21   you met Mr. Sweets?

22   A.   To my recollection.

23   Q.   And that was at the football game?

24   A.   Yes, ma'am.

25         (Audio continued.)

1    Q.  So right here, where Mr. Sweets asks you if you are a

2    lawyer and then he asked, do you run his business, what

3    business is he talking about?

4    A.  I believe he's talking about Governance.

5    Q.  So his business, who is "him"?

6    A.  He is referring to Mr. Maddox.

7    Q.  Okay.

8    A.  And then I clarified, yes, my business.

9       (Audio continued.)

10   Q.  All right.  Ms. Carter-Smith, this exchange right here,

11   first of all, do you recall Mr. Maddox being there for that

12   conversation?

13   A.  I do.  Once again, we were all in and out; but, yes, or

14   back and forth.

15      (Audio continued.)

16   Q.  And Mr. Sweets asked where does he send a check.  Do you

17   know who he is talking to?

18   A.  I would assume he's talking to me, but I don't know.

19   Q.  Who answered that question?

20   A.  Scott.

21   Q.  And what does Mr. Maddox tell Mr. Sweets when he says

22   where does he send the checks?

23   A.  Governance Services, LLC.

24   Q.  And what is your response to that?

25   A.  I don't have a card.

1   Q.  What is the first thing you say?

2   A.  Yeah.

3   Q.  You agree?

4   A.  Yes.

5   Q.  At that moment, when you confirmed with Mr. Maddox's

6   statements to Mr. Sweets that he should send the check to

7   Governance Services --

8          MR. KEHOE:  I'm going to object to leading, Judge.

9          THE COURT:  Overruled.  Let me hear the rest of the

10  question.

11         MR. KEHOE:  I'm sorry?

12         THE COURT:  I haven't heard the question yet.  The

13  question is overruled so far.

14  BY MS. O'GARA:

15  Q.  At this moment, had you done any work for Southern Pines?

16  A.  I had not.

17  Q.  Other than the conversation we just listened to and your

18  reference to the meeting in the hallway at the football game,

19  had you had any conversations about specific work they wanted

20  you to do for them?

21  A.  I had not.

22  Q.  In this conversation, who are you speaking to?

23  A.  In this conversation?  It appears that I'm speaking to

24  Mike Sweets.

25  Q.  Okay.  You are not speaking to Mr. Miller, correct, in

1 | this conversation specifically?

2 | A.  My recollection is we were all standing there together,

3 | but I don't remember.

4 | Q.  Okay.

5 |       MS. O'GARA:  Go ahead and play it again.

6 |       (Audio continued.)

7 | BY MS. O'GARA:

8 | Q.  So, what are you doing right there with Mr. Sweets?

9 | A.  Well, a couple of things.  One, I'm trying to establish a

10 | rapport, because I think he wants to hire me; and, two, I'm

11 | putting his phone number into my phone and then I called it

12 | so that he would have my phone.

13 | Q.  Just to be clear, when you say you think he wants to hire

14 | you, you just confirm that he should send the check to

15 | Governance, correct?

16 | A.  Yes.

17 | Q.  So you get the phone number here?

18 | A.  Correct.

19 | Q.  And so you call him.  Why did you do that?

20 | A.  So that I can call.  Oh, I called him, yes.  At that

21 | moment?  Yes, I call him so that he has my phone number in

22 | his phone.

23 | Q.  Okay.

24 |       MS. O'GARA:  Continue.

25 |       (Audio continued.)

1  BY MS. O'GARA:

2  Q.  What is Ms. Mattox referring to when he says Whitesnake;

3  I haven't seen Whitesnake for a while.  What is that?

4  A.  Evidently -- by reading this, I'm assuming that Mr.

5  Maddox had Mike Sweet's name in his phone under Whitesnake.

6  Mike Sweets has long, white hair and he looks like a rocker.

7  That's what that's referring to.

8  Q.  And that -- and the reference to Tom Petty?

9  A.  Yes.  So, evidently, they must have had a discussion that

10  he preferred Tom Petty to Whitesnake.  I don't know.

11  Q.  So this is in reference to what Mr. Sweets looks like?

12  A.  Yes.

13     (Audio continued.)

14  Q.  So Mr. Sweets says, Before you fly to Vegas.  What is

15  that about?  Do you know what they are talking about there?

16  A.  At that point -- excuse me -- I think there had been a

17  discussion about Scott going to Vegas.  But, beyond that.

18  Q.  Going to Vegas with Mr. Sweets?

19  A.  With Mr. Sweets and with Mr. Burnette.

20  Q.  Okay.

21     (Audio continued.)

22     What does Mr. Sweets tell Mr. Maddox right there?

23  A.  I'm going to send the plane for y'all.

24  Q.  Did you understand what that meant?

25  A.  I was assuming.  Yeah, I mean, I wasn't paying attention;

1    but, yeah, to go Vegas.

2    Q.  A plane to go to Vegas?

3    A.  Uh-huh.

4    Q.  And Mr. Maddox's responds?

5    A.  Sweet.

6         (Audio continued.)

7    Q.  Do you remember this portion of the conversation?

8    A.  Just vaguely, yes.

9    Q.  When you tell Mr. Sweets that you are putting it in his

10   calendar --

11   A.  Yes.

12   Q.  -- what are you referring to?

13   A.  Putting the dates down so Scott won't forget what the

14   dates are.

15   Q.  The dates for what?

16   A.  When they would go to the Vegas.

17   Q.  And you also say:  We'll talk about that.  We're going to

18   talk to him about his night.  Do you recall that?

19   A.  Yes.

20   Q.  Do you know if you talked to him about it?  Do you

21   remember if you talked to him about it?

22   A.  (Shakes head.)  I'm sure we didn't talk about it that

23   night because it was a football game.

24   Q.  Okay.  At the end, you say:  Sweets, now that I have this

25   number, I know how to make things happen; and you confirm:

1  Yes, yes, yes.

2  A.  Yes.

3  Q.  What are you confirming there?

4  A.  That Scott was just horrible for not remembering dates;

5  so this was trying to communicate when Scott's dates would be

6  available.

7  Q.  When he says I have this number, is he referring to your

8  number?

9  A.  Correct.

10  Q.  And he says:  That's how had it happened?

11  A.  I think he was implying that I was the person that ran

12  Scott's life, but -- calendar-wise.  And when you are in the

13  party, you're kind of, like, whatever.  So that was the

14  implication.

15  Q.  But you confirmed that, correct?

16  A.  Well, in the middle of a party, yes.  I didn't take the

17  time to say:  Actually, he has a date at City Hall and all of

18  the scheduling; but, yes.

19  Q.  And, in fact, you actually put the dates into his

20  calendar while you were there, correct?

21  A.  I think I put the dates in my calendar, and then told him

22  the dates later.

23  Q.  But you calendered this trip to Las Vegas?

24  A.  I participated in making the calendar -- yes.  I mean, I

25  just reminded him.

1    Q.  Okay.

2    A.  He wasn't going to remember.  He's not good at that.

3    Q.  So this football game on November 11th, do you recall the

4    date that you received the first check from Southern Pines?

5    A.  I don't, but I believe it was initially right after that.

6    Q.  We can look at it again, but it was November 16th.

7    A.  Okay.

8    Q.  Does that sound right to you?

9    A.  Yes, ma'am.

10   Q.  So five days after this football game?

11   A.  Yes, ma'am.

12   Q.  Ms. Carter-Smith, you were asked by Mr. Kehoe on

13   cross-examination a number of questions about whether or not

14   certain things were fraudulent or criminal.  Do you recall

15   those questions from Mr. Kehoe?

16   A.  Yes.

17   Q.  Now, I want to talk a little bit about your plea

18   agreement in this case.  You told us earlier that you pled

19   guilty to three counts, correct?

20   A.  Correct.

21   Q.  And those included -- do you remember what they are,

22   right now?

23   A.  Wire fraud, honest services fraud, and conspiracy to

24   defraud the government.

25   Q.  When you say honest services fraud, is it honest mail

1   fraud?

2   A.  Yes, I believe so.

3   Q.  We can look at it, if you want.

4        MS. O'GARA:  Let's pull it up.  Go to the second

5   page, that first paragraph at the top.  Can we publish this to

6   the jury?  It's been admitted.

7   BY MS. O'GARA:

8   Q.  And that paragraph, does that accurately list the counts

9   you pled guilty to?

10  A.  Yes, it does.

11  Q.  And does that include one count of honest services wire

12  fraud?

13  A.  Yes, it does.

14  Q.  And a count of the honest services mail fraud?

15  A.  Yes, it does.

16  Q.  Did you enter into this plea agreement with the

17  government?

18  A.  I did.

19  Q.  And did you review this plea agreement?

20  A.  I did.

21  Q.  Did you review it with your lawyer?

22  A.  I did.

23  Q.  And after reviewing it, did you sign it?

24  A.  I did.

25  Q.  Okay.  Did you understand this honest services mail

1  fraudulent count to involve a scheme of using the U.S. mail

2  to send checks to Governance Services?

3  A.  I understood that that is what it referenced.

4  Q.  And did you understand that those were the Southern Pines

5  checks?

6  A.  I did.

7  Q.  And if we can zoom back out.

8      Did you understand that those checks that were sent to

9  Governance Services were sent to influence Mr. Maddox?

10  A.  No.

11        MS. O'GARA:  Can we zoom -- let's go to the next

12  page, paragraph(d).

13  BY MS. O'GARA:

14  Q.  Do you recognize this paragraph as the plea agreement

15  that you reviewed with your attorney and signed?

16  A.  Yes.

17  Q.  And does that include reference to the honest services

18  mail fraud count?

19  A.  Yes, it does.

20  Q.  And at the end, can you read that last sentence out loud?

21  A.  Defendant acknowledges that were this case to go to

22  trial, the government would present evidence to support the

23  charges beyond a reasonable doubt.

24  Q.  When you signed this agreement, did you agree that the

25  government could prove that you were guilty of honest

1  services mail fraud?

2  A.  Yes.

3  Q.  And did you understand that that count to be the Southern

4  Pines checks that were made to Governance?

5  A.  I did.

6  Q.  And did you also agree to a statement of facts that

7  supported your guilty plea in this case?

8  A.  I did.

9          MS. O'GARA:  And if you can zoom back out.  Can you

10  zoom on the paragraph (c).

11  BY MS. O'GARA:

12  Q.  Is that the paragraph where you acknowledged that those

13  facts to support your guilt to those counts, including mail

14  fraud, are accurate?

15  A.  Yes.

16  Q.  Do you understand that those facts included that you

17  caused the checks to be mailed -- or, to be cashed?

18  A.  Yes.

19  Q.  Okay.  Do you understand that those facts also included

20  that Mr. Maddox told the undercover agents that you knew how

21  and why those checks were coming to Governance?

22          MR. KEHOE:  I'm going to object.

23          THE COURT:  Overruled.

24          THE WITNESS:  I do not know --

25  BY MS. O'GARA:

1  Q.  I'm asking what you agreed to in the statement of facts.

2  Do you understand that you agreed that Mr. Maddox -- with the

3  statement of facts, that Mr. Maddox told the undercovers that

4  you knew how and why those checks were coming to Governance?

5  A.  I don't remember.  I mean, if you've got it in front of

6  me -- I don't remember that that's what I was agreeing to.

7  Q.  Do you remember pleading guilty in this case?

8  A.  I do.

9  Q.  And do you remember doing that under oath in court here?

10  A.  I do.

11  Q.  And do you remember what you said during your plea

12  colloquy?

13  A.  For the most part, yes.

14  Q.  Do you remember being asked a number of questions?

15  A.  Yes, yes.  It was all kind of a blur, actually; but, yes.

16  Q.  And do you remember being asked by the judge these same

17  questions that I have just asked you, about whether or not

18  you are pleading guilty because you are guilty in this case?

19  A.  Yes.

20  Q.  And do you remember specifically being asked about

21  whether or not what was in the statement of facts that you

22  agreed to was true and accurate?

23  A.  Yes.

24  Q.  And did you agree that those things were true and

25  accurate?

1   A.  Yes.

2   Q.  Do you remember the Judge specifically going through a

3   number of facts related to this count, this honest services

4   mail count?

5   A.  Yes.

6   Q.  And Ms. Maddox -- I'm sorry.  Excuse me,

7   Ms. Carter-Smith.

8       Do you recall the Judge asking you about Count 23 and the

9   FBI company that was set up?

10  A.  I don't recall the specifics of the question.

11  Q.  Would it refresh your recollection for you to see that

12  plea colloquy?

13  A.  Yes, it would.

14          MS. O'GARA:  Your Honor, may I approach?

15          THE COURT:  You may.

16          MR. KEHOE:  Excuse me, can I just see it?  Page,

17  please?

18          MS. O'GARA:  22.

19          THE WITNESS:  Count 23?

20  BY MS. O'GARA:

21  Q.  (Handing.)  If you can just take a moment to review that

22  page.

23      (Pause.)

24  A.  Okay.

25  Q.  Do you recall the Judge asking you whether you knew about

1   this operation?

2   A.  I do.

3   Q.  And do you recall your response to that?

4   A.  The Court said:  And, Ms. Carter-Smith, you knew about

5   this operation?

6       And my response:  Not initially; but then, yes, sir.

7   Q.  And do you remember the Court asking you whether that you

8   came to know about this company and about the $10,000

9   payments a month to Governance in exchange for Mr. Maddox's

10  favorable action; do you recall that?

11  A.  I do.  And I said:  Yes, sir, my only pause was the

12  initial discussion.  As I recall, it was my understanding

13  that everything was in the county; but I came to understand

14  in further conversations that there was some city interest as

15  well.  So, yes, sir.

16  Q.  So you confirmed that you did understand that those

17  payments were made to influence Mr. Maddox, correct?

18  A.  I believed that those payments were made in hopes that

19  Mr. Maddox would influence what happened, yes.

20  Q.  Ms. Carter-Smith, in your plea, in your guilty plea, in

21  fact you pled to three counts, correct?

22  A.  Yes.

23  Q.  And one of them, I think you told us, was an honest

24  services wire fraud count, correct?

25  A.  Yes.

1   Q.  And do you recall what that count was about?

2   A.  I do not.

3   Q.  Do you recall it being about related to a ride share

4   company?

5   A.  Yes.

6   Q.  Okay.  And did you understand that there was an ordinance

7   in front of the city related to this ride share company?

8   A.  Yes.

9   Q.  And do you recall that you pled guilty to a scheme

10  involving your representation of that company in front of the

11  city?

12  A.  I recall that I pled guilty relating to the happenings,

13  yes.

14  Q.  Do you recall acknowledging the statement of facts that

15  supported your guilt to that count?

16  A.  I do.

17  Q.  And do you recall that you agreed with the statement of

18  facts that Mr. Maddox accepted payments to Governance as work

19  for that ride share company?

20  A.  I'm sorry, could you repeat the question?

21  Q.  Do you recall that you agreed to the statement of facts?

22  A.  Yes.

23  Q.  Okay.  And do you recall that that statement of facts

24  included that Mr. Maddox accepted payments through Governance

25  as work for that company?

1   A.  Can we look at what I said?

2   Q.  Sure.

3       First of all, what do you generally recall about that,

4   about your representation of that company?

5   A.  That I was hired to provide strategic advice to Uber in

6   the city of Tallahassee as they were trying to get

7   permissions to provide the services, Uber services, in the

8   city of Tallahassee.

9   Q.  Do you recall pleading guilty to a fraud count, a wire

10  fraud count related to that representation?

11  A.  Yes.

12  Q.  And do you recall that you stated an agreement to the

13  statement of facts that supported that charge?

14  A.  Yes.

15  Q.  As part of that agreement with that company, was

16  Governance accepting a monthly retainer payment from that

17  company?

18  A.  Yes.

19  Q.  Similar to the way that Governance was accepting a

20  monthly retainer payment from the Southern Pines?

21  A.  Most of my clients were monthly retainers.

22  Q.  And do you recall that you agreed that you understood the

23  payments that were coming to Governance from that ride share

24  company were meant to influence Mr. Maddox's vote on the ride

25  share ordinance?

1  A.  I believed that there was some discussion at the plea

2  about that, because -- my recollection is that Mr. Maddox

3  said that he was more involved than he would have been if I

4  had not been participating.  So, yes.  But his vote would

5  have not been different.  That's why I asked to see it,

6  because I remember agreeing to that, yes.

7  Q.  I'll show you your statement of facts in support of that.

8  A.  Okay.

9        MR. KEHOE:  I object to the form.

10       THE COURT:  Overruled.  This again, would be better

11  if you have it electronically.  If you don't, we'll go off of

12  the paper.

13       MR. KEHOE:  If I can have a moment, Judge.

14       THE COURT:  Okay.

15       MR. KEHOE:  Just to go to sidebar for a moment.

16       THE COURT:  All right.

17       You may need to push the button to turn on your

18  headsets.

19       (*Bench conference.*)

20       THE COURT:  All right.

21       MR. KEHOE:  Just a clarifying instruction to the jury

22  that Uber has nothing to do with this.

23       THE COURT:  I'm not going to give the jury an

24  instruction, no.  I didn't stop you during your cross to tell

25  them that some of your questions didn't have anything to do

1    with the charges; I'm not going to stop in the middle of this.

2    Overruled.

3         *(End of bench conference.)*

4         THE COURT:  You probably should turn the headsets

5    back off; and, in any event, keep the microphone away from any

6    of the other microphones in the courtroom.

7         THE WITNESS:  Okay.  Could you repeat your question?

8    BY MS. O'GARA:

9    Q.   Sure.  First of all, does that refresh your recollection

10   of the facts that supported your guilty plea to that?

11   A.   Yes.

12   Q.   I'm going to come collect that.

13   A.   Okay.

14        MR. KEHOE:  What page are you referring to?

15   BY MS. O'GARA:

16   Q.   Ms. Carter-Smith, do you remember pleading guilty to that

17   count?

18   A.   I do.

19   Q.   And do you remember agreeing in court during your plea

20   that that statement of facts was accurate that supported your

21   plea to that count?

22   A.   I do.

23   Q.   Do you remember the court asking you whether or not you

24   took money for the purpose of paying some of it to Mr. Maddox

25   in exchange for official action on that ride share ordinance?

1    A.   I guess I would -- you've got the record in front of you,

2    so I must have.

3    Q.   Would your like to refresh your recollection on your

4    colloquy with the court on that specific count?

5    A.   Yes.

6    Q.   (Handing.)

7    A.   Okay.

8    Q.   Ms. Carter-Smith, I'll ask you again, do you recall

9    telling the court that you took money for the purpose of

10   paying some of it to Mr. Maddox in exchange for official

11   action on the ride share ordinance?

12   A.   In exchange for official action.

13   Q.   And do you recall that that count involved a scheme

14   wherein that company also paid you a monthly retainer?

15   A.   They did.

16   Q.   When was that representation, approximately?

17   A.   I'm very fuzzy with the dates, as I've mentioned before.

18   Q.   Was it prior to 2017?

19   A.   Yes.

20   Q.   Okay.  Was it prior to your meeting of the gentlemen from

21   the Southern Pines at that football game --

22   A.   Yes.

23   Q.   -- where you arranged to have the checks sent to

24   Governance?

25   A.   Yes.

1   Q.  You were also asked a number of questions by Mr. Kehoe

2   this morning about your cooperation with the government.  Do

3   you recall that?

4   A.  I do.

5   Q.  And Mr. Kehoe asked you a number of questions

6   specifically about the motion that the government may make to

7   basically ask the court for a lower sentence.  Do you recall

8   that?

9   A.  I do recall that.

10  Q.  Ms. Carter-Smith, you understand that to be a motion,

11  correct?  Do you understand what a motion is?

12  A.  Yes.  In this context, I'm trying to --

13  Q.  What do you understand that to be?

14  A.  That someone would move in favor of a recommendation.

15  Q.  Okay.  And do you understand what happens after the

16  government were to make that motion?

17  A.  The Judge would have to rule on that motion.

18  Q.  Okay.  And so do you understand the discretion about

19  whether or not to grant that motion to be the judge's, or --

20  A.  Absolutely, yes, ma'am.  It's the judge's.

21  Q.  And who do you understand to be the final decider about

22  what your sentence will be?

23  A.  The judge.

24  Q.  Mr. Kehoe also asked you a number of questions about the

25  lis pendens on your property; do you recall that?

1   A.  I do.

2   Q.  And he asked you about an appraisal on those properties

3   of $4.5 million.  Do you recall the question?

4   A.  I do recall the question.

5   Q.  Ms. Carter-Smith, what did you ultimately sell those

6   properties for?

7   A.  I don't remember, but it was -- I really -- I'm very bad

8   with the numbers, but it was nowhere near $4.5 million.  You

9   probably have it in front of you.

10  Q.  Do you recall if it was even $1 million?

11  A.  I think it was just not even $1 million.  Basically --

12  yeah.  I took a -- I took what would be considered, in real

13  estate, would be a loss; but, yes.

14  Q.  Do you recall the question that Mr. Kehoe also asked you

15  about when the government, quote -- I'm not going to quote.

16  I'm just going summarize.

17  A.  Okay.

18  Q.  When the government gave those properties back to you; do

19  you recall that question?

20  A.  I do.

21  Q.  Did you understand that those properties had ever left

22  your -- were they ever not in your name?

23  A.  No, I'm glad you brought that up.

24      My understanding was the lis pendens meant that the

25  government had the right to go in -- for lack of a better --

1  call back those properties if I did not cover my debts and

2  fines.  But I never thought that the properties left my

3  direct ownership or control.

4  Q.  You never understood those to have been taken from you in

5  any respect?

6  A.  Correct, absolutely.

7  Q.  You were asked a number of questions about the McKibbon

8  representation and specifically about your communications

9  with Mr. Townsen.  Do you recall that?

10  A.  With mister who?

11  Q.  Mr. Townsen.

12  A.  Yes, yes.

13  Q.  And Mr. Kehoe showed you a number of exhibits from

14  February and March of 2013, a number of email exchanges.  Do

15  you recall those?

16  A.  I do.

17  Q.  And one of them was an email where Mr. Townsen said

18  something about having not told -- not told Michael about the

19  hotel.  Do you recall that email?

20  A.  I do.

21  Q.  And I believe you said this, but do you know, at that

22  point were you representing McKibbon?

23  A.  At that?

24  Q.  In February and March of 2013.

25  A.  In February and March of 2013.  I don't remember when

1   Gary signed the contract, but I don't --

2   Q.  Well, do you recall the May 2013 email proposal of work

3   that you sent to Mr. Townsen?

4   A.  Yes.  So, no, I was not representing them.  Once, again,

5   the timeline.

6   Q.  Sure.  So those March 2013 email exchanges where

7   Mr. Townsen is representing what he has told the people, were

8   you involved in the representation of McKibbon at that point?

9   A.  Not at all.

10  Q.  Did you anticipate that at some point he may come to you

11  and ask you to work for him?

12  A.  Yes.

13  Q.  So were you familiar with every communication that

14  Mr. Townsen was having with city employees about that?

15  A.  Not at all.

16  Q.  Or --

17  A.  By that point, he had an independent relationship with

18  all of the city employees.

19  Q.  Okay.  And that included Mr. Parker, I assume?

20  A.  Very much so.

21  Q.  Did it include other city officials?

22  A.  I believe probably Mr. McCraw and others.

23  Q.  Mr. Kehoe also asked you some questions about city

24  commission meetings where Mr. Maddox did not vote on the

25  McKibbon project.  Do you recall that?

1  A.  I do.

2  Q.  Ms. Carter-Smith, had you, in 2013, seen any formal

3  recusal form by Mr. Maddox?

4  A.  I had not.  That was not under my bailiwick.

5  Q.  Do you know if or when such a formal recusal was ever

6  filed?

7  A.  I do not; no.

8  Q.  You were asked a number of questions about sort of the

9  timeline, about when Mr. Maddox told you that you should not

10  represent McKibbon Hotel Group and when he said that he would

11  be abstaining.  Do you recall that?

12  A.  Yes.

13  Q.  And Mr. Kehoe showed you Defendant's Exhibit 942.  I just

14  want to look at that again very quickly.  And this is just

15  for you.

16  A.  Okay.

17  Q.  This is the document that Mr. Kehoe showed you to refresh

18  your recollection, correct?

19  A.  Correct.

20  Q.  Ms. Carter-Smith, had you ever seen this document before

21  today?

22  A.  I had not.

23       MS. O'GARA:  If you could back to page 8, the page I

24  think you originally looked at, and zoom in on the bullet

25  points.

1  BY MS. O'GARA:

2  Q.  And he showed you this section; is that correct?

3  A.  Correct.

4  Q.  Okay.

5        MS. O'GARA:  If we could zoom back out.

6  BY MS. O'GARA:

7  Q.  After looking at this, do you recall that you did confirm

8  that you did have that conversation with Mr. Maddox?

9  A.  Yes.

10  Q.  And in that conversation, that was the conversation where

11  he told you not to represent McKibbon and that he would be

12  abstaining from the vote?

13  A.  Yes.

14  Q.  Take a minute to read that paragraph, please.

15        MR. KEHOE:  I object to the form.

16        THE COURT:  There is not a question pending, so let's

17  just wait for a question.

18        MR. KEHOE:  Yes.

19        THE WITNESS:  Okay.

20  BY MS. O'GARA:

21  Q.  Do you recall looking at this?

22        MR. KEHOE:  I object to the form, Judge.

23        THE COURT:  Overruled.

24  BY MS. O'GARA:

25  Q.  Ms. Carter-Smith, after refreshing your recollection

1  looking at this, do you recall whether the conversation you

2  had with Mr. Maddox about his abstaining from the McKibbon

3  Hotel Group vote and you not representing them -- do you

4  recall exactly when that happened?

5  A.  Looking at this, I think when we put up our timeline I

6  was able to -- when it happened was -- ask the question

7  again, because -- I know what you are getting at; I just want

8  to make sure I'm hearing you correctly.

9  Q.  I'm just asking the question:  Do you recall exactly when

10 that conversation happened?

11 A.  I don't recall exactly; but I do recall it was after I

12 had had conversations about the initial contract with

13 KaiserKane, and I went back to Mr. Maddox and said:  This is

14 the contract.  And at that point he said:  You need to go

15 back because you are supposed to be paid more.

16 Q.  Okay.  And those initial conversations you had with

17 KaiserKane, we've looked at number of email exchanges and

18 we've seen the contracts.  Those occurred in January; is that

19 correct?

20        MR. KEHOE:  Object to the form, leading, Judge.

21        THE COURT:  Sustained.

22 BY MS. O'GARA:

23 Q.  When did those conversations occur?

24 A.  My initial conversations with KaiserKane, we weren't

25 exactly able to tell when they occurred, but sometime in the

1    January time frame.

2    Q.  When did you sign the contract with KaiserKane?

3    A.  January.

4    Q.  Okay.  And so when you say that, that conversation with

5    Mr. Maddox had happened after that contract?

6    A.  Correct.

7    Q.  Is it fair to say that that conversation would have

8    happened after you signed that contract in January?

9            MR. KEHOE:  Objection, leading.

10           THE COURT:  Overruled.

11           THE WITNESS:  Yes.

12   BY MS. O'GARA:

13   Q.  Ms. Carter-Smith, you were shown some notes that you took

14   in this time period, by Mr. Kehoe; and you had testified to

15   those on direct, correct?

16   A.  Yes.

17           MS. O'GARA:  Let's pull up the ones that you were

18   shown, Defendant's Exhibit 291.

19           One moment, I think I have the wrong exhibit.  Give

20   me one second.

21           Defendant's Exhibit 76.  Thank you.  Or, Government's

22   Exhibit 295, either one.  And can we publish to the jury?

23           Can you scroll to the next page, and the next page.

24   BY MS. O'GARA:

25   Q.  All right.  Mr. Kehoe asked you a number of questions

1  about this page of notes.

2  A.   Uh-huh.

3  Q.   Specifically, that writing within the box up there.  Can

4  you read that to the jury.

5  A.   Runway, 10K.

6  Q.   What does it say right above that?

7  A.   5-to-10 to give it a try.

8  Q.   Looking at those notes together, not just the word

9  "runway," what do those notes mean to you?

10 A.   What those notes meant to me was 5- or 10,000 to give the

11 representation a try, to see if it was productive.

12      And then the runway, 10K.  I remember this conversation a

13 little differently than the whole airport thing, because I

14 kind of remember it meaning that is your leeway up to about

15 $10,000, but I -- it's fuzzy.

16 Q.   Do you remember talking about an airport or anything

17 related to airplanes in relation to KaiserKane?

18 A.   Actually, it may have been an -- I'm trying to remember

19 back to the whole conversation about what type of buildings

20 that they did and what type of services they provided.  So

21 there could have been something relating to a runway with

22 KaiserKane, so.

23 Q.   Do you have a recollection of that?

24 A.   Not really.

25 Q.   Okay.  So, what did you understand Mr. Burnette's

1  relationship to KaiserKane to be?

2  A.  Initially, I thought it was one of his companies.

3  Q.  Did you understand, or did you believe him to have a

4  financial interest in the company?

5  A.  I thought he did.

6  Q.  Okay.  Was it confusing to you at all, then, that he

7  would be negotiating a contract that would be beneficial to

8  KaiserKane?

9  A.  No.

10  Q.  Mr. Kehoe had also asked you, and you looked at the

11  contract that you had with KaiserKane and the email exchanges

12  in that time and asked you repeatedly whether or not the

13  $100,000 was part of that contract.

14  A.  Correct.

15  Q.  Was it ever part of the written contract that you had

16  with KaiserKane?

17  A.  It was not.

18  Q.  And were you at one point concerned about that?

19  A.  That the $100,000 was never mentioned?

20  Q.  Yes.

21  A.  Yes.

22  Q.  What did you do about that?

23  A.  Well, I went back and talked to Scott, and said:  It's my

24  understanding that I was going to be getting more than the

25  $10,000.

1    Because the way the contract was written, initially I

2  thought that, okay, maybe that's how I'm getting to the

3  $100,000; because the $100,000 was a number that was there in

4  the conversations.

5  Q.  Okay.

6  A.  I'm sorry.

7  Q.  When it wasn't in that contract, what did you do?  Did

8  you follow up on that with anyone?

9  A.  Eventually, I think that came up in a conversation with

10  Scott to follow up, encouraging me to follow up with

11  Mr. Burnette.

12  Q.  Okay.  And did you do that?

13  A.  Yes, I did.

14  Q.  And did you eventually send an invoice to KaiserKane for

15  that $100,000?

16  A.  I did.

17  Q.  When you sent that invoice, had you earned -- had you

18  done $100,000 worth of work for KaiserKane?

19  A.  No.  At that point, I had not.

20  Q.  Okay.  And when that invoice -- that invoice eventually

21  got paid; is that correct?

22  A.  Correct.

23  Q.  Do you remember when that was?

24  A.  I don't.

25  Q.  When it was paid, though, had you at that point earned

1  $100,000 worth of work for KaiserKane?

2  A.  I had set up the meetings; but, no.

3  Q.  Did Governance ever earn $100,000 worth of work by

4  assisting KaiserKane in getting GSA contracts?

5  A.  No.

6  Q.  Did Governance ever do any other type of work for

7  KaiserKane that would justify a $100,000 payment?

8  A.  No.

9  Q.  So, Mr. Kehoe also asked you about how this contract was

10  a 90-day contract, correct?

11  A.  Yes.

12  Q.  And about the end of it and how you continued.  Did you

13  ever renegotiate the contract with the defendant or with

14  KaiserKane?

15  A.  No.

16  Q.  Did the defendant ever tell you that you were going to --

17  that there was more work to be done that would justify

18  $100,000?

19  A.  I didn't have a conversation with the defendant regarding

20  that.

21  Q.  Okay.  You were also asked by Mr. Kehoe about how big

22  these GSA contracts were.  Do you recall that?

23  A.  Yes.  I mean, I don't recall the specifics; but, yes.

24  Q.  Do you know any specifics about any -- do you know any

25  specifics about any contract with GSA that KaiserKane was

1  working on or negotiating?

2  A.  No.  I know somewhere, I think in my notes at some point

3  there was something about the contract could range from a

4  certain amount to a certain amount, but I -- you know.  I

5  want to say that there was something, like, $50,000 would be

6  the smallest one they would be interested in, and then they

7  could go up to $4 million or something.  But I don't remember

8  the specifics.

9  Q.  But nobody from KaiserKane -- did anyone from KaiserKane

10  ever tell you any specifics about any GSA contracts?

11         MR. KEHOE:  Objection, leading.

12         THE COURT:  Overruled.

13         THE WITNESS:  I had never had a conversation with the

14  specifics they expected for what a contract would be.

15  BY MS. O'GARA:

16  Q.  Okay.  And your contract with KaiserKane -- well, let's

17  pull it up again just so that we can see the specifics on it.

18         MS. O'GARA:  Can you pull up Government's Exhibit 125

19  and publish to the jury.  It's been previously admitted.

20  Government's Exhibit 125.  And if you can zoom in on the

21  compensation section on the bottom there.

22  BY MS. O'GARA:

23  Q.  This is the signed agreement, correct?

24  A.  Yes.

25  Q.  And in this agreement, you agreed to that up-front fee of

1   10,000, correct?

2   A.  Correct.

3   Q.  And then a success fee?

4   A.  Yes.

5   Q.  And if we go to the next page.  And these details in here

6   related to the regions and the specific percentages.  Do you

7   see that?

8   A.  I do.

9   Q.  What did you understand those percentages to be

10  percentages of?

11  A.  The overall contract that they would have received from

12  the GSA.

13  Q.  Okay.  So if you had received a success fee as part of

14  this contract in relation to the GSA contract that KaiserKane

15  got, would you need to know what that contract was worth?

16  A.  Yes.

17  Q.  In order to calculate your payment?

18  A.  Correct.

19  Q.  Did you ever receive any information from KaiserKane or

20  the defendant, or anyone, about the value of a specific GSA

21  contract?

22  A.  I did not.

23          MS. O'GARA:  Your Honor, if I could have one moment.

24          THE COURT:  You may.

25          MS. O'GARA:  I'm done, Your Honor.  Thank you.

1    THE COURT:  All right.  Thank you, Ms. Carter-Smith.

2    You may step down.

3    Members of the jury, that makes this a good time to

4    take the lunch break.  Recall my instructions:  Don't talk

5    about the case, don't get any information from anywhere else.

6    We will start back one hour from now, at 1:20 by that clock.

7    Jury out, please.

8    (*The jury exited the courtroom at 12:22 p.m.*)

9    THE COURT:  You may be seated.

10   Yes, you may step down.  Thank you, Ms. Carter-Smith.

11   The break takes care of the logistics.  You can have

12   your next witness on the stand at 1:20 when we start back.

13   Mr. Kehoe, I overruled the objection about refreshing

14   recollection when Ms. O'Gara brought it back up.  At that

15   point, it wasn't just refreshing recollection; it was

16   following up on your examination.  So, yes, you are right.

17   I'm sorry.  I know you don't agree with some of my

18   rulings.  You don't have to put your hands like that.

19   MR. KEHOE:  I just wanted to explain.

20   THE COURT:  If you don't want the explanation, the

21   others might, and so I'm going to give an explanation.  Here's

22   the explanation:

23   To refresh your recollection, you're of course

24   correct that first you have to ask the question, and then

25   refresh if the witness says I don't remember.  At that point,

1    you can show a document to refresh.

2         I overruled the government's objections, such as that

3    the witness hadn't seen the document, because it doesn't

4    matter whether the defendant has seen the -- the witness has

5    seen the document.  You can show the witness anything that

6    might refresh the witness's recollection.  As someone once put

7    it:  You can show the witness the Brooklyn Bridge, if it helps

8    remember, it's okay.  You did that proper; I let you do it.

9         At that point the witness had said she didn't

10   remember, and she gave some fairly equivocal testimony about

11   what the facts were.  The government was then entitled on

12   redirect to go back to the subject and to test what the

13   witness had already said.  At that point I thought it

14   appropriate to ask the question, regardless of whether the

15   witness again said I don't remember.  The witness had already

16   said on cross first that she did not remember.  And so I

17   thought the government's questions at that point were

18   appropriate without asking, again, whether the witness

19   remembered the answer.  That's why I overruled your objection.

20        What do we need to do before we break?

21        MR. NOTHSTEIN:  Nothing from the government, Your

22   Honor.

23        THE COURT:  Anything from the defense?

24        MR. KEHOE:  Nothing, Judge.

25        THE COURT:  We'll be in recess.  We'll be back at

```
 1    1:20.

 2        (A luncheon recess was taken at 12:25 p.m.)

 3
                           AFTERNOON SESSION
 4                           (1:20 P.M.)

 5        (The proceedings resumed at 1:20 p.m.)

 6        (Defendant present; jury not present.)

 7            THE COURT:  Good afternoon.  Please be seated.

 8            Before we bring the jury in?

 9            MR. NOTHSTEIN:  I was just going to ask the court to

10    remind anyone in the --

11            THE COURT:  I was just about to.

12            Raise your hand if you are a sketch artist.  No

13    sketch artists.  Okay.  The reason for requesting is that the

14    next witness is going to be an undercover agent and we weren't

15    going to draw the witness.

16            Jury in, please.

17        (The jury entered the courtroom at 1:21 p.m.)

18            THE COURT:  Ms. Dougherty, in the back, you probably

19    know, if someone comes in who is a sketch artist, if you can

20    just keep an eye out.  Thank you.

21            MS. DOUGHERTY:  Yes, sir.

22        (The jury entered the courtroom at 1:21 p.m.)

23            THE COURT:  All right.  You may be seated.

24            Mr. Nothstein, or the government, please call your

25    next witness.
```

1      MS. O'GARA:  Your Honor, the government calls Mike

2   Miller.

3      THE COURT:  Ladies and gentlemen of the jury, let me

4   give you an explanation about Mr. Miller.  The lawyers had

5   told me about this ahead of time.

6      Mr. Miller is one of the undercover agents that you

7   have heard about.  Mike Miller is not his true name; it's the

8   name he used as part of the undercover operation.  Government

9   agents, law enforcement officers may act in an undercover

10  capacity; and when they do that, they may of course use a

11  fictitious name.  The actual name would not contribute

12  anything to your understanding of the case, and so the witness

13  is going to testify under the name he used in this

14  transaction.  That's the name you've heard in other testimony;

15  it makes more sense to do it that way.

16     Anyway, as I say, it wouldn't serve any purpose to

17  use the actual name as part of the public trial in this case,

18  and it might impair his ability to act in other cases.  So

19  that's the way the testimony will be presented here.

20     Please swear the witness.

21     DEPUTY CLERK:  Please raise your right hand.

22     *MICHAEL MILLER, GOVERNMENT WITNESS, DULY SWORN*

23     DEPUTY CLERK:  Be seated.

24     THE COURT:  You can state your name used in this

25  case, and then spell it for the record.

*Michael Miller - Direct*

1133

```
 1              THE WITNESS:  Michael Miller.  M-i-c-h-a-e-l,
 2   M-i-l-l-e-r.
 3              THE COURT:  You may be seated.  Thank you.  And while
 4   you are testifying, if you're comfortable, you may take your
 5   mask out.
 6              THE WITNESS:  Thank you, sir.
 7                        DIRECT EXAMINATION
 8   BY MS. O'GARA:
 9   Q.  Good afternoon, Mr. Miller.
10   A.  Good afternoon.
11   Q.  Where do you work?
12   A.  I work for the Federal Bureau of Investigation.
13   Q.  And what is your job?
14   A.  I am a supervisory special agent.
15   Q.  And how long have you worked as a -- well, first of all,
16   how long have you been an FBI agent?
17   A.  Since 2009.
18   Q.  And you said your current position is a supervisory
19   special agent?
20   A.  That's correct.
21   Q.  How long have you been a supervisory special agent?
22   A.  For about seven months.
23   Q.  Okay.  Are you, in your current position, assigned to any
24   specific area?
25   A.  I work for the National Covert Operations section of the
```

1   FBI.

2   Q.  And the National Covert Operations section, does that

3   involved use of undercover agents?

4   A.  It does.

5   Q.  Can you just describe to the jury your training and

6   experience that led you up to this point?

7   A.  As an FBI special agent, I attended the new agent's

8   course at Quantico, Virginia, which is approximately 21 weeks

9   long.  From there, I've done additional training in complex

10  investigation as far as the criminal, what is called a

11  stage-two school, which is kind of the next-level, two-week

12  advanced course.  I've attended the FBI undercover

13  certification course, and a few other additional training.

14  Q.  Over the course of your experience in the FBI, have you

15  served as a case agent?

16  A.  I have.

17  Q.  Can you just describe to the jury, what is a case agent?

18  A.  Sure.  As a case agent, you are the primary person who is

19  leading the investigation.  So you would have an alleged

20  offense or subject that you are looking into.

21      All of my experience has been on the criminal side, so

22  working everything from public corruption investigations to

23  drug and narcotics investigations.

24      So as the case agent, you are the one who is developing

25  informants, collecting evidence.  You may employ undercovers

 1   as a technique; you may use a Title 3 wire intercept on

 2   someone's phone, multiple different techniques, depending

 3   on -- but the case agent is the person who decides the

 4   direction and manages that case.

 5   Q.  Have you also, in your experience, acted as an undercover

 6   agent?

 7   A.  Yes, I have.

 8   Q.  Just briefly, what is the difference between an

 9   undercover agent and a case agent?

10   A.  Well, the undercover technique is just a tool that a case

11   agent can employ.  Sometimes a case calls to use an

12   undercover and it's appropriate, and that's at the discretion

13   of the case agent.

14       But as an undercover agent, you would come in and play a

15   fictitious role, meeting directly, usually, with the subjects

16   of that case agent's investigation to help.  You are directly

17   collecting evidence for the case agent.

18   Q.  Okay.  How does an agent get selected to become an

19   undercover agent?

20   A.  There's an FBI-wide canvass for, whenever they hold the

21   undercover certification course.  So you apply, and then from

22   there they select the number of attendances for each course;

23   and then there's approximately a two-week course,

24   certification course, to become a certified undercover.

25   Q.  And when did you take that certification course?

1  A.   In 2012.

2  Q.   Without describe specifically what the class entails,

3  what kind of aptitude or skills are generally required to

4  succeed in that class?

5  A.   Numerous things.  So it's your ability for planning,

6  decision-making, flexibility, your ability to communicate.

7  Those are the main things that they are looking for in

8  undercovers.

9  Q.   How would you describe the difficulty of that class?

10 A.   It's -- I would say it probably has -- it has probably

11 the second highest attrition rate of any course the FBI has

12 second to the FBI's hostage and rescue team trials.

13 Q.   In that regard, what is the average graduation rate of

14 the class?

15 A.   It is -- it has been as high as 70 percent and as low as

16 30 percent, depending on the students in each class.

17 Q.   After you completed the course in 2012, did you begin

18 working as an undercover agent?

19 A.   I did.

20 Q.   And, since then, approximately how many cases do you

21 think you have worked on as an undercover?

22 A.   I have probably worked on, in an undercover capacity,

23 probably over 25 investigations.

24 Q.   And do undercover agents generally specialize in a

25 particular subject area?

1  A.  Most do.  As they become more experienced, usually an

2  undercover kind of has a type of violation or offense that

3  they are good at or kind of are drawn to working those type

4  of cases.

5  Q.  And do you have a specialty or an area that you tend to

6  work?

7  A.  I work -- I've almost only worked -- I've only worked

8  criminal undercover investigations, and primarily public

9  corruption investigations.

10  Q.  Okay.  How does an undercover agent fit into an overall

11  criminal investigation?

12  A.  Like I said, it is a tool for the case agent to use.

13  Sometimes that can be in the middle of a case, sometimes it's

14  at the end of a case.  It depends on how that case agent --

15  where they are in their investigation what pieces of evidence

16  they are still trying to collect, and how the undercover and

17  the scenario that is developed fits into kind of their

18  overall equation of how they are going to run their case and

19  what pieces they are missing.

20     So, there is not really a textbook answer for that.  It

21  kind of just depends on where the case agent is in their

22  investigation.

23  Q.  Is there a general manner in which you get brought into

24  an investigation as an undercover?

25  A.  There's usually kind of two ways that it happens.  There

1    are -- for all of the certified undercovers in the FBI, every

2    division -- so there is 56 field offices for the FBI.  Each

3    one of those is a separate division.  That division has an

4    undercover coordinator.

5        That undercover coordinator will receive canvasses from

6    the undercover unit at headquarters if a particular division

7    is looking for starting an undercover investigation.  So what

8    we call a canvass would go out, and then that puts the

9    potential undercovers directly in contact with the case agent

10   to discuss if they are right the fit.

11       The other way it happens is there are -- most of the

12   certified undercovers, the network is pretty close-knit and

13   so you may get a call from another undercover in a particular

14   division that says:  Hey, I have a case agent who is starting

15   a case, and I think you would be the right undercover for

16   them.  And it may just go direct contact between you and that

17   person to get started in the investigation.

18   Q.  And as an investigative technique, what does introducing

19   an undercover to an investigation bring to a case?

20   A.  It gives the case agent a trained investigator who will

21   go meet directly with the subjects of that investigation and

22   collect evidence.  So, versus using an informant or

23   historical records, it gives that case agent the ability to

24   have actually have someone who understands what they are

25   trying to accomplish and can work with them to help them

*Michael Miller - Direct*

1  formulate a plan on how to collect the evidence that they

2  need in their investigation.

3  Q.  What is the primary sort of mode of evidence collection

4  that an undercover agent uses, and what kind of evidence do

5  you collect?

6  A.  For the undercover itself, it's usually recordings.  And

7  that's recording telephone conversations or recording

8  in-person meetings.

9  Q.  And is that video recordings, audio recordings?

10  A.  It can be both.  It depends on the circumstances, depends

11  on the location.  But we do both audio recordings and

12  audio-video recordings.

13  Q.  Do you, as an undercover going into an investigation, do

14  you record every single thing that you do?

15  A.  No.

16  Q.  How do you choose, or who chooses, what to record?  How

17  do you make that determination?

18  A.  It's always a discussion with the case agent on the

19  investigative plan.  It's ultimately their decision.  Again,

20  we kind of give our opinion based on our interaction with the

21  subjects of the investigation on:  Hey, here's what we

22  recommend, here's what we think is possible; but it's the

23  case agent's decision.

24      There will be circumstances where, if we are going in

25  purely for a meeting that may just be what we would consider

1  ingratiation or rapport building, or just -- if we are not

2  there to collect evidence, if it is just to be seen or to

3  kind of bolster our persona, then sometimes we may choose to

4  not record that meeting.  But if we are in a mode where we

5  know we are going in to collect evidence, then we will always

6  try to have a recorder running when that's happening.

7  Q.  So along those lines, who directs how and when you meet

8  subjects?

9  A.  That's always the case agent.  I mean, the case agent is

10 involved in all of the discussions and planning of where we

11 are going to meet, when we are going to meet, that type of

12 thing.

13     Now, some of it may be dictated by interactions with the

14 parties, but it's always -- we don't schedule meetings

15 without first scheduling with the case agent on:  Hey, here's

16 what our plan is; here's -- for instance, like if we get a

17 call and somebody invites us to a meeting, we always run that

18 by the case agent:  Is this something you want us to do?

19 That type of thing.  They're the one directing all of your

20 activities.

21 Q.  As part of your evidence collection as being an

22 undercover agent, do you record phone calls and record

23 telephone calls as well?

24 A.  Yes, we do.

25 Q.  Generally, how do you report back your observations or

1  your collected evidence to the case agent?

2  A.  Two ways.  If we're carrying a recording device or

3  recording a phone call, that device is always turned over to

4  the case agent.  We do not handle entering it into evidence

5  or the downloading of the recordings or anything.  That is

6  all the case agent's responsibility, and they handle all

7  that.  We just hand them the device and then they take it

8  from there.

9      And then -- yeah.  So does that answer the question?

10  Q.  Yeah.  How about observations that you have while you are

11  in the field interacting with subjects?

12  A.  Okay.  Yeah, that was the second part.  Sorry.

13      So we will always -- almost always on a daily basis, if

14  not more than once a day, meet with the case agent after a

15  meeting.  So if we go meet with a subject for, just as an

16  example, if we have a lunch meeting and we don't have

17  anything else until dinner that night, we'll usually try to

18  the meet the case agent in between.  We may have to switch

19  out recording devices, but we also kind of give them a brief

20  summary:  Hey, here's what just happened.  Based on that,

21  here's our plan for the night.  What do you have?  What do we

22  need?  What pieces are we missing?  That kind of thing.

23      So there's constant meetings with the case agents between

24  operational activities.

25  Q.  When you come into a case as an undercover, do you come

1    in with a predetermined role or persona?

2    A.   No.

3    Q.   How is your role determined?

4    A.   It is based on kind of a working relationship with the

5    case agent of -- number one, it starts with what they are

6    trying to collect.  What piece do you need the undercovers to

7    collect?  And we will kind of discuss.  The case agent may

8    have an idea of:  Okay, I need someone to play this type of

9    role.

10       As the undercover we may say:  Hey, like, I think I would

11   do a better job if we pivot that a little bit and do a little

12   different scenario.  But, ultimately, it's the case agent who

13   decides:  Hey, I need -- like, for example, in this case, I

14   need someone to come in and pose as a real estate developer

15   in Tallahassee.  And they kind of decide what that role looks

16   likes.

17   Q.   Are you familiar with the term "legend"?

18   A.   Yes.

19   Q.   What is that?

20   A.   So a legend is, for the undercover, that is your history,

21   that's who you are.  So your legend, as far as what you do

22   for a living, where you live, where you're from, what you've

23   done in the past; and then, also, why you are there doing --

24   you know, for instance, again, as a real estate developer,

25   why are you in Tallahassee?  What are you trying to

1  accomplish?  All of that legend is basically your back story.

2  Q.  How do you get introduced into a situation as an

3  undercover?  How do you make entrance into a circumstance or

4  a situation?

5  A.  It depends on what's available to you.  So that, again,

6  goes back to the case agent, where they are with their

7  investigation.  There are a lot of cases where you introduced

8  by what we would consider an informant or a confidential

9  source that is already involved, and they may take you and

10  introduce you.

11     Or sometimes you go in, what we consider, cold, where you

12  have no introduction.  So you are going into town and you are

13  just going to have to make your own introduction and your way

14  into what is a plausible reason that you are here and how are

15  you going to get introduced to the subjects of the

16  investigation.

17  Q.  So regardless of how you get introduced into a situation,

18  are there techniques that you have learned toward developing

19  trust with the subjects that you are interacting with?

20  A.  Yes.  Any time we are trying to collect evidence, we have

21  to build a relationship with the subject of the

22  investigation.  They are never going to let us, kind of,

23  inside the circle of what they are doing or be able to

24  connect any evidence until we build trust with them and they

25  believe our legend and who we are and that we have a

1   relationship with them.

2   Q.  Do you have any specific techniques that you use for

3   doing that?

4   A.  We -- what we would consider mirroring.  We try to

5   identify what the subject of the investigation, their

6   interests are, and so we will try to mirror that person.  So,

7   if the person likes to play golf, we will talk about going to

8   play golf; if they like to go fishing, we'll go fishing.

9   Whatever we feel like is going to pique their interest and

10  help us build that relationship with them, that's what we

11  will try to do.

12  Q.  And, again, what's the purpose of trying to build this

13  trust?

14  A.  Again, we are trying to collect direct evidence from

15  these subjects.  And so they are not going to tell someone

16  who is just a stranger and let that person inside of their

17  inner circle, or whatever the criminal activity that the case

18  agent believes is happening.  Without that level of trust,

19  you'll never be able to collect that information.

20  Q.  Who makes the decision when to stop collecting evidence

21  by an undercover, or as an undercover?

22  A.  At a -- are you talking about a specific event, or, like,

23  for the total of the case?

24  Q.  For the total of the case.

25  A.  Yeah, the case agent makes that decision:  Hey, we're

1  going to end the undercover operation.

2      So that could be a number of things.  They may have

3  decided to go a different avenue in the investigation, they

4  may be pursuing other things; or they may have decided to go

5  what we consider overt.  So, hey, we are going to go execute

6  search warrants or go interview people, and so we are going

7  to expose the undercover operation so it's done.

8  Q.  Once you are done gathering evidence as an undercover,

9  are you involved in any way in charging decisions?

10 A.  No.

11 Q.  What is your role once the undercover portion of the

12 investigation is completed?  Do you have one?

13 A.  Show up for court if it goes to the trial.  Other than

14 that, in preparation for that, you know, reviewing recordings

15 and that type of transcripts after the case.  But as the

16 undercover, you go away, your part of that case is over; and

17 the case agent continues forward with the prosecutors on

18 deciding what they are going to do moving forward with it as

19 part of their investigation, or whether they are ready to try

20 to charges, or whether the case is over.  So we have no role

21 at that point.

22 Q.  Okay.  When were you first contacted about getting

23 involved in this investigation?

24 A.  It was somewhere in the summer of 2015.

25 Q.  And how did that contact come to you?  What happened?

1  A.  There was a canvass that was out for -- Tallahassee put

2  out a canvass looking for an undercover.

3  Q.  And when you say "canvass," are you referring what you

4  described early, where all of the field office undercovers

5  are notified?

6  A.  Yes.

7  Q.  And what did you understand this investigation to be

8  about?

9  A.  So the canvass doesn't have any specifics as far as the

10  subjects go, just kind of very general information.  I don't

11  remember specifically the canvass for this one but I remember

12  being put in contact with the case agent.  And then we

13  started talking and kind of gave him my background as far as

14  case experience, and then making the decision of whether I

15  thought I was the right person to start this investigation.

16  Q.  And did you, with the case agent, determine what your

17  undercover role and persona would be?

18  A.  We did.

19  Q.  And what was that going to be?

20  A.  So, it was going to be as a real estate developer looking

21  to do numerous projects in Tallahassee and Leon County.

22  Q.  Okay.  When was the first time you came into Tallahassee

23  or first began operation in this undercover investigation?

24  A.  It was somewhere in the summer of 2015; July time frame,

25  July, August time frame.

1    Q.   And what did you do?  What was the first thing you did?

2    A.   The first operational thing I did -- so I came to

3    Tallahassee first to meet with the case agents face-to-face,

4    where we sat down and kind of got into more details for a

5    couple of days of formulating our plan and making sure we had

6    the right level of backstopping, which is legend.  So meaning

7    I had an undercover company, I had a website, I had an email

8    address, I had a phone, that type of thing.  So we were

9    making sure all of that stuff was together.

10       The next trip I came to Tallahassee, so we had to

11   formulate, I was going in -- I had no introduction from an

12   informant so I was going in cold, so I had to come up with a

13   plausible reason to try to get an introduction to the

14   subjects of the investigation.

15       So we knew that there was an event being held at

16   Sandestin in August that was hosted by the Tallahassee

17   Chamber of Commerce, so we needed to have a logical reason to

18   get invited to that event.  So I went and had a meeting with

19   the Ben Pingree, who was the economic development director, I

20   think, at the time for Leon County.  I kind of gave him my

21   sales pitch of what I wanted to do as far as a real estate

22   developer in Tallahassee, and he made the recommendation that

23   I attend that event.  So that gave me a plausible reason to

24   show up to the chamber of commerce event in August.

25   Q.   In August of 2015, you said?

1   A.   Yes.

2   Q.   What was this event, and what was happening at this

3   event?

4   A.   So, the chambers of commerce hosted an event, and it was

5   mainly focused on real estate development.  It went through

6   covering topics such as zoning changes and ordinances, some

7   of the money and funding through different municipal groups

8   that were available to developers.  And so it was kind of an

9   overall conference, and then it had individual breakout,

10  workout sessions that covered different topics.

11  Q.   And what were you doing at the event?

12  A.   I was, you know, again, posing as a real estate developer

13  and looking to do business in Tallahassee.  And then I was

14  also attempting to get an introduction to J.T. Burnette.

15  Q.   When you attended this event, what was the story that you

16  told people that you encountered about what you were doing in

17  Tallahassee?

18  A.   The original story we started with was that we had

19  identified an individual in Tallahassee that had a large

20  portfolio of land, it was numerous parcels, and that we were

21  looking -- myself as a developer and a group of investors

22  that I had -- at purchasing that entire portfolio of land.

23       So, therefore, it was a multiple parcels that would need

24  to be rezoned, redeveloped, potentially eligible for money

25  through different funding mechanisms in Leon County and

1  Tallahassee, and that was the story that we were putting out

2  there.

3  Q.  You said that one of your goals was getting an

4  introduction to Mr. Burnette at this event.

5  A.  That's correct.

6  Q.  Were you successful in the goal of meeting Mr. Burnette

7  at that event?

8  A.  Yes.

9  Q.  Where did you meet him?

10 A.  The first time I met him, there was a -- just a general

11 social gathering the first night that everybody was just

12 there, like a large, open ballroom-type setting.  It was just

13 kind of a meet-and-greet situation.  And he -- I think I ran

14 in to him at the bar the first time and introduced myself,

15 and it was probably a 20-second conversation.

16     The next time I met him, I think it was the following day

17 or maybe the day after.  It was during one of breakout

18 sessions that was covering either an ordinance or something

19 that was happening that he was attending as well that I was,

20 and we exchanged information at that time.

21 Q.  Did you have a conversation with him?

22 A.  I did.

23 Q.  And what was that conversation?

24 A.  I just introduced myself, told him that I had heard his

25 name and that he was somebody that people recommended that I

1    meet.  I kind of told him -- you know, gave him 30-second

2    spiel of what I was doing in Tallahassee; and at that time,

3    he sent me a text message with his contact information and

4    told me to give him a call the next time I was in

5    Tallahassee.  And that started the contact.

6    Q.  And that phone number -- did you have any more

7    conversations with him at that event?

8    A.  I don't think I did at that event.

9    Q.  Okay.  The text message he sent you, when you -- did you

10   continue to communicate with him after that?

11   A.  I did.

12   Q.  And did you do so primarily by text?

13   A.  Usually by text messages.

14   Q.  I'm going to show you Government's Exhibit 203.  It's on

15   your screen in front of you.  Do you recognize this?

16   A.  I do.  That is a string of text messages between myself

17   and J.T. Burnette.

18   Q.  And did you take these pictures?

19   A.  I did.

20   Q.  And what did you take these pictures of?

21   A.  My undercover cell phone.

22        MS. O'GARA:  Your Honor, I move to admit Government's

23   Exhibit 203.

24        MR. JANSEN:  No objection.

25        THE COURT:  Government's 203 is admitted.

1   (GOVERNMENT EXHIBIT NO. 203:  Received in evidence.)

2         MS. O'GARA:  And if we can start at the left-hand

3   side.

4   BY MS. O'GARA:

5   Q.  That first text message, is that from Mr. Burnette?

6   A.  It is.

7   Q.  And was the introductory text message you just told us

8   about?

9   A.  Yes, it is.

10  Q.  Okay.  And it looks like there is another exchange right

11  below that on the 7th of September; and it looks like he said

12  to you:  2 p.m., DoubleTree, Wednesday.

13        Do you see that?

14  A.  I do.

15  Q.  What is that about?

16  A.  That is the next time I was in Tallahassee.  That was the

17  meeting the next time I met J.T. in person.

18  Q.  And do you know what the DoubleTree is?

19  A.  It is a hotel in Tallahassee.

20  Q.  And did you know -- what did you know to be

21  Mr. Burnette's relationship with the DoubleTree?

22  A.  My understanding was he was the owner of the DoubleTree.

23  Q.  You say:  Great, see you then.  Correct?

24  A.  Yes.

25  Q.  Did you meet him at the DoubleTree?

1   A.   I did.

2   Q.   And do you know why you met at the DoubleTree?

3   A.   He was -- he owns the DoubleTree.  He was working on

4   something there, so.

5   Q.   Okay.  What was the purpose of meeting him at the

6   DoubleTree?  What were you doing there?

7   A.   Again, my purpose was -- again, I was trying to establish

8   contact and a relationship with him.  So this was just my

9   first attempt in Tallahassee to reengage with that

10   conversation with him.

11   Q.   Okay.  And did you meet him at the DoubleTree; and what

12   did you do?

13   A.   Yeah, I did meet him at the DoubleTree.  He was -- he was

14   busy, he was working.  We walked and talked most of the time.

15   He was -- every time I met J.T., he was always busy, he was

16   always working, so it was very hard to get him to stop and

17   kind of talk to you.

18       So we kind of walked around the DoubleTree.  He was

19   working on some things he had.  I think the pool was under

20   construction at the time and we were in the conference room

21   at one point, and so different things.  And I was again

22   giving him my sales pitch.  He kind of asked a few questions

23   about the portfolio of land I was looking to develop.  We

24   started talking about that, and I started to -- I was just

25   trying to pique his interest to see if I could get him

1    interested in what we were -- our projects, and to discuss

2    those.

3    Q.  Do you remember approximately how long you were there,

4    how long that meeting lasted?

5    A.  I don't.  I don't remember exactly.  I mean, I would say

6    it was 30 minutes or so, would be kind of my estimate, but

7    I'm not sure.  And, again, we were kind of walking and

8    talking as we went through there.

9    Q.  And what was the sort of general tenure of that

10   conversation?

11   A.  J.T. was -- I mean, he was very nice but also very busy,

12   not very interested in what I had to offer.  I mean, he gave

13   me some advice as far as people to talk to and things to do,

14   but kind of at a very superficial level, like very kind of

15   arms-distance nice.  Clearly not very engaging.  I mean,

16   again, very polite and -- but, again, not super interested in

17   what I was putting out there.

18   Q.  Did you talk about the portfolio of properties that you

19   mentioned earlier?

20   A.  I did.

21   Q.  And did you get an impression from him about what he

22   thought about those?

23   A.  Yeah.  He did not -- he did not see much potential in the

24   portfolio.  He -- mainly, he knew the owner of the portfolio,

25   and he did not think that that person would do a reasonable

1  deal that could be developed based on his previous business

2  dealings with that person.

3  Q.  Do you recall if he made suggestions about any other

4  possible deals in Tallahassee during that meeting?

5  A.  I don't remember during that meeting if he started

6  bringing up other deals.  As the relationship developed, he

7  brought up several other deals, but.

8  Q.  As part of that conversation, did you learn about any

9  other industries or areas that he worked in or had business

10  in?

11  A.  Well, I knew that he was working on one of -- acquiring

12  one of the -- Florida had passed the cannabis grow licenses,

13  and so he was attempting to obtain one of the five grow

14  licenses that were going to be issued for the state of

15  Florida.

16  Q.  Did you recall meeting or talking or texting with him

17  that fall, in September and October of that year?

18  A.  Yes.

19  Q.  Okay.  If you can take a quick look at the bottom of the

20  left-hand side, the text messages.

21      And this was in early October, correct?

22  A.  Correct.

23  Q.  Did he send you his email address?

24  A.  He did.

25  Q.  Okay.

1        MS. O'GARA:  On the next page.

2   BY MS. O'GARA:

3   Q.  When you say:  I have a couple of things to send you,

4   generally, what are you talking about there?

5   A.  Again, more stuff on the developments that we are trying

6   to do.  So, again, we are trying to convince him that we are

7   real, that we are really looking at developing something

8   here.

9   Q.  Okay.

10        MS. O'GARA:  Zoom in on the right side.

11  BY MS. O'GARA:

12  Q.  In late November, you send a text message there at the

13  bottom about five licenses.  What was that about?

14  A.  That is after the announcement that Florida had issued

15  the five cannabis grow licenses for Florida.

16  Q.  Okay.  And he responds, yes; then you congratulate him.

17  And then what do you propose to him?

18  A.  So, to see if we can meet the next time I'm in town.  I

19  told him that I have a meeting with someone that he

20  recommended that I met with, and I did that meeting.  So I

21  was asking him if he could meet me for a drink.

22  Q.  You say you going to meet Will.  Who is Will?

23  A.  He had recommended -- while at the DoubleTree, I believe,

24  he had made a recommendation that somebody I should meet with

25  was Will Butler.

1  Q.  Why did he mention Will Butler?

2  A.  Will Butler is kind of a lobbyist or political consultant

3  in Tallahassee.  So I told him, you know, some of the pieces

4  of property that I was looking at would needed to rezoned or

5  had other action that needed to be taken, and he recommended

6  that Will Butler was a person I could deal with.

7  Q.  Okay.  So there's a few text messages that we have seen

8  in here; but between August and September of 2015, how much

9  contact do you think you had had with Mr. Burnette?

10  A.  Between what time frame?

11  Q.  Between August and December of 2015.

12  A.  So at that point, we'd had three in-person meetings and

13  probably ten or so text messages, maybe a one or two phone

14  calls maybe.

15  Q.  And, generally, what was your impression of his interest

16  in you and your business?

17  A.  He was not very interested in my business.  I mean,

18  again, he was always nice and cordial, but not very

19  interested in or wanting any involvement in what I was

20  potentially doing.

21  Q.  And, again, during this time period were you primary

22  talking about that portfolio of properties?

23  A.  That's correct; yes.

24  Q.  Do you recall meeting Mr. Burnette for drinks in December

25  of 2015?

1   A.   I do.

2   Q.   Where did you go; do you remember?

3   A.   I'm not sure.   I think it was like a TGIFridays or

4   something.   I remember it was a chain-type restaurant and we

5   sat outside, and it was somewhere over in the area of the

6   side of Tallahassee where he lived.   It wasn't downtown.

7   Q.   Okay.   And do you remember what you talked about?

8   A.   So we again talked about my portfolio.   But I started

9   trying to pique his interest by discussing more -- part of

10   the story I told him was that all of my development projects

11   were funded through private equity groups.   So instead of

12   traditional financing where I go to the bank and get a loan,

13   I had private investors who would put up the money for my

14   development deals.

15       And I planted the idea that one of my primary investors

16   was very involved on the West Coast in the cannabis industry,

17   and I thought it was somebody that he would be interested in

18   meeting based on him trying to acquire one of the five grow

19   licenses in Florida.   And so that's where I started to kind

20   of push that narrative to him.

21   Q.   Do you recall him having any sort of reaction when you

22   mentioned how your investors, most of the projects were done

23   with private equity?

24   A.   He never understood why we did business the way we did.

25   He always tried to push us back towards using traditional

1  financing and not just using our cash to do deals.

2      However, he was very interested in the investor who I

3  said was in the cannabis industry and had been in that

4  industry for a long period of time.

5  Q.  During that meeting with him, did you have any

6  conversations about meeting these investors?

7  A.  I did.  I told him that I would -- that I usually do

8  quarterly or regular meetings with my investors, and it's

9  usually someplace either Nashville or Las Vegas or Miami or

10  something to that effect, and that I was scheduled to meet

11  with them soon.

12  Q.  Did he have anything to say about that?

13  A.  He did.  He said he would love to meet particularly the

14  investor who was in the cannabis industry.

15  Q.  And did he say where he would like to meet them?

16  A.  I said something about them potentially coming to

17  Tallahassee.  And he said -- at one point, he said:  I would

18  much rather go to Vegas.

19  Q.  Did he tell you how he would get to Vegas?

20  A.  He did not tell me how he would get to Vegas.  When we

21  were talking about other meetings and stuff he did mention

22  that he had his own private plane, but he said that he

23  primarily used it traveling regionally just so it's quicker.

24  But he did not say how he was going to get to Vegas.

25  Q.  Was this the first time that you heard that he had a

1  private plane?

2  A.  Yes.

3  Q.  At this point, well, you mentioned earlier that he seemed

4  largely uninterested in your portfolio and your story.  At

5  this point, in early December, did that start to change?

6  A.  It did.  He -- the story of the investor who was in the

7  cannabis industry definitely piqued his interest.  Like,

8  there was a noticeable change in the level of interest he had

9  in questions about that individual and kind of what their

10  role was in that industry.  And, again, it was a notable

11  difference.

12  Q.  As a result of that change by the defendant, did your --

13  did the investigation -- did the investigative strategy

14  changed in any way?

15  A.  It did.  We knew that we were going to need an undercover

16  to play the role of a -- in the cannabis -- as an investor

17  who was in the cannabis industry in order to build that

18  relationship and get close to J.T.

19  Q.  And you said you talked at this meeting about an investor

20  meeting.  Did you have further communications with

21  Mr. Burnette about that possibility?

22  A.  We did.  There was -- we attempted to try to come up with

23  some dates, but we could never get anything ironed out as far

24  as -- you know, unfortunately for us it takes a little bit of

25  time, so we can't react quickly to setting something like

1  that.  So we couldn't get a firm commitment from him versus

2  the dates and availability of the undercovers involved, so we

3  ended up not doing it.

4        MS. O'GARA:  If you can go down to the next page, and

5  then down to the next page.  On the right-hand side, if you

6  can zoom in on that whole side over there.

7  BY MS. O'GARA:

8  Q.  These text messages, what's the date on the top one up

9  there?

10  A.  That is December 29, 2015.

11  Q.  And is that you in the blue at the top?

12  A.  Yes.

13  Q.  What are you saying there?

14  A.  So at this point we had been unable to get the investor

15  meeting in Nashville or Las Vegas scheduled, so I'm bringing

16  the investors to Tallahassee.

17  Q.  And what does Mr. Burnette say to you in response to your

18  request to let him know by Wednesday?

19  A.  Sorry, this is the string where we are still trying to

20  get the meeting scheduled, and this is back and forth on --

21  he says 50/50 on whether he can make the investor meetings

22  out of town.

23  Q.  Got it.  And then he says he's open on the 11th and the

24  12th, down there at the bottom?

25  A.  Yes.

1    MS. O'GARA:  Can you zoom out and go to the next

2    page.

3    BY MS. O'GARA:

4    Q.  And is this where you sort of pulled on the schedule and

5    doesn't work out?

6    A.  Yes.  At this point, we couldn't get -- his schedule was

7    too busy and then we -- like I said, we need a little bit of

8    a lead time to set something like this and so we ended up

9    just -- ended up cancelling the meeting or pushing it to a

10    later date.

11    Q.  And what's the alternative that you propose here?

12    A.  That I'm going to bring my investors to Tallahassee.

13    Q.  When you say, I'm going to bring the guys I told you

14    about, who are you referring to there?

15    A.  My primary investors.  And those are two other

16    undercovers.

17    Q.  And who was -- specifically when you say "the guys," is

18    there a specific guy that you are referring to?

19    A.  So the individual that I told him about that is in this

20    cannabis industry, that is the specific one that I'm talking

21    about bringing.

22    Q.  Okay.

23    MS. O'GARA:  Zoom out and go to the next string.

24    BY MS. O'GARA:

25    Q.  And do you describe these investors to Mr. Burnette in

1   this text message?

2   A.   I do.

3   Q.   And at the end of your text message to him you say:   I

4   want to introduce you to them and show them a good time.

5        Do you see that?

6   A.   Yes.

7   Q.   Tell me a little bit about, what's the purpose of --

8   investigative purpose of bringing agents to a city and

9   showing them around and showing them what a good time is?

10  Why would you do that?

11  A.   Well, the purpose wasn't to show them a good time.  That

12  was just to add to the story.  If I was truly the persona I

13  was playing as a real estate developer and these were my

14  investors, then I would entertain them when they came to

15  town.  I would make sure dinner or whatever they would like

16  to do.

17       But in the undercover scenario, that is just me hoping

18  that he will take the opportunity to want to meet with us

19  and, again, for us to have that opportunity to build a

20  relationship with him.

21  Q.   You talked earlier about the mirroring technique that you

22  use to do the things that subjects are interested in doing.

23  Did you have an idea of what that was with Mr. Burnette?

24  A.   Well, I'd only been successful in really having a decent

25  conversation with him was either -- it was usually after

*Michael Miller - Direct*

1   working hours.  Every time I -- the few time I'd tried to

2   talk with him during the day, he was always too busy, just

3   like the meeting at DoubleTree where he was doing -- because

4   he had numerous projects and things going on everywhere, so

5   it was very hard to get him to engage and have a

6   conversation; and then he seemed amenable to always meeting

7   for a drink or after kind of the business day was over.

8   Q.  Okay.  So did you bring these two investors to

9   Tallahassee?

10   A.  I did.

11   Q.  And did you meet up with Mr. Burnette?

12   A.  Yes, we did.

13   Q.  Do you remember what the context for that meeting was?

14   A.  I think we tried to meet; the first time was in the

15   evening and he ended up unable available, and we ended up

16   meeting for breakfast the next morning.

17   Q.  Okay.

18       MS. O'GARA:  Can you zoom out and go to next page.

19   BY MS. O'GARA:

20   Q.  You said in that last text message that you were

21   available on the 14th, correct?

22   A.  Yes.

23       MS. O'GARA:  Can you zoom in on the -- great.

24   BY MS. O'GARA:

25   Q.  So this is on January 13th.  Do you recall this

1    interaction with Mr. Burnette?

2    A.   Yes.

3    Q.   And what were you guys arranging?

4    A.   We were trying to arrange a meeting.

5    Q.   Was this the meeting that you hoped to meet up in the

6    evening?

7    A.   Yes.

8    Q.   And zoom out, and zoom in on the 14th on the bottom.

9    BY MS. O'GARA:

10   Q.   What's going on here?

11   A.   I think this was maybe an address or -- oh, no, that was

12   a -- I don't know what that number was at the top.  And then

13   he basically wasn't available, and so that was -- I was again

14   trying to confirm if he was coming out that night.

15   Q.   Okay.

16        MS. O'GARA:  Zoom out and go to the next page.

17   BY MS. O'GARA:

18   Q.   And this is the next morning, correct?

19   A.   Correct.

20   Q.   And tell us what your communications with him were like

21   the next morning.

22   A.   So we had -- this was -- we had met for breakfast that

23   morning, and then he had something to meet us.  He had

24   something else to do during the day and he was going to meet

25   later that night and then we never hooked up.  We never were

1  able to meet back together.

2      So this was just me thanking him for telling the guys,

3  enjoyed meeting with him, and we would catch up with him

4  soon.

5  Q.  Had you already met him for breakfast the day before?

6  A.  Yes.

7  Q.  And you had tried to meet up with the night before?

8  A.  Right.  He had met us for breakfast and then had other

9  things going on, and had discussed meeting up with us later

10  that night and then he never - he wasn't available.

11  Q.  Okay.  So tell us about breakfast.  What happened at that

12  breakfast meeting?  Who was there?

13  A.  So my two primary investors who were FBI undercover

14  agents.  So Michael Sweets was the -- or Michael Sweet, which

15  we all refer to as Sweets, was the marijuana or cannabis

16  industry investor; and then Brian Butler was the other FBI

17  undercover.

18  Q.  Okay.  And what was the conversation like at breakfast?

19  A.  I mean, we kind of gave him our story of how we knew each

20  other, our business relationships; and then there was a lot

21  of discussion from -- I'll refer to him as Sweets, just to

22  make it simple so it won't be Mike and Mike.

23      Sweets started talking a lot with J.T. about the

24  marijuana industry and cannabis industry and his history with

25  it on the West Coast, and discussion of, you know, how

1  Florida had done their five grow licenses and the

2  opportunities there.  So that kind of started their

3  conversation in that part of the business.

4  Q.  Okay.  And how did the breakfast end?

5  A.  Good.  I mean, it was the first time, again, J.T. really

6  seemed engaged and interested.  So I took it as a very

7  positive meeting.

8  Q.  And when you say he was engaged and interested in, what

9  was he expressing interest in?

10  A.  He just seemed more engaged in us in general.  So I think

11  the introduction of Michael Sweets and the marijuana side of

12  it piqued his interest, which also helped him kind of pay a

13  little bit more attention to the development things that I

14  was discussing.  So it was kind of a combination, that we

15  could tell that relationship had kind of gotten a little bit

16  closer and more a little bit more of a rapport built between

17  us.

18  Q.  And over the course of the next month in January of 2016,

19  did you continue to -- did you see him again?  Did you have

20  additional conversations with him?

21  A.  Yes.

22  Q.  And, just generally, what did you all talk about?

23  A.  We were still -- I was still trying to get kind of his

24  insight and pitch the story of what I wanted to do

25  develop-wise.

1   Q.  Did you continue to talk about the portfolio that you had

2   raised originally?

3   A.  Yes.

4   Q.  And what -- was Mr. Burnette still reacting in the same

5   way to that?

6   A.  Yeah, he never -- he never saw the opportunity to make

7   money, I would say, on that portfolio.  He just did not think

8   the person selling the portfolio would ever come to a number

9   that would make it reasonable to redevelop.

10  Q.  Did he quote any other ideas to you in terms of real

11  estate and development?

12  A.  Not at -- further down the road.  I don't think at this

13  point he had started pitching that -- talking about any of

14  those yet.  But there were numerous ones that he brought to

15  us later.

16  Q.  Okay.

17          MS. O'GARA:  Let's go back to the text messages and

18  scroll forward.  And on the left-hand side.

19  BY MS. O'GARA:

20  Q.  So in late January of 2016, do you recall meeting him for

21  a drink?

22  A.  Yes.

23  Q.  Where did you guys go?

24  A.  I don't remember exactly where we went.  I don't remember

25  exactly where we went that time, so.

*Michael Miller - Direct*

1  Q.  Okay.  Were you generally having the same types of

2  conversations?

3  A.  Yes.

4  Q.  And at this point, do you know whether or not he was

5  talking about other real estate projects in the area?

6  A.  He -- at one point he told us about another building that

7  was on South Monroe that he thought was a better development

8  opportunity; and then somewhere in this time frame he started

9  discussing the Cascade Park, another development opportunity

10  there.

11  Q.  Okay.  Do you recall discussions with him about a project

12  in Jacksonville at some point?

13  A.  Yes.  He -- it was at another meeting; I think it was

14  Sweets and myself and him, and he brought up that he had the

15  opportunity to look at potential hotel, mixed-use development

16  in Jacksonville, Florida.

17  Q.  Okay.

18       MS. O'GARA:  You can zoom back out.

19  BY MS. O'GARA:

20  Q.  Let's look at the next page, on the right-hand side.

21       Mike and Brian, in that text message, who are Mike and

22  Brian?

23  A.  Those are the other two undercovers; so Mike Sweets and

24  Brian Butler.

25  Q.  Okay.  And do you propose meeting up with him when they

1  are in town in February?

2  A.  Yes.

3  Q.  Do you recall if you did meet up with him?

4  A.  We did meet up with him.

5  Q.  And do you remember where that meeting was?

6  A.  I think that meeting happened at Madison Social.

7  Q.  Okay.

8       MS. O'GARA:  Zoom back out.  Go to the bottom half on

9  the left-hand side.

10  BY MS. O'GARA:

11  Q.  And is this just additional coordination to met up with

12  him while y'all are in town?

13  A.  Yes.

14  Q.  Okay.

15       MS. O'GARA:  Go to the next page.

16  BY MS. O'GARA:

17  Q.  And does he in fact propose Madison Social?

18  A.  He does.

19  Q.  Okay.  Do you recall this text message that he sent the

20  day after?

21  A.  Yes.

22  Q.  And what does he tell you?

23  A.  For me to -- he wants me to give him a call, that he has

24  a deal in Jacksonville that he wants to look at with me.

25  Q.  Okay.  Were you interested in the deal in Jacksonville?

*Michael Miller - Direct*

1   A.  No.

2   Q.  Did you tell him that?

3   A.  No.

4   Q.  Okay.

5       MS. O'GARA:  Go to the next page.  And zoom in on the

6   left-hand side.

7   BY MS. O'GARA:

8   Q.  That blue text message, where -- is that you, first of

9   all?

10  A.  Yes.

11  Q.  And you say you're trying to catch up with him on the

12  Jacksonville deal.  Why are you doing that?  Why are you

13  still asking about that?

14  A.  I want every opportunity to spend as much time with him

15  as possible.  Again, we are trying to build that

16  relationship; and so if he proposes some location or

17  something that where I can -- it gives me more face time with

18  him, then we always try to take those opportunities as much

19  as we can.

20     And I'm also trying to continue my legend as a developer.

21  So if he has a deal that's a workable deal, it wouldn't make

22  sense for me to not look at it.

23  Q.  Okay.

24      MS. O'GARA:  Zoom out, go to the next page, the page

25  on the right.  You can do all of it.

```
1    BY MS. O'GARA:

2    Q.  Does he invite you to Jacksonville?

3    A.  He does.

4    Q.  Okay.  And do you agree to go at some point?

5    A.  Yes.

6           MS. O'GARA:  Go to the next page.  Zoom in on the

7    left-hand side.

8    BY MS. O'GARA:

9    Q.  Did you meet up with him prior to going to Jacksonville?

10   A.  We met in Jacksonville.

11   Q.  In Jacksonville.  And is that what that text message is?

12   A.  Yes.

13   Q.  Okay.  And that Corner Bakery that he proposes is in

14   Jacksonville?

15   A.  It is.

16   Q.  So this was in February of 2016, correct?

17   A.  Uh-huh.

18   Q.  So y'all went to Jacksonville; you met up with him?

19   A.  Yes.

20   Q.  And what did you do?

21   A.  We walked around and looked at the project he was -- the

22   location.  We walked around, all around Jacksonville.  We

23   kind of talked about the current environment there, what was

24   happening economically, what was happening development-wise,

25   what opportunity he saw there with this project, that type of
```

1    thing.

2    Q.  Was there a proposal that you would be involved in the

3    project?

4    A.  Yeah.  He wanted to partner on a project with us, with

5    me, there, so.

6    Q.  Okay.  Did that ever happen?

7    A.  No.

8    Q.  Okay.  But he was proposing to partner with you?

9    A.  Yes.

10   Q.  So we saw -- you told us earlier about your first meeting

11   at the DoubleTree when he said he was uninterested in what

12   you had to offer.  What has changed?

13   A.  It was -- the change happened when the introduction of

14   Michael Sweets happened.  So I would equate that as to that's

15   what changed.  That made him look at me and the collective

16   group of undercovers differently, and it started to build

17   that relationship, so.

18   Q.  Do you know, if you know, whether Mr. Burnette was

19   talking to Mr. Sweets?  They had meet, correct?

20   A.  Correct.

21   Q.  Were they also having conversations during this time?

22   A.  At some point in late February, March time frame, they

23   started making direct contact with each other.  They had

24   exchanged contact information and they were going direct with

25   each other.

1  Q.  Okay.

2          MS. O'GARA:  Let's zoom in on the right-hand side.

3  BY MS. O'GARA:

4  Q.  So in late March of 2016 -- that's you in the blue,

5  correct?

6  A.  Correct.

7  Q.  And what do you tell Mr. Burnette?

8  A.  That Mike Sweets had told me that Mr. Burnette was going

9  to meet us in Vegas, it would be a good time.  So, again, I'm

10 just trying to foster that relationship and continue the

11 contact.

12 Q.  And, again, what's in Vegas?  Why Vegas?

13 A.  We were just supposed to go there for an investors'

14 meeting; but, again, it was just to try to find an

15 opportunity to spend some time with him.

16 Q.  Okay.  And Mr. Burnette confirmed:  Good time?

17 A.  Yes.

18 Q.  Go to the next page, and zoom in on the left-hand side

19 there.

20     So this is in mid-May.  Do you recall meeting up with him

21 in mid-May?

22 A.  I don't remember if we met at that time or not.

23 Q.  Okay.

24          MS. O'GARA:  Zoom out, and see the rest of the text

25 messages.  And then the next page the whole page.

```
1          THE WITNESS:  So we were never able to meet up with

2   him at that point when we came into town for those few days.

3   BY MS. O'GARA:

4   Q.  And at 4:34, it looks like he's expressing some

5   disappointment or frustration about that?

6   A.  Yes.  So, I mean, I said:  Tell him we're flying out

7   early, and then he replies.

8   Q.  And what does he say?

9   A.  He says:  Shit.  And then:  I like Vega better than

10  Tallahassee.

11  Q.  And when he says "Vega," did you understand that to be

12  Vegas?

13  A.  Yes.

14  Q.  Okay.

15          MS. O'GARA:  Zoom out and go to the next page.

16  BY MS. O'GARA:

17  Q.  That first text message from him at the top there:  Are

18  you guys here to look at Recess?

19      What is that?  Do you know what that is?

20  A.  Recess was a bar located above Madison Social; and

21  apparently at that time they were looking for capital

22  investors or to sell the ownership of it, so.

23  Q.  Okay.  Was that something you were looking at or

24  interested in?

25  A.  No.
```

1    Q.  Okay.

2           MS. O'GARA:  Go to the next page.

3    BY MS. O'GARA:

4    Q.  Does he propose another possible building or piece of

5    property?

6    A.  Yes.  The Maaco building on South Monroe.

7    Q.  Is that the property that you mentioned earlier?

8    A.  It is.

9    Q.  Do you know what that building was or what his proposal

10   is there?

11   A.  No.  It was one -- of the buildings or kind of the main

12   structure that was in the portfolio that we were pitching was

13   on South Monroe, close to that.  And he was telling me that

14   he thought this was a much better opportunity than the piece

15   I was looking at.

16   Q.  Okay.  So he was processing a different piece of real

17   estate?

18   A.  Yes.

19   Q.  Okay.

20          MS. O'GARA:  Go to the next page.  You can do the

21   whole page.

22   BY MS. O'GARA:

23   Q.  In June of 2016, you say:  Good to see you.  Do you see

24   that?

25   A.  Yes.

1  Q.  Were you back in the Tallahassee in the middle of June?

2  A.  Yes.

3  Q.  And do you recall where you saw him?

4  A.  I don't recall where we saw him.

5  Q.  Okay.  It looks like there's a couple of text messages

6  from him in July and August.  Do you recall, during this time

7  period, how often were you meeting with Mr. Burnette?

8  A.  My communication with him had dropped off significantly

9  because Sweets was in contact -- more direct contact with him

10 and I was working on the other part of the investigation.

11 Q.  Okay.  And, I mean, what was your relationship with

12 Mr. Burnette like at this point?

13 A.  It had gotten much more friendly in comparison to the

14 first three months of the relationship, so that when we would

15 see him it was always a lot more of a friendly relationship;

16 and then his interest with Mike Sweets had grown

17 considerably.

18 Q.  Was he still not that interested in the real estate

19 portfolio that you had --

20 A.  No.  That -- throughout this investigation, he never

21 really kind of -- he never changed his opinion of thinking

22 that that was a bad investment.

23 Q.  At some point, did y'all start talking about other real

24 estate projects in earnest?

25 A.  We did.

1   Q.   What other projects did you start discussing with

2   Mr. Burnette?

3   A.   Over the course of it, the two major ones ended up kind

4   of coming to the forefront, which there was a piece of

5   property that was owned by the city colocated with Cascades

6   Park that was going to be developed, and then there was

7   development out of Fallschase.  And that was a large tract of

8   land that there was different things that were going to

9   happen there, to include selling off a couple pieces for

10  multifamily, and then developing lots for builders to build

11  single-family homes.

12  Q.   Okay.  What did you understand the projects at Fallschase

13  to be?  Besides what you just explained, what was

14  Mr. Burnette's vision that he proposed to you all about what

15  this project was?

16  A.   He basically told us that it was -- there was no lot

17  inventory left in Tallahassee; that all of the builders in

18  town, there was only one location they could go, one

19  development, and that development was owned by another

20  builder and, therefore, they would much rather go somewhere

21  else.

22      He knew what it could be purchased for, and then he

23  recommended that we -- the property was currently zoned or --

24  the property was located in the county, and he thought that

25  we should get the city to annex that property in and that we

1  could then get them to purchase the property around.  There

2  was a lake in conjunction, and they would probably give us

3  $2 million or somewhere in that number to offset the cost of

4  the project to maintain that lake property.

5  Q.  And at this point in time, in the late summer/early fall

6  of 2016, had Mr. Burnette proposed anyway that he would be

7  involved in this project with you?

8  A.  He had not at that point.  He eventually starts kind of

9  defining what his role would be in that involvement.

10  Q.  Okay.  And the $2 million that you talked about that

11  would purchase that property, where would that money come

12  from?

13  A.  I don't remember.  There were a couple of different

14  funding mechanisms that we discussed, but basically he --

15  Mr. Burnette said if we can get it out of control of the

16  county and annexed into the city, that potentially the city

17  could come up with the funding for that.

18     We constantly talked the CRA, which was the Community

19  Redevelopment Authority -- or, Association.  I may have those

20  backwards.  But that was one funding mechanism for a lot of

21  the projects that historically had been done, which was kind

22  of a tax credit side of it.  Then there were other dollars

23  that he, that Mr. Burnette was very familiar with that the

24  county or the city had set aside to buy certain pieces of

25  property or that developers could use to help their projects,

1   so.

2   Q.   Okay.  So throughout these text messages that we've

3   looked at, there have been a number of references to Vegas,

4   and you said you talked to him about these investor meetings.

5   In the late summer of 2016/early fall, did the possibility of

6   an investor meeting come up with Mr. Burnette again?

7   A.   Yes.

8   Q.   And where was that investor meeting going to be?

9   A.   Again, we discussed Vegas.  At one point somehow there

10  was a discussion between Mr. Burnette and Mr. Butler even on

11  going to a live concert.  I mean, there were multiple

12  different locations and events that they talked about

13  attending together, so.

14  Q.   Was there a determination made on where an investor

15  meeting would be that fall?

16  A.   I don't think we ever lined one up for that.  That fall,

17  we were still looking at Vegas or Nashville.

18  Q.   Okay.  And did y'all eventually take a trip to Nashville

19  with Mr. Burnette?

20  A.   We did.

21  Q.   I want to ask a little bit, just operationally, why would

22  you want to leave Tallahassee with Mr. Burnette?  What was

23  the purpose of that from an undercover investigative point,

24  perspective?

25  A.   Well, two-fold for us:  One is, again, it gets him a more

1  intimate relationship with us.  So we get to spend more time

2  with him, we get to hang out with him, and we can kind of

3  control his time.  We know any time we were in Tallahassee,

4  which you can kind of see from the messages, we may get a

5  breakfast, we may get a dinner, but we would -- you know, he

6  was very busy.  He had tons of different businesses and

7  things going on all the time, and so it was very hard for us

8  to kind of get a lot of focused time with him and we knew we

9  needed that.

10     So we were trying to get him out of town so that we could

11  really spend some time with him and get further into the

12  investigation of collecting the evidence that the case agent

13  was looking for.

14  Q.  And the different places that you all had talked about --

15  it sounds like you talked about Nashville, you talked about

16  Vegas, these type of cities.  Why would you want to go to

17  those types of cities like that with Mr. Burnette?

18  A.  Well, those, we were -- again, we had kind of noticed

19  that usually he was more open to relaxing and talking to us

20  after business hours and stuff.  So those are places that are

21  easy to entertain any day of the week.  You know, if you pick

22  a town where there's nothing going on on a Tuesday night,

23  it's tough to have anything more than a dinner.  So we wanted

24  a place that would give us, you know, an extended period of

25  time to just hang out with him and spend some time with him.

1  Q.  And did Mr. Burnette come to Nashville and meet with you

2  in 2016 in the fall?

3  A.  Yes, he did.

4  Q.  Who else was there?

5  A.  In Nashville?

6  Q.  Who else came to Nashville?

7  A.  Mike Sweets and Brian Butler, the two other undercovers

8  that he had previously met.

9  Q.  So he already knew these individuals?

10  A.  Yes.

11  Q.  And what was -- what was your plan for what you were

12  going to do in Nashville?

13  A.  So we knew at some point we wanted to do a -- for lack of

14  a better term, a formal meeting, a real sit-down meeting in a

15  place in a controlled environment.  But we also wanted to

16  entertain him.  And, again, we were still building the

17  rapport and the relationship.

18      At that point he really had not opened up to us and

19  really kind of said, hey, you know, here's how I get things

20  done and businesses done in Tallahassee, and giving us what

21  we would -- you know, kind of open the door for us to see

22  behind the curtain type thing of how things really happened.

23      So we were hoping that this trip would be where he would

24  really start to let us in.  So we were going to -- the first,

25  the plan was the first night to just go out, like no -- try

1   to not have to discuss business, just purely hanging out,

2   building rapport, and then the next day to do a meeting.  We

3   had rented a hotel room that was a suite so that we knew we

4   had a place that we could control the -- we could get a good

5   recording.  We could set up audio-video recording equipment,

6   and that we could really sit down and have a meeting that we

7   knew could capture a good recording.

8   Q.  So that first night in Nashville, did you all go out and

9   spend time socially with Mr. Burnette?

10  A.  We did.

11  Q.  And did you record that evening as well?

12  A.  We did.

13  Q.  Okay.  I'm going to show you Government's Exhibit 351 and

14  the transcript is 352.

15          THE COURT:  Government's Exhibit 351 and 352 are

16  admitted.

17      (GOVERNMENT EXHIBIT NOS. 351 AND 352:  Received in

18  evidence.)

19      (Government's Exhibit 351 published to the jury.)

20          MS. O'GARA:  We switched the mike.

21          THE COURT:  Can we try driving this off one of the

22  other computers or --

23      (Pause.)

24          Are we at the point where it would help just to take

25  a break?

```
 1            IT:  One more minute, Judge.  We could be very close.

 2       (Pause.)

 3            IT:  I'm sorry, Judge.

 4            THE COURT:  All right.  It would be earlier than we

 5   would ordinarily break, but it's close.  Recall my

 6   instructions:  Don't discuss the case.

 7            Jury out, please.

 8       (The jury exited the courtroom at 2:34 p.m.)

 9            THE COURT:  Does either side need me before we break?

10            MR. NOTHSTEIN:  No, Your Honor.

11            MS. O'GARA:  No, Your Honor.

12            THE COURT:  All right.  Mr. Miller, if you would be

13   on that stand at 2:50 by that clock.  We'll take 15 minutes.

14   We'll start back at 2:50, unless it will take us longer to get

15   the equipment up and going.  We'll be in recess.

16       (A recess was taken at 2:35 p.m.)

17       (The proceedings resumed at 2:50 p.m.)

18       (Defendant present; jury not present.)

19            THE COURT:  Please be seated.

20            Jury in, please.

21            Ms. O'Gara, I'm told that it would be a lot easier if

22   you would speak up louder.  The court reporter and the

23   courtroom deputy and I have noticed the same thing.

24            MS. O'GARA:  Yes, Your Honor.  I have received the

25   message.  I will do my best.  I apologize.
```

1          THE COURT:  They may have delivered it directly.

2    Thank you.

3          (*Jury entered the courtroom at 2:50 p.m.*)

4          THE COURT:  All right.  You may be seated.

5          Mr. Miller, you are still under oath.

6          Ms. O'Gara, you may proceed.

7          MS. O'GARA:  Thank you, Your Honor.

8    BY MS. O'GARA:

9    Q.  Mr. Miller, we were talking about your trip to Nashville

10   right before the break.

11   A.  Yes.

12   Q.  Do you recall meeting with Mr. Burnette the night before

13   the planned meeting, the formal meeting?

14   A.  Yes.

15   Q.  And where were you guys?

16   A.  We bounced around to a bunch of different bars and

17   restaurants right on Broadway, downtown Nashville.

18   Q.  And were you just -- what were you doing?  Why were you

19   bouncing around to different bars?

20   A.  We were just showing him around downtown Nashville.  So

21   we'd go to -- talk about different locations, we'd walk in

22   one place and have a drink or something and then walk to the

23   next one.

24   Q.  I think you said you were recording as well?

25   A.  Yes.

1       MS. O'GARA:  Your Honor, we're going to hopefully

2  play Government's Exhibit 351.  The transcript is 352.

3       THE COURT:  Those are admitted.

4     (*Government Exhibit No. 351 published to the jury.*)

5  BY MS. O'GARA:

6  Q.  Mr. Miller, do you recall this conversation?

7  A.  Yes.

8  Q.  And what did you know about Mr. Burnette and the

9  DoubleTree?

10  A.  I knew he was the owner of the DoubleTree.

11  Q.  Okay.  Had he ever talked to you about how he purchased

12  the DoubleTree before?

13  A.  No.

14  Q.  And so when he says, I knew I could kill it, what did you

15  understand that to mean?

16  A.  He's explaining, before he purchased it, that there was

17  another hotel project that was proposed for downtown

18  Tallahassee; and if that happened, it would devalue the

19  DoubleTree by $7 million, and he could basically stop the

20  development of the other hotel.

21  Q.  And when he says, Politically, I knew I had it, did you

22  know what that meant?

23  A.  We -- I had a --

24       MR. JANSEN:  Objection, calls for speculation.

25       THE COURT:  Sustained.  You'll have to rephrase the

1  question.

2  BY MS. O'GARA:

3  Q.  When Mr. Burnette was telling this story about the

4  DoubleTree, what was he demeanor like?

5  A.  He was very relaxed, comfortable, confident.

6  Q.  You understood that he owns the DoubleTree, correct?

7  A.  Yes.

8  Q.  Before this conversation, did you have any ideas about

9  the way that he -- did you have any understanding about how

10  he purchased the -- the manner he purchased the DoubleTree?

11  A.  No.

12  Q.  What was your impression of the manner in which he

13  purchased the hotel after he told you this story?

14  A.  That it was a calculated decision on how he strategically

15  was formulating a way to buy it at a discounted price.

16      So every business deal and conversation I ever had with

17  Mr. Burnette, he analyzes and has the next steps down to a T

18  with every deal he does on how he can maximize his profit on

19  that deal.

20  Q.  Okay.

21      (Audio continued.)

22      So, Mr. Sweets there said, You had a stacked deck.  Do

23  you remember this?

24  A.  Yes.

25  Q.  And then what is Mr. Burnette's response to that?

1    A.   He acknowledges, yes.

2    Q.   Mr. Sweets says:  That's kinda what I want to get into

3    tomorrow.  What does that mean?

4    A.   So this was the first time Mr. Burnette kind of started

5    telling us how he conducted business and was able to get

6    things done in Tallahassee.

7        We knew we had scheduled a meeting tomorrow in the hotel

8    room where we wanted to get into that, and we knew usually in

9    a -- and you can hear from the audio, we know -- we don't

10   know what the recording sounds like while we are doing, but

11   we know there is a lot of background noise.  So we would

12   normally try to make a note to have that conversation or

13   recreate the conversation the next day when we know there is

14   going to be a good audio recording.

15   Q.   And that's what Mr. Sweets means right there?

16   A.   Yes.

17   Q.   Wants to talk about that issue again.

18        MS. O'GARA:  Okay, continue.

19        (Audio continued.)

20   BY MS. O'GARA:

21   Q.   So Mr. Burnette asked you about Fallschase here, right?

22   A.   Yes.

23   Q.   And you responded to the question.  Did you know what he

24   was talking about?

25   A.   No.

1    Q.   Had you ever talked to him about Fallschase before then?

2    A.   I don't think it had ever come up before then.

3    Q.   Okay.  Go ahead.

4         (Audio continued.)

5         So Mr. Burnette says that he doesn't know anything about

6    lots development.  Was that your understanding or your

7    impression?

8    A.   That he didn't know anything about lot development?  I

9    did not know of him ever doing a project that was lot

10   development previously.

11   Q.   With Fallschase, did you understand that to be a lot

12   development project?

13   A.   Yes.  That would be one where you would be selling lots

14   to homebuilders to build single-family homes.

15   Q.   Okay.

16        (Audio continued.)

17        This was a very long conversation about lots and numbers

18   in there.  Did you get the impression that Mr. Burnette had

19   looked into Fallschase?

20   A.   Yes.

21   Q.   And at this point, again, had you have any conversations

22   with him about Fallschase?

23   A.   Not at this point.

24   Q.   So this was all new information to you?

25   A.   Yes, it was.

1   Q.  Do you recall exchanging some text messages with

2   Mr. Burnette the next morning?

3   A.  Yes.

4           MS. O'GARA:  If you would could go back to

5   Government's Exhibit 203 and scroll forward to September

6   2016.

7   BY MS. O'GARA:

8   Q.  Is that you on the right-hand side in the blue?

9   A.  It is.

10  Q.  Okay.  And those first few text messages that morning

11  around 11:30 and 12:00, what are you communicating with

12  Mr. Burnette about?

13  A.  Just checking in with him.  When we left the bar that

14  night he did not leave with us, and so I was just checking to

15  see where he was.

16  Q.  Okay.  And did you meet up with him that morning or that

17  day?

18  A.  Yes, I met up with him that morning, or midday; sometime

19  that morning, lunchtime, somewhere around there.

20  Q.  And was it just the two of you?

21  A.  Yes.

22  Q.  And first of all, why did you meet up with him?

23  A.  Mr. Burnette wanted to talk to me about -- so we were

24  scheduled to meet with the investors, the two other

25  undercovers, that afternoon.  Mr. Burnette knew that that

1  meeting was happening, so he wanted to talk to me prior to

2  meeting with the investors.

3  Q.  And what did you guys talk about?

4  A.  Basically, he told me -- you know, it was really a

5  courtesy meeting.  He basically was, like:  Hey, here's what

6  I'm planning on telling the investors.

7      I think at that point he wanted to make sure he wasn't

8  going to do something that made me look bad to my investors.

9  He was obviously still very down on the original portfolio

10  that I was planning on developing, and so he was going to

11  bring up the Fallschase development and he was going to bring

12  up the development across from Cascades Park to the investors

13  during that meeting that afternoon, and we wanted to make

14  sure we were on the same page prior to the meeting.

15  Q.  Okay.  Did he give you a preview of sort of what his role

16  or his interests would be in those projects?

17  A.  He did.

18  Q.  What did he tell you?

19  A.  So he -- this is the first time he kind of told myself

20  and all the undercovers later that afternoon in that meeting

21  what his role would be in getting involved with us on a

22  project.

23      So, essentially, what he told us is that he would take 20

24  percent of what he refers to as the pref.  So if the -- the

25  investors would put their money into a project, they would

1  get paid -- as the project developed, they would get paid

2  their money out plus their profit, a certain profit; and then

3  the -- what was left, the profit that was left was

4  essentially mine as the developer.  He would take 20 percent

5  of that money, and for that he said he would deliver the

6  politics.

7  Q.  And he previewed this to you that sort of midmorning,

8  midday --

9  A.  Yes.

10  Q.  -- that meeting?

11      And was it consistent with what he told the investors

12  later that afternoon?

13  A.  Yes.

14  Q.  Okay.  That meeting that happened that afternoon, who was

15  there?

16  A.  The meeting in the hotel room?

17  Q.  Yes.

18  A.  Myself, the other two undercovers, so Mike Sweets and

19  Brian Butler, and then Mr. Burnette came to the meeting.

20  Q.  Again, what was the purpose of doing sort of a formal

21  sit-down meeting like this?

22  A.  We knew we could control the environment.  So we had

23  audio-video recording devices set up, and we had -- so that

24  we knew that we could capture a good recording.

25  Q.  So that from an operational standpoint, what did you lead

1  Mr. Burnette to believe the purpose of the meeting was?

2  A.  I mean, we told him that, again, that the purpose of this

3  trip was still an investor's meeting; so that we still needed

4  to talk about some business and what our plans were in

5  Tallahassee.  Yeah, we were there to have a good time, but we

6  still at some point had to have a business meeting, and that

7  was the time to do that.

8  Q.  And how did you start that conversation, if you recall,

9  or formal meeting?

10  A.  I don't recall exactly how I started it.

11  Q.  Okay.  Did you record it?

12  A.  We did record it.

13  Q.  Okay.  And so I'm going to show you Government's

14  Exhibit 6, and the corresponding transcript is Government's

15  Exhibit 10.

16        MR. JANSEN:  No objection.

17        THE COURT:  Government's 6 and 10 are admitted.

18     (GOVERNMENT EXHIBIT NOS. 6 AND 10:  Received in evidence.)

19  BY MS. O'GARA:

20  Q.  So, first of all, where are you?

21        MS. O'GARA:  Sorry.  Can you pull up at the beginning

22  where it was.

23        THE WITNESS:  We are at a suite at a hotel in

24  downtown Nashville.

25  BY MS. O'GARA:

1   Q.  And on this video that we can see on the screen here, who

2   is this there?

3   A.  That is myself on the left and Mr. Burnette on the right.

4   Q.  Was anyone else in the room?

5   A.  Yes.  Michael Sweets and Brian Butler were also in the

6   room.

7   Q.  We don't see them on this shot.  Where are they sitting?

8   A.  They are directly in front of -- so myself and

9   Mr. Burnette are sitting on the couch, and they are on the

10  other side of that table.  So one is to my right and one is

11  to Mr. Burnette's left, kind of.

12  Q.  And this was the setup for the formal business meeting

13  that you were going to have with Mr. Burnette?

14  A.  Yes.

15  Q.  Okay.

16       MS. O'GARA:  Let's go ahead and play it.

17      (Government Exhibit 6 published to the jury.)

18  BY MS. O'GARA:

19  Q.  These references that Mr. Burnette is making to Starwood

20  and Marriott, is he talking about hotels?

21  A.  Yes.

22  Q.  Did you know him to be involved in the hotel business?

23  A.  We knew he owned the DoubleTree and had previously owned

24  another hotel, or was a partner in another hotel.

25  Q.  Do you know why he is talking to about hotels right now?

1  A.  Something came up in the conversation.  This is right

2  when the Marriott and Starwood had combined their rewards

3  system and became one, and so I think -- I think it was

4  Sweets who originally had asked him kind of his opinion on

5  how that was going to work out as far as it becoming one

6  system.

7  So he was just explaining to us his opinion of how that

8  system worked and how the inner workings of being under

9  Marriott versus Hilton and how that percentage of profit

10  breaks down.

11  Q.  Okay.

12  (Audio continued.)

13  When Mr. Burnette says "oceanfront," first of all, do you

14  know what particular parcel he is talking about here?

15  A.  You're talking about that Sweets is talking about,

16  references?

17  Q.  Yes.  This parcel that Burnette and Sweets are talking

18  about, when he says, One particular parcel; and Sweets says,

19  The one parcel isn't necessarily oceanfront property?

20  A.  Okay.  Yeah, so there they are talking about the largest

21  parcel that was part of that portfolio that we were looking

22  at.

23  Q.  And that's the portfolio that Mr. Burnette was not

24  excited about?

25  A.  Correct.

1    Q.  And Sweets that one property wasn't necessarily

2    oceanfront property, what does he mean by that?

3    A.  He's just making a reference that it's not a prime

4    location for development.  So there is nothing that would

5    make it attractive.

6    Q.  So "oceanfront" doesn't necessarily mean actually

7    oceanfront?

8    A.  No.

9    Q.  It just means prime property?

10   A.  Yes.

11   Q.  Okay.  Go ahead.

12        (Audio continued.)

13        So, Mr. Burnette brings up Scott Maddox.  Had you ever

14   heard Mr. Burnette talk about Scott Maddox before this?

15   A.  No, not before this.

16   Q.  Did you know who Scott Maddox was?

17   A.  I did.

18   Q.  I'm sorry?

19   A.  I did know who he was.

20   Q.  Okay.  But you'd never heard Mr. Burnette talk about him

21   before?

22   A.  No.

23   Q.  Okay.

24            MS. O'GARA:  Go ahead.

25            (Audio continued.)

1    BY MS. O'GARA:

2    Q.  So all of this discussion, all of the comments from

3    Mr. Burnette about city managers and Mr. Maddox and his

4    influence, what is he telling you here?  What's your

5    understanding of what he's trying to do?

6    A.  He is for the first time really telling us how he can

7    control things politically as far as the development of

8    projects, anything that has to be approved by the city.  He's

9    explaining his relationship with Scott Maddox and why that's

10   an advantage for him and any deal that he does, or would be

11   for us if we partnered with him.

12   Q.  And what is he telling you about Mr. Maddox's influence

13   on the city manager?

14   A.  He -- so, previously, Mr. Maddox had been the mayor of

15   Tallahassee, and at the time he hired Anita as the city

16   manager.  So her loyalty was to Scott, so he could -- or

17   Mr. Maddox.  And Mr. Maddox could -- he was a current city

18   council member.  They could not have a meeting with another

19   city council member to discuss something that was up for a

20   vote; however, he could then have a meeting with Anita and

21   get her to essentially pass -- sway the other city council

22   members without him having to violate the rules of having a

23   meeting with other city council members.

24   Q.  Okay.

25        (Audio continued.)

1    So Rick Fernandez, would did you understand that to be?

2   A.   So at the time when we were doing this, he was the

3   current city manager at that time.

4   Q.   And the city manager, would he have any involvement in

5   anything related to development projects in the city?

6   A.   Yeah.   I mean, everything comes through -- planning and

7   zoning, everything, basically all those departments work for

8   him.

9   Q.   Okay.   And so what does Mr. Burnette tell you about

10  Mr. Maddox and Rick Fernandez?

11  A.   Basically, that Mr. Maddox had made a strategic move

12  because he was leaving the council, to nominate Mr. Fernandez

13  so Mr. Fernandez would be loyal to Mr. Maddox even after he

14  left the city council, because he was planning to run for a

15  different position; but that Mr. Maddox knew he wanted

16  Mr. Fernandez to know he's the one that got him that job so

17  he would still have that power and control.

18  Q.   And you said that Mr. Maddox was no longer on the city

19  council.   At the time, Mr. Maddox was a city commissioner?

20  A.   He was at the time of this recording.   But at the time,

21  Mr. -- there was a period where he had a break where he was

22  not on -- he was not on the city council for a period of

23  time, and -- but when he nominated Mr. Fernandez he was, but

24  he was considering running for a different position as the, I

25  think, superintendent of the schools.

1   Q.   Okay.  Was that earlier?

2   A.   Yes.

3   Q.   So previous to this time period?

4   A.   Yes.

5   Q.   So at the time that you're talking with Mr. Burnette, you

6   understood Mr. Maddox was on the city commission?

7   A.   He was a current city council member, yes.

8   Q.   Okay.

9           MS. O'GARA:  Go ahead.

10          (Audio continued.)

11  BY MS. O'GARA:

12  Q.   So Mr. Burnette, here, he said earlier that, Scott and I

13  have always done deals together, and then he goes on to talk

14  about this project.  What did you understand that to mean?

15  A.   Which part?  The project or the --

16  Q.   What was the project, and what was the relationship with

17  Mr. Maddox?

18  A.   So the Cascades Park, there were two parcels there that

19  were development opportunities.  One of them, he's describing

20  it in reference to The Edison restaurant.  One's out the

21  front door and one's out the back door.

22       So North American Properties had secured one of those

23  properties, and he is essentially explaining to us that the

24  agreement was they were going to give North American

25  Properties this project, and the other parcel was basically

*Michael Miller - Direct*

1    Mr. Burnette's, if he wanted it, essentially to keep him and

2    North American Properties from getting into a competition

3    over the first parcel.

4        But then he's also explaining to us that, basically, he

5    can deliver that parcel; it's been promised to him, but that

6    he just doesn't have the time or resources to deal with it

7    right now, and so he would be willing to partner with us to

8    develop that parcel.

9    Q.   And this is different from the Fallschase project?

10   A.   Different project.

11   Q.   And did you have an understanding, based on what he's

12   just describing, about what Mr. Maddox's role in this was?

13   A.   Yeah.  Essentially, he's explaining to us; so, the city

14   council was composed of five members and so there's five

15   votes for anything that gets approved.  And he's explaining

16   to us that Scott Maddox is one of those votes and essentially

17   controls two additional votes.

18       So, basically, he -- anything that -- because of his

19   relationship with Scott Maddox, anything of his, he knows

20   he's got at least a 3-2 vote.

21   Q.   Okay.

22       (Audio continued.)

23       The Joan Fregly property, what is that?  What's he

24   referring to?

25   A.   That's the original portfolio of property that we started

1  with.

2  Q.  Okay.  So when he's expressing dislike with that, he's

3  just saying what he's always said about that?

4  A.  Yes.

5      (Audio continued.)

6  Q.  So what was Mr. Burnette describing here?

7  A.  He's describing what his role would be in partnering with

8  us on developing that project.

9  Q.  And what is his role?

10  A.  He would deliver -- for basically 20 percent of the total

11  profit, he would deliver the politics.  He says he doesn't

12  want to be the developer, he doesn't want to build anything,

13  he just wants to deliver the politics.

14  Q.  And what is the specific way that he proposed to you to

15  deliver the politics?

16  A.  Again, it's a city project, so he is referencing the fact

17  that he has Scott Maddox, and he can work with Scott to make

18  sure that he can get the politics.  So anything that would

19  need to be approved -- or, for instance, in this case it

20  would be the city awarding us the property to develop on.

21  Q.  Okay.

22      (Audio continued.)

23      When Mr. Burnette was saying, We are the largest

24  contributors, do you know what he was talking about?

25  A.  Contributors to the city council members' campaign for

 1   reelection.

 2   Q.   And when he said, We are the large contributions, do you

 3   know who he was referring to?

 4   A.   Himself and the companies he was associated with.

 5   Q.   Do you recall that, in this conversation, you went on to

 6   talk a little bit more in detail about the specific city

 7   commissioners and their votes?

 8   A.   Yes.

 9   Q.   I'm going to show you Government's Exhibit 7, and the

10   corresponding transcript is 11.

11           MS. O'GARA:  Move to publish it.

12           THE COURT:  Those are admitted.

13       (GOVERNMENT EXHIBIT NOS. 7 AND 11:  Received in evidence.)

14   BY MS. O'GARA:

15   Q.   What is Sweets talking about when he says -- and what is

16   the market budget?  What is this in reference to?

17   A.   So Sweets is asking Mr. Burnette -- he says he doesn't

18   really care who the particular council members that can be

19   bought, or -- he just wants to know that the votes can be

20   bought.  And he's looking for that reassurance from

21   Mr. Burnette, which he gives him, and he's telling him that:

22   We'll -- we creatively will hide it in the development

23   project under our marketing budget.

24           MS. O'GARA:  Okay.

25           (Audio continued.)

*Michael Miller - Direct*

1    BY MS. O'GARA:

2    Q.  When Mr. Burnette says, it's not going to be an easy

3    thing to get done with Jackie because he's under so much

4    scrutiny, what does he mean by the easy thing to get done?

5    A.  He's comparing doing -- getting a project or something

6    approved through with the schools versus the city of

7    Tallahassee.

8    Q.  What is the easy thing to get done with Jackie?  What is

9    that?

10           MR. JANSEN:  Objection, speculation, Your Honor.

11           THE COURT:  Sustained.

12   BY MS. O'GARA:

13   Q.  Who did you understand Mr. Burnette to be talking about

14   here?

15   A.  Brian Butler, the undercover, his legend was in the

16   getting government contracts for green energy projects, so

17   his market was to do a project with the school district.  And

18   so Mr. Burnette was basically explaining to him there is no

19   way to ensure or buy influence over the school board right

20   now to guarantee you could get a project.

21   Q.  Okay.

22       (Audio continued.)

23       What did you understand Mr. Burnette was talking about

24   when he said, Access starts at a hundred thousand dollars?

25   A.  So my understanding, what he's referring to is:  You're

1  going to have to pay at least $100,000 or contribute at least

2  $100,000 to any individual politician to truly have access.

3      And so then he's explaining that:  There's no reason to

4  write a hundred thousand dollar check unless your project is

5  worth at least a million dollars; that it's not a good

6  investment to spend $100,000 to get a project approved if

7  it's not going to make you at least a million.

8  Q.  Okay.

9      (Audio continued.)

10      First of all, who is Nancy?

11  A.  He's referring to Nancy Miller, who is another city

12  council member.

13  Q.  So when he says, Nancy is not for sale, what is he

14  talking about there?

15  A.  I think he is putting that into contrast with Scott

16  Maddox, and that vote is not for sale; that in order to get

17  her vote you have to coerce her, she's morally driven, that's

18  how you get her to vote your way.

19  Q.  And is this a different conversation than the access

20  conversation that you all were having earlier?

21  A.  The access conversation -- so the previous part where

22  Butler was talking, it was focused on the green energy

23  contracts.  Now we're going back to -- back into the

24  conversations about the development and how things would get

25  approved in the city of Tallahassee.

*Michael Miller - Direct*

```
 1        So Sweets was bringing it back to the original
 2   conversation.  We have moved on from, basically, Mr. Burnette
 3   didn't have an answer for Mr. Butler on an opportunity on the
 4   state level, or anywhere else, to get a contract.  So we now
 5   are going back to talking about the city.
 6   Q.  And Nancy Miller is a city commissioner, correct?
 7   A.  She is.
 8   Q.  Okay.  Go ahead.
 9        (Audio continued.)
10        Mr. Miller, do you know who Mr. Burnette is talking about
11   here?
12   A.  Kim Rivers.
13   Q.  Do you know who that is?
14   A.  I believe it's his wife now.  At the time she was his
15   girlfriend, and I think they were living together at the
16   time, and business partner.
17   Q.  I'm sorry?
18   A.  Business partner.
19   Q.  Can you say that again?
20   A.  I'm sorry.  I was saying that at the time it was his
21   girlfriend, they lived together, and they were business
22   partners or worked together in all of their business
23   ventures.
24   Q.  Okay.  Thank you.
25        (Audio continued.)
```

*Michael Miller - Direct*

1    When Mr. Burnette is talking about Scott, Scott Maddox,

2  when he says, you can can get there with them, what is your

3  understanding of what he's telling you?

4  A.  Again, he's explaining to us -- we're asking him what we

5  would have to pay in order to ensure that we would have the

6  votes to get an approval through the city council.  And he

7  again is explaining that Nancy and Gil's votes are not for

8  sale; that they have to be convinced to vote for something,

9  and putting that in contrast with Scott Maddox in saying that

10  that vote -- inferring that that vote can be purchased.

11  Q.  Okay.

12         MS. O'GARA:  Go ahead.

13         (Audio continued.)

14  BY MS. O'GARA:

15  Q.  Right there where Mr. Burnette uses quotes, what was he

16  referring to?

17  A.  He's referring back, earlier in the recording where we

18  discussed payments for votes, that we backed that into our

19  marketing budget on the development.

20  Q.  So what did that mean to you when he put that in quotes?

21  A.  So I'm telling him that I usually factor in 10 percent to

22  pay for votes on a project in other places; and he's --

23  basically equates that to our marketing budget.

24  Q.  Okay.

25         (Audio continued.)

1      What is Mr. Burnette describing to you right here?

2  A.  So we're trying to get a firm number or a percentage of

3  what it's going to cost us to pay for votes in Tallahassee,

4  and essentially he won't give us a firm number.  He's saying:

5  It depends on the project.  It depends on how hard of an

6  approval it is; and references that nothing costs less than

7  $25,000, and you can get pretty much get anything done for

8  $100,000.

9      So, for example, in the Fallschase development, he's

10 talking that we could potentially -- he's going back to that

11 where they would buy some of the lots for $3 million.  So he

12 is telling us that if we told Scott Maddox to go find us $3

13 million from the blueprint -- which is a funding mechanism

14 between the county and the city -- that we would then have to

15 pay Scott $10,000 for the next three years for him finding us

16 that $3 million of money from the city and the county.

17 Q.  And does he describe how that has to go through his

18 lobbying firm?

19 A.  He says he'll pay it, yeah, through lobbying it through.

20     (Audio continued.)

21 Q.  That's the end.

22         MS. O'GARA:  Your Honor, we'd move on to the rest of

23 it, Government's Exhibit 8, and the corresponding transcript

24 is 12.

25         THE COURT:  All right.  Government 8 and 12 are

1   admitted.

2       (GOVERNMENT EXHIBIT NOS. 8 AND 12:  Received in evidence.)

3   BY MS. O'GARA:

4   Q.  So, there's a lot of conversation here about Adam.  Can

5   you just tell us what that is all about, briefly?

6   A.  Sure.  Adam Corey was a lobbyist in Tallahassee that we

7   were -- we had retained his services and were using him to

8   set up meetings as another part of this investigation.

9   Q.  And what's Mr. Burnette's perspective on that

10  relationship, you paying Mr. Corey?

11  A.  Basically, he's discounting the value of Adam Corey.  He

12  says -- in there, he says:  He may be the last 10 percent,

13  but he's not the 90 percent of the deal.  So he can,

14  essentially, only get you one of the five votes on the city

15  council.

16  Q.  Okay.

17      (Audio continued.)

18      Mr. Miller, first of all, do you know what the CRA is?

19  A.  Yes.

20  Q.  What is it?

21  A.  It's the -- I don't know if it's Community or County

22  Redevelopment Authority.  It's a joint partnership with the

23  city and the county that, again, they help give rebates to

24  developers for developing projects so that you're getting

25  incremental part of your tax dollars back when you develop a

1    new project.

2        So it's a way to incentivize developers to work in a

3    particular area.

4    Q.  Okay.  Did you know, or was it explained to you what, if

5    any, role Mr. Maddox had on the CRA?

6    A.  We knew he was -- it's nine members, so it's composed of

7    the city council and the county commission.  So he is one of

8    the voting members on the CRA.

9    Q.  Okay.

10        (Audio continued.)

11        So you just described how the CRA is composed of nine

12    members, including the five commissioners?

13    A.  Yes.

14    Q.  And this discussion right here about the different

15    commissioners, what is Mr. Burnette saying about how to win a

16    vote on the CRA?

17    A.  He's just giving an example of -- so you got -- in order

18    to get an approval, you would need five votes.  And, for

19    example, he's saying that, if you had Curtis's vote, then you

20    would automatically get Andrew Gillum's, who was the mayor,

21    vote, and then you had to get Gil, Nancy, and Scott.  And

22    then he says, you have to pay Scott.

23    Q.  To get his vote?

24    A.  Right.  And then you would have a -- at least a 4-5 vote.

25    So at that point it didn't matter how the county

1 commissioners voted because you already had the five you

2 needed.

3 Q.  Right.

4     (Audio continued.)

5     This cup description, what's he talking about?  What did

6 you understand him to mean?

7 A.  He explained it in more detail earlier.  So he basically

8 is referring to every project or deal that you would have

9 that would come up for a vote in front of the city council or

10 county commission, he is referring to as a cup.  So he's

11 saying the merits of that project alone will fill that cup up

12 a certain percentage.

13     So if everybody in the community wants a project to go,

14 then that cup is pretty much almost all the way full; so,

15 therefore, for someone to vote for it, it doesn't cost them

16 much political capital.

17     However, if it's a very controversial issue, that cup is

18 not very full; and, therefore, it costs that politician more

19 political capital to vote on that; and, therefore, that's

20 where your level of compensation to pay for that vote is

21 going to be higher.  If the ask is greater of that

22 politician, then it's going to effectively cost you more

23 because it costs them more political capital.

24 Q.  Okay.

25     (Audio continued.)

*Michael Miller - Direct*

1    So this whole set here, this whole section here where

2  Mr. Burnette starts by saying, I'm not trying to noodle my

3  way in, what did you understand he wanted to do?

4  A.  So he's basically -- this is the first time he's talking

5  about partnering with us, becoming a partner or a member

6  of -- kind of working with us on a project.  So he's

7  explaining that what he would bring to the equation of

8  helping us do this development project.  So he is explaining

9  that he doesn't have the time, he wants me, as the developer,

10 to run the project, and my investors would put up the money

11 to fund it, but we would do an pro forma to say, okay, to

12 make the money we want on this project, it is short

13 $2 million, and when he says he'll go find that $2 million as

14 an example, he means he will go get that money from either

15 the city or the county or some government entity to make the

16 numbers work the way we want it to.  And he wants to

17 capitalize on the political equity -- I can't remember the

18 term he used -- that he has already invested -- he already

19 has, the political capital that he already has.

20 Q.  Did you understand that he wanted in?

21 A.  Yes.

22 Q.  Okay.

23     (Audio continued.)

24     What's happening right here?

25 A.  Mr. Butler had to leave.  So he's leaving the meeting.

1   So 4:50 or something, that's him calling -- he's calling the

2   valet to bring his car in.

3   Q.  And he's one of the individuals who we couldn't see in

4   the video?

5   A.  Yes, he's one of the undercovers that you can't see.

6        (Audio continued.)

7   Q.  After this meeting which -- what time of day was this?

8   A.  What time of day?

9   Q.  Yes.

10  A.  Midafternoon.

11  Q.  What did you guys do after that meeting?

12  A.  We all went our separate ways for a while and met back up

13  later that evening.

14  Q.  And how did the rest of the trip go?

15  A.  The rest of the trip was all very little discussion of

16  business or anything.  It was all just ingratiation, rapport

17  building, hanging out.

18  Q.  You guys went out to dinner that evening?

19  A.  We did.

20  Q.  And what happened the next day?

21  A.  We all went our separate ways, flew out of town.

22  Q.  So there was a lot of discussion -- well, first of all,

23  you told us that was the first time you'd heard Mr. Burnette

24  mention Scott Maddox, correct?

25  A.  Yes.

1  Q.  Had you at that point in September, had you ever met

2  Scott Maddox?

3  A.  No.

4  Q.  Did you know who he was before Mr. Burnette brought him

5  up?

6  A.  I heard his name.  I had not met him or seen him.

7  Q.  Do you remember the first time that you met Scott Maddox?

8  A.  I do.

9  Q.  And when was that, approximately?

10  A.  It was sometime in November I believe.  It could have

11  been late October, that fall.  I know it was at a Florida

12  State football game.

13  Q.  At a football game?

14  A.  Yes.

15  Q.  And do you remember who introduced you?

16  A.  Adam Corey.

17  Q.  And was that the Adam Corey that was discussed at length

18  in those recordings?

19  A.  Yes, it was.

20  Q.  And tell us about that introduction.  How did it go?

21  A.  It was just -- we were at the Florida State football

22  game, and we went down to Scott Maddox's -- he has his own, I

23  don't know if he shares it with someone but -- he refers to

24  it as own box at the Florida State football games.  Adam

25  Corey took me down there and introduced me to him.  It was

 1  just a brief introduction.

 2  Q.  And when you met him, did you recognize him as the person

 3  that Mr. Burnette had been telling you about in Nashville?

 4  A.  Yes.

 5  Q.  After you met him, did you make any plans to see him

 6  again?

 7  A.  I did not.  Adam Corey arranged for a lunch or I think he

 8  called it a brunch.  It ended up being a lunch meeting the

 9  next day.

10  Q.  Okay.  Did you have -- when you met him, did you have any

11  conversations with Mr. Maddox at the football game that first

12  time?

13  A.  No, not at the football game, I mean, just general who I

14  was and introduction.

15  Q.  Okay.  The brunch that Mr. Corey set up, where was that?

16  Where did that take play?

17  A.  At The Edison restaurant.

18  Q.  Okay.  And do you recall letting Mr. Burnette know about

19  that meeting, about that brunch that you were going to have?

20  A.  I did tell him it was set up, but I don't remember if I

21  told him after it happened or before it happened.

22          MS. O'GARA:  Can we pull up Government's Exhibit 203.

23  They are your text messages.

24          Go forward one more, and then on the left-hand side,

25  zoom in on that.

1    BY MS. O'GARA:

2    Q.  So down there at the box, you see there is a date.

3            MS. O'GARA:  Actually, can we go to the first page

4    before that.

5    BY MS. O'GARA:

6    Q.  So this was in early October, correct?

7    A.  Yes.

8    Q.  Okay.

9            MS. O'GARA:  Can you go to the next page.

10   BY MS. O'GARA:

11   Q.  What did you -- were you in Tallahassee?

12   A.  I was.

13   Q.  And what did you tell Mr. Burnette?

14   A.  That's when I -- I told him I was at the -- I was

15   referring to the Florida State football game, and that Adam

16   Corey set up a meeting with Maddox and just -- the reason I

17   was texting him is I didn't want him to find out through

18   Maddox that the meeting had been set up, 'cause he thought I

19   was going around him or something.  So I was letting him know

20   that Adam Corey had set up that meeting.

21   Q.  Was that because Mr. Burnette is the person who had told

22   you about Mr. Maddox originally?

23   A.  Yes.

24   Q.  When you say, I am not telling AC anything about what we

25   have discussed, what are you referring to?

1    A.   Any of the projects or Mr. Burnette's relationship with

2    Mr. Maddox.

3    Q.   Okay.   Then down there he says, two works for me, I will

4    meet you at Costco at two, what is that about?

5    A.   I was supposed to meet Mr. Burnette to go actually to

6    tour and look at the property at Fallschase, the development

7    project with single family lots that we had previously

8    discussed.

9    Q.   And were you supposed to do that on the same day that you

10   were supposed to have brunch with Mr. Maddox?

11   A.   Yes.

12   Q.   And did you do both of those things?

13   A.   I did.

14   Q.   Where was the brunch again?   I'm sorry, you may have

15   already said this.

16   A.   It was at The Edison.

17           MS. O'GARA:   If we can pull up Government's

18   Exhibit 14 and the corresponding transcript which is 18.

19   BY MS. O'GARA:

20   Q.   Did you record this brunch?

21   A.   I did.

22           THE COURT:   Before we play that, tell me how much

23   we've got.   We have been in court for just over two hours, so

24   we may need to break here pretty soon.   How long is the tape

25   going to be?

```
 1              MS. O'GARA:  This recording is five minutes, but
 2    there's quite a bit left for Mr. Miller.
 3              THE COURT:  This is as good a break place as any?
 4              MS. O'GARA:  Sure.
 5              THE COURT:  Let's break for the afternoon and we'll
 6    start back tomorrow morning at nine.  Recall my instructions:
 7    Don't talk about the case; don't get any information from any
 8    other source.  Have a safe and pleasant evening and trip back
 9    here in the morning.  We will see you -- we'll you in the
10    courtroom right at 9:00 tomorrow morning.
11         (The jury exited the courtroom at 4:58 p.m.)
12              You may all be seated.
13              Thank you, Mr. Miller.  You may step down.  If you
14    hold your position for a minute, the jurors will clear the
15    hallway and then you will be excused.
16              THE WITNESS:  Do you want me to step out the door?
17              THE COURT:  No, stay right there.  Just give the
18    jurors a minute.
19              I had a note to ask about Defense 172.  It is the
20    November 16, 2016, check, so it's in evidence as a government
21    exhibit, but I'm not sure it was admitted as a defense
22    exhibit.  I turned the viewer on without interrupting.  So
23    Defense 172 admitted.  I think it's just a duplicate of
24    Government's 172.
25              MR. KEHOE:  Yes, Your Honor.
```

1    MR. NOTHSTEIN:  Your Honor, to be clear, Government

2  172 is the check; Defense 172 is the Governance contract, Your

3  Honor, I believe, between KaiserKane and Governance.

4    THE COURT:  Oh.

5    MR. NOTHSTEIN:  Defense 172 is that; Government 172

6  is the check.

7    THE COURT:  Well, all my note refers to is

8  Defense 172 and then the check.  So it could be that it was

9  just referred to as defense exhibit --

10    MR. NOTHSTEIN:  I think that's what happened.

11    THE COURT:  -- even though it was a government

12  exhibit.

13    MR. NOTHSTEIN:  I think that's what happened.

14    MR. KEHOE:  I referred to it as a defense exhibit and

15  it was, in fact, a government exhibit.

16    THE COURT:  So I do not need to admit Defense 172 at

17  this point.

18    MR. NOTHSTEIN:  Correct, sir.

19    THE COURT:  We're finished for the day.  I have one

20  matter, though, to take up with the lawyers after the public

21  part of the trial.  So for the public, nothing else is going

22  to happen that you can be here for.  We are going to be

23  adjourned.  I'm going to talk to the lawyers here for just a

24  minute.

25    MR. NOTHSTEIN:  Can Mr. Miller step out?

1    THE COURT:  He can.  Ms. Dougherty was helping him to

2  get him around when the jurors are gone.

3    COURT SECURITY OFFICER:  I have another half of the

4  jurors coming out now.

5    THE COURT:  Just hold your position just a minute.

6    (Pause.)

7    You probably also noticed the juror who is nodding

8  off some, has nodded off a great deal during the day.  For a

9  while I could kick the bench and get her to wake up a little

10  bit, but I've stopped, it was less effective.  I'm concerned

11  that her sleeping now could affect other jurors if it

12  continues.

13    She's the one in the back row on the far right; and,

14  of course, when the jurors were looking at the screen, a

15  couple of them are looking right past her.  It doesn't do

16  anybody any good for other jurors to think we have a juror who

17  is sleeping.

18    I think she may be in pain.  Sometimes when she is

19  more awake, she's moving around some.  I think she may be in

20  pain.  I think it's even possible she's taking something to

21  deal with the pain.  That's complete speculation, but she's

22  not staying awake.

23    She's also the one that didn't tell us that she had a

24  family trip at the end of the week that we talked to in

25  chambers earlier.  But she -- as you recall at that point, she

1   was willing to cancel the trip and she was cooperative, she

2   wasn't asking to get off.  I don't think it was a contrived

3   thing.  I think she for whatever reason didn't tell us about

4   the trip during jury selection.  Her explanation partly was

5   she didn't think she'd be picked.

6         Had we not lost the juror who was exposed to the

7   person with COVID, the decision at this point would be pretty

8   easy.  I would just say we need to excuse this juror, we have

9   one alternate left, we'll keep going.

10        We still have some amount of time left.  The

11   government can probably tell me better, but I'm guessing

12   nobody thinks we're going to finish this week.

13        MR. NOTHSTEIN:  It's not likely, Your Honor.  I will

14   say early next week we will be done, but I don't think we will

15   finish this week.

16        THE COURT:  I was going to say it's possible that we

17   would rest this week.

18        MR. NOTHSTEIN:  Oh, yes, we would.  I'm sorry.  It

19   kind of depends on how long the cross-examination goes, but

20   it's maybe outside or unlikely that we would finish our case

21   by the end of Friday, if not Friday, then I think Monday most

22   likely.

23        THE COURT:  So here's what the rules provide:

24        Rule 23 provides that, if both sides stipulate, a

25   trial can be finished with fewer than 12.  That's, of course,

```
1    entirely up to you.  You are not going to offend me one way or

2    the other.  One possible approach at this point is that excuse

3    Juror Number 8 -- I think her number is 8, the one that has

4    slept some -- go on with 12.  The other 12 are all paying

5    close attention, engaged, and doing just what you would want

6    jurors to do.  So we seem to have 12 good jurors.  Go forward

7    with the 12.

8             Candidly, I would be much more comfortable with that

9    at this point if the two sides agreed to proceed with 11 if we

10   lost another one.  That's entirely up to you.  I invite what

11   you have to say; and if the answer is, we need to talk about,

12   think about it, and you can talk about it and think about it.

13   Tell me if you got a --

14        MR. NOTHSTEIN:  That is your position, Your Honor, we

15   would like time to consider this and speak with the defense.

16        MR. JANSEN:  Yes, Your Honor, we would like to think

17   about it and talk with our client.

18        THE COURT:  All right.  Do that.  I will ask you

19   this:  Anybody disagree with my assessment of the facts?

20   She's been asleep a good bit.

21        MR. NOTHSTEIN:  No, Your Honor.

22        MR. JANSEN:  We've seen her sleeping, Judge.

23        THE COURT:  Mr. Jansen, you brought it up once before

24   and she's the one that you were talking about.

25        MR. JANSEN:  Yes.
```

1    THE COURT:  All right.  We'll talk about it again in

2    the morning.  So be here by quarter of nine and we'll address

3    that, and if you have anything else, we'll address it.

4        We are adjourned.

5      (*The proceedings adjourned at 5:10 p.m.*)

6                    *   *   *   *   *   *   *   *

7

8

9

10   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
11   redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
12   transcript.

13

14

15   *Judy A. Gagnon*                        *7/20/2021*
     Judy A. Gagnon, RMR, FCRR              Date
16   Registered Merit Reporter

17

18

19

20

21

22

23

24

25

1

INDEX

2

3      WITNESSES FOR THE GOVERNMENT:                              PAGE

4        **PAIGE CARTER-SMITH**
              CROSS-EXAMINATION CONTINUED BY MR. KEHOE......... 1010
5             REDIRECT EXAMINATION BY MS. O'GARA............... 1092

6        **MICHAEL MILLER**
              DIRECT EXAMINATION BY MS. O'GARA................. 1133

7

8                      *   *   *   *   *   *   *   *

9

10                           DEFENSE EXHIBITS

11
        NO.:              DESCRIPTION                         PAGE
12
        69        2013-11-26 Carter-Smith Note re: GSA        1054
13                regions

14      76        Paige Carter-Smith Notes                    1059

15                Paige Carter-Smith Notes                    1065

16      90        2014-01-08 JT Burette email to Paige        1073
                  Carter-Smith
17
        94        2014-01-09 Paige Carter-Smith email to      1057
18                Trey Gardner

19      94        2014-01-09 Paige Carter-Smith email to      1061
                  Trey Gardner
20
        94        2014-01-09 Paige Carter-Smith email to      1075
21                Trey Gardner

22      95        2014-01-09 Trey Gardner email to Paige      1076
                  Carter-Smith
23
        131       2014-02-16 Paige Carter-Smith email to      1081
24                Trey Gardner

25      142       2014-03-10 Paige Carter-Smith email to      1082
                  Reggie Cardozo

| | | | |
|---|---|---|---|
| 156 | 2014-04-10 Paige Carter-Smith email to Reggie Cardozo | 1082 |
| 434 | Doc 208 - Partial Release of Notice of Lis Pendens as to 209 W Georgia St only | 1023 |
| 435 | Doc 207 - Release of Notice of Lis Pendens as to 208 W Carolina Street | 1023 |
| 436 | Doc 206 - Release of Notice of Lis Pendens as to 502 N Adams Street | 1023 |
| 440 | 2019-12-19 Carter-Smith Letter re: Release of Lis Pendens | 1021 |
| 625(b) | Summary of calls and texts between JT Burnette and Carter-Smith | 1069 |
| 625(j) | Summary of calls and texts between Gardner and Carter-Smith | 1070 |
| 673 | 2014-02-04 Emails between Gary Yordon and John McKibbon (MHG 70) | 1079 |
| 704 | 2013-05-24 Emails between Paige Carter-Smith and Wes Townsen (MHG 1041) | 1042 |
| 705 | 2013-04-22 Emails between Paige Carter-Smith and Wes Townsen (MHG 1046) | 1038 |
| 706 | 2013-04-11 Emails from Wes Townsen to Terry Daniel Ccing Paige Carter-Smith (MHG 1047) | 1036 |
| 708 | 2013-03-18 Email from Wes Townsen to Paige Carter-Smith (MHG 1052) | 1035 |
| 710 | 2013-03-12 Correspondence from Wes Townsen to Michael Parker and Rick McCraw (MHG 1056) | 1034 |
| 711 | 2013-03-12 Email from Wes Townsen to Paige Carter-Smith (MHG 1057) | 1033 |
| 729 | 2014-06-14 Emails between Paige Carter-Smith and Wes Townsen (MHG 1436) | 1047 |

| 769 | Governance Website.1 | 1030 |

| 953 | 2014-06-20 Carter-Smith Yordon email chain re Thoughts | 1089 |

| 954 | 2014-04-24 Yordon and Maddox texts | 1087 |

\* \* \* \* \* \* \* \*

GOVERNMENT'S EXHIBITS

| NO.: | DESCRIPTION | PAGE |
|------|-------------|------|
| 6 | Clip of Sept. 21, 2016  recording | 1192 |
| 7 | Clip of Sept. 21, 2016  recording | 1201 |
| 8 | Clip of Sept. 21, 2016 recording | 1207 |
| 10 | Transcript of clip of Sept. 21, 2016 recording | 1192 |
| 11 | Transcript of clip of Sept.  21, 2016 recording | 1201 |
| 12 | Transcript of clip of Sept.  21, 2016 recording | 1207 |
| 203 | Text messages between JT Burnette and UCE 5271 between Aug. 15, 2015 and Dec. 29, 2016 | 1151 |
| 331 | Feb. 26, 2013 email from  W. Townsen to P. Carter-Smith, subject: Option Extension | 1031 |
| 351 | Excerpt of Sept. 20, 2016 recording of J.T. Burnette, UC Miller, UC Sweets, and UC Butler (NE-25) | 1182 |
| 352 | Transcript of excerpt of Sept. 20, 2016 recording of J.T. Burnette, UC Miller, UC Sweets, and UC Butler (NE-25) | 1182 |
| 357 | Excerpt of Nov. 11, 2016 recording of S. Maddox, P. Carter-Smith, UC Miller, UC Sweets, and UC Butler (NE-38) [end at 0:10:06] | 1093 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

358      Transcript of excerpt of Nov. 11, 2016          1093
         recording of S. Maddox, P. Carter-Smith, UC
         Miller, UC Sweets, and UC Butler (NE-38)


              *   *   *   *   *   *   *   *