**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE, FLORIDA**

| | |
|---|---|
| *UNITED STATES OF AMERICA,* | ) |
| | ) |
| *Plaintiff,* | ) *Case No:  4:18-cr-76* |
| | ) |
| *vs.* | ) *Tallahassee, Florida* |
| | ) *July 26, 2021* |
| *JOHN THOMAS BURNETTE,* | ) *8:44 A.M.* |
| | ) |
| *Defendant.* | ) |
| ———————————————————— | ) |

**VOLUME X**
**(Pages 1873 through 2135)**

**TRANSCRIPT OF TENTH DAY OF TRIAL**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**UNITED STATES DISTRICT JUDGE, and a jury**

APPEARANCES:

| | |
|---|---|
| For the Plaintiff, United States of America: | Jason  R. Coody Acting United States Attorney By:  STEPHEN M. KUNZ     ANDREW J. GROGAN     Assistant U.S. Attorneys     *stephen.Kunz@usdoj.gov*     *andrew.grogan@usdoj.gov* 111 North Adams Street, Suite 400 Tallahassee, Florida  32301 |
| | Corey R. Amundson, Chief Public Integrity Section Criminal Division U.S. Department of Justice By:  PETER M. NOTHSTEIN     Deputy Chief     ROSALEEN T. O'GARA     Trial Attorney     *peter.nothstein@usdoj.gov*     *rosaleen.o'gara2@usdoj.gov* 1301 New York Avenue NW Washington, DC   20005 |



APPEARANCES:  Cont'd

For the Defendant,          Jansen & Davis, P.A.
John Thomas Burnette:    By:  R. TIMOTHY JANSEN
                                    Attorneys at Law
                                    jansen@jansenlawoffice.com
                              1206 North Duval Street
                              Tallahassee, Florida   32303

                              Greenberg Traurig, P.A.
                              By:  GREGORY W. KEHOE
                                    JORDAN BEHLMAN
                                    KAYLI SMENDEC
                                    Attorneys at Law
                                    kehoeg@gtlaw.com
                                    behlmanj@gtlaw.com
                                    smendeck@gtlaw.com
                              101 East Kennedy Boulevard
                              Tampa, Florida   33602

                              Law Office of Adam J. Komisar
                              By:  ADAM J. KOMISAR
                                    Attorney at Law
                                    adam@KomisarSpicola.com
                              Post Office Box 664
                              Tallahassee, Florida 32303

1      P R O C E E D I N G S

2      (*Call to Order of the Court.*)

3      (*Defendant present; jury not present.*)

4          THE COURT:  Good morning.  Please be seated.

5          I'm told there are issues.  I did get the

6   government's sealed filing but --

7          MR. NOTHSTEIN:  Very briefly, Your Honor.

8          THE COURT:  -- I haven't gotten all the way through

9   it.

10          MR. NOTHSTEIN:  I figured.  I just wanted to let the

11   court know that it was filed.  It pertains to a few of the

12   defense witnesses we expect them to call which we may get to

13   today.  We can discuss it at a later time or whenever the

14   court is ready.

15          But the other, Judge, we were provided this morning

16   some new exhibits.  I don't know when exactly they're going to

17   be used.  These are now Defense Exhibits 93 and 94.  We would

18   object to them as argumentative, Your Honor.  They are sort

19   of, I would say, advocacy pieces.  I can pass them to the

20   court to take a look at, if you would like.

21          THE COURT:  All right.

22          MR. NOTHSTEIN:  (Handing.)  I think we have seen

23   similar ones put on the screen, but these are the first that

24   have been provided as exhibits that would go back to the jury.

25          THE COURT:  The defense proposes to put these in

1  evidence?

2          MR. KEHOE:  As demonstrative aids, Your Honor.

3          THE COURT:  As demonstrative.  I mean, this is just

4  publishing an exhibit, right?

5          MR. NOTHSTEIN:  I have no problem publishing the

6  exhibit, Your Honor.  It's sort of the entirety of putting the

7  whole thing together and moving it in as an exhibit that we

8  have an issue with, which is what I understood was going to be

9  happening, which is why they're on the exhibit list.

10          THE COURT:  Right.  These won't go to the jury.

11  These are just excerpts from an exhibit.  So it's the same

12  kind of thing that's been put on the board.  And if it makes

13  it quicker to put it on the board, great.

14          MR. NOTHSTEIN:  That's fine, Your Honor.

15          THE COURT:  But it will not come in as a separate

16  exhibit to go to the jury.

17          The last thing I will do after the jury goes out is

18  tell you to review the exhibits compiled by the clerk to make

19  sure the compilation is proper.  And make sure these are not

20  in it.  These are extra copies?

21          MR. NOTHSTEIN:  Yes, sir.

22          THE COURT:  What else?  Anything else?

23          MR. NOTHSTEIN:  Nothing from the government.

24          THE COURT:  All right.  I'll read on through this and

25  we can discuss it.  It strikes me as fairly optimistic to

1    think we'll get to the defense case today.  I could be wrong,

2    but as long as the cross has been running of all of the

3    witnesses -- all right.

4           Anything else?

5           MR. KEHOE:  No, Your Honor.

6           THE COURT:  I'll be back at 9:00.

7       (*A recess was taken at 8:47 a.m.*)

8       (*The proceedings resumed at 9:00 a.m.*)

9       (*Defendant present; jury not present.*)

10          THE COURT:  Please be seated.  Jury in, please.

11          COURT SECURITY OFFICER:  We have them here.  Do you

12   want them brought in?

13          THE COURT:  Yes.

14          COURT SECURITY OFFICER:  Bring the jury in.

15      (*The jury entered the courtroom at 9:01 a.m.*)

16          THE COURT:  All right.  You may all be seated.

17          Good morning, ladies and gentlemen.  Welcome back.

18   Again, thank you for being so prompt.  I hope you had a good

19   weekend and you're ready to start back to go to work once

20   again.

21          Mr. Nothstein, please call your next witness.

22          MR. NOTHSTEIN:  Thank you, Your Honor.  The

23   government calls Scott Maddox.

24          DEPUTY CLERK:  Please raise your right hand.

25          ***SCOTT MADDOX, GOVERNMENT WITNESS, DULY SWORN***

1    DEPUTY CLERK:  Be seated.

2    Please, state your full name and spell your last

3    name for the record.

4    THE WITNESS:  Scott Charles Maddox, M-a-d-d-o-x.

5                    DIRECT EXAMINATION

6    BY MR. NOTHSTEIN:

7    Q.  Good morning, Mr. Maddox.

8    A.  Good morning, sir.

9    Q.  Mr. Maddox, in August 2019, did you plead guilty to

10   multiple crimes?

11   A.  Yes, sir.

12   Q.  Prior to doing so, did you enter into a plea agreement

13   with the government?

14   A.  Yes, sir.

15   Q.  And did you have counsel advise you in connection with

16   that plea?

17   A.  Yes, sir.

18   MR. NOTHSTEIN:  Could we please show the witness

19   Government Exhibit 98, please.

20   BY MR. NOTHSTEIN:

21   Q.  It will be to your right, Mr. Maddox.

22   And, Mr. Maddox, is this -- Government's Exhibit 98, is

23   this your plea agreement?

24   A.  Yes, sir.

25   MR. NOTHSTEIN:  Your Honor, we move Government 298.

1    MR. KEHOE:  No objection.

2    THE COURT:  Government's 298 is admitted.

3    (GOVERNMENT EXHIBIT NO. 298:  Received in evidence.)

4  BY MR. NOTHSTEIN:

5  Q.  Now, let's look, please, at page 2, paragraph small (a).

6    Mr. Maddox, what crimes did you plead guilty to?

7  A.  Count 20, honest services wire fraud; 23, honest services

8  mail fraud; and, 41, conspiracy to defraud the United States.

9    MR. NOTHSTEIN:  And if we could please have page 3,

10  paragraph D.

11  BY MR. NOTHSTEIN:

12  Q.  What does your plea agreement state with regard to why

13  you are pleading guilty.

14  A.  Because the defendant is, in fact, guilty of the charges

15  alleged in Counts 20, 23, and 41.

16  Q.  And did you actually plead guilty because you were, in

17  fact, guilty?

18  A.  Yes.

19  Q.  In connection with your plea agreement, Mr. Maddox, did

20  you also execute a written statement of facts?

21  A.  Yes.

22    MR. NOTHSTEIN:  Your Honor, could we please show just

23  the witness what's been marked as Government's Exhibit 403 for

24  identification purposes.

25  BY MR. NOTHSTEIN:

1    Q.  Is that your statement of facts that you signed,

2    Mr. Maddox?

3    A.  Yes.

4    Q.  Prior to your guilty plea, did you review the statement

5    of facts?

6    A.  Yes.

7    Q.  And is the statement accurate?

8    A.  Yes.

9    Q.  Did you sign it?

10   A.  Yes.

11   Q.  And did you knowingly, voluntarily, and truthfully, under

12   oath, admit the facts in that statement?

13   A.  Yes.

14   Q.  And admit that the government could prove those facts at

15   trial?

16   A.  Yes.

17          MR. NOTHSTEIN:  If we could go back to Government's

18   Exhibit 298, please, page 3, paragraph (e).

19   BY MR. NOTHSTEIN:

20   Q.  And in your written plea agreement, did you also -- did

21   you agree that statement of facts fairly and accurately

22   described the defendant's actions and involvement in the

23   offense?

24   A.  To the offenses which I pled guilty, yes.

25   Q.  All right.  Now, if we can go to page 2, paragraph (a),

1  again.

2      Mr. Maddox, just in exchange for your agreement to plead

3  guilty, what did the government say -- what was one of the

4  things the government said it would do in exchange for that?

5  A.  Drop the additional counts.

6  Q.  Okay.

7          MR. NOTHSTEIN:  If we could have page 4, paragraph

8  (f), please.

9  BY MR. NOTHSTEIN:

10  Q.  And did the government also agree not to file additional

11  charges from that same set of facts?

12  A.  Yes.

13          MR. NOTHSTEIN:  The next paragraph, paragraph(g),

14  please.

15  BY MR. NOTHSTEIN:

16  Q.  Did this agreement provide that you would not be

17  protected from additional crimes committed after the plea?

18  A.  Yes.

19  Q.  Now, did you, as part of your overall agreement, have a

20  second agreement, a supplement to your plea agreement?

21  A.  Yes.

22          MR. NOTHSTEIN:  If we can have Government 299, for

23  just the witness, please.

24  BY MR. NOTHSTEIN:

25  Q.  Do you recognize Government 299, Mr. Maddox?

1    A.   Yes, sir.

2    Q.   What is it?

3    A.   The supplement to my plea agreement.

4         MR. NOTHSTEIN:  Move in 299, Your Honor.

5         MR. KEHOE:   No objection.

6         THE COURT:  Government 299 is admitted.

7         (GOVERNMENT EXHIBIT NO. 299:  Received in evidence.)

8         MR. NOTHSTEIN:  If we can look at page 1,

9    paragraph 1.

10   BY MR. NOTHSTEIN:

11   Q.   As part of this plea supplement, what did you agree to

12   do?

13   A.   To cooperate fully and truthfully.

14        MR. NOTHSTEIN:  If we can have the top of page 2,

15   please, the remainder of that paragraph.

16   BY MR. NOTHSTEIN:

17   Q.   Did you agree also to provide complete and truthful

18   debriefing testimony, whether at grand jury, trial, or

19   otherwise requested?

20   A.   Yes, sir.

21        MR. NOTHSTEIN:  Now, if we can look at page 3,

22   paragraph 6, please.

23   BY MR. NOTHSTEIN:

24   Q.   Mr. Maddox, if you hold up your end of the bargain and

25   provide cooperation and truthful testimony, what is one of

1  the things that the government has agreed to do?

2  A.  Let the judge know that I substantially cooperated.

3         MR. NOTHSTEIN:  If we can have page 4, paragraph 9,

4  please.

5  BY MR. NOTHSTEIN:

6  Q.  Is it your understanding that the government has agreed,

7  if you hold up your end of the bargain, to file a motion for

8  substantial assistance with the court?

9  A.  Yes, sir.

10        MR. NOTHSTEIN:  If we could have, again, at page 4,

11  subparagraphs,(b), (c), and(d).

12  BY MR. NOTHSTEIN:

13  Q.  Mr. Maddox, pursuant to this agreement, what could happen

14  if you do not comply with your party of the agreement?

15  A.  The United States may file charges without limitation.

16  All statements, information, and the evidence provided by me

17  pursuant to the agreement may be issued against me.  That's

18  it.

19  Q.  And, ultimately --

20        MR. NOTHSTEIN:  If we could have -- go back to

21  Government Exhibit 298, please, page 4, subparagraph (i),

22  please, at the bottom.

23  BY MR. NOTHSTEIN:

24  Q.  Ultimately, Mr. Maddox, who will determine your sentence

25  at the end?

1  A.   The prosecution.  Oh, the sentence?  Your Honor, the

2  Judge.

3  Q.   Judge Hinkle?

4  A.   Yes, sir.

5       MR. NOTHSTEIN:  You can clear that, please.

6  BY MR. NOTHSTEIN:

7  Q.   Okay.  Mr. Maddox, could you please give the jury an idea

8  of your background, starting with your education?

9  A.   I have a bachelor's degree in political science and

10  public administration from Florida State, and a juris

11  doctorate from Florida State College of Law.

12  Q.   And what year did you graduate from law school?

13  A.   1992, I think.  '94.  '94, I'm sorry.

14  Q.   Prior to --

15  A.   A long time ago.

16  Q.   Prior to graduating from law school, did you run for

17  public office?

18  A.   Yes, sir.

19  Q.   What office did you run for?

20  A.   City commission.

21  Q.   Prior to that, did you run for an office?

22  A.   Yes, sir.  I ran for the House of Representatives when I

23  was 21.

24  Q.   And did you succeed?

25  A.   No, sir.

1  Q.  Now, you also said you ran for the city commission.  How

2  old were you when you ran for the city commission?

3  A.  24.

4  Q.  Were you in school at the time?

5  A.  Yes, sir.  My second year of law school.

6  Q.  Were you successful?

7  A.  Yes, sir.

8  Q.  And at 24 years old, had there been any commissioners

9  younger than you, to your knowledge?

10  A.  No, sir.

11  Q.  How long did you serve on the commission after being

12  elected in 1993?

13  A.  I served on the commission as mayor from 1993 to 2003.

14  Q.  Now, prior to you serving as mayor, had there been a

15  mayor of Tallahassee?

16  A.  We had a rotating form of government where the mayor was

17  chosen from the commission and basically took turns being the

18  mayor.

19      I served as mayor of that forum in 1995.  In 1996, I gave

20  up my seat to have it be the mayor's seat; and there was a

21  charter referendum on the ballot which passed that created a

22  leadership mayor that the first elected mayor since 1919.

23  And I was elected mayor in March of 1997.

24  Q.  When you were serving as mayor of the city of

25  Tallahassee, did you become acquainted with a woman named

1  Paige Carter-Smith?

2  A.  Yes, sir.

3  Q.  How did you meet her?

4  A.  I had already met her prior to that.

5  Q.  Did you begin working with her when you were the mayor?

6  A.  Yes, sir.

7  Q.  What was her position?

8  A.  Chief of staff.

9  Q.  Now, let's just talk for a moment about the time that you

10  were commissioner up until -- 2003, you said you left the

11  commission?

12  A.  Yes, sir.

13  Q.  Is being a commissioner a full-time job?

14  A.  No, sir.  Well, I mean, it could be.  You're allowed to

15  have jobs and outside income, and individual commissioners

16  are treated differently.  Some of them have made that their

17  full-time work and some of them have not.

18  Q.  About how much does the commission pay?

19  A.  30,000, something.

20  Q.  So while you were on the commission, we'll just say in

21  the first -- the first time, did you do outside work?

22  A.  Yes, sir.

23  Q.  What a kind of work did you do?

24  A.  I was an attorney, and a consultant.

25  Q.  Let's talk first about your work as an attorney.  What

1  kind of legal work did you do?

2  A.  Back then, I worked for the Pennington law firm, and I

3  did whatever they assigned me.  Later in life, I represented

4  deputy sheriffs in use-of-force incidents.

5  Q.  Have you ever done any kind of criminal work in your

6  practice?

7  A.  No, sir.

8  Q.  Never a defense attorney?

9  A.  No, sir.

10  Q.  Never a prosecutor?

11  A.  No, sir.

12  Q.  While you were at the Pennington firm, you said you did

13  whatever they wanted you to do.  Did some of that involve

14  sort of work with local governments?

15  A.  Not so much in the Pennington firm.  Later on, with

16  Akerman, I did some work in front of local governments.

17  Pennington firm, I did bids, RFPs -- request for proposals --

18  bid protests on the state level.

19  Q.  You mentioned you also served as a consultant.  Did you

20  start a consulting business?

21  A.  Yes, sir.

22  Q.  What was the name of that business?

23  A.  Governance.

24  Q.  Approximately, when did you start Governance?

25  A.  1999.

1  Q.  We will come back to some of the details on that.

2      When you left the commission in 2003, what did you leave

3  it for?

4  A.  I became chair of the Democratic Party.

5  Q.  And what does the chair of the Democratic Party do?

6  A.  It's the CEO of the statewide party.

7  Q.  Did Ms. Carter-Smith join you?

8  A.  Yes, sir.

9  Q.  What was her role?

10  A.  She was the executive director.

11  Q.  Did you she report to you?

12  A.  Yes, sir.

13  Q.  How long did you serve as the chairman of the Democratic

14  Party for Florida?

15  A.  Two years.

16  Q.  And what did you do after that?

17  A.  I ran briefly for governor in 2005, and then dropped out

18  of the race.

19  Q.  And have you run for other elected positions?

20  A.  Yes, sir.  I ran -- well, prior to that I had.  But after

21  2005, I ran for commissioner of agriculture and was the

22  nominee in 2010.

23  Q.  And you said there was a position you ran prior to that.

24  Was that for the Florida Attorney General?

25  A.  Yes, sir, in 2002.

1  Q.  And were you successful?

2  A.  No, sir.

3  Q.  Were you successful in your 2010 run for the secretary of

4  agriculture?

5  A.  Commissioner; no, sir.

6  Q.  Thank you.

7      So, you mentioned Governance which you started in 1999.

8  What kind of business was Governance?

9  A.  It was representing people in front of local governments

10  outside the city of Tallahassee.

11  Q.  Now, representing people outside Tallahassee.  Did you

12  perform a lobbying function?

13  A.  Yes, sir.  That, as well as help, assistance with

14  proposals, people that wished to do government business, and

15  consult with them on how best to do that.

16  Q.  Is there a difference between lobbying and consulting?

17  A.  I think so.

18  Q.  What is the difference?

19  A.  Well, lobbying is -- my definition of lobbying is

20  strictly advocating on behalf of a client for a specific

21  vote.  Consulting is also helping the client think about

22  their product, how to refine their product, how to best

23  present that to government in order to get government to buy

24  the product or service.

25  Q.  So, let's walk through Governance through the years.

1    So when you first started Governance, who worked there?

2    A.   Just me.

3    Q.   And where, physically, were you located?

4    A.   A little office on Adams Street.

5    Q.   So, was there time that Governance began to grow?

6    A.   Yes, sir.

7    Q.   When was that, approximately?

8    A.   Two thousand -- when I got out of the governor's race,

9    2005, 2006.

10   Q.   And I think you told us that you had around that time

11   also left the Florida Democratic Party; is that right?

12   A.   Yes, sir.

13   Q.   So at that point, was Governance your primary employment?

14   A.   Yes, sir.

15   Q.   But did you also carry a law practice?

16   A.   Yes, sir.

17   Q.   What was the name of that law practice that you worked

18   with?

19   A.   I'm not sure when I started the law firm, but it's called

20   Maddox Horne.

21   Q.   And who is the "Horne" in Maddox Horne?

22   A.   Mallory Horne.

23   Q.   Who is Mallory Horne?

24   A.   Mallory Horne is a former Speaker of the House and

25   President of the Senate, a Tallahassee person from way back,

1    and then was my mentor in politics.

2    Q.  Were Maddox Horne and Governance located in the same

3    building?

4    A.  Yes, sir.

5    Q.  You mentioned that Ms. Carter-Smith had been working at

6    the Florida Democratic Party with you when you left in 2005.

7    Did she come join you at Governance?

8    A.  Yes, sir.

9    Q.  What was her role at Governance at that time?

10   A.  The same that she did basically at the party.  She would

11   have been like an executive director.  She ran things,

12   basically.

13   Q.  Making sure the trains run on time?

14   A.  Yes, sir.

15   Q.  At this time, in 2005, when you started increasing, or

16   growing Governance, I think you said, did you hire other

17   people to work there?

18   A.  Yes, sir.

19   Q.  And who are some of the other folks that worked there?

20   And I'll just separate it, let's say, for the people that did

21   sort of the lobbying/consulting, the professional work,

22   first.

23   A.  Over time, Gary Yordon, Bo Bloodworth.  We would have

24   satellite people in other areas around the state that kind of

25   worked under our umbrella.  That would have been J.J.

1    Baroudi.

2    Q.   Did someone named Reggie Cardozo work for you for a time?

3    A.   Yes, sir.

4    Q.   And what was Mr. Cardozo's role, generally?

5    A.   Reggie worked both for my campaign and for my consulting

6    firm after the campaign.  He was the person that I traveled

7    with in my campaign; and he started out working in more of an

8    administrative level and then worked his way up to advocacy.

9    Q.   From an administrative side, who worked for Governance?

10   A.   Over time?

11   Q.   Over time.

12   A.   Christy Carter Cameron, Katie Lilly.  There were a slew

13   of bookkeepers.  I don't remember all of their names.

14   Q.   Did you tend to go through bookkeepers pretty regularly?

15   A.   It was the hardest position to find.

16   Q.   As a general matter, how well were the books kept at

17   Governance when you didn't have professional bookkeepers?

18   A.   Well, we always had profession bookkeepers -- well,

19   people hired to do it, but I don't think that they were kept

20   very well.

21   Q.   You mentioned Christy Cameron.  What's her relationship

22   to -- well, was she related to anyone in the business?

23   A.   She's Paige's sister.

24   Q.   Did you eventually hire a company called the Bean Team?

25   A.   Yes, sir.

1  Q.  Approximately when was that?

2  A.  It was 2017-ish, maybe.

3  Q.  Was it after the allegations in this matter came out?

4  A.  Yes, sir.

5  Q.  So, I would like to turn now to your relationship with

6  Ms. Carter-Smith.

7      What is your relationship with Ms. Carter-Smith?

8  A.  She's my girlfriend.

9  Q.  And approximately how long has that been going on?

10 A.  11 years, maybe.

11 Q.  Do y'all have financial ties to each other?

12 A.  Yeah.  I don't -- you know.

13 Q.  In other words, have y'all shared properties in the past?

14 A.  No, either she owned it or I owned it.

15 Q.  But they've moved back and forth between you two; is that

16 correct?

17 A.  We've sold property back and forth; yes, sir.

18 Q.  And, in fact, we'll come back it.  But at some point you

19 sold Governance to her; is that right?

20 A.  Yes.

21 Q.  So between the financial -- I'm sorry, the professional

22 connection and a personal connection, how sort of intertwined

23 are you and Ms. Carter-Smith?

24 A.  She's my best friend.

25 Q.  So, I want to turn now to March of 2010.

1      In March of 2010, did you sell Governance to

2  Ms. Carter-Smith?

3  A.  Yes, sir.

4           MR. NOTHSTEIN:  Could we have Government's

5  Exhibit 107, which is in evidence, please.  I believe this is

6  in, Your Honor, but if not we would move in 107.

7           MR. KEHOE:  I think it's in already, Judge, but no

8  objection.

9           THE COURT:  It's admitted if it wasn't previously.

10  BY MR. NOTHSTEIN:

11  Q.  Mr. Maddox, here on the screen, what is this document,

12  Government's Exhibit 107?

13  A.  A contract between Paige Carter-Smith and I for the sale

14  of Governance.

15  Q.  Who drafted this contract?

16  A.  I did.

17  Q.  And why did you sell Governance to Ms. Carter-Smith?

18  A.  I was running for commissioner of agriculture and felt

19  that I would be successful.  I was wrong, but I thought I was

20  going to be successful.

21  Q.  So how did the fact that you were running for --

22  commissioner of agriculture; is that right?

23  A.  Yes, sir.

24  Q.  I'm getting it wrong.

25      How did the fact that you were running for that position

1  prompt you to sell Governance to Ms. Carter-Smith?

2  A.  Well, it's a full-time position.  Being on the cabinet,

3  you are precluded from outside of income.  So I was preparing

4  for that.

5  Q.  And this document -- if we look at just the top part.

6  What is the purchase price of Governance?

7  A.  $100,000.

8  Q.  And what was Ms. Carter-Smith buying?  Did Governance

9  have a bunch of assets?

10  A.  Clients, basically.

11  Q.  The client list?

12  A.  Yeah.  She had ongoing retainer clients.

13  Q.  So while they were your clients -- or, Governance's

14  clients, now she had the right --

15  A.  Right.

16  Q.  -- to solicit them?

17  A.  Well, no.  I mean, she got the retainers that came in

18  every month.

19  Q.  And if we go to the bottom part.

20      What was the term that Ms. Carter-Smith agreed to pay you

21  the $100,000?

22  A.  Seven years.  No later than seven years.

23  Q.  So, did you continue to receive payments from

24  Ms. Carter-Smith after you sold her the business?

25  A.  Yes, sir.

1  Q.  And were those -- do you know, did she pay it off in

2  seven years?

3  A.  Yes, sir.  What we did is I just kept getting a full

4  paycheck, even though I wasn't working, until the amount was

5  exhausted.  In hindsight, it was really dumb because I paid

6  double taxes, because she paid payroll taxes and I paid

7  income taxes on that when it could have been capital gains.

8  But that's what we did.

9  Q.  So, just to be clear; what you're saying is the payments

10  you received from Ms. Carter-Smith, you just continued to

11  receive the same paycheck --

12  A.  Yeah.

13  Q.  -- which had withholdings taken out, like all of that

14  other stuff, even though, as you're saying, these were loan

15  payments?

16  A.  Yes, sir.

17  Q.  Did you have any other sort of loans that you made to

18  Ms. Carter-Smith?

19  A.  Yes, sir.

20  Q.  What was that?

21  A.  I sold her real estate, and she owed a note on the real

22  estate.

23  Q.  Do you recall the amount of the note?

24  A.  I think 475,000.

25  Q.  And did you continue to receive paychecks and payment of

1  that note?

2  A.  Yes, sir.

3  Q.  And did you receive other payments that were sort of a

4  credit against that?

5  A.  Yes, sir.  Basically, whenever I would receive anything,

6  the bookkeepers were told to take that amount off of the

7  loan.  So, anything from when she made a direct payment, to

8  my son putting stuff on the company credit card, whatever, it

9  was supposed to come off the loan every month.

10  Q.  Let's go through a couple of those.

11     Were payments made for your corporate card from

12  Governance?

13  A.  Yes, sir.

14  Q.  And were they made for your son's card when he needed it?

15  A.  Yes, sir.

16  Q.  And did your father have a card that was paid for?

17  A.  Yes, sir.

18  Q.  Did Governance also pay your phone bills?

19  A.  I don't know for -- I'm sure for a period of time.  My

20  recollection is my phone bills were out of Maddox Horne, but

21  I don't know when that switched.

22  Q.  Did Governance also pay for a skybox at Florida State

23  University football?

24  A.  Yes, sir.

25  Q.  And were you closely tracking the balances of this loan?

1  A.  I had not tracked anything.  It's embarrassing to say,

2  I'm 53 years old, I've never balanced a checkbook.  I've

3  always either paid people to do that; I've never filed my own

4  taxes.  I was not tracking that.

5  Q.  And given that she was your business partner and

6  girlfriend for the last 11 years, did you care what the

7  balance of the loan was?

8  A.  No, sir.

9  Q.  Would you have foreclosed on her?

10  A.  I would not have foreclosed on her; no, sir.

11  Q.  And, just in general, did you have a desire to see

12  Governance succeed financially?

13  A.  Yes, sir.

14  Q.  Now, let's turn to 2012.

15      In 2012, did you decide to run for public office again?

16  A.  Yes, sir.

17  Q.  What office did you run for?

18  A.  City commission.

19  Q.  And were you successful?

20  A.  Yes, sir.

21  Q.  What's the general timing of election to the city

22  commission?

23  A.  It's in the fall.

24  Q.  And so when you are elected, how quickly do you take

25  office?

1   A.   Relatively quickly.

2   Q.   And when you take office, are you administered an oath?

3   A.   Yes, sir.

4        MR. NOTHSTEIN:   May we have Government's Exhibit 88

5   for the witness, please.   Second page, please, Ms. Orozco.

6   BY MR. NOTHSTEIN:

7   Q.   Do you recognize Government's Exhibit 88?

8   A.   Yes, sir.

9   Q.   What is it?

10  A.   It's an oath of office.

11  Q.   And what is the date on it?

12  A.   I think it says 19th day of November.

13  Q.   What year?

14  A.   2012.

15       MR. NOTHSTEIN:   Move in Government's Exhibit 88, Your

16  Honor.

17       MR. KEHOE:   No objection, Judge.

18       THE COURT:   It is admitted.

19  (GOVERNMENT EXHIBIT NO. 88:   Received in evidence.)

20       MR. NOTHSTEIN:   If we could have the text of the

21  oath, please, Ms. Orozco.

22  BY MR. NOTHSTEIN:

23  Q.   Mr. Maddox, is that your signature there below the oath?

24  A.   Yes, sir.

25  Q.   And what does it say, the oath, itself?

1  A.  I do solemnly swear that I will support, protect, and

2  defend the Constitution, the government of the United States,

3  the state of Florida, and the city of Tallahassee; that I am

4  duly qualified to hold office under the Constitution of the

5  State of Florida, and that I will well and faithfully perform

6  the duties of the office of city commissioner on which I am

7  about to enter, so help me God.

8  Q.  Did you actually take that oath?

9  A.  I did.

10  Q.  Now, as a Tallahassee city commissioner, were you an

11  agent of the city of Tallahassee?  Did you act on the city's

12  behalf?

13  A.  Yes, sir.

14  Q.  And did you have a fiduciary duty to act in the best

15  interests of Tallahassee and its citizens?

16  A.  Yes, sir.

17  Q.  Were you reelected after your election in 2012?

18  A.  Yes, sir.

19  Q.  Approximately, what year was that?

20  A.  2016.

21       MR. NOTHSTEIN:  Can we have Government's 105 for the

22  witness, please.  Second page.

23  BY MR. NOTHSTEIN:

24  Q.  Mr. Maddox, do you recognize Government's Exhibit 105?

25  A.  Yes, sir.

1   Q.   What's the date of this?

2   A.   5th day of December, 2016.  I'm sorry, 6th day.

3   Q.   And is this the same oath that you took in 2012?

4   A.   Yes, sir.

5   Q.   And that's your signature?

6   A.   Yes, sir.

7         MR. NOTHSTEIN:  Move in Government's Exhibit 105,

8   Your Honor.

9         MR. KEHOE:  No objection.

10        THE COURT:  It is admitted.

11        (GOVERNMENT EXHIBIT NO. 105:  Received in evidence.)

12        MR. NOTHSTEIN:  You can clear that off, please.

13   BY MR. NOTHSTEIN:

14   Q.   So, Mr. Maddox, tell us a little bit about how it works

15   on the city commission with regard to commissioners

16   communicating with each other and with city staff,

17   particularly in context of what is known as the Sunshine

18   Laws.

19   A.   City commissioners are precluded from talking about

20   business that could come before them privately outside of the

21   sunshine.

22   Q.   So when can you actually discuss with your fellow

23   commissioners the merits of matters before the commission?

24   A.   On the dais, unless you register some -- if you had an

25   email communication, it has to be registered through the city

1    attorney's office and disclosed.  But, primarily on the dais.

2    Q.  So, there are the commissioner and commission.  And then

3    is there also staff that runs the city?

4    A.  Yes, sir.

5    Q.  Are they elected?

6    A.  No, sir.  They are appointed.

7    Q.  And, how -- are the commissioners allowed to communicate

8    with the staff?

9    A.  Yes, sir.

10   Q.  How does that work?

11   A.  Well, while the commissioners can communicate with any

12   staff, they cannot direct the staff of the appointed

13   officials by charter.  There's a prohibition for that, and

14   it's called a non-inference provision of the charter.

15       The appointed officials -- the city attorney, the city

16   manager, the treasurer-clerk, and independent auditor -- work

17   for the commission as a whole, and they can communicate to

18   them at any time, as well as to their employees.  They just

19   can't direct their employees.

20   Q.  So, can the commissioners direct those appointed

21   officials, the city manager, treasurer-clerk, and the city

22   attorney?  Can they sort of talk directly to them and give

23   them more instruction?

24   A.  If they are -- a majority of the commission can.

25   Q.  And do they hire and fire those people?

1    A.   Yes, sir, a majority of the commission.

2    Q.   From the staff point of view, who is sort of the head of

3    the city's staff?

4    A.   The city manager.

5    Q.   And when we talk about the city manager, under this form

6    of government, is it kind of akin to a position, like another

7    position in other kinds of city government, the kind of power

8    that the city manager has?

9    A.   Yes, sir.  It's not just your council manager form of

10   government.

11   Q.   I'm sorry?

12   A.   I'm sorry, I have a cough drop.  I've been fighting

13   bronchitis.

14       It's the council manager form of government, where the

15   city manager is the CEO that handles the day-to-day

16   operations of the city.

17   Q.   Is that position of city manager -- are many of its

18   functions similar to what the mayor might do in another city?

19   A.   In a large city, there's -- that term is called a strong

20   mayor, that form of government.  So when a city, like

21   Orlando, I guess, would be a strong mayor, Chicago would be a

22   strong mayor, where the mayor does all of the hiring and

23   firing and runs the day-to-day operation.

24       The city of Tallahassee is not that way.  The city

25   manager does all of that.  The mayor has no specific powers,

1   other than to run the meetings, set the agenda, has the

2   ability in the charter to declare martial law in an

3   emergency, but, other than that, has no special powers unless

4   the commission vests the mayor with any powers.

5   Q.   But on a day-to-day basis, is the city manager the person

6   who directs the staff and their work --

7   A.   Yes, sir.

8   Q.   -- or their peers?

9   A.   Yes, sir.

10  Q.   Now, I want to talk a little bit about the CRA.  What's

11  the CRA?

12  A.   The CRA is set up under state law to deal with blighted

13  areas, and it's a body made up of the entire city commission

14  and part of the county commission.  It captures tax dollars

15  through tax refinancing -- probably more than you want to

16  know -- but to reinvest in blighted areas.

17  Q.   And how does the CRA make decisions?  How does it act?

18  Who can vote on those things?

19  A.   The city commission as whole sits the CRA, and then a few

20  members of the county commission.

21  Q.   And did you sit -- as a city commissioner, did you sit on

22  the CRA board?

23  A.   Yes, sir.

24  Q.   And we talked before about the oath you took and the

25  fiduciary duties you owed to the people of Tallahassee.  Did

1  those also apply to your actions with regard to the CRA?

2  A.  Yes.  I would assume so, yes, sir.

3  Q.  Now, are you familiar with something called the

4  blueprint?

5  A.  Yes, sir.

6  Q.  What's the blueprint?

7  A.  Well, in 2000, we did a tax referendum to add sales tax,

8  an extra penny sales tax.  It passed, my recollection is,

9  with 68 percent of the vote to do roads and storm water

10  infrastructure improvement.

11     And, prior to 2000, roads didn't get built in Tallahassee

12  because if someone was against a road or a neighborhood was

13  against a road, it would stop the vote.  You know, if it

14  would be a 3-2 votes and then somebody would get unelected,

15  then it would go back and forth.  That's why Blairstone Road

16  took so long and other road improvements.

17     So, to avoid that, after this sales tax, we created a

18  separate body that dealt -- was the same people, the city and

19  county commission, but their only function was to do the

20  infrastructure program that was outlined in the tax vote so

21  that it would seamlessly get done and not be affected by

22  politics.

23  Q.  So is the blueprint and the CRA -- are those different?

24  A.  Yes, sir.

25  Q.  But you said that your role, the city commission's role

1   was the same with regard to blueprint as was the CRA?

2   A.   Yes, sir.   Just a limited focus on what came before the

3   blueprint.

4   Q.   So a detected pot of money for a specific type of

5   infrastructure?

6   A.   For a set of projects, yes, sir.

7   Q.   So, as a city commissioner, did you have a staff?

8   A.   Yes, sir.

9   Q.   How many people on your staff?

10  A.   One.

11  Q.   Who was your staff person?

12  A.   Allie Merzer.

13  Q.   Did --

14  A.   Fleming.

15  Q.   Excuse me?

16  A.   Allie Merzer Fleming.   Sorry.

17  Q.   Did you have an official email address?

18  A.   Yes, sir.

19  Q.   Did you ever check it?

20  A.   No, sir.

21  Q.   Who actually had access to your official email?

22  A.   Allie.

23  Q.   And did you give her authority to read and respond and so

24  forth?

25  A.   Yes, sir.

1    Q.   Now --

2    A.   I'm sure I responded to an odd email, but it would have

3    been rare.  It's usually she'd print them out and show them

4    to me, and I would write on the bottom what I wanted to do

5    and then she would respond to them.

6    Q.   Now, I would like to turn your attention to J.T.

7    Burnette.

8         Do you know J.T. Burnette?

9    A.   Yes, sir.

10   Q.   How do you know him?

11   A.   He's my friend.

12   Q.   How did you meet him?

13   A.   I met him when I was not in office and representing a

14   group to bring competition at the airport and fixed-base

15   operations.

16   Q.   What was the context in which you met him in this work at

17   the airport?

18   A.   He was representing the group in trying to get that done.

19   Q.   And, specifically, what were you trying to do?

20   A.   Well, there was one company at the airport that did

21   fixed-based operators.  So, because of that, there was no

22   competition, fuel price was high, et cetera, et cetera.  And

23   this group that I represented was bringing in competition.

24   Q.   Now, what's a fixed-based operator?  Is that, like,

25   American, Delta?

 1  A.   Little planes.  So, private affiliation.

 2  Q.   And who were you representing on that deal?

 3  A.   It was a group of people that included J.T., and Steve

 4  Leoni, and --I don't know in name of the entity.

 5  Q.   Who's Steve Leoni?

 6  A.   Steve Leoni was a developer businessman in Tallahassee.

 7  Q.   How did your relationship progress with Mr. Burnette

 8  after meeting him on this airport transaction?

 9  A.   We -- he was a fundraiser on my campaigns, and I got to

10  know him and liked him very much.

11  Q.   How significant a fundraiser was he for you?

12  A.   He was in the top tier of our fundraising.  He wasn't the

13  highest, for sure, but he definitely raised money for us.

14  Q.   When he would donate money, would it come from him or

15  from other people he put together or companies?

16  A.   Each one of his companies.

17  Q.   Did you say each one of his companies?

18  A.   Yes, sir.

19  Q.   Do you remember, sort of ballpark, how many there were?

20  A.   It was more than five, for sure.

21  Q.   Now, after meeting Mr. Burnette on this airport

22  transaction, how often would you say that y'all were in

23  communications?

24  A.   Fairly regular.

25  Q.   How did you communicate?

1    A.   Usually on the phone.

2    Q.   Did you text as well?

3    A.   Yes, sir.

4    Q.   Would you meet in person together?

5    A.   Yes, sir.

6    Q.   What kind of things would you do when you met in person?

7    A.   Drink bourbon.

8    Q.   Did you have places that you liked to go, specific ones?

9    A.   No, sir.  We met at several different places.

10   Q.   What kind of things did y'all talk about?

11   A.   I was always interested in his business, and he would

12   talk to me what he did in business.

13   Q.   Did you consider him a close friend?

14   A.   Yes, sir.

15   Q.   Now, I would like to turn to the McKibbon Hotel Group.

16        In your capacity as a consultant, did you represent

17   McKibbon Hotel Group?

18   A.   Yes, sir.

19   Q.   When did you -- approximately, when did you start

20   representing the McKibbon Hotel Group?

21   A.   It would have been --I was not in office, so it would be

22   sometime between 2006 and 2012.

23   Q.   And what was the nature of your representation of

24   McKibbon?  What were you trying to do for them?

25   A.   They wanted to build a hotel and office building on the

1    corner of Tennessee and Monroe.

2    Q.  And were you successful?

3    A.  With part of it, yes, sir.

4    Q.  What part were you successful on?

5    A.  The hotel.

6    Q.  And what is that hotel now?

7    A.  The Aloft.

8    Q.  And what about the office building part of it?

9    A.  So, the city commission and the mayor at the time wanted

10   a very iconic building, a big project, because that's

11   probably the best corner of Tallahassee that everyone

12   recognizes, Tennessee and Monroe.

13       So they weren't completely happy with the Aloft concept

14   because they wanted it to be like the Floridan hotel that had

15   once sat there and was very majestic looking, or much more

16   majestic looking than the Aloft hotel.

17       So, the project negotiated with the city.  The city owned

18   the land and was willing to sell it with CRA assistance on

19   increment -- tax increments for the right project.  So the

20   agreement was for them to do the Aloft Hotel and then have an

21   option on the corner, and on the corner to do a beautiful

22   office building that's sort of almost like the Flatiron

23   Building in New York.  It looks sort of like that but very

24   iconic for Tallahassee.

25   Q.  And after sort of achieving this agreement from the

1    McKibbon with the city, did you continue your professional

2    relationship with them?

3    A.  No, sir.  Well, I did for a little while.  I remember

4    offering assistance to them in other cities.  I can't

5    remember what city, but other cities.  And then, eventually,

6    there weren't any more projects.

7    Q.  So, after you were elected to the city commission in late

8    2012, or when you took office in late 2012, did the McKibbon

9    Hotel Group come back to you for work on another project?

10   A.  Yes.

11   Q.  And what was that project?

12   A.  Well, I mean, they didn't -- I was already on the

13   commission, but they talked to Paige about the project.  It

14   was, they wanted to not build the office building and instead

15   build a hotel -- I want to say the Hampton Inn -- on that

16   corner, and needed the city's permission to allow them to

17   execute the option agreement with changing the product.

18   Q.  Who was your primary contact at the McKibbon Hotel Group?

19   A.  Wes.  What's Wes's last name.  I always want to say Wes

20   McKibbon, but it's not.

21   Q.  You recall his name being Wes?

22   A.  Wes.

23   Q.  Does Wes Townsen sound familiar?

24   A.  Wes Townsen, I'm sorry.  And I dealt with John McKibbon

25   as well, but Wes Townsen.

1   Q.   Now, you said that when McKibbon --or, Wes Townsen came

2   back, he came and spoke to Paige.  Did you actually have

3   conversations with him as well, though?

4   A.   I had several.

5   Q.   And what did you talk about, generally?

6   A.   He talked about the project, what he wanted to do with

7   the project.

8   Q.   And what would that project have required?  Would it have

9   required action by the city?

10  A.   Yes, sir.

11  Q.   And what, generally -- I know it's city, sort of,

12  ordinances and so forth and they are very complicated.  But,

13  just very generally, what did McKibbon need to do before it

14  could change its plan?

15  A.   The city commission had to vote to allow them to do so,

16  for them to exercise the option and change what they were

17  going to build on it.

18  Q.   Now, do you recall this issue coming up before the city

19  commission in early 2013?

20  A.   I do now, yes.

21  Q.   And have you sort of refreshed your recollection on what

22  happened in preparation for trial?

23  A.   Yes, sir.

24  Q.   So, do you recall there being a commission meeting in

25  April of 2013?

1   A.  Yes, sir.

2   Q.  And at that meeting, did McKibbon's proposal come up

3   before the commission?

4   A.  Yes, sir.

5   Q.  And was there a vote on it?

6   A.  Yes, sir.

7   Q.  Were you present for that vote?

8   A.  I was not.

9   Q.  Why not?

10  A.  I don't really remember.  I racked my brain.  Either I

11  was out -- which I frequently was during the meeting, going

12  to the bathroom or taking a phone call or whatever -- or I

13  saw it on the agenda and was -- and had not declared a

14  conflict yet, so I was out of the room.  It was one of the

15  two of those.

16      MR. NOTHSTEIN:  Government's Exhibit 191, please.

17  And the second page.

18      If you can just highlight the top summary part for

19  the witness, please.

20  BY MR. NOTHSTEIN:

21  Q.  Mr. Maddox, what is Government's Exhibit 191(a)?

22  A.  It looks like a meeting summary.

23  Q.  What is a meeting summary?

24  A.  The minutes.  I mean, I -- this isn't the minutes, but I

25  guess a summary of what happened at the city commission

1    meeting.

2            MR. NOTHSTEIN:  We would move in Government's 191(a),

3    Your Honor.

4            THE COURT:  It is admitted.

5        (GOVERNMENT EXHIBIT NO. 191(a):  Received in evidence.)

6    BY MR. NOTHSTEIN:

7    Q.  What meeting is this summary from?

8    A.  April 24, 2013.

9    Q.  Now, according to these minutes, were you present at the

10   meeting?

11   A.  Yes, sir.

12           MR. NOTHSTEIN:  If we can go page 4, Item 13.03.

13   BY MR. NOTHSTEIN:

14   Q.  What was this item?  And leave it on there for a second.

15       The minutes or the summary, when they referred to an item

16   before the commission, what is an item?

17   A.  It's an agenda item.

18   Q.  What does that mean?

19   A.  Well, they are just numbered.  What comes before the

20   commission is numbered.

21   Q.  And for every meeting, does an item have to be on the

22   agenda in order to be considered?

23   A.  Yes, sir.  Yes, sir, pretty much.  I mean, you can have

24   -- commissioners can bring up things sort of by surprise, but

25   usually its custom is that it should be an agendaed.

1    Q.   By and large, do commissioners routinely bring up things

2    that were not on the agenda?

3    A.   I always objected to it when they did but, I mean, it has

4    happened but not by and large.

5    Q.   According to this summary -- well, back up.

6         What is Item 13.03 about?

7    A.   To approve the 2030 master sewer plan amended, to include

8    additional un-sewered areas in the unincorporated areas

9    requested by the Leon County Board of Commissioners.

10   Q.   Did that have to do with the McKibbon Hotel Group?

11   A.   No, sir.

12   Q.   Were you present for that vote?

13   A.   No, sir.

14        MR. NOTHSTEIN:  May we have page 5, Item 13.04.

15   Just the top part, please.

16   BY MR. NOTHSTEIN:

17   Q.   And what is Item 13.04?

18   A.   To authorize the city manager to execute a two-year

19   extension to the option of agreement with McKibbon Hotel

20   Group subject to the terms and conditions as detailed below.

21   Q.   Did this deal with the McKibbon Hotel Group?

22   A.   Yes, sir.

23   Q.   Were you present for that?

24   A.   No, sir.

25        MR. NOTHSTEIN:  Page 6, Item 14.05.  The top part,

1    please.

2    BY MR. NOTHSTEIN:

3    Q.   What is Item 13.05?

4    A.   To approve the 2012 transit development plan minor update

5    which will allow the city's transit system to continue to

6    provide service to the community and offset the use of city

7    funds.

8    Q.   Were you present for that?

9    A.   No, sir.

10   Q.   So when it says you are absent, does it say where you

11   are?

12   A.   No, sir.

13   Q.   Do you know where you are?

14   A.   I mean, I couldn't tell you today where I was, but I

15   could -- I would leave and go to the bathroom, sometimes

16   return phone calls, sometimes go up to my office.  The

17   commission meetings would go long periods, so that's not an

18   uncommon for me.

19   Q.   At some point --

20       MR. NOTHSTEIN:  You can clear that, Ms. Orozco.

21   BY MR. NOTHSTEIN:

22   Q.   At some point after this commission meeting, did the

23   defendant approach you and talk to you about the McKibbon

24   Hotel Group project?

25   A.   Yes, sir.

1   Q.  And what did he say to you when he approached you?

2   A.  He wanted for me not to support the McKibbon Hotel option

3   and for Paige not to represent them.

4   Q.  Let's kind of take those one at a time.

5       The first part.  Do you recall specifically what he said

6   to you about not wanting you to support the McKibbon Hotel

7   Group project?

8   A.  He was in negotiations to buy -- he told me he was in

9   negotiations to buy the DoubleTree hotel; and that if a hotel

10  was approved there, it would poorly affect his ability to buy

11  it, or something along those lines.

12  Q.  Specifically in regard to his request about your action,

13  was he asking you to vote "no" on it?

14  A.  Well, my memory is that he just didn't want me to support

15  it.  And I told him that I was going to declare a conflict.

16  Q.  And what did the defendant say when you told him you were

17  going to declare a conflict?

18  A.  He said, good, he can get the other votes.

19  Q.  Now, let's take it to the second part of that.

20      You said that he didn't want Ms. Carter-Smith to

21  represent McKibbon before the commission; is that right?

22  A.  Yes, sir.

23  Q.  Did he explain to you why he wanted that?

24  A.  Because he didn't want her to sway the other

25  commissioners.

1    Q.  And did he explain sort of why he thought

2    Ms. Carter-Smith would be able to sway the other

3    commissioners?

4    A.  No, sir.

5    Q.  Did he explain at all about a perceived connection

6    between you and Ms. Carter-Smith?

7    A.  No, sir.  In that context, I think it was more the

8    connection she had with the other commissioners.

9    Q.  Did the defendant explain any more about his plan with

10   regards to DoubleTree hotel; any other aspects of what he was

11   planning to do?

12   A.  With the hotel?

13   Q.  Well, as far as his efforts to purchase the hotel?

14   A.  That he was in negotiations to purchase it; and that, if

15   the other hotel was approved, it would affect detrimentally

16   the price that he would have to pay.

17   Q.  And how about with regard to his plan to stop the Hampton

18   Inn; did he tell you any other aspect of his plan?

19   A.  Yes, that he was going to file suit.

20   Q.  And did he explain?

21   A.  And work on the other commissioners.

22   Q.  Now, let's talk about that lawsuit.  Did he explain any

23   more about the lawsuit?

24   A.  I think he did.  I don't remember the details, but I'm

25   sure he did.

1  Q.  And specifically about the votes of the other

2  commissioners, did he tell you how he felt about whether or

3  not he had enough votes?

4  A.  Yes.  He said that with me declaring a conflict, that he

5  had two votes that he thought he was confident in, and that

6  it would die in a tie.

7  Q.  And did he tell you who the other two commissioners he

8  had, or that he thought he had?

9  A.  I believe he did.  I couldn't tell you today which ones

10  they were, but I believe he did.

11  Q.  And how would it be that a tie, 2-to-2, would stop the

12  Hampton Inn?

13  A.  Well, any time there's a tie, a tie fails.  So whatever

14  is proposed, if you propose A and it's a tie, it fails; if

15  it's B, it's a tie, it's fails.

16  Q.  So what was being proposed here by McKibbon?

17  A.  To be able to build the Hampton Inn.

18  Q.  So that if there is a tie, that fails?

19  A.  Right.

20  Q.  Now, at this time, the defendant approached you and asked

21  you not to vote.  I think you told us you that you said --

22  you told him you'd already decided you had a conflict; is

23  that right?

24  A.  Yes, sir.

25  Q.  At this point, had you publicly declared your conflict?

1  A.  I don't remember whether -- I don't remember the exact

2  time that we had that conversation, whether it was before or

3  after I publicly declared the conflict.  It was certainly

4  before the vote.

5  Q.  Did the defendant seem to know you were going to recuse

6  or not going to vote on this?

7  A.  I told him that.

8  Q.  Before you told him, did he seem to know?

9  A.  Oh, no, he did not.

10 Q.  Now, you have had previous meetings with the government,

11 have you not, Mr. Maddox?

12 A.  Yes.

13 Q.  Do you recall previously telling us that you believed

14 that this conversation with the defendant happened before you

15 publicly announced your recusal?

16 A.  Yes, sir.  I've tried to -- I was trying to piece it

17 together with the documents -- other documents that you shown

18 me.  So, that's my best recollection.

19 Q.  And we'll come back to that.

20     In exchange for these things the defendant was asking you

21 to do, did he tell you he would give you anything in

22 exchange?

23 A.  He was going to give Paige Carter-Smith the amount of

24 business that she would have gotten by representing McKibbon.

25 Q.  And did you tell him how much that business would be?

1    A.   He asked; and, yes, I did.

2    Q.   What did you tell him?

3    A.   $100,000.

4    Q.   Did he tell you how he would get Ms. Carter-Smith that

5    amount of business?

6    A.   He said -- yes.  He said that he had a business that did

7    federal contracting that she could assist in.

8    Q.   Now, I know we talked about the date of this conversation

9    and whether you remember it specifically; but do you remember

10   sort of where you had it, on the phone, in person, the

11   location?

12   A.   I don't.  I think it was on the phone, but I'm not sure.

13   It was so long ago.

14   Q.   So, ultimately, did you agree to what the defendant was

15   proposing?

16   A.   Yes, sir.

17   Q.   Did you tell Ms. Carter-Smith about the arrangement?

18   A.   I told her that J.T. did not want her representing

19   McKibbon; and that he was going to get her the same amount of

20   business that she would have gotten from representing

21   McKibbon.

22   Q.   And was she okay with that?

23   A.   She was.

24   Q.   So did you tell her at that time about the other part of

25   the agreement, that you would not support the McKibbon

1   project on the dais?

2   A.  No, sir.

3   Q.  So after telling Ms. Carter-Smith about this agreement

4   and getting her agreement not to represent McKibbon, what did

5   -- did she do anything next, to your knowledge, about that?

6   A.  Yes.  I think she met with J.T.

7   Q.  With regards to the representations of McKibbon Hotel

8   Group?

9   A.  Oh, she did not represent them.

10  Q.  What did she do instead?

11  A.  Gary Yordon wanted to represent them because he wanted

12  the business; so he represented them.

13  Q.  Okay.

14      MR. NOTHSTEIN:  May we have Government's Exhibit 108,

15  please, which I believe is in evidence.  Can we just have the

16  top paragraph.

17  BY MR. NOTHSTEIN:

18  Q.  So Mr. Maddox, do you recognize this document?

19  A.  That's the standard consulting agreement that we used for

20  years at Governance.  I don't -- that document, itself, I

21  didn't prepare or anything but I recognize it.

22  Q.  So you didn't have any role in this?

23  A.  No, sir.

24  Q.  But were you aware that Mr. Yordon was going to be

25  representing the McKibbon Hotel Group through the Zachary

1    Group?

2    A.  Yes, sir.

3    Q.  What was your involvement -- let me back up.

4        So what is your recollection about when the conversation

5    with Mr. Burnette happened with regard to this consulting

6    agreement for the June 7th?

7    A.  Yeah.  I would think that it would be prior to this,

8    because then you had Gary.  I knew Gary wanted to represent

9    McKibbon, but I don't know.  I would think it would be prior

10   to that, but I'm not sure.

11   Q.  So after making this agreement with the defendant and

12   after getting Ms. Carter-Smith's agreement not to represent

13   McKibbon Hotel Group in front of the commission, what was

14   your involvement with McKibbon Hotel Group going forward?

15   A.  Well, Wes would call me and vent.  But other than that, I

16   mean, I declared a conflict.

17   Q.  Were you -- but did you have conversations with him, with

18   Gary Yordon, just generally about what was going on?

19   A.  Limited.  Erwin Jackson would say that Gary didn't have

20   -- hadn't registered to lobby and his company was inactive.

21   I had conversations with Gary about that.

22   Q.  Speaking of --

23        MR. NOTHSTEIN:  Let's turn now to Government's

24   Exhibit 92(e), please, which is in evidence.  Your Honor,

25   this is about two minutes.  This is a clip we have seen, but

1   it is brief.

2       (Government's Exhibit 92(e) published to the jury.)

3           MR. NOTHSTEIN:  You can stop.

4   BY MR. NOTHSTEIN:

5   Q.  Do you recall this, Mr. Maddox?

6   A.  Yes, sir.

7   Q.  And in preparation for trial, have you watched this

8   video?

9   A.  Yes, sir.

10  Q.  In fact, you watched several commission videos leading up

11  to this?

12  A.  Yes, sir.

13  Q.  And is your recollection, was this the first time you

14  publicly announced your recusal from the McKibbon matter?

15  A.  I believe so; yes, sir.

16  Q.  Just in general, what was going on with Mr. Jackson?

17  A.  I ran for the city commission in 2012 against Steve

18  Stewart, who was his friend.  And he asked me to come to his

19  office, and told me that if I ran against Steve Stewart, that

20  he would make sure he ruined me.  And then every commission

21  meeting, basically, with a very few exceptions, he tried to

22  do that at every meeting.

23  Q.  And what topics did he sort of talk about in regards to

24  you?

25  A.  Are you kidding me?  Everything.  Where I lived, who I

1  was, who I knew, my kids, you name it.

2  Q.  How seriously did the commission generally take

3  Mr. Jackson?

4  A.  They took him seriously because he had resources.  He's a

5  multimillionaire, and he's mean and vindictive and wants to

6  hurt people.  So he was taken seriously that way.  And the

7  commissioners were afraid that he would turn his sights on

8  them.  They didn't take his information seriously because it

9  wasn't always accurate.

10 Q.  So am I correct to say that they were concerned about the

11 spotlight being shown on them but not for what he was saying

12 about them?

13 A.  Not so much the spotlight, he would give vendettas.  So

14 if a commissioner crossed him in any way, he would file

15 ethics complaints and, you know, hound them, which he did for

16 Mayor Marks, Commissioner Katz, me, Mayor Gillum.

17 Q.  Now, you announced that you were going to recuse from all

18 of the matter regarding the McKibbon Hotel Group.  As a

19 matter of, I believe, state law, is there a form you are

20 required to file to document your recusal?

21 A.  Yes, sir.

22 Q.  Did you file it after this meeting?

23 A.  Whenever the city attorney -- yes, I did, when the city

24 attorney brought it to me.

25 Q.  What was the process, as you understood it, at that time?

1  A.  The city attorney's office would prepare the form, along

2  with your aide, and then they'd bring it to you and you'd

3  sign it.

4  Q.  Speaking of the city attorney, I believe you made

5  reference there to consulting with the city attorney.  Prior

6  to this meeting, had you consulted with the city attorney,

7  Lew Shelley, about your potential conflict?

8  A.  Yes, sir.

9  Q.  And had he provided advice to you?

10  A.  Yes, sir.

11      MR. NOTHSTEIN:  If we could have Government's

12  Exhibit 93(e).  It's another clip we have seen, Your Honor,

13  but not very long.

14      (Government's Exhibit 93(e) published to the jury.)

15      MR. NOTHSTEIN:  Can you move forward, please.

16      (Audio continued.)

17  BY MR. NOTHSTEIN:

18  Q.  So, Mr. Maddox, with what Mr. Shelley just said, is that

19  consistent with the advice you received from him?

20  A.  I think what Mr. Shelley was trying to say is that I

21  didn't declare a conflict because Erwin mentioned that I had

22  a conflict, which is what Mr. Jackson was trying to say

23  happened.

24   I sat down with the city attorney and went back and

25  forth.  And I explained to him that I had negotiated the

1    actual deal.  As an advocate, I had negotiated the actual

2    deal with the city that was now coming before me to vote.

3        And he said, You know, you can go either way.  You cannot

4    vote, clearly, as an appearance of a conflict; or we can

5    argue that you don't have an actual conflict, but we thought

6    there would be an ethics complaint made as a result.

7    Q.  So the advice, though, generally, was it's your choice?

8    A.  Yes, sir.

9    Q.  So, Mr. Maddox, going forward, I believe you said there

10   were additional votes, and you weren't involved because you

11   had announced your recusal; is that right?

12   A.  Yes.

13   Q.  I want to turn to the other part of your agreement with

14   the defendant.

15       Did you -- were you involved or aware of Ms. Carter-Smith

16   meeting with this company that the defendant said he could

17   get her work with for the $100,000?

18   A.  Yes, sir.

19   Q.  And, just generally, when do you recall that occurring?

20   Or, let me ask you a better question.

21   A.  In the fall -- I'm sorry.

22   Q.  When do you recall it occurring?

23   A.  I think it was in the fall.

24   Q.  And what happened, as far as you know?

25   A.  She had meetings with the officials from KaiserKane, and

1    negotiated a contract to represent them.

2    Q.  You say she negotiated the contract, or did you negotiate

3    it?

4    A.  She did.

5         MR. NOTHSTEIN:  I'm going to turn to Government's

6    Exhibit 124, please, which I believe is in evidence.  If we

7    could have just the "to" and "from" attachment.

8    BY MR. NOTHSTEIN:

9    Q.  So, Mr. Maddox, this is a January 10, 2014 email from you

10   to Ms. Carter-Smith, attaching what appears to be the

11   contract or the document.

12        Do you recall this?

13   A.  Yes, sir.

14   Q.  What was your involvement in the contract?

15   A.  Well, I had all the contracts on my computer, the form

16   for them.  So when someone needed a contract, usually they

17   would --if Paige did, she would email me and say:  These are

18   the details.  Can you prepare the contract?

19        And I would take out the part where it had compensation

20   and put in whatever her compensation was, change the dates,

21   change the names, and send it back to her.

22   Q.  Do you remember having conversations -- there are no

23   details in here.  Did you have conversations with

24   Ms. Carter-Smith about those details?

25   A.  I don't recall.  I remember -- I remember the

1    compensation being different than $100,000 worth of work, it

2    was structured differently.  And she said that's what she

3    negotiated.

4    Q.  And was Ms. Carter-Smith concerned about that, or did she

5    have questions about why the compensation was different than

6    the 100,000 that she was promised?

7    A.  Not that I recollect.

8    Q.  Do you recall having any conversations -- or, do you

9    recall her telling you if she had any conversations with the

10   defendant about that?

11   A.  Yes.  She had discussed it back and forth with J.T. as

12   well the KaiserKane people, and that's what they came up

13   with.

14   Q.  Now, one of your previous meetings with the government,

15   do you recall saying that you think you did discuss the

16   disparity in the compensation and the 100,000 with

17   KaiserKane?

18   A.  Yes.

19        MR. KEHOE:  Objection, Your Honor, leading.

20        THE COURT:  Sustained.

21   BY MR. NOTHSTEIN:

22   Q.  So after this contract, after he's being involved in the

23   contract here, was there another -- was there a vote in

24   February in regards to the McKibbon Hotel Group?

25   A.  Yes, sir.

1    Q.   And what happened at that vote?

2    A.   I believe that's when it failed on the tie, but I would

3    have been out of the room because I declared a conflict.

4    Q.   And after that -- after declaring the conflict, did you

5    file your conflict form?

6    A.   Yes, sir.

7         MR. NOTHSTEIN:   Can we have Government's Exhibit 103

8    for the witness.  Go to the top, please.

9    BY MR. NOTHSTEIN:

10   Q.   Mr. Maddox, what is this document?

11   A.   Memorandum of voting conflict for county, municipal, and

12   other local public officers.

13   Q.   If you'd look at the body --

14        MR. NOTHSTEIN:   A little lower, please, Ms. Orozco.

15   I'm sorry, the second page, and the part, "The disclosure of

16   local officers' interest."

17   BY MR. NOTHSTEIN:

18   Q.   What does this conflict form relate to, Mr. Maddox?

19   A.   Approval of the fourth extension of purpose option --

20   purchase option agreement with McKibbon Hotel Group.

21   Q.   So this is in regard to the McKibbon vote?

22   A.   Yes, sir.

23        MR. NOTHSTEIN:   We move in Government's 103, Your

24   Honor.

25        MR. KEHOE:   It's in, Judge.

1        THE COURT:  Either way, it's admitted now if was not

2    before.

3        (GOVERNMENT EXHIBIT NO. 103:  Received in evidence.)

4    BY MR. NOTHSTEIN:

5    Q.  So this statement here under (b), what is that?  Where it

6    says Item 13.05, what does that say?

7    A.  Approval of fourth extension of purchase option agreement

8    with McKibbon Hotel Group.  I did not vote on the measure

9    because, pursuant to Florida Statute Section 286.012, there

10   is an appearance of conflict of interest since I previously

11   represented the same developer involving the same property.

12        MR. NOTHSTEIN:  Can we clear that, please.

13   BY MR. NOTHSTEIN:

14   Q.  Is this the form that you filed, Mr. Maddox?

15   A.  Yes, sir.

16        MR. NOTHSTEIN:  Can you pull it back up, the second

17   page.  The bottom, date and signature.

18        THE WITNESS:  Yes, sir.

19   BY MR. NOTHSTEIN:

20   Q.  Is that your signature, Mr. Maddox?

21   A.  It is.

22   Q.  And what date did you sign it?

23   A.  February 27, 2014.

24   Q.  Now, around the time of the McKibbon vote where it failed

25   and this form, did you speak to Ms. Carter-Smith or the

1  defendant about invoicing for the $100,000?

2  A.  J.T. told me to tell Paige to send him an invoice for

3  $100,000, the same one KaiserKane -- or whatever the company

4  was.

5  Q.  And what did you do after he told you that?

6  A.  I told Paige that.

7  Q.  And do you know if she actually sent the invoice?

8  A.  She did.

9  Q.  Now, did you learn from Ms. Carter-Smith whether or not

10  the $100,000 had been paid?

11  A.  Yes, sir.

12  Q.  And what did she tell you?

13  A.  That it was paid.

14  Q.  Do you recall when it was?

15  A.  I don't.

16  Q.  Do you recall if there was any delay in time between the

17  invoice and the payment?

18  A.  I don't.

19  Q.  To your knowledge, had Ms. Carter-Smith or Governance

20  earned the $100,000 under the contract?

21  A.  Yeah.  She had set up meetings with the GSA, but she

22  thought there was going to be more work that was involved in

23  that, and there was not.

24  Q.  Now, I would like to turn forward about two years to

25  2016.  Let's say the middle of 2016.

1    What was going on in your life at that time?

2  A.  I was separated from my wife.

3  Q.  What kind of effect was that having on you?

4  A.  It had a pretty -- a pretty big effect.

5  Q.  As a result of that, were you tending to drink more than

6  usual?

7  A.  A lot.

8  Q.  And would you drink before sort of heading out for the

9  night?

10  A.  Yes, sir.

11  Q.  And what, generally, were you drinking?

12  A.  Whiskey.

13  Q.  And were you tending to drink to excess?

14  A.  Yes, sir.

15  Q.  Now, let's turn your attention to October 1st, 2016.  Do

16  you know, do you recall if you attended a Florida State

17  football game that day?

18  A.  I would have, if it was a home game.

19  Q.  And do you recall meeting a person by the name of Mike

20  Miller at that football game?

21  A.  Yes, sir, I do now.

22  Q.  And do you recall what you talked about?

23  A.  My recollection is that I had bumped into him and Adam

24  Corey.  And Adam would always have some out-of-town person

25  that was a client of Adam's, and he would bring him over to

1    where the elected officials were.  And it was sort of

2    professional courtesy to say something nice about the

3    lobbyists, and so you would say:  Oh, yeah, he's a great guy

4    or, you know, he's fantastic.

5        And that's my recollection of that, that he wanted to do

6    real estate in Tallahassee, and I said he's a great guy.  And

7    Adam wanted me to meet him for brunch the next day, and I

8    agreed to, but I was drunk and I didn't remember it until he

9    texted me the next day.

10   Q.  And where were you in the stadium when you met Mr. Corey

11   and Mike Miller?

12   A.  In the skyboxes.

13   Q.  Your skybox or Adam Corey's?

14   A.  I don't remember.  I think it's outside of his.  His was

15   on the seventh floor; and when you walk by, he had a person

16   that would stand there by the door and if it were an elected

17   official he'd grab them and bring them in, or I guess anybody

18   that they thought was important.

19   Q.  What was the general atmosphere like inside Mr. Corey's

20   box?

21   A.  Like a disco.  It was very different than all the boxes,

22   including mine.  It had -- it was double the size, and loud

23   music, and shots and, you know, people dancing.

24   Q.  Was Mr. Burnette there?

25   A.  I don't recall if he was there.

1  Q.  Do you recall saying something to Mr. Miller about

2  Mr. Burnette?

3  A.  I recall telling Mr. Miller that J.T. was my friend, my

4  guy, that I thought he was great.  I don't know if it was

5  then or the next day, but I certainly told him that.

6  Q.  So, you said that Mr. Corey invited you to a brunch.  Did

7  you remember that?

8  A.  No, sir.

9  Q.  How did you know to go to the brunch?

10  A.  I was having lunch, and I got a text saying, Are you

11  still coming?  And I completely forgot and had to run.

12  Q.  Where was the brunch?

13  A.  The Edison.

14  Q.  When you got to The Edison, I guess, who was there?

15  A.  Adam Corey always had an entourage of many people.  So it

16  was a table full of people.

17  Q.  Was Mr. Miller there?

18  A.  Yes, sir.

19        MR. NOTHSTEIN:  Could we please have Government's

20  Exhibit 14.  This is a clip of an October 2nd, brunch.  I'm

21  just going to play small parts of this, Your Honor.  If we can

22  start from the beginning.

23  BY MR. NOTHSTEIN:

24  Q.  And the transcript will be there, Mr. Maddox.

25        (Government's Exhibit 14 published to the jury.)

1  BY MR. NOTHSTEIN:

2  Q.  Mr. Maddox, that voice we hear on there that's attributed

3  to you in the transcript, is that you?

4  A.  Yes, sir.

5  Q.  Do you recall saying the things on this transcript?

6  A.  Yes, sir.

7  Q.  You say that -- you mentioned Fallschase.  Had you had

8  personal involvement in the Fallschase in the past?

9  A.  Yes, sir.

10  Q.  What was your involvement?

11  A.  Paige Carter-Smith and I represented AIG Baker in the

12  previous attempt before this to develop Fallschase.  That

13  resulted in the Costco and the movie theater and all that

14  being in Fallschase.

15  Q.  Okay.

16       MR. NOTHSTEIN:  If we can move up to three minutes

17  and 20 seconds.

18       (Audio continued.)

19  BY MR. NOTHSTEIN:

20  Q.  Again, Mr. Maddox, the voice on the recording that is

21  attributed to you in the transcript, is that you?

22  A.  Yes, sir.

23  Q.  Now, you are now talking now about something that is

24  going out to bid and RFP for a developer.  What property are

25  you talking about there?

1   A.   Behind where we were sitting at The Edison is Myers Park,

2   and the city planning staff came up with the idea.  The

3   neighbors wanted a wall built to block the sound from the

4   amphitheater and the wall was going to be extremely

5   expensive.  Staff did not think that the wall would actually

6   repel the sound.

7       So, the planning department had come up with a concept of

8   taking the city-owned property where the parks and recreation

9   is and doing an RFP for a developer to do a mixed-use

10  development that would include sound deadening in it rather

11  than building a wall that they didn't think would be

12  effective.

13  Q.   So this is to be a barrier between The Edison and Myers

14  Park; is that right?

15  A.   Yes, sir.

16  Q.   And The Edison, where is that located?

17  A.   On the edge of Cascades Park.

18  Q.   Of Cascades Park.

19  A.   Yes, sir.

20  Q.   So those three things are all in close proximity?

21  A.   Yes, sir.

22  Q.   So there, at the end, do you recall saying:  Yeah, I'd go

23  in with J.T., I think he'd have an edge?

24  A.   Yes, sir.

25          MR. NOTHSTEIN:  Now, I would turn to Government

1    Exhibits 30 and 32 which are in evidence.

2    BY MR. NOTHSTEIN:

3    Q.   Now, just in general, Mr. Maddox, do you recall meeting

4    an individual by the name of Mike Sweets?

5    A.   Yes, sir.

6    Q.   And, generally, what do you recall about when you met

7    him?

8    A.   I was severely intoxicated at Madison Social, and --

9    Q.   Do you know what brought you to be out at Madison Social

10   that night?

11   A.   I was out with a friend who was also going through a

12   divorce and wanted to go out drinking, and he came and met me

13   and picked me up and we went to a couple of places before.

14   We went to The Wine Loft, for sure, before going to Madison

15   Social.  And then he came back and spent the night at my

16   house with me.

17   Q.   Now, at the time that you met Mr. Sweets, had you already

18   been drinking a lot?

19   A.   Yes, sir.

20        MR. NOTHSTEIN:  Government's 130.  We're going to

21   start at 1 minute and 2 seconds, please.

22        (Audio continued.)

23   BY MR. NOTHSTEIN:

24   Q.   So, Mr. Maddox, again, the voice on the recording that's

25   attributed to you in the transcript, is that you?

1    A.  Through the slurring?  Yes.

2    Q.  Do you remember this conversation?

3    A.  No.  I mean -- no, not until I heard the tapes.

4    Q.  But just to be clear --

5    A.  I remember parts of it, you know.

6    Q.  Well, just in general, do you remember meeting Mr. Sweet

7    there?

8    A.  Yes, sir.

9    Q.  Do you remember having a conversation generally about

10   this?

11   A.  Yes, sir.

12   Q.  Now, at this time, did you understand that Mr. Sweet's

13   company was looking at things in Tallahassee potentially?

14   A.  I was foggy between what he did and the other guy,

15   Miller.  But I thought, between the two of them, I didn't

16   know which one was doing what.  That was the first time I'd

17   met Sweets, to my knowledge.

18        MR. NOTHSTEIN:  Can we go to 4 minutes and 45

19   seconds, please.

20        (Audio continued.)

21   BY MR. NOTHSTEIN:

22   Q.  Is that you in the recording?

23   A.  Yes, sir.

24   Q.  Do you recall having this portion of the conversation?

25   A.  Not at the time.  I do now.

1   Q.  So this discussion about you potentially being

2   conflicted, when you say, If you had shit coming up in front

3   of me, what does that mean?

4   A.  I mean, I'm only guessing.  I didn't remember that this

5   even occurred until much later when the tapes were played for

6   me.

7       I think what I was trying to say there was the other guy,

8   Mike Miller, had told me that they would have lots of

9   different things, projects, that they would do because they

10  buying Joan Fregly's parcels.  And I'm telling him if he

11  hired me, that it would conflict me on all of their stuff no

12  matter what it was.

13  Q.  Just in general, you wouldn't be conflicted until

14  something was coming before the city, right?

15  A.  Yes, sir.

16  Q.  Or the CRA?

17  A.  Or the blueprint, yes, sir.

18  Q.  And do you recall there at the end telling them that J.T.

19  would tell them, who?

20  A.  Yeah.  He said, J.T. will tell me, right?  I said, yes,

21  J.T. will tell you.

22          MR. NOTHSTEIN:  If we could move up to about 12:56,

23  please.

24          (Audio continued.)

25  BY MR. NOTHSTEIN:

1    Q.  Again, Mr. Maddox, is that you on the recording?

2    A.  Yes.

3    Q.  How did you know how much they were paying Adam Corey?

4    A.  J.T. had told me.

5    Q.  And what else had Mr. Burnette told you at this point

6    about Mr. Sweet or Mr. Miller?

7    A.  That he wanted them to do Fallschase.

8    Q.  Did he say anything else about what he needed from them?

9    A.  He wanted them to invest money and to do Fallschase

10   development.

11   Q.  Specifically, did he talk to you about needing or wanting

12   their financing?

13   A.  Yes.  And he was hoping that I could put in a good word

14   for him.

15   Q.  With these guys?

16   A.  Right.

17   Q.  And that conversation was prior to the Madison Social

18   meeting?

19   A.  Yes, I think it was, because I told him I had met with

20   Mike Miller.  This is, to my recollection, the first time I

21   had met Mike Sweets.

22        MR. NOTHSTEIN:  Play one more, 15 minutes and 9

23   seconds, please.

24             (Audio continued.)

25   BY MR. NOTHSTEIN:

1  Q.  Again, Mr. Maddox, is that you in the recording?

2  A.  Yes.

3  Q.  And do you recall saying that, J.T. knows how to get the

4  deal done?

5  A.  Yes.

6  Q.  Now, after --

7          MR. NOTHSTEIN:  You can clear that, please,

8  Ms. Orozco.

9  BY MR. NOTHSTEIN:

10 Q.  After meeting Mr. Sweets at Madison Social, did you talk

11 to Mr. Burnette again and tell him that you had met him?

12 A.  Yes.

13 Q.  And what do you remember telling him?

14 A.  That I met this guy that looked like Whitesnake that was

15 trying to get me to drink a lot, and that, you know, that we

16 discussed -- and he told me that's Mike Sweets and he is

17 involved with the other guy, Mike Miller.

18 Q.  And did he say anything more about what he wanted from

19 those folks?

20 A.  That he wanted them to invest in Fallschase.

21 Q.  And did you say anything to him about sort of not wanting

22 new friends, basically?

23 A.  That came up in context of -- at some point they wanted

24 me to go on the trip with them or -- I don't recall -- like

25 an MMA fan.  They knew I was an MMA fan, that they wanted me

1  to go to a fight, you know.  And I told J.T., I don't want to

2  travel with anybody, I don't want to do anything, I don't

3  need any new friends.

4  Q.  Did you ask him to run sort of business communications

5  through him instead of directly with you?

6  A.  I mean, what I said was, I don't know these guys, and I

7  don't want to go hang out and party with them, you know.

8  Q.  So let's turn your attention now to October 29th to

9  another Florida State football game.

10     Do you recall meeting Mr. Sweet again at a Florida State

11  football game?

12  A.  Yes, sir.

13  Q.  What happened?

14  A.  I'm not sure which dates, because I saw them -- they

15  would come into my skybox.  But I remember, I think, seeing

16  him either at Old School or the Old School Box.  But I

17  remember specifically Adam Corey bringing him into my box.

18  Q.  And what happened when he came into the box?

19  A.  He was talking about wanting to go to Vegas and, you

20  know, more of the same:  They needed support for his

21  projects, whatever.  I was intoxicated as well.

22  Q.  Do you have a clear recollection of this conversation

23  sitting here today?

24  A.  No, sir.

25  Q.  Do you recall introducing Mr. Sweets to Ms. Carter-Smith?

1   A.   No, sir.

2   Q.   Do you recall telling him that you had no secrets from

3   Ms. Carter-Smith?

4   A.   I have since I've listened to the tape, yes, sir, but --

5   that's true, I don't.

6   Q.   And do you recall telling him that he should pay $10,000

7   a month to Governance?

8   A.   No, sir.  I recall after listening to the tapes.

9   Q.   So you're saying you do recall that happening?

10  A.   I think so.  I didn't recall at the time.

11  Q.   Now, after meeting Mr. Sweet at that game, did you have

12  another conversation; did you speak with the defendant about

13  meeting Mr. Sweet?

14  A.   Yes.

15  Q.   And what did you generally talk about?

16  A.   It's -- you know, I'm trying to remember the sequence.

17  But I talked to the defendant about -- he was the one that

18  told me that they wanted to hire Paige to do Fallschase.  I

19  remember having that conversation with him.  I don't remember

20  having it with Mike Sweets.

21       I remember having it with J.T., saying that he -- that

22  they wanted to hire Paige to represent them at Fallschase.

23  And I said, That's good.  That's good for her, and she's

24  already done Fallschase before so it makes sense.

25  Q.   So this was prior to Ms. Carter-Smith receiving any money

1   from Southern Pines?

2            MR. KEHOE:  Objection, leading.

3            THE COURT:  Overruled.

4   BY MR. NOTHSTEIN:

5   Q.  Let me rephrase it.

6   A.  Yes, I think so.

7   Q.  The conversation with Mr. Burnette, was it prior to

8   Ms. Carter-Smith getting any money from Southern Pines?

9   A.  I remember that conversation, that they wanted

10  to hire Paige to do Fallschase, yes.  I think that was prior

11  to that.  And then there was another conversation that she

12  received a check from Southern Pines and didn't know what it

13  was.  And I had a conversation with J.T. and said:  What is

14  Southern Pines?  Paige got a check, and -- you know, is that

15  those guys that wanted to hire her for Fallschase?  And he

16  said yes.

17  Q.  Just to be clear, your recollection is that, prior to the

18  money coming in, the defendant informed you that they would

19  be hiring Paige Carter-Smith; and then, once the money came

20  in, you had to go to the defendant and ask him who was

21  Southern Pines, and he informed you that it was Mike Sweets

22  and Mike Miller?

23  A.  Yes.

24           MR. KEHOE:  Objection, Your Honor, leading.

25           THE COURT:  Sustained.

1  BY MR. NOTHSTEIN:

2  Q.  So specifically, though, after this meeting in the skybox

3  you say you don't really remember very clearly, did you have

4  any conversations with the defendant sort of about your

5  comfort level of speaking with folks like Mike Sweets?

6  A.  I did, yes.

7  Q.  What did you tell him?

8  A.  That I didn't want to go out and go party with those

9  guys.

10  Q.  But how about just the interaction with those folks going

11  forward; did you have conversations with the defendant about

12  that?

13  A.  Yeah.  I remember him saying he wanted them to invest in

14  Fallschase and wanted to be part of that.  And I said:  Okay,

15  you handle that.  He wanted me to put a good word for him

16  with them.

17  Q.  Did you want to do that?

18  A.  Yes, sir.

19  Q.  Now, I would like to turn to a recording from

20  November 11, 2016.

21          MR. NOTHSTEIN:  This is Government's Exhibit 357.

22          THE WITNESS:  Real quick, Your Honor.  When is the

23  next bathroom break?

24          THE COURT:  It turns out, it's right now.

25          THE WITNESS:  Sorry.

1    THE COURT:  Members of the jury, recall my

2  instructions:  Don't talk about the case.  We will be back

3  with you in a few minutes.

4    Jury out, please.

5    (*The jury exited the courtroom at 10:30 a.m.*)

6    THE COURT:  Thank you, Mr. Maddox.  You may step

7  down.  If you would please be back on that witness stand at

8  10:45 by that clock, 15 minutes from now.

9    THE WITNESS:  Yes, sir.

10    THE COURT:  Does either side need me before the

11  break?

12    MR. NOTHSTEIN:  No, Your Honor.

13    MR. KEHOE:  No, Your Honor.

14    THE COURT:  We'll be in recess until 10:45 by that

15  clock.

16    (*A recess was taken at 10:31 a.m.*)

17    (*The proceedings resumed at 10:45 a.m.*)

18    (*Defendant present; jury not present.*)

19    THE COURT:  Please be seated.  Jury in, please.

20    (*The jury entered the courtroom at 10:46 a.m.*)

21    THE COURT:  All right.  You may be seated.

22    Mr. Maddox, you are still under oath.

23    Mr. Nothstein, you may proceed.

24    MR. NOTHSTEIN:  Thank you, Your Honor.

25    May I have Government's Exhibit 357, please; and, if

1    we could start at 4 minutes, 20 seconds.

2              (Government's Exhibit 357 published to the jury.)

3    BY MR. NOTHSTEIN:

4    Q.  Mr. Maddox, is this your voice on the recording?

5    A.  Yes, sir.

6    Q.  And do you recall what was going on that day?  Where you

7    were?

8    A.  Yes, sir.

9    Q.  Where were you?

10   A.  Skybox.  Yeah, I think it's either my skybox or Old

11   School, one of those two.

12   Q.  And in that, you are saying "Governance Services LLC," in

13   response to Mr. Sweets' question of where do you send the

14   check?

15   A.  Yes.  He was asking Paige, her company's -- he was trying

16   to find a card, and I gave him the name of her company.

17             MR. NOTHSTEIN:  And if we could have Government's

18   Exhibit 172, please.

19   BY MR. NOTHSTEIN:

20   Q.  Did Ms. Carter-Smith ever inform you that she had

21   received a check from Southern Pines Development?

22   A.  Yes.

23   Q.  Now, prior to receipt of this check, in your interactions

24   with Mike Sweets, did you indicate to him that you would do

25   anything in exchange for this payment?

1   A.   I think I did in the Madison Social conversation.

2   Q.   And what did you indicate to him?

3   A.   That, just general support.

4   Q.   What kind of support?

5   A.   That he would have -- he would have my favorable support.

6   Q.   As a city commissioner?

7   A.   Yes, sir.

8   Q.   After receipt of this check, did Ms. Carter-Smith tell

9   you about it?

10  A.   Yes.

11  Q.   And what did you do?  Or, what did she ask you about it?

12  A.   She said:  What is Southern Pines?  I got a check.

13  Q.   Now, prior to this, had you had a conversation with the

14  defendant about Southern Pines hiring Governance?

15  A.   Yes, sir.

16  Q.   When Ms. Carter-Smith came you to and asked who's

17  Southern Pines, what did you do?

18  A.   I said:  Well, that may be those guys that want to hire

19  you for Fallschase.  And I asked J.T. Burnette, and he said:

20  Yes, that's them.

21  Q.   And did you tell him specifically that they had started

22  paying Ms. Carter-Smith?

23          MR. KEHOE:  Object to the form, Judge, leading.

24          THE COURT:  Overruled.

25  BY MR. NOTHSTEIN:

1  Q.  Did you tell the defendant specifically that they had

2  started paying Ms. Carter-Smith?

3  A.  Yes.

4  Q.  Did you tell him how much?

5  A.  Yes.

6  Q.  After this interaction, did you take a trip to Las Vegas

7  with Mr. Burnette and Southern Pines Development?

8  A.  Yes, sir.

9  Q.  You said before you had told the defendant that you

10 didn't want to sort of hang out with these guys and go on a

11 trip with these guys.  Why did you ultimately go?

12 A.  Because Mr. Burnette on several occasions asked me to

13 please go.

14 Q.  And did he tell you why he wanted you to go?

15 A.  Yes.  He said that they were a group of -- that I was

16 going to give a presentation to a group of investors and

17 their company's investors.  And I asked:  Well, why -- why

18 would they want me?  Their project is in the county --

19 Fallschase is in the county, not the city.  Why would they

20 want me?

21     And he said:  Well, you're a pro business commissioner so

22 they want you.  And I said:  Well, so is Brian Desloge.  Why

23 don't they want him?

24     And he said:  Because they met you, and they think that

25 you will give a favorable impression to the investors, and

1  wanted me to do it so it would help them be able to develop

2  Fallschase.

3  Q.  And do you recall sort of -- do you recall not wanting to

4  go at the last minute?

5  A.  Absolutely.

6  Q.  And did you tell the defendant that?

7  A.  Yes.  I didn't want to go all along, and then it changed

8  to -- originally, we were going to fly in Mr. Burnette's

9  small plane to New Orleans and then take a commercial flight

10  to Las Vegas.

11     Then -- and I had talked to the city attorney about that,

12  told him that I had been asked to go talk to a group of

13  investors, explained it to him, making sure it was proper,

14  and he said it was.

15     Then when I got to the airport, then it changed from

16  there to they were going to send a plane that was going to be

17  because of somebody's birthday.  And then when I got to the

18  airport, Mr. Burnette told me that it was a big plane that

19  they were sending there, and he couldn't believe that it was

20  that size of a plane, and I didn't want to go.  I came very

21  close to not going.

22  Q.  Did the defendant say anything to you to get you to go?

23  A.  Yeah.  He said that he was hoping that I could help him

24  lock up them investing in Fallschase.

25  Q.  Do you remember him saying:  I really need this?

1        MR. KEHOE:  Objection, Your Honor, leading.

2        THE WITNESS:  Sustained.

3  BY MR. NOTHSTEIN:

4  Q.  Do you recall him saying anything else?

5  A.  That he wanted me to go, and it's important for him for

6  me to go.

7  Q.  When you got to Las Vegas, generally, what did y'all do?

8  A.  When we got there, Mike Sweets was waiting and took us to

9  a hotel, and he had us check in with room keys to drop off

10  our bags.  And he said:  I found a place for us to go

11  tonight, a spot we're going to stop at.

12      So we all got in the car and drove, and it was a strip

13  club.  But he didn't say, Hey, do you want to go to a strip

14  club?  He just took us to the strip club.

15  Q.  Is that where y'all were that entire night, essentially?

16  A.  Yes.

17  Q.  So the next day, do you recall having a conversation with

18  Mr. Burnette and Mr. Sweets in the lobby of the building?

19  A.  Yes, sir.

20  Q.  Just sort of generally, what did y'all speak about in

21  that meeting, as you recall?

22  A.  Well, the next day, I reached out -- I was asking Mr.

23  Burnette what to wear because I thought it was going to be,

24  like, around a table.  I had brought presentation material

25  from Tallahassee about the city, you know, in general, right,

1  that I got from the tourist place.

2      I was expecting that, and then he said:  No.  We've got a

3  surprise for you later, but Sweets wants to talk to you, just

4  he and I, in the lobby of the hotel.

5  Q.  And who was it that said, We have a surprise for you

6  later?

7  A.  J.T.

8  Q.  And did you go, then, and talk to Mr. Sweets and

9  Mr. Burnette in the lobby?

10  A.  Yes, sir.

11  Q.  Just generally, what did you speak about?

12  A.  He asked questions again about Fallschase; and then I

13  remember him bringing up the annexation.

14          MR. NOTHSTEIN:  We're going to turn now to

15  Government's Exhibit 47, a recording from December 3rd, I

16  believe it was.  If we can start at 22 minutes, 40 seconds,

17  please.

18          (Government's Exhibit 47 published to the jury.)

19  BY MR. NOTHSTEIN:

20  Q.  Mr. Maddox, what property are you talking about here?

21  A.  Fallschase.

22  Q.  And you mentioned annexation, and annexation in the

23  recording.  What is annexation?

24  A.  Well, they brought annexation.  What annexation is, is

25  the city, and other cities -- if I get too long-winded,

1  please tell me.

2     But in other cities like Detroit, for instance, Atlanta,

3  the city limits didn't go with the growth; and then it left a

4  declining tax base inside of city limits and still service

5  needs outside of the city limits.

6     So the city of Tallahassee has a very aggressive

7  annexation process.  We were featured in a book called Cities

8  Without Borders, where we kept pace and annexed with growth.

9     So the city wants people to annex.  So if a big

10  development comes in -- Summerbrooke on Meridian Road is

11  probably the last big one -- the city annexes all of that

12  prior to it being developed.

13     Southwood was a giant annexation agreement.  If that

14  hadn't happened, then they wouldn't have been paying city

15  taxes to pay for police, fire, all of those different things,

16  sidewalks, streetlights.  So the city tries to get

17  undeveloped that's contiguous with other parts of the city

18  and have them come in the city when they develop.

19  Q.  So what is the actual process before the city commission?

20  Just very generally, not every step.  But, very generally,

21  what's the process for a piece of property to be annexed into

22  Tallahassee?

23  A.  It's almost like 99.9 staff driven.  Staff would go to

24  the developer, bring a proposal to the developer to annex;

25  the developer says, okay, they are set, like fees that they

1    pay for hooking up to the sewer, and they get rebates for

2    that if they are in the city.  Then once they sign the

3    annexation agreement for final approval, it comes to the city

4    commission.

5    Q.  And the city commission would vote on it?

6    A.  Correct.

7    Q.  And does every commissioner get a vote?

8    A.  Yes, sir.

9    Q.  And once the property is annexed, what government body

10   sort of governs that area?

11   A.  Well, they are part of the city.

12   Q.  So, as you were mentioning, police, fire, sewers, lights,

13   would all of those be governed by the city as well?

14   A.  Yes, sir.  Some of those were run by city county-wide,

15   and the county contracts with the city board.

16        MR. NOTHSTEIN:  Now, let's turn to 29 minutes and 4

17   seconds.

18        (Audio continued.)

19   BY MR. NOTHSTEIN:

20   Q.  So, again, Mr. Maddox, is that you in that recording?

21   A.  Yes, sir.

22   Q.  In the beginning of the recording, Mr. Sweets brings up

23   Myers Park.  What is Myers Park?

24   A.  It's the property that I described earlier that is by The

25   Edison.

1 Q.  And you said before there something about the city

2 wanting to build a wall before.  What were you telling them

3 about sort of that possibility?

4 A.  Blueprint had before it a proposal to build a wall to be

5 a berm against sound from an amphitheater.  City staff came

6 up with the idea of taking city-owned land around there and

7 doing a request for proposals where people would come in and

8 say:  This is what we would build there if you sold it to us.

9 Maybe it's a wall with townhouses, maybe the townhouses act

10 as a wall.  Maybe it's a mixed-use development, something

11 that buffers the neighborhood while being an amenity to the

12 neighborhood rather than just a wall.

13      And then people would -- the staff would set up that

14 process and they would answer the requests for proposals,

15 like they did like regular bids.

16      So that's what I'm describing there.

17 Q.  And this property, is it located in the city or county?

18 A.  City.

19 Q.  And the blueprint that you said wanted to build a wall

20 and then changed the plan, is that the blueprint dollars you

21 told us earlier on today?

22 A.  Yes.

23 Q.  And that was sort of that board or commission; you sat on

24 that in your role as city commissioner?

25 A.  Yeah.  The RFP would been the city, not the blueprint,

 1   because the city owns the property.  It's not like a zoning

 2   thing where you would have blank property and say, What are

 3   you allowed to build here?  This is, like the McKibbon Hotel,

 4   where the city owns the property and say:  We will sell it if

 5   you come up with the best concept of what you are going to

 6   put on it.

 7   Q.  So that one gets to compete for that.

 8   A.  Right.

 9   Q.  And then the city chooses which one it wants?

10   A.  Yes, sir.

11   Q.  So what did you do the rest of the evening?

12   A.  Then they said they had a surprise for me, and I had to

13   go up to one of the rooms for a surprise.

14   Q.  And what was the surprise?

15   A.  A little person performer.

16   Q.  Was this the kind of thing -- do you know why they got it

17   for you?

18   A.  It was a running joke for years and years.  I once put

19   somehow a prank on Gary Yordon's phone the screen of a little

20   person stripper; and then he couldn't figure out how to get

21   it off of his phone and it became a joke, because then

22   everybody would see his phone and laugh.

23        So we would do that to each other, all our group of

24   friends.  So I've done it to my father who was, at the time,

25   in his 80s, and became a joke back and forth.

1    And when they had little person wrestling in Tallahassee,

2    my wife called me and said:  The boys and I have a surprise

3    for you; we are going to take you out somewhere tonight.  I

4    thought it was a Yo-Yo Ma concert at Florida State, but

5    instead it was that, it was wrestling.

6    So it became a joke that we did back and forth, and I had

7    done that with J.T.  And so that got brought up to the

8    undercovers, who -- and they were talking about it and it was

9    a joke back and forth.

10   Q.  And what did y'all do that evening after that

11   entertainment?

12   A.  By the way, when the -- I told the lady to keep her

13   clothes on.  I mean, it was an ah-hah.  It wasn't anything

14   other than that.  Then we went to dinner at a steakhouse.

15   Q.  And what did you do the next day?

16   A.  J.T. and I got up and flew home.

17   Q.  What happened when you got home?

18   A.  I met with the city attorney and told him that there was

19   no presentation; I never met -- I met two guys who said they

20   were investors, but Mike Sweets told me he didn't want me to

21   sell them, they were sold on Tallahassee; and I wanted to

22   declare a conflict if anything came forward from Southern

23   Pines.

24   Q.  Did you tell Ms. Carter-Smith to not accept any more

25   money from them?

1  A.  No, sir.  I told her that -- I told her about the trip,

2  and I told her that I thought they were going to move forward

3  with Fallschase.

4       MR. NOTHSTEIN:  If we can have Government's

5  Exhibit 179, please.

6  BY MR. NOTHSTEIN:

7  Q.  Did Ms. Carter-Smith tell you that she received this

8  check?

9  A.  I don't recall, but she probably would have.

10       MR. NOTHSTEIN:  If we could have Government's

11  Exhibit 180, please.

12  BY MR. NOTHSTEIN:

13  Q.  Did she tell you that she had received this on

14  January 23, 2017?

15  A.  Yeah.  The same answer:  I don't recall her telling me

16  that, but it would have been normal for her to tell me that.

17       MR. NOTHSTEIN:  And Government's Exhibit 187, please.

18  BY MR. NOTHSTEIN:

19  Q.  Do you recall Ms. Carter-Smith telling you about this

20  February 22nd, check?

21  A.  The same answer.

22  Q.  Now, what contact, if any, did you have with Mr. Miller,

23  Mr. Sweets, or anyone else with Southern Pines in January and

24  February of 2017?

25  A.  None, to my knowledge, to my memory.

1  Q.  When was the next time that you met with them?

2  A.  In March.

3  Q.  What happened when you met with them in March?

4  A.  J.T. told me that they were in town.  And I had offered

5  them a place to stay because they had bought my hotel room in

6  Vegas.  And he said, no, they don't need a place to stay but

7  they wanted to meet.  And so we met at Table 23.

8      And I asked Ms. Carter-Smith if she wanted to come with

9  me.  I said:  I'm meeting with your client; do you want to

10  come with?  And she said:  Yeah, because I haven't been able

11  to get ahold of them.  I need to know what I'm supposed to be

12  doing with Fallschase.

13      So we went to -- and I told J.T. that I was bringing

14  Paige.  Then we went to Table 23.  My memory of Table 23 is

15  we're -- they were very, much more aggressive, and they asked

16  me about the police station for the first time.  And they

17  were asking Paige what they'd get for having a lobbyist, and

18  she was trying to explain to them what she does.

19      I remember getting up and going to the bathroom.  When I

20  came back, they were having the same conversation and then

21  they were saying that, what do they get for their money?  And

22  I said:  I don't think you'd get any -- if you're trying to

23  get, like, a special privilege, that's not how it works.  I

24  mean, there's no way you can't get a special privilege, and

25  we're not that kind of town; and if I were me, I wouldn't

1  hire Paige or anybody else, if that's what you thought you

2  were getting.

3  Q.  To your knowledge, at this point had Ms. Carter-Smith

4  done any work for Southern Pines?

5  A.  Had not.  That was her concern.

6  Q.  And after the meeting there at Table 23, did you have any

7  additional contact with Mr. Miller or Mr. Sweets?

8  A.  No, sir.

9          MR. NOTHSTEIN:  Nothing further, Your Honor.

10          THE COURT:  Cross-examine?

11                         CROSS-EXAMINATION

12  BY MR. KEHOE:

13  Q.  Good morning, Mr. Maddox.  I don't think we have met

14  before.  My Greg Kehoe; I represent J.T. Burnette.

15  A.  How are you?

16  Q.  Sir, I think you said on direct examination that you had

17  listened to these tapes with the government concerning prior

18  meetings that you had; is that right?

19  A.  Yes, sir.

20  Q.  And they had you listen to a series of phone calls that

21  Mr. Burnette had with these guys from Southern Pines,

22  Mr. Miller and Mr. Sweets, right?

23  A.  Yes, sir.

24  Q.  And in some of those calls, Mr. Burnette said that you

25  were going to be there for them, that you wanted to get paid,

1  that you were going to be the political solution, that you

2  were essentially open to being on the payroll.

3      Do you remember those tapes?

4  A.  Yes, sir.

5  Q.  And you told the government -- and correct me if I'm

6  wrong -- you told the government that you were shocked when

7  you heard those tape recordings, weren't you?

8  A.  Yes, sir.

9  Q.  And you said to them you were shocked by what

10 Mr. Burnette was telling them, right?

11 A.  Correct.

12 Q.  Because you had never had any conversation with

13 Mr. Burnette about anything involving Southern Pines where

14 you said anything that you did was for sale, did you?

15 A.  No.

16     MR. KEHOE:  Excuse me a second, Judge.

17 BY MR. KEHOE:

18 Q.  I think you also mentioned you were surprised when you

19 heard these calls?

20 A.  And upset.

21 Q.  And you told the government that Mr. Burnette was selling

22 falsehoods to these Southern Pines people, right?

23 A.  Yes, sir.

24 Q.  As a matter of fact -- and pardon me -- you told the

25 government when you talked to them essentially that J.T. was

1 | full of shit?

2 | A.  In those things he said, absolutely.

3 | Q.  And I think you used those words on several occasions;

4 | did you not?

5 | A.  I don't recall, but I believe it.

6 | Q.  Excuse me?

7 | A.  I believe that.

8 | Q.  Okay.  For instance -- if we can turn to a call -- and

9 | this is one that you are not on but that Mr. Burnette had

10 | with Mr. Miller.

11 |         MR. KEHOE:  If we can go to Plaintiff's Exhibits 38

12 | and 40 in evidence, page 7, line 19.

13 |         (Government's Exhibit 38 and 40 published to the

14 | jury.)

15 | BY MR. KEHOE:

16 | Q.  And the "him" there is you.  Isn't it a fact, Mr. Maddox,

17 | you never had a conversation with Mr. Burnette where you told

18 | him that you wanted to get paid through Governance?  Isn't

19 | that a fact?

20 | A.  That's a fact.

21 | Q.  So what -- again, what Mr. Burnette has said in this

22 | call, for an example, is absolutely not true?

23 | A.  Correct.

24 | Q.  And it is part of your description of Mr. Burnette

25 | selling falsehoods to the Southern Pines people, right?

1   A.   Yes.

2   Q.   The date of that call, just for ease of evidence, it's in

3   evidence but it's October 4th of 2016.

4        And you weren't on that call?

5            MR. NOTHSTEIN:  Your Honor, I object.  I think that's

6   incorrect.

7            THE COURT:  Sustained.  Just ask the next question.

8            MR. KEHOE:  If I may.

9   BY MR. KEHOE:

10  Q.   I take that back.  The question --

11           THE COURT:  Just ask a question.

12           MR. KEHOE:  Yes, sir.

13  BY MR. KEHOE:

14  Q.   So, going back, then.  And that covers basically all of

15  the phone calls that you had that you listened to between the

16  agents and Mr. Burnette, where he makes similar claims about

17  making payments to Scott and Scott is going to be there,

18  et cetera.  That was all false, wasn't it?

19  A.   Yes.  I listened to recordings where he was on trips with

20  them as well where the statements were made.

21           MR. KEHOE:  Your Honor, if I may just correct the

22  record as to what I said before.  The record was that exhibit

23  that the government had put in that I referenced was October

24  24th.  And I misspoke and said October 4 and my colleague

25  corrected me, and I just wanted to correct the record because

1   I misspoke.

2   BY MR. KEHOE:

3   Q.   Now, you have a series of meetings, and I think you told

4   us about meeting Mr. Miller and meeting Mr. Sweets.  And

5   Mr. Burnette was not at those meetings, was he?  Let me

6   withdraw that.

7       Mr. Burnette was not the person who introduced you to

8   Mr. Miller, did he?

9   A.   Correct.

10  Q.   That was Adam Corey, I believe?

11  A.   Yes, sir.

12  Q.   And even the brunch I believe the next day, that was Adam

13  Corey's group of people that you were with when you were

14  eating with Mr. Miller?

15  A.   I didn't eat; but, yes, sir, they were there already.

16  Q.   And when you had this meeting at Madison Social where you

17  went out drinking -- that date was October 4th --

18  Mr. Burnette wasn't there, either, when you met Mr. Sweets,

19  was he?

20  A.   Correct.

21  Q.   So all of these initial meetings -- and I'm talking about

22  what we talked -- and I'm referring to what we spoke about on

23  direct examination, this October 1st, October 2nd -- this

24  meeting in Madison Social on the 4th, and I think you talked

25  about some meetings you had met Sweets and/or Miller at the

1    skybox at FSU games, and also Old School which I guess is a

2    club to drink before games; is that right?

3    A.  Yeah, eat, drink.

4    Q.  And in all of those meetings, Mr. Burnette was not in any

5    of those meetings, was he?

6    A.  No, sir.  They were -- they weren't meetings other than

7    the brunch.  It was I'd just run in to them or Adam Corey

8    would bring them to wherever I was.  They weren't scheduled

9    meetings.

10   Q.  Now, let me turn your attention to some questions that

11   were asked by -- and, again, this is the October 4th meeting

12   at Madison Social where Mr. Burnette is not present.

13       And, again, just based on recollection -- I mean, you

14   were drunk at the time and you had some problem recalling all

15   this, right?

16   A.  Yes.

17   Q.  And you began to speak about several things.

18           MR. KEHOE:  If we can turn to, if we can go to the

19   transcript on page 3.  If we can put Exhibit 32, page 3 up on

20   the screen.  It's the top quarter of the page.

21           If we can blow up the top quarter of the page.

22   BY MR. KEHOE:

23   Q.  So you say:  Oh, you, too.  So when your partner came and

24   talked to me about Myers Park --

25       That would have been Mr. Miller, right, Mike Miller?

1  A.  Yes, sir.

2  Q.  And you say:  Yeah, that's it.  I had to explain to him

3  you had to have J.T. in the mix.

4      When you said that, did you not tell the government that

5  you mentioned J.T. to be included because you were trying to

6  take credit for any project going on, that was going to go

7  on, at Myers Park.  Do you recall telling the government

8  that?

9  A.  No.  That I was going to take credit?

10 Q.  Yes.

11 A.  I guess I'm not understanding.  Take credit with whom?

12 Q.  Did you tell the government that the reason that you

13 mentioned --

14         MR. NOTHSTEIN:  Objection, hearsay, Your Honor.

15         THE COURT:  Let me hear the question.

16 BY MR. KEHOE:

17 Q.  Do you recall telling the government that you brought up

18 Myers Park because you wanted to take credit for it?  Do you

19 recall that?

20 A.  No.

21 Q.  May I show you something to refresh your recollection?

22 A.  Sure.

23         MR. KEHOE:  Just on Mr. Maddox's screen, Defense

24 Exhibit 941.

25         MR. NOTHSTEIN:  Your Honor, I'm going to object to

1    this on foundation.

2              THE COURT:  You can show him.

3              Mr. Maddox, he's not asking you to read what's on the

4    screen or tell anybody what's in it.  He's going to ask you

5    whether, having read that, you now remember your prior

6    statement.

7              THE WITNESS:  Okay.

8              THE COURT:  Or remember whether you made a prior

9    statement.

10             MR. KEHOE:  I'm sorry.  Can we go to page 18.

11   BY MR. KEHOE:

12   Q.  Do you see that, page 18?  Does that refresh your

13   recollection, that you bring this up because you wanted to

14   take credit for it?

15   A.  Yeah.  What I was referring to is that I was bragging

16   when drunk at Madison Social taking credit for, like -- it

17   was more to the statement of:  Things are all set up, and --

18   you know.

19      Like, at one point, I said that Myers Park was -- that I

20   had set that up for J.T., and that's just not true, I was

21   just bragging, because staff brought the Myers Park deal, the

22   potential for an RFP to the commission.  It wasn't my idea.

23   Q.  And --

24   A.  It was a good idea.  They never acted on it, but it was a

25   good idea.

1  Q.  Pardon my description, but it's often a politician -- in

2  this instance, you -- trying to take credit for something,

3  right?

4  A.  I don't know about politicians, in general, but I was

5  bragging like it was my brainchild when it was not.

6        MR. KEHOE:  If we can go back to the prior exhibit,

7  Exhibit 32.  If we can put back on the screen page 3.  If we

8  can go a little further down.

9  BY MR. KEHOE:

10  Q.  Now, when Sweets brings up -- put it this way.  Let me

11  read.

12     Okay, that's the deal.  It's got to be there.

13     Sweets says:  That's okay.

14     You:  We'll take care of it.  I've set the deal up.  The

15  whole deal from the start I set up specifically for J.T.

16     Okay, is that all it takes, it's just 20 percent, like

17  seriously?

18     And you say:  I mean, I think it would be a good product

19  there.

20     It's a fact, you had no idea what he was talking about

21  for this 20 percent?

22  A.  Correct.

23  Q.  You didn't know?

24  A.  I had no idea.

25  Q.  Now, if we go to page 6.  And, again, sir, I'm not

1  playing the whole thing.  But if at any point you need

2  clarification, please tell me while I go through.

3  A.  Okay.

4  Q.  And it's on page 6 that you had a conversation back and

5  forth that you say, you'd want to hire Governance,

6  Incorporated.

7     Okay.  And then I think you later say Governance

8  Services, is that right, I think in another tape?

9  A.  Yes, sir.

10 Q.  Now, throughout all of this, the idea was that you began

11 to know that Fallschase was on the bubble and that these guys

12 wanted to operate in there, right?

13 A.  Yes, sir.

14 Q.  And Fallschase is in the county?

15 A.  Yes, sir.

16 Q.  And your comments about hiring Governance, be it

17 Incorporated or Governance Services, are related to

18 Ms. Carter-Smith working on Fallschase in the county, isn't

19 it?

20 A.  Yes, sir.

21 Q.  Now --

22        MR. KEHOE:  If we can go back on to page -- let me

23 see where we are here so I can just talk a little bit about a

24 trip.  If I may, it is -- I'm just looking for the page.

25 BY MR. KEHOE:

1   Q.  And you talked to him about paying, you know, money back

2   and forth.  And you say:  $20,000 a month.

3       I mean that was relevant to nothing, wasn't it?  It was

4   just talk.

5   A.  Well, what I had in my mind on that is that when you do a

6   big development like Fallschase, usually you hire one person

7   to put together a team.  So if they hired Ms. Carter-Smith

8   and paid that amount, then she hires landscape people,

9   natural features, index people, engineers, land use lawyers,

10  and they all work collaboratively and she pays them out, or

11  whoever gets hired for the original amount, per month.

12      And, like, some months, some months there -- in my

13  experience doing this when I wasn't in office, some months

14  there's no work and then in other months there's lots of

15  work.  But in the end, the person who represents and

16  primarily puts the team together gets paid to put the team

17  together.

18      That's what was going through my drunken mind, that

19  20,000.

20  Q.  The money that you're talking about was all tied to doing

21  a project in the county and involving Fallschase, right?

22  A.  Yes, sir.

23  Q.  It's got nothing to do with you selling your vote or your

24  influence in the city commission for anything, does it?

25  A.  No, sir.

1  Q.  And when Mr. -- I believe it's on page 13 -- when we go

2  to page 13 at the top, and Sweets says, about the fourth line

3  from the top:  J.T. only pays you 15, he told me.

4      And you say:  He don't pay me that.

5      J.T. Burnette wasn't paying you anything, was he?

6  A.  No, sir.

7  Q.  As a matter of fact, when you -- when you routinely went

8  to dinner at the Hotel Duval at Shula's, he never paid for

9  your dinner, did he?

10  A.  No, sir.

11  Q.  And when you had your birthday party at Hotel Duval for

12  your wife, Mr. Burnette had you pay full price for

13  everything, didn't he?

14  A.  It was the DoubleTree.

15  Q.  My apologies, the DoubleTree.

16  A.  Yes, sir.  I didn't have anybody pay stuff for me, in

17  general.

18  Q.  But, I mean, as far as Mr. Burnette specifically --

19  A.  Never paid for me.

20  Q.  -- he never paid for anything for you, did he?

21  A.  No, sir.  If we met for drinks, he would buy drinks one

22  time and then the next time I would buy drinks.  So, he

23  didn't pay me.

24  Q.  Now, if I could talk a little about these Southern Pines

25  meetings, if we can.  And I might jump around a little bit

 1   because I'm not going to cover everything that was covered

 2   before.

 3       So we talked a little bit about these football games, and

 4   you noted that -- by the way, the October 29th meeting that

 5   you were at the football game and you met Sweets, did the

 6   government tell you that meeting was not recorded?

 7   A.  Recently.

 8   Q.  Excuse me?

 9   A.  They told me that recently.

10   Q.  That it was not recorded?

11   A.  Well, that there was no recording.

12   Q.  That's fine.  But prior to that, you had conversations

13   with Mr. Burnette, where Mr. Burnette advised you that

14   Southern Pines wanted to hire Paige Carter-Smith for

15   Fallschase, right?

16   A.  Yes, sir.  I had conversations with him, I don't know

17   when the date was, but, yes, on that subject.

18   Q.  And if we go back to that just a little bit, obviously

19   you told us a little about your work for AIG Baker, I think

20   it was AIG Baker for Fallschase.  And when was that?

21   A.  It would have been about the time of the real estate

22   collapse.  So 2008, 2009, somewhere around there.

23   Q.  And you had done some extensive work on that project and

24   you had all of the concurrency completed; is that right?

25   A.  Yes, sir.

1  Q.  So, essentially, this property was teed up from the

2  county because it had all of these work done already?

3  A.  Yes, sir.

4  Q.  And it was your belief at this time that, given the fact

5  that you are the commission, that Ms. Carter-Smith was

6  uniquely qualified to work with Southern Pines on the

7  Fallschase matter in the county, right?

8  A.  Yes, sir.  And she had just also worked on an apartment

9  development on the cusp of Fallschase, recently, right before

10  this.

11  Q.  Now, you heard a little bit about this 7th meeting --

12  excuse me, this November 11th meeting in Old School.  If I

13  can just turn to that one moment.  And I believe the exhibit

14  is Government Exhibit 58.

15      And that is the call that we heard where you say:  You

16  got to pay Governance Services.  And that's when

17  Ms. Carter-Smith is attempting to give them a card.

18      Do you recall that, sir?

19  A.  Yeah, it wasn't a call.

20  Q.  Excuse me, meeting, I apologize, the meeting.  And it was

21  the meeting at Old School on November 11, 2016, and you are

22  -- and I believe it's on page 9.  And you are talking to them

23  about sending the check to Governance Services, and then

24  Ms. Carter-Smith attempts to give them a card.

25      Do you recall that?

1  A.  My memory is he was asking where to -- what her business

2  was to send a check.  And she was fumbling for a card, and I

3  said the name of her business.

4  Q.  And she didn't have a card, I take it, at the time?

5  A.  Didn't, right.

6  Q.  And the belief of both you and Ms. Carter-Smith at this

7  time is that this was a business transaction related to

8  Fallschase, right?

9      MR. NOTHSTEIN:  Objection, calls for speculation.

10      THE COURT:  Sustained.

11 BY MR. KEHOE:

12 Q.  So your understanding at the time was that this was a

13 business transaction related to Fallschase, right?

14 A.  Yes.

15 Q.  And when your discussions down the road with

16 Ms. Carter-Smith, you and she talked about the fact that they

17 wanted to hire -- they, being Southern Pines -- wanted to

18 hire Fallschase in the county, right?

19 A.  Yes, sir.

20 Q.  By the way, this is another meeting where in there --

21      MR. KEHOE:  And you can just blow that up.  It says

22 Governance Services, just so we have a frame of reference.

23 BY MR. KEHOE:

24 Q.  This is another meeting where Mr. Burnette is not

25 present, right?

1  A.  Yes.  We bumped in to him at there.  I mean, when you say

2  "meeting," it's just -- I never had, like, an scheduled

3  meeting with any of these folks, other than Vegas.

4  Q.  I understand.

5  A.  Yeah.

6  Q.  This was at skybox or Old School --

7  A.  Right.

8  Q.  -- where you run in to people that are either watching

9  football, or drinking, getting ready to watch football?

10  A.  Yes, sir.

11  Q.  But that's what this was, right?

12  A.  Yes, sir.

13  Q.  And your thought process throughout all of this, sir, was

14  consistent concerning Fallschase; which carried you to the

15  conversation referred to by my colleague in Las Vegas when

16  you were talking about concurrency and the fees being paid,

17  et cetera.  That is one line for you all involving Fallschase

18  and the county, right?

19  A.  Yes.  Mr. Burnette wanted them to invest in Fallschase,

20  and he wanted to -- he asked me to help spur that.  So, yes.

21  Q.  He asked you to help:  Hey, put in a good word for me,

22  because I want to do business with these guys?

23  A.  Yes.

24  Q.  There was never any conversation where:  Mr. Maddox, we

25  are going to give you $10,000 a month, or any amount of

1  money, for you to do something illegal on behalf of

2  Fallschase, was there?

3  A.  No, sir.  And, I mean, they brought up annexation, in

4  Vegas.

5  Q.  But the subject of you doing something illegal was never

6  brought up, was it?

7  A.  No.

8  Q.  And you never -- and Mr. Burnette never said they were

9  going to pay Scott Maddox $10,000 a month for you to do

10  something illegal to use your influence in an improper way;

11  is that right?

12  A.  He did not say that to me.

13  Q.  That's what I'm talking about, just to you.

14  A.  No.

15  Q.  As a matter of fact, didn't you tell the government that

16  the money that did come to Paige Carter-Smith, you didn't

17  even get?

18       MR. NOTHSTEIN:  Objection, Your Honor, hearsay.

19       THE COURT:  Sustained.

20  BY MR. KEHOE:

21  Q.  The money that was -- the checks that we looked at this

22  morning that were referred to by the government, you didn't

23  get any of that money, did you?

24  A.  No, sir.

25  Q.  It all went to Governance, Governance Services, didn't

1    it?

2    A.  Yes, sir.

3    Q.  So when you were sitting in Las Vegas and talking to

4    these gentlemen -- and I'm referring to Exhibit 358.  And

5    this is -- excuse me, not 358.  I apologize.

6        When you were sitting in Las Vegas talking to these

7    gentlemen and talking about the concurrency plan and talking

8    about what was such a good project, were those your own

9    honest thoughts about how good a project that this was?

10   A.  Yes, sir.

11   Q.  And when you were offering what was -- when you were

12   talking about Myers Park, and you were telling them that this

13   had to go out for an RFP, that is a request for proposal that

14   has to be put out that anybody can bid on.

15   A.  Yes, sir.

16   Q.  Isn't that right?

17   A.  Yes, sir.

18   Q.  And you weren't guaranteeing these Southern Pines guys

19   that they were going to win that RFP, were you?

20   A.  No, sir.

21   Q.  So when the first check came in --

22        MR. KEHOE:  If we can go to the first check that was

23   put on the screen this morning, that is Government's

24   Exhibit 172.

25   BY MR. KEHOE:

*Scott Maddox - Cross*

1   Q.  When that check comes in and there are some questions

2   about it, you think ultimately, after discussions about

3   what's going on with Southern Pines, discussions with

4   Mr. Burnette, that you think this is all part of the Southern

5   Pines deal, right?

6   A.  The Southern Pines, what?

7   Q.  That Fallschase deal.  You think this is all part of the

8   Fallschase deal that Ms. Carter-Smith is going to work on,

9   right?

10  A.  Yes, sir.

11  Q.  And that goes for the next check, which I believe is 179.

12  A.  Yes.

13  Q.  Now, again, none of these checks were part of any payment

14  to you for anything -- you to do anything illicit or illegal,

15  right?

16  A.  Yes.

17  Q.  And let's go to what has been received in evidence as

18  Defense Exhibit --

19          MR. KEHOE:  Actually, I think we have used a

20  Government Exhibit, it's probably a better one, Judge.

21      It's Government Exhibit 174.

22  BY MR. KEHOE:

23  Q.  Now, were you aware that after getting the first check --

24  and that was the first check that we just talked about --

25  that Ms. Carter-Smith was trying to get in touch with these

1  guys to get a contract going?

2  A.  Yes, sir.

3  Q.  And did you talk to her about that?

4  A.  Yes, sir.

5  Q.  Did you see these text messages at all?

6  A.  I don't remember seeing the text messages, but I talked

7  to her about it.

8  Q.  But you talked to her about it; and she was concerned

9  that checks were coming in the door and she didn't have a

10  contract, right?

11  A.  Yes, sir.

12  Q.  Did she tell you that, why she was reaching out to them,

13  in order to -- in order to find out whether or not these guys

14  are actually going to sign a contract, right?

15  A.  Yes, sir.

16  Q.  Let me show you what has been received in exhibit as

17  Defense 199.  And if you can look at -- this is a -- this is

18  in evidence, this is an email from Ms. Carter-Smith to Mr.

19  Miller:  Mike, please see attached agreement.  When you

20  execute and return, I will sign and send you a copy.  I

21  received your initial retainer.  Thank you very much.  From

22  this point forward, please have checks made out to Governance

23  Services, LLC.  Thanks for your confidence in my firm.  We

24  are excited about assisting you in succeeding in Leon County.

25      If you can turn to the next page.

1    At the top is the consulting agreement with -- the 16th

2  of December, Governance Services and Southern Pines.

3    And if we can go to the last page, in 7, Miscellaneous:

4  Southern Pines Development understands and accepts that the

5  consultant is a nonlegal services, entity.  SPD understands

6  that consultant shall represent SPD in front of applicable

7  Leon County agencies but will not do so before the city of

8  Tallahassee.

9    You were aware, were you not, that she didn't want to do

10  work in front of the city of Tallahassee, at this time; she

11  didn't want to do that?

12  A.  Yes, sir.

13  Q.  Because she had other employment that she didn't want to

14  jeopardize; isn't that right?

15  A.  Yes, sir.

16  Q.  And this was continued, as we move on, and we continue to

17  get checks.  She has a growing concern about:  What's going

18  on here?  I don't have a signed agreement.  Right?

19        MR. NOTHSTEIN:  Objection, calls for speculation.

20        THE COURT:  Sustained.

21  BY MR. KEHOE:

22  Q.  Well, did you have a conversation with her where she had

23  a concern about getting these checks without a signed

24  agreement?

25  A.  Yes.

1  Q.  And was she concerned?

2  A.  Yes.

3  Q.  Now, sometime -- this was, I believe it was,

4  December 16th this exhibit has been sent.  If we can go to

5  the first page just to clarify that date.  And --

6  December the 16th.

7      Sometime thereafter, into January, did you have a

8  conversation with Mr. Burnette about you getting paid, and

9  did you tell him:  They are not paying me, they are paying

10 Paige.

11     Do you recall that conversation?

12 A.  No.

13 Q.  Well, did you ever have this conversation, after these

14 checks are coming in, where you told Mr. Burnette that the

15 these Southern Pines guys weren't paying Scott Maddox; they

16 were paying Paige Carter-Smith and Governance?

17 A.  Well, he knew that.  He told me that they wanted to hire

18 her in the beginning to work on Fallschase.  So he knew that

19 from the start.

20 Q.  So this whole understanding with regard to, you know,

21 these -- this is one ongoing story with regard to these

22 checks, et cetera, concerning Fallschase, right?  It's all

23 Fallschase?

24 A.  Yes.

25 Q.  So you told us -- and I think you told us you didn't see

1  these text messages.  When you did, in fact, go to the

2  meeting on September -- of March 27th, of 2017, Paige

3  Carter-Smith wanted to go, right?

4  A.  Yes.

5  Q.  And she had received four checks from Southern Pines

6  then, right?

7  A.  Yes.

8  Q.  And you hadn't gotten any of that money, had you?

9  A.  No.

10  Q.  And she wanted to go to the meeting because her client

11  was going to be there, right?

12  A.  Yes.

13  Q.  And she wanted to see her client to find out what, in

14  fact, she was supposed to do, right?

15  A.  Yes, sir.

16  Q.  So when she went to that meeting, she was, in fact,

17  asked --

18         MR. KEHOE:  And if we can use -- if I can use

19  plaintiff's exhibit -- excuse me, Government's Exhibit 358.

20  BY MR. KEHOE:

21  Q.  She is, in fact, you said --

22         MR. KEHOE:  Can I have one moment, Judge.

23  BY MR. KEHOE:

24  Q.  She has, in fact, talked about this in that she -- and

25  Sweets asked her:  What in fact are you going to do?  And she

1   says:  Anything he wants me to do, being Miller.

2       Right?  Do you recall that?

3   A.  I don't.

4   Q.  During this conversation, she went to the meeting at

5   Table 23 to solidify what, in fact, she was going to do for

6   Southern Pines, right?

7   A.   I think she knew was going to be working on Fallschase.

8   In her conversations with me, she wanted to know when they're

9   going to start, when they were making application.  A lot of

10  things had to be done in preparation for that.

11  Q.  And obviously, during that meeting, she didn't get the

12  answer -- any answers -- from that, did she?

13  A.  No, sir.  It was the opposite.

14  Q.  Now, all of these checks that, by the end of March --

15  March 27, 2017, meeting, all of the checks, the four checks,

16  all refer to money that she was getting for her potential

17  work on Fallschase, right?

18  A.  Yes.

19  Q.  And at the end of that meeting, you had a discussion with

20  Mr. Sweets and Mr. Miller concerning what I think you

21  referred to it on direct examination:  What am I going to get

22  for my money?  I'm paying you guys this money, what I'm going

23  to get?

24      And you responded that:  You don't get anything.

25      Is that right?

1  A.  Correct.  I mean, you get her professional services.

2  What you don't get is some kind of favorable -- they were

3  intimating that, by hiring her, they would get favorable,

4  something.  That's not how the process works.

5  Q.  And what did you tell them?  What kind of process did you

6  tell him it was?

7  A.  That they -- you have rules that you have to go through

8  no matter who you are.  So, if they were paying Paige

9  thinking that they were going to get automatic approval of

10  Fallschase -- or, they brought up the police department, and

11  that's another -- that's an RFP.  You're not going to get

12  favorable treatment.

13  So, if I were them, I wouldn't hire her or anybody else,

14  if that's what you are looking for.

15  Q.  So, is it fair to say that what you told them, that in

16  return for your money you are going to get her services, and

17  you don't have inside track on anything; isn't that right?

18  A.  Yes, sir.

19  Q.  And, in fact, you left that meeting a bit disturbed with

20  where they were coming from, right?

21  A.  Yes.

22  Q.  And that was because they seemed to be indicating that

23  they were going to get something for their $40,000; and you

24  were rejecting that, right?

25  A.  Yes.

*Scott Maddox - Cross*

1   Q.   And after those four checks had come in and

2   Ms. Carter-Smith cashed them, it was your understanding,

3   based on what you knew and your conversations with

4   Ms. Carter-Smith, that this was all part of a legitimate

5   transaction involving Fallschase; isn't that right?

6   A.   Her involvement?  Yes.

7   Q.   And it didn't it have anything to do with facilitating or

8   executing some fraudulent scheme to defraud anybody, did it?

9   A.   They hired her to do Fallschase.  That's my complete

10  understanding.

11  Q.   And your understanding was they hired her to do a

12  legitimate job at Fallschase, right?

13  A.   Yes.

14  Q.   And the taking of these checks and cashing of these

15  checks had nothing to do with executing any fraudulent

16  scheme, does it?

17          MR. NOTHSTEIN:  Objection, calls for a legal

18  conclusion.

19          THE COURT:  Sustained.

20  BY MR. KEHOE:

21  Q.   Now, neither you nor Ms. Carter-Smith, when those checks

22  came in and were cashed, thought there was anything wrong

23  with those checks being cashed and going into the bank

24  account of Fallschase, did you?

25          MR. NOTHSTEIN:  Objection, calls for speculation.

1       THE COURT:  Sustained.

2   BY MR. KEHOE:

3   Q.  You, individually?

4       THE COURT:  That was not the question.

5       MR. KEHOE:  I understand, Judge.  I'm just altering

6   the question.

7   BY MR. KEHOE:

8   Q.  You, individually, didn't think there was anything wrong

9   with Ms. Carter-Smith taking those checks and depositing them

10  in -- excuse me, not to Fallschase -- the Governance bank

11  account, right?

12  A.  Yes.

13  Q.  And your participation in those check, you weren't part

14  of any fraudulent scheme with those checks or getting those

15  checks deposited, were you?

16  A.  I should not have said the things that I said at Madison

17  Social intimating that I had things set up, or that if he

18  hired the right people or had J.T. involved or anything else,

19  that -- I intimated that it would favorable treatment.  I

20  should have never done that.

21  Q.  Well, and it wasn't true, either, was it?

22  A.  That they would get favorable treatment?

23  Q.  Yes.

24  A.  I mean, certainly after Vegas, I declared a conflict so I

25  couldn't have voted for it if I wanted to.

1  Q.  And certainly, if you thought there was something wrong,

2  that you would have told Ms. Carter-Smith to:  Don't try to

3  use them as a client, right, if you thought there was

4  something wrong?

5  A.  Correct.

6  Q.  And you didn't do that.

7  A.  Correct.

8  Q.  Right.  So at the end of the day, after these four checks

9  came in and were deposited by Governance, you didn't think

10  there was anything wrong with this arrangement with

11  Ms. Carter-Smith and Fallschase, did you?

12  A.  No.

13  Q.  Now -- and, by the way -- by the way, as we go through

14  this and we just take off, I mean, you told us earlier that

15  you didn't have these discussions with Mr. Burnette about,

16  you know, running money through Governance, and you didn't

17  have any plan with Mr. Burnette and Ms. Carter-Smith to

18  extort anybody for money, either, did you?

19          MR. NOTHSTEIN:  Objection, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. KEHOE:

22  Q.  Well, let's talk a little bit about, you know, the Las

23  Vegas situation.

24      I mean, you noted in direct examination that you went to

25  Las Vegas in December and you brought some materials.  What

1  was your understanding as to what you were going to do in Las

2  Vegas?

3  A.   That I was going to make a presentation to a group of

4  investors about the business climate of Tallahassee.

5  Q.   And you had done that before in other instances, such as

6  JetBlue, right?

7  A.   Oh, yes, sir.

8  Q.   Okay.  And tell us a little bit what you do under those

9  circumstances.

10 A.   Well, I would make presentations to try to get people to

11 come to Tallahassee.  Like JetBlue Airlines, we tried really

12 hard to get them to be an additional carrier, and I set up

13 lots of different meetings where you basically brag about the

14 town you live in and say why it would be a good reason to do

15 business in our town.

16 Q.   And what kind of materials did you bring to Las Vegas?

17 A.   Promotional, you know, tourist materials about

18 Tallahassee.

19 Q.   Because, you brought them, you obviously thought you

20 were going to -- you did think you were going to meet with

21 investors, right?

22 A.   Yes, sir.

23 Q.   And even before you went there, you told the city

24 attorney, Mr. Shelley, what you were going to do, didn't you?

25 A.   Yes, sir.

1    Q.  And what did you tell him?

2    A.  That I had -- that J.T. Burnette had asked me to go meet

3    with a group of investors that wanted to do business in

4    Tallahassee to -- that wanted to talk a pro business

5    commissioner.  And I wanted to know if that was okay, and how

6    do I report the spending on it.

7    Q.  Because you wanted to know whether or not you could

8    expense this trip or if it was going to be something else?

9    A.  Or you had to -- whatever process you had to go through

10   with that.

11   Q.  And when you got there, Mr. Sweets told you that you

12   didn't have to sell; is that right?

13   A.  He did; yes, sir.

14   Q.  And he told you --

15   A.  I think he --

16   Q.  Did he tell you why -- I'm sorry, I didn't mean to the

17   cut you off.

18   A.  I think he told me that because I was trying to sell the

19   two additional guys that showed up.  I assumed that they were

20   the investors, so I was bragging Tallahassee to them and Leon

21   County and -- you know.  I think that's why he said -- it was

22   my opinion as to why he said:  You know, you don't need to

23   sell them; they're already sold.

24   Q.  Those are not Mr. Sweets and Mr. Miller; those are the

25   two other guys that were there?

1   A.  Yes, sir.

2   Q.  And you're talking to them about the benefits of

3   Tallahassee, right?

4   A.  Yes, sir.

5   Q.  And, in fact, when you are in there, you note that -- and

6   I'm talking about --

7           MR. KEHOE:  If we can just put this transcript up.

8   This would be Government's Exhibit 49, page 3.  And just for

9   ease of reference, this is Government's Exhibit 49 in evidence

10  and it is December 2nd of 2016.  Just the top half of the

11  page, please.

12  BY MR. KEHOE:

13  Q.  He is talking to you about selling Tallahassee.  He says:

14  Speak into my mike.  The issue about this is they have these

15  two guys; literally have wealth behind them.  So, I mean,

16  Mike was talking raising 30 million, says Mr. Burnette.

17      Sweets:  They can.

18      Sweets says:  Jack, he can bring a hundred million

19  dollars to the table if he says this is where they are

20  investing.

21      Mr. Sweets:  So they don't give a shit about Tallahassee.

22      They don't.

23      And you ask:  So why am I here?

24      Why do you ask that question?

25  A.  Because I didn't want to go to begin with, and I didn't

1    know -- you know, there was the last-minute thing with the

2    plane, and then it being a big plane and then the strip club.

3    And I'm, like, I thought my whole purpose was to talk about

4    Tallahassee and to sell Tallahassee.  And he was saying they

5    don't care about Tallahassee.  Well, then why am I here?

6    Q.  Would it be fair, Mr. Maddox, that you went there to

7    attempt to conduct legitimate business in selling

8    Tallahassee?

9    A.  Yes.

10   Q.  So, if you go further down the page, you say -- go to the

11   second half of the page.  Do you see that, "in Tallahassee,"

12   in the middle of that page?

13   A.  Right.

14   Q.  In Tallahassee, all you have to do is play by the rules,

15   right, and put things what you want to do.  And I mean, I'll

16   sell it for you, that's all you gotta do.

17       When you are telling him that, In Tallahassee, all you

18   have to do is play by the rules, what are you saying to him?

19   A.  I kept getting the impression from him that they were

20   looking for -- that his relationships were more important

21   than the actual nuts and bolts of government.  And so you --

22   in the nuts and bolts of government on a big development, you

23   have to go through layers and layers and layers of staff

24   approval, you have to go through public hearings, you have to

25   deal with neighborhoods.

1    I was trying to explain to him that there are rules by

2  that.  And you go by the rules, you do all that, and your

3  project will be fine, like, you know -- and it doesn't -- he

4  was also concerned about being an out-of-town developer and

5  there had been some discussion about that.  We've had plenty

6  of out-of-town developers, North American Properties, the

7  Zimmerman Group, all the stuff around Cascades, they were all

8  from out of town.  And Gaines Street.  And they just went

9  through the process.

10  Q.  And throughout all of this, you are telling them that

11  because you are expecting them to do what you are saying,

12  play by the rules, right?

13  A.  Yes.

14  Q.  And had no expectation that they are going to pay Scott

15  Maddox in this instance, to do anything illicit or illegal;

16  isn't that right?

17  A.  No.  But I certainly gave them the impression in my first

18  meeting with Mike Sweets, when I was intoxicated, that I was,

19  you know, the wizard behind the curtain and, you know, I knew

20  everything going on, which I should not have done.

21  Q.  And you shouldn't have done it because, when you were

22  dealing with this, it wasn't true, right?

23  A.  Right.

24  Q.  And what you are saying, in Tallahassee, you play by the

25  rules.  Is that what you are trying to convey to them here?

1   A.   Yes.

2   Q.   And the next day -- and let's turn to the Government's

3   Exhibit 50, page 19, this is the conversation you have with

4   Mr. Burnette, Mr. Maddox -- excuse me, Mr. Burnette and Mike

5   Sweets, and you note at the top of the page -- and, again,

6   this is -- let's turn to page 18, first, and take that back.

7   Top of page 18.

8        This is where you are talking about the concurrency

9   issues.  And these are the concurrency issues you worked on,

10  right?

11  A.   Yes, sir.

12  Q.   And if we go down there a little bit, you say:  Yeah,

13  usually you have to pay it up front to do that.  So what J.T.

14  is saying is that the concurrency agreement I worked on years

15  ago is already done, it's already there, I mean, it's done

16  for Fallschase.  So the legal work is done, he's just gotta

17  pay fees.  No, you don't have to pay the fee, it's already

18  paid.

19       Now, what fees are we talking about here?

20  A.   The fees to the local government for the impacts of the

21  development.

22  Q.   All paid for already.

23  A.   I don't remember the exact details, but I know that a

24  substantial amount of it was.  I don't know whether for the

25  second and third phases it was paid, but certainly a lot of

1    it was.

2            MR. KEHOE:  If we can turn to the next page, page 19.

3    The top half of the page there.

4    BY MR. KEHOE:

5    Q.  Is that why you say in the second one that:  The

6    development stands on its own, I would imagine.  I don't know

7    the numbers, but with everything you just said, I can't

8    imagine it not running on it ones because -- there's an

9    inaudible -- because the rest is icing on the cake.

10       And the project you're talking about, again, is

11   Fallschase?

12   A.  Yes, sir.

13   Q.  And it was standing on its own because all of this work

14   had been done prior to this, right?

15   A.  Well, not only that, there was a shortage of new

16   construction houses in Tallahassee.  And I thought if new

17   construction came up timing-wise, where if you started just

18   from raw land and you hadn't done any part of work, it would

19   take much longer to get it done.  But if you came up and had

20   one that was ready to go and developed it, that it would sell

21   very quickly.  I think we are a seeing that with Welaunee

22   today.

23   Q.  So, Mr. Maddox, during these conversations with Mr.

24   Sweets, both on second and the -- this date, I believe.  I'm

25   getting my 2nd's and 3rd's mixed up here a little bit.

1     On the 2nd and 3rd of December, both the first day and

2  when you are having this meeting with Mr. Burnette, you and

3  Mr. Sweets, are you lying to these people about all the

4  things that have been done with Fallschase, et cetera?  Were

5  you lying to them about it?

6  A.  No.

7  Q.  Were you lying to them about what was going on with Myers

8  Park and that you had to go for a RFP?  Were you lying to

9  them about that?

10 A.  No.

11 Q.  In fact, sir, until this last meeting on March the 27th

12 of 2017, at Table 23, you still think that this -- all of

13 these transactions are all part of a legitimate transaction

14 to hire Paige Carter-Smith to work on Fallschase and then

15 Southern Pines to develop Fallschase; isn't that right?

16 A.  Yes.

17 Q.  By the way, sir, as the spectrum moved on, and we can

18 draw our attention to when you do recall of these discussions

19 about Myers Park, in Las Vegas that we talked about, right?

20 That you guys were talking about Myers Park and also

21 Fallschase when you were in Las Vegas?

22 A.  Yes.

23 Q.  There came a time, sir, where a vote concerning the

24 property on Myers Park came before -- let me ask you:

25     Do you recall a vote coming before the county commission

1  on Myers Park in February of 2017, where you voted for

2  something that was against the Southern Pines Development

3  interests?

4  A.  I wasn't on the county commission.

5  Q.  Excuse me.  City commission.  I'd correct that.

6  A.  Yes, I recall voting against doing the RFP for Myers

7  Park.

8  Q.  Let's turn our attention to Defense Exhibit 645, which is

9  another city commission meeting summary.

10         MR. KEHOE:  I'm going to offer this into evidence,

11  Judge.

12         THE COURT:  Defendant's 645 is admitted.

13         MR. KEHOE:  And if we can put this on the screen,

14  sir.

15         MR. NOTHSTEIN:  Judge, we do object to relevance to

16  this, Your Honor.

17         THE COURT:  All right.  Give me just a minute.

18         MR. KEHOE:  And for ease of reference, Judge, I'm

19  looking at page 6, the pertinent part.  Just put this on the

20  screen, please.

21         THE COURT:  You want to highlight what you are

22  talking about?

23         MR. KEHOE:  Yes, Your Honor.  Can we highlight that

24  area for the court?

25         THE COURT:  The objection is overruled.  I take it

1  the rest of it is not anything of concern?

2          MR. NOTHSTEIN:  No, sir.

3          THE COURT:  All right.  The objection is overruled.

4  That exhibit is admitted.

5      (DEFENDANT'S EXHIBIT NO. 645:  Received in evidence.)

6  BY MR. KEHOE:

7  Q.  Mr. Maddox, just for your reference --

8          MR. KEHOE:  If we can go to the first page, please.

9  And if we can give the date up there for Mr. Maddox.

10  BY MR. KEHOE:

11  Q.  So this is February 22nd, 2017.  These again -- I think

12  we talked about one of them on direct examination, but they

13  are meeting summaries of city of Tallahassee commission

14  meetings, right?

15  A.  Yes, sir.

16          MR. KEHOE:  If we can turn back to where we were,

17  15.01, on page 6.

18  BY MR. KEHOE:

19  Q.  Can you read that for us and tell us what that is?

20  A.  Do you want me read it out loud?

21  Q.  Yes, please.

22  A.  Item 15.01:  City Commission Information Sharing of

23  Ideas:

24      After much discussion initiated by Commissioner Ziffer,

25  voted 5-0 to withdraw, Comprehensive Plan Amendment PCM201706

1  from the 2017 Comprehensive Plan Amendment Cycle, the

2  proposed rezoning of city-owned properties, 1201 Myers Park

3  Drive and 400 E. Van Buren Street from Recreation/Open Space

4  (OS) to Central Urban (CU); and, directed staff to develop a

5  path for building a facility on said site that would provide

6  housing for special needs adults that have aged out of the

7  state system.

8  Q.  Mr. Maddox, this was a 5-0 vote to remove UPUD and have

9  staff see whether or not it is feasible that housing for

10 special needs individuals, who I guess aged out of the state

11 system, could be built on this Myers Park property; isn't

12 that right?

13 A.  Yes, sir.

14 Q.  And you voted for it, along with four other

15 commissioners, right?

16 A.  Yes.

17 Q.  And this is the piece of property, this Myers Park

18 property, that you had been talking to Sweets about back in

19 Las Vegas several months before that, right?

20 A.  Yes, sir.

21         MR. KEHOE:  I'm going to go to a rather lengthy area,

22 Judge.  I don't know if you want me to continue.

23         THE COURT:  Keep going.

24         MR. KEHOE:  If I may, Judge.

25 BY MR. KEHOE:

1    Q.  Now, Mr. Maddox, I want to cover a few issues concerning

2    your plea transaction that you had with the government.  And

3    if I may -- if I can put Government's Exhibit 298 up on the

4    screen.  And you told us previously that that was your plea

5    agreement, right?

6    A.  Yes, sir.

7    Q.  If we can just turn our attention for a moment to your

8    Government's Exhibit 299.  And that is your -- excuse me --

9    299, yes.  And that is your cooperation agreement with the

10   government, right?

11   A.  Yes.

12   Q.  And, if you ever want to take a look at any of this.

13       Now, in the plea that you have with the government, there

14   were 47 counts in your indictment?

15   A.  I think 44.

16   Q.  And you pled to three of those counts?

17   A.  Yes.

18   Q.  And you had been indicted for a RICO conspiracy as well,

19   correct?

20   A.  Yes, sir.

21   Q.  And you didn't plead to that, did you?

22   A.  No.

23   Q.  Now, the agreement that you have is that you plead to the

24   three charges and that the rest of the charges were going to

25   be dismissed; is that right?

1    A.  Yes.

2    Q.  And I think you told us that -- well, as part of this

3    plea agreement, if we can go into it, on paragraph 4.  And in

4    that, the government has agreed that no statements that you

5    give them can be used against you; is that right?

6    A.  Yes.

7    Q.  And, by the way, how many times have you spoken with the

8    government?

9    A.  Several.

10   Q.  Like five, ten?

11   A.  I imagine five, but I don't know the exact number.

12   Q.  And approximately how long was each individual interview?

13   Do you know?

14   A.  Two-thirds of a day usually.

15   Q.  And prior to this, you're beginning to interview with the

16   government, there was nothing in your indictment about

17   anything involving $100,000 from KaiserKane to Governance,

18   was there?

19   A.  No.

20   Q.  You told them about that, right?

21   A.  Yes.

22   Q.  Now, if we continue on here into page 3, paragraph 7.

23       At the top of the page, it notes that:  The parties agree

24   that the United States or the Public Integrity Section may

25   revoke their agreement based on a variety of things.

1   So you understand that it is -- it is up to the

2   government whether or not they want to revoke your particular

3   plea, right?

4   A.   Well, I don't know about revoking the plea.  I thought it

5   was cooperation.

6   Q.   It says:  May revoke their agreement.

7   Their agreement with you is their plea agreement with

8   you, right?

9   A.   Okay.

10  Q.   Okay.  So it is up to -- it's up to the government, be it

11  the United States Attorney's Office or the Public Integrity

12  Section, whether or not your agreement is revoked, right?

13  A.   Yes.  I don't know if it's the judge or the prosecutor.

14  Q.   I'm sorry, I didn't mean to cut you off.

15  A.   I don't know whether it's up to them or the judge.

16  Q.   Well, if we just look at what it says here.

17  A.   I can take your word for it.  You're a criminal lawyer; I

18  don't know.

19  Q.   Okay.  I don't want to put any words in your mouth.  I'll

20  just go to the written page.  It just notes that:  The

21  parties agree that the United States Attorney or Public

22  Integrity Section may revoke their agreement.

23  A.   Okay.

24       MR. NOTHSTEIN:  Your Honor, I'm going to object.

25  This document speaks for itself.  I believe it's being

 1   mischaracterized.

 2             THE COURT:  He can ask the witness's understanding,

 3   no more and no less.

 4   BY MR. KEHOE:

 5   Q.  That's your understanding of this, right?  They may

 6   revoke it, right?

 7   A.  Yes.

 8   Q.  Now let's turn to paragraph 9 on page 4.

 9        Now, paragraph -- we talked a little bit about

10   substantial assistance a little bit on direct examination.

11   And you are testifying here today because you hope to get any

12   sentence by Judge Hinkle reduced; is that right?

13   A.  I mean, it's my understanding I would have to testify

14   here today regardless.

15   Q.  Well, as part of your substantial assistance agreement,

16   to get a substantial assistance reduction you have to testify

17   here, right?

18   A.  Yes.

19   Q.  And let us turn to paragraph 9.  And, if you look at the

20   top -- if you can just blow up that top part, four lines:

21        If, in the sole discretion of the United States Attorney

22   and the Public Integrity Section, the defendant is deemed to

23   have provided substantial assistance in the investigation or

24   prosecution of other persons who have committed offenses.

25        Now, you understand that, as part of your substantial

1   assistance agreement, it is up to the government to decide

2   whether or not to file a motion before the Judge for a

3   reduction in sentence for substantial assistance; isn't that

4   right?

5   A.  Yes, sir.

6   Q.  And it is solely -- as you see, it is solely within the

7   discretion of the government whether to do so, right?

8   A.  Yes, sir.

9   Q.  And you also understand that the Judge can't consider a

10  substantial assistance reduction motion unless and until the

11  government files that motion; isn't that right?

12  A.  Yes, sir.

13  Q.  So at the end of the day on whether or not you have

14  provided substantial assistance, it is in the lap of the

15  government either to give you -- provide a substantial

16  assistance motion or not, right?

17  A.  Yes, sir.

18  Q.  Now, sir, there have been times in the past -- well,

19  prior to coming here or prior to even talking to the

20  government, had you spoken about what you were going to tell

21  the government with Ms. Carter-Smith?

22  A.  What I was going to tell the government?

23  Q.  Well, when you sat down and first spoke first with the

24  government.  And I'm talking about the first interview with

25  the government.  For ease of reference, it was back in

1   August 20, 2019.

2       Had you spoken to -- with Ms. Carter-Smith about what, if

3   anything, you were going to tell the government during that

4   period of time?

5   A.  I don't recall that.

6   Q.  Now, going back a bit, Mr. Maddox, I think you told the

7   government that in the past, you did not tell some

8   authorities the truth when you were under oath; isn't that

9   right?

10  A.  I don't recall that.

11  Q.  Well, did you -- were you asked by the government -- were

12  you asked by the government, when you inquired about your

13  testimony before the ethics commission, that when you were

14  answering questions under oath, you were evasive in your

15  answers with the ethics officer?

16  A.  I don't recall that, but I could have been evasive.

17  Q.  Well, do you recall telling the government that?

18  A.  I don't.

19  Q.  May I show you something to refresh your recollection?

20  A.  Sure.  I mean, I could very well have, I just don't

21  recall it.

22          MR. KEHOE:  Defendant's Exhibit 531, just on the

23  screen, page 6.

24  BY MR. KEHOE:

25  Q.  Do you recall telling the government that, when you were

1  under oath being examined in their ethics commission

2  interview, that you were evasive in your answers?

3  A.  Yes.

4  Q.  And do you recall telling the government that you had, in

5  fact, lied under oath during that interview?

6  A.  I don't.

7  Q.  I'm going to show you to refresh your recollection.

8  A.  I don't.  I don't remember telling them that.  That

9  doesn't mean I didn't.

10     Do I remember being asked the question in that it was by

11  deposition, in the ethics thing, asking me -- Erwin Jackson's

12  lawyer asking me if I had -- my family or business had a

13  relationship --

14  Q.  Excuse me, don't read it.  All you do is use it to

15  refresh your recollection.

16  A.  Okay.  Whether I had a relationship with Governance.  And

17  I was interpreting that to mean whether I owned -- I had

18  ownership in it.

19     So I said, what relationship are you talking about?  And

20  they never clarified it.  That's my recollection of it.

21  Q.  So, did you tell the government that you had lied during

22  this interview?  Did you tell the government?

23  A.  I don't remember telling the government that.

24  Q.  Did you tell the government -- do you remember telling

25  the government that, during the course of this interview with

1  the ethics commission, that you were artfully dodgy, do you

2  remember that?

3  A.  Yes.

4  Q.  And artfully dodgy means that, when you were under oath,

5  you weren't completely candid with that person in that

6  interview when you were under oath, doesn't it?

7  A.  It means you answer the questions that are asked of you.

8  Q.  Did you lie to -- did you lie to the ethics commission or

9  not?

10  A.  I don't think I lied to the ethics commission.  If I did,

11  I mean, you'll have to show me what it is, I'll own up to it

12  if I did.  I just don't recall it.

13  Q.  Do you remember telling the government that -- they asked

14  you about being evasive.  Do you remember telling the

15  government that:  When asked about his statement to the

16  ethics commission regarding not receiving any compensation

17  was true, and you said, no.

18      Do you remember saying that to the government?

19  A.  No.

20  Q.  Would something refresh your recollection?  Page 6, at

21  the bottom.  Would something refresh your recollection; yes

22  or no?

23  A.  I just don't remember, sorry.

24  Q.  So are you saying that nothing would refresh your

25  recollection about what you told the government?

 1   A.   I mean, what does "nothing" mean?

 2   Q.   I'm sorry.

 3   A.   Are you asking me what I should have to refresh my

 4   recollection of it?

 5   Q.   No.  Withdraw.

 6        Would something refresh your recollection with regard to

 7   your answer to that question and what you told the

 8   government?

 9   A.   A better memory.

10   Q.   I'm asking you, if I show you something, might it refresh

11   your recollection about what you told the government about

12   the answers that you gave to the ethics commission regarding

13   receiving compensation from the Governance?

14   A.   I just don't -- I don't recall the specifics of it.

15   Q.   During the course of this investigation, you and

16   Ms. Carter-Smith purchased some burner phones, didn't you?

17   A.   I did not.

18   Q.   Was it Ms. Carter-Smith?

19   A.   Yes.

20   Q.   She purchased a burner phone and gave it to you?

21   A.   Yes.

22   Q.   And she did that so you would only communicate with very

23   few people and your telephone couldn't be tapped, right?

24   A.   Well, my attorney advised me if I wanted to have

25   private --

1        MR. NOTHSTEIN:  Objection, Your Honor.

2   BY MR. KEHOE:

3   Q.  Without telling us what any attorney gave to you in an

4   attorney-client conversation, you bought the phones with

5   Ms. Carter-Smith so that the government couldn't tap your

6   conversations; isn't that right?

7   A.  I didn't buy the phones from Ms. Carter-Smith.

8   Q.  Oh, Ms. Carter-Smith purchased one and gave one to you?

9   A.  Yes.

10  Q.  And who else got one of these phones?

11  A.  I think maybe my aide.  I don't recall.  Rick Fernandez

12  because he asked for one.

13  Q.  A phone was not given to Mr. Burnette, was it?

14  A.  No.

15        MR. KEHOE:  Excuse me, Your Honor.

16  BY MR. KEHOE:

17  Q.  By the way, sir, if I can just for one moment go back to

18  your plea.

19        MR. KEHOE:  If he can go back and put Mr. Maddox's

20  plea agreement back up on the screen, and that would have been

21  Government's Exhibit 290 -- excuse me, not 294.

22        If we can put his plea agreement back on, which I

23  believe is 298.  And, if we can go to the second page, and the

24  top of the page.

25  BY MR. KEHOE:

1   Q.  If we look at the counts that you have pleaded guilty to,

2   and if we look at Count 23, honest services fraud; and you

3   pleaded guilty to that, right?

4   A.  Yes.

5   Q.  And that count involves the causing to be transmitted

6   this $10,000 check to Governance on November the 16th of

7   2016.

8       Now you told us that when the check was paid in to

9   Governance, and thereafter, you didn't think there was

10  anything wrong with that check at all; isn't that right?

11  A.  Yes.

12  Q.  And that when Ms. Carter-Smith cashed it, you didn't

13  think there was anything wrong with that, either, did you?

14  A.  No.

15  Q.  And you were not part of some fraud to get that check

16  sent to Governance Services, were you?

17  A.  Well, I never should have told Mike Sweets in my meeting

18  with him at Madison Social that he should hire Governance,

19  that -- and I told him that's what he should do.  And he was

20  talking about wanting to do business here and I told him that

21  he should hire Governance and I should never have done that.

22  Q.  Well, that check, were you part of some fraud in causing

23  that check to be sent to Governance and then cashed by

24  Ms. Carter-Smith?

25          MR. NOTHSTEIN:  Objection, asked and answered.

1              THE COURT:  Sustained.

2    BY MR. KEHOE:

3    Q.  Well, sir, you told us previously that -- when you

4    decided what you shouldn't have said to Mr. Sweets.  When all

5    of the checks came in, all the way through March 27, 2017,

6    you didn't think there was anything wrong.

7              MR. NOTHSTEIN:  Objection, asked and answered.

8              THE COURT:  Sustained.

9              MR. KEHOE:  I'll move on, Judge.  I'm going to move

10   on to another topic now, Judge, if it's --

11             THE COURT:  Go for it.

12             MR. KEHOE:  Okay.

13             THE COURT:  Everybody okay?

14   BY MR. KEHOE:

15   Q.  Let me turn our attention to the whole McKibbon

16   situation, if we can.

17             THE COURT:  That is a different topic.  Maybe this is

18   a good time to take a lunch break.

19             Recall my earlier instructions:  Don't talk about the

20   case, don't let anyone talk about it in your presence.  We'll

21   start back at 1:25 by that clock.  One hour from now.  Jury

22   out, please.

23        (*The jury exited the courtroom at 12:25 p.m.*)

24             THE COURT:  You may all be seated.  Thank you,

25   Mr. Maddox, you may step down.  If you would be back on that

1  witness stand by 1:25 by that clock.

2       A couple of notes about rulings.  There have been a

3  number of questions asking him what he told the government.

4       If it's a question about what he told the government

5  on direct here in the courtroom, it's not hearsay and it's a

6  fair predicate and question.  If the question is what he told

7  the government somewhere else, it's a fair question, if it's

8  inconsistent to impeach the witness, but first you have to ask

9  the underlying facts.

10      You can't say, didn't you tell the government the

11 light was red until you first say, What color was the light,

12 or was the light red?

13      So it's sometimes hard for me to tell from the

14 question whether you are asking about what he said on the

15 witness stand here or what he told the government in earlier

16 debriefings or whatever.  I did my best, and I think that

17 explains the ones I sustained or didn't.

18      There was a question about whether he had a plan to

19 extort somebody.  There has been a great number of questions

20 where there is a long predicate statement, four or five

21 different things, perhaps, and then a question, not

22 necessarily even related to the long statement.  That was one

23 such statement.  You had made some statement and then you

24 asked that question.  If you had just asked whether there was

25 a plan to extort, I would have allowed the question.  But it

1   really is a compound question among other matters that makes

2   it objectionable for you to make that kind of a long statement

3   before you asked the question.  That's why I sustained the

4   objection.

5           How long do you think you expect to be with

6   Mr. Maddox?

7           MR. KEHOE:  An hour or so, Your Honor, maybe a little

8   bit more.  I have to -- I can tell you, I'm going through the

9   McKibbon stuff and that was brought up this morning.

10          THE COURT:  I got it.  We'll start back at 1:25.

11      (A luncheon recess was taken at 12:28 p.m.)

12

                        **AFTERNOON SESSION**

13                        (1:25 P.M.)

14      (*Defendant present; jury not present.*)

15          THE COURT:  Please be seated.

16          Are we ready for the jury?

17          MR. NOTHSTEIN:  Yes, Your Honor.

18          THE COURT:  Jury in, please.

19      (*The jury entered the courtroom at 1:26 p.m.*)

20          THE COURT:  All right.  You may be seated.

21          Mr. Maddox, you are still under oath.

22          Mr. Kehoe, you may proceed.

23          MR. KEHOE:  Thank you, Your Honor.

24   BY MR. KEHOE:

25   Q.  Mr. Maddox, just going back momentarily on a few

1   questions that I neglected to ask you on your plea.

2       The other counts that you pleaded guilty to, the honest

3   services charge and the defrauding the government, those

4   counts have nothing to do with McKibbon or with Southern

5   Pines or anything else, do they?

6   A.   No, sir.

7   Q.   Before we end up on the whole Southern Pines

8   transactions, were you individually a part of any plan to

9   extort any money throughout any of that?

10  A.   Throughout all what?

11  Q.   Throughout the dealings with the Southern Pines folks

12  that we talked about this morning.  Were you part of any plan

13  to extort anybody?

14  A.   No.

15  Q.   I'm going to jump around a little bit and move on to the

16  McKibbon situation, if we can.

17      We talked a little bit about your recusal.  Is it true

18  that prior to you actually taking office, I think

19  November 19th of 2012, it's accurate to say that you talked

20  to Jim English, the former city attorney, about a conflict --

21  about a potential conflict, didn't you?

22  A.   I don't recall.  A conflict with McKibbon?

23  Q.   Well, just conflicts in general.  Did you talk to Jim

24  English about --

25  A.   Yes.

1  Q.  You did?  Did Mr. English retire?

2  A.  Yes.

3  Q.  And is it a fact that part of the people or entities that

4  you talked to Mr. English about was the McKibbon matter and

5  the potential conflict if McKibbon came back before the city

6  commission, didn't you?

7  A.  I don't recall.

8  Q.  Well, was that something that was potentially on the

9  bubble given the fact that -- potentially on the bubble,

10  story for vernacular -- that was potentially going to come up

11  before the commission given the option out there coming up?

12  A.  Yes.

13  Q.  And you don't recall, but logically as to how you handled

14  things, would you logically have discussed that with

15  Mr. English before you took office?

16  A.  I would have spoken about several past clients.  So I

17  don't know if that was included or not.

18  Q.  So as you sit here today, logically with McKibbon's where

19  they are with the options -- given that their options were

20  coming back up, would that be something you would have talked

21  to Mr. English about?

22          MR. NOTHSTEIN:  Objection, asked and answered.

23          THE COURT:  Sustained.

24  BY MR. KEHOE:

25  Q.  Well, let us talk April 24th, 2013.  And you left the

1  podium there to avoid voting the McKibbon Hotel Group

2  project, right?

3  A.  I never said that.

4  Q.  Did you, in fact, leave the dais on April 24th, 2013?

5  A.  Yes.

6  Q.  To avoid voting on the McKibbon project?

7  A.  No, I didn't say that.

8  Q.  Excuse me?

9  A.  I'm sorry, you paused in the middle of your question, so

10  if you can restate your whole question.

11  Q.  Absolutely.  If I ever do that, please stop me if you

12  don't understand one of my questions, honestly.

13      Did you, in fact, leave the dais on April 24th, 2013 to

14  avoid voting on the McKibbon project?

15  A.  I don't recall why I left the dais in April of 2013.

16  Q.  If you don't recall, if I showed you something, might it

17  refresh your recollection?

18  A.  Sure.

19          MR. KEHOE:  Defendant's Exhibit 783, page 3.

20  BY MR. KEHOE:

21  Q.  Does that refresh your recollection as to whether or not

22  you left the dais because of the McKibbon project?

23  A.  I don't know if I left because I had to go to the

24  bathroom or because I had to make a phone call, or because I

25  saw it on the agenda and I had not filed a conflict.  And --

1    it could have been any of the above.  I just don't recall.  I

2    mean, it was eight years ago.

3    Q.  When you were interviewed by the FBI, when you were asked

4    that question, did you say -- when asked whether you left to

5    avoid voting on the McKibbon project, did you say, quote:

6    Yeah, I'm sure?

7    A.  My recollection of that is that I told them I did not

8    know whether I left at that point for that reason; that it

9    could have been.  Like I testified to today, it could have

10   been why I left.  I just simply don't recall.  It was not

11   uncommon for me to leave the dais during meetings, so I don't

12   recall whether at that instance it was because I saw it on

13   the agenda or because a million other reasons.

14   Q.  Well, thereafter, I think you talked a little bit about

15   Erwin Jackson.  Things started to escalate with Erwin

16   Jackson's attacks on you, right, after April of 2013?

17   A.  They were consistent throughout my entire tenure from

18   2012 on.

19   Q.  And I understand.  And that, ultimately, you declared a

20   -- recused yourself on September 11th of 2013; is that right?

21   A.  Yes.

22   Q.  Let us turn a little bit to the actual transaction.  And

23   I think you did say -- correct me if I'm wrong -- that even

24   after you recused on McKibbon project, you still stayed in

25   contact with Wes Townsen and spoke with him at various times

1    at various places, right?

2    A.  I have recollection of him calling me.

3    Q.  Now, we talked a little bit about this -- I want to talk

4    to you a little bit about this transaction that you testified

5    to about Mr. Burnette and him allegedly saying that he wanted

6    you not to vote, and that he would have Paige Carter-Smith

7    not represent McKibbon and that he would get some work for

8    them.  I'm going to refer to that particular scenario.

9        Now, I believe you testified this morning that after you

10   had this agreement with Mr. Burnette about Ms. Carter-Smith

11   not representing McKibbon Group, that's when Mr. Yordon

12   stepped in; is that right?

13   A.  I don't recall the timing of the first conversation.  It

14   would make sense that it would have been then, but I don't

15   recall.

16   Q.  Might I show you something to refresh your recollection,

17   sir.

18           MR. KEHOE:  Go to Defendant's Exhibit 941, page 7.

19   BY MR. KEHOE:

20   Q.  So do you recall, sir, that it was after you had struck

21   this alleged deal with Mr. Burnette regarding Paige

22   Carter-Smith not representing McKibbon before the city

23   commission that Gary Yordon stepped in to represent McKibbon?

24   A.  I don't recall the timing.

25   Q.  Excuse me?

*Scott Maddox - Cross*

1  A.  I don't recall the timing of that.

2  Q.  Do you recall telling the FBI that, when you were

3  interviewed on May 19, 2021, just less than two months ago?

4  A.  When shown documents, it would make sense to me that that

5  conversation happened before The Zachary Group represented

6  McKibbon.  But I don't know remember if it was before then or

7  after then.  I do know that it was before the vote, but I

8  don't know whether it was before or after.

9  Q.  Just going back to my question.  You did tell the FBI,

10  you struck the deal, this alleged deal, with Mr. Burnette

11  before Mr. Yordon stepped in, did you not?

12  A.  I don't know.  I could have very well.

13  Q.  I'm sorry?

14  A.  I could have very well.  I don't know.  I was shown a lot

15  of documents and asked to remember when something was.  I

16  don't -- I've said several times that I don't have an exact

17  recollection of when that conversation was.

18  Q.  And during this -- you're talking about being shown these

19  documents by the government during preparation, trial

20  preparation; is that right?

21  A.  I don't know whether it's -- I had a meeting with the

22  government.  I don't know if it's my trial preparation.

23  Q.  A meeting with the government.  And they had a big

24  calendar on the board -- a calendar board on the wall; is

25  that right?

1   A.  I don't remember a calendar board.

2   Q.  Was there a board or the wall with a calendar to get you

3   to this particular date?

4   A.  No, sir.  They had a TV screen like this, and they would

5   show different documents.

6   Q.  And did they discuss this calendar with you as to when

7   this alleged conversation with Mr. Burnette took place?

8          MR. NOTHSTEIN:  Objection, facts not in evidence.

9          THE COURT:  Sustained.

10  BY MR. KEHOE:

11  Q.  Did you have a conversation with the government as to

12  when this conversation took place, this alleged conversation

13  between you and Mr. Burnette to strike the deal?

14  A.  Yes.

15  Q.  And let us go to Defense Exhibit 703 in evidence.  This

16  is the initial proposal from Ms. Carter-Smith to Mr. Townsen

17  on May the 30th of 2013.  And let me -- obviously you can see

18  the date at the top, May 30th, 2013.

19  A.  Okay.

20  Q.  And the Zachary Group contract, I'm going to -- already

21  in evidence.  That's Defense Exhibit 10.

22      Now, do you see that date, the 7th of June of 2013; is

23  that right?

24  A.  That's what that says.

25  Q.  And it makes sense to you that this agreement -- this

1  alleged agreement with Mr. Burnette that you testified to,

2  took place before Mr. Yordon was in, brought in to represent

3  McKibbon, on the 7th of June, 2013?

4  A.   I don't recall when the conversation happened.

5  Q.   Now, this $100,000 payment that was ultimately made by

6  the KaiserKane, you -- I think you were shown this this

7  morning, which is Government's Exhibit 124.  This is dated

8  June 10th of 2014; and I think you testified on direct

9  examination that you put this contract together from forms

10 that you had; is that right?

11 A.   If Ms. Carter-Smith needed contracts, I had the blank

12 consulting agreement in my computer and she would tell me who

13 the different parties were and the amounts, et cetera, that

14 would change.  And I would make those changes and send her

15 the document.

16 Q.   So, if you'd take a look, go through the first page.

17 This is the agreement.  And if you'd look down at the bottom

18 of the page, which is consultant's compensation, and it

19 carries over to the next page.

20     Now, sir, you sent this back to Ms. Carter-Smith on

21 January the 10th.  And as you read this, there is nothing in

22 this agreement that talks about the $100,000 payment, does

23 it?

24 A.   No, sir.

25 Q.   You certainly -- well, you had the opportunity to include

1  that there, didn't you?

2  A.  She gave me that information.

3  Q.  Well, if you -- as you were going through the agreement,

4  you, acting like a lawyer, could have included the $100,000

5  payment in there, right?

6  A.  I guess I could have.  I mean, she told me that's what

7  she wanted in the contract.

8  Q.  I think you just said.  But it's not in there, obviously,

9  right?

10  A.  Right.

11       MR. KEHOE:  If I might have a moment, Your Honor?

12  BY MR. KEHOE:

13  Q.  Let me just ask you a couple of final of questions, sir.

14       You are familiar with the Killearn situation that

15  Mr. Burnette was involved in, correct?

16  A.  Yes.

17  Q.  Isn't it a fact that you didn't even know that

18  Mr. Burnette was involved in the Killearn project until it

19  was very late?

20       MR. NOTHSTEIN:  Objection, Your Honor, relevance.

21       THE COURT:  Overruled.

22       THE WITNESS:  Yes, sir.

23  BY MR. KEHOE:

24  Q.  And the vote on the Killearn project was unanimous,

25  wasn't it?

1   A.  That is my recollection.

2   Q.  One last question, sir, if I may:

3       When you left Las Vegas, and after you had all of these

4   contacts with the Southern Pines Development folks, you

5   didn't think that they were law enforcement, did you?

6   A.  No.

7           MR. KEHOE:  Thank you, Mr. Maddox.  I have nothing

8   further.

9           THE COURT:  Redirect?

10                      REDIRECT EXAMINATION

11  BY MR. NOTHSTEIN:

12  Q.  Mr. Maddox, you were asked several questions about sort

13  of your reaction to some of the things that happened with

14  regard to the Southern Pines folks and the things you heard

15  on the tapes in regard to Mr. Burnette.  I believe that your

16  response was that, you said several times, that you have to

17  just play by the rules in Tallahassee.  Do you remember that?

18  A.  Yes, sir.

19  Q.  And do you remember saying that the way you were hearing

20  things was not how it works?  Is that what you testified to?

21  A.  In the one that they asked me about.

22  Q.  So, I just want to turn to your plea agreement

23  specifically with regard --

24          MR. NOTHSTEIN:  Can we have Government's Exhibit 298,

25  please, and page 2, paragraph (a).

*Scott Maddox - Redirect*

1   BY MR. NOTHSTEIN:

2   Q.  Now, specifically with regard to -- well, it says here

3   that you are pleading guilty to Count 23, which is honest

4   services mail fraud; is that right?

5   A.  Yes, sir.

6   Q.  And that is the count -- that count, at least of these

7   three, is the one that relates to Southern Pines?

8   A.  Yes, sir.

9   Q.  Now, as you said before, you also had a statement of

10  facts that you signed in conjunction with your plea

11  agreement; is that right?

12  A.  Yes, sir.

13  Q.  Now, in your statement of facts --

14          MR. NOTHSTEIN:  Let me show just the witness,

15  please, governments 403?

16  BY MR. NOTHSTEIN:

17  Q.  Now, in Government's 403 -- I'm sorry, page 14, please,

18  for the witness.

19  BY MR. NOTHSTEIN:

20  Q.  Now, to be clear, as part of your plea agreement, you

21  reviewed this statement of facts -- or, did you review this

22  statement of facts?

23  A.  Yes.

24  Q.  And did you sign it?

25  A.  Yes.

1   Q.  And in so signing it, did you agree that the government

2   could prove the facts that are listed therein?

3   A.  Yes.  There were some facts that I -- that we discussed

4   in the plea that there's not other evidence to or defenses

5   that were defenses to.

6   Q.  To be clear, did that relate to other conduct besides

7   Southern Pines?

8   A.  Yes, sir.

9   Q.  And so with regard to Mr. Maddox, on page 39 --

10  paragraph 39, page 14, what did you agree with regard to the

11  offense about your instructions?

12          MR. KEHOE:  I'm going to object, Your Honor.  This

13  particular document.  He can ask the question, I just object

14  to leading.

15          THE COURT:  Overruled.

16  BY MR. NOTHSTEIN:

17  Q.  So, Mr. Maddox, paragraph 39 of your statement of facts,

18  what did you agree about what you did in that paragraph?

19  A.  That Burnette facilitated the flow of communication

20  between Company F and me, and instructed representatives of

21  Company F, they supported contact between them and me, and

22  would determine with me how I wanted to receive the money

23  into Governance.

24  Q.  Mr. Maddox, I think you skipped part of there.  At whose

25  instruction was done?

1   A.   Oh, at Maddox's instruction.

2         MR. NOTHSTEIN:  And on paragraph 42, page 15, if we

3   can have that for the witness, please.

4   BY MR. NOTHSTEIN:

5   Q.   What did you agree in paragraph 42?

6   A.   On October 29, 2016, Maddox met with Company F

7   representative and confirmed that Company F's $10,000 payment

8   should be made to Governance.  In exchange, Maddox agreed to

9   perform official acts to benefit Company F.  Maddox advised

10  that Carter-Smith was on board with how and why these

11  payments were being made to Governance and that Maddox had no

12  secrets from Carter Smith.  Maddox reiterated that, if

13  Burnette was involved, Maddox was on board.

14  Q.   And you created -- this as a statement of facts that you

15  signed and agreed to; is that right?

16  A.   Yes.

17  Q.   Now, after signing this statement of facts and entering

18  into your plea agreement, did you come into this courtroom to

19  enter your plea?

20  A.   I believe it was this courtroom.

21  Q.   Did you come into a courtroom in this courthouse?

22  A.   Yes, sir.

23  Q.   And at that time, were you represented by counsel?

24  A.   Yes, sir.

25  Q.   And were you in front of Judge Hinkle?

1   A.  Yes, sir.

2   Q.  And do you recall being asked several questions about

3   your willingness to plead guilty?

4   A.  Yes, sir.

5   Q.  In fact, do you recall it being a bit of a lengthy

6   hearing?

7   A.  Yes, sir.

8          MR. NOTHSTEIN:  Now, I would like to show for the

9   witness, please, what has been marked as Government's

10  Exhibit 420, please, just to the witness.  If you go to

11  page 22, the top third -- or, two-thirds, that is.

12  BY MR. NOTHSTEIN:

13  Q.  Do you recall being asked by Judge Hinkle the following:

14  Counts 23 is the FBI company that they set up to solicit a

15  payment?

16         MR. KEHOE:  Judge, I would object to the form.  He

17  can ask a question.

18         THE COURT:  Overruled.

19  BY MR. NOTHSTEIN:

20  Q.  So, let me tell you what I think is involved in this, and

21  then, again, I'm going to get you to straighten me out if I

22  got the facts wrong.

23      The FBI, acting undercover, purported to have -- I think

24  it's a real estate development operation -- and the proposal

25  was that the company referred in the papers as Company F,

1    which is the front company for the FBI, was going to the pay

2    $10,000 a month.  And if I understand it, Mr. Maddox, you met

3    with representatives of Company F.

4        And what did you say in response?

5    A.  Yes, sir.

6    Q.  And the court indicated that you could provide favorable

7    support in exchange for this $10,000 a month, and that

8    Ms. Carter-Smith was on board, and that would be the way the

9    money would be paid, is that about it?

10       What was your response?

11   A.  I don't know.  It's not on the screen.

12   Q.  Oh.

13   A.  Yes, sir.

14   Q.  What was your response?

15   A.  Yes, sir.

16   Q.  Now, on that same day, did you also plead guilty to

17   another similar count?

18   A.  Yes, sir.

19   Q.  Okay.  And, as Mr. Kehoe pointed out, that related to a

20   different company?

21   A.  Yes, sir.

22   Q.  Okay.

23           MR. NOTHSTEIN:  If we show the witness Government's

24   Exhibit 403, the statement of facts.  And if we could go --

25   just a moment -- to page 4, paragraphs 9 and 10.

1  BY MR. NOTHSTEIN:

2  Q.  Generally, Mr. Maddox, this conduct, did this deal with a

3  different client of Governance's?

4  A.  Yes, sir.

5  Q.  Was a ride sharing company?

6  A.  Yes, sir.

7  Q.  Looking to do business here in Tallahassee?

8  A.  Yes, sir.

9  Q.  And, just in general, approximately when did this conduct

10  take place?

11  A.  2015.

12  Q.  So was that before or after the Southern Pines conduct?

13  A.  Before.

14  Q.  And looking at paragraph 9, what was the -- what was the

15  sort of issue before the city commission?

16  A.  There was an ordinance on regulating ride sharing

17  companies.

18  Q.  And according to paragraph 10 that you admitted to, what

19  did you do when the representatives of the ride sharing

20  company came to you?

21  A.  The ride sharing company came to me and asked me if -- a

22  good lobbyist to hire, and I told them Paige Carter-Smith.

23  Q.  And did you suggest to them that they could get a

24  favorable result by having Ms. Carter-Smith?

25  A.  I don't remember suggesting that to them.

1  Q.  According to your plea agreement -- look at the bottom of

2  page 4.

3  A.  I signed it, but I just don't recall suggesting that to

4  them.

5  Q.  I'm asking what's in your statement of facts.

6  A.  Oh, okay.  If it's in the statement of facts.

7  Q.  Can you could just read on page 4, start at paragraph 10,

8  please?

9  A.  On or about March 2nd, 2015, Person A, who was a

10  government relations professional employed by Company B, met

11  with Maddox to discussed the ride share ordinance.  Maddox

12  was non-committal and stated that he was being lobbied by

13  Company B's opponent on the ordinance; namely the taxi

14  industry.

15  Q.  If we can continue on to page 5.

16  A.  It says:  Further stated that Carter-Smith could help

17  Company B obtain a favorable result on the ordinance.

18  Thereafter, with Maddox's knowledge and at Maddox's

19  direction, Carter-Smith met with Person A, and solicited

20  payments from Company B.  Maddox and Carter-Smith agreed to

21  solicit payments in exchange for Maddox's vote on the

22  ordinance and related issues.  On or about March 25, 2015,

23  Maddox -- Carter-Smith procured Company B's agreement to pay

24  Governance a $5,000 monthly retainer for her consulting

25  services.  After securing Company B's agreement to pay

*Scott Maddox - Redirect*

1   Governance, Carter-Smith served as a go-between for

2   communications between Company B representatives and Maddox.

3   Q.  And turning to paragraph 11, if we can look at the bottom

4   three lines, please.  I'm sorry, I apologize.  The first

5   three lines of paragraph 11.

6   A.  On or about March 25, 2015, the city commission met to

7   vote on whether to delay passage of the amended ordinance

8   that would have made it difficult for Company B to operate

9   profitably in Tallahassee.

10  Q.  And the last three lines of the paragraph, please.

11  Starting with "Maddox then moved."

12  A.  Maddox then moved to delay the vote and the commissioners

13  voted unanimously for the delay.  On the dais, Maddox stated

14  that he had a long history of supporting the taxicab

15  industry.

16  Q.  And then on page 6, paragraph 13, what does that first

17  sentence say at paragraph 13?

18  A.  Between on or about May 7th, 2015, and on or about

19  October 15, 2015, Company B paid Governance $30,000.

20  Q.  And, Mr. Maddox, just to be clear, did you agree to all

21  of those facts in your statement of facts?

22  A.  I did.

23  Q.  Now, when this all occurred in the 2015, how long had it

24  been since you had accepted $100,000 in exchange -- $100,000

25  from the defendant in exchange for your agreement not to vote

1  in favor of McKibbon and for Ms. Carter-Smith not to

2  represent McKibbon?

3           MR. KEHOE:  Object to the form, leading.

4           THE COURT:  Overruled.

5           THE WITNESS:  I think that he paid the $100,000

6  when -- wasn't that in January of 2015?

7  BY MR. NOTHSTEIN:

8  Q.  What's your recollection of how close in time they were?

9  A.  I think it was January of 2015, but I'm not the best on

10  dates.

11  Q.  So would it a short time or a long time between those two

12  events?

13  A.  I guess, short.

14  Q.  Now, you were also asked several questions about what

15  happened after you reviewed recordings of Mr. Burnette that

16  you heard.

17      Now, Mr. Kehoe asked if you heard them when you spoke

18  with us.  But, to be clear, had you had access to those

19  recordings prior to meeting with the government?

20  A.  Yes, sir.

21  Q.  Were you provided those in discovery?

22  A.  Yes, sir.

23  Q.  A year or so, even more, before you met with the

24  government?

25  A.  Yes, sir.

1    Q.   And had you listened to some of them on your own?

2    A.   I listened to some of them, yes, sir.

3    Q.   So, Mr. Maddox, what shocked you about them?

4    A.   Mr. Burnette and I had many conversations about not

5    cutting corners and things; that I'm just not a

6    corner-cutting person.  And then in these tapes, I'm hearing

7    him say that I'm the Mafia and I'll destroy the project if

8    they didn't have me on board, and that the only way to have

9    me is to go through him; and they had to do that, and

10   otherwise -- and that the other commissioners are going to

11   vote the way that he wants them to vote because they are

12   afraid of his wife or all of these things.

13        And I knew the things he was saying about me weren't

14   true, that I had not destroyed people's projects as a sitting

15   city commissioner because they didn't hire me or hire Paige

16   or anybody else.

17             MR. NOTHSTEIN:  Can we play Government's Exhibit 52?

18   BY MR. NOTHSTEIN:

19   Q.   Before we do, do you recall on your last night in Las

20   Vegas, Mr. Maddox, having a dinner with Mr. Burnette and with

21   the -- well, with the investors as you knew them at that

22   time?

23   A.   Yes, sir.

24             MR. NOTHSTEIN:  Please play.

25             (Government's Exhibit 52 published to the jury.)

1   BY MR. NOTHSTEIN:

2   Q.  Mr. Maddox, do you recall telling that story in Las

3   Vegas?

4   A.  I do.

5   Q.  You told us earlier about when you first met Mr. Burnette

6   working on a deal at the airport and the client's Steve

7   Leoni.

8       Is that the client you're talking about?

9   A.  Yes.

10  Q.  Now, you also said that some of the calls that you

11  listened to with Mr. Burnette, that you weren't having the

12  conversations that he was intimating or telling the

13  undercover agents that you were actually having.  Do you

14  recall that testimony?

15  A.  Yes.

16  Q.  So I would like to bring up a transcript, please.

17          MR. NOTHSTEIN:  Government's Exhibit --

18          THE WITNESS:  Can I clarify this.  I wasn't in

19  office.

20  BY MR. NOTHSTEIN:

21  Q.  I understand.

22  A.  What I'm describing here is I was not in office, and what

23  was presented to the city commission to be passed was

24  competition in the FBOs.

25  Q.  Mr. Maddox, the question is whether you told the story.

```
 1   A.  I'm sorry.

 2   Q.  Did you tell the story?

 3   A.  Yes, I told the story.

 4           MR. NOTHSTEIN:  And can I have Government's 36,

 5   please.  And page 3, the middle of the page, please.  And

 6   where Sweets say "cool," down to "okay" by Sweets.  There we

 7   go.

 8   BY MR. NOTHSTEIN:

 9   Q.  And this is Government's Exhibit 36, Mr. Maddox, a

10   recording from October 19, 2016.  And just take a look at

11   this excerpt of the transcript, and tell me if this is one of

12   the recordings you listened to that left you shocked.

13   A.  Yes, sir.

14   Q.  So this is October 19th we are now?

15           MR. NOTHSTEIN:  If we now can show Government's

16   Exhibit 201, Your Honor, which we move in at this time.

17           THE COURT:  Government 201?

18           MR. NOTHSTEIN:  Yes, sir.

19           THE COURT:  Is admitted.

20      (GOVERNMENT EXHIBIT NO. 201:  Received in evidence.)

21           MR. NOTHSTEIN:  If we could have page 37, I believe

22   it starts in the middle, maybe the top half of the page.

23   BY MR. NOTHSTEIN:

24   Q.  Can you see these records here, Mr. Maddox?

25   A.  Yes, sir.
```

1   Q.  Okay.  Do you see one where it says "John Thomas

2   Burnette" and some numbers next to it?

3   A.  Yes, sir.

4   Q.  Do you recognize that phone number?

5   A.  Yes, sir.

6   Q.  Whose number is that?

7   A.  J.T. Burnette.

8   Q.  And below that is your name and some numbers next to it?

9   A.  Yes, sir.

10  Q.  Is that your phone number next to it?

11  A.  Yes, sir.

12  Q.  Now, let's look at the third one down.  This is October

13  19, 2016.  What did Mr. Burnette send to you?

14  A.  10:00 p.m., or so, for some wine/dinner.

15  Q.  I'm sorry.  The third one down, I'll highlight it for

16  you.

17  A.  Swing by The Edison when you're done.

18  Q.  And what's your response?

19  A.  How late will you be there?  Were you there?

20  Q.  Okay.  Looking at these messages, do you recall meeting

21  Mr. Maddox -- Mr. Burnette at The Edison that day?

22  A.  I really don't, because I hated going to The Edison.

23  Q.  Can you look at the rest of the text messages in the

24  chain, please.

25      All right, so how does the rest of your conversation go?

1  A.  It says:  Yeah, upstairs.  I can come down for a few on

2  the way.

3       So I guess I did.

4       He says:  Test me when you're here, which I guess means

5  text.

6       And it says:  Okay.  I say:  Okay.

7  Q.  Next page, please, top?

8  A.  Walking in.  He says he's outside.

9  Q.  Looking at this, do you recall if you met with

10  Mr. Burnette at The Edison?

11  A.  I could very well.  I just don't recall it.  We met at

12  several bars.

13  Q.  Okay.

14       MR. NOTHSTEIN:  If we could have Government's

15  Exhibit 40, please, page 4, the bottom two exchanges on

16  page 4.

17  BY MR. NOTHSTEIN:

18  Q.  Is this one of the recordings?  Take a look at this, and

19  tell us if this is one of the recordings that you listened to

20  that shocked you.

21  A.  I think so.

22       MR. NOTHSTEIN:  If we could please see -- I

23  apologize -- Government's 44 as well.  And the top, sort of --

24  maybe third, of page 3, please.

25  BY MR. NOTHSTEIN:

1    Q.  Please take a look, and tell me if this was one of the

2    recordings that you listened to that shocked you.

3    A.  Yeah, I don't remember listening to it.

4    Q.  This is October 29, 2019.  Do you remember listening or

5    reading Mr. Burnette talking about you and say that you said:

6    You tell me what you need and I'll, like I always will, I'll

7    get it done?

8    A.  I don't remember that.

9    Q.  Do you remember reading or listening to Mr. Burnette say:

10   Mike and I talked about it, and run that through Governance?

11   A.  He said it -- so Sweets says:  So he's not wanting -- he

12   does not want to get paid.

13       And then he says -- oh, yeah, I do remember this, being

14   shocked by it, yes.

15   Q.  Now, they are talking about you getting paid through

16   Governance.  Governance was paid by Southern Pines, right?

17   A.  Yes, sir.

18   Q.  And so this is October 29, 2016.

19            MR. NOTHSTEIN:  If we could turn back to

20   Government's Exhibit 201, page 38, please.  And let's start

21   at the top half.

22   BY MR. NOTHSTEIN:

23   Q.  So these text messages on the 29th, what were you and

24   Mr. Burnette talking about?

25   A.  He's talking about going to Vegas.

1    Q.  And the bottom half, please.

2    A.  Okay.

3    Q.  And what are you and Mr. Burnette talking about here?  As

4    we get to the bottom two messages, November 2, 2016, what

5    were you --

6    A.  He asked if I could meet downtown around 5:00, and I

7    said:  Yes, sir.

8    Q.  And the next page, please, top half.

9        Okay.  What does the top message from Mr. Burnette say?

10   A.  Let's meet at DT at 5:00.

11   Q.  What does that mean to you?

12   A.  DoubleTree.

13   Q.  And is your response?

14   A.  See you then.

15   Q.  And do you think you went?

16   A.  Yes, sir; I would think I did.

17   Q.  We also -- we won't go to the recording, but we listened

18   to a recording of you and Mr. Sweets and Ms. Carter-Smith at

19   Old School on November 11th.  Do you remember that?

20   A.  Yes, sir.

21   Q.  Okay.

22        MR. NOTHSTEIN:  If we can go to page 36 -- to the

23   bottom of this page.  I'm sorry, one message up from there,

24   I'm sorry.

25   BY MR. NOTHSTEIN:

1  Q.  Now, this is a text message from November 14, 2016.  And

2  what do you write to Mr. Burnette?

3  A.  I said:  You around this afternoon for a drink?

4     He said:  I have the kids tonight.  Open tomorrow from

5  5:00 to 7:00.

6          MR. NOTHSTEIN:  If we go to the next page, please.

7  BY MR. NOTHSTEIN:

8  Q.  I apologize, I think I cut it off.  I think you proposed

9  the lounge at Provence.  Do you know what that is?

10  A.  Yes, sir.

11  Q.  What is it?

12  A.  A bar.

13  Q.  And what is his response?

14  A.  Perfect.

15  Q.  And what do you say to him?

16  A.  See you then.

17  Q.  Now, Mr. Maddox, you were asked some questions about your

18  recusal, your announcement of your recusal from the McKibbon

19  issue.  And when you stated your recusal -- I think we saw

20  the video on September 11, 2013.  Was there a vote on

21  McKibbon on the agenda, if you recall, a substantive vote?

22  A.  Yes.  I believe it was the extension.

23  Q.  Well, let's look at Government's Exhibit 92(a), please.

24     THE WITNESS:  Your Honor, if I could do it in 30 seconds,

25  can I run to the men's room?

1      MR. NOTHSTEIN:  I don't have much more, Your Honor.

2      THE WITNESS:  Okay.  I can hold it, I'm sorry.

3  Sorry, go ahead.

4      THE COURT:  Well, here's the rule.  When a juror or

5  witness or, for that matter, a lawyer needs a restroom break,

6  we take one.  If you are okay for a minute and we're about

7  through, good.

8      THE WITNESS:  Okay, we're good.

9      THE COURT:  If you really need a break, we can take

10  it.

11      THE WITNESS:  I'm sorry.

12      THE COURT:  Or the judge.  When the judge needs a

13  break.

14      THE WITNESS:  I have a weak bladder.

15      MR. NOTHSTEIN:  Can we go to the next page, please.

16  BY MR. NOTHSTEIN:

17  Q.  Mr. Maddox, if you can just look through this document,

18  please, and let me know if it appears to you that there was a

19  vote on McKibbon on this date?

20  A.  Okay.  It doesn't have -- I think you're on the wrong

21  page.

22      MR. NOTHSTEIN:  Can you go to the next page, please.

23  Going go to the middle.

24  BY MR. NOTHSTEIN:

25  Q.  There in the middle, do you see Item 12.01?

1  A.  Okay.  Yes.

2          MR. NOTHSTEIN:  Can you enlarge that please.

3          THE WITNESS:  Yes.  It was just an introduction of

4  ordinance.

5  BY MR. NOTHSTEIN:

6  Q.  What's an introduction of ordinance?

7  A.  Under the rules, the law, you have to introduce an

8  ordinance first, and then it usually waits 30 days, and then

9  they have to vote on the ordinance.  So everything is

10  introduced, but there is no action taken until the final vote

11  on the ordinance.

12  Q.  The last thing I want to ask you about; you were asked

13  several questions about whether or not the $40,000 that was

14  paid to Governance from Southern Pines was then paid on to

15  you.  Do you remember those questions?

16  A.  Yes, sir.

17  Q.  During the time that Ms. Carter-Smith was receiving that

18  money, were you still receiving the same financial benefits

19  from Governance you described to us, such as the paycheck,

20  the loan payments, credit card payments, and things like

21  that?

22  A.  No, sir.  I wasn't receiving any paycheck.  Any benefits

23  I got would come off of the loan payments.  They are supposed

24  to keep those, the county people were.

25  Q.  I understand --

```
 1              MR. KEHOE:  Your Honor, excuse me.  If the witness

 2    can finish the question.

 3              THE COURT:  I thought he might have been.  But if you

 4    hadn't finished, go ahead.

 5              THE WITNESS:  I'm fine.

 6    BY MR. NOTHSTEIN:

 7    Q.  I understand you were taking them off the loan.  But you

 8    were still receiving money even if it was coming off of the

 9    loan?

10              MR. KEHOE:  Objection, leading.

11              THE COURT:  Overruled.

12    BY MR. NOTHSTEIN:

13    Q.  Were you?

14    A.  I don't know if I was receiving actual money.  It could

15    have been.  I certainly had a credit card and was charging

16    things on the credit card that was supposed to come off of

17    the loan.  And I'm sure there could have been a loan payment

18    during that period of time, I don't know.

19    Q.  And during that time, you were in a romantic relationship

20    with Ms. Carter-Smith, were you?

21    A.  Yes, sir.

22    Q.  Did you want her to succeed?

23    A.  Yes, sir.

24    Q.  Did you want Governance to do well?

25    A.  Yes, sir.
```

*Evan Hurley - Direct*

2044

 1          MR. NOTHSTEIN:  Nothing further, Your Honor.

 2          THE COURT:  Thank you, Mr. Maddox.  You may step

 3   down.

 4          THE WITNESS:  Thank you, sir.

 5          THE COURT:  Please call your next witness.

 6          MR. NOTHSTEIN:  Your Honor, the government calls

 7   Special Agent Hurley.

 8          DEPUTY CLERK:  Please raise your right hand.

 9          ***EVAN HURLEY, GOVERNMENT WITNESS, DULY SWORN***

10          DEPUTY CLERK:  Be seated.

11          Please, state your full name and spell your last

12   name for the record.

13          THE WITNESS:  Evan Hurley, H-u-r-l-e-y.

14                        DIRECT EXAMINATION

15   BY MR. NOTHSTEIN:

16   Q.  Good afternoon, Agent Hurley.

17   A.  Good afternoon, sir.

18   Q.  Agent Hurley, what do you do for a living?

19   A.  I'm a special agent with the FBI.

20   Q.  How long have you been a special agent with the FBI?

21   A.  Approximately, seven years.

22   Q.  And during that time -- we'll start off with, what kind

23   of training did you initially receive from the FBI?

24   A.  We start off with approximately 20 weeks of training at

25   our facility in Quantico, Virginia, learning investigative

1   techniques, tactical instructions, interviewing; a multitude

2   of varying things you need to be an FBI agent.

3   Q.  After completing your training initially, are you

4   assigned to a field office?

5   A.  Yes, sir.

6   Q.  Where were you initially assigned?

7   A.  Assigned to the Jacksonville Division, which then

8   assigned me to the Tallahassee Resident Agency, which is a

9   satellite office of the Jacksonville Division.

10  Q.  And approximately what year did you start in Tallahassee

11  RA?

12  A.  2014.

13  Q.  And have you been working in this office since then?

14  A.  Yes.

15  Q.  At some point, Agent Hurley, did you become the case

16  agent on this investigation?

17  A.  I did.

18  Q.  And approximately when was that?

19  A.  Approximately, end of May, early June 2017.

20  Q.  Prior to that, becoming the case agent, had you become

21  involved in the case in sort of a lesser capacity?

22  A.  Yeah.  We are a small office here in Tallahassee, so at

23  any given time we have somewhere between five to seven

24  agents.  So we're always helping each other out.  I helped

25  probably with some ancillary things during the investigation

1  prior to me getting actually a case agent on it, but they

2  would have been minor.

3  Q.  Did you participate in an interview of the defendant,

4  J.T. Burnette, on May 24, 2017?

5  A.  I did.

6  Q.  Could you please explain for the jury what the

7  circumstances were of that interview?

8  A.  Basically, we approached Mr. Burnette's residence pretty

9  early, I think it was about 8:00 a.m.; the sole purpose of

10  the investigation at that point had gone into the overt

11  phase, so we were going to publicly go out and do interviews.

12  I think you heard from undercovers that was the covert phase.

13      Went to Mr. Burnette's home with the goal of speaking to

14  him and speaking with his then-girlfriend, Ms. Rivers.

15  Q.  You may have mentioned this, but what time of day was

16  this?

17  A.  It was about 8:00 a.m., morning.

18  Q.  And who went, aside from yourself?

19  A.  Myself and the case agent at the time, Special Agent Josh

20  Doyle.

21  Q.  What kind of clothing were y'all wearing?

22  A.  Probably the exact same suit I am wearing today.

23  Q.  Were you armed?

24  A.  I was.

25  Q.  Where do you carry your gun?

1  A.  I have a gun I carry inside my waistband.

2  Q.  Was it visible?

3  A.  No, sir.

4  Q.  When you approached the door of the defendant's door,

5  what happened?

6  A.  We knocked on the door, took a minute and kind of knocked

7  again.  Ms. Rivers, eventually answered the door.  We

8  identified ourselves and who we were with, and told her that

9  we wanted to speak with Mr. Burnette.

10  Q.  What happened next?

11  A.  She went into the home, got Mr. Burnette; she told

12  Mr. Burnette who we were, he came to the door and spoke with

13  us briefly, and then invited us inside.

14  Q.  What was he wearing?

15  A.  I think he had been at the gym previously.  So I believe

16  he was still wearing gym clothes, and I know he was wearing a

17  True Leaf hat.  I just remember that.

18  Q.  What was his general demeanor when he first encountered

19  you?

20  A.  He was calm and collected, from what I saw.

21  Q.  During the time that you were speaking with him that day,

22  did he maintain that demeanor?

23  A.  During the time when I was in the room with Josh, he

24  seemed calm and collected.

25  Q.  Were you and Agent Doyle carrying recording devices?

1    A.  Yes, sir.

2    Q.  Did you make a recording of the interview?

3    A.  We did.

4    Q.  And have you listened to that prior to today?

5    A.  I have.

6          MR. NOTHSTEIN:  Judge, at this time we would offer

7    Government's Exhibits 85 and 86, which are the clip and

8    transcript of the May 24th, 2017 interview.

9          MR. KEHOE:  No objection.

10         THE COURT:  Those are admitted.

11       (GOVERNMENT EXHIBIT NOS. 85 AND 86:  Received in

12   evidence.)

13         (Government exhibits 85 and 86 published to the

14   jury.)

15   BY MR. NOTHSTEIN:

16   Q.  Agent Hurley, just a couple brief questions.  Were you

17   present here in the courtroom when a recording was played

18   which the defendant referred to a project he had at Tennessee

19   and Monroe with a Walgreens in it?

20   A.  Yes.

21   Q.  Are you familiar with what the name of that project is?

22   A.  The Gateway project?

23   Q.  Is that the same one that Mr. Musgrove referred to in his

24   testimony?

25   A.  Yes, sir.

```
1              MR. NOTHSTEIN:  Nothing further, Your Honor.

2              THE COURT:  Cross-examine?

3                        CROSS-EXAMINATION

4   BY MR. KEHOE:

5   Q.  Good afternoon, Agent Hurley.

6   A.  Good afternoon, sir.

7   Q.  Agent, you came on to this case a little bit later.

8   A.  I did.

9   Q.  And I think you testified in the grand jury a few times?

10  A.  I had, sir.

11  Q.  And you told the grand jury that, of course, you had

12  familiarized yourself with this case?

13             MR. NOTHSTEIN:  Objection, hearsay.

14             THE COURT:  Sustained.

15  BY MR. KEHOE:

16  Q.  Did you familiarize yourself with the case?

17  A.  As best I could; yes, sir.

18  Q.  And did that include looking at prior grand jury

19  testimony?

20  A.  No.

21  Q.  Did that include looking at city records that you had

22  that had been turned over to the government?

23  A.  Yes.

24  Q.  And did that also include your ability -- or, let me

25  withdraw that.
```

*Evan Hurley - Cross*

1    You also had the ability to review matters online, city

2  records online, too, right?

3  A.  At certain points in the investigation, yes, we would

4  have done that.

5  Q.  Well, isn't it a fact that the city records or commission

6  records are online and they are pretty easy to navigate?

7  A.  I would agree with that.

8  Q.  And you went through a series of, I guess what you call,

9  superseding indictments.  There was an indictment and then

10  another indictment, and I believe there was a third, right?

11  A.  Yes, sir.

12  Q.  And I think the first indictment came out in May,

13  approximately May of 2019; is that about right?

14  A.  I don't recall the specific date.

15  Q.  But in that first indictment of my client, did you

16  testify in the grand jury prior to that?

17  A.  Where are we here?  This is the first indictment?

18  Q.  The spring of 2019, prior to --

19        MR. NOTHSTEIN:  I'm going to object based on

20  relevance.

21        THE COURT:  Sustained.

22  BY MR. KEHOE:

23  Q.  Well, sir, when you testified -- let us in fact talk

24  about the last time.  The court records will reflect that the

25  last indictment was handed down on the October 2nd.

1    MR. NOTHSTEIN:  Objection, Your Honor.

2    THE COURT:  Sustained.  Isn't this all beyond the

3    scope?  Just cross-examine; if you need to call him back in

4    your case, you can.

5    MR. KEHOE:  Okay.  I'll call him back if we need.  We

6    will reserve that right to call him back.

7    BY MR. KEHOE:

8    Q.  Sir, let us go through these alleged false statements

9    that you just testified to.

10    MR. NOTHSTEIN:  Objection, Your Honor.  The witness

11    has not testified to that.

12    BY MR. KEHOE:

13    Q.  Let us go through the statements that you taped with

14    Agent Doyle on the early morning hours of the 24th of

15    May 17th; is that right?

16    A.  I believe that was the date, yes.

17    Q.  And what time -- again, what time of morning did you go

18    to Mr. Burnette's residence?

19    A.  Approximately, 8:00 a.m.

20    Q.  And you came in the -- did you call him on the phone to

21    have him come in to the FBI office?

22    A.  No, sir.

23    Q.  Did you set up any meeting ahead of time?

24    A.  No, sir.

25    Q.  So you actually went there in the early morning hours to

 1 | attempt to catch him off guard, didn't you?

 2 | A.   No, sir.  We went to talk to him.

 3 | Q.   But you didn't call him to set up an appointment, nor did

 4 | you tell him that you were coming in advance; is that right?

 5 | A.   That's right.

 6 | Q.   Now, you note in several items that you asked that -- the

 7 | question was, Mr. Burnette didn't know who Southern Pines

 8 | wrote checks to.  Well, let us show --

 9 |        MR. NOTHSTEIN:  Objection, Your Honor.  This witness

10 | has not testified that he said that.

11 |        THE COURT:  Just ask a question.

12 | BY MR. KEHOE:

13 | Q.   Well, in the tapes, there was a question given to

14 | Mr. Burnette about did he know who Southern Pines wrote

15 | checks to.  Do you recall that?

16 | A.   If you have it, I can take a look at it to make sure.

17 | Q.   Absolutely, sure.

18 |        MR. KEHOE:  If we can go to Government Exhibit 86, if

19 | we can.  It would be on page 8, if we can, of Government's

20 | Exhibit 86.  If we can go to page 8, please.

21 | BY MR. KEHOE:

22 | Q.   Do you see the question at the top:

23 |      Who did he hire?

24 |      I don't know who they ever wrote a check to.

25 | A.   I see that.

1   Q.  And the answer to that is there are two different

2   companies involved, aren't there?

3         MR. NOTHSTEIN:  Objection, Your Honor.  May we have a

4   sidebar.

5         THE COURT:  We may.

6      *(Conference held at the bench via headphones.)*

7         MR. KEHOE:  I'm good, Judge.

8         THE COURT:  Mr. Nothstein.

9         MR. NOTHSTEIN:  Your Honor, this witness is about to

10  be asked about the truth, essentially, of these statements.

11  This witness was not asked to comment on the nature of what

12  was said, simply to ask the questions.  All of these questions

13  are improper.

14        THE COURT:  What is it you are trying to establish?

15        MR. KEHOE:  My client is indicted for not giving a

16  particular answer, and I'm going to explore the fact that

17  there are other answers to these questions.  He's the case

18  agent and he should know.  The government placed these things

19  and says it's offered -- yes.

20        THE COURT:  That's exactly what they said.  If this

21  was accurately recorded of what was said, cross-examine him

22  about it.  The witness did not give testimony about what you

23  are talking about.

24        MR. KEHOE:  He didn't --

25        THE COURT:  The questions about what actually

1   happened are beyond the scope.  I sustain the objection.

2        MR. KEHOE:  We reserve the right to call him back in

3   our case.

4        THE COURT:  You can call him back and ask him

5   anything he has personal knowledge of.

6        MR. KEHOE:  Yes, Your Honor.  Thank you.

7        (End sidebar conference.)

8        MR. KEHOE:  Your Honor, I have no further questions.

9        THE COURT:  You do or do not?  I didn't hear.

10       MR. KEHOE:  No, Your Honor, I do not.

11       THE COURT:  All right.  Redirect?

12       MR. KEHOE:  Excuse me, Your Honor.  Well, outside the

13   scope.

14       MR. NOTHSTEIN:  No questions, Your Honor.

15       THE COURT:  Thank you, Mr. Hurley.  You may step down

16   and return to the counsel table.

17       Mr. Nothstein, please call your next witness.

18       MR. NOTHSTEIN:  Your Honor, pending review of the

19   evidence and exhibits, I believe we are prepared to rest, Your

20   Honor.

21       THE COURT:  All right.

22       Members of the jury, as I told you at the beginning

23   of the case, the government goes first; and then when the

24   government finishes its case-in-chief by announcing that the

25   government rests, as Mr. Nothstein just did, then the

1  defendant has an opportunity to present evidence if the

2  defendant choices to do so.  As I told you earlier, the

3  defendant is not required to present evidence, but this is the

4  time in the trial when the defendant would do that, if he

5  chooses.  This also makes this a convenient time to take the

6  afternoon break.

7          Even though you have now gotten all of the evidence

8  in the government's case-in-chief, it's still not time to

9  start talking about case.  Wait until you have gotten all of

10  the evidence, the closing arguments, and my instructions on

11  the law.  We'll be back with you in a few minutes.

12          Jury out, please.

13      (*The jury exited the courtroom at 2:37 p.m.*)

14          THE COURT:  All right.  You may be seated.

15          Anything we need to do before the defense calls its

16  first witness?

17          MR. KEHOE:  Excuse me, Your Honor?

18          THE COURT:  Anything we need to do before the defense

19  calls their first witness?

20          MR. KEHOE:  Just a Rule 29 motion.

21          THE COURT:  Now is the time.

22          MR. KEHOE:  Yes, Your Honor.

23          Your Honor, the government has put on their case, and

24  they have failed to establish sufficient evidence to sustain a

25  conviction on all of the counts that are now before the court.

1    If we can just go through these seriatim.

2          The first count is the RICO count.  Judge, obviously

3    there is a significant continuity problem with the --

4    according to Jacksonville -- the *Jacksonville versus Bell*

5    *South Telecom*, 372 F.3d, 1250 at 1264, the government has to

6    show that the predicate acts are of a continuing nature.

7          These are disparate acts over -- looking in the light

8    most favorable to the government, these are disparate acts

9    that have no continuity to them at all.

10          THE COURT:  I've got that basis.  Go to the next one.

11          MR. KEHOE:  The next basis --

12          THE COURT:  All I need you to do is give me the

13    grounds of the motion.  I'll give you a chance at the end of

14    the day, you can argue as long as you wish.  But, right now,

15    all I need is the grounds for the motion.

16          MR. KEHOE:  The grounds for the motion, of course,

17    are continuity.  The other grounds for the motion on Count One

18    is the conspiracy itself.  The government's witnesses

19    themselves said that there was no conspiracy, certainly on the

20    portion of the case for the FBI.

21          What does that do, Judge?  If we knocked out that

22    portion, we go back to 2014, and we have statute of

23    limitations problem because that would have ended in April of

24    2014.  Five years later was April 2019.  This indictment

25    didn't come down until October of 2019.

1    So once that FBI matter goes aside, you have a -- in

2  addition to the continuity problem and in addition to the

3  enterprise problem, they have a statute of limitations problem

4  as well.

5    If you go into the other counts of the indictment, if

6  I may, the extortion.  Obviously, if there is no conspiracy,

7  there is extortion.  There is no evidence that anybody was

8  extorted to do anything.  Even Mr. Maddox himself sat here

9  this afternoon, a government witness, that said he was not

10  part of any extortion.  I think the question remains is, if

11  all of these people were in it together, who was part of this

12  extortion?

13    THE COURT:  Next grounds.  Look here's the

14  explanation.  I'll let you argue as long as you want to argue.

15  The question at this point, of course, is not whether the

16  government is entitled to prevail, not whether its case is

17  persuasive or not persuasive.  I have to decide whether, if

18  the jury resolves all of the factual disputes in the

19  government's favor, there is enough evidence that a reasonable

20  jury could decide beyond a reasonable doubt that Mr. Burnette

21  is guilty of these charges.

22    We don't need a lot of argument on this.  I have been

23  here for nine full days of trial, so I have heard the

24  evidence.  I've thought about this over the last nine days.  I

25  need you to put on the record what your grounds are.  If we

1    get you one that is going to keep you from presenting your

2    defense on any of this or going to make a difference, we may

3    spend more time talking about it.  I think that's very

4    unlikely.

5           So I need you to give me the grounds of your motion

6    and then we will get on it.  As I say, at the end of the day

7    when the jury goes -- and I've told the jury they are going to

8    be out of here by 5:00 today, this is one of those days when

9    we are going to quit on time, if not early, I'll sit as long

10   as you wish to talk.

11          MR. KEHOE:  That's fine, Judge.

12          THE COURT:  Number two, facts don't establish

13   extortion.

14          MR. KEHOE:  That's right, the facts don't establish

15   extortion.  Counts 3 through 6, these three checks, of course

16   the facts don't count that there was part of any fraudulent

17   scheme for these checks, based on testimony of Paige

18   Carter-Smith and Mr. Maddox today.

19          The Travel Act count, that's the promoting and

20   managing and establishing the unlawful activity, Count 7.

21   Obviously, Count 7 is -- I believe that's the first -- yes,

22   the Count 7 is the count with Mr. Burnette and Mr. Sweets.

23   The person that is establishing anything going on there is

24   Mr. Sweets, not Mr. Burnette.

25          And Count 8, there is, of course, a jurisdictional

1    issue and a venue issue, because Mr. Burnette is an Iowa --

2    and Mr. Miller, according to his testimony here, was not in

3    the state of Florida.  The way it is charged right now is that

4    he has a -- excuse me -- that he has a -- he was somewhere

5    else.  And we did not know that until he testified here today.

6    So that is not properly here before the Northern District of

7    Florida.  That's Count 8.

8           The last count is the false statements count, Judge.

9    Our argument there is, obviously, there are factual issues

10   there that we can get into on the defense, but certainly

11   there's a materiality issue.  These matters are not material

12   in any way.  A material fact is an important fact and not some

13   trivial detail that has a natural tendency to influence or

14   capable of influencing a decision or agency in reaching a

15   required decision.  We submit to the court that there is no

16   materiality to this.

17          So absent being able to go into some of the factual

18   details on the false statements, certainly they haven't

19   established that these statements are false at all.

20          So that's the basis of our argument at this juncture,

21   Judge.

22          THE COURT:  Mr. Nothstein, tell me about venue on

23   Count 8.  Mr. Grogan?

24          MR. GROGAN:  Yes, Your Honor.

25          Count 8 is the Travel Act count, the October 24th

1   phone call, I believe.  So the elements of that offense, Your

2   Honor, I believe venue would be established by the defendant

3   knowingly committing -- thereafter, the defendant knowingly

4   committing an act to promote or establish or carry on the

5   unlawful activity which, among other things, would be the

6   October 29th conversation in the vehicle from the airport.

7            THE COURT:  I'm not sure I followed all of that.  The

8   indictment says October 24th.

9            MR. GROGAN:  Yes, Your Honor.

10           THE COURT:  The facility is the cell phone, a call

11  from a representative of Southern Pines to Burnette.

12  Mr. Kehoe tells me that the two participants in the phone call

13  were not in this district.

14           Now, venue over conspiracy can be proper in this

15  district even for a defendant who has never been to this

16  district as long as any overt act of the conspiracy takes

17  place in this district.  But this is a substantive count, and

18  the charge is using a facility in interstate or foreign

19  commerce to promote the unlawful activity.  I guess the

20  question is whether the use of the facility has to occur in

21  this district.

22           You may not have seen this question coming, and I

23  didn't.  Candidly, I listened to the questions about where

24  people were as relevant to interstate commerce, not as

25  relevant to venue.  So until Mr. Kehoe said it, I wouldn't

1   have known that neither person was in Florida at the time.

2          Do you have anything to tell me on that question,

3   whether everybody has to be in Florida?

4          MR. GROGAN:  Not specifically on that question, Your

5   Honor, whether the use has to be in the district in order to

6   establish the offense.  But I think that's one element of the

7   offense, is the use of the facility in interstate commerce;

8   and another element being that you thereafter committed an act

9   in furtherance of it.  But if that act is committed in this

10  district, then venue is in this district.

11         I'd be happy to research the first question, Your

12  Honor, in the interim, but --

13         THE COURT:  Fair enough.

14         Mr. Kehoe, how about that?  If they make a phone call

15  out of the district and then part of the offense is doing

16  something to manage the unlawful activity, and they do it in

17  this district, isn't that enough for venue?

18         MR. KEHOE:  No, Your Honor.

19         THE COURT:  Why not?

20         MR. KEHOE:  Because that's not what they charged.

21         THE COURT:  I'm reading the indictment.

22         MR. KEHOE:  Well, if we look at what they charged,

23  they said they used a facility in interstate commerce here,

24  and then they charge it as something that's in the Northern

25  District.  But they didn't use a facility in the Northern

1    District of Florida.

2            I understand the second part.

3            THE COURT:  Back up.  The charge is --

4            Mr. Grogan, I'll give you a chance if I need to.

5    Thank you.

6            MR. GROGAN:  Yes, sir.

7            THE COURT:  The charge is that Mr. Burnette used a

8    cell phone to promote an unlawful activity; namely, bribery,

9    and thereafter performed and attempted to perform an act to

10   promote, manage, establish, carry on the unlawful activity.

11           So the charge is used a cell phone to promote

12   bribery, and thereafter performed an act to perform bribery.

13   And if he did an act in this district, isn't that plainly

14   enough for venue in this district?

15           MR. KEHOE:  What I say here, Judge -- and I

16   understand Your Honor's point, is that, of course, the first

17   half of this is not there as we've already established.

18           THE COURT:  Right.  But all he has to do is, if part

19   of the offense occurred in this district, he can be charged in

20   this district, right?  Otherwise, he couldn't be charged

21   anywhere.  All you would have to do to avoid prosecution is

22   just carry on the offense in different jurisdictions; and if

23   you couldn't be charged in any jurisdiction where you did

24   it --

25           MR. KEHOE:  I would beg to differ, Judge.  They could

1  have venue where the actual calls took place, you know,

2  wherever Miller happened to be.

3          THE COURT:  But what if the act he did to promote it

4  later was in this district?  Then he'd be in Iowa saying, oh,

5  no, he did that in -- I got it.

6          MR. KEHOE:  That's our argument, Judge.

7          THE COURT:  I got it.  I was with you with the

8  assertion -- or was going to go do some research to find

9  out -- if the charge was using the cell phone and nobody used

10 the cell phone in this district, I was with you that far,

11 subject, again, to the conspiracy issue and so forth, but this

12 is a substantive count.  But, then, if you look at the

13 indictment itself, it says there were additional acts, and

14 some of those surely were carried on in this district.

15          I'll go back and re-read the statute, but I assume

16 that this language in the indictment tracks the statute.  It

17 generally does.  And so if those are parts of the elements of

18 the offense and one of the elements took place in this

19 district, then I think you're going to lose your venue motion.

20          In any event, I will look at that some; and, as I

21 said, I will give you as long as you want at the end of the

22 day to talk about this.

23          MR. KEHOE:  Yes, sir.

24          THE COURT:  I try to remind defense lawyers this:

25          The motion you just made preserves nothing for

1    purposes of appeal.  You have to renew the motion at the end

2    of all the evidence.  I try to remind people, but the

3    responsibility to renew your motion is your responsibility,

4    not mine.

5         MR. KEHOE:  Absolutely, Judge.

6         THE COURT:  I don't remember when I sent the jury

7    out.  Five more minutes?

8         MR. KEHOE:  I just need a little more time, if we are

9    going to proceed today.

10        THE COURT:  We are going to proceed.

11        MR. KEHOE:  I understand.

12        THE COURT:  Do you have your witness ready to go?

13        MR. KEHOE:  I need a little bit more time, Your

14   Honor.

15        THE COURT:  Let's start at 3:00 by that clock.  Ten

16   minutes.  We're in recess.

17       (A recess was taken at 2:51 p.m.)

18       (The proceedings resumed at 3:01 p.m.)

19       (Defendant present; jury not present.)

20        THE COURT:  Please be seated.  Do we have any issues

21   before we get the jury back?

22        MR. KEHOE:  No, Your Honor.

23        MS. O'GARA:  Yes, Your Honor.  We have one issue.

24        It is our understanding that the defense is going to

25   -- and correct me if I'm incorrect, but attempt to introduce

1    Defendant's Exhibit 626 with this witness, and we want to

2    raise with the court that we object to this exhibit.

3            THE COURT:  Tell me who the witness is.

4            MR. KEHOE:  This is Larry Daniel.

5            THE COURT:  What is this exhibit?

6            MR. KEHOE:  Excuse me, Your Honor?

7            THE COURT:  What is the exhibit?

8            MR. KEHOE:  This is a compilation of the text

9    messages that were given between and among the parties to the

10   phones.  And then what Mr. Daniel did was go through these and

11   put them in there in a readable form so you can see them time,

12   sequence-wise, et cetera.  So this is a summary of what the

13   government has of all of these text messages back and forth.

14           MS. O'GARA:  Your Honor, the government's position is

15   that this not an appropriate summary.  First of all, these are

16   not voluminous records that the witness has compiled here.

17   These are records that are actually already in evidence, and

18   they are in evidence in their original and proper form which

19   are text messages between different parties.

20           It appears that what they have done is to have this

21   witness compile all of the text messages from different

22   exhibits into one.

23           Those exhibits, again, are already in evidence, and

24   it's our position that the defense can simply use the exhibits

25   that are the evidence that are the original documents and the

1  original photographs of these text messages as the appropriate

2  exhibit.  This exhibit is argumentative and it's not a proper

3  summary of the evidence.

4       THE COURT:  Well, let's deal with argumentative

5  first.  This is just the exact text?  So they have not added

6  anything?

7       MS. O'GARA:  It is not, Your Honor.  There are a

8  number of text messages.  For example, there were -- as the

9  court seen in the evidence, there were website links in some

10  text messages sent between, for example, the defendant and

11  some of the undercovers.  They have replaced those links with

12  actually thumbnails of articles, so those were not in the

13  original text messages.  So there have been alterations made.

14       THE COURT:  But the thumbnails are accurate?

15       MS. O'GARA:  I don't know that, Your Honor, I don't

16  know where those thumbnails came from.

17       THE COURT:  The only real question here is whether

18  these go back to the jury or don't go back to the jury.  He

19  can certainly go through these with the witness -- yes? -- the

20  same way you did.  And then you can put them up on the screen

21  in the sequence you want to, highlight the parts you want to,

22  right?

23       MS. O'GARA:  As a demonstrative.

24       THE COURT:  Sure.

25       MS. O'GARA:  Sure.  Our objection is to these

1  exhibits being admitted into evidence and going back to the

2  jury as evidence in their case.

3        MR. KEHOE:  If I may, Judge, this is summary.  Any of

4  the thumbnails are the actual articles.  All Mr. Daniel did

5  was take exhibits that the government had and put them in

6  chronological order, and when there are some thumbnails they

7  are up there.  So, in that sense, it is the classic summary as

8  opposed to the taking disparate documents.

9        THE COURT:  It is not a classic summary.  Come on.

10        We can address this more later.  You can certainly

11  use it with the witness.  I doubt I'll let it go to the jury,

12  but I might.

13        This doesn't have to be an irrational process.  So

14  something that helps one evaluate the evidence, if it is

15  helpful and it is all admissible evidence, I may allow it.

16  The concern is, we're not going to take the evidence that the

17  defense likes and introduce it twice.  And that's the concern,

18  that you emphasize some things and not others, because you're

19  introducing yet another copy of the exhibit.  And that's the

20  concern.  We can deal with it later.  You don't need to --

21        I'll allow it to be shown to the witness.  So when

22  you get to it, I'm not going to admit it into evidence but you

23  can show it.  We may treat it just as a demonstrative.  You

24  should identify it by an exhibit number when you get to it.

25        MR. KEHOE:  Yes, Your Honor.

*Lawrence Daniel - Direct*

1          THE COURT:  Is that all we have right now?

2          MS. O'GARA:  That's all, Your Honor.

3          THE COURT:  Jury in, please.

4      (*The jury entered the courtroom at 3:06 p.m.*)

5          THE COURT:  All right.  You may be seated.

6          Mr. Kehoe, please call your first witness.

7          MR. KEHOE:  Yes, Your Honor.  Mr. Burnette calls

8   Larry Daniel.

9          DEPUTY CLERK:  Please raise your right hand.

10         **LAWRENCE EUGENE DANIEL DEFENSE WITNESS, DULY SWORN**

11         DEPUTY CLERK:  Be seated.

12         Please, state your full name and spell your last

13  name for the record.

14         THE WITNESS:  Lawrence Eugene Daniel, Last name is

15  spelled D-a-n-i-e-l.

16                    DIRECT EXAMINATION

17  BY MR. KEHOE:

18  Q.  Good afternoon, Mr. Daniel.

19  A.  Good afternoon, sir.

20  Q.  What do you do for a living, sir?

21  A.  I am a technical director of digital forensics for a

22  large forensic engineering firm.

23  Q.  How long have you been doing that?

24  A.  I've been doing digital forensics for 20 years.

25  Q.  When you say "digital forensics" what are we talking

1  about?

2  A.  That's a field that encompasses computer forensics, cell

3  phone forensics, GPS, and call detail record analysis, both

4  for communications interaction and for location of cell

5  phones.

6  Q.  And during -- and how long have you been doing this, sir?

7  A.  20 years.  I have been doing the call detail record

8  analysis for 10 years.

9  Q.  Sir, do you have any certifications in your field?

10 A.  I have nine certifications; three in telecommunications,

11 one in GPS -- three, or -- yeah, three in cell phone

12 forensic; and two in computer forensic.

13 Q.  And would this entire field logically be called digital

14 forensics?  Is that the proper terminology?

15 A.  Yes, sir.  When I had began in this field 20 years, it

16 was just computer forensic.  As cell phones came online to be

17 able to be forensically examined, I started doing those 14

18 years ago.  And then we started doing other devices.  So,

19 overall, the field has come under the umbrella of digital

20 forensics.

21 Q.  Digital forensics; is that right?

22 A.  Yes, sir, that's right.

23 Q.  Have you testified in courts, both in state and federal,

24 throughout the United States as an expert in digital

25 forensics?

1  A.  I have, about 75 times and in 14 federal districts.

2  Q.  Have you ever not been qualified as an expert in that

3  field?

4  A.  No, sir.

5  Q.  Have you been qualified in federal courts?

6  A.  Yes, sir.

7       MR. KEHOE:  Your Honor, at this time, under 702, we

8  would offer Mr. Daniel as an expert in digital forensics.

9       THE COURT:  Any questions at this time from the

10  government?

11       MS. O'GARA:  No, Your Honor.

12       THE COURT:  You may proceed.

13  BY MR. KEHOE:

14  Q.  Now, I would like to show you first, before we introduce

15  them, Defendant's Exhibits 625(b), (e), (i), (j), and (m).

16       MR. KEHOE:  And if we can just put the first one on

17  the screen for Mr. Daniel.

18  BY MR. KEHOE:

19  Q.  Before we move these in, basically, what is Defendant's

20  Exhibit 625(b), I believe this is.  Yes.

21  A.  This is literally a summary of the AT&T call detail

22  record information, in this case, between Mr. Burnette's

23  phone and Paige Carter-Smith's phones.

24     And what I did in this case is I took out records that

25  didn't have anything to do with people; there were just the

1  network doing things.  So what we have here are actual call

2  attempts or completed phone calls, as well as text messages

3  and text message attempts from the records.

4  Q.  And did you have the backup information from which to

5  glean this information?

6  A.  Yes, sir.  These were all gleaned from the AT&T records

7  directly.

8  Q.  And all of the records, if we look in 625(b), (e), (i),

9  (j), and (m), are of a similar nature, are they not?

10  A.  They are.  So they're all AT&T records.

11         MR. KEHOE:  Your Honor, at this time I'd offer into

12  evidence 625(b), 625(e), 625(i), 625(j) and 625(m).

13         THE COURT:  Those are admitted.

14    (DEFENDANT'S EXHIBIT NOS. 625(b), 625(e), 625(i), 625(j)

15  AND 625(m):  Received in evidence.)

16  BY MR. KEHOE:

17  Q.  Now, before we go into this, what were you asked to do

18  with these particular records?  And we have 625(b) on the

19  screen right now, which I think you noted was the summary of

20  calls between Mr. Burnette and Paige Carter-Smith.

21     What were you called upon to do?

22  A.  Yes, sir.  I was given several thousand pages of records

23  for Mr. Burnette's phone, the 7879 number.  I was also given

24  records for Paige Carter-Smith, the 4520 number, and for Mike

25  Maddox, which would have been the same phone number sending

1    in 4521.

2    Q.  And there's a little -- there's individual information,

3    if we can blow it up on the top.

4        Can you explain -- you see that bar right above the first

5    call?  Can you take the jurors through these so they can

6    understand what all of these items are?  Sorry about that.

7    A.  It's pretty small now.

8        Yes.  So the way the AT&T does their call detail record

9    reports is they give you a set of data, and each data has a

10   line number.  So in this case, we are seeing it as an item

11   number, that's what they call it.  And the 36,860 would be

12   that line number for Mr. Burnette's records.

13       And you'll see, these are not always in chronological

14   order -- or, excuse me -- in numerical order, because we also

15   have text messages in here and they have a separate set of

16   records that starts with their own line numbers.

17       So this is all of the item numbers from the records, and

18   makes it very easy to refer back to the physical paper record

19   if you wanted to see what this record actually says.  It's a

20   call detail record.

21   Q.  If we could move over to the next column or so.  If you

22   could explain those as well.

23   A.  Yes.  So this is a connect date/time, and this is

24   actually a date/time field that is universal time

25   coordinated.

1   Q.  What does that mean?

2   A.  So universal time coordinated is a reference time zone.

3   We think of it as Greenwich mean time, or Zulu time if you're

4   in the military.  Now it's called UTC.  It's not a physical

5   place on the earth like Greenwich, England is, so it's useful

6   for generating records without having to deal with the local

7   time zones.

8       So this is what many of the carriers are going to, but

9   AT&T has been using this time stamp for a while.

10  Q.  Let's move over.  Then you have the local date.  Is that

11  self-explanatory?

12  A.  Yeah, the local date and local time are actually

13  calculations that we have done to take that UTC date/time

14  field and put it into a local date and local time for that

15  record.

16  Q.  So what you did was take the Zulu time and translate it

17  into local time.  Is that accurate?

18  A.  Yes, sir, and taking into account the shift between

19  Standard and Daylight time.

20  Q.  I say Zulu time.  You have UTC time; it's the same thing?

21  A.  Yes, sir.

22  Q.  Let's go to the next column, please.

23  A.  So this the seizure time.  And the way seizure time works

24  -- and AT&T is the only phone company that provides this to

25  us.  From the time you press "send" on your cell phone until

1  the time that someone picks up on the other end, whether it's

2  a human or a voicemail system or whatever, it counts the

3  seconds it takes for that call to connect.

4     And if you are looking at this from the standpoint of

5  when the person actually pressed that dial button, you would

6  take the connect date/time and subtract this information from

7  it.  So, if you are dealing with an accident, for instance,

8  if you want to know when the driver pressed "send" on their

9  phone, we can figure that out from this.

10 Q.  And if we can go to the next column.

11 A.  And ET stands for elapsed time.  And this is the amount

12 of time from the time it connected until the time that the

13 network released that phone from the network.

14 Q.  Explain that a little bit more.

15 A.  It's the time that the other phone disconnected,

16 basically.

17 Q.  I'm sorry?

18 A.  It's the duration of the call until somebody hangs up.

19 Q.  Understood.  And, of course, the originating number?

20 A.  Yes, sir.  That is self-explanatory.  This is the phone

21 that's dialing the call.  That's what is important.  So, if

22 you want to figure out what the direction of this call is,

23 well, for this case, it's Mr. Burnette's phone so it's 7879.

24 So any time his is the originating number, it's an outgoing

25 call; any time you see some other number on this call, it

1   would be an incoming call.

2   Q.  And let's go to the next column.

3   A.  And the terminating number is the phone number of the

4   device that answered the phone.

5       So, if you are forwarding your phone, for instance, and

6   you're forwarding it to a different number -- like sometimes

7   you do if you close your office and you forward the phone.

8   Well, if the terminating number would be the phone that

9   actually answered, not the forwarded -- not your number.

10      So that's ultimately the phone that answered -- or, the

11  device that answered.

12  Q.  Well, let me just say this.  So if I have a phone call

13  that is made to an office and that office has call forwarding

14  to a cell phone, the terminating number would be to the cell

15  phone that it was forwarded to?

16  A.  That is correct.

17  Q.  And CT?

18  A.  CT is the direction of this particular line item through

19  the last switch it went to.  So, MO and MT don't indicate the

20  direction of the phone call.  That's why we use the phone

21  numbers for that.  This only tells us what direction it moved

22  through a switch.  It's not much use to non-nerdy types, but

23  it's in there and I wanted to put it in.

24  Q.  The next column.  For the purposes of us looking at these

25  calls, is that of any independent significance?

1    A.  Not particularly, no.

2    Q.  Okay.  Let's go to the next column.

3    A.  So this is the type of call; and what I did is I created

4    a formula that takes the next column information, which is

5    called feature codes, and turns it into English.

6        So, for instance, if it's a completed call there won't be

7    a feature code, or it may have a feature code like NIOP,

8    which stands for the calling phone number was presented to

9    the person; or NOIR, which means that the calling number was

10   restricted, so you get that private caller things.  That's

11   all that is.  So I have taken and translated that back into

12   English.

13       So, call forwarded because the phone was busy or the user

14   was busy, then we have call forwarded because the person

15   didn't answer and things like that.

16   Q.  And the next column?

17   A.  And this is where I have taken and calculated whether it

18   was an incoming or outgoing phone call.  So this direction is

19   based on the phone numbers that you saw on the line.

20   Q.  And the next column?

21   A.  And this is the feature columns.  So NIOR just means that

22   the phone number wasn't presented to the other handset.

23   Q.  Could you say that again, please?

24   A.  NIOR means the subscriber's number -- the calling number

25   was restricted.  So you get the private caller at the other

1 end.

2    This one, Call Forward B means call forwarded because the

3 user was busy; and the NIOP means that the phone number was

4 presented to the other person.

5    What you will see a lot of times, if the call forward is

6 busy is what you see in the line item, the call either never

7 actually connected or it went to voicemail.

8 Q.  So this is 625(b).  If we can go to the top, please.  And

9 these are the toll records from Mr. Burnette to Paige

10 Carter-Smith?

11 A.  That's correct.

12 Q.  Between -- it's bracketed between January 1st, 2013 and

13 December 31st, 2014?

14 A.  That's correct.

15 Q.  Let us go to the next exhibit, which is 625(e).  And if

16 we can just go to the top.

17    And these are the summary of calls between Mr. Burnette

18 and an individual you know as Oglesby from January 1st, 2012,

19 to 2018.  Is there anything different in this methodology

20 than we have in the first?

21 A.  No, sir.  All of these are going to be same.  The only

22 thing that I will point out here is that now we see some text

23 messages, and we show you the direction of the text message

24 as incoming here in both instances because of the phone

25 numbers; and then we have some records that went to

1  voicemail.

2    So one of things that makes AT&T particularly difficult

3  to deal with is that they have multiple lines in their call

4  detail records for individual things that happen.  So I could

5  call you, for instance, and there could be five lines in the

6  AT&T report of all of things that happened between me dialing

7  you and you actually getting the call.  So we go through and

8  filter out that network traffic to make sure that what we are

9  showing you here are actual call attempts or text message

10  attempts as well as actual phone calls or connected and

11  whether or not they went to voicemail.

12  Q.  Now, to go through the last exhibit, we now have

13  telephone calls that are connected, text messages, voicemail,

14  and then, of course, you say completed calls.

15  A.  Yes, sir; that's correct.

16  Q.  Let us turn our attention next to the 625(i).  And if we

17  could go to the top again.  This is calls between Wes Townsen

18  and Maddox, January 1, 2013 through December 31, 2014.

19    Again, are these the similar methodology that you

20  employed with regard to the first two exhibits?

21  A.  Yes, sir, it's the same methodology.  This is derived

22  from Mr. Maddox's phone records rather than Mr. Burnette's

23  records.

24  Q.  And is there anything that is different in this

25  particular exhibit that we didn't explore with the first two?

1  A.  No, sir.

2  Q.  And let us turn our attention to, I believe the next one

3  is 625(j).  And these are calls and texts between Trey

4  Gardner and Paige Carter-Smith January 1, 2013 to December

5  31st, 2014.

6      Again, Mr. Daniel, was the same methodology employed?

7  A.  It was.  I do want to correct myself for the last slide.

8  We showed two columns one there, one labeled IMEI, which is

9  the international mobile equipment identifier.

10 Q.  Let me stop you there and flip back to that.

11 A.  If you don't mind.

12 Q.  So let's go back to 625 (i), so we get clarity about

13 that.

14     So, if we can look at -- which column are we looking at

15 here?

16 A.  The first one is the IMEI column.

17 Q.  Yes.

18 A.  And this is the international mobile equipment

19 identifier, which is the hardware serial number for the

20 device.  So everyone's cell phone has one of those, right?

21 And the second column is the IMSI, and that's the

22 international mobile subscriber identifier.  And what's

23 important about that is that for you to make a phone call on

24 the AT&T network, you have to have an AT&T subscriber

25 identity.  Yeah, so that's the way it works.

1    So you can't really make phone calls or text messages; it

2   won't work without these two number.  However, with AT&T,

3   there's exception for every rule.

4    So, for instance, this is a good example here.  If you

5   look at lines 7 and 8, or cell 7 and 8, we have two things

6   happening here, 303335 and 303336 are the same phone call.

7   That's what makes it confusing about these records.

8    So you'll notice that we don't have that IMEI or IMSI in

9   the first record in the 30335, but we have it in the second

10  one, and that's because the second one actually connected to

11  something.  The first one was just the network transferring

12  this call to voicemail.

13  Q.  Okay, sir.  And just go back to the one we were just

14  looking, 625(j).

15   Now, if there are any additional features in this

16  exhibit, you can blow that up at the top of the page there.

17  A.  There is not.  The only difference here is -- and this

18  happens in some of these tabs, is we did not show those two

19  columns.  Again, to the layperson they really don't mean

20  anything, so this is more appropriate to view just from a

21  clarity standpoint.

22  Q.  And let us go to 625(m).  And 625(m) in evidence is a

23  summary of texts and tolls with Paige Carter-Smith and Reggie

24  Cardozo.

25  A.  Yes, sir.  So this is all exactly the same thing.  We

1  have those two columns in here, but now they are reversed

2  but, again, they really don't mean anything to the layperson.

3  Everything else is exactly the same.

4  Q.  Correct me if I'm wrong.  Under the terminating number,

5  we have a column CT.  Can you remind me what that is?

6  A.  That stands for the direction of that transaction line

7  number through the last switch in the network.

8  Q.  Now, let us shift gears.  And I would like to bring to

9  your attention Defense Exhibit 626.  If I could show this to

10  you.

11     What is this, sir?

12  A.  This is actually a defense exhibit that I was given to do

13  some verification on.  So, to clarify our previous point, I

14  did not create this exhibit; it was created by someone else

15  and given to me for verification.

16  Q.  And did you, in fact, verify it?

17  A.  Yes.  I verified everything on these screens against

18  paper records and against the Government Exhibits for

19  everything that I had.  And it's all listed somewhere, but I

20  looked at a number of government screen shot exhibits.

21          MR. KEHOE:  Your Honor, at this time we would offer

22  626 as a demonstrative reserving on admission.

23          THE COURT:  All right.

24  BY MR. KEHOE:

25  Q.  If we can put 626 up on the screen.

1       Now, Mr. Daniel, in laymen's terms, tell us what is going

2   on here.  What is this exhibit?

3   A.  Well, when you text somebody on your cell phone, if you

4   have a smartphone, it's usually going to look like this on

5   your screen, something similar to this; where you are on the

6   right-hand side of the screen and everyone you are talking to

7   is on the left-hand side, in particular with an iPhone, and

8   it has something called a conversation view and that's what

9   this is.

10      And what has happened here, as a consulting company, has

11  taken all of text messages from the various Government's

12  Exhibits and put them into conversation view to make them

13  easier to the read.

14  Q.  Explain that a little bit, the conversation view being --

15  if you can blow that up a little bit.

16  A.  Sure.  So it's like you are having a conversation except,

17  obviously, with text messages you don't always respond

18  immediately, necessarily, or you may not respond at all.

19      But this one shows, for instance, Mr. Burnette sending a

20  text that showed the time, to -- I believe this is Michael

21  Maddox -- on 8/15/2015, and this is at 12:25 p.m.  And then

22  he has on 9/07 of 1215 there's two text messages, one

23  outgoing to Michael Maddox and one incoming from Michael

24  Maddox at those particular times.

25  Q.  Now, there were a series of text messages given by

1  Mr. Burnette and others and the case agents that you put

2  together; is that right?

3  A.  Again, I didn't put them together.  I just verified what

4  the consulting company did.

5  Q.  And after they were put together by the consulting

6  company, you verified that information?

7  A.  Right.  What I did is I went through, and we're viewing

8  this as it would be if you are looking at Mr. Burnette phone.

9      So I went through Mr. Burnette records and verified all

10  of these dates and times as being local to his cell phone.

11      So I would take -- for instance, this call -- this text

12  message on 8/15/2015, that local to him is the 12:25 p.m.,

13  and I would look at that UTC column and his text messages,

14  and look at the offset time to make sure this was presented

15  correctly.

16  Q.  As part of the task, is 626 a fair and accurate

17  representation of the text messages you were provided and

18  verified -- and were verified by you?

19  A.  Yes, sir.

20  Q.  And that would include the time stamps and the date

21  stamps in there as well?

22  A.  Yes, sir.

23          MR. KEHOE:  Your Honor, I have no further questions.

24          Thank you, sir.

25          THE COURT:  Cross-examine?

1                          CROSS-EXAMINATION

2    BY MS. O'GARA:

3    Q.   Good afternoon, Mr. Daniel.

4    A.   Good afternoon, ma'am.

5    Q.   I just have a couple of questions for you on these

6    exhibits that you have prepared.

7         So, am I correct in understanding from your testimony

8    that you have prepared a series of spreadsheets summarizing

9    calls and texts between different individuals; is that

10   correct?

11   A.   Between different phone numbers.  I don't know any of the

12   individuals.  So, yes, ma'am.

13   Q.   So the names that are on those summaries, where did you

14   get those names?

15   A.   They were provided to me by the attorney.

16   Q.   Okay.  Did you verify if the phone numbers on those

17   documents actually matched the individual accountholders?

18   A.   No, ma'am, I did not.  That would be a private

19   investigator's job.

20   Q.   Okay.

21   A.   I'm just the phone guy.

22   Q.   Okay.  Those records that we looked at, those summary

23   spreadsheets, the title on each one, I think it said Summary

24   of Calls and Texts; is that correct?

25   A.   Yes, ma'am.

1  Q.  Now, you said that you reviewed AT&T records in preparing

2  those summaries, correct?

3  A.  They were actually prepared from the AT&T records.

4  Q.  You reviewed the AT&T records?

5  A.  Yes, ma'am.

6  Q.  Did you review any other records to prepare those summary

7  spreadsheets from any other sources?

8  A.  No, ma'am.

9  Q.  Okay.  Mr. Daniel, do you know what an iMessage is?

10 A.  I do.

11 Q.  What is an iMessage?

12 A.  An iMessage is a message that you would send, let's say,

13 an Apple proprietary format that sends over the data rather

14 than over the cellular network.  So those messages would not

15 appear on the phone bill.

16 Q.  So the AT&T records that you reviewed and that you

17 prepared these summary sheets from, would that include -- is

18 it fair to say those don't include the iMessage texts; is

19 that correct?

20 A.  They would not; no, ma'am.

21 Q.  Okay.  So when the summary sheets that you have prepared,

22 those exhibits that we just looked at, when it says Summary

23 of Calls and Text Messages, is it fair to say that is not a

24 comprehensive summary of all calls and text messages between

25 those two individuals?

1  A.  I would say it's comprehensive for AT&T records.  I don't

2  know anything about any application traffic.  So you can talk

3  to people in multiple ways over the phone today, so there is

4  no way for me capture that.

5  Q.  Fair enough.  And iMessage is one of those ways that you

6  would communicate outside of the AT&T cellular network?

7  A.  Yes, ma'am, that's one way.

8  Q.  Are there others?

9  A.  Yes, ma'am.

10  Q.  What are some examples of other ways people may text

11  message or call each other on their phones outside of the

12  cellular network?

13  A.  Well, there's a lot of applications that you can use.

14  UVO will let you do voice calls; Google Voice will let you do

15  calls and texts.  All of those are outside of the network.

16  Q.  What about WhatsApp?

17  A.  WhatsApp, that was going to be the next thing out of my

18  mouth.  Snapchat.  There are actually dozens of application.

19  Q.  So there are numerous ways that the individuals that we

20  saw on those summaries may have been communicating with each

21  other that are not reflected on those summary sheets; is that

22  fair to say?

23  A.  Yes, ma'am.

24  Q.  And iMessage; do you understand that an iMessage is a

25  text message between two individuals who both are

1   communicating on iPhones?

2   A.  That's correct.  You can't communicate with other phones,

3   only iPhone.

4   Q.  And do you know, of those numerous spreadsheets that we

5   saw, the individuals listed on there, do you know what types

6   of phones any of them had?

7   A.  I do not.

8   Q.  Okay.  I want to ask you a couple of questions about the

9   summaries, about the text messages exhibit that you were just

10  shown.

11      You said that you verified that exhibit.  What exactly

12  did you verify?

13  A.  I verified the dates and times against Mr. Burnette's

14  phone records, and then I verified that the little screen

15  shots of the links went back to those articles, and the

16  content of the text messages as they were presented.

17  Q.  And the content of the text messages that you were using

18  to verify that exhibit, were those -- was that content drawn

19  from those screen shots of phones with text messages on it?

20  A.  From the government exhibits, yes, ma'am.

21  Q.  I want to ask you a quick question about the government's

22  exhibit.

23      Did you write a letter dated July 6th reflecting the work

24  that you had done to verify this exhibit?

25  A.  Yes, ma'am.

 1   Q.  And in that letter that you wrote, did you tell Mr. Kehoe

 2   and Mr. Jansen that you had reviewed Government's

 3   Exhibits 170, 171, 186, 203, 204, 391, 392, 393, 394, 397 and

 4   398?

 5   A.  Yes, ma'am.

 6   Q.  Do you know what all of those --

 7          MS. O'GARA:  First of all, can we pull up

 8   Government's Exhibit 391, which I believe is in evidence, I

 9   believe.  One moment.

10          Can we pull up Government's Exhibit 392.

11   BY MS. O'GARA:

12   Q.  Have you seen this exhibit before, Mr. Daniel?

13   A.  It's hard for me to see right now.

14   Q.  We can zoom in on the top of it, if you would like.

15   A.  I don't remember seeing this one, no.

16   Q.  Okay.

17          MS. O'GARA:  Can we pull up Government's Exhibit 393.

18   No, I'm sorry.

19   BY MS. O'GARA:

20   Q.  Well, so you've never seen this before; but it does say

21   Government's Exhibit 329, doesn't it?

22   A.  It does.

23   Q.  Is this one of the exhibits that you said you reviewed in

24   verifying that summary of those text messages?

25   A.  It is.

1   Q.  But you've never seen this before?

2   A.  No, ma'am.  So I apparently misspoke.

3   Q.  That was just a mistake?

4   A.  Yes.

5   Q.  That exhibit, 625 -- I'm sorry, 626 -- Defendant's

6   Exhibit 626 that you looked at or that you verified, you said

7   you verified the times on that, of those text messages; is

8   that correct?

9   A.  As they would be local time to Mr. Burnette's phone, yes.

10  Q.  The times that are reflected -- and, again, the exhibits

11  that you looked at to create or to verify the creation of

12  that exhibit, that was just the photos of the screen shots of

13  the phones; is that correct?

14  A.  That is correct, yes.

15  Q.  And so the times on those text messages, are those taken

16  just from the face of the phone, just from the screen shots?

17  A.  Yes, ma'am.

18  Q.  Do you know, sitting here today or when you verified that

19  document, where the individuals sending those text messages

20  were located?

21  A.  I can tell you, I know what time zone they were based on

22  the offset between the time stamps on the phone and the UTC

23  time in the records.

24  Q.  Well, I'm curious about that.  Can we look at one of

25  those -- show what's Government's Exhibit 203.

1          So these text messages, is this one of the exhibits that

2     you looked at to verify that summary exhibit?

3     A.  Yes, ma'am.  I remember the content of these messages.

4     Q.  Okay.  So when you looked at this screen shot of this

5     text message, how did you verify -- for example, on the

6     right-hand side -- that that text message was sent at

7     10:51 a.m.?  What did you do to verify the time when that

8     message was sent?

9     A.  Well, that is actually -- again, I'm working from what it

10    would look like on Mr. Burnette's phone, right, so -- when I

11    could find it in his records -- and I found all of these in

12    his records -- so this would be at whatever time would be --

13    his phone would be in at wherever it was.  I'm -- let me see

14    if I can say this right.

15         If you're in Florida, this is going to be presented to

16    you in Eastern Time.  If you're in Vegas, it's going to be

17    presented to you in Mountain Time.  So your phone isn't going

18    to say, oh, this is Mountain Time, but your record would show

19    an offset in October of 2015 of minus six hours -- excuse

20    me -- minus five hours in Eastern Time and seven hours in

21    Vegas time.

22    Q.  So that summary exhibit that you said -- is it fair to

23    say that you simply based the times in that summary exhibit

24    on only the defendant's phone?

25    A.  How it would have been presented to him, yes, ma'am.

1   Q.  Do you know -- first of all, the time period that those

2   text messages cover, is it fair to say that that covered more

3   than a year?

4   A.  Yes, ma'am.

5   Q.  Do you know that the defendant was in Florida for that

6   entire year?

7   A.  I don't know that, but that would make sense.

8   Q.  Do you know if he was in the same time zone for that

9   entire time period?

10  A.  There is no way for me to know that, ma'am.

11  Q.  Okay.  I also want to clarify one thing.  You repeatedly

12  referred in that when looking at that time -- I'm sorry --

13  that exhibit to the individual who was identified in there as

14  MM as Mike Maddox?

15  A.  That's my understanding.  I don't know if that's true or

16  not.

17  Q.  Okay.  Mr. Daniel, you said you are a digital forensic

18  engineer; is that correct?

19  A.  No, ma'am.  We're not engineers.  So I'm just a digital

20  forensics, I guess, guy, examiner.

21  Q.  And you don't have any factual information about this

22  case; is that correct?

23  A.  I only have phone records.

24  Q.  Okay.  And you were hired by the defendant to create the

25  spreadsheets that we saw, correct?

```
 1    A.  Yes, ma'am.

 2    Q.  And to verify that exhibit that someone else created and

 3    gave to you?

 4    A.  Yes, ma'am.

 5    Q.  And you were paid for your time, correct?

 6    A.  Of course.

 7    Q.  How much were you paid for your time to create those

 8    spreadsheets from those AT&T records?

 9    A.  I honestly don't know.  I just submit time, and

10    accounting does the billing.  So I would say probably in

11    excess of $6,000 my company got paid, not me.  I'm an

12    employee.

13    Q.  Okay.  Is it fair to say that, as of July, you'd actually

14    been paid a significant amount more than $6,000 for your work

15    in this case?

16    A.  It's very possible, ma'am.  I don't know.

17    Q.  Does $85,000 sound more like it?

18    A.  It sounds a little high, but I don't know.

19    Q.  You don't know how much money you made to do this work,

20    to create these exhibits?

21    A.  I don't do the accounting, ma'am.  I just turn in the

22    billing.

23    Q.  Okay.

24            MS. O'GARA:  Thank you, Your Honor.

25            THE COURT:  Redirect?
```

*David Adams - Direct*

1        MR. KEHOE:  Yes, sir.

2                         REDIRECT EXAMINATION

3    BY MR. KEHOE:

4    Q.  Let me show you a couple of documents that you were asked

5    about.  Let's go to Defense 392.

6         Now, sir, Defense 392, was that one of the exhibits that

7    you were provided?

8    A.  It is.

9    Q.  And were you also told that that exhibit had come from

10   the government?

11   A.  That is correct.

12   Q.  And let us go to Defense 397.  Is that a --

13   A.  That is one that I reviewed.

14   Q.  Is that, likewise, a document that had come from the

15   government?

16   A.  That was my understanding, yes.

17        MR. KEHOE:  Nothing further.  Thank you very much,

18   Mr. Daniel.

19        THE COURT:  Thank you, Mr. Daniel.  You may step

20   down.

21        Please call your next witness.

22        MR. KEHOE:  The defense calls Mr. David Adams.

23        Your Honor, he's coming.

24        DEPUTY CLERK:  Please raise your right hand.

25        *DAVID P. ADAMS, III, DEFENSE WITNESS, DULY SWORN*

1           DEPUTY CLERK:  Be seated.

2           Please, state your full name and spell your last

3  name for the record.

4           THE WITNESS:  David P. Adams, III, A-d-a-m-s.

5           THE COURT:  Mr. Adams, you may have a seat.  And if

6  you are comfortable, you can remove your mask while you are

7  testifying.

8           THE WITNESS:  Thank you, sir.

9                      DIRECT EXAMINATION

10  BY MR. KEHOE:

11  Q.  Good morning, Mr. Adams.  Would you like to push up a

12  little bit so that the microphone is right in front of you.

13  A.  All right.

14  Q.  Mr. Adams, what do you do for a living?

15  A.  Business valuation and economic advisory work for

16  businessowners.

17  Q.  And what does that mean?

18  A.  I help people understand what their businesses are worth

19  and how to maximize shareholder value.

20  Q.  And do you have any degrees and certifications that you

21  have obtained in this area?

22  A.  I do.  I'm a mechanical engineer, and I have an MBA in

23  international banking and finance.  I am a CPA.  I'm

24  accredited in business valuation, and I'm also an accredited

25  senior appraiser with the American Society of Appraisers.

*David Adams - Direct*

1  Q.  Sir, have you -- would your expertise be in business

2  evaluations and economics?

3  A.  Yes; that's correct.

4  Q.  And in that particular area, how long have you been

5  involved in that area?

6  A.  Oh, well, Adams Capital celebrates our 25th anniversary

7  this month.  Prior to that, I was ten years working with,

8  primarily, KB&G and Coopers & Lybrand.

9  Q.  So, just to get this out of the way.  Now, you have been

10  hired by Mr. Burnette.  How much have you been paid to date?

11  A.  I believe I have been paid $20,000 to date.

12  Q.  Now, just tell us a little bit before we go into your

13  expertise on business valuations and economics, what does

14  that mean?

15  A.  Well, any time somebody makes an investment, they are

16  trying to get a return on their investment.  So we have our

17  IRAs, our 401(k)s, and that money is invested in businesses,

18  and you are trying to get a little return on that money and

19  your money back.  So I help people make better decisions

20  about that process of investing money.

21  Q.  And, Mr. Adams, have you testified previously as an

22  expert in courts, both on the federal and state level?

23  A.  Yes, I have.

24  Q.  And have you qualified as an expert in business

25  valuations and economics?

*David Adams - Voir Dire*

2096

1    A.  I have.

2          MR. KEHOE:  Your Honor, at this time we would offer,

3    under Rule 702, Mr. Adams as an expert in business valuations

4    and economics.

5          THE COURT:  Any questions at this time?

6          MR. NOTHSTEIN:  Very briefly, Your Honor.

7                        VOIR DIRE EXAMINATION

8    BY MR. NOTHSTEIN:

9    Q.  Mr. Adams, do you have any experience in the real estate

10   business specifically?

11   A.  Well, I'm an owner of several investment properties.

12   Q.  In your professional work, do you do valuations for real

13   estate?

14   A.  Well, many clients who we -- we work with their real

15   estate portfolios in valuing the operating businesses that

16   manage the real estate and how they structure their

17   investments in real estate.

18         MR. NOTHSTEIN:  No objection, Your Honor.

19         THE COURT:  You may proceed.

20                        DIRECT EXAMINATION

21   CONTINUED BY MR. KEHOE:

22   Q.  Mr. Adams, tell me a little bit, you were provided some

23   information that had some nomenclature that is common in your

24   area of expertise; is it not?  You were provided

25   information --

1   A.   I was provided information about -- it referencing

2   preferences and carried interests.  Yes, that's normal

3   terminology in my industry.

4   Q.   So, can you break this down?  Have you heard -- excuse

5   me -- heard the term of "waterfall distribution"?

6   A.   Yes, sir.

7   Q.   Can you explain to the jury what that is?

8   A.   So, waterfall -- if you just imagine a waterfall, it's

9   just the -- and I like to think, if you have ever seen the

10  waterfall, I think it's in South America, might be Brazil, it

11  starts with a lot of water and by the time it gets to the

12  bottom, it's just a mist.  It's so far, there's just nothing

13  left at the bottom.

14      And that's kind of how financial waterfalls work as well.

15  The people at the top, who I'll call them the primary

16  investors, but it's like the bank on your house, they get

17  paid before -- if you sell your house, they get paid first;

18  and then, if there is any money left, that's your equity and

19  that's what you get.  So you're further down on the waterfall

20  than the bank.

21      Property taxes actually come before the bank.  So the

22  property tax gets paid first, then the bank, and then you.

23  That would be an example of a waterfall that all homeowners

24  deal with.

25  Q.   In this waterfall distribution, are you familiar with the

1   terms of return on capital, preferred return, and promote

2   payment?

3   A.  Yes.  Return on capital, preferred, promote are all

4   terms, again, that we work with routinely in our industry.

5   Q.  Can you explain those to the jury?

6   A.  Sure.

7   Q.  Well, before we do, would a demonstrative assist you in

8   that regard?

9   A.  That would be awesome.  Yes, sir.

10   Q.  So using the demonstrative that is currently on the

11   screen, could you explain it?

12   A.  There it is.

13   Q.  Is that a demonstrative that would assist you in

14   explaining these money flow and the return on capital to the

15   jurors?

16   A.  Yes.  This is helpful.

17       So this is a little --

18       MR. KEHOE:  I would move into evidence for

19   demonstrative purposes.

20       MR. NOTHSTEIN:  Your Honor, we do object.

21       THE COURT:  Sustained.  You're going to have to match

22   it up to this case before we go further with it.

23   BY MR. KEHOE:

24   Q.  So, in looking in this particular case, can you explain

25   the three categories you're talking about, return on capital,

*David Adams - Direct*

1    a preferred, and a promote?  What are those?

2    A.  Well, so a return of capital is if I invest a dollar, I

3    want to get my dollar back.  That's the return of capital.  I

4    just get my money back.  I haven't made a return on it, I

5    just get my money back.  And that's something, at a minimum,

6    we always want to do when we are making an investment, is get

7    our money back.

8        And then the preferred return, in this case it's the 12

9    percent return, so I want to get my dollar back plus another

10   12 cents.

11   Q.  When you say "in this case," did you cull that from the

12   evidence and the transcripts that you were given in this

13   case?

14   A.  When I read the transcripts, the 12 percent preference

15   was referenced, so I just used 12 percent in my example.  But

16   it could be 6 percent, it could be 18 percent.  So you

17   negotiate.  You negotiate the preference.

18       As an entrepreneur, if I'm trying to raise capital in the

19   market, my interest is raising that capital at the lowest

20   possible cost.  So I would want my preferred return, my

21   preference, to be low.  But as an entrepreneur, the people

22   with the money might see me as a risky investment, and they

23   want to get a higher return on their investment.

24       And so we negotiate and come up with a return that they

25   thought would be fair for the risk they're taking, and a

1   return that I thought I could still make money on the deal

2   after paying the return.  So the preference, typically, that

3   rate is negotiated.

4   Q.  And you took the 12 percent return from the transcripts,

5   the taped transcripts that you were provided?

6   A.  Yes, sir, I did.

7   Q.  And the last category you were talking about is the

8   promote.  What does that mean?

9   A.  Well, the promote is -- if I'm an investor and I got my

10  money back and I get my 12 -- I get my dollar back and my 12

11  cents back, so I'm pretty happy as an investor at this point.

12  I feel like I've gotten a good return.

13      But I took the risk, and there is more money left because

14  the deal maybe performed extraordinarily well.  And let's say

15  there's an extra 30 cents left.  So our deal made a dollar --

16  $1.42.  So that 30 cents left would get divided:  80 percent

17  would go to the investor, and 20 percent -- 6 cents -- 20

18  percent of 30 cents would go to the promote.  And that's a

19  typical -- typically, you will see an 80/20 split, but this

20  is negotiated as well.

21  Q.  The time frame, is it your experience that the time frame

22  of these types of transactions -- like your real estate

23  portfolios that you looked at, are those over a period of

24  time?

25          MR. NOTHSTEIN:  Objection, Your Honor, relevance.

1          THE COURT:  Sustained.

2    BY MR. KEHOE:

3    Q.  Well, just looking at what you saw here, is there a

4    period of time that you focused on for this entire

5    transaction for return on capital, preferred return, and

6    promote?

7    A.  Well, what I generally see in the marketplace is --

8          THE COURT:  Mr. Adams, it's going to help us if you

9    could answer the questions that Mr. Kehoe asks you.

10          THE WITNESS:  I'm sorry.  I was sort of already on my

11    answer.  Could you repeat the question, please?

12    BY MR. KEHOE:

13    Q.  Did you -- generally on these returns from the evidence

14    that you looked at, on a time frame, what is the time frame

15    that you are talking about here before the return on capital,

16    preferred return, and the promote?

17    A.  I typically see 10 percent.

18          MR. NOTHSTEIN:  Objection.

19          THE COURT:  Mr. Hurley, he didn't ask what you

20    typically see.  He asked you about this case.

21          THE WITNESS:  Okay.

22          THE COURT:  I sustained an objection to a question

23    about what you typically see.

24          THE WITNESS:  All right.

25          THE COURT:  We're not here to talk about general

1   questions.

2           THE WITNESS:  Okay.

3           THE COURT:  We're here to talk just about this case.

4           THE WITNESS:  All right.

5           THE COURT:  So his questions need to be just about

6   this case and your answers need to respond to his questions.

7           THE WITNESS:  Yes, sir.  I'm sorry, sir.

8           So in this case, what I read was 7 to 10 years, was

9   the overall expected life for the whole thing to play out.

10  And a capital return would take place in years 1 through 4,

11  and years 5 through 6 or so would be the 12 percent return

12  would get paid out.  And then after that begins any -- if

13  there is anything left, after paying the capital return and

14  the preferred, then the promote would be paid out 80/20 to the

15  investors.

16  BY MR. KEHOE:

17  Q.  And is the chart that you have here based on your

18  understanding of the facts in this case overlaid with your

19  knowledge as to how this methodology is employed?

20  A.  Yes, sir.  That was the purpose of putting this chart

21  together.

22          MR. KEHOE:  Your Honor, I would move this in as a

23  demonstrative aid.

24          MR. NOTHSTEIN:  Your Honor, we do object.

25          THE COURT:  Let me talk to you.

1          (Conference held at the bench.)

2          THE COURT:  My first question is this:  Frankly,

3     maybe I missed it.  I don't recognize the facts that he

4     testified to from the testimony that was given in the case.

5     Now we are talking about a number of different alternatives,

6     how this deal might work; but, one, for example, Mr. Burnette

7     was going to be an investor right from the get-go.  I thought

8     the first percentage given was 10, not 12, but then there was

9     a discussion maybe 12.  I don't recall any testimony that it

10    was going to be 7 to 10 years before this played out.  You

11    can't have this man come in and make up the facts.  Where did

12    he get these facts?

13         MR. KEHOE:  And this was early on when Your Honor saw

14    that they said, okay, Scott Maddox was going to get --

15    Mr. Burnette was going to get 20 percent of the promote and

16    Scott Maddox was going to get paid from that.  So these

17    tapes -- and, yes, the deal did change over time, you're

18    absolutely right.

19         THE COURT:  There is no testimony in this case about

20    the deal this man testified to, is there?

21         MR. KEHOE:  He's explaining the terminology.

22         THE COURT:  You can ask him the terminology.  But you

23    can't have him put numbers on here like 7 even to 10 years

24    when --

25         MR. KEHOE:  I putting the terminology in, making it

1    easier.  I don't need to use the exhibit itself, Judge.  If

2    Your Honor is uncomfortable, we won't use it.

3              THE COURT:  It's not that I'm uncomfortable.  The

4    expert can't testify to things that are not supported by the

5    evidence.

6              MR. KEHOE:  He looked at the tape recordings that

7    were provided by the government; and, if you recall, for

8    instance, the tape recording going back to Nashville, the 20

9    percent of the promote, et cetera, those are issues.

10             THE COURT:  Who said it was going to be 7 to 10

11   years?  Who did that come from?

12             MR. KEHOE:  The tapes.

13             MR. NOTHSTEIN:  This is nowhere in the tape.  This

14   witness's disclosure does not discuss the time frame like

15   this.

16             THE COURT:  I sustain the objection.  Look, he can't

17   come up with the 7 or 10 years without testimony to support

18   it.

19             MR. KEHOE:  Yes, Your Honor.

20             THE COURT:  Let's focus on this case.

21        *(End of bench conference.)*

22             MR. KEHOE:  Your Honor, I have no further questions.

23             THE COURT:  Cross-examine?

24                            CROSS-EXAMINATION

25   BY MR. NOTHSTEIN:

1    Q.  Good afternoon, Mr. Adams.

2    A.  Good afternoon.

3    Q.  So, just to understand what you did here -- well, let me

4    back up.

5        Just in general, you listened to excerpts of recordings

6    you were provided by the defense; is that correct?

7    A.  That's correct.

8    Q.  And that was sort of everything you had to do your work,

9    right?

10   A.  Well, I have a lot of experience in similar deals for

11   many years.  But, yes, this was everything I had specific to

12   this case.

13   Q.  My apologies, that was a bad question.

14       In addition to your experience, those are the facts on

15   which you relied in arriving at your opinion; is that right?

16   A.  Generally, yes; that's correct.

17   Q.  And the structure of this transaction, as far as you saw,

18   initially was that -- and this was from September 2016 -- was

19   that Mr. Burnette was proposing to receive 20 percent of that

20   pref that you were just discussing, right?

21   A.  Well, there seems to be some confusion amongst the

22   parties on the transcript as to 20 percent of what.  And

23   Mr. Burnette was - seemed to be very clear that it was 20

24   percent of the preference.  After everybody got paid, after

25   they got their preferred interest, only then would there be

1    20 percent of preference available to Mr. Burnette; and

2    still, then, 80 percent of the preference goes to the

3    original investors.

4    Q.  Got it.  But that was what he was proposing, 20 percent

5    of the pref?

6    A.  That's my understanding.  It's a similar deal term.

7    Q.  In addition, or later on, he proposed a different setup;

8    isn't that right?  At this point -- let me ask a better

9    question.

10        Later on down the road, he proposed that he would

11   actually put in money as an investor; is that true?

12   A.  Yes.  And one of the things that is common in the

13   marketplace is for the promoters to also invest in their own

14   deals.  In fact, a lot of investors will not invest unless

15   the promoter has money in the deal as well.

16   Q.  To be clear, that's what he was proposing in the

17   recordings from January of 2017 that you listened to,

18   correct?

19   A.  Yeah.  He was talking about in addition to the promote,

20   he would put in his own money.

21   Q.  In addition to that, he also offered to take out a loan;

22   isn't that right?

23   A.  He did, he offered to take out a loan.

24   Q.  And he offered to personally guaranty that loan?

25   A.  That was implied, but -- yeah, maybe he would have, maybe

1  not.

2  Q.  Well, what I'm asking is that's what you heard him say in

3  those recordings, correct?

4  A.  Well, what I heard was somebody pitching or selling a

5  deal, and he was very persuasive in that.  But the reality is

6  he probably wouldn't have a personal guaranty on that note.

7  Q.  Just to be clear, the person pitching that deal was

8  Mr. Burnette?

9  A.  That's my understanding.

10  Q.  And, as he explained in the recording that you listened

11  to, that he preferred the loan because it would bring about a

12  faster return; is that right?

13  A.  Yes.

14  Q.  And, of course, everybody would like a faster return?

15  A.  Well, you get your money back faster, you can make a

16  better return.

17  Q.  Of course, he's expecting his money back.

18  A.  Well, he's got to pay the bank, too.  But, yes, everybody

19  is expecting to get the money back.

20  Q.  But as you said in the very beginning, the reason that

21  people are investing when you are advising them is to help

22  them get their money back plus a little bit more, right?

23  A.  Well, that's the reason we want to invest.  But when you

24  borrow money, you have to pay the bank before yourself.  So

25  your investment, after the bank money, becomes a little more

1    risky.

2    Q.   But what I'm saying is that's the reason that someone

3    would go to invest and why you advise them, is to help them

4    get their money back plus a return?

5    A.   We all want to get our money back and a return, yes.

6    Q.   Now, so you told us before that in conducting your

7    review, you paid approximately -- or you were paid $20,000;

8    is that right?

9    A.   That's right.

10   Q.   What's your hourly rate?

11   A.   It's $595 an hour.

12   Q.   By my count, the transcript pages you reviewed was about

13   16 pages.  Does that sound correct to you?

14   A.   Maybe about that.

15   Q.   So that's -- and by my math, $20,000 at $595 an hour,

16   that is about 33.6 hours.  Does that sound correct?

17   A.   I'll trust your math on that.

18   Q.   Okay.  So now, as you said, in your work you were

19   reviewing these recordings, and you state in the sort of

20   letter you drafted for this that your opinions are based on

21   these excerpts and audio recordings; is that right?

22   A.   My opinions are based on the audio recordings and my

23   experience with similar matters.

24   Q.   Of course in your experience.  But as far as the facts to

25   apply your experience to, those are from the audio

1    recordings, right?

2    A.  Yes, I gleaned a number of facts from the audio

3    recordings.

4    Q.  And you assumed that the information you are being

5    provided is accurate, correct?

6    A.  I assume that's what they said, that it was transcribed

7    accurately, yes.

8    Q.  So you were listening to what the defendant -- what

9    Mr. Burnette was describing as a proposed transaction,

10   correct?

11   A.  Well, I was listening to conversation.

12   Q.  And you were able to sort of apply your expertise to

13   that, because you believed that they meant what they said,

14   what they were proposing, correct?

15   A.  Yes, I believe they meant what they said.

16   Q.  And there was nothing that you heard in there to think

17   that anybody was kidding or play-acting, do you?

18         MR. KEHOE:  Objection to the form.

19         THE COURT:  Overruled.

20         THE WITNESS:  Well, what I heard was more of a sales

21   pitch.  It wasn't like a final deal; this is just -- it was an

22   educational, this is how deals work.  That's what I heard.

23   BY MR. NOTHSTEIN:

24   Q.  So like a sales pitch, like someone wanted to buy

25   something; does that sound right?

1   A.  That's a little -- but there was clearly an educational

2   element, because it seemed a little lopsided on the

3   understanding of the terms.

4   Q.  And, in fact, that lopsided nature was the other folks in

5   the room and Mr. Burnette was the one who was clearly more

6   financially savvy; is that right?

7   A.  That was my interpretation.

8   Q.  So as he was explaining things to the other people, there

9   was nothing you heard to make you think that he didn't mean

10  exactly what he was saying when he was explaining those

11  things?

12  A.  Well, I mean, what I heard was, you know, a competent

13  explanation of economics in normal deal terms, nothing

14  unusual.

15          MR. NOTHSTEIN:  Thank you, nothing further.

16          THE COURT:  Redirect?

17          MR. KEHOE:  Yes, sir.

18                      REDIRECT EXAMINATION

19  BY MR. KEHOE:

20  Q.  Mr. Adams, you were just talking a little bit in response

21  to some questions by my colleague concerning the promote.

22      Let's get clear here.  We are talking about a return on

23  capital from these deals, a preferred return, and the last

24  part is the promote, right?

25  A.  That's correct.

1  Q.  And Mr. Burnette was taking -- was talking about taking

2  20 percent of the promote?

3  A.  20 percent of the very last piece, the promote.

4  Q.  The very last piece?

5  A.  Uh-huh.

6  Q.  So all of these folks that are the investors and are

7  getting the preferred return get paid before the promote

8  people do, right?

9  A.  That's correct.

10  Q.  Now, we were talking to -- counsel just talked to you

11  about levered and un-levered returns.  A levered return is

12  borrowing money from the bank, right?

13  A.  Yes.

14        MR. NOTHSTEIN:  Your Honor, I'm going to object.  I

15  don't believe there were any questions about that.

16        MR. KEHOE:  Yes.

17        THE COURT:  The terms weren't used.  Ask another

18  question.

19  BY MR. KEHOE:

20  Q.  So, and an un-levered return is not using bank money,

21  right?

22  A.  We -- when we leverage, we borrow money from the bank.

23  Like when we mortgage our house, we're borrowing money from

24  the bank.  And un-leverage, you are able to pay cash for the

25  house.

1    Q.  And when he's taking about getting money back quicker, an

2    investor's money back quicker, you pay the bank what the bank

3    owes and what is remaining is to the investor.  So in the

4    leverage situation, you have money being paid back to the

5    bank and the money then going back to the investor, the

6    preferred return and the promote, right?

7    A.  Something like that.  But the bank can be sometimes just

8    a little more patient about getting their money back, and so

9    you -- it's like your mortgage on your house; you pay every

10   month the same amount but -- and if you get, you know, a

11   bonus on your paycheck, you don't have to pay the bank extra

12   money, you get to keep the extra.

13        And that's a lot of -- one of the reasons that investors

14   can get a return more quickly with bank money is because they

15   are paying the bank a fixed amount.

16   Q.  And what Mr. Burnette and the rest of these people on the

17   tapes were talking about is just another way to structure a

18   business deal, wasn't it?

19            MR. NOTHSTEIN:  Objection, Your Honor, leading.

20            THE COURT:  Sustain.

21   BY MR. KEHOE:

22   Q.  Well, was it your interpretation looking at this as they

23   were thinking about structuring a business deal in various

24   different ways?

25   A.  Well, in real estate, there are pretty much, I'll call

1    it, three different ways to buy it:  You could pay all cash;

2    you can borrow some money from a bank and pay cash for the

3    rest; or, you can borrow some money from the bank -- borrow

4    some money from some investors at a higher rate of percent

5    and not put any of your own money in.  So, if you will, no

6    cash.

7         So what I read in the transcript was that, the leverage

8    of using the bank and some investor money, or using all of

9    investor money.

10             MR. KEHOE:  Thank you very much, sir.

11             No further questions, Your Honor.

12             THE COURT:  Thank you, Mr. Adams.  You may step down.

13             Please call your next witness.

14             MR. JANSEN:  Judge, we are going to call Mr. Burnette

15   today.

16             THE COURT:  This is the day we were not going to run

17   beyond 5:00.  I take it he would be beyond 5:00.

18             MR. JANSEN:  Yes, sir.

19             THE COURT:  Let me talk to you on the headphones just

20   a second.

21        *(Conference held at the bench via headphones.)*

22             THE COURT:  What else do you have on the defense?  Is

23   Mr. Burnette last?

24             MR. JANSEN:  Maybe not, Judge.  We may have one or

25   two other witnesses.

1          THE COURT:  Can you not put them on now?

2          MR. JANSEN:  They are not here, Judge.

3          THE COURT:  Okay.  All right.  I think I propose to

4    quit for the day.  Anybody have a different view of that?

5          MR. NOTHSTEIN:  No, Your Honor.

6          MR. KEHOE:  No, Your Honor.

7     *(End of bench conference.)*

8          THE COURT:  Members of the jury, as you heard, the

9    next witness for the defense is going to be Mr. Burnette.  He

10   will be on longer, and today is the day where somebody had a

11   matter to deal with, I promised you we would be out of here

12   before 5:00.  So we're going to adjourn for the day.  Enjoy

13   your last 45 minutes.

14         Recall my instructions:  Don't talk about the case

15   with anybody; don't let anybody talk about it in your

16   presence; don't get any information from any other source.

17         Have a pleasant evening, safe trip home, and back in

18   the morning.  We will again start at 9:00.  I know there is a

19   potential glitch there, but plan to be here at 9:00, and we

20   will start when we can.

21         Jury out, please.

22     *(The jury exited the courtroom at 4:13 p.m.)*

23         You may be seated.

24         I had raised the question once before.  If there is

25   an acquittal, this doesn't come up.  If there is a conviction,

1   the forfeiture question comes up.  Do you expect to wish for a

2   jury trial on the forfeiture question?

3          MR. KEHOE:  We will conduct that in front of the

4   court, Your Honor.

5          THE COURT:  So a bench trial.

6          MR. KEHOE:  Yes, sir.

7          THE COURT:  So the jury will not be coming back, and

8   I will not be preparing forfeiture instructions.

9          I interrupted Mr. Adams at one point.  I was kind of

10  keeping track.  It was about the third question in a row where

11  he had gone completely away from the question and he was

12  getting into matters where there had been a motion in limine

13  and, in fact, I had sustained the objection in part.  So I

14  thought it important to tell him to wait for the question.

15  It's only fair for the opposing side to hear the question

16  before they hear the answer.

17         We've got the motion in limine we can talk about.

18  It's moot with respect to Mr. Adams, obviously.  Mr. Daniel

19  wasn't subject to it, but we have a couple of others.  The

20  defense said in the bench conference you may have one or two

21  other witnesses.

22         MR. JANSEN:  Yes, sir.

23         THE COURT:  They may all be moot.  I mean, the reason

24  I asked is because often the defendant testifies last, not

25  always, but that's why I asked if he was going to be your last

1    witness.  You think you are going to call others?

2           MR. KEHOE:  Yes, sir.  I think Mr. Quintero is moot.

3           THE COURT:  Because he's not going to testify?

4           MR. KEHOE:  No, he's not, Judge.

5           THE COURT:  All right.  So Mr. Doyle I guess is the

6    only one left?

7           MR. NOTHSTEIN:  He is, Your Honor.  But I think based

8    on the questioning, we would expanded our motion regarding

9    Mr. Doyle to include Mr. Hurley as well.  I can address that.

10   Your Honor, it wasn't in our papers.  I didn't expect what

11   happened today.

12          THE COURT:  All right.  I don't know if you're

13   planning on calling Mr. Hurley back.

14          MR. KEHOE:  I have to talk to my client.  We haven't

15   resolved that yet, on Mr. Hurley, to get through some of the

16   stuff that I wanted to ask him on cross, but I will check with

17   him.

18          THE COURT:  Partly that was clearly beyond the scope

19   of the direct.  It also sounded like it was just going to be

20   argument -- you were just going to argue with him.

21          MR. KEHOE:  I don't think so, Judge.  I mean, I was

22   not just going to just argue with him.  I was at the point of

23   asking him those questions.

24          THE COURT:  Sometimes I say things too colloquially

25   or too vividly.  Not argue in the sense of arguing, but

1    questions that were argumentative, what would legally be

2    called argumentative.  Wasn't that it?

3            MR. KEHOE:  We ask questions that are what somebody

4    else does.

5            THE COURT:  But, I mean, what factual questions?  The

6    problem was what -- back up.

7            I understand there's a difference between a judge's

8    perspective of what a witness ought to be asked and a lawyer's

9    perspective of what a witness ought to be asked.  We judges

10   like for the questions to go to facts known to the witness so

11   that we get the facts out.  That's really the point of calling

12   witnesses.  And lawyers want to get the facts out, too, but

13   you are also trying to win the case.  I get it.

14           And so while I'm going to give you closing argument

15   at the end of the case, you would like to get your closing

16   argument in as the case goes along.  And that goes on, that's

17   part of every trial, both sides do it, and that's okay up to a

18   point.  But the rules do provide for me to sustain objections

19   to questions that are argumentative; that is, that have no

20   prospect of getting out factual information from the witness

21   but that are, instead, just making an argument to the jury.

22           So I tolerate that to a point.  I give you some

23   leeway there, but only to a point and only some leeway.

24           So, if the point is to beat the FBI up over the way

25   they conducted the investigation, we're past that point.  I'm

1  going to tell the jury that whether they approve or don't

2  approve how the FBI conducted the investigation is not the

3  issue in the case.

4           MR. KEHOE:  Well, the other issue going to the false

5  statements with regard to what is charged in the indictment

6  that was the basis for playing that tape were questions that

7  the government has now said this was the statement, this was

8  the lie.  And my cross-examination was, on those particular

9  issues, there is the answer here, answer here, answer here,

10  which belies the allegation that this was not true.

11           THE COURT:  Well, I would have let you ask Mr. Hurley

12  while he was on the stand those questions.

13           MR. KEHOE:  I was trying to do that, Judge.

14           THE COURT:  No.

15           MR. KEHOE:  I beg to differ, Judge.  I was trying to

16  do that.

17           THE COURT:  There is at least one of those questions

18  where there was an answer and then an equivocation.  And if

19  you wanted to cross and redirect him to the equivocation, you

20  would have been welcome to do it.  But the question that you

21  asked and I sustained the objection to was going to not what

22  Mr. Burnette said on the tape, but what other evidence there

23  was or what other answers could have been given.

24           Now, in any event, at this point it certainly would

25  serve no purpose to call Mr. Hurley back and have him read

1  another part of the transcript or part of the transcript that

2  has already been played.

3          MR. KEHOE:  Your Honor --

4          THE COURT:  Is that what you're trying to do?

5          MR. KUNZ:  We're talking past each other.  Because

6  there was one set of questions I had concerning the FBI, and

7  Your Honor sustained an objection.  Then I moved into the

8  false statements to ask him about items on the tape and ask

9  particular questions about those items on the tape.  There was

10  an objection by counsel and Your Honor sustained it, and then

11  you told me I couldn't go into it.

12          There were two distinct areas.  One was completely

13  separate from the other, and I know it was that way because I

14  had a completely separate folder, but you told me I couldn't

15  do it.  And then I consulted with co-counsel as to what we

16  needed to do, and with my client just briefly.  But that's

17  where I was going with that.

18          THE COURT:  Well, you know, I filed an order the

19  other day on the revision of history coming out of the

20  defense; and if I need to do it again, I'll do it again.  But,

21  look, we're not accomplishing anything here.  There is a

22  transcript of what was said and what wasn't said.

23          MR. KEHOE:  Your Honor --

24          THE COURT:  What do you want to ask Mr. Hurley?  Give

25  me an example of a question that you think you could properly

1    ask that I sustained an objection to.

2         MR. KEHOE:  The particular false statement that the

3    government claims is a false statement, right, let's say, one,

4    you know, not knowing if the checks went to.  The checks went

5    to two separate companies.  The whole idea that he lied about

6    not knowing Paige Carter-Smith's business, he gave them Paige

7    Carter-Smith's name.  He also forgot the name of Miller and

8    Butler.  I have to submit to you, Your Honor, those are

9    fruitful areas of cross-examination.

10        THE COURT:  Who the checks were sent to is not a

11   matter within Mr. Hurley's personal knowledge, wasn't the

12   subject of the direct.  So I sustained the objection, and

13   properly so.  And what you just said makes my point.  It's not

14   inconsistent with what I told you.  It confirms that I had it

15   right.  You just told me that what you were going to ask was

16   not what was said by Mr. Burnette during that conversation,

17   but what the real facts were.

18        MR. KEHOE:  That's the basis of their charge for the

19   false statements, Judge.

20        THE COURT:  Yes, it is.

21        MR. KEHOE:  Okay.  And if --

22        THE COURT:  You go ahead.

23        MR. KEHOE:  They are taking that statement, and they

24   are saying, okay, this is not true.  And the investigator

25   certainly is more than apt or able during the course of this

1    investigation -- which is why I asked him if he had

2    familiarized himself with everything -- more than apt to know

3    where those individual checks went to.

4              THE COURT:  Let me ask you this.

5              MR. KEHOE:  Sure.

6              THE COURT:  If the government came in here and called

7    an FBI agent who had no personal knowledge of the transaction

8    and said, who did Mr. Burnette pay money to, you think that

9    would be okay?  Of course not.

10             MR. KEHOE:  Judge --

11             THE COURT:  We beat this to death.  You can make

12   those arguments to the jury.  The time to make them is in

13   closing argument, not by making your argument while

14   Mr. Hurley, who has no personal knowledge of who got the

15   checks, is on the witness stand.

16             You can call Mr. Hurley if you have a factual

17   question of something within his personal knowledge that goes

18   to an issue in this case.  Don't call him to make a jury

19   argument.

20             MR. KEHOE:  Yes, sir.

21             THE COURT:  Don't call him just to beat up the

22   government over the way they conducted the investigation.

23             Mr. Doyle, you plan to call Mr. Doyle?

24             MR. KEHOE:  I do not believe so, Judge.

25             THE COURT:  That moots that.  That's a long

1  discussion of a moot motion.  Is there anything you really

2  need me to decide at this point on the motion in limine?

3  Apparently not.

4          MR. NOTHSTEIN:  There are two left, Your Honor.

5  Nancy Linnan and Keith Dantin.

6          THE COURT:  Oh, yeah.  Are you still planning on

7  calling Nancy Linnan?

8          MR. KEHOE:  Yes.

9          THE COURT:  And she's going to say, what, annexation

10 is a foregone conclusion?

11         MR. KEHOE:  I think she's going to talk about the

12 procedure to get it done, et cetera, yes.

13         Judge, one of the things, when you read this motion,

14 which is something we had a litany of from the defense, is --

15         THE COURT:  From the government.

16         MR. KEHOE:  Excuse me -- from the government is

17 trying to preclude the defense from putting on a defense,

18 because they are somewhat uncomfortable about all of this.

19         With all due respect, Judge, just hear me out.  And

20 that's what -- this is not the first isolated incident of

21 this.  This has been going on for quite a period of time.  And

22 the attempt is to prevent the defense from putting on exactly

23 that -- a defense.

24         THE COURT:  Nancy Linnan is going to testify about

25 how the process would work, what would need to be done to get

1    Fallschase approved.

2              MR. KEHOE:  Yes, sir.

3              THE COURT:  Fair enough.  And who is the other one?

4              MR. NOTHSTEIN:  The other expert was Keith Dantin,

5    Your Honor.  But there's also the matter of sort of the 404(b)

6    evidence regarding Killearn and Imagine Tallahassee.

7              THE COURT:  We do need to discuss that.  Who is the

8    other expert?

9              MR. NOTHSTEIN:  Keith Dantin.

10             THE COURT:  Dantin?

11             MR. NOTHSTEIN:  He will testify to the same thing as

12   Ms. Linnan.

13             THE COURT:  Isn't one enough?

14             MR. KEHOE:  It may very well be, Judge.  There are

15   some issues concerning one of those witnesses that I prefer to

16   tell you at sidebar, but it may very will be that one is

17   enough.

18             THE COURT:  All right.  Again, this is really not the

19   central part of this, but certainly you can call at least one

20   of those to address how the process works and what would be

21   going on with Fallschase.

22             MR. KEHOE:  Yes, Your Honor.

23             THE COURT:  Killearn, what do you plan to prove about

24   Killearn?

25             MR. KEHOE:  Killearn and Imagine Tallahassee, this

 1   entire case, all of these tapes, is going to this political

 2   capital, and this is an explanation from our client of exactly

 3   what political capital is, that he has political capital.

 4          THE COURT:  Mr. Burnette is going to testify about

 5   Killearn?

 6          MR. KEHOE:  Killearn, and also Imagine Tallahassee.

 7          THE COURT:  But not one of these others, but so this

 8   would be part of Mr. Burnette's testimony?

 9          MR. KEHOE:  That's correct, Judge.

10          THE COURT:  So what he's going to say about Killearn

11   is he got involved 45 days ahead, he managed to bring it in

12   for a landing, it was successful, he didn't have to bribe

13   anybody?

14          MR. KEHOE:  There's a little more detail than that,

15   but that's exactly -- well, it's more than that in the sense

16   of why does this man have political capital before the

17   commission?  He's got political capital because he has done a

18   series of things on behalf of the city that the city wants,

19   and this is Exhibit A and Exhibit B of what exactly the city

20   wants that he has done, and he has basically -- I don't want

21   to say unilaterally, that's a little extreme.  But he was the

22   driving force by turning a very difficult situation into a

23   successful situation.  And did he do that because of his

24   political capital?  Absolutely.  Did he then earn political

25   capital because of that?  Absolutely.

1        It's a significant part of the defense that we put a

2   different understanding of political capital than the one the

3   government wants to do, which is always in a negative place.

4   And that's just not the case, and we'll point you to a case in

5   fact during the same time frame where he did this.

6        THE COURT:  All right.  Let me tell you where you are

7   on this:

8        There's a significant body of precedent on the other

9   side of this issue.  I take it your side didn't bring any

10  cases to cite.

11       MR. KEHOE:  Not right now, Judge.

12       THE COURT:  There's a list of cases on this.  This is

13  not the first time a defendant has tried to say, even in a

14  corruption case, look at these other three times when I didn't

15  pay a bribe, and the courts have pretty consistently said, no,

16  you can't do that.

17       Now, Professor Capper called it a tough sell trying

18  to use it that way.

19       This case is not quite like those cases.  There has

20  been a lot of discussion about political capital, but also

21  about how things get done in Tallahassee.  You've got

22  discussions of bribes and filling up the cup, and then you've

23  got statements, maybe false exonerations, saying, oh, we just

24  do things on the merits.

25       As I ruled earlier, I'm going to allow some evidence

1    about the Killearn transaction.  You need to get into it and

2    get out of it.  It doesn't need to be long.

3         Even aside from the 404(b) question about whether

4    this kind of evidence can come in at all -- I'll come back to

5    that -- there's also a 403 issue about this kind of evidence.

6         I come back to 404(b).  Look, testimony that he's a

7    good guy, he's done good projects, that kind of testimony in a

8    criminal case, good character evidence, comes in under 405 or

9    not at all.  Of course, 405 limits the kind of evidence that

10   can be presented, and prior good acts is not within the scope

11   of the evidence that can be presented, and that's mostly what

12   the cases I referred to say.

13        One of those cases, I have a cite in front of me,

14   maybe *United States versus Dimora*, D-i-m-o-r-a, 750 F.3d 619

15   at page 630, a 6th Circuit case from 2014.  There are others.

16   Professor Capper addresses this, and I don't have the cite

17   right in front of me.

18        Under the 403 analysis, it's not terribly probative.

19   Just because somebody can get one deal done without paying a

20   bribe doesn't mean the person wouldn't pay a bribe to get a

21   harder deal done.  So it doesn't have a lot of probative

22   value.  It has very little prejudicial impact.  He may have

23   done good things.  The government probably put on a couple of

24   projects that he apparently did well in their case.  We are

25   not here to try whether he has done other good projects or

1    not.  We're here to decide whether he paid a bribe in

2    connection with the property at the corner of Monroe and

3    Tennessee, the proposed option extension, or whether he

4    extorted or accepted a bribe in connection with the FBI's

5    fictitious operation.

6         The merits of the Killearn project have absolutely

7    nothing to do with that or just very little.

8         So, yeah, he can talk a little bit about how he does

9    business, the fact he was involved in that.  But the

10   discussion of Killearn ought to be, what, five minutes?  Not

11   much more than that.

12        What else?  That's that one.

13        MR. NOTHSTEIN:  That's all, Your Honor.

14        THE COURT:  All right.  I'm working on instructions.

15        Mr. Nothstein, let me --

16        Thank you, Mr. Kehoe.  You can go back and mask up

17   and give Mr. Nothstein a chance.

18        MR. JANSEN:  Judge, may I be heard?

19        THE COURT:  Okay.  You won that, but if you want to

20   tee it back up, have at it.

21        MR. JANSEN:  Judge, I'm going away from Killearn.

22        THE COURT:  All right.

23        MR. JANSEN:  It's to Imagine Tallahassee.

24   Government's Exhibit 8 on that tape, they played Imagine

25   Tallahassee on the tape, Judge.  Our position, Judge, is that

```
 1  he discussed delivering the politics, and he also discussed

 2  multiple times he had political capital.

 3          Our position is he had political capital and he also

 4  discussed how his wife took on the city and beat them down,

 5  and that was the Imagine Tallahassee, and our client was

 6  intimately involved in that.

 7          THE COURT:  Remind me what the Imagine --

 8  embarrassing to ask -- what Imagine Tallahassee was?

 9          MR. JANSEN:  It was a citizen initiative, the

10  blueprint dollars --

11          THE COURT:  That's the one percent sales tax?

12          MR. JANSEN:  Yes, sir.

13          THE COURT:  Okay.  I forgot the name.

14          MR. JANSEN:  They wanted to get the citizens involved

15  it in, and they did.  He was instrumental in doing that.  He

16  described it, and it was on tape with the agents, and he was

17  using that as a mechanism saying how he delivered politics,

18  why he had political capital already, and that's what he's

19  going to want to testify to.

20          THE COURT:  So that one is even less than the five

21  minutes, but --

22          MR. JANSEN:  Less than five minutes?

23          THE COURT:  Right.  You're not talking about very

24  long.  We don't need to talk about the campaign.  Look, I've

25  got 12 people on the jury.  I'm going to give you a rough
```

1    guess that eight of them voted in favor of the one cent sales

2    tax and four voted again it, or maybe seven to five, just

3    based on the way it passed.

4            MR. JANSEN:  We will try to limit it, Judge.

5            THE COURT:  Right.  The point you just made, fair

6    enough.

7            MR. JANSEN:  Okay.

8            THE COURT:  Just make the point, get in and get out.

9    Let's don't relitigate whether the one percent sales tax is a

10   good idea or not.

11           MR. JANSEN:  No, I'm not doing that.

12           THE COURT:  Here's the question:  I will tell the

13   jury, of course, that, if Mr. Burnette paid $100,000 -- I

14   won't use the number, but you get it -- essentially, if he

15   paid the $100,000 for Mr. Maddox to abstain, not to vote on

16   the option extension, or to persuade the other commissioners

17   to vote it down, that's bribery.

18           What if he paid $100,000 to Paige Carter-Smith not to

19   represent McKibbon?

20           MR. NOTHSTEIN:  So, Your Honor, I think what that's

21   coming down to is simply the factual question of what the

22   agreement was.

23           THE COURT:  Right.

24           MR. NOTHSTEIN:  So I think, if there is sort of a

25   mixed motive, it just comes down to the jury about whether or

1  not part of the agreement was that a thing of value was going

2  to the -- or a thing of value was exchanged for a public

3  official agreeing to take an official act.  It's as simply as

4  that.

5        THE COURT:  My inclination is to say that, if he paid

6  $100,000 for Ms. Carter-Smith not to work on the matter, even

7  if Mr. Maddox got part of the money, even if that was

8  unethical as it could be, it's not bribery.

9        MR. NOTHSTEIN:  If there is no official act, there is

10 no bribery -- if there's no agreement to take an official act,

11 there's no bribery.  Ms. Carter-Smith's representation would

12 not be an official act.

13       THE COURT:  All right.  That's what I think the law

14 is.  I just wanted to give you a chance to address that.

15       MR. NOTHSTEIN:  We agree on the law, Your Honor.

16       THE COURT:  That's probably the McDonald case or

17 maybe not quite.

18       MR. NOTHSTEIN:  Yeah.  And it gets into mixed motive.

19       THE COURT:  But there is a lot of that.

20       MR. NOTHSTEIN:  Okay.

21       THE COURT:  All right.  The other question I was

22 working through, I still haven't -- I'm trying to get language

23 on interstate commerce that is acceptable.

24       Is there anything different about interstate commerce

25 in any of these than interstate commerce instructions I give

 1   in all manner of cases?

 2           MR. NOTHSTEIN:  I don't believe so, Your Honor.  I

 3   would have to look at the instructions that we put together

 4   and used before, the pattern instructions, but I don't believe

 5   so.  Simply interstate commerce is interstate commerce.

 6           THE COURT:  Well, the proposal, I think it was your

 7   proposal, that we had was long and convoluted.  Mine may be

 8   more to the point.  I mean, interstate commerce shouldn't

 9   really be a question here.

10           MR. NOTHSTEIN:  No, sir.

11           THE COURT:  I mean, it's an issue that the government

12   has to prove, but it's not -- if the defense gets down to

13   interstate commerce, they're going to be unhappy with where

14   it's gone up to that point.

15           All right.  Anything else we can address?

16           MR. KEHOE:  No, Your Honor.

17           THE COURT:  I did mention to you, I expect to start

18   at 9:00 in the morning.  We have a juror with a medical

19   appointment.  She is first up at 8:00.  She should be

20   finished, so she ought to be here without any difficulty,

21   but -- enough said.  She needs to be able to see the doctor,

22   and I don't think it would delay anything, but we will deal

23   with it as we can.

24           Please be here at quarter of 9:00, and if I don't

25   hear you have an issue, I'll plan to be in the room at 9:00.

1        Let me tell you one more thing.  I said I would get

2   the instructions over CM/ECF.  It turns out that's not the

3   best idea because then that hits the public.  And it will be a

4   draft at that point.  So I will figure out a way to email them

5   to you, if I get them done tonight.

6        You may rest tomorrow.  I mean, I take it, we may

7   finish tomorrow.

8        MR. KEHOE:  I don't think so, Judge.

9        MR. JANSEN:  No.

10        THE COURT:  Fair enough.  You answered my question.

11        We're adjourned.

12      (The proceedings adjourned at 4:41 p.m.)

13                * * * * * * * *

14

15

16

17   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
18   redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
19   transcript.

20

21

22   *Judy A. Gagnon*                    *7/26/2021*
     Judy A. Gagnon, RMR, FCRR                Date
23   Registered Merit Reporter

24

25

<pre>
 1                              INDEX

 2


 3
        WITNESSES FOR THE GOVERNMENT:                        PAGE
 4

 5      SCOTT MADDOX
             DIRECT EXAMINATION BY MR. NOTHSTEIN............. 1878
 6           CROSS-EXAMINATION BY MR. KEHOE.................. 1961
             REDIRECT EXAMINATION BY MR. NOTHSTEIN........... 2023
 7
        EVAN HURLEY
 8           DIRECT EXAMINATION BY MR. NOTHSTEIN............. 2044
             CROSS-EXAMINATION BY MR. KEHOE.................. 2049
 9           CROSS-EXAMINATION BY MS. O'GARA................. 2084

10
                   *   *   *   *   *   *   *   *
11

12      WITNESSES FOR THE DEFENDANT:                         PAGE

13
        LAWRENCE EUGENE DANIEL
14           DIRECT EXAMINATION BY MR. KEHOE................. 2068
             REDIRECT EXAMINATION BY MR. KEHOE............... 2093
15
        DAVID P. ADAMS, III
16           DIRECT EXAMINATION BY MR. KEHOE................. 2094
             VOIR DIRE EXAMINATION BY MR. NOTHSTEIN.......... 2096
17           DIRECT EXAMINATION CONTINUED BY MR. KEHOE....... 2096
             CROSS-EXAMINATION BY MR. NOTHSTEIN.............. 2104
18           REDIRECT EXAMINATION BY MR. KEHOE............... 2110

19
                   *   *   *   *   *   *   *   *
20

21                                                           PAGE

22      GOVERNMENT RESTS                                     2054
        RULE 29 MOTION BY THE DEFENSE                        2055
23

24

25
</pre>

1                    GOVERNMENT'S EXHIBITS

2
    <u>NO</u>.:              DESCRIPTION                    PAGE
3
    85      May 24, 2017 Interview of J.T. Burnette    2048
4
    86      Transcript of May 24, 2017 interview of J.T.  2048
5           Burnette

6    88      Nov. 19, 2012 S. Maddox  Oath of Office    1899

7   103      Feb 27, 2014 Form 8B filed by S. Maddox re:  1931
             Feb. 12, 2014 agenda item 13.05, "Approval
8            of fourth extension of purchase
             option agreement with McKibbon Hotel Group"
9
    105      Dec. 6, 2016 S. Maddox Oath of Office      1901
10
    191(a    Summary of Commission meeting held 4/24/13  1914
11  )
    201      Texts between J.T. Burnette and S. Maddox  2035
12
    298      Plea Agreement - Scott Maddox             1879
13
    299      Plea Supplement - Scott Maddox            1882
14

15              *   *   *   *   *   *   *   *

16                    DEFENSE EXHIBITS

17
    <u>NO</u>.:              DESCRIPTION                    PAGE
18
    625(b)   Summary of calls and texts between JT     2071
19           Burnette and Carter-Smith

20  625(e)   Summary of calls and texts between JT     2071
             Burnette and Oglesby
21
    625(i)   Summary of calls and texts between Townsen  2071
22           and Maddox

23  625(j)   Summary of calls and texts between Gardner  2071
             and Carter-Smith
24

25

1    625(m).    Summary of calls and texts between        2071
                Carter-Smith and Cardozo
2
     645        2017-02-22 City Meeting Summary            1998
3

4
                          *   *   *   *   *   *   *   *
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25