IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                          4:18CR76-RH

JOHN THOMAS BURNETTE.
_____/

## RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

Defendant John Thomas Burnette, pursuant to Federal Rule of Criminal Procedure 29(c), files his Renewed Motion for Judgment of Acquittal on Counts Two, Five, Six, Eight, and Nine of the Second Superseding Indictment.

## INTRODUCTION

Burnette renews his Motion for Judgment of Acquittal because there is insufficient evidence to sustain a conviction on each element of every count. This case stands before the Court in a far different light following the jury's verdict. The jury acquitted Burnette on the RICO conspiracy count (Count One), meaning that Burnette cannot be liable on *any* counts on a theory of conspiracy liability. *See* Jury Instructions, ECF 433, at 19-20. The jury also acquitted Burnette of participating in a scheme to defraud the public of honest services resulting in the first two $10,000 checks sent by the FBI's front operation (Counts Three and Four). That fact compels acquittal on Counts Two, Five, Six, and Eight. The jury found that Burnette did not

participate in the alleged scheme's initiation, and no evidence proves beyond a reasonable doubt that he subsequently joined an alleged scheme at a later date.

For the reasons set forth herein, this Court should enter judgment of acquittal on Count Two (Extortion Under Color of Official Right) because there is insufficient evidence of complicity with Maddox, causation, and/or the official act element; on Counts Five and Six (Honest Services Mail Fraud) because there is insufficient evidence of Burnette's involvement in a scheme to defraud or intent to defraud or of the official act that was the supposed purpose of such scheme; and on Count Eight (Travel Act) because there is insufficient evidence of bribery, in part because the specific phone call that is the basis of that count does not contemplate any official act.

In addition, the evidence does not support Burnette's false-statements conviction (Count Nine) because the questions posed to Burnette were fundamentally ambiguous, his answers were not false, and the questions and answers did not concern a material matter.

## LEGAL STANDARD

The question on a motion for judgment of acquittal is whether a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In ruling on such a motion, the Court must view the evidence in the light most favorable to the Government.  *See*

*United States v. Sellers,* 871 F.2d 1019, 1021 (11th Cir. 1989) (citing *Glasser v. United States,* 315 U.S. 60, 80 (1942), *superseded by rule on other grounds, Bourjaily v. United States,* 483 U.S. 171 (1987)).   The Court must resolve any conflicts in the evidence in favor of the Government.   *See United States v. Taylor,* 972 F.2d 1247, 1250 (11th Cir. 1992).   The Court must also accept all reasonable inferences that tend to support the Government's case.   *See United States v. Burns,* 597 F.2d 939, 941 (5th Cir. 1979).   The Court must accept all of the jury's "reasonable inferences and credibility determinations."   *Sellers*, 871 F.2d at 1021 (citing *United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir. 1984)).

## LEGAL ARGUMENT

The evidence is insufficient on every element of every count.   In particular, Burnette highlights the following deficiencies.

## I.   Count Two (Extortion Under Color Of Official Right)

To sustain a conviction against Burnette for Extortion Under Color of Official Right, the Government must "show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States*, 504 U.S. 255, 268 (1992).   Importantly, "[a] private citizen can neither extort money 'under color of official right' nor can he or she extort money by actual or threatened fear of economic loss *unless* there is complicity of a public official." *United States v. Bryant*, 697 F. Supp. 457, 467 (M.D. Fla. 1988)

(emphasis added).  This rule makes sense:  as the Court instructed the jury, extortion requires "a public officer's receipt of money or anything else of value in exchange of an official act."  ECF 433, at 8.  As a private citizen, Burnette can be liable for extortion (or attempted extortion) only if he aided and abetted Maddox—*i.e.*, "willfully join[ed] together" with [Maddox] in the commission of a crime."  *Id.* at 19; *see also, e.g., Ocasio v. United States*, 136 S. Ct. 1423, 1432-33 (2016) (explaining that private individuals are incapable of obtaining property under color of official right but may be liable for conspiring to help a public official do so).[1]  Because the Government's evidence does not demonstrate the required knowledge and complicity of Maddox or Burnette, Burnette should be acquitted on Count Two.

Maddox and Janice Paige Carter-Smith ("Carter-Smith") – both of whom were cooperating Government witnesses – rejected any possibility that they were involved or complicit in any extortion plan.  Specifically, Maddox denied participating in any plans of extortion during cross-examination:

> Q. Before we end up on the whole Southern Pines transactions, were you individually a part of any plan to extort any money throughout any of that?
> A. Throughout all what?
> Q. Throughout the dealings with the Southern Pines folks that we talked about this morning. **Were you part of any plan to extort anybody?**
> **A. No.**

---

[1] As noted above, the jury's acquittal on Count One forecloses conspiracy liability on the remaining counts under the instructions given to the jury.  *See* p. 1, *supra*.

Trial Tr. vol. 10, 2014:7-14, July 26, 2021 (emphasis added). Without Maddox's involvement, there is no extortion in which Burnette could have participated. Maddox further explained that he believed the checks related to Southern Pines Development were for legitimate lobbying in Leon County (where Maddox is not a public official). Trial Tr. vol. 10, 1986:1-13, July 26, 2021. Without Maddox's knowledge that the checks from Southern Pines Development to Governance were in exchange for his official acts, there is insufficient evidence to support Count 2.

Carter-Smith's testimony further requires acquittal. Carter-Smith testified that she was never knowingly part of any unlawful activity. Trial Tr. vol. 6, 1018:11-1019:14, July 20, 2021. Throughout the entire time that Carter-Smith received checks from Southern Pines Development, it was also her understanding that she was being paid to lobby in Leon County on behalf of Southern Pines Development for Fallschase. Trial Tr. vol. 4, 938:23-940:6, 949:10-21, July 15, 2021. Maddox and Carter-Smith did not plead guilty to any racketeering conspiracy with Burnette (Gov. Exs. 298 and 293), and the jury acquitted Burnette of being involved in a racketeering conspiracy with Maddox and Carter-Smith. ECF 442. The Government's lack of evidence of complicity between Burnette, Maddox, and Carter-Smith was manifest in these outcomes.

Burnette thus did not aid and abet Extortion Under Color of Official Right. Under the aiding and abetting statute, a jury can find "a person guilty of a substantive

crime even though that person did not commit all acts constituting elements of the crime." *United States v. Broadwell*, 870 F.2d 594, 608 (11th Cir. 1989).  But to establish aiding and abetting, "the government must prove that the defendant in some way associated himself with the criminal venture, that he wished to bring it about, and that he sought by his actions to make it succeed."  *Id.*; *see also* Jury Instructions, ECF 433, at 19 (defendant must "willfully associate in some way with the crime and willfully participate in it").  As the Court instructed the jury, "[m]ere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime." Jury Instructions, ECF 433, at 19.  As the evidence shows that Burnette did not have any official right and that Maddox was not complicit with Burnette, Burnette cannot have aided and abetted Extortion Under Color of Official Right.

The jury's acquittal on Counts Three and Four further forecloses aiding and abetting liability.  As charged in the indictment, the Government alleged that Maddox, Burnette, and the FBI agents agreed in fall 2016 that the FBI front company would pay Maddox $10,000 per month in exchange for official acts.  Second Superseding Indictment, ECF 145, at ¶¶ 43-49.  The Government labored to convince the jury in closing argument that Burnette knew about the payments made in November and December 2016, Trial Tr. vol. 15, 3100-3101, Aug. 11, 2021, because Burnette's participation in and knowledge of those *first* monthly payments

is central to the Government's claim that he aided and abetted Maddox's alleged extortion scheme (and/or participated in a scheme to defraud). The jury's acquittal on Counts Three and Four demonstrates that it rejected this core component of the Government's case.

The Government's extortion case collapses in light of the acquittals on Counts Three and Four. For the reasons just explained, the extortion count cannot rest on the Government's allegation that Burnette aided and abetted a supposed agreement in fall 2016 that resulted in the first two payments. And, critically, no evidence proves beyond a reasonable doubt that Burnette and Maddox joined together between the date of the second check (December 18, 2016) and the third check (January 23, 2017). The only relevant event between those two dates is the Dallas meeting on January 9, 2017, when FBI agents told Burnette that they had *already* started making the payments and Burnette warned them that stopping payments could have negative consequences.

As the Court instructed the jury, "knowledge that a crime is being committed" does not give rise to aiding-and-abetting liability. Jury Instructions, ECF 433, at 19. So too, Burnette's failure to stop an alleged extortion scheme that the Government alleges had already commenced—an alleged scheme that the jury verdict establishes commenced *without* Burnette's willing participation—does not create aiding-and-abetting liability because it does not establish that Burnette willfully joined with

Maddox in a scheme between December 18, 2016 and January 23, 2017.  Given that the jury found that Burnette was not involved in the initiation of the scheme, his statements warning the FBI agents that stopping payment would have negative consequences are insufficient to show that he later willfully joined with Maddox.  The Government adduced no evidence of any later cooperation, coordination, or collusion between the two.  Similarly, the evidence does not establish that Burnette "*caused* Southern Pines Development LLC to pay money directly or indirectly to Mr. Maddox," or aided or abetted any such payment.  ECF 433, at 13 (emphasis added).  The jury's verdict establishes that the supposed agreement to make monthly payments arose in fall 2016 *without* Burnette's complicity.

In addition, the evidence did not show that any payment was tied to a promise to perform an "official act," *McDonnell v. United States*, 136 S. Ct. 2355, 2367-72 (2016), as is required to prove extortion under color of official right.  *See* Jury Instructions, ECF 433, at 8-9.  To meet the official act requirement, the Government must both identify a "question, matter, cause, suit, proceeding or controversy that may at any time be pending or may by law be brought before a public official," and "prove that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *McDonnell*, 136 S. Ct. at 2368 (quoting 18 U.S.C. § 201(a)(3)) (cleaned up).  "The agreement need

not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain." *Id.* at 2371. But the Government must identify a "specific and focused" matter on which the official agreed to act, *id.* at 2372, as well as an agreement "to perform specific official acts," *Evans*, 504 U.S. at 268.

Here, the evidence does not prove either a specific and focused matter or specific official acts. The evidence showed that Southern Pines paid Maddox not for any official act on any specific project, but at most for some unidentified future act on an unidentified future project. *See, e.g.*, Gov. Ex. 40, at 3 (Transcript of Oct. 24, 2016 phone call) (Miller stated payments were for "something" in the future, and Burnette acknowledged Southern Pines did "not know exactly what you're doing").[2] As a result, the extortion count fails for lack of an official act.

## II. Counts Five And Six (Honest Services Mail Fraud)

For Counts Five and Six, there is insufficient evidence that Burnette engaged in a scheme to defraud, much less with the *specific intent to defraud* required for conviction. To convict Burnette for Honest Services Mail Fraud, the Government "'must show that the accused intentionally participated in a scheme or artifice to

---

[2] Burnette submits that acquittal is also required on this count because the evidence does not prove that the public official, Maddox, induced the payments in question. This argument is, admittedly, foreclosed under current precedent. *See Evans*, 504 U.S. at 256. Burnette submits that the Supreme Court's decision in *Evans*, which merges extortion under color of official right with bribery, was erroneous. *See Silver v. United States*, 141 S. Ct. 656, 656 (2021) (Mem.) (Gorsuch, J., dissenting from denial of certiorari) (calling for the Court to revisit *Evans*). Burnette raises this argument for purposes of preserving it for further appeal.

deprive the persons or entity to which the defendant owed a fiduciary duty of the intangible right of honest services, and used the United States mails to carry out that scheme or artifice.'" *United States v. McNair*, 605 F.3d 1152, 1200 (11th Cir. 2010) (citing *United States v. Browne*, 505 F.3d 1229, 1265 (11th Cir. 2007)).  As is the case with Extortion Under Color of Official Right, "private citizens, *acting in conjunction with a public official*, may be adjudged guilty of violating section 1346 *if* the official colluded with the citizen to use his public office to serve the citizen's interests at the public's expense." *United States v. Woodard*, 459 F.3d 1078, 1087 (11th Cir. 2006) (emphasis added).  There is no such conjunction or collusion here for the reasons just discussed.

At trial, Carter-Smith and Maddox denied being part of a fraudulent scheme related to the checks in these counts.  Trial Tr. vol. 4, 928:20-22, July 15, 2021; Trial Tr. vol. 10, 1986:1-1987:12, July 26, 2021.  To the contrary, Carter-Smith and Maddox believed that Governance was retained for legitimate lobbying *in Leon County*, as opposed to the City, for Fallschase, and *not* to influence Maddox.  Trial Tr. vol. 6, 1105:8-10, July 20, 2021; Trial Tr. vol. 10, 1986:1-1987:12, 1996:11-16, July 26, 2021.  The Government did not provide any evidence that Burnette acted in conjunction with Maddox.  There is not a single recording of a conversation between Burnette and Maddox that shows that they colluded in any bribery scheme and Maddox confirmed that no such conversation took place:

Q. And they had you listen to a series of phone calls that Mr. Burnette had with these guys from Southern Pines, Mr. Miller and Mr. Sweets, right?

A. Yes, sir.

Q. And in some of those calls, Mr. Burnette said that you were going to be there for them, that you wanted to get paid, that you were going to be the political solution, that you were essentially open to being on the payroll. Do you remember those tapes?

A. Yes, sir.

Q. And you told the government -- and correct me if I'm wrong -- you told the government that you were shocked when you heard those tape recordings, weren't you?

A. Yes, sir.

Q. And you said to them you were shocked by what Mr. Burnette was telling them, right?

A. Correct.

**Q. Because you had never had any conversation with Mr. Burnette about anything involving Southern Pines where you said anything that you did was for sale, did you?**

**A. No.**

Trial Tr. vol. 10, 1961:20-1962:15, July 26, 2021 (emphasis added); *see also id*. at 1963:16-20.   To the contrary, Carter-Smith testified at trial that it was her understanding throughout the time that the four $10,000 checks were received by Carter-Smith (two of which the jury returned a verdict of not guilty) that Southern Pines Development was not paying for any influence from Maddox.  Carter-Smith explained her understanding of the $40,000 payment and what transpired at her last meeting with Southern Pines Development on March 27, 2017 – less than two months before the end of the investigation:

Q. And what he wanted to directed [sic] towards is, hey, I want to know what influence I'm going to get, criminal influence, I'm going to get for my $40,000; isn't that right?

A. Correct.

**Q. And you and Mr. Maddox said, you're paying $40,000, you aren't paying for anything; isn't that right?**

**A. Correct.**

Q. And I think you got a little upset with some of the comments that Mr. Sweets made, didn't you?

A. I did.

Q. What did you get upset about?

A. Well, basically -- and I don't remember all of the details, but -- basically, he was cutting me off, wouldn't let me finish, and I was trying to explain to him what a lobbyist does, and he was very dismissive; that he kept saying, people buy influence in Tallahassee, you're, you know, it's very difficult to do business here, people buy influence. I said, no, that's why you hire a lobbyist, a lobbyist can help you work through the process. So it was that type of conversation. And he wanted to know what he was getting for his money, and that he wanted guarantees for his $40,000.

**Q. And you nor Mr. Maddox gave him any guarantees?**

**A. Neither of us gave him any guarantees.**

Q. Suffice it to say that your conversation here, you think you are going there to talk about what you're going to do on Fallschase, a project in the county?

A. Well, I invited myself to talk about that, yes.

Q. You invited yourself to talk about --

A. They did not invite me.

Q. My apologies. But you invited yourself to go to this meeting to talk about what you were going to do in Fallschase, which is in the county?

A. Yes.

Trial Tr. vol. 4, 938:23-940:6, July 15, 2021 (emphasis added).  Carter-Smith's

belief that the $40,000 payment was for legitimate lobbying for Fallschase in Leon

County is well documented throughout the evidence admitted at trial.  *See* Gov. Exs. 174 and 177.   Carter-Smith sent a lobbying agreement to Southern Pines Development stating that she was to be retained to lobby Leon County.  She then put forth substantial effort to follow up with Southern Pines Development to arrange a time to meet when she received no direction from her client.  Without any evidence of collusion from Maddox and solely with evidence to the contrary, there is insufficient evidence to sustain a conviction on Counts Five and Six for Honest Services Mail Fraud or for aiding and abetting.

Additionally, as discussed above, the jury's acquittal on Counts Three and Four forecloses any finding beyond a reasonable doubt that Burnette participated in a scheme to defraud that resulted in the mailing of the third and fourth checks.  The jury verdict establishes that if any scheme to defraud existed, Burnette did not participate in its initiation.  And, again, no evidence proves that he joined any such scheme between December 18, 2016 and January 23, 2017.  *See* pp. 7-8, *supra*.

In addition, for the reasons stated in the discussion of the extortion count, the evidence does not prove beyond a reasonable doubt the official act element.

## III.   Count Eight (Travel Act)

Judgment of Acquittal should be entered on Count Eight because, for all the reasons already explained, there was insufficient evidence at trial that Burnette, Carter-Smith, or Maddox ever agreed to a bribe or any other unlawful activity or that

Burnette used his phone on October 24, 2016 with the specific intent to facilitate bribery.  A Travel Act violation requires showing that the defendant traveled or used a facility in interstate commerce "with intent to . . . promote, manage, establish, carry on, or facilitate the [same], of any unlawful activity, and thereafter performs or attempts to perform" an act such as extortion or bribery.  18 U.S.C. § 1952(a)(3).

Without a bribe, there can be no facilitation of a bribe.  There is no evidence that Burnette agreed to or facilitated a payment in exchange for Maddox's agreement to perform an official act.  Maddox testified that he never had a conversation with Burnette involving Southern Pines where he said anything that he did was for sale or about wanting to get paid through Governance.  Trial Tr. vol. 10, 1962:12-15, 1963:16-20, July 26, 2021.  When Maddox listened to the recordings and calls between Burnette and the undercover agents, including this October 24, 2016 call, he was "shocked" and "upset" that Burnette was "selling falsehoods" and was "full of shit."  Trial Tr. vol. 10, 1962:5-15, 1962:18-1963:2, 1964:2-1965:1, July 26, 2021.  Importantly, Maddox testified to the following:

> Q. And you said to them you were shocked by what Mr. Burnette was telling them, right?
> A. Correct.
> Q. Because you had never had any conversation with Mr. Burnette about anything involving Southern Pines where you said anything that you did was for sale, did you?
> A. No.

Trial Tr. vol. 10, 1962:9-15, July 26, 2021.  Without any bribe to facilitate, Burnette cannot be convicted on Count Eight for violating the Travel Act or aiding and abetting same.

Critically, for Burnette to have had the "specific intent to facilitate bribery" during the phone call, Jury Instructions, ECF 443, at 16, he must have intended to pay something of value "in exchange for the officer's performance of, or agreement to perform, an *official act*." *Id.* at 7 (emphasis added).  But Burnette did not identify, or even imply, an official act in the October 24, 2016 phone call.  As explained above, bribery for an official act requires identification of a specific matter that is or may by law come before the official, and a specific action that the official agrees to take.  *Supra* pp. 8-9.  Burnette did not identify a specific matter or act in the phone call.  Nor did he identify the possible of a future vote "on any not-yet-known matter that might later come up for a vote," in the words of the Jury Instructions.  ECF 443, at 8.

In the call, Burnette asked whether Southern Pines is "fairly certain you're going to do a deal in Tallahassee," Miller responded "we're gonna get something," and Burnette responded, "I just hate to see you guys spend money and not know exactly what you're doing."  Gov. Ex. 40, at 3.  Similarly, Burnette referred vaguely to Maddox "be[ing] there when he's needed," without any suggestion of an official act.  This ambiguity is the antithesis of an official act.  Because there was no specific

matter or specific official action contemplated, there could be no bribery and therefore no facilitation of bribery.

## V.    Count Nine (False Statements)

Judgment of acquittal should be entered on Count Nine because (1) one or more of the questions posed to Burnette were fundamentally ambiguous and (2) there is insufficient evidence of falsity, intent to deceive, and materiality.

Fundamental ambiguity.  The law is settled that answers to questions that are fundamentally ambiguous are insufficient as a matter of law to support a false statement conviction.  *See United States v. Manapat*, 928 F.2d 1097, 1099 (11th Cir. 1991).  A question is fundamentally ambiguous as a matter of law when it lacks a "meaning about which men of ordinary intellect could agree."  *Manapat*, 928 F.2d at 1100 (quoting *United States v. Lattimore*, 127 F.Supp. 405, 410 (D.D.C. 1955), *aff'd by an equally divided court*, 232 F.2d 334 (D.C. Cir. 1955)).  It is improper

> to indict and prosecute an individual for perjury when the questions forming the basis of the charge are so vaguely and inarticulately phrased by the interrogator as to require the jury to probe the inner workings of the accused's mind to seek to ascertain which of several plausible meanings he attributed to the ambiguous inquiries when he gave the allegedly perjurious responses.

*Id.* at 1099; *see id.* at 1101 ("When the question that led to the allegedly false response is fundamentally ambiguous, we cannot allow juries to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made.").  Because "[p]recise questioning is imperative as a

predicate for the offense of perjury," "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Bronston v. United States*, 409 U.S. 352, 360, 362 (1973).

Courts have identified a variety of factors that demonstrate fundamental ambiguity, including: "(1) the inherent vagueness—or, conversely, the inherent clarity—of certain words and phrases, (2) the compound character of a question, (3) the existence of defects in syntax or grammar in a question, (4) the context of the question and answer, and (5) the defendant's own responses to allegedly ambiguous questions." *United States v. Strohm*, 671 F.3d 1173, 1179 (10th Cir. 2011). When a question is fundamentally ambiguous, a "jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner." *Id.* at 1185 (citing *Bronston*, 409 U.S. at 359).

This Court acknowledged these principles when it previously denied co-defendant Carter-Smith's Motion to Dismiss and stated:

> If, when the evidence is presented at trial, it turns out that the statement at issue was made in response to a fundamentally ambiguous question or that, in context, the statement was true, Ms. Carter-Smith will prevail, either by judgment of acquittal or not-guilty verdict.

ECF 105, at 2.

When a question that forms the basis of a false-statements count is fundamentally ambiguous, a court commits *legal* error in giving the issue to the jury to decide. *See, e.g.*, *United States v. Schulte*, 741 F.3d 1141, 1149 (10th Cir. 2014) ("Whether the question itself is unable to legally support a perjury or false statement conviction depends on whether it contains a 'fundamental ambiguity.'"); *see also Manapat*, 928 F.2d at 1109 ("[W]hen a line of questioning is so vague as to be fundamentally ambiguous, the answers associated with the questions posed may be insufficient *as a matter of law* to support [a] perjury conviction." (emphasis added) (internal quotation marks omitted) (second alteration in original)).  And, when a jury convicts a defendant of false statements, and at least one of the at-issue questions is fundamentally ambiguous, the conviction cannot stand.  *See Schulte*, 741 F.3d at 1149 (citing *Griffin v. United States*, 502 U.S. 46, 56-57 (1991)).  In that situation, the jury was improperly presented with "a legally inadequate theory" of guilt, and because the court cannot know which theory the jury chose, acquittal is required.  *Id.* (quoting *Griffin*, 502 U.S. at 59).

Materiality.  Moreover, a false statement must be material in order to support a conviction under 18 U.S.C. § 1001.  The materiality requirement "exclude[s] 'trivial' falsehoods from the purview of the statute."  *United States v. Beer*, 518 F.2d 168, 170-71 (5th Cir. 1975).

<u>The At-Issue Statements</u>.    The Government alleged five distinct false statements in support of Count Nine.  As just discussed, if even one of the five at-issue questions was fundamentally ambiguous—and all of them were—the Court must enter acquittal.  Alternatively, because the Government failed to prove the elements of falsity, intent to deceive, and materiality for all of them, acquittal is required.

### A. Burnette Did Not Know To Whom Southern Pines Development Wrote Checks

Judgment of acquittal should be granted based on the first alleged false statement.  The relevant colloquy with the FBI agent was as follows:

> SA DOYLE: He's paying off officials to try to get -- I don't know what the hell it is, zoning or, or -- I don't know what he -- you know, for some official acts. Did he interact with any local officials here in town?
> BURNETTE: So I never had – so all he would do is he hired lobbyists. … So they work with lobbyists in Tallahassee –
> **SA DOYLE: Who did he – did he – oh, he did?  Who did he hire?**
> **BURNETTE: I – let me say this.  I don't know who they ever wrote a check to.**

Gov. Ex. 86, at 7-8 (emphasis on exchange at issue).

First, the question is fundamentally ambiguous.  Both the words "who" and "hired" are ambiguous.  "Who" could refer either to a person or a corporate entity—for example, Carter-Smith or Governance.  "Hire" could refer to a formal contractual relationship, to an informal arrangement, or to a specific payee.  The answer to this

question could vary depending on its meaning, and is therefore impermissibly ambiguous and vague.   Moreover, Burnette's response, which conveyed his understanding that the question was asking what entity was formally paid, further demonstrates the question's ambiguity.  *See Strohm*, 671 F.3d at 1179.

Second, Burnette truthfully answered the question by stating that he did not know to whom the checks were written.  There is no allegation, let alone evidence, that Burnette had ever seen any of the checks, and the checks were written to two different entities: Governance, Inc. and Governance Services, LLC.  *See* Gov. Exs. 172 and 179.  Moreover, Miller and Sweets informed Burnette that checks had been sent to Maddox, yet shortly thereafter, Maddox confirmed to Burnette that he was not receiving checks personally from Southern Pines Development.  Gov. Ex. 63, at 9 and Trial Tr. vol. 13, 2648:19-2649:6, August 9, 2021.  Burnette therefore answered this ambiguous question truthfully.

Third, even if the question was not fundamentally ambiguous, Burnette's statement was at most "an unresponsive answer" that was nevertheless literally true. *Bronston*, 409 U.S. at 359.  In these circumstances, if the agent thought Burnette was being evasive, it was his "responsibility to recognize the evasion and bring the witness back to the mark, to flush out the whole truth." *Id.* at 362.  "[P]roblems arising from the literally true but unresponsive answer are to be remedied through

the questioner's acuity and not by a federal [false statements] prosecution." *Id.* (cleaned up). The agent failed to clarify what he was asking.

Fourth, even if it was false, the statement was not material. The Supreme Court has held that a statement is materially false "if it has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988). "Trivial" misstatements are not actionable. *Beer*, 518 F.2d at 170-71. Burnette informed the agents that he recommended that Southern Pines Development hire Carter-Smith—that was the material information he had. Given that he shared that information, his statement that he did not know to whom the checks were actually written, even if it was false, was not a material misstatement.

### B. Burnette Did Not Know the Name of Carter-Smith's Firm

Judgment of acquittal should be granted based on the second alleged false statement. The relevant colloquy with the FBI agent was as follows:

> SA DOYLE: Okay. Who did you recommend?
> BURNETTE: I recommended, uh, Paige Carter-Smith – and – that was it.
> **SA DOYLE: Okay. Who, is she with a firm or with … Is she on her own?**
> **BURNETTE: She … used to be with – I don't even know the name of the firm.**

Gov. Ex. 86, at 8 (emphasis on exchange at issue).

First, a person of ordinary intellect would be unsure whether the agent was asking for (1) the legal entity with which Carter-Smith was associated or (2) *whether* Carter-Smith ran her own firm or was part of a larger firm.   The fundamental ambiguity of this question is heightened by the compound, disjointed nature of the question, which asks *both* "who" the firm is with which Carter-Smith is associated, and also *whether* she is "on her own."   Such an imprecise question cannot give rise to a false statement conviction.

Second, Burnette truthfully answered the question.   Burnette's response, "I don't know even know the name of the firm," truthfully conveyed that she was with a firm, which truthfully answered one aspect of the ambiguous, compound question.

Third, even if false, Burnette's statement was at most an unresponsive answer to the question.   If the agent's question is interpreted as asking the name of the firm with which Carter-Smith was currently affiliated, Burnette responded in the past tense that she "used to be with" a firm whose name he could not remember.   That is both true, because Carter-Smith was associated with numerous firms over time. Trial Tr. vol. 4, 798:18-23, 805:21-806:6, July 15, 2021.   And it is non-responsive, because the agent asked about her then-current affiliation.   If the question is interpreted as asking whether Carter-Smith was a solo practitioner or practiced as part of a larger lobbying group, Burnette did not answer that question at all.   The agent failed to follow up on either point.

Fourth, there was nothing materially misleading about his statement that he didn't know the name of the firm.  Carter-Smith is associated with numerous "firms" including Governance, Inc., Governance Services, LLC, and The Big Production.  Trial Tr. vol. 4, 798:18-23, 805:21-806:6, July 15, 2021.  Burnette provided the material information:  the name "Paige Carter-Smith" and the fact that she was with a firm.  Gov. Ex. 86, at 8.

C.   *Burnette Did Not Know Who Southern Pines Development Had Retained*

Judgment of acquittal should be granted based on the third alleged false statement.  The relevant colloquy with the FBI agent was as follows:

> BURNETTE: Um, but, like, I mean, I hate to say it. Like, they didn't know, like, who the right -- I mean -- like, they hired, like, Adam Corey, okay?
> SA HURLEY: They did hire Adam Corey?
> SA DOYLE: Oh, he's been in the paper with um – excuse me – with um –
> BURNETTE: With the Edison.
> SA DOYLE: That restaurant, yeah.
> BURNETTE: So, you know, Adam is a lobbyist.  I don't – I mean, he's not like the best lobbyist in the world. (Laughter)
> BURNETTE: Um, so I mean, they just – they didn't really seem to know what they were doing.
> **SA DOYLE: Okay.  Do you know did they retain anybody?**
> **BURNETTE: I do not know who they retained.**

Gov. Ex. 86, at 8-9 (emphasis on exchange at issue).

First, the question is fundamentally ambiguous.  In context, Burnette could have easily thought that the agent was asking whether Southern Pines Development had retained Adam Corey or someone at his firm, rather than an unaffiliated lobbyist such as Carter-Smith.  Moreover, what it means to "retain" somebody in this context is ambiguous.  A reasonable listener could have thought "retaining somebody" referred to executing a retainer agreement.  Indeed, Burnette appeared to distinguish between "hiring" Adam Corey, which he had knowledge of, and "retaining" somebody, which he did not.  Alternatively, "retaining somebody" could refer informally to any form of client relationship.  The question is ambiguous.

Furthermore, as discussed above, Carter-Smith owned multiple companies, Southern Pines Development sent checks to multiple companies, Gov. Exs. 172 and 179, and there was no allegation or evidence at trial that Burnette was aware of the consulting agreement between Governance Services, LLC and Southern Pines Development.  Gov. Ex. 177.  Importantly, Miller testified that he never had any conversations with Carter-Smith about the agreement, he never negotiated the agreement, and he never signed and returned the agreement.  Trial. Tr. vol. 7, 1262:8-1263:2, July 21, 2021.  Miller therefore never formally retained Carter-Smith or her firm.

Burnette also provided the material information to the agent when he stated that Southern Pines had "hired" Adam Corey and that Burnette had recommended Carter-Smith.  Gov. Ex. 86, at 8.

> D.   *Burnette Did Not Know The Content Of Conversations That Southern Pines Development Had With Maddox*

Judgment of acquittal should be granted based on the fourth alleged false statement.  The relevant colloquy with the FBI agent was as follows:

> SA HURLEY: Sorry.  Corey introduced them to Maddox and you did as well?
> BURNETTE: I was told that Maddox, they – that they were introduced to Maddox.
> SA HURLEY: Okay.
> **SA DOYLE: Do you know the content of their conversa—what did they want from Maddox or what did –**
> **Burnette: I don't know the answer to that.**

Gov. Ex. 86, at 9 (emphasis on exchange at issue).

First, the question is fundamentally ambiguous.  It is thrice compound:  The agent appears to ask (1) whether Burnette knows the content of the conversations between Maddox and the undercover agents, (2) whether Burnette knows what the undercover agents wanted from Maddox, and (3) a third question that he only half asked.  Each question is ambiguous.  It is unclear what conversations the agent is referring to, as there were many conversations between the undercover agents and

Maddox.[3]   It is further unclear what the agent means by "content" of the conversations, which could refer to anything from specific statements, to the general subject matter discussed.   In the context of an FBI interview, it is reasonable to assume the agents are asking for specific or even firsthand knowledge.   And it is unclear whether "what did they want from Maddox" referred to Burnette's knowledge of Southern Pines' general business interests, specific requests made to Maddox, or just a request to speculate.

For the same reasons, his statement that he did not know the "content" of myriad conversations to which he was not a witness could not have been material to the investigation.

E.     *Burnette Did Not Know That Southern Pines Development Representatives Had Paid Maddox*

Judgment of acquittal should be granted based on the fifth alleged false statement.   The relevant colloquy with the FBI agent was as follows:

> **SA DOYLE: Do you know did they pay Maddox?**
> **BURNETTE: No.   Well, let me say this.   I don't know who they paid.   I never saw them pay anybody.**

---

[3] For example, Burnette was not present when Miller was introduced to Maddox on October 1, 2016 at an FSU football game, when Miller met Maddox for brunch the following day on October 2, 2016, when Sweets was introduced to Maddox at Madison Social on October 4, 2016, when Sweets met Maddox at an FSU football game on October 29, 2016, and when Sweets met Maddox at Old School and an FSU football game on November 11, 2016, among other conversations. Miller and Sweets confirmed that Burnette was not present for these meetings when they testified at trial.   Trial. Tr. vol. 7, 1413:8-1414:12, July 21, 2021; Trial Tr. vol. 9, 1752:7-13, 1775:21-1776:2, 1779:22-25, July 23, 2021.

> SA DOYLE: Did they -- do you know if they gave him any gifts, and by that I mean money, tangible property, trips, anything like that to any public officials?
> BURNETTE: Uh, the only trip we went on, we went on -- we went -- we did go on a Vegas trip with them one time.

Gov. Ex. 86, at 9-10.

First, it is fundamentally ambiguous what the agent meant by "pay Maddox." The agent could refer to payments made directly to Maddox, indirect payments, promised future payments, or in-kind contributions such as leisure travel.   For example, the facts of the case show that Southern Pines Development never paid Maddox – it paid Governance, Inc. and Governance Services, LLC.  In the context of the conversation, in which Burnette had repeatedly stated that he did not know the specifics of payment arrangements – to whom the checks were written, etc. – a reasonable person could conclude that the question asked about payments directly from the undercover agents to Maddox.

Indeed, the ambiguity of the question is confirmed by the agent immediately asking a follow-up question in an attempt to clarify.  After Burnette states, "No. … I don't know who they paid.  I never saw them pay anybody," the agent asks whether "they [the undercover agents] gave [Maddox] any gifts, and by that I mean money, tangible property, trips, anything like that."  Gov. Ex. 86, at 9.  That clarification again emphasized transfer of valuables *directly* from the agents to Maddox.  Upon that clarification, Burnette truthfully answered that the only direct payment of any

form to Maddox that he was aware of was the trip to Las Vegas. *Id.* at 9-10. That follow-up exchange confirms the ambiguity of the prior question, Burnette's truthfulness, and the value of agents asking follow-up questions.

Burnette's answer was also truthful, because he did not know who, exactly had been paid, and because he clarified the exact basis for his statement—that he never saw any payments to Maddox. This was true. The evidence showed that Southern Pines never paid Maddox directly. Trial Tr. vol. 13, 2648:20-2649:6, August 9, 2021; Trial. Tr. vol. 10, 1977:21-24, July 21, 2021. Burnette's statement, "No. Well, let me say this. I don't know who they paid. I never saw them pay anybody," was truthful, and at most unresponsive to the question asked by the agent. Burnette did not knowingly and willfully provide a false statement, and any false statement could not have been material.

## <u>CONCLUSION</u>

Based on the foregoing, Burnette respectfully requests that this Court enter a Judgment of Acquittal on Counts Two, Fix, Six, Eight, and Nine of the Second Superseding Indictment.

Dated:  September 13, 2021

Respectfully submitted,

/s/ Gregory W. Kehoe
Gregory W. Kehoe
Florida Bar No. 0486140
kehoeg@gtlaw.com
Jordan L. Behlman

Florida Bar No. 111359
behlmanj@gtlaw.com
Greenberg Traurig, P.A.
101 East Kennedy Blvd., Suite 1900
Tampa, FL 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

R. Timothy Jansen
Florida Bar No. 0691208
jansen@jansenanddavis.com
Jansen & Davis, P.A.
125 N Franklin Blvd.
Tallahassee, FL 32301
Telephone: (850) 224-1440
Facsimile: (850) 224-0381

Adam Komisar
Florida Bar No. 86047
adam@komisarspicola.com
PO Box 664
Tallahassee, FL  32302
Telephone: (850) 591-7466
Facsimile: (850) 320-6592

Michael Ufferman
Florida Bar No. 114227
ufferman@uffermanlaw.com
Michael Ufferman Law Firm, P.A.
2022-1 Raymond Diehl Road
Tallahassee, FL  32308
Telephone:  (850) 368-2345
Facsimile: (850) 224-2340

*Counsel for Defendant John Thomas Burnette*

## LOCAL RULE 7.1(F) CERTIFICATE

I certify that this paper contains 6818 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

/s/ Gregory W. Kehoe
Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this document has been served to counsel for the United States of America via email to their addresses of record on this 13th day of September, 2021.

/s/ Gregory W. Kehoe
Attorney