**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                          **Case No. 4:18cr76-RH/EMT-3**

**JOHN THOMAS BURNETTE,**

        **Defendant.**

_____/

**GOVERNMENT'S OPPOSITION TO
RENEWED MOTION FOR JUDGMENT OF ACQUITTAL**

## I.        INTRODUCTION

The United States of America, by and through undersigned counsel, respectfully submits this response to Defendant's post-trial Renewed Motion for Judgment of Acquittal ("Defendant's Motion").   ECF No. 483.   For the reasons discussed herein, the Government respectfully submits that the Defendant's Motion should be denied.

## II.        PROCEDURAL BACKGROUND

Trial began on July 12, 2021.   At the close of the Government's evidence, the Defendant filed a motion for a judgment of acquittal pursuant to Federal Rule of Evidence 29 ("Rule 29").   Trial Tr. at 2055; ECF No. 431.

On August 13, 2021, the jury delivered a verdict finding the Defendant

guilty of Counts Two, Five, Six, Eight, and Nine, and not guilty of Counts One, Three, Four, and Seven.   ECF No. 442.   On September 13, 2021, the Defendant filed a Renewed Motion for Judgment of Acquittal.   ECF No. 483.

## III.   **LEGAL STANDARD**

The Defendant is only entitled to a judgment of acquittal under Federal Rule of Criminal Procedure 29 if the evidence was insufficient to support the jury's guilty verdict.   FED. R. CRIM. P. 29(a); *United States v. Williams*, 390 F.3d 1319, 1323 (11th Cir. 2004) (citations omitted).   A defendant carries a "heavy burden" in challenging the sufficiency of evidence under Rule 29. *See United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002) (noting the defendant's sufficiency of the evidence burden on appeal).

In evaluating evidentiary sufficiency, this Court must examine the evidence "in a light most favorable to the Government," and "[a]ll credibility choices must be made in support of the jury's verdict." *Williams*, 390 F.3d at 1323 (reversing grant of judgment of acquittal because the district court erroneously credited defendant's testimony).   Therefore "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a

reasonable doubt."   *Id*. at 1324 (citing *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990)).

## IV.   **DISCUSSION**

With regard to the bribery-related counts, the defendant argues that (1) there was insufficient evidence of coordination between the defendant and Maddox with regard to the bribery scheme (2) there was insufficient evidence that any agreement contemplated a legally sufficient official act, and (3) the jury's verdict on certain counts and specific testimony by government witnesses commands acquittal on some or all counts.

The defendant also argues that this Court should grant a judgment of acquittal on Count Nine because the questions posed to the defendant by the FBI on May 24, 2017 were ambiguous and his answers to those ambiguous questions were truthful.

There was sufficient evidence for the jury to find, as it did, that Maddox and the defendant coordinated with regard to the bribery scheme which contemplated official acts.   Further, the questions posed to the defendant by the FBI were not fundamentally ambiguous and there was sufficient evidence to supports the jury's verdict that the defendant's responses were false.

**A.**     **The government presented ample evidence that the defendant participated in a bribery scheme with co-defendant Maddox sufficient to support the jury's verdicts on Counts Two, Five, Six, and Eight.**

Most of the defendant's arguments why acquittal is required on Counts Two, Five, Six, and Eight—the bribery-related counts—are common to those counts, and so are addressed together.   The defendant argues that there was insufficient evidence of: (1) a bribery scheme among the defendant and Maddox; and (2) that any scheme contemplated official acts.   The evidence adduced at trial, including statements by the defendant himself, show that there was sufficient evidence to support the jury's guilty verdict on Counts Two, Five, Six, and Eight.

1.     There was ample evidence of a bribery scheme involving the defendant and Maddox.

The defendant argues that this Court must grant a judgment of acquittal on all of the bribery-related counts because there "is no evidence that Burnette agreed to or facilitated a payment in exchange for Maddox's agreement to perform an official act."   Mot. at 14 (Ct. 8); *see* Mot. at 4 (arguing with regard to Count 2 that Maddox and Carter-Smith "rejected any possibility that they were involved in or complicit in any extortion plan"); Mot. at 9 ("[f]or Counts Five and Six, there is insufficient evidence that Burnette engaged in a scheme

to defraud, much less with the specific intent to defraud required for conviction."). This argument ignores the substantial evidence—largely consisting of the defendant's own words—which established that the defendant paid a bribe to Maddox in 2014 and that he explained to the FBI UCs in 2016 how to bribe Maddox as the defendant had two years before.

A reasonable jury could have found that the evidence established that the UCs followed those instructions and paid a bribe to Maddox in the manner the defendant told them to, and that the defendant willingly joined the scheme with knowledge the UCs were paying Maddox bribes. Further, Maddox admitted that he accepted the money knowing it was intended to influence him.

The evidence also established that the defendant and Maddox discussed and coordinated on the key aspects of the scheme, namely that the UCs and the defendant were looking to invest in real estate opportunities in Tallahassee, and that the UCs would be paying money to Maddox through Governance and Carter-Smith. While the defendant is correct that the defendant and Maddox testified that they did not have overt conversations regarding the bribery scheme, a reasonable jury could have found that there was sufficient evidence to conclude that the two men understood the contours

of the scheme without such explicit conversations. Furthermore, a reasonable jury could have rejected the testimony of both the defendant and Maddox on this point, as the Court properly instructed, and concluded, relying on the remainder of the evidence, that such conversations did occur. *See* ECF No. 433 at 4 ("You may believe or disbelieve any witness, in whole or in part."). Regardless of which conclusion the jury reached, there was ample evidence to support it.

> a. *The defendant conceded in his testimony that he paid a bribe to Maddox in 2014 and that he intentionally tried to convince the UCs that they could bribe Maddox.*

The government's evidence established that in 2014 the defendant paid $100,000 to Carter-Smith and Governance to ensure that Maddox did not vote against the defendant's interests with regard to the McKibbon Hotel Group (MHG) issue. *See e.g.* Trial Tr. at 878-79 (Carter-Smith testimony); 1916-22 (Maddox testimony). The government argued that the jury should credit the testimony from Maddox and the corroborating evidence that the defendant proposed the bribe to Maddox in 2013. The defendant claimed that he did not propose the bribe at that time, instead casting himself as the victim of extortion—which this Court instructed the jury is the "flip side of bribery"—by Maddox. ECF No. 433 at 8. Even if the jury rejected Maddox's

testimony and credited the defendant's testimony, that testimony established that the $100,00 payment was a bribe—the defendant admitted that he willingly paid $100,000 to Carter-Smith so that Maddox would not use his position to harm the defendant's interests:

> Q.     But if Mr. Maddox is not a city commissioner on this issue, you said, so how is he going to give you any consequences?
>
> A.     Just like Maddox said in that meeting related to the FBO: I'm going to kill your next ten projects just so you know that it was me.
>
> Q.     So you were afraid of the retaliation from Mr. Maddox, correct?
>
> A.     Yes.
>
> Q.     And the retaliation from Mr. Maddox in relation to other deals you might do in future, correct?
>
> A.     Scott Maddox, you would never -- Scott Maddox always said: You would never know but you would feel it.
>
> Q.     So that's a "yes" to my question, which is that you were concerned about Mr. Maddox's retaliation on potential deals in the future; is that correct?
>
> A.     That is correct.
>
> \*      \*      \*
>
> Q.     Well, I'm asking you, on February 11, 2014, your impression was: If you pay Paige this money, Scott Maddox won't, as you say, go kill your next ten deals?

A.      Yes.

Q.      Now, you didn't call anyone and tell them that happened, right? You didn't call law enforcement, did you?

A.      No.

Q.      You didn't call the FBI?

A.      No, I never told anybody.

Q.      Instead, what you did is you said: Well, Ms. Carter-Smith, I don't need you to lobby or anything, but I will extend your contract for $100,000 with KaiserKane.

A.      That is correct.

Trial Tr. at 2790, 2792.

Two years later, by his own admission, the defendant intentionally conveyed to the UCs that they could bribe Maddox in the same manner as the government argued the defendant had bribed Maddox in relation to the MHG vote.

Q.      But just to be clear, you are intentionally giving him the impression that he can pay bribes in Tallahassee, right?

A.      Yes.

Trial Tr. at 2918; *see* Gov. Ex. 6, 7, 8, 10, 11, 12.

The defendant claimed that he did not truly intend to engage in bribery, but the jury was free to reject this testimony in light of the defendant's

statements—recorded at a time he did not know anyone was listening.   The

jury's convictions suggest that it did just that, as it was free to do and which

this Court may credit as evidence of the defendant's culpability.   *See United*

*States v. Woodard*, 459 F.3d 1078, 1087 (11th Cir. 2006) ("a defendant's

testimony—if disbelieved by the jury—may be considered substantive

evidence of guilt").   The jury did so because the evidence was overwhelming

that what the defendant was conveying to the UCs—and which he admitted

he intended to do—was how to bribe Maddox.

> b.   *The government's evidence corroborated the defendant's willing participation in the bribery scheme.*

The jury heard more than just the defendant's admissions in court; they

repeatedly heard hours of recordings of the defendant speaking with the UCs.

In those recordings, he explained in detail how the UCs could bribe Maddox

and how the defendant could facilitate that bribery through his personal

relationship with Maddox.   Indeed, that was a substantial part of how the

defendant justified to the UCs that he could provide value to them in exchange

for his share of the profits without making a monetary investment.   For

example, when asked by the UCs in the Nashville meeting (where he first

described in detail the manner they could use to bribe Maddox) how he fit in

to their business arrangement, the first thing the defendant brought up was his

personal connection to Maddox:

| | |
|---|---|
| UC SWEET: | . . . but I also want to figure out, you know, where do you fit into the scheme of things for us? |
| BURNETTE: | So I really think there's I think there's two core issues to have a conversation about. So there so Scott Maddox and I have a very deep relationship. |
| UC SWEET: | Now, he's the county guy? County. |
| BURNETTE: | He's the city commissioner. Okay. |
| UC SWEET: | City commissioner. Okay. |
| BURNETTE: | Scott Maddox is, you know, arguably, probably the most sophisticated politician of all the city and county players period. |

Gov. Ex. 10 (transcript of Gov. Ex. 6) at 4-5.

After building up his relationship with Maddox, the defendant

explained how Maddox received his bribes, telling the UCs that Maddox

"definitely gets paid through [his] lobbying firm."   Gov. Ex. 11 (transcript of

Gov. Ex. 7) at 16.   The defendant then explained that the amount of the bribe

the UCs would have to pay to Maddox would be determined by the difficulty

of the official acts the UCs needed Maddox to perform, which Burnette called

the "lift" and which would cost approximately 10% of the total project cost, from $25,000 up to $100,000:

| | |
|---|---|
| UC MILLER: | But for me, factoring that in, when I look at every project I do, what number am I factoring in? Am I saying this is a . . . |
| BURNETTE: | It's all on how heavy the lift is. I mean, look, it's . . |
| UC MILLER: | So it's not like he's not like a like there's one place that I budget 10 percent because I know it is going to cost me about 10 percent of my total development cost, I'm going to spend making . . . |
| BURNETTE: | On "marketing cost" [hand gesture emphasis]. |
| UC MILLER: | . . . sure when something goes when I go in front of a vote, I already know what the votes are. |
| UC SWEET: | You [UI]. Yeah. |
| UC MILLER: | And it's costing me about 10 percent. |
| BURNETTE: | Yeah. So . . . |
| UC MILLER: | Is that a . . . |
| BURNETTE: | No. And that's a realistic number. I mean, here here there's a minimum threshold. There ain't nothing happening for less than $25,000. Right? And you can damn near move a mountain for 100. |
| UC MILLER: | Yeah. |

| | |
|---|---|
| BURNETTE: | Right? |
| UC SWEET: | Per project. If there's a lift in that project |
| BURNETTE: | If there's a lift, it's costing you $25,000. |
| UC SWEET: | And if it's a heavy lift, it could cost 100. |
| BURNETTE: | It could cost 100. |

*Id.* at 17-18.   Burnette also explained what Maddox could do for them, explaining as an example that Maddox could obtain funding from the joint City-County entity Blueprint and that the amount of the bribe would be determined by the amount of funding received:

| | |
|---|---|
| BURNETTE: | Well, no. It's like, for example, I you know, for example, let's just say you are going to get Scott to go find $3 million of blueprint dollars to buy a piece of a deal. Right? |
| UC SWEET: | Uh-huh. |
| BURNETTE: | You know, you're going to end up paying, you know, call it $10,000 a month the next 3 years for him to lobby for you. |
| UC SWEET: | Okay. I gotcha. |
| BURNETTE: | Right? His lobbying terms, he'll lobby for you for $10,000 a month the next 3 years. So . . . |
| UC SWEET: | That's how he structures it? |
| BURNETTE: | Yeah. |

*Id.* at 18-19.

Notably, in his example, the defendant used $10,000 per month as the hypothetical payment, which is the amount that Maddox and the UCs agreed upon and was communicated to the defendant, as described below.  The defendant capped his description of how to bribe Maddox by explaining that Maddox is the type of public official who "wants his piece of the pie"—that is, he wants to be paid bribes.  *Id.* at 21.

The defendant testified and his counsel argued to the jury that in these conversations he was not describing bribery but rather the legal means one could use to retain lobbyists and acquire political capital in Tallahassee. Trial Tr. at 2622-23, 2660, 2679, 2917-18, 2946, 3182, 3188-89, and 3210. UCs Miller and Sweet both testified that they understood the defendant to be explaining to them how to bribe Maddox in these conversations.  *See, e.g.*, Trial Tr. at 1205 (UC Miller testifying that the defendant was "explaining that Nancy and Gil's votes are not for sale; that they have to be convinced to vote for something, and putting that in contrast with Scott Maddox in saying that that vote -- inferring that that vote can be purchased."), 1603 (UC Sweet testifying, "Well, we're talking about a different -- two different business models if, you will, on how to pay a bribe.  And J.T.'s business model on how to pay a bribe or how to get things done was to know what the problem

is, and then to pay to have that problem solved right then and there; and I'm telling them I have a different business model."). The jury's verdict of guilty on Counts Two, Five, Six, and Eight suggest that they jury credited the recordings and the testimony of the UCs and rejected the defendant's testimony.

The jury may also have discredited the defendant's testimony because it was internally inconsistent. He testified that when he used the term "political capital," he was not referring to bribes:

> Q. And what did you mean when you said "political capital"?
>
> A. Yeah. The political capital that I've earned by doing the right thing and earning the trust.
>
> Q. And how did you earn it?
>
> A. Hotel Duval, DoubleTree, Tennessee and Monroe, revitalizing the south side, revitalizing Gaines Street, rebuilding College Town. I mean, the list goes on and on and on.

Trial Tr. at 2660. However, the defendant also testified that he was intentionally giving the UCs the impression they could bribe Maddox:

> Q. Now, Mr. Burnette, this cup metaphor we're talking about, this is something that you said to them, right?
>
> A. Yes.

Q.      And you are saying that what you want to do basically concerns how much you have to fill that cup, right?

A.      Yes.

Q.      And you say that the political capital -- so what you were talking about yesterday with the political capital that you've earned by doing good projects, doing what the community wants, doing what government wants. That's the political capital you already have, correct?

A.      Yes.

Q.      And that political capital goes in the cup, doesn't it?

A.      Yes.

Q.      But the rest of the way is filled with the dollar signs, correct?

A.      I believe that's what Mike Sweets needed to believe, yes.

Q.      But that's what you told him, correct?

A.      Yes.

Q.      You said that?

A.      Yes.

Q.      So what you're talking about there is you're telling Mr. Sweets that you can pay bribes here. Those dollars signs in the cup are bribes, correct?

A.      I'm trying to give him the assurance that he wants to know that he can get anything he wants.

Q.   But just to be clear, you are intentionally giving him the impression that he can pay bribes in Tallahassee, right?

A.   Yes.

*Id.* at 2917-18.   Surely this contradiction was not lost on the jury.

In resolving the defendant's motion of acquittal, "[a]ll credibility choices must be made in support of the jury's verdict." *Williams*, 390 F.3d at 1323.   The jury's credibility determination as to the defendant's intent should not be disturbed by this Court.

> c.   *The government's evidence established that the defendant was aware of and communicated with Maddox about the bribery scheme.*

The defendant argues correctly that, with regard to each of the bribery-related counts, the evidence must establish coordination with the public official—Maddox—to meet the bribery-related elements of each count.   Mot. at 3 (Ct. 2) and 10 (Cts. 5 and 6).   As the Court properly instructed the jury with relation to extortion under color of official right, the jury was required to find that the defendant "'willfully join[ed] together' with Maddox in the commission of a crime."   ECF No. 433 at 8, Mot. at 4.

The government's evidence established such willful action by the defendant.   There was ample evidence for a reasonable jury to find that after

explaining to the UCs how they could bribe Maddox, the defendant continued to coordinate with both the UCs and Maddox regarding their execution of his instructions.   The defendant is correct that Maddox and the defendant did not testify at trial that they had explicit conversations about the bribery scheme involving the FBI UCs.   Nevertheless, a reasonable jury could have found that, given the defendant and Maddox's close relationship and prior dealings, no more explicit language was needed for the defendant and Maddox to understand the reason for the payments. That is especially true given that the UCs were relaying their discussions with Maddox to the defendant and describing their interactions with the defendant to Maddox.

However, a reasonable jury may have also discredited the testimony of both the defendant and Maddox on this point and instead credited the defendant's and Maddox's many recorded statements—made when they believed no one was listening—that the two of them were communicating about and in agreement regarding the scheme.   The defendant made recorded statements where he expressed to the UCs that he was coordinating with Maddox about the bribes and that Maddox was in agreement. For example, on October 5, 2016, the defendant and UC Sweet had the following exchange:

UC SWEETS:        We gotta get... we do gotta, seriously, all...
                  Why don't you talk to... why don't you talk

|  |  |
|---|---|
|  | to Maddox. And maybe look at some dates. And then, text me with a couple of dates? |
| BURNETTE: | Here's what I want to do for Maddox. I want to figure out what we wanna do because I want to get Maddox on board and have a conversation with him. |
| UC SWEETS: | OK, but here's the thing. So, you and I look at things a little bit differently in this regard, right?! You're like, action-reaction. So you wanna know, like, what lift do we need, and can you make the lift. And I'm like... |
| BURNETTE: | I already have a relationship. |
| UC SWEETS: | I get that. And I am looking at it, like: "Hey, we know we're gonna need some lift. So, I'd just as soon start paying into that lift that lift bucket now, right?! And then, when we get to it... |
| BURNETTE: | We know, we know. (UI) |
| UC SWEETS: | The glass is already up here, and the lift is very little. I'd rather do that than, and you know. Man, I've been around this game a long time, brother. |
| BURNETTE: | (UI) worry about Maddox. |
| UC SWEETS: | Yeah. |
| BURNETTE: | He realizes that you've paid him a lift, and somebody else is paying the lift, he'll go get (UI) |
| UC SWEETS: | Ok, then, I'm cool with that. I'll just pay it all the way. |

| | |
|---|---|
| BURNETTE: | No, what I am saying is this: if you paid it all the way and he hasn't had to make lift yet, he'll go get somebody else to pay him and give them a lift. |
| UC SWEETS: | Yeah, but that won't happen with you on board. |
| BURNETTE: | That's true. |
| UC SWEETS: | Ok, that won't happen with you on board. |
| BURNETTE: | He knows it's a long term relationship. |
| UC SWEETS: | Yeah. So, while he may not give a shit about a guy like me, other than for the momentary good time, I get that, and the momentary cash, that's another part of your value, which is what you bring to the table.... |
| BURNETTE: | So like, for example, Maddox talked to five marijuana people (UI). Ok. He didn't lift anybody a license, because that's outside the realm of ability. |
| UC SWEETS: | Right. But that's not gonna happen with you. |
| BURNETTE: | Well, here's the thing. I wouldn't, I wouldn't take you to the right person if it's not in the realm of ability. |

Gov. Ex. 28 (transcript of Gov. Ex. 24) at 2-3.   The defendant later explained

to UC Miller that he had spoken to Maddox and Maddox wanted to

*communicate* with the UCs through the defendant but he wanted to be *paid*

through Governance:

19

UC MILLER:      I don't know if he wants cash or would rather have a check or . . .

BURNETTE:       I will talk to Maddox. I will tell you kind of Maddox's position. I mean, I'll just be transparent with you, he's like, look, you know . . . I just don't want to deal with anybody I don't know.

UC MILLER:      Sure.

BURNETTE:       So, I mean, again, I don't wanna be the middle man on the money.

UC MILLER:      Right.

BURNETTE:       You know Maddox doesn't . . . he wants to keep his conversations narrowed to one person.

UC MILLER:      Gotcha, ok.

BURNETTE:       Uh, that's his only concern whatsoever, um, but Maddox will be there, um, when he's needed. That's, that's not gonna be an issue, it's just . . . you know . . . I know Sweets wanted him to come out to Vegas and that stuff and he's like look, I just, you know Maddox's comment was "I got enough friends" you know?

UC MILLER:      Yeah.

BURNETTE:       I'd rather work with the friends I have, you know?

UC MILLER:      Ok, yeah.

BURNETTE:       So, I mean, I don't want Mike . . . or you guys to take it the wrong way. I don't think that's

|  | the intention, I just think the intention is that, you know . . . he doesn't know, right? So he wants to work with somebody he knows, nothing more nothing less. |
|---|---|
| UC MILLER: | I get it, yeah. |
| BURNETTE: | Um. So, we'll discuss this some more. I had a conversation with him, though, I kind of knew that was the plan, I kind of laid that ground   work, and Governance is the answer. I just want to have a discussion with him about you know, how he wants to receive those funds, call it "into Governance" |

Gov. Ex. 40 (transcript of Gov. Ex. 38).   Maddox similarly told UC Sweet that the defendant had to be "in the mix" and, with regard to hiring Maddox's consulting firm, that the defendant would tell the UCs which entity to hire. Gov. Ex. 32 (transcript of Gov. Ex. 30) at 6.

The evidence established that the defendant, Maddox, and the UCs communicated among each other in such a manner that they all understood the arrangement, but there was not an explicit statement of the criminal scheme.   For example, after UC Sweet met Maddox,[1] he relayed the

---

[1]      It is also notable that the first time UC Sweet met Maddox, Maddox had already spoken with the defendant about the UCs.   Gov. Ex. 32 (transcript of Gov. Ex. 30) at 7. For example, Maddox knew that the UCs had retained Adam Corey and how much they were paying him.   *Id*. at 11-12.

conversation to the defendant and specifically stated that Maddox was trying

to "extort" him, which the defendant laughed off:

> UC SWEET:     Well, now, that he is aware of it, he can look
> into it. Maddox said something about he has
> three or four places tee'd up for you. And his
> only . . . the only thing we talked like
> business-wise was, other than him trying to
> extort 20 out of me, was, instead . . . I am,
> like: "No! No!" [Laughs]
>
> BURNETTE:     You can't knock him for asking.
>
> UC SWEET:     No, you can't knock him for asking. . . . uh,
> was, uh, that you gotta be involved. And thus,
> he's involved. And I said, that's not even a
> question of it. We're not even worried about
> that.
>
> BURNETTE:     Right.

Gov. Ex. 27 (transcript of Gov. Ex. 23) at 3.   This conversation demonstrates

that the defendant knew that UC Sweet and Maddox had spoken about the

general nature of the bribery scheme.   A reasonable jury could have

concluded that the defendant knew from this point in early October 2016 that

he, Maddox, and UC Sweet all understood the nature of the bribery

arrangement.   All that needed to be finalized was the payment amount and

mechanism.

Further, it is clear that the defendant and Maddox communicated about their arrangement, as the defendant was representing to the UCs. For example, in the recorded Oct. 19 call, the defendant told UC Sweet that he and Maddox were trying to get together to discuss the possible trip to Las Vegas. Gov. Ex. 36 (transcript of Gov. Ex. 34) at 2. The defendant then told UC Sweet that he had just sent Maddox a text message to coordinate a meeting because he would be in downtown Tallahassee that evening. *Id*. at 3. The defendant confirmed that he sent a text to Maddox at that point. Trial Tr. at 2570. Phone records confirmed that the defendant sent several text messages to Maddox that day to confirm a meeting and that the two men met at the Edison in downtown Tallahassee. Gov Ex. 201 at 37-38. Maddox not recall what was discussed at the meeting (Trial Tr. at 2037), but the defendant testified that he met with Maddox that night and told him that Southern Pines may be hiring Carter-Smith and Governance. Trial Tr. at 2574.

Maddox confirmed that he said things to the defendant that the defendant then relayed to the UCs. On October 29, 2016, the defendant told UC Sweet that Maddox said he "d[id]n't want any more friends" and that communications should be run through the defendant, not Maddox. Gov. Ex. 44 (transcript of Gov. Ex. 42) at 2. Although he gave his own explanation

for why he said those things, Maddox confirmed that he did, in fact, make that statement to the defendant.   Trial Tr. 1942-43.

Further, Maddox testified that the defendant and Maddox had conversations about the central aspect of the scheme—that the UCs would hire Governance.   Trial Tr. at 1944.   When Maddox was told this, he expressed his approval.   *Id*.   After the UCs began paying Governance, Maddox again spoke to the defendant who confirmed that the checks from Southern Pines were from the UCs.   Trial Tr. at 1945.

The defendant argues that Maddox's testimony that he was "shocked" by some of the things he heard on the recording precludes the jury's verdict that there was a bribery conspiracy.   However, the defendant ignores that the jury heard that testimony and still convicted the defendant, apparently concluding that it did not undermine the evidence of a bribery conspiracy. Again, this Court must make "[a]ll credibility choices . . .  in support of the jury's verdict." *Williams*, 390 F.3d at 1323.

This not a reach by any stretch, though, as the jury's credibility determination on this matter is clearly supported by the evidence.   Although Maddox testified he was shocked, he conceded that the Defendant's language that he said "shocked" him was consistent with his own admitted conduct and

his interactions with the defendant.   For example, Maddox testified that one of the recordings that shocked him was a recording from October 29, 2016, wherein the defendant told Sweets that Maddox wanted to be paid and that the money should be paid through Governance.   Tr. 2038; Gov. Ex. 44.   A reasonable jury could have concluded that the trial evidence established that the defendant and Maddox talked about the UCs hiring Governance and that Southern Pines did indeed pay money through Governance.   *See* Trial Tr. at 1945.   So although Maddox expressed surprise during his testimony, the jury reasonably could have rejected or disbelieved Maddox's claims of surprise, as it appears to have done in convicting the defendant.

2.   The government presented ample evidence that the defendant's bribery scheme contemplated legally-sufficient official acts.

The defendant argues that there was insufficient evidence that the acts discussed by the defendant and Maddox constituted official acts under the Supreme Court's standard set forth in *McDonnell*.   Mot. at 8-9, 14-16; *McDonnell v. United States*, 136 S. Ct. 2355, 2369–70 (2016).   This is not so; the defendant, the UCs, and Maddox discussed several actions Maddox could take that would constitute legally-sufficient official acts.   Furthermore, the defendant cites to legally inapplicable authority in support of his argument

that there must have been an agreement to take *specific* official acts.   The law

he cites applies when the thing of value in a bribery arrangement is a campaign

contribution, which it was not in this case.   Mot. at 9.

As the Court properly instructed the jury, there were three types of

official acts at issue in the case: (1) "a vote on any matter that was pending or

might later come before a local governmental entity"; (2) "abstaining from a

vote—that is, not voting—on the same kind of matter"; or (3) "pressuring or

advising another official, including another commissioner or a staff member,

on the same kind of matter."   ECF No. 433 at 7-8.   The trial evidence

established that the defendant discussed with the UCs, and that Maddox

understood, that the UCs expected that he would be available to take actions

in furtherance of the real estate projects that the FBI front company, Southern

Pines, may bring before the commission.

Generally, the defendant discussed with the UCs the type of influence

Maddox could wield to their benefit.   In Nashville, he explained that then-

city manager Rick Fernandez was loyal and "beholden" to Maddox.   Gov.

Ex. 10 at 8-9.   And beyond Nashville, the defendant continued to refer to

Maddox's ability to influence Fernandez.   During the trip to Dallas, for

example, the defendant explained that Maddox could help them by influencing the city manager even if Maddox did not vote on their project:

| | |
|---|---|
| UC SWEET: | Are you sending the checks to Maddox? |
| UC MILLER: | Yeah. Sending what you told me to send. |
| BURNETTE: | Let me tell you this, don't stop that. Here's, wait hold on, listen to me [UI] You just send the checks to Paige. |
| UC MILLER: | Ok, yeah, well Governance. |
| BURNETTE: | It'll get done. Scott'll get it run through Rick Fernandez. Scott won't vote, but the three votes will be there without Scott. You'll have one person vote against you, Curtis. It'll be a 3-1 vote. |

Gov. Ex. 63 (transcript of Gov. Ex. 60) at 9. The defendant further explained that Maddox would do this by "pushing" Fernandez.   Gov. Ex. 64 (transcript of Gov. Ex. 61).

The defendant also expressed, both in Nashville and later in Dallas, that, in addition to Fernandez, Maddox was able to "wrangle the commission . . . in his direction."   *Id.* at 9.   In Nashville, specifically, Burnette discussed Maddox's influence over commissioners Gil Ziffer and Nancy Miller:

| | |
|---|---|
| UC SWEET: | And then you get so you get Maddox, and then you've got so there's three other people besides those two. |
| BURNETTE: | So you've got, you've got Nancy. |

| | |
|---|---|
| UC SWEET: | (Inaudible.) But you have let's see. |
| BURNETTE: | Gil Ziffer. |
| UC SWEET: | Okay. |
| BURNETTE: | Okay? Scott Maddox, Curtis Richardson, and the mayor. |
| UC SWEET: | How do those other three fall? How did they-- how do we proceed? |
| BURNETTE: | Nancy and Gil are going to fall. |
| UC SWEET: | For Scott? |
| BURNETTE: | For Scott. |

Gov. Ex. 10 at 9-11.   The defendant further explained that they would not be able to bribe Miller and Ziffer, so they would need Maddox to "convince them." *Id.* at 17.   The defendant discussed other official acts, such as Maddox not voting against the UCs' projects:

| | |
|---|---|
| BURNETTE: | Well, it could be an abstained vote, too, at times. So, it could be the -- Put it this way. I mean, let me just say -- I'm gonna tell you. It is what it is. The problem is if you started something, if you stop it, it's going to kill you. |

Gov. Ex. 75 (transcript of Gov. Ex. 71) at 2.   Specifically, Burnette explained the type of things he and Maddox could do to help Southern Pines:

| | |
|---|---|
| UC SWEET: | But they are saying why do we need --why do we need J.T., why do we need Maddox? I mean, 20 percent what's their value to this? |

28

| BURNETTE: | Right. I think, keep in mind it's not 20 percent, it's 20 percent after the PREFF. |
|---|---|
| UC SWEET: | Yeah, yeah, yeah. |
| BURNETTE: | Which is really only about six or seven percent. |
| UC SWEET: | Okay. |
| BURNETTE: | Um, You basically need to push it through across the finish line, make sure it gets permitted the way you want it to get permitted. So you know how these things go, right? |
| UC SWEET: | Right. |
| BURNETTE: | Always take this risk and you always need something to happen, and you've got to make those things happen. |

Gov. Ex. 50 (transcript of Gov. Ex. 47) at 7.

Pursuant to the proper jury instructions and relevant precedent, the acts contemplated by the defendant, Maddox, and the UCs qualify as legally-sufficient official acts.   Courts interpreting *McDonnell* have held that the "particular act of influence need not be identified at the time of the official's promise, [but] the particular question or matter to be influenced must be." *United States v. Silver*, 948 F.3d 538, 553 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656, 209 L. Ed. 2d 18 (2021).   As the Eleventh Circuit has explained, "although *McDonnell* specified that the 'question or matter' to be influenced

must be identified, that case did not reject the retainer theory of bribery. . . . Thus, the retainer theory of liability is still a valid basis of conviction under section 666 in this type of case." *United States v. Roberson,* 998 F.3d 1237, 1251 (11th Cir. 2021) (citing *McDonnell v. United States*, 136 S. Ct. 2355, 2369–70 (2016) and *United States v. Silver*, 948 F.3d 538, 552–55 (2d Cir. 2020) (noting that *McDonnell* did not invalidate the "as the opportunities arise" theory of bribery)); *see also* ECF No. 145 at ¶ 19 (alleging that the conspirators "demanded, sought, and received the money and bribes with the intent that Maddox would be influenced in the performance of official acts, as opportunities arose.").

Here, the defendant, Maddox, and the UCs discussed only the types of official acts and the matter to which they would relate—voting, abstaining, and advising and pressuring other public officials with regard to the real estate projects contemplated by the defendant and the UCs.   As an example, when the defendant explained that Maddox could "wrangle the commission" he specifically referenced a potential development of a piece of property owned by the city near Cascades Park.   Gov. Ex. 10 at 9.   Burnette then told the UCs that, in relation to the $10,000 per month payments, Maddox "isn't going to vote, but he's going to make sure that the votes are enough. Okay."   Gov.

Ex. 64 at 1.   What the defendant is describing is Maddox advising or pressuring other officials to take official acts.

And with Maddox, they discussed the two primary projects that Southern Pines was interested in—Fallschase and the Myers Park parcel—and discussed matters that may come before the commission.   With regard to annexation, they discussed that the property did not have to be annexed into the city, but that the defendant believed that the property should be annexed and that the project would be better financially if it was annexed.   Gov. Ex. 50 at 6.   Although annexation was not likely to be difficult to pass the commission, Maddox testified that it still required votes by the commissioners.   Tr. 1954-55.

With regard to Myers Park, the defendant explained that it was advantageous for their group to wait to decide what to propose to build on that property until it was known what the developer who owned the nearby property would do with his parcel.   Gov. Ex. 50 at 23.   The defendant, UC Sweet, and Maddox discussed that a potential issue would be if the city decided to put the Myers Park project out for bid before the nature of the nearby property was known.   *Id.* The defendant explained to UC Sweet that one benefit they had was that the commission could decide to delay putting

out the request for bids until a later date. *Id.* The defendant explained that this could be done through the city manager, who the defendant had already said was "beholden" to Maddox. *Id.* at 24.

The defendant's citation to *United States v. Evans* for the proposition that the government must prove an agreement "to perform specific official acts" is simply legally wrong. Mot. at 9. The defendant conveniently ignores that *Evans* dealt with campaign contributions as bribes and that the Supreme Court set a different standard for that type of bribery case. *Evans v. United States*, 504 U.S. 255, 257 (1992); *see United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) ("The instruction approved in *Evans* required that the acceptance of the campaign donation be in return for a specific official action—a *quid pro quo*."). In such cases, the government must prove that there was an "explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick v. United States*, 500 U.S. 257, 273 (1991). The portion of *Evans* to which the defendant cites to support his proposition that there be a "specific" official act identified is inapplicable, as the Supreme Court there was holding that the jury instruction in question "satisfies the *quid pro quo* requirement of *McCormick v. United States*." *Evans*, 504 U.S. at 268. Insofar as *McCormick* and *Evans* deal with

32

campaign contributions and the requirement for an explicit *quid pro quo* that is not present in this case, this Court should ignore all of the defendant's inapposite citations to *Evans*.

> 3. The jury's verdict on Count One does not require acquittal on any other count.

The defendant argues, incorrectly, that because "[t]he jury acquitted Burnette on the RICO conspiracy count (Count One), . . . Burnette cannot be liable on any counts on a theory of conspiracy liability." Mot. at 1. The Supreme Court "has made clear that a defendant cannot challenge a conviction on the ground that it is inconsistent with a verdict of acquittal on another count." *United States v. Romero*, 542 F. App'x 879, 884 (11th Cir. 2013) (citing *United States v. Powell*, 469 U.S. 57, 69, (1984) (holding that "there is no reason to vacate [a] conviction merely because the verdicts cannot be rationally reconciled" and that jury verdicts are "insulate[d] . . . from review" on grounds of inconsistency)); *see also United States v. Mitchell*, 146 F.3d 1338, 1344 (11th Cir. 1998) ("The Supreme Court has plainly determined that jury verdicts are 'insulated from review' on the ground that they are inconsistent.")

The jury's verdict on Count One does not compel any conclusions of fact as to any other count—the elements of Count One are quite different from

the elements of the counts of conviction.   *See* ECF No. 433.   A reasonable jury could have found the defendant guilty on Count One for several reasons while still concluding that the defendant was involved in a bribery scheme with Maddox and Carter-Smith with regard to MHG and the UCs.   The jury's acquittal on Count One therefore is not inconsistent with the jury's conviction on other counts.   However, even if it was inconsistent, "where truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'"   *Powell*, 469 U.S. at 64–65 (quoting *Dunn*, 284 U.S at 393).   A jury may reach seemingly inconsistent verdicts through "mistake, compromise, or lenity," which often makes it impossible to determine whether the inconsistency favored the defendant or the government. *Powell*, 469 U.S. at 65.

> 4.   The jury's verdicts on Counts Three and Four do not require acquittal on Count Two.

Similarly, the defendant is also incorrect that "The jury's acquittal on Counts Three and Four further forecloses aiding and abetting liability" on Count Two.   Mot. at 6.   Count Two alleged that the defendant engaged in and aided and abetted extortion "between in or about October 2016 and in or

about March 2017."   ECF No. 145.   The jury's verdict on Counts Three and Four—which alleged that checks were mailed in November and December 2016 in furtherance of the honest services mail fraud scheme—have no bearing on the convictions on Count Two Five and Six.

First, as is discussed above, inconsistent verdicts are not a basis to set aside a conviction.   *Powell*, 469 U.S. at 69.   Second, the conviction on Count Two is consistent with he jury's verdict on Counts Five and Six—wherein the jury found the defendant guilty of honest services wire fraud relating to checks sent in February and March 2017, within the time period alleged in Count Two.   The defendant argues that "no evidence proves beyond a reasonable doubt that Burnette and Maddox joined together between the date of the second check (December 18, 2016) and the third check (January 23, 2017)." Mot. at 7.   However, the defendant concedes that "[t]he only relevant event between those two dates is the Dallas meeting on January 9, 2017, when FBI agents told Burnette that they had already started making the payments and Burnette warned them that stopping payments could have negative consequences."   *Id.*

This January 9 meeting would have been significant to a reasonable jury because after this meeting that there is no doubt that the defendant knew

the UCs were sending checks to Maddox through Governance.   Gov. Ex. 63 at 9-11.   Not only did the defendant explicitly acknowledge during that meeting that the UCs were sending checks, he told the UCs that he would not be part of their deal if they stopped paying Maddox: "I'm not, you don't have to worry about him fucking me because I'm not getting into the deal! I can assure you! Rest 100% fucking for sure I'm not getting into the deal if you tell me that's the deal."   *Id*. at 11.   To remove any doubt, the defendant told Sweets the next day, "keep Maddox on payroll."   Gov. Ex. 68.

After that meeting, the UCs sent two more checks: one on January 23 and one on February 24.   Contrary to the defendant's assertion, there was sufficient evidence for the jury to conclude that the defendant "caused" the UCs to send the checks by telling them to do so.   Mot. at 8.

The defendant's actions go far beyond what the defendant asserts is "knowledge that a crime is being committed" or a "failure to stop an alleged extortion scheme."   Mot at 7.   There was ample evidence for a reasonable jury to fund that the defendant was presented with a bribery scheme and expressly joined it.

5.   <u>Maddox and Carter-Smith's testimony does not require acquittal on any counts.</u>

The defendant argues that Maddox and Carter-Smith's testimony about their own culpability in the charged conduct commands acquittal.   Mot. at 10-13.   The defendant's argument again amounts to little more than a disagreement with the jury's credibility determinations, which are not to be relitigated or questioned by the Court in resolving this motion.   *See Williams*, 390 F.3d at 1323.

However, considering the testimony of Maddox and Carter-Smith, it does not undermine the jury's verdict.   The defendant asks this court to focus on a limited number of answers to carefully crafted cross examination questions intended to give the impression that the witnesses denied or qualified their own culpability but which in reality have no bearing on the guilt of the defendant.

For example, the defendant is correct that Maddox testified that he was not a part of any "plan to extort anybody," but this testimony does not require acquittal.   Mot. at 4.   The question before the jury was whether the *defendant* aided and abetted "a public officer's receipt of money or anything else of value in exchange for an official act."   ECF 433 at 8.   The question posed to Maddox did not define "extortion" as it was defined for the jury and so

Maddox's response that he was never part of a "plan" to "extort" anyone is not relevant to the question before the jury.   The jury apparently agreed—after hearing Maddox's testimony and being properly instructed on the law, they convicted the defendant of Count Two, as compelled by the evidence.

The defendant argues that testimony from Maddox and Carter-Smith that they believed Carter-Smith was going to perform legitimate lobbying for Southern Pines requires acquittal.   Mot. at 5, 10, 12.   The defendant ignores, however, that regardless of what Carter-Smith was going to do with the money Southern Pines paid her, the relevant question was whether the money was paid by the UCs and accepted by Maddox knowing it was intended to influence him as a city commissioner.   ECF No. 433 (Jury Instructions) at 7 ("A 'bribe' is a payment of anything of value, including money, to a public officer in exchange for the officer's performance of, or agreement to perform, an official act.").   Both Maddox and the UCs testified that it was.

Accordingly, whether Maddox or Carter-Smith believed that she would do legitimate lobbying is of no moment because the payments were a thing of value to Maddox, obtained corruptly—to influence Maddox.   Of course, the jury was also free to reject Maddox and Carter-Smith's testimony and conclude that the was no legitimate lobbying contemplated.   A reasonable

jury could have come to this conclusion given that Carter-Smith accepted tens of thousands of dollars for weeks without making any genuine efforts to earn the payments.   Evidence that Maddox and Carter-Smith had done this same thing before–by using the guise of legitimate lobbying to conceal the MHG bribes and the ride share bribes–supports that conclusion.

The defendant also argues—inconsistent with the trial evidence—that "[w]ithout Maddox's knowledge that the checks from Southern Pines Development to Governance were in exchange for his official acts, there is insufficient evidence to support Count 2."   Mot. at 5.   This ignores Maddox's testimony that he indicated to UC Sweets that, in exchange for the payments to Governance, he would provide support as a city commissioner to the UCs' company, Southern Pines.   Trial Tr. at 1948-49; Gov. Ex. 403 at 15.

Similarly, Carter-Smith's testimony does not require acquittal, as the defendant argues.   Mot. at 5.   Carter-Smith's testimony was not only "that she was never knowingly part of any unlawful activity," as the defendant asserts.   Mot at 5.   The context of that statement is important.   Regarding her knowledge, she testified that she did not initially know about the bribe scheme, but later on became aware.   Trial Tr. at 1109.   Ultimately, however, Carter-Smith's testimony has no bearing on the defendant's guilt on Count 2.

In that count, the defendant was charged with attempting to obtain and obtaining property not due to Maddox, the public official, under color of official right. Whether or not Carter-Smith participated in that extortion, or believes she did, is irrelevant to the defendant's guilt.   The properly instructed jury weighed Carter-Smith's testimony and convicted the defendant nevertheless.

The defendant's arguments relating to Maddox and Carter-Smith's testimony amount to nothing more than an argument that the jury should have reached a different conclusion about what portion or portions of the testimony to credit based on the evidence.   However, the defendant made these same arguments to the jury at trial and the jury rejected them by convicting him. This Court should not upset that credibility determination.

**B.     The government presented ample evidence to allow a reasonable jury to find that the defendant made knowingly false statements sufficient to support the jury's verdict on Count Nine.**

The defendant argues that this Court must enter a judgment of acquittal on Count Nine because the questions posed were fundamentally ambiguous, the questions did not address a material issue, and the defendant's answers were literally true.   None of these arguments have merit.

1.    <u>Legal Standard</u>

  *a.    Fundamental ambiguity*

  "A question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) (quoting *United States v. Lattimore*, 127 F. Supp. 405, 410 (D.D.C. 1955)).[2]   Ambiguity "may not be established by isolating a statement from context, giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole." *Lighte*, 782 F.2d at 375 (citing *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir. 1976)).   Furthermore, some ambiguity does not preclude a conviction for making a false statement; "[i]f the response given was false as the defendant understood the question, his conviction is not invalidated by the fact that his answer to the question might generate a number of different interpretations."   *United States v. Williams*,

---

[2]  The Eleventh Circuit has not provided a fulsome definition of "fundamental ambiguity," but in *United States v. Manapat*, 928 F.2d 1097, 1099 (11th Cir. 1991) (relied upon by the defendant), the Court cited to *Lighte* for the legal standard relating to fundamental ambiguity.

552 F.2d 226, 229 (8th Cir. 1977); *see also Chapin*, 515 F.2d 1274, 1280 (D.C. Cir. 1975).

b.    *Materiality*

The test for determining materiality under 18 U.S.C. § 1001 is whether the false statement has the capability of affecting or influencing the exercise of a government function. *United States v. Herring*, 916 F.2d 1543, 1547 (11th Cir. 1990); *United States v. Fern*, 696 F.2d 1269 (11th Cir.1983). Materiality is satisfied even if the federal government was not actually influenced by the false statements. *Id.* (citing *Fern* at 1273).

An actual effect or influence is not required for a statement to be material; the capability or potential for effect or influence is enough. *United States v. Bazantes*, 978 F.3d 1227, 1247 (11th Cir. 2020) (citing *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). "The false statement must simply have the capacity to impair or pervert the functioning of a government agency." *United States v. Lichenstein*, 610 F.2d 1272, 1278 (5th Cir. 1980); *see Herring*, 916 F.2d at 1547. "A statement can be material even if it is ignored or never read by the agency receiving the misstatement." *United States v. Diaz*, 690 F.2d 1352, 1358 (11th Cir. 1982).

2.      <u>There was ample evidence to support the jury's verdict
on Count Nine as to each of the five false statements.</u>

The government presented plentiful evidence at trial that the questions posed to the defendant were not fundamentally ambiguous, the defendant's responses were false, and the statements concerned material matters.

a.      *Burnette's Statement That He Did Not Know To
Whom Southern Pines Development Wrote Checks*

The defendant asserts, incorrectly, that the question, "who did they hire" is ambiguous simply because the question could prompt different answers based on the underlying facts.   This is not fundamental ambiguity. The word "who" is not ambiguous because the response could be a person or a company; in this instance both could be correct.   Further, "hire" is not ambiguous because there are multiple ways to hire someone.   The defendant was not convicted because he responded that the UCs hired "Carter-Smith" instead of "Governance" or for telling the agents that the UCs had entered into a verbal contract when it was in fact written.   He was convicted because his answer—that he did not know who the UCs had paid—was false.

The defendant's argument that his answer—that he did not know to whom the UCs wrote checks and so it was "literally true"—is completely unsupported by the trial transcript.   As is evident from the trial testimony, he

knew full well that the UCs had been sending monthly checks for $10,000 to Carter-Smith.   The defendant's own recorded statements were unambiguous that he was aware that the UCs were sending checks to Maddox through Carter-Smith's company, which he knew as Governance.   After discussing multiple times, detailed above, that the UCs should pay Maddox by sending money to Carter-Smith at Governance, and the UCs telling him they sent those checks as he specified, he later specifically instructed the UCs to *continue* to send checks to Governance.   For example, in a January 9, 2017 recording in Dallas, the defendant stated the following:

> UC SWEET:      Are you sending the checks to Maddox?
>
> UC MILLER:      Yeah. Sending what you told me to send.
>
> BURNETTE:      Let me tell you this, don't stop that. Here's, wait hold on, listen to me [UI] You just send the checks to Paige.
>
> UC MILLER:       Ok, yeah, well Governance.

Gov. Ex. 63 at 9-11.   Two months later, in Tallahassee, the defendant discussed the payments again:

> UC BUTLER:      But, the result is we are paying him now. So at this point, either --
>
> BURNETTE:      Is Mike still paying? Are you still paying?
>
> UC MILLER:      I was told to start writing checks. I started writing checks, so --

| BURNETTE: | And you haven't stopped. |
|---|---|
| UC MILLER: | No, every month. |
| BURNETTE: | Then I wouldn't stop. I see, for some reason -- I could be wrong -- I was under the impression that you wrote two checks and hadn't written anymore. You've been continuing to write the checks. Don't stop. Take that back what I said. |

Gov. Ex. 75 at 5.

Perhaps most importantly, the jury heard the defendant's argument that

his answer was true and rejected it, in convicting him of Count Nine:

> Q.   And you said you didn't know who he wrote a check to. What did you mean by that?
>
> A.   I never saw any of the checks that they wrote. And so the answers, getting Paige -- or Miller was saying one thing and Scott was saying another, I didn't know who they were writing checks to.

Trial Tr. at 2684.

### b.   Burnette's Statement That He Did Not Know the Name of Carter-Smith's Firm

The question asked by SA Doyle as to whether Carter-Smith was with

a firm or "on her own" is not fundamentally ambiguous.   A person of

ordinary intellect would understand that SA Doyle was asking what firm

Carter-Smith was affiliated with, if any.   This is apparently how the

defendant understood the question, as he responded that he did not know the

name of her firm, which was false.   As with the above statement, the defendant was not charged and convicted with giving an answer that would have been accurate based on a different interpretation of the question—he was charged and convicted of giving a completely fabricated answer designed to distance himself from the criminal activity.

The trial evidence established that the defendant's answer was false because he knew the name of Carter-Smith's firm, and had repeatedly referenced it (and Maddox's relationship with and involvement in it) in his conversations with the UCs.   What follows are just a few examples of the defendant discussing Governance specifically.

| | |
|---|---|
| UC MILLER: | Cool. Sounds good man. Hey, Sweets had told me . . . you know the whole deal that he worked out with Maddox and stuff and the only thing I was going to ask you was . . . um, so my understanding is . . . you know Sweets gets a little confused with how stuff's going where, and he told me it was going to Governance, is that right? |
| BURNETTE: | Yeah, we'll discuss that a little more when you guys get into town. I actually had a meeting with Maddox and, uh, and talked to him a little bit about it, um, you know, I, I will tell you that, you know, I think that's a good plan to start, I think you got a little runway to do it, I mean, and I guess the big question I got is, I mean, I assume you guys are fairly |

certain you're going to do a deal in Tallahassee.

Gov. Ex. 40 at 3-4.   The defendant then stated "there's nobody else in Governance other than Paige." *Id.* at 4.

| | |
|---|---|
| UC SWEET: | Are you sending the checks to Maddox? |
| UC MILLER: | Yeah. Sending what you told me to send. |
| BURNETTE: | Let me tell you this, don't stop that. Here's, wait hold on, listen to me [UI] You just send the checks to Paige. |
| UC MILLER: | Ok, yeah, well Governance. |

Gov. Ex. 63 at 9.

Furthermore, the jury heard and must have rejected the defendant's testimony that he did not *remember* the name of Carter-Smith's firm:

| | |
|---|---|
| Q. | Tell us what you meant by that. |
| A. | I just didn't remember the name of the firm. Like, professional organizations, you know the name of the people. I mean, I told them Paige Carter-Smith, I just didn't remember the exact name of the firm. Like, I don't know my doctor's practice; I know my doctor. |
| Q. | Were you purposely trying to not give them the firm? |
| A. | No. I was not trying to hide anything from them. I told them I recommended Paige Carter-Smith. |

Trial Tr. at 2684-85.

### c.   Burnette's Statement That He Did Not Know Who Southern Pines Development Had Retained

The question of who the UCs retained is not fundamentally ambiguous. The word "retain," like the word "hire," has a commonly accepted and understood meaning, particularly for a sophisticated businessman such as the defendant who often retains professionals for various reasons.   Furthermore, in the context of the conversation, the agents were asking generally who the UCs had hired in the Tallahassee area, so to ask who they "retained" would have been clear to Burnette.   The defendant's answer was definitive—he stated that he did not know who they retained—evincing no confusion by the defendant as to the question.

As the trial evidence demonstrated, this was a lie.   As described above, the defendant told the UCs many times that they could pay Maddox by hiring Carter-Smith through Governance.   The defendant explained early on that Maddox was paid through his lobbying firm, starting in Nashville on September 21, 2016:

> UC SWEET:       Okay. So you he just gets paid through his lobbying firm, right?
>
> BURNETTE:       He definitely gets paid through the lobbying firm.

Gov. Ex. 10 at 16.   And on October 5, 2016, the defendant stated the following:

| | |
|---|---|
| UC SWEET: | So, how do we . . . how do we fill Maddox's coffers? How do we fill that cup up? |
| BURNETTE: | So, Maddox has a consulting. |

Gov. Ex. 26 at 2.   Maddox also testified that he told the defendant when the UCs started paying Governance.   Trial Tr. at 1949.   In January 2017, the UCs confirmed to the defendant that they were paying Maddox through Governance.

| | |
|---|---|
| UC SWEET: | Are you sending the checks to Maddox? |
| UC MILLER: | Yeah. Sending what you told me to send. |
| BURNETTE: | Let me tell you this, don't stop that. Here's, wait hold on, listen to me [UI] You just send the checks to Paige. |
| UC MILLER: | Ok, yeah, well Governance. |

Gov. Ex. 63 at 9.

The defendant discussed the payments with the UCs in March 2017 as well:

| | |
|---|---|
| UC BUTLER: | But, the result is we are paying him now. So at this point, either -- |
| BURNETTE: | Is Mike still paying? Are you still paying? |
| UC MILLER: | I was told to start writing checks. I started writing checks, so -- |

| BURNETTE: | And you haven't stopped. |
|---|---|
| UC MILLER: | No, every month. |
| BURNETTE: | Then I wouldn't stop. I see, for some reason -- I could be wrong -- I was under the impression that you wrote two checks and hadn't written anymore. You've been continuing to write the checks. Don't stop. Take that back what I said. |
| UC BUTLER: | Because it will reverse the effect. |
| BURNETTE: | It will reverse the effect. |

Gov. Ex. 75 at 5.  And on March 13, the defendant advised the UCs to "continue to pay Paige the ten thousand dollars."  *Id*. at 2.

As with his other false statements, the jury heard the defendant's argument that his answer was true and rejected it, in convicting him of Count Nine:

> Q.    What did you mean by that answer, "I do not know who they retained"?
>
> A.    I just didn't know exactly who all they retained. I mean, like I didn't know the name of Adam Corey's firm, either.

Trial Tr. at 2685.

> d.   *Burnette's Statement That He Did Not Know The*
> *Content Of Conversations That Southern Pines*
> *Development Had With Maddox*

The defendant argues that the question about the content of the conversations that Southern Pines had with Maddox is compound, and therefore ambiguous.   The question, though, is not compound; it is simply whether the defendant knew the content of conversations.   What the defendant calls the "second question" (whether Burnette knows what the undercover agents wanted from Maddox) is the agent clarifying what he was asking.   And the defendant claims there is a third question, but he never articulates what it is, and concedes that it was never asked.   Mot. at 26. Given that, it cannot create ambiguity.   The question, however, about the content of the conversations, is not ambiguous at all, and the defendant's answer—that he did not know the answer to the question—is false.   He knew what UC Sweets and Maddox talked about because Sweets told him.   And he knew what Sweets and Maddox talked about in Las Vegas because he was there.

Again, the jury heard the defendant's argument that his answer was true and rejected it, in convicting him of Count Nine:

> Q.   Mr. Burnette, looking at lines 17 and 18, can you
> tell us what that question was asking you to answer?

A.   Do you know what the content of their conversa –
     what did they want from Maddox? What did they -
     - It was kind of broken up, I mean. But I think as
     part of the answer I'm, like: Well, the content of
     their conversation was they had a bunch of
     conversations with Maddox I wasn't present at. And
     I didn't know the answer to that.

Q.   When you said, "I don't know the answer to that,"
     what did you mean?

A.   I thought they were talking about the first part of the
     thing about the conversations they had with
     Maddox.

Trial Tr. at 2685-86.

> e.   *Burnette's Statement That He Did Not Know That*
>       *Southern Pines Development Representatives Had*
>       *Paid Maddox*

The defendant again claims ambiguity in the question—did they pay

Maddox—simply because this unambiguous question may have various

answers.   The defendant is correct that a payment to Maddox may take

several forms, such as "indirect payments, promised future payments, or in-

kind contributions such as leisure travel."   Mot. at 27.   Those possible

*answers* do not make the *question* ambiguous, though—if an agent were to

ask the defendant the color of a room, it does not make the question

ambiguous because the room could have been any number of colors.

The defendant's answer was knowingly false because he knew that the UCs were paying Maddox—he told them they should pay him, he told them how to pay him, the UCs told the defendant that they had paid Maddox (as instructed), and the defendant told them not to stop paying Maddox.

UC Miller told the defendant that he wanted to be sure the payments to Governance were "for Maddox and not for another lobbyist," to which the defendant replied: "Yeah, no, no, definitely for Ma . . . the only . . . I mean, so . . . it's definitely for Maddox, there's nobody else in Governance other than Paige, which is Maddox effectively, indirectly."   Gov. Ex. 40 at 3.

On October 29, 2016 UC Sweets asked Burnette to clarify whether Maddox wanted to get paid, to which Burnette replied "No, no, he does. He wants to get paid."   Ex. 44 at 3.   Burnette then confirmed what he had discussed with UC Miller: "Uh, Mike and I talked about that and run that through Governance."   *Id.*   On January 10, the defendant advised the UCs to "keep Maddox on payroll."   Gov. Ex. 68 (transcript of Gov. Ex. 66) at 1.

The jury heard the defendant's argument that his answer was true as to this question, and rejected it as well, in convicting him of Count Nine:

Q.    Mr. Burnette, did you know if they paid Maddox?

A.    I mean, in my conversation with Maddox, Maddox told me that he did not pay them -- pay him. But I

> said no, and then I said: Let me tell you this, I don't
> know who they paid. I never saw them pay anybody.
> I never saw the checks.

Trial Tr. at 2686.

    3.   <u>There was ample evidence that defendant's false statements
were material.</u>

The defendant's argument that his false statements were not material is also without merit.   The core of the FBI's investigation was whether Maddox was receiving payments from those with business before the city commission intended to influence them.   Each of the questions asked and each of the defendant's false statements in response related to important facts about a bribery investigation that the FBI was undertaking, and involved actors and co-conspirators, as well as the enterprise (or Governance), the payments that were made by the UCs, and who those payments were made to.   The FBI was investigating how money was paid to public officials, and every question asked was about how the money got to which public officials. The answers to those questions has a natural tendency to influence the FBI's investigation, and were therefore material.

## V.   <u>CONCLUSION</u>

For the reasons stated herein, the government respectfully submits that the Defendant's motion should be denied.

Respectfully submitted on October 15, 2021,

JASON R. COODY
United States Attorney

*/s/ Stephen M. Kunz*
STEPHEN M. KUNZ
ANDREW J. GROGAN
Assistant United States Attorney
Florida Bar No. 322415
Florida Bar No. 85932
111 North Adams St., 4th Floor
Tallahassee, FL 32301
(850) 942-8430
stephen.kunz@usdoj.gov
andrew.grogan@usdoj.gov

COREY R. AMUNDSON
Chief
Public Integrity Section

*/s/   Peter M. Nothstein*
PETER M. NOTHSTEIN
Deputy Chief
ROSALEEN T. O'GARA
Trial Attorney
Maryland Bar No. 0512140322
Arizona Bar No. 029512
Public Integrity Section
Criminal Division
1331 F Street NW
Washington, D.C. 20005
(202) 514-2401
(202) 616-2464
rosaleen.o'gara2@usdoj.gov
peter.nothstein@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of this motion has been filed via the

CM/ECF filing system on this 15th day of October 2021, and thereby has

been provided to counsel for defendant Burnette.

<u>/s/ Peter M. Nothstein</u>
Peter N. Nothstein
Deputy Chief