**THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                           **Case No. 4:18cr76-RH/EMT**

**JOHN THOMAS BURNETTE,**

      **Defendants.**

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, respectfully submits this Sentencing Memorandum.

## I.     INTRODUCTION

The defendant John Thomas Burnette ("Burnette") was convicted after a trial of participating in a bribery scheme with former Tallahassee city commissioner, defendant Scott Charles Maddox ("Maddox"), who perpetrated a long-running bribery scheme along with his long-time business and romantic partner, defendant Janice Paige Carter-Smith ("Carter-Smith"). The evidence at trial established two similar instances of bribery among the defendant, Maddox, and Carter-Smith: a $100,000 bribe associated with a vote relating to the McKibbon Hotel Group and $40,000 in bribes associated with FBI front company Southern Pines.

In both instances, the defendant paid or caused to be paid to Maddox substantial bribes to ensure positive results before the city commission. These bribes amounted to little more than an insurance policy—a cost of doing business, as the defendant remarked—that provided the defendant assurance his projects would not be derailed or delayed.   That insurance, however, came at the tremendous cost of the public's confidence in the integrity of its elected officials.

As was his right, the defendant testified and told a story that in part attempted to justify his actions and in part asked the jury and this Court to accept a fabricated version of events that was implausible, illogical, and untrue when viewed in light of the damning evidence against him.   Perhaps most importantly, although the defendant essentially admitted his complicity in a bribery scheme, he was unrepentant as to the gravity and impact of his actions.

The evidence showed that the defendant was willing to use his power and wealth to corrupt the political process for his own advantage, and he has shown no remorse for doing so.   To achieve the purposes of sentencing embodied in 18 U.S.C § 3553, this Court must sentence the defendant to a substantial term of imprisonment, as called for by the guidelines.   Only such

a sentence will properly punish the defendant and deter other rich and powerful individuals from using their money to corrupt public officials.

## II.   SENTENCING GUIDELINES

The Presentence Investigation Report ("PSR") accurately calculates the advisory guidelines range for the defendant.   The PSR correctly assigns a base offense level of 12, pursuant to U.S.S.G. § 2C1.1(a)(2).   ECF No. 492 at ¶ 79.   Two levels are properly added under § 2C1.1(b)(1) because the offense involved more than one bribe or extortion.   *Id.* at ¶ 80.   Another four levels are properly added under § 2C1.1(b)(3) because Maddox was an elected public official.   *Id.* at ¶ 82.   The PSR also correctly adds an additional eight levels under § 2B1.1(b)(1)(E) because the loss exceeded $95,000 but was less than $150,000.   *Id.* at ¶ 125.   Finally, the PSR correctly adds two levels under § 3C1.1 because the defendant was convicted of making a false material statement.   *Id.* at ¶ 85.   The defendant's objections to these final two guidelines adjustments are addressed below.

The final offense level is 28 and the defendant's criminal history category is I, resulting in an advisory guidelines range of 78-97 months   *See Id.* at ¶ 95.

### III.   OFFENSE CONDUCT

This Court is well acquainted with the facts of this case, having presided over the pretrial litigation and the month-long trial.   For that reason, the government will not recount all of the facts relevant to sentencing, but instead includes only the evidence necessary to rebut the defendant's lengthy objections to the factual findings in the PSR.   *See* ECF No. 496.

The defendant's objections rehash arguments made during trial.   With regard to Southern Pines, the defendant argues, as he did at trial, that he never truly intended to bribe Maddox—he was only pretending that he could or would do so, but the UCs bribed Maddox without the defendant's knowledge or assent.   These arguments were largely rejected by the jury and should be rejected by this Court in assessing the defendant's culpability at sentencing. The government's evidence establishes that the defendant willfully, if not enthusiastically, convinced the UCs that Maddox could be bribed and that the defendant was the UCs' key to their ability to do so.   The defendant falsely testified that he was not genuine in his recorded statements, but the evidence shows this was not true.

4

A.    **The defendant correctly informed the UCs that they could bribe Maddox and provided detailed instructions of how to do so.**

The government's evidence proved that the defendant was a ready and willing participant in the bribery scheme.   After nearly a year of developing a personal relationship with UCs Miller and Sweet, the defendant revealed to them in September 2016 that it was possible to bribe Maddox and how to do it.   In that meeting in Nashville, Tennessee, the defendant explained that his close relationship with Maddox was valuable to the UCs' business interests.

| | |
|---|---|
| UC SWEET: | . . . but I also want to figure out, you know, where do you fit into the scheme of things for us? |
| BURNETTE: | So I really think there's I think there's two core issues to have a conversation about. So there so Scott Maddox and I have a very deep relationship. |
| UC SWEET: | Now, he's the county guy? County. |
| BURNETTE: | He's the city commissioner. Okay. |
| UC SWEET: | City commissioner. Okay. |
| BURNETTE: | Scott Maddox is, you know, arguably, probably the most sophisticated politician of all the city and county players period. |

Gov. Ex. 10 (transcript of Gov. Ex. 6) at 4-5.

The defendant then explained to the defendants how Maddox could be

bribed by paying Maddox's consulting company and that the amount they would have to pay Maddox was determined by the difficulty of their request of him—the "lift."   Trial Tr. at 1582, 1598, 1602-03, 1608.

The defendant argues in the PSR that the UCs were the first to bring up Maddox, a point the defendant pressed at trial in an attempt to insinuate to the jury that the defendant was entrapped by the FBI without properly asserting the defense.   However, as this court stated during trial, it is perfectly legal for the government to use undercover agents in this manner.   Trial Tr. at 1492. The government is entitled to provide the defendant "a favorable opportunity for the defendant to commit a crime."   Eleventh Cir. Pattern Jury Instr. S13.1. The question is whether the defendant will take the bait.   In this case, the defendant did—and ran with it.

The defendant heard UC Sweet's desire to pay bribes and did not distance himself from UC Sweet or report him to law enforcement.   The defendant continued to do business with UC Sweet in spite of—or perhaps *because of*—his desire to pay bribes.   This is strong evidence of the defendant's criminal intent.

The defendant has asserted in his PSR objections that he was discussing legitimate political influence, not bribes, in the September 21, 2016 recording.

The defendant's own statements demonstrate that this is not true.

In those recordings, the defendant made clear that Maddox needed to be paid, unlike other commissioners who could be influenced in other, legitimate, ways:

| | |
|---|---|
| BURNETTE: | **So Nancy is a moral-driven person.** Okay? |
| UC SWEETS: | Okay. |
| BURNETTE: | **So Nancy is not for sale**. She has to be coerced into a vote. |
| UC SWEETS: | Okay. |
| BURNETTE: | Does that make sense like . . . |
| UC SWEETS: | Yeah. |
| BURNETTE: | You've got to hit a moral . . . |
| UC SWEETS: | Yeah. |
| BURNETTE: | piece with her. |

Gov. Ex. 11 (transcript of Gov. Ex. 7) at 13 (emphasis added).

| | |
|---|---|
| UC SWEETS: | Okay. It sort of does because I've never seen it operated like that, but I guess it could happen. **So that explains Nancy, like you come at her . . .** |
| BURNETTE: | **And Gil's the same**. |
| UC SWEETS: | **. . . from a moral position.** |
| BURNETTE: | **Gil's the same deal**. |

7

| | |
|---|---|
| UC SWEETS: | Okay. |

*Id*. at 15 (emphasis added).

| | |
|---|---|
| BURNETTE: | It's a project-by-project thing. I-- I just don't, so you have Nancy, right? **You're not going to buy Nancy. You're really not going to buy Gil either.** |
| UC SWEETS: | Yeah. |
| BURNETTE: | Right? **You're only going to convince them on the merits of what you're doing.** Now, keep in mind that Scott or all |
| UC BUTLER: | But Scott convinces them. |
| BURNETTE: | Scott convinced them. So does Drew. |

*Id*. at 17 (emphasis added).

| | |
|---|---|
| BURNETTE: | Alright? They could give you 100 percent of it, could give you 50 percent of it. |
| UC SWEET: | So how do you get 100 -- how do you guarantee 100 percent for 20 years? |
| BURNETTE: | It -- there's a cost associated with that and about 10 percent of what you're going to get. |
| UC SWEET: | Okay. |
| BURNETTE: | It could be up to 20 percent of what you get. |
| UC SWEET: | And how does that get -- how does that cost get distributed? Where is that |

8

|                | cost? |
|----------------|-------|
| BURNETTE:      | So here's the thing. It depends on where the project is. Okay? So here's the thing. For example, if Curtis supports the project, Andrew is going to support the project. Okay? |
| UC SWEET:      | Okay. |
| BURNETTE:      | So there's two votes. Then all you need is-- is Scott, Nancy, and Gil. **You've gotta pay Scott**. |

Gov. Ex. 12 (transcript of Gov. Ex. 8) at 7 (emphasis added).

The defendant capped his description of how to bribe Maddox by explaining that Maddox is the type of public official who "wants his piece of the pie"—that is, he wants to be paid bribes. *Id.* at 21. Lest there be any doubt as to what the defendant was trying to accomplish in that meeting, he admitted on cross examination that he was intentionally giving the UCs the impression they could bribe Maddox:

> Q.   So what you're talking about there is you're telling Mr. Sweets that you can pay bribes here. Those dollars signs in the cup are bribes, correct?
>
> A.   I'm trying to give him the assurance that he wants to know that he can get anything he wants.
>
> Q.   But just to be clear, you are intentionally giving him the impression that he can pay bribes in Tallahassee, right?
>
> A.   Yes.

*Id.* at 2917-18.   The defendant testified that he was only pretending to intend to participate in a bribery scheme, but the evidence shows this is not true.

    **B.**    **The defendant's testimony about his true intent is not credible; he willingly inserted himself as the middle man between the UCs and Maddox but did nothing to prevent the UCs from paying bribes to Maddox.**

The defendant testified that when he told the UCs in Nashville that he would pay Maddox bribes out of his share, he did not actually intend to go through with the bribery scheme he was describing but was "placating" the UCs' desire to pay bribes.   Trial Tr. at 2549.   Instead, he planned to insert himself between Maddox and the UCs and actually *prevent* the bribery.   Trial Tr. at 2548.   His post-Nashville conduct belies that claim.   Soon after leaving Nashville, on October 2, the defendant learned that UC Miller met with Maddox without the defendant's knowledge.   According to the defendant, he had recently spent effort convincing UC Miller that he could bribe Maddox, but instead of being concerned that UC Miller may act on the defendant's suggestion that Maddox could be bribed, the defendant was upset that UC Miller told Maddox about the defendant's interest in Fallschase, not the prospect that UC Miller might offer Maddox a bribe in a manner the defendant could not intercept:

    Q.    Did you learn that Mike Miller had met Scott

Maddox at some point?

A.     Yeah, I think -- because I remember being ticked off about it. I think he told me that he met Scott Maddox that day that we went and walked Fallschase earlier in the month, like the second, or whatever day it is.

Q.     You're talking about Mike Miller now?

A.     Mike Miller. And he told me that he had told Scott Maddox about my interest in Fallschase.

Q.     And why were you mad?

A.     Why the heck would he be going around telling everybody that I'm interested in Fallschase? That's not the way you do business. You don't -- that's not the way you do it.

Trial Tr. at 2567 (discussing the Oct. 2, 2016 recording, Gov. Ex. 17, 20).

Just days later, on October 5, the defendant learned that UC Sweet—the UC who was most determined to pay bribes, according to the defendant—met Maddox, unbeknownst to the defendant, and had relatively explicit conversations about the UCs paying bribes to Maddox:

UC SWEET:     Well, now, that he is aware of it, he can look into it. Maddox said something about he has three or four places tee'd up for you. And his only . . . the only thing we talked like business-wise was, other than him trying to extort 20 out of me, was, instead . . . I am, like: "No! No!" [Laughs]

BURNETTE:     You can't knock him for asking.

11

| | |
|---|---|
| UC SWEET: | No, you can't knock him for asking. . . . uh, was, uh, that you gotta be involved. And thus, he's involved. And I said, that's not even a question of it. We're not even worried about that. |
| BURNETTE: | Right. |

Gov. Ex. 27 (transcript of Gov. Ex. 23) at 3.   The defendant again did nothing to prevent UC Sweet and Maddox from talking about bribery; he laughed off Maddox's attempted extortion.

If the defendant's testimony that he was trying to fool the UCs was truthful, one might expect the defendant to try to put himself between the UCs and Maddox to stop the payments.   Instead, the defendant deepened his involvement in the developing bribery scheme by inserting himself in the middle as the communicator with Maddox, but simultaneously removed himself as the intermediary on the money, instructing the UCs to pay Governance but to execute the payments without him.

| | |
|---|---|
| UC MILLER: | I don't know if he wants cash or would rather have a check or . . . |
| BURNETTE: | I will talk to Maddox. I will tell you kind of Maddox's position. I mean, I'll just be transparent with you, he's like, look, you know . . . I just don't want to deal with anybody I don't know. |
| UC MILLER: | Sure. |

12

| | |
|---|---|
| BURNETTE: | So, **I mean, again, I don't wanna be the middle man on the money.** |
| UC MILLER: | Right. |
| BURNETTE: | You know Maddox doesn't . . . he wants to keep his conversations narrowed to one person. |
| UC MILLER: | Gotcha, ok. |
| BURNETTE: | Uh, that's his only concern whatsoever, um, but Maddox will be there, um, when he's needed. That's, that's not gonna be an issue, it's just . . . you know . . . I know Sweets wanted him to come out to Vegas and that stuff and he's like look, I just, you know Maddox's comment was "I got enough friends" you know? |
| UC MILLER: | Yeah. |
| BURNETTE: | I'd rather work with the friends I have, you know? |
| UC MILLER: | Ok, yeah. |
| BURNETTE: | So, I mean, I don't want Mike . . . or you guys to take it the wrong way. I don't think that's the intention, I just think the intention is that, you know . . . he doesn't know, right? So he wants to work with somebody he knows, nothing more nothing less. |
| UC MILLER: | I get it, yeah. |
| BURNETTE: | Um. So, we'll discuss this some more. I had a conversation with him, though, |

> I kind of knew that was the plan, I kind of laid that ground work, and Governance is the answer. I just want to have a discussion with him about you know, how he wants to receive those funds, call it "into Governance"

Gov. Ex. 40 (transcript of Gov. Ex. 38) (emphasis added).   Just days later, the defendant confirmed to UC Sweet that Maddox wanted to be paid but that the defendant would be the communication conduit to Maddox:

| | |
|---|---|
| BURNETTE: | Okay? So, I don't - did Mike tell you - I had a conversation with Maddox. |
| UC SWEETS: | He said you just talked, but we didn't go into any detail on the phone. |
| BURNETTE: | So, effectively, Scott's like, "Look, here's the deal." He's like, "Look, I think these guys are great guys," but he's like, "Look, I don't want any more friends," you know what I mean? He's like, "I don't want to deal with any more people, you know what I mean?" |
| UC SWEETS: | Right. |
| BURNETTE: | He's like, "I want to deal with you." |
| UC SWEETS: | Okay. |
| BURNETTE: | And, you know, he's like look, "You tell me what you need and I'll -" You know, "And you know, like I always will, I'll get it done." |
| UC SWEETS: | So, is he not wanting - does he not |

|  | want paid? |
| --- | --- |
| BURNETTE: | No, no, he does. **He wants to get paid**. |
| UC SWEETS: | Okay. |
| BURNETTE: | So, we worked that out. Uh, Mike and I talked about that and run that through Governance. |
| UC SWEETS: | Okay. |

Gov. Ex. 44 (transcript of Gov. Ex. 42) at 2-3 (emphasis added).

That act of cutting himself out as of the money conduit but not as the communication conduit reveals the lie behind the defendant's testimony.   If the defendant truly wanted to prevent the UCs from paying a bribe to Maddox—because in his telling, "Scott Maddox is not going to vote for anything that is not good for Tallahassee" and did not accept bribes—the defendant would have sought to stop the payments.   *See* Trial Tr. at 2553. But he did not.   To the contrary, he told the UCs to go ahead and pay Maddox through Governance.

The defendant also argues in his PSR objections that the November and December 2016 checks to Governance should not be considered relevant conduct because he did not actually know that the UCs had paid Maddox until January 2017.   That argument is addressed more fully below, but this conversation shows that the defendant knew they were going to pay Maddox

and he was fine with it:

> BURNETTE: And I still gotta talk to Scott about how he wants to exactly do that. But here - here - this is what I'm getting at, right? This is definitely a preemptive approach you're taking.
>
> UC SWEETS: Absolutely.
>
> BURNETTE: All right. I just wanna make sure you understand that that's what it is.
>
> UC SWEETS: Yeah, yeah, yeah. And there's no guarantees with that, right?
>
> BURNETTE: That's right.
>
> UC SWEETS: I mean, that - that's the way it is, but that's kind of the way we've always done business. I should say that's like-
>
> BURNETTE: And again, not saying anything's wrong with it.

*Id*. at 3. This exchange shows that despite his claims to the contrary, the defendant knew the UCs were going to pay Maddox before a specific ask was identified and he agreed to that plan.

These recordings also show that the defendant's true intent was not to fool the UCs, but to get the UCs to actually pay bribes to Maddox. In light of the defendant's own statements, recorded when he thought no one was listening, it is clear that his claims at trial that he was only pretending to

explain to the UCs how to pay Maddox were a fabrication.

The defendant argues in his PSR objections, as he did at trial, that on November 10, 2016, he tried to dissuade UC Miller from paying Maddox at all.   In support, he points to this single exchange:

| | |
|---|---|
| M.M.: | Hey, who do I need to -- because I'm getting beat up here.   Who do I need to send a check to? |
| J.T.B.: | We're going to talk about it with Maddox, but it's Governance. |
| M.M.: | Okay.   Do I need to like mail it or – |
| J.T. B.: | We're going to talk about it in Vegas. |
| M.M.: | Okay.   So I don't need to send it before then? |
| J.T.B.: | No, no, no. |
| M.M.: | Okay. |

Def. Ex. 204; *see* ECF No. 496 at 6.

This recording does not prove what the defendant insists it does.   UC Miller asks the defendant where he should send a check and the defendant's response is that they will talk about it with Maddox, but the defendant confirms that "it's Governance"—that is where the bribe money should be sent.   It was only when UC Miller asked whether the check should be sent *before* the Las Vegas trip that the defendant stated "no, no, no."   He was

telling UC Miller only that they don't need to pay Maddox *at that moment*, not that they should not pay him bribes *at all*.   This is consistent with the defendant's explanation to UC Sweet that he prefers to pay the bribe once the requested official action is identified, not before.

Further, it is not credible that in uttering the word "no" three times, with nothing more, the defendant was trying to put the brakes on the entire bribery scheme he—by his own admission—put in motion.   The defendant had many chances, both before and after this recording, to dissuade the UCs or extricate himself from the scheme.   He did neither.   He encouraged the UCs to continue with the plan to pay Maddox.   Far from "placating" the UCs, the defendant knew full well that they were going to pay Maddox and was encouraging them to do so.

To the extent there was any doubt about the defendant's intent to enter into a bribery scheme with the UCs and Maddox, the defendant removed it with his actions in January and March, 2017.   In January, the defendant instructed the UCs not to stop sending checks to Maddox:

| UC SWEET: | Are you sending the checks to Maddox? |
|---|---|
| UC MILLER: | Yeah. Sending what you told me to send. |

| | |
|---|---|
| BURNETTE: | Let me tell you this, don't stop that. Here's, wait hold on, listen to me [UI] You just send the checks to Paige. |
| UC MILLER: | Ok, yeah, well Governance. |
| BURNETTE: | It'll get done. Scott'll get it run through Rick Fernandez. Scott won't vote, but the three votes will be there without Scott. You'll have one person vote against you, Curtis. It'll be a 3-1 vote. |
| UC SWEET: | But, okay, so, let me ask you this, what are you sending him ten grand? |
| UC SWEET: | Why send him ten grand? |
| BURNETTE: | (SC) Adam Corey, let me be very clear with you [UI] Scott Maddox can kill you Adam can't, Scott can. |
| BURNETTE: | Yeah! I'm gonna get on some Mike Sweets here! |
| UC SWEET: | Yeah? I'm fine with that! |
| BURNETTE: | Let me tell you this, Scott Maddox is god damn mafia.   If you think he isn't, shame on you!   What I'm saying is this, you've got Andrew.   You've got Nancy, like Scott's leading all this fucking (SC). |
| UC SWEET: | [UI] Well at this point we've put him in a paycheck. |
| BURNETTE: | Yeah. |
| UC SWEET: | We can't take him out. |
| BURNETTE: | You can't take him out. |

> UC SWEET:        Because he'll fuck us.

Gov. Ex. 63 at 10.   The defendant went further, telling the UCs that he would

not participate in the real estate deal if they did *not* pay Maddox:

> BURNETTE:        And let me just tell you this . . .
>
> UC SWEET:        Even if you're involved in the deal?
>
> BURNETTE:        And it'll be fucking served cold, too!
>                  Ha!   That motherfucker will be on an
>                  ice plate!   Now, let me tell you this,
>                  I'm not, you don't have to worry about
>                  him fucking me because I'm not
>                  getting into the deal!   I can assure
>                  you!   Rest 100% fucking for sure I'm
>                  not getting into the deal if you tell me
>                  that's the deal.
>
> UC SWEET:        Okay!
>
> BURNETTE:        Because . .
>
> UC SWEET:        You know me well enough by now to
>                  know how I operate! Right?
>
> BURNETTE:        I'm gonna tell this, if you want to burn
>                  your house down, so fucking be it!
>                  Because I don't want my house
>                  burning down with yours!   Right?

*Id*.   The defendant made clear in this recording that he was willingly part of

the bribery scheme.   If the defendant truly had never intended to enter a

bribery scheme, he would have removed himself from the scheme at this point,

not doubled down.

At trial, and again in his PSR objections, the defendant argues that this recording shows that he did not know that the UCs had actually been paying Maddox.   It is not clear from the evidence how this could be so because, as demonstrated in the recordings above, the defendant had repeatedly told the UCs to send checks to Maddox through Governance and Maddox testified that he told the defendant that they were paying Governance.   Nevertheless, the two checks associated with Counts Three and Four should be included as relevant conduct, as discussed below.   Even if the defendant was not actually aware the checks were sent, he nevertheless devised the bribery scheme, convinced the UCs to participate, and instructed them to send checks to Maddox.   He cannot avoid accountability for two bribes payment sent as part of a bribe scheme he orchestrated.

Two months later, the defendant repeated his instruction to continue to pay Maddox through Governance:

> Let me say this, and I -- by the way, I'm completely okay with this, alright?  I would continue to pay Paige the ten thousand dollars, and I think that will save you from having to use me a lot.

Gov. Ex. 75 (transcript of Gov. Ex. 71) at 2.   The defendant continued:

> UC BUTLER:      But, the result is we are paying him now.   So at this point, either --

| | |
|---|---|
| BURNETTE: | Is Mike still paying?  Are you still paying? |
| UC MILLER: | I was told to start writing checks.  I started writing checks, so -- |
| BURNETTE: | And you haven't stopped. |
| UC MILLER: | No, every month. |
| BURNETTE: | Then I wouldn't stop.  I see, for some reason -- I could be wrong -- I was under the impression that you wrote two checks and hadn't written anymore.  You've been continuing to write the checks.  Don't stop.  Take that back what I said. |
| UC BUTLER: | Because it will reverse the effect. |
| BURNETTE: | It will reverse the effect. |

*Id*. at 5.   The March 2017 recording reinforces the defendant's criminal intent.

## IV.   RELEVANT CONDUCT

The PSR properly includes the $100,000 McKibbon bribe and the $20,000 paid to Governance in November and December 2016 as part of relevant conduct.   PSR at ¶ 81.   The defendant objects to the inclusion of these amounts, arguing that the government's evidence did not prove that it was a bribe and that the jury's acquittal on Count One precludes inclusion of the $100,000.

22

Neither argument is valid; the trial evidence proved by a preponderance of the evidence that both the $100,000 payment and the $20,000 in payments were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."   U.S.S.G. § 1B1.3(a)(1)(B).

### A.     The McKibbon Bribe

Contrary to the defendant's argument, the jury's verdict on Count One is not determinative of the scope of relevant conduct; not only was the jury applying a higher standard of proof, but the verdict may have been the product of factors other than the credibility of the government's evidence with regard to the McKibbon bribe.   The government's evidence established by a preponderance of the evidence that the defendant offered and paid a bribe as testified to by Maddox and the defendant's testimony, if credited, also proves that it was a bribe.

Although the government maintains that the evidence supports its position on the McKibbon bribe, whether this Court credits Maddox or the defendant for purpose of sentencing, the result is the same; the defendant entered into a bribery scheme with no reservation.   If Maddox is credited, the defendant suggested a $100,000 bribe without solicitation from Maddox.   If

the defendant is credited, he quickly acquiesced to Maddox's out-of-the-blue request for a bribe with little to no hesitation.   In either scenario, the defendant quickly and easily paid a sizeable bribe to an elected official.

        1.      <u>Testimony from Maddox and Carter-Smith established that the defendant offered and paid a bribe through Governance.</u>

The government's evidence at trial showed that the defendant agreed to pay a bribe to Maddox through Governance to ensure that Maddox did not support a request by the McKibbon Hotel Group to construct a hotel in downtown Tallahassee.   The defendant wanted to ensure that McKibbon would not succeed in obtaining this approval because: (1) he perceived that the seller of the Doubletree Hotel would see the potential McKibbon hotel as a threat if approved and knowing that it would not be approved gave the defendant a strategic advantage in negotiating for the purchase of the hotel; and (2) the potential McKibbon hotel would compete against the Doubletree, which the defendant did not want to happen once he owned it.

At trial, Maddox testified that in 2013, the defendant asked Maddox not to support the McKibbon hotel and wanted Carter-Smith not to publicly represent McKibbon.   Trial Tr. at 1917-22.   Carter-Smith testified that she was not told of the full agreement at first but that in February 2014, Maddox

explained it to her.   *Id*. at 878-79.   Maddox could not recall exactly when the defendant offered the bribe, but he generally remembered it being before he publicly declared his conflict in September 2013.   *Id*. at 1920.

2.   <u>The trial evidence corroborates Maddox's testimony.</u>

The $100,000 payment should be part of the loss amount even if the defendant's testimony is credited, but the trial evidence shows Maddox and Carter-Smith's testimony was truthful and the defendant's testimony was false.   The government presented compelling substantial circumstantial evidence to support Maddox and Carter-Smith's testimony.   <u>First</u>, the text and email traffic and testimony from Charles Simon and the defendant confirmed that the defendant used the threat of the McKibbon project as a negotiating tactic.   Trial Tr. at 2223-24.   Circumstantially, it is logical that the defendant would be more willing to use this tactic if he knew that Maddox would not vote in favor of McKibbon.

<u>Second</u>, the phone records showing contacts between the defendant and Maddox at key times relating to the McKibbon issue supports Maddox's testimony and a finding that Burnette's testimony was a complete fabrication. Trial Tr. at 2749-50; 2754-63, 2767-69.   The records of phone calls between Maddox and the defendant confirm that there were several contacts between

the defendant and Maddox in July, August, and September, 2013.   Def. Ex. 625A.   Those contacts essentially ended on September 20, the day after the defendant filed his lawsuit to halt the commission's consideration of the MHG hotel proposal.   The next phone contact, per the records, was on February 11, 2014, the day before the vote that effectively killed the McKibbon project. These records support Maddox's testimony that he spoke with and coordinated the bribe agreement before the September 11, 2013 recusal by Maddox.   After all, they would need to speak to arrange the bribe but after that there would not be the need to coordinate.   The February 11, 2014 call was likely for the defendant to confirm the vote was going to proceed as expected.

The phone records are particularly damning for the defendant.   In particular, the fact that after allegedly being so taken aback by the call from Maddox and Carter-Smith that his "heart started racing" because he was "afraid of retaliation" from Maddox, the records show that the defendant and Maddox spoke eight more times, with the defendant initiating many of those calls, undermines the defendant's testimony.   Trial Tr. at 2238, 2790, 2796-97.   This behavior by the defendant is consistent with someone checking in on the status of the commission vote from his bought-and-paid commissioner,

not with someone who has just been extorted by that commissioner and is afraid of him.

Third, the testimony of the KaiserKane employees, who had no motive to lie, shows that the defendant's explanation is fabricated. Accountant Melissa Whittaker testified that, when she received the $100,000 invoice from Governance, she asked for a contract or any other document that would justify a $100,000 payment to Governance and none was provided. Trial Tr. at 332. Oglesby testified the defendant told her it was "something to do with Scott Maddox and the Doubletree" and nothing more. Trial Tr. at 172. Oglesby's testimony on this point is particularly probative because she recalled having a lengthy telephone call with the defendant around the time the payment was authorized but did not recall the defendant telling her that he had extended Carter-Smith's contract for $100,000. As the owner of the company, she would presumably be focused on an unexplained $100,000 payment. The defendant testified that he explained to her what the payment was for, so the fact that she did not recall his explanation suggests that it never happened.

Oglesby's recollection is not the only piece of evidence supporting that conclusion. The government introduced several contemporaneous emails among Oglesby, Whittaker, and Musgrove about the payment and not one of

27

them states that the defendant told her he was extending Carter-Smith's contract.   Gov. Ex. 141, 157, 165, and 166.   The absence of such an explanation at the time it was allegedly provided is further evidence that the defendant fabricated testimony to fit his false narrative.   Oglesby's testimony, however, is corroborated by her contemporaneous emails that the $100,000 was "for something to do with the Doubletree for JT" and that the defendant "told [her] to pay it and one day told me it was something Scott M was helping him with for the Doubletree."   Gov. Ex. 166.

Fourth, the defendant's explanation of what happened is not logical. The defendant wants this court to believe that out of the blue Maddox decided to extort a friend of his for $100,000 even though—according to the defendant's testimony that the deal was non-public and strictly confidential—Maddox should not have known about the defendant's pending purchase of the Doubletree and therefore his stake in the McKibbon vote.   The defendant further asked the jury and this Court to believe that after being extorted by Maddox, he had nearly a dozen more phone calls with him that day.   That is not credible.

Further, it is not credible that the defendant would agree to extend Carter-Smith's contract, which had two months remaining on it, with no

evidence of success.   The defendant testified in detail about the changes he made to the Governance consulting contract and how it was important to him to revise the contract to make it more favorable to KaiserKane.   *See* Trial Tr. 2302-03.   He testified that a problem with the contract as initially drafted was that it could require KaiserKane to pay Carter-Smith a large success fee after a contract was awarded but before KaiserKane received any revenue from the contract.   Trial Tr. at 2804-05.   As the defendant and Oglesby explained, this was bad for KaiserKane and was to be avoided.   But the defendant asked the jury and this court to believe that after just a few weeks—which the defendant called an "evaluation period," but during which no contract had been obtained, and little work done on KaiserKane's behalf at all—he verbally agreed to pay Carter-Smith ten times the initial contract.   Trial Tr. at 2303.   That is not credible.

The defendant, an experienced and sophisticated businessman, also asked the jury and this Court to believe that he did nothing at all to document this change in the relationship.   Trial Tr. at 2828.   This lack of diligence stands in stark contrast to the detailed records maintained by Paul Keller, the other lobbyist for KaiserKane that the defendant repeatedly compared to Carter-Smith.   Trial Tr. at 2155, 2804-05.   That is not credible.

What is credible is the testimony of Carter-Smith that she did not earn the $100,000.   Trial Tr. at 1125-26.   Her testimony is backed up by the documentary record.   There were three emails in total that comprised the work Carter-Smith did for KasierKane.   It was not worth $100,000.   Those facts, coupled with the other facts cited above, corroborate Maddox's testimony that the defendant offered and paid him a $100,000 bribe.

### 3.   The defendant's testimony confirmed that the $100,00 payment was a bribe.

The defendant in his testimony, intentionally or not, confirmed that the $100,000 payment was a bribe.   He testified that Maddox, despite never having discussed the McKibbon project or the defendant's interest in it, called the defendant and used Carter-Smith to impliedly threaten to hurt the defendant's interests.   Trial Tr. at 2790, 2792.   The defendant did not explain how Maddox learned of Burnette's interests given the secrecy surrounding the negotiations.   Trial Tr. 2203-05, 2309.   Regardless of how Maddox learned of the project or why, according to the defendant, Maddox believed he could successfully extort the defendant, the defendant testified that he paid Carter-Smith to prevent Maddox from taking action as a city commissioner that would harm his potential project in the city.   In other words, he testified that he paid Maddox a bribe:

Q.     But if Mr. Maddox is not a city commissioner on
       this issue, you said, so how is he going to give you
       any consequences?

A.     Just like Maddox said in that meeting related to the
       FBO: I'm going to kill your next ten projects just so
       you know that it was me.

Q.     So you were afraid of the retaliation from Mr.
       Maddox, correct?

A.     Yes.

Q.     And the retaliation from Mr. Maddox in relation to
       other deals you might do in future, correct?

A.     Scott Maddox, you would never -- Scott Maddox
       always said: You would never know but you would
       feel it.

Q.     So that's a "yes" to my question, which is that you
       were concerned about Mr. Maddox's retaliation on
       potential deals in the future; is that correct?

A.     That is correct.

                     *     *     *

Q.     Well, I'm asking you, on February 11, 2014, your
       impression was: If you pay Paige this money, Scott
       Maddox won't, as you say, go kill your next ten
       deals?

A.     Yes.

Trial Tr. at 2790, 2792.   Burnette testified that, other than ordering the money

be paid by KaiserKane, he did not take any action in response to Maddox's

"strong arming"—he did not report it to the police or FBI; he just paid the

31

money.   Trial Tr. at 2791.   It was simply a cost of doing business, as he later explained to the UCs.   For this reason alone, the $100,000 payment should be included in the loss amount under U.S.S.G. § 3C1.1(b)(2).

       4.   <u>The jury's verdict on Count One does not preclude this Court from considering the $100,000 bribe as relevant conduct.</u>

The defendant argues in his objections to the PSR that the jury's verdict finding the defendant not guilty of Count One, the only count that included the McKibbon bribe, prohibits this Court from considering the McKibbon bribe in sentencing.   This is not correct.   As the Supreme Court has explained, "where truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'"   *United States v. Powell*, 469 U.S. 57, 64-65 (1984).   A jury may reach seemingly inconsistent verdicts through "mistake, compromise, or lenity," which often makes it impossible to determine whether the inconsistency favored the defendant or the government.   *Id*. at 65.

In this case, if the Court does not view this as an inconsistent verdict, it could easily find that the jury credited the government's evidence as to the

McKibbon bribe but nevertheless found the defendant not guilty on Count One but guilty of the other bribery-related counts because the elements of Count One differ so greatly from the others.   For example, the jury could have found that the evidence established the McKibbon bribe but not a pattern of racketeering activity or that the defendant intended, when he entered the conspiracy, for a member of the conspiracy to commit two acts of racketeering.   There are many reasons for a jury to return a split verdict, and the defendant's assertion that the Court must disregard conduct clearly established by the evidence from a count that the defendant was acquitted on is simply not appropriate under well-established law.

At sentencing, this Court will make its own determination of the relevant facts and will apply a lower standard of proof than the jury did to determine the scope of the relevant conduct.   The jury's verdict does not dictate that determination.   The government's evidence proved the McKibbon bribe at least by a preponderance of the evidence.

5.   Whether the bribe affected the outcome of the McKibbon vote is not relevant.

The defendant argues in his objections to the PSR that the bribe to Maddox did not affect the outcome of the McKibbon project.   ECF No. 496 at 16-21.   That cannot be known for certain, but even if it was true, it is

irrelevant.  One of the insidious effects of bribery is its corruption of the process that erodes the public's trust in government.  Corruption reinforces the noxious idea that those with power and money—such as the defendant—can use those resources to gain unfair advantage.  Whether or not the bribe changed the outcome, the injury to the system is the same, and the law recognizes that inherent harm in not requiring that a desired event flow from the payment of a bribe to accomplish the crime of bribery.  As this court properly instructed the jury in this case: the crime is the corrupt agreement, not the desired execution of any particular official act.  Furthermore, in this particular case, the defendant's goal was not necessarily to change the outcome, but to purchase insurance to assist him in his negotiations for the purchase of the Doubletree Hotel.  Through that lens, the bribe *was* successful—the defendant purchased the hotel at a price he wanted.  The insurance paid off.  Whether or not the bribe changed anything does not matter; it was never intended to.  Either way, it was a bribe.

## B.    The First Two Bribe Payments to Governance

The two $10,000 payments to Governance by the UCs are properly considered relevant conduct even though the jury acquitted the defendant of Counts Three and Four.  It is settled law that the Court may consider

acquitted conduct that is proven by a preponderance of the evidence at sentencing. *United States v. Watts*, 519 U.S. 148, 157 (1997) ("a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."); *see United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015) ("Because the limits of sentencing accountability are not coextensive with the scope of criminal liability, relevant conduct is broadly defined to include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence." (citation and internal quotation marks omitted)); *United States v. Proctor*, No. 19-14323, 2021 WL 2456945, at *3 (11th Cir. June 16, 2021); *see also* USSG § 1B1.3, background note ("[r]elying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses").

The first two checks are properly considered as part of the relevant conduct because it was the defendant who instructed the UCs that they could bribe Maddox and told him how to do it.  As is described in greater detail above, in the meeting on September 21, the defendant made clear that Maddox

would accept the bribe from the UCs because of his close relationship with the defendant, that he would be paid through his lobbying firm, and that the amount of the bribe would be tied to the difficulty of the official act they needed Maddox to take.   *See supra* at 6.

Shortly thereafter, on October 5, the defendant learned that both UC Sweet and Miller had met Maddox on their own, and that Maddox tried to "extort" UC Sweet for $20,000 per month.   *See supra* at 12; Gov. Ex. 27 at 3.   UC Sweet asked the defendant directly how to "fill Maddox's coffers" and the defendant told him that Maddox was paid through his consulting firm. Gov. Ex. 26 at 2.   The defendant also cautioned UC Sweet that even if they paid Maddox, he could still double-cross them, but with the defendant on board, Maddox would not do that.   Gov. Ex. 28 at 2-3.

Two weeks later, on October 19, UC Sweet told the defendant that they were going to start paying Maddox $10,000 per month and told the defendant that UC Miller would talk to the defendant about the logistics of making those payments.   Gov. Ex. 36 at 3.   The defendant did not object.

Five days later, on October 24, UC Miller spoke with the defendant, referenced the conversation with UC Sweet that the defendant had a few days before, and confirmed that his understanding was that the money for Maddox

36

would be paid to Governance.   Gov. Ex. 40 at3.   The defendant agreed.   UC Miller asked the defendant to confirm that the money would be for Maddox and not another consultant, to which the defendant replied, "it's definitely for Maddox, there's nobody else in Governance other than Paige, which is Maddox effectively, indirectly."   *Id*.   UC Miller asked the best way to get it through Governance, to which the defendant replied that he wanted to have a discussion with Maddox about " how he wants to receive those funds, call it 'into Governance.'"   *Id*. at 4.

Five days later, on October 29, the defendant told UC Sweet that Maddox was having reservations about traveling with the UCs to Las Vegas, which prompted UC Sweet to ask the defendant if that meant that Maddox did not want to be paid, to which the defendant replied, "[n]o, no, he does.   He wants to get paid."   Gov. Ex. 44 at 3.

The defendant then confirmed what he had told UC Miller just days before: "So, we worked that out.   Uh, Mike and I talked about that and run that through Governance."   *Id*.   The defendant and Sweet then discussed the fact that in paying bribes before the request from the public official, UC Sweet was doing things differently than the defendant usually did.   When UC Sweet told the defendant that he had always paid bribes that way, the defendant

37

replied, "[a]nd again, not saying anything's wrong with it." *Id*. This exchange is important because it showed that the defendant knew the UCs were planning to pay Maddox, through Governance, in advance of any "ask" or "lift" and he agreed that there was nothing wrong with doing it that way.

Approximately two weeks later, on November 10, the defendant told UC Miller that he did not need to send checks to Maddox just yet but did not discourage UC Miller from paying a bribe to Maddox at all.   *See supra* at 18; Def. Ex. 204.

The next day, on November 11, UC Sweet met Maddox and Carter-Smith at an event and Maddox told him to send checks to Governance Services.   Gov. Ex. 358 at 7.   On November 16, the UCs did just that, sending the first check to Governance Services.   Gov. Ex. 172.

According to Maddox, Carter-Smith received the check and did not know who Southern Pines was.   Trial Tr. at 1945.   Maddox testified that he told the defendant the check had been received and the defendant told Maddox that Southern Pines was the UCs' company.   *Id*.   On December 18, the second check for $10,000 was sent by the UCs and received by Carter-Smith. Gov. Ex. 179.

The evidence established, at least by a preponderance of the evidence,

that the defendant concocted a scheme to bribe Maddox, explained to the UCs how to execute it and encouraged them to do so, repeatedly reaffirmed that they should follow through on the scheme, and was advised that they had done so by Maddox.   The two $10,000 checks in November and December 2016 are properly considered as part of relevant conduct.

## V.     THE SECTION 3553 FACTORS

In determining an appropriate sentence, this Court must consider all of the factors listed in 18 U.S.C § 3553(a).   Here, the most important factors are the history and characteristics of the defendant, the seriousness of the offense, and the need to deter criminal conduct.   When viewing all of the relevant evidence, a picture of the defendant emerges as a man who rose from humble beginnings to create an incredibly valuable business enterprise.   However, the evidence also shows that the defendant operated that enterprise in a corrupt manner without remorse.   Whether it was a bribery scheme that violated federal law, leveraging his power and relationships to benefit himself in state legislative proceedings, or simply manipulating his cousin and abusing an SBA program not intended for him, the defendant's pattern of operations was consistent.   He used his money, influence, and power for personal profit to the detriment of others.

The defendant is sure to dedicate a significant portion of his sentencing advocacy to highlighting his successful business and philanthropic enterprises. Along with those, though, this Court must also consider that when the curtain was pulled back and the defendant's course of conduct revealed—when he thought no one was watching—he offered a massive bribe to a city commissioner with no solicitation. He offered it out of the blue. And shortly thereafter, when an attractive business opportunity presented itself from FBI UCs posing as investors desiring to obtain the inside track by paying bribes, the defendant enthusiastically showed them how to do it, referencing how he had done it before.

A significant sentence is also necessary to further the need for general deterrence. *See* 18 U.S.C § 3553(a)(2)(B) (listing the need to "afford adequate deterrence to criminal conduct" as a factor in sentencing). As the Eleventh Circuit has explained, "'[b]ecause economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Our basis for this determination was that '[d]efendants in white[-]collar crimes often calculate the financial gain and risk of loss, and white[-]collar crime therefore can be affected and reduced with serious punishment." *United*

*States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see United States v. Kuhlman*, 711 F.3d 1321, 1328-29 (2013).   The need for general deterrence is paramount, even if the defendant is individually unlikely to reoffend, as the Eleventh Circuit explained: "the Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense."   *Martin*, 455 F.3d at 1240.

In addition to the facts of the offenses of conviction and the relevant conduct, in assessing the defendant as a person and crafting an appropriate sentence, this Court should also consider the defendant's admitted conduct with regard to KaiserKane and Trulieve.   These episodes shed important light on who the defendant is as a person, the seriousness of the offense, the likelihood of recidivism, and the need for general deterrence.

### A. The Defendant's Control and Manipulation of KaiserKane for His Own Benefit and Abuse of the SBA Program

In sentencing the defendant, this Court should consider the defendant's control over KaiserKane, the company he used to facilitate his bribes to Maddox, and how the defendant abused the spirit and purpose of the SBA 8a program to do so.   This court should also consider that the defendant was able to control KaiserKane by manipulating his cousin Melissa Oglesby.

41

The trial testimony established that KaiserKane was a participant in the SBA's 8A program for minority and women owned small businesses.  As a woman, Oglesby qualified to enter the program, so long as she maintained actual control of the company and the majority of the financial benefits.[1] However, as Oglesby and the defendant's accountant explained, when KaiserKane was created, the defendant insisted that he—not Oglesby—be entitled to receive the company profits and Oglesby receive only a contractually-defined 3% commission on sales and 20% of profits.[2]   Trial Tr. at 371.

The defendant claimed that this arrangement was intended to protect Oglesby, but the financial windup documents of KaiserKane plainly show that the defendant and his friend, Frank Whitley[3] reaped 74% of the benefits of

---

[1]      SBA regulations provide that the disadvantaged owner—here, Oglesby—must control the company.  13 C.F.R. § 124.101.  Non-disadvantaged individuals—such as a wealthy white man like the defendant—are not permitted to be involved in the management of the company if they (1) **"[e]xercise actual control or have the power to control" the disadvantaged person**; (2) are a "a former employer or a principal of a former employer of any disadvantaged owner"; or (3) "**[r]eceive compensation from the applicant or Participant in any form as directors, officers or employees, including dividends, that exceeds the compensation to be received by the highest officer.**"   13 C.F.R. § 124.106(e) (emphasis added).

[2]      Notably, the defendant had a similar arrangement with Shelton Dean, an 8A company nominally owned by his former girlfriend, Catherine Baker.   Trial Tr. at 2149-50.

[3]      The trial testimony established that the defendant forced Oglesby to work with

KasierKane, leaving Oglesby with only 26%.   Gov. Ex. 169 at 4.   In dollar

terms, the defendant and Whitley received more than $10.7 million to

Oglesby's $3.7 million.[4]   Trial Tr. at 240; Gov. Ex. 169 at 4.     As owner,

she was entitled to 100%.

That the defendant robbed KaiserKane of other financial benefits is

evident with regard to the Gateway Project.   The project was supposed to be

developed by KaiserKane, which purchased the property for $1.5 million from

one of the defendant's companies.   Trial Tr. at 395-97   However,

KaiserKane's bonding company objected to KaiserKane pursuing this new

line of business, so the defendant directed Musgrove to arrange for the

---

Whitley against her wishes.   Further, it established that Oglesby represented only the sales function, while the actual construction work—the actual business of KaiserKane—was outsourced to Whitley.   Trial Tr. at 205 (testimony from Oglesby that Whitley Construction did the construction for Kaiser Kane); 251 (testimony from Oglesby that she did the sales but that Kaiser Kane needed Whitley to "do the work"); 406 (testimony from Musgrove that Oglesby and Gardner "did all of the sales work"); 2298 (testimony from the defendant that "in the sales department is Melissa Oglesby, my cousin which you got to meet, and a guy by the name of Trey Gardner.").

This is not within the spirit of the 8A program, which is intended to benefit small businesses which are "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals." Congressional Research Service, SBA's "8(a) Program": Overview, History, and Current Issues, Updated August 3, 2021, *available at* https://sgp.fas.org/crs/misc/R44844.pdf

[4]     Second, the defendant was entitled to an impermissibly high percentage of retained earnings.   SBA regulations require that the owner of the 8a business be entitled to receive at least 51% of the retained earnings of the company.   13 CFR § 124.105(f)(3).   Retained earnings are profits which are not distributed to shareholders as dividends.   This arrangement certainly violated the spirit of the SBA regulations.

property to be sold to TM Street for approximately $3.4 million just six months after KaiserKane had purchased the Gateway. *Id*. at 398-99. Notwithstanding that KaiserKane had made a paper gain of approximately $1.9 million, Burnette directed Musgrove to divert approximately $2.4 million of the purchase proceeds from KaiserKane to another of Burnette's companies, Hunter & Harp Holdings Acquisition Company, LLC.   *Id*. at 399-402.

Similarly, in connection with the purchase of the Doubletree, the defendant directed KasierKane to give his company a total of $4.2 million in interest-free loans.   Oglesby authorized each of these loans, but always after the defendant had already begun the transfer process and usually on request from Musgrove, not the defendant.   Nearly half of those loans were not repaid.

As the documents show, $1 million was "job cost" when the loan was made—an accounting fiction that KaiserKane had a job with the Doubletree for which KaiserKane would incur $1 million in costs payable to the defendant or Whitley Contracting despite the fact that there was no such job at the time the loan was made and no witness could recall any job ever materializing. Gov. Ex. 161, 163.   The other $1 million was promised to be repaid by the

end of the year, but again there was no evidence repayment ever occurred.

The defendant referred to these as "family loans" but there is no such thing within the 8A program, and the 8A program is not intended to benefit sprawling family conglomerates like the one the defendant operates.    In truth, these were highly beneficial, no-interest loans; KaiserKane charged 15% interest on other loans it made, but the defendant did not have to pay any interest.   Gov. Ex. 161 at 2.   As this Court noted during trial,

> I overruled the objection about the 8(a) and whether this was a proper 8(a) project. One of the things that the defense said in opening statement was these are loans between related companies. Nothing illegal about that.
>
> Well, if it's the company run by a white guy that a white guy is getting most of the benefit out of, can just go tap it for his source, then there probably is something illegal about that.

Trial Tr. at 3017.

The evidence established that KaiserKane was simply a vehicle for the defendant to use his cousin to obtain sole-source government contracts meant for disadvantaged owners and keep the profits, and to pay a bribe to Maddox.

**B.**  **The defendant's leveraging of his personal relationships with state legislators and undisclosed conflicts of interest to gain unfair advantage in the medical marijuana business.**

The defendant's use of his connections and governmental influence to corruptly secure business advantage is also evident in his actions with regard to the medical marijuana company, Trulieve.   As the defendant explained to the UCs, when the Florida legislature was enacting its medical marijuana laws, he worked with then-state representative and close friend Halsey Beshears to insert a barrier to entry into the legislation that would benefit the defendant and the Beshears family.   Gov. Ex. 12 at 22-23; Trial Tr. at 2926-27.

The defendant explained to the UCs that they inserted the requirement that any nursery applying for a license to grow medical marijuana had to have been in operation for 30 years prior to application.   Gov. Ex. 12 at 22-23; Trial Tr. at 2927.   The defendant told the UCs that this requirement had nothing to do with the merits, but instead served only to keep out competitors. Gov. Ex. 12 at 22-23; Trial Tr. at 2927.   This action benefitted both men, as the Beshears family operated a nursery in Florida, Beshears' brother Thad serves on the board of directors of Trulieve, and the defendant's wife, Kim Rivers, is the CEO.   Trial Tr. at 2927.   The defendant himself is heavily

46

invested in Trulieve, to the tune of more than $400 million.   The legislation was clearly beneficial to him as well.

The defendant's explanation when asked about these statements on cross examination was that he was "bragging about something that happened before his time"—essentially that he was puffing to impress the UCs—very similar to the explanation he gave with regard to his explanation to the UCs on how to bribe Maddox.   Trial Tr. at 2927.   The jury rejected that excuse in reaching its verdict, and this Court should reject it in this circumstance as well.

## VI.   FINE

The maximum fine is $250,000 per count each for Counts 2, 5, 6, 8, and 9 and the guidelines range for a fine for each offense ranges from $25,000 to $250,000.   PSR at ¶¶ 144, 146.   Due to the defendant's substantial financial means, the government suggests than an appropriate fine would be the maximum on each count, a total of $1,250,000.   *See* PSR at ¶ 125.

## VII.   RESTITUTION

The government agrees with the restitution amount of $20,000.   PSR at ¶ 148.

## VIII.   CONCLUSION

At sentencing, the government will provide a sentence recommendation

for the defendant in light of the ultimate guidelines range as found by the Court.

Respect fully submitted on November 2, 2021,

JASON R. COODY
Acting United States Attorney

COREY R. AMUNDSON
Chief, Public Integrity Section

/s/ Stephen M. Kunz
STEPHEN M. KUNZ
ANDREW J. GROGAN
Assistant United States Attorney
Florida Bar No. 322415
D.C Bar No. 484813
Florida Bar No. 85932
111 North Adams St., 4th Floor
Tallahassee, FL 32301
(850) 942-8430
stephen.kunz@usdoj.gov
andrew.grogan@usdoj.gov

/s/  Peter M. Nothstein
PETER M. NOTHSTEIN
Deputy Chief
ROSALEEN T. O'GARA
Trial Attorney
Maryland Bar No. 0512140322
Arizona Bar No. 029512
Public Integrity Section
Criminal Division
1301 New York Avenue NW
Washington, D.C. 20005
(202) 514-2401
(202) 616-2464
peter.nothstein@usdoj.gov
rosaleen.o'gara2@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that a copy of this document has been filed via the CM/ECF filing system  on November 2, 2021, and thereby has been provided to counsel for defendant Burnette.

*/s/Peter M. Nothstein*
PETER M. NOTHSTEIN
Deputy Chief

## **LOCAL RULE 7.1 CERTIFICATE**

I certify that this memorandum is 9,878 words, per Microsoft Word's word count, which is in excess of the word limit requirements set forth in Local Rule 7.1(F). A motion requesting leave to file this sentencing memorandum in excess of the word limit has been filed with the Court.

*/s/ Peter M. Nothstein*
PETER M. NOTHSTEIN
Deputy Chief