IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                                          4:18CR76-RH

JOHN THOMAS BURNETTE.
_____/

## SEALED SENTENCING MEMORANDUM OF DEFENDANT JOHN THOMAS BURNETTE

Defendant John Thomas Burnette ("Burnette") respectfully submits this sentencing memorandum in support of his request for a sentence below the applicable United States Sentencing Guidelines ("Guidelines") range that does not include an unnecessarily lengthy term of imprisonment.

## INTRODUCTION

Burnette, a first-time non-violent offender, has been a leader and philanthropist in the Tallahassee community for over a decade.  As described in the letters attached, Burnette has selflessly devoted his time, money, and even his home to people in need in the Tallahassee community, and welcomed underprivileged children into his home.  He has also contributed countless hours to mentor local students, entrepreneurs, and has provided generous charitable assistance to various organizations and medical care facilities.   While Burnette regrets the taped

statements played in court and the impact the trial has had on the community and the people he loves, this Court should respectfully examine the whole person including Burnette's positive actions, charitable works, and good character.

Title 18 U.S.C. § 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary." Although the Court's sentencing analysis must begin "by correctly calculating" the applicable Guidelines range, *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)), this is only one element in determining the appropriate sentence. "[T]he application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered." *United States v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005). As discussed herein, it is submitted that the Guidelines range has been improperly increased by including relevant conduct not established by a preponderance of the evidence. To the contrary, Burnette should be eligible for a downward variance pursuant to 18 U.S.C. § 3553(a) because of, among other things, all the positive contributions he has made to others throughout his lifetime.

## **RELEVANT CONDUCT**

In the Eleventh Circuit, "[r]elevant conduct of which a defendant was acquitted nonetheless may be taken into account in sentencing for the offense of conviction, as long as the government proves the acquitted conduct relied upon by a preponderance of the evidence." *United States v. Duncan*, 400 F.3d 1297, 1304

(11th Cir. 2005) (citing *United States v. Barakat*, 130 F.3d 1448, 1452 (11th Cir. 1997); *United States v. Watts*, 519 U.S. 148, 153, 117 S.Ct. 633, 636, 136 L.Ed.2d 554 (1997); *United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996); *United States v. Averi*, 922 F.2d 765, 766 (11th Cir. 1991)).[1] The Guidelines calculations here have included as relevant conduct the MHG allegations regarding the McKibbon Hotel Group ("MHG"). However, Burnette was acquitted of the allegations because the Government not only failed to prove the allegations beyond a reasonable doubt, but also failed to establish the charges by a preponderance of the evidence. Accordingly, for reasons set forth below, Burnette objects to including MHG in the loss calculation or for the multiple bribe enhancement under the Guidelines.

## I.    The September 25, 2013 Text Message

The most compelling evidence that the MHG allegations are false and unsubstantiated is Scott Maddox's ("Maddox") September 25, 2013 text message searching for a motive for Burnette's lawsuit months after the alleged bribe occurred in May or June of that same year. Ex. A. ██████ REDACTED ██████ ██████ Maddox writes the following to Paige Carter-Smith ("Carter-Smith") and Yordon: "Found the answer. On Taldem [*Tallahassee Democrat*]. Hotel

---

[1] While foreclosed by precedent, Burnette asserts that sentencing based on acquitted conduct violates his Fifth and Sixth Amendment rights and reserves the right to challenge that precedent in the appropriate forum.

Duval selling to Kentucky company. That's why the opposition. Paige- pull up and call Wes right away. Paige-confirm?" *Id.* Clearly Maddox did not know why Burnette was opposing MHG's project and believed the motive was the sale of Hotel Duval, **not** the purchase of the DoubleTree. Notably, this text message was sent only one week after InvestCorp informed Burnette that it was willing to sell the DoubleTree, but after the sale of Hotel Duval went public.



II.     REDACTED

---

[2] REDACTED , Maddox was "shocked" and "upset" that Burnette was "selling falsehoods" and was "full of shit." Comp. Ex. B at 1962:5-15, 1962:18-1963:2, 1964:2-1965:1. Carter-Smith and Maddox also believed that Governance was retained for legitimate lobbying in Leon County, as opposed to the City, for Fallschase. Comp. Ex. C at 1105:8-10; Comp. Ex. B at 1986:1-1987:12, 1996:11-6.



REDACTED



REDACTED

REDACTED

REDACTED

Conveniently, as discussed in the Government's Sentencing Memorandum for the Co-Defendants, it was only after Burnette's testimony that Maddox informed the Government that he recalled Burnette "frequently constantly calling him to check up on whether Maddox would still recuse and discussing the position of other commissioners on the [MHG] vote." ECF No. 477 at 25. REDACTED

Carter-Smith also testified

9

how the Government refreshed her recollection with a timeline board during her interviews to nail down the MHG story:

> Q. Do you recall telling the FBI that the comment by Mr. Maddox in setting out a chronology, that this comment was between May the 30th of 2013 and June the 7th of 2013?
> A. So, I recall that we got a big timeline on the board and I was trying to put pieces together. So if I said that, that was my recollection at the time with looking at the big timeline, yes.

Comp. Ex. C at 1048:8-14.　**REDACTED**

As for the actual payment of the $100,000, the only thing that changed between the January 10, 2014 invoice for $10,000 and the February 26, 2014 invoice for $100,000 was that the Co-Defendants learned on February 4, 2014, that Burnette was going to purchase the DoubleTree – months after Maddox alleged he was bribed by Burnette.  Ex. L at 2.

### III.　Burnette Did Not Have a Willing Seller for the DoubleTree Prior to Maddox's September 11, 2013 Public Recusal

In addition to Maddox's September 25, 2013 text message and the Co-Defendants' inconsistencies, the MHG allegations are also counterintuitive because Burnette did not have a willing seller of the DoubleTree prior to Maddox's recusal. If Burnette was unwilling to file a lawsuit until after he had a verbal commitment from InvestCorp to sell the DoubleTree, it is hardly believable that Burnette would

have already agreed to pay a $100,000 bribe to Maddox.  The evidence demonstrates

that when Burnette initially approached InvestCorp on July 22, 2013 to sell the

DoubleTree, he was rejected.  Ex. M.  Despite continued negotiations, Burnette was

not informed that InvestCorp was willing to sell the DoubleTree until September 18,

2013 – a week after Maddox's recusal.  *See* Exs. N, O, P, Q, R.  Putting aside

Burnette's evidence,[3] the record overwhelmingly establishes the weaknesses in the

Government's MHG allegations, which fail to prove the Government's position by

a preponderance of the evidence.

## IV.   Even if Maddox Could Have Un-recused, the Political Pressure from Erwin Jackson Would Have Prevented Him from Doing So

Given the political pressure from Erwin Jackson, it is also illogical that

Burnette would have believed that Maddox would have un-recused himself after his

September 11, 2013 recusal.  **REDACTED** and Yordon's

testimony established that it was Erwin Jackson's ("Jackson") public and political

pressure that led to Maddox's recusal.  Even if one disagrees that Jackson, and not a

bribe, led to Maddox's recusal, it is implausible that Maddox would un-recuse

himself thereafter.

In the week preceding Maddox's recusal, Jackson publicly condemned

Maddox for his MHG conflict of interest.  On September 5, 2013, *Tallahassee*

---

[3] *See* Comp. Ex. S. at 2171:19-2172:15, 2167:15-2168:16, 2229:18-2230:8; Ex. T at 3.

*Reports* noted that Yordon conducted business for MHG before the City of Tallahassee without registering as a lobbyist. Ex. U at 1. After *Tallahassee Reports* requested a list of registered lobbyists, Yordon registered under The Zachary Group. *Id.* at 2. According to the article, "Tallahassee Reports has learned that due to the relationship that Governance reportedly has with City Commissioner Scott Maddox, Mr. Yordon could not register as lobbyist under the Governance name." *Id.* at 3.

On September 9, 2013, Jackson sent Maddox and other City Commissioners an email with the subject "Scott Maddox Doesn't Know Where He Lives or the Business Interests He Represents." Ex. V. This article stated that "[a] vote for 12.01 is a vote to reward Scott Maddox handsomely for representing Mckibbon [sic] Hotel Group. It doesn't matter if Scott represents MHG personally, through his law firm, his lobbying firm Governance, or his business partner, Gary Yordon...It [sic] is wrong!" *Id.* at 1. The following day, on September 10, 2013, Jackson sent two emails addressing Maddox's conflict with MHG to the Commission and the *Tallahassee Democrat.* Exs. W, X. Although Maddox was not included on the emails, Commissioner Gil Ziffer forwarded them to Maddox. Immediately before his public recusal on September 11, 2013, Jackson publicly addressed Maddox's conflict in front of the Commission. Ex. Y. Given the tremendous political pressure to recuse, Maddox did just that.

**REDACTED**

████████████████████████ *see also* Comp. Ex. B at 1927:5-6 ("there

would be an ethics complaint made as a result").   **REDACTED**

████████████████████████████████████████████████████████

██████   Yordon also stated that he was retained to represent MHG so that

Maddox would avoid the wrath of Jackson.   *Id.* at 531:21-532:2.  Notably, Yordon

raised the MHG conflict with Maddox numerous times:

> If we were going to do The Zachary Group Scott needed
> to step out front immediately and clearly recuse himself
> and do everything he needed to do to do that.  So when it
> wasn't happening, it was a bit of a frustration, especially
> when he would get up and leave the room, because he
> wasn't fooling anyone and it was making it more and more
> ammunition for Erwin Jackson, and it just – it just making
> it worse.

*Id.* at 531:12-20.  Based on Maddox and Yordon's testimony, and considering the

tremendous pressure Jackson placed on Maddox, it is inconceivable that Maddox

would have un-recused from MHG following his public recusal on September 11,

2013.[4]  Based on the foregoing, the alleged $100,000 MHG bribe should not be

---

[4] Notably, it has been argued that Burnette did not think Maddox's abstention was
"set in stone" based on Burnette's text to Charlie Simon ("Simon") stating, "I assure
you Hampton can be back alive in 2 phone calls" as evidence to support this
contention. *See* Ex. AA at 3031:13-18.  However, the Burnette-Simon text message
was sent on February 27, 2014 – more than two (2) weeks **after** the final vote.
Clearly the statement was simply another Burnette negotiation tactic.

included in the loss calculation and there should be no multiple bribe enhancement under the Guidelines.

The Government's and the PSR's position that the four (4) checks paid from SPD to Governance constitute "more than one bribe" is misguided.  PSR ¶ 173. Application Note 2 to §2C1.1 states, "Related payments that, in essence, constitute a single payment of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, *even if charged in separate counts*" (emphasis added).  Taking the Government's position that these payments constitute bribery, the four (4) payments were monthly installment payments constituting one (1) bribe under the Guidelines.   It is counterintuitive for the Government to posit a retainer theory of bribery yet argue the four (4) payments were four (4) separate bribes.  The PSR asserts that the enhancement applies because Burnette was convicted of two (2) counts of honest services fraud.  PSR ¶ 173.  The Application Note discussed above clearly rejects that reasoning.  The two (2) counts merely reflect two uses of the mails—not two (2) separate alleged bribes.   The PSR cites Eleventh Circuit cases that it claims "applied this enhancement in similar applications" that it incorrectly submits are "controlling."  To the contrary, the Eleventh Circuit did not even consider whether the enhancement was correctly applied since the issue was not presented.  The cases are not even relevant, let alone controlling.  This Court should reject this argument.

## SECTION 3553(a) FACTORS

Section 3553(a) instructs, in pertinent part, that in addition to the advisory Guidelines range, "[t]he court, in determining the particular sentence to be imposed, shall consider" the following factors among others:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    . . .

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

The Guidelines are only one of the factors to be considered by the District Court that must, after considering all the sentencing factors, "tailor the sentence in light of other statutory concerns." *United States v. Ellis*, 419 F.3d 1189, 1193 (11th Cir. 2005). Burnette respectfully asks this Court to consider the Section 3553 factors as well as the case law discussed below when evaluating the appropriate sentence.

I.      **The History and Characteristics of the Defendant**

Burnette's personal history and character are exceptional and warrant a downward variance from the Guidelines.  He was raised in Monticello, Florida, and had an unstable and underprivileged childhood.  Through most of his younger years, Burnette was raised by his mother and his stepfather, Randy Elkins, both of whom were heavily addicted to crack cocaine.  Burnette was raised in a neglectful household where he witnessed his mother and stepfather steal his brother's belongings to purchase drugs and saw his stepfather physically abuse his mother.  Burnette's brother, Caleb Burnette, recounts the time Burnette prevented him from killing his stepfather:

> After years of watching Randy physically abuse my mother, I finally decided at 10 years old I was going to kill him. I decided that Randy Elkins was never going to hit or hurt my mother again.  I grabbed a .38 pistol from my grandfather's house and I walked back to our house. My intent was to kill Randy Elkins that day.  JT intercepted me in the yard.  At 12 years old, JT had the insight and ability to talk me out of killing my step father.  That was not the first nor the last time that JT would change the trajectory of my life in a positive direction.

*See* Caleb Burnette's letter attached as Ex. BB.

Due to his mother's drug addiction, Burnette began living with his maternal grandparents through his pre-teen and adolescent years.  Despite trying to escape his mother and stepfather's drug addiction, Burnette was eventually subject to his grandmother's alcoholism when his great aunt passed away from cancer.  Because

his grandfather, a truck driver, was the only sober member of his family, he spent much of his adolescence with him in the back of the truck and at truck stops.

Burnette suffered from Dyslexia throughout his education but graduated from Godby High School in 1996.  After high school, Burnette attended Georgia Military College in Valdosta, Georgia from 1996 until 1998, and transferred to Tallahassee Community College, where he was enrolled from 1998 to 2000, but did not earn a degree.

Notwithstanding his limited education, Burnette harnessed his entrepreneurial spirit at a young age.  He started his first information technology business at seventeen (17) years old and shortly thereafter transitioned into roofing.  He obtained a Florida roofing license at the age of twenty (20) and was a licensed Florida General Contractor by his early thirties.  After his grandmother and grandfather died, Burnette became the only source of financial support for the rest of his family.

Burnette not only selflessly gives to his family, but also to those around him. When Denee Love, his child's nanny, approached him about her daughter and granddaughters' troubles, Burnette and his wife opened their home to Shadreka Jackson's two (2) daughters, Dajanae and De'Yanni Stephens.  In her letter to the Court, Ms. Jackson writes that:

> My girls are all I have and at that time, I felt as though I was failing in life. I was living with my mom, her husband, and my daughters. Basically, living from check to check, car problems, and debt on every end. My mom Denee

17

> Love, the hired nanny to the Burnettes, through her work discussed extensively my situation. JT and Kim immediately stepped in, providing my daughters a better way of life and stability, which has made them better students and young ladies. The Burnette's opened their home to my daughter's, assisting in teaching them the values of consistency in being reliable, honest, and sincere individuals. They have taught all three of us the values of saving money, making money, and managing our money. Both my daughters have excelled in their educations due to the family environment they were given while I pulled myself up in life. JT and Kim, made certain that my daughters were treated like the young ladies they have become, by giving them birthday parties to remember, trips to placing we could have not otherwise afforded such as Disney World and New York City, cell phones to stay in touch, placed in ballet classes, taught how to drive and purchased brand new vehicles to drive based on their educational efforts, and a beautiful home with the Burnettes to live in.  I often become teary eyed and speechless… when it comes to speaking of the blessings that JT and Kim have provided for me and my daughters. I really don't know what I would have done at times if it had not been for these two caring individuals.

*See* Shadreka Jackson's letter attached as Ex. CC.  These sentiments were echoed by

Ms. Jackson's daughter, De'Yanni Stephens:

> Moving into middle school, I began going through a rough patch. I started slacking on my grades and frequently getting into altercations with other students. When my mother reached out to John Thomas and his wife for help[ ], they welcomed me into their homes with open arms and big smiles and gave me the guidance that I needed.

*See* De'Yanni Stephens's letter attached as Ex. DD.

18

Burnette's caring nature is also expressed by his friend, Jennifer Bryant, who

Burnette assisted when she left her marital home:

> On November 8th, 2020, I packed what I could into my
> Toyota Highlander and moved out of my marital home. JT
> offered me a safe place to stay at their home that day and
> have every day since. A scared woman, using all the
> strength I could just to put the car in drive after yet another
> vivid altercation, will never forget the welcoming look and
> hug from JT. He had the bed made, clean towels laid out
> and a warm dinner on the table for me. All I could think
> was "what did I do to deserve this and what kind of friend
> does this?' JT does this, that's who. With his continued
> love and support, I filed for divorce on June 22nd, 2021.
> With his trial preparation going on, JT still checked in with
> me consistently to make sure I was doing ok. All the while,
> JT continued to assure me "You are going to be ok and
> you are welcome as long as you need." Meanwhile, he has
> one of the biggest events in his life going on and, yet, he
> is worried about me. That is who JT is, Your Honor. JT
> is always worried about others, making sure they are ok, and
> that no one around him suffering if he can help it.

*See* Jennifer Bryant's letter attached as Ex. EE.

Similarly, when his friend Richard Wise's father-in-law suffered an accident

in Mississippi, Burnette flew his mother-in-law to be beside him:

> JT understands the meaning of friendship and
> commitment. One example includes the time my father in
> law suffered a serious accident in Northern Mississippi. JT
> made sure someone was able to fly my mother in law to be
> by his side immediately and help him get home weeks
> later.

*See* Richard Wise's letter attached as Ex. FF.

When a friend needed access to a tennis court to keep providing for her family as a tennis coach, Burnette did not hesitate.  Burnette's friend, Patricia Shaw, writes about Burnette's generosity:

> I met JT over 10 years ago as a single mother of twin boys. I am a professional tennis player and coach and was in a frantic search to find a tennis court where I could continue coaching tennis lessons to provide for my boys. JT immediately and generously offered up his home and has allowed me to coach tennis lessons there since then. His kindness, generosity, and selflessness allowed me to continue to provide for my children. Not only was I able to provide for my family because of JT's generosity, but I was able to give back to our community and share the love and joy of tennis.

*See* Patricia Shaw's letter attached as Ex. GG.

As demonstrated, Burnette is always there to help someone in need.

Burnette's friend, Brian Rich, provide another example of Burnette's generosity:

> On a personal level, I was once describing a situation where I was helping a lifelong friend negotiate a small workout with a large national bank that held her mortgage. She has a chronically disabled child and a life-long dedication to helping her child who was not supposed to live past the age of 5 but is now 19.   Her son cannot verbally communicate, requires around the clock care and she has specifically outfitted the home that was the subject of the mortgage to accommodate his needs and limitations. The bank was going to foreclose on her property due to missed payments that totaled approximately $12,500. I casually described the situation to Mr. Burnette one day and without hesitation, he offered to, and then did pay off the mortgage to allow her to keep the home. My friend would mail Mr. Burnette checks on a monthly basis to

> repay him, but to my knowledge, he never cashed the
> checks. She considers him an angel.

*See* Brian Rich's letter attached as Ex. HH.

Burnette has also committed himself to Tallahassee and its entrepreneurial community.  While most of his business ventures were elsewhere, Burnette remained focused on his passion projects of renovating and remodeling older hotels to revitalize the City's downtown area.  Burnette also played an integral role in Imagine Tallahassee, a community initiative that developed a unified vision for economic development in Tallahassee.

In the community, Burnette committed himself to supporting and mentoring young entrepreneurs.  For example, Burnette served as a volunteer and panelist with the Entrepreneurial Excellence Program ("EEP").  Affectionately called "Shark Tank Night," the program assisted start-up businesses and entrepreneurs in navigating the early and vulnerable stages of business development.  Each participant would provide a five (5) minute presentation on the business startup and face questioning from judges on the panel.  Larry Lynch, the EEP program director, recalls the first night Burnette participated in the EEP:

> To say he was a huge success in that role would be a large
> understatement. He told the class about his own personal
> story as a developer of new businesses in our community,
> his business successes and failures and the lessons learned
> from both of them.  He then listened to 10 different new
> startup business entities pitch him on why and how their
> plans would succeed. He then grilled them on every aspect

> of their plan from marketing to personnel sharing incredible insight based on his knowledge and experience. That first night was scheduled to end at 9 PM. It finished at midnight and not a soul left because of the benefit they knew they were receiving from Mr Burnette[']s questions and suggestions. At the close of the session Mr Burnette gave the class members his personal email and phone contacts should they ever want to discuss any issue that he might be able to help with, and many class members took him up on his offer. Mr Burnette came back to do shark tank night for the next 5 EEP classes.

*See* Larry Lynch's letter attached as Ex II.  Burnette's participation in the EEP was featured in the *Tallahassee Democrat*.  Ex. JJ.

Burnette also participated as a judge in InNolevation, a Florida State University College of Business pitch competition.  Two students, Connor Grady and Bryant Joseph, have submitted letters expressing the profound impact Burnette had on their business success.  According to Connor Grady:

> JT Burnette has been one of the most influential people in my life, and has positively affected my personal trajectory. The chance he took on me not only profoundly affected who I've become professionally, but also how I've matured as a person. He's my living, breathing proof that there are people out there willing to contribute their time, money, and effort to help members of their local community for no reason other than a desire to help someone succeed.

*See* Connor Grady's letter attached as Ex. KK.  Bryant Joseph also explained Burnette's impact on his life:

> I cannot overstate the positive impact he's had on my life and on those around me. JT has continued to be a

22

> champion of innovative business and community
> involvement for myself and many others throughout the
> years. I may have received a Bachelor's of Science from
> Florida State University, but I received a "Doctorate of
> Entrepreneurship" from JT Burnette.

*See* Bryant Joseph's letter attached as Ex. LL.

In addition to EEP and InNolevation, in 2016, Burnette presented to the final class of The Jim Moran Institute's Small Business Executive Program. During this final class, the students discussed what they learned from the program and how they could apply this information to their own small businesses. Burnette provided the class members with business advice in response to their presentations.

Burnette has also worked with other young entrepreneurs in the community. Another mentee, Zach Zelner, recounts Burnette's role in his journey from young entrepreneur to successful businessman:

> As I reflect on the past decade, I'm immensely grateful for
> your role in defining my journey from an impulsive young
> entrepreneur willing to do anything to get ahead, to one
> driven by conscience, contribution, and an obligation to do
> what's right. Over the years, the investments I've made in
> philanthropic efforts and in my people have changed the
> lives of thousands, and the common thread runs directly to
> you. Perhaps most importantly, you showed me that
> change only happens when you lead from the front and by
> god, I've got an encyclopedia of examples you've set.
>
> …
>
> I would be remiss not to mention the time you've spent
> convincing me of my own potential. One year I
> downloaded my call logs from ATT and found that we'd

23

> had 267 calls in 12 months. We're talking about hundreds
> of hours of your time, no doubt in demand by many, spent
> on my future. I never heard a single complaint. Many of
> these calls consisted of sparring matches in which you
> tirelessly attempted (often unsuccessfully) to help me
> avoid making the foolish mistakes I so vehemently
> insisted were great ideas.

*See* Zach Zelner's letter attached as Ex. MM.   J. Randall Graham describes

Burnette's impact on young entrepreneurs:

> Judge, I have seen so many of those kids grow their ideas
> and dreams into bonafide, successful businesses and I have
> repeatedly heard them quote JT's advice that they should
> simply do things the right way the first time and the rest
> will take care of itself.

*See* J. Randall Graham's letter attached as Ex. NN.

As for local philanthropy, from 2013 to 2016 Burnette served on the steering

committee and was a contributor to 50 Large, a Leon County School District

program designed to curtail youth gangs, targeting young males between the ages of

fourteen (14) and seventeen (17) years old.  The program's key components include

character development, academic support and tutoring, referrals for social services,

life skills and personal development, and assisting youth in finding employment

opportunities.   Burnette was also actively involved in speaking to students at

Heritage Trails School (formerly known as Pace Secondary School), who typically

come from at-risk families and often have severe behavioral issues.  Burnette was

also crucial to the Capital Region Young Men's Christian Association.   Aaron
Boyette describes Burnette's generosity:

> From 2016-2018, I was Chairman of the Board of the
> Capital Region Young Men's Christian Association, Inc.
> (CRYMCA) in Tallahassee. The CRYMCA struggled for
> years; however, J.T. was always a big supporter of ours.
> J.T. did way more than just buy a table at our annual event;
> he answered the call when I asked him for $20,000.00 to
> help us make payroll during one of our most challenging
> times. He did not hesitate to help us even though he knew
> his chances for repayment were negligible at best. The
> only things he asked of me were to ensure that the loan
> remain anonymous and that the lowest paid personnel
> were paid first.

*See* Aaron Boyette's letter attached as Ex. OO.

Throughout the years, Burnette has also provided charitable donations to
Goodwood, a local museum and garden, and the Challenger Learning Center, which
provides young students with a "hand-on, minds-on" STEM (science, technology,
engineering and mathematics) educational experience and is equipped with an
IMAX theater and planetarium.   Michelle Personette, Executive Director of the
Challenger Learning Center, writes:

> For the last twenty years, I have dedicated my professional
> life to increasing the availability and accessibility of
> STEM educational opportunities to teachers and K-12
> students throughout the tri-state service area. Last year, as
> the COVID-19 pandemic continued, my organization
> struggled to accomplish our mission for many reasons,
> including travel restrictions, virtual vs. in-person
> instruction, lack of donors and shrinking school district
> budgets. While having dinner with J.T. and Kim one night

in late 2020, I mentioned that I had a growing concern about the educational gap that was going to occur in the aforementioned subject areas for these students. I went on to explain that our team was dedicating our "Giving Tuesday" fundraising campaign to offset the lack of financial resources within the school districts throughout our North Florida region. The next day, I was contacted by J.T informing me that he was donating $10,000 (our largest single donor gift in the last 24 months) to provide scholarships to students in Title I schools so that those students and teachers could attend a STEM field trip at the Challenger Learning Center.

*See* Michelle Personette's letter attached as Ex. PP.  Burnette also consistently contributes to Florida State University, the James Madison Institute, Tallahassee Community College, Boys Town, and the Agape Christian Fellowship Center.

Burnette has also donated bicycles for Darryl Jones's (Vice-Chair of the Leon County School Board) holiday bicycle drive for needy students.   In his letter, attached as Ex. QQ, Mr. Jones describes Burnette's impact on his toy drive:

JT Burnette is a consistent champion for children. For a number of years, Mr. Burnette has been an annual supporter of my Toy Drive and Give-Away for children and families living in public housing. His support has ensured that children from working class families have been able to enjoy the holidays. His generosity and support of charities that [s]upport my schools has been extraordinarily.

Mr. Jones also describes Burnette's love for the Tallahassee community:

What remains clear to me is that JT Burnette loves this community. He loves the people, and most specifically, Mr. Burnette loves the children of Leon County and this is also evident in how Mr. Burnette and his family create

26

> workforce opportunities for working class families by
> paying livable wages. Further evidence of his good will
> and character is that there is no one celebrating his present
> circumstances. There are no enemies skulking in corners.
> As a friend and supporter, I am very much aware of what
> Mr. Burnette and his family mean to this community. I
> look forward to his rightful return to our community
> because to me he is more than a community trustee—his
> love for the children in this community makes him a
> community treasure to me.

Most recently, a month into the COVID-19 pandemic, Burnette donated
10,000 KN95 masks to local hospitals and private physicians, and 5,000 masks to
local senior centers when there was a personal protective equipment shortage for
healthcare workers.  President and Chief Executive Officer of Tallahassee Memorial
Healthcare ("TMH"), G. Mark O'Bryant, wrote that "Mr. Burnette's unselfish act of
giving allowed our healthcare workers additional resources needed to remain safe
and provide high quality care to our patients."  On April 24, 2020, shortly after
providing 10,000 KN95 masks to TMH, G. Mark O'Bryant thanked Burnette for his
generosity at the height of the COVID-19 pandemic:

> On behalf of everyone here at Tallahassee Memorial
> HealthCare, please accept my sincerest appreciation for
> your generous donation of 10,000 KN95 masks. We all
> recognize that these masks are increasingly in limited
> supply and essential to our hospital's efforts to provide
> high quality care and compassionate support for COVID-
> 19 patients.  Your gift is also saving lives by keeping
> healthcare providers and patients safe as they come face-
> to-face with the growing presence of COVID-19 in our
> community. To date, not a single TMH provider working
> with these patients has tested positive for the virus. This

has much to do with having an adequate supply of PPEs like the KN95 masks you contributed. Thank you again for your generosity. Please know your gift will make a difference for our organization and the community we serve.

*See* G. Mark O'Bryant's letters attached as Comp. Ex. RR.

Finally, past Florida Bar President, Michael J. Higer best summarizes Burnette's character in his letter to the Court:

> Over the past several years, my life as a leader in The Florida Bar led me to travel often to Tallahassee. My first call always was to JT to get together. As a result, I was able to watch him first-hand as he conducted his business—as he interacted with his various business relationships and how they interacted with him. From these observations, I saw someone of the highest moral character who put friends and family above all else. I saw someone who was both charitable with his wallet but also his time and his heart. In short, I saw someone without ego who thinks and cares deeply about his family, his friends and his community. I understand and respect the jury's verdict. But that jury does not know the man I and many others know. I very respectfully ask this Court in rendering its decision to give great weight to JT as a whole and not a solitary incident which does not and should not define him.

*See* Michael J. Higer's letter attached as Ex. SS.



REDACTED

REDACTED



### III.   Substantially Below-Guidelines Sentence Would Provide Adequate Deterrence

Section 3553(a)(2)(C) requires that a sentencing court consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." *United States v. Pizzino*, 419 F. App'x 579, 583-85 (6th Cir. 2011) (sentence vacated where court failed to address defendant's low risk of recidivism and extensive rehabilitation); *United States v. Pritchard*, 392 F. App'x 433, 437-42 (6th Cir. 2010) (sentence vacated due to court's failure to address defense psychologist's report that defendant had a low risk of recidivism). A substantially below-Guidelines sentence would also achieve both of these deterrence goals.

A lengthy term of imprisonment is unnecessary to achieve specific deterrence. First, Burnette poses a negligible risk of recidivism and is not a danger to the public. According to the United States Sentencing Commission's empirical research, as a true first-time offender released without incident during the pendency of this case, Burnette is less likely to recidivate than virtually any other category of defendant.

Offenders with a criminal history category of I and are between 41 and 50 years old recidivate a mere 6.9% of the time. *See* Ex. UU at 28. The subset of first offenders who have zero Criminal History points are even less likely to re-

REDACTED

31

offend.  Only 3.6% of defendants in this category were reconvicted during the initial two (2) years back in the community.  *See id.* at 23; *see also United States v. Wunder*, No. 09–40052–01–RDR, 2010 WL 654754, at * 3 (D. Kan. Feb. 23, 2010) ("This was defendant's first criminal offense. He has no prior arrests. His chance of recidivism is less than some other persons who may also have a criminal history category of 'I.'"); *United States v. Oldani*, No. 3:09-00010, 2009 WL 1770116, at *7 (S.D.W. Va. June 16, 2009) (observing that "[b]ased on empirical research, the commission found that a defendant with no prior arrests or criminal history has . . . the lowest rate of recidivism of any group in the study").

As a true first-time offender released without incident since his arrest over two years ago, Burnette has proven he is not a danger to society.  *See Oldani*, 2009 WL 1770116, at *7 ("[b]ased on his status as a true first offender, there is little likelihood that [the defendant] will be brought before the criminal justice system in the future.").  As such, sentencing Burnette to a substantially below-Guidelines sentence, without a lengthy term of imprisonment would be sufficient to achieve specific deterrence.  *See Wunder*, 2010 WL 654754, at *3 (imposing sentence approximately 60% less than the guideline range's minimum; "[t]he court does not believe a lengthy jail term is necessary to protect the public from further crimes by defendant").

Two Eleven Circuit cases, *United States v. Mathis*, 186 F. App'x 971 (11th Cir. 2006) and *United States v. Winingear*, 422 F.3d 1241 (11th Cir. 2005), are instructive.  In *Mathis*, the defendant was convicted of three (3) counts of extortion by a public official and one (1) count of misleading statements.  Despite the Guidelines range being fifty-seven (57) to seventy-one months (71), the Court sentenced the defendant to thirty-six (36) months in prison.  The thirty-six (36) month sentence was upheld on appeal because the district court found that the Guidelines were "'excessively punitive' based on Mathis's commitment to public service, the monetary amount involved, and that this was his only criminal conviction" and "because the extortion convictions for counts two and three were so closely related as they involved the same business." *Mathis*, 186 F. App'x at 982. Similarly, here, Burnette's convictions are only related to Burnette's interactions with SPD, and Burnette's commitment to community service and leadership warrant a downward variance from the Guidelines range.

In *Winingear*, the defendant defrauded twenty-one (21) people, had multiple previous convictions, committed wire fraud while still under sentence for a previous crime, violated his bond, and threatened to murder arresting officers as he fled. Despite facing a twenty (20) year maximum sentence, and considering the facts discussed above, the Court reviewed the sentencing factors outlined in section 3553(a) and determined that a sentence of two (2) years imprisonment was sufficient

but not greater than necessary.  Based on the totality of the circumstances including Burnette's dedication to community services, charity, and leadership, and Burnette's lack of any previous criminal record, this Court should grant a downward variance from the Guidelines.

**IV.   Burnette's Sentence Should be Consistent with Other Defendants with No Criminal History Who Have Been Found Guilty of Similar Conduct**

Burnette's sentence should be consistent with other defendants with no prior criminal history convicted of similar crimes.  Based on the United States Sentencing Commission data between 2015 and 2020, 71.8% of sentences for bribery/corruption for individuals Criminal History Category I were twenty-four months or less.  Ex. VV.  Not only is Burnette not a public official, but there is no evidence that Burnette received any financial benefit from the charges upon which he was convicted.

Maddox, the public official, was involved in numerous bribery/extortion schemes over the course of many years (not to mention bank and tax fraud) with his partner, Carter-Smith, was sentenced to sixty (60) months.  Carter-Smith was sentenced to twenty-four (24) months.  Burnette was only convicted of being involved in one (1) extortion scheme with SPD, and Burnette received no financial benefit from any of the payments.

**IV.   Response to Government's Sentencing Memorandum**

Burnette intends to respond to the Government's Sentencing Memorandum at sentencing, but one inaccuracy in the Government's memorandum requires

34

immediate correction.   The Government's assertion (at pages 46-47) that "[t]he defendant himself is heavily invested in Trulieve, to the tune of more than $400 million," is false.   As Burnette's financial disclosure to the Probation Office makes clear, Burnette does not own $400 million in Trulieve shares.   Ex. WW.   Burnette's wife Kim Rivers owns those shares, *see id.*, and she received those shares before their marriage.   Publicly available SEC filings confirm that Rivers is the beneficial owner of those shares.   *See* Ex. XX (2018); Ex. YY (2021).   Undersigned counsel alerted the government to this inaccuracy in its memorandum, but the government refused to correct it.   Ex. ZZ.

## CONCLUSION

For the reasons stated above, Defendant John Thomas Burnette respectfully requests that this Court impose a substantially below-Guidelines sentence, which would be sufficient but not greater than necessary to accomplish the objectives set forth in 18 U.S.C. §3553(a).

Dated:  November 4, 2021

Respectfully submitted,

/s/ Gregory W. Kehoe
Gregory W. Kehoe
Florida Bar No. 0486140
kehoeg@gtlaw.com
Jordan L. Behlman
Florida Bar No. 111359
behlmanj@gtlaw.com
Greenberg Traurig, P.A.
101 East Kennedy Blvd., Suite 1900
Tampa, FL 33602

Telephone: (813) 318-5700
Facsimile: (813) 318-5900

R. Timothy Jansen
Florida Bar No. 0691208
jansen@jansenanddavis.com
Jansen & Davis, P.A.
125 N Franklin Blvd.
Tallahassee, FL 32301
Telephone: (850) 224-1440
Facsimile: (850) 224-0381

Adam Komisar
Florida Bar No. 86047
adam@komisarspicola.com
PO Box 664
Tallahassee, FL  32302
Telephone: (850) 591-7466
Facsimile: (850) 320-6592

Amy Mason Saharia
asaharia@wc.com
*Admitted Pro Hac Vice*
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5847

Michael Ufferman
Florida Bar No. 114227
ufferman@uffermanlaw.com
Michael Ufferman Law Firm, P.A.
2022-1 Raymond Diehl Road
Tallahassee, FL  32308
Telephone:  (850) 368-2345
Facsimile: (850) 224-2340

*Counsel for Defendant John Thomas
Burnette*

## LOCAL RULE 7.1(F) CERTIFICATE

I certify that this paper contains 8,738 words, per Microsoft Word's word count, which is in excess of the word limit requirements set forth in Local Rule 7.1(F).  A motion requesting leave to file this sentencing memorandum in excess of the word limit was granted by the Court.

/s/ Gregory W. Kehoe
Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this document has been served to counsel for the United States of America via email to their addresses of record on this 4th day of November, 2021.

/s/ Gregory W. Kehoe
Attorney