**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                 **Case No. 4:18cr76-RH/EMT-3**

**JOHN THOMAS BURNETTE,**

   **Defendant.**

_____/

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL

### I.   INTRODUCTION

The United States of America, by and through undersigned counsel, respectfully submits this response to the defendant's Motion for Continued Release Pending Appeal.   ECF No. 517.   For the reasons stated herein, this Court should deny the defendant's motion for release pending appeal because he has not established that (1) by clear and convincing evidence he is not a flight risk; (2) there are "substantial questions" raised by his pending appeal; or (3) that any questions raised would be likely to result in a reversal or an order for a new trial.

### II.    BACKGROUND

On August 13, 2021, after a fifteen-day jury trial, the defendant was

found guilty of one count of extortion under color of official right, in violation of 18 U.S.C. § 1951; two counts of honest services fraud, in violation of 18 U.S.C. §§ 1341 and 1346; one count of violating the Travel Act, in violation of 18 U.S.C. § 1952(a)(3); and one count of making material false statements, in violation of 18 U.S.C. § 1001(a)(2).

On November 9, 2021, this Court sentenced the defendant to concurrent three-year sentences on the counts of conviction and ordered him to surrender on or before January 9, 2022.   ECF No. 514.

On November 12, 2021, the defendant filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit.   ECF No. 516.   Defendant also filed a motion for release pending appeal.   ECF No. 517.

## III.   <u>LEGAL STANDARD</u>

Prior to a jury's verdict of guilty, defendants enjoy a powerful presumption that they should remain free pending trial.  *See* 18 U.S.C. § 3142(e)(1), (f) (requiring the government to show that by clear and convincing evidence that no combination of conditions can guarantee a defendant's presence in court or the safety of the community).   However, once a jury finds a defendant guilty, that powerful presumption reverses and counsels in favor of a defendant serving his sentence during his appeal.   *See id.*

§ 3143(b).

Indeed, Congress has instructed that only in truly exceptional cases may a defendant remain free pending appeal. "A defendant seeking release on bond during the pendency of his appeal must show: (1) he is not likely to flee if released; (2) he is not likely to pose a danger to the community if released; and (3) his appeal raises a substantial question of law or fact likely to result in a reversal or an order for a new trial." *United States v. Lamar*, 820 F. App'x 996, 997 (11th Cir. 2020) (citing *United States v. Giancola*, 754 F.2d 898, 899-901 (11th Cir. 1985)); 18 U.S.C. § 3143(b). The defendant has failed to meet his burden as to any of the three criteria, let alone all three.

### A.   Substantial Question

A "substantial question" is "one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." *Giancola*, 754 F.2d at 901. A substantial question is "one which is either novel, . . . has not been decided by controlling precedent, or . . . is fairly doubtful." *Id*. at 900 (citing *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)).

Moreover, whether there is a substantial question does not end the inquiry, for "[a] question of law or fact may be substantial but may,

nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to have been insufficiently preserved." *Giancola*, 754 F.2d at 900 (quoting *Miller*, 753 F.3d at 23). Therefore, the substantial question must be likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed. *Giancola*, 754 F.2d at 900 (quoting *Miller*, 753 F.3d at 23, 24). "A court may find that reversal or a new trial is 'likely' only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Giancola*, 754 F.2d at 900 (quoting *Miller*, 753 F.3d at 23).

## B.    Standard of Review

The Eleventh Circuit will ultimately review the defendant's appeal on some of the issues presented in the Motion for plain error because the defendant did not object to the jury instructions and either did not object to or did not properly preserve an objection to the testimony he alleges was in error.[1] FED. R. EVID. 103; FED. R. CRIM. P. 30, 52(b). Meanwhile, one of the defendant's issues—the defendant's claim that this Court failed to instruct

---

[1]    The defendant did not object to the jury instructions as read. ECF No. 466 (Trial Tr., Day 15) at 3256. The defendant's failure to properly preserve his objections to UC Sweet's testimony is discussed *infra* at 27-29.

the jury using *McDonnell*'s "critical analogy" (Mot. at 7-10)—is waived and will not be considered at all on appeal. *See infra* at 9-10.

Although there is no case from the Eleventh Circuit or this District directly connecting the ability to prevail on plain-error review or waived claims with the existence of a "substantial question," several other district courts have found that the defendant failed to present a substantial question where he failed to show that the court plainly erred. *See, e.g. United States v. Antoine*, No. 1:18CR17-1, 2021 WL 3882972, at *2 (N.D. W.Va. Aug. 13, 2021) (finding that the defendant had failed to show "substantial questions" because he had not shown a "reasonable probability" that he would prevail under plain error review on appeal); *United States v. Tinghui Xie*, No. CR 17-92-JWD-EWD, 2019 WL 982855, at *3 (M.D. La. Feb. 28, 2019) (holding the defendant could not show that he had raised "substantial questions" where he could not show that he would, more probably than not, prevail under the plain error or abuse of discretion standards); *United States v. Geddings*, 497 F. Supp. 2d 729, 737 (E.D.N.C. 2007) (finding that the defendant had not raised a substantial question of law or fact likely to result in reversal because he could not demonstrate a likelihood he would prevail under plain error review).

To the extent the defendant has not affirmatively invited error on his claims, this Court should examine whether the defendant's alleged errors were plain. "The plain-error test has four prongs: there must be (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are met, then a court may exercise its discretion to correct the error if (4) the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Madden*, 733 F.3d 1314, 1320 (11th Cir. 2013) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993) (additional citations omitted)). "For a plain error to have occurred, the error must be one that is obvious and is clear under current law." *United States v. Dortch*, 696 F.3d 1104, 1112 (11th Cir. 2012) (quoting *United States v. Carruth*, 528 F.3d 845, 846 n. 1 (11th Cir. 2008)). "[T]here can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving" the disputed issue. *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003). Plain error review is to be exercised only "sparingly" to correct "particularly egregious errors" in "circumstances in which a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15 (1985).

III.  **ARGUMENT**

The defendant has failed to establish by clear and convincing evidence that he is not a flight risk.   He also has not demonstrated that there are "substantial questions" raised by the defendant's pending appeal because this Court made no error, plain or otherwise.   This Court's instructions to the jury and admission of testimony by FBI undercover agent ("UC") "Mike Sweet" ("UC Sweet") were appropriate and consistent with Supreme Court and Eleventh Circuit precedent.   And even if there were any errors, they were not obvious, egregious, or in contravention of current law, nor did they affect the outcome of the trial.

    **A.**    **The defendant has not met his burden that he is not a flight risk.**

As a threshold matter, although the defendant is not a danger to the community, he has not shown by clear and convincing evidence that he does not pose a risk of flight.   The defendant is in his mid-40s, has health issues that he argued would be exacerbated by a sentence of incarceration, and is facing 36 months of imprisonment.   ECF No. 510 at 29-30.   Most importantly, he has access to substantial financial resources, with assets of more than half a billion dollars when combined with those of his wife.   While he has complied with conditions to date, his financial resources make flight a

possibility. *See, e.g., United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) ("As to the incentive to flee (based on his age and exposure to a lengthy imprisonment), we consider that such an incentive naturally bears upon and increases the risk of flight."); *United States v. Khanu*, 370 F. App'x 121, 121-22 (D.D.C. 2010) (affirming post-conviction detention order due, in part, to defendant's "extensive financial resources" and concurrent flight risk*); United States v. Poulsen*, 521 F. Supp. 2d 699, 704 (S.D. Ohio 2007) (ordering post-conviction detention based in part on consideration of "the apparently substantial resources that [the defendant] has available, which could be used to finance his flight.").

Further, although he has surrendered his pilot's license, the defendant is an experienced pilot with access to an airplane and a boat. The defendant has now been convicted of serious crimes, including making false statements which obstructed the investigation. That conviction and the Court's issuance of a serious term of imprisonment materially change the calculation the Court made pre-trial (and even post-trial but pre-sentence) regarding the defendant's flight risk.

**B.**  **The defendant's asserted errors in the jury instructions do not raise "substantial questions," and if they did they would not require a new trial.**

The defendant alleges that that this Court erroneously (1) defined "official act" for the jury using only the word "matter" instead of the entire list of synonyms from *McDonnell*: "question, matter, cause, suit, proceeding, or controversy . . . similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee" (Mot at 13 (citing *McDonnell v. United States*, 136 S. Ct. 2355, 2371–72 (2016))); and (2) failed to instruct the jury that the "public official must promise to perform an official act on a matter that is 'specific and focused.'"  Mot. at 5.  These alleged errors are both premised on a misrepresentation of how the word "matter" is used in *McDonnell* and in the jury instructions in this case.   This Court made no error, plain or otherwise, in its instructions, so the defendant's appeal does not raise "substantial questions."

1.    There is no substantial question with regard to this Court's definition of the word "matter."

The defendant claims that this Court improperly "watered down" the *McDonnell* definition of "matter" and thus gave an inaccurate "official act" instruction.   Mot. at 7.   That argument is both waived and misguided.   This Court carefully crafted its instructions to fit the facts of this case.

9

At the outset, the defendant has affirmatively waived this claim by inviting this alleged error and thus cannot obtain any relief on appeal. "It is well established in this Circuit that to invite error is to preclude review of that error on appeal." *United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005). When a party indicates that a jury instruction is acceptable or "cover[s] the bases," that party waives the right to challenge that instruction on appeal. *Id.* Here, when discussing the "official act" instruction at issue in this case, defense counsel explicitly approved the instruction that the Court drafted. ECF No. 463 (Trial Tr. Day 12) at 2451 (discussing ECF No. 419, the "Discussion Draft: Official Act Instruction"). Indeed, in response to the government's request to include the Eleventh Circuit's standard definition of an "official act," defense counsel told the court that, "looking at [*McDonnell*], I understand what the court did" and confirmed that the court's official act instruction "captured it." ECF No. 463 at 2449-51. Under these circumstances, any challenge to the contents of that instruction are barred because the defense invited the supposed errors it now complains of. *Silvestri*, 409 F.3d at 1337; *see also United States v. Gibson*, 708 F.3d 1256, 1279 (11th Cir. 2013) (stating it was likely that defense counsel invited any

error in the jury instructions when he stated "I've read it and reread it, and I've—I actually like it, Judge.   I think it's well written.   I think it applies").

Even if the defendant had not waived this claim and plain-error review governed, his argument would still fail.   In *McDonnell*, the Supreme Court provided a definition of the term "official act" in 18 U.S.C § 201 which relied on the word "matter" and several synonyms:

> In sum, an "official act" is a decision or action on a "question, **matter**, cause, suit, proceeding or controversy."   The "question, **matter**, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official.

*McDonnell*, 136 S. Ct. at 2371–72 (emphasis added).   The Court directed that this definition is to be used in determining whether an "act" by a public official is an "official act" for purposes of the bribery statute.

In the context of this case, and as clearly articulated in the jury instructions, the official acts at issue were votes before the city commission, abstaining from such votes, and pressuring other city officials to take official acts on matters such as votes.   *See, e.g.* ECF No. 433 at 7-8; 466 (Trial Tr., Day 15) at 3098, 3107-09, 3214 (references to official acts in the government

11

closing argument and rebuttal).   It is indisputable that these acts are "official acts" under the *McDonnell* definition.   *See McDonnell*, 136 S. Ct. at 2370 (noting that a "public official" takes an "official act" if he "us[es] his official position to exert pressure on *another* official to perform an 'official act'" or "to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official"); *United States v. Roberson*, 998 F.3d 1237, 1251–52 (11th Cir. 2021) ("explaining that a "vote on [a state legislative bill] is undeniably an official act because it involves 'a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee'").

Because this Court crafted its instructions to frame for the jury the specific, concrete, and indisputable official acts at issue in this case, the jury was not instructed on the definition of "official act" or the technical legal definition of "matter" under 18 U.S.C. § 201(a)(3).   "[D]efining the alleged 'official act[s]' at issue" gave the jury sufficient "guidance" in this case. *United States v. Mayweather*, 991 F.3d 1163, 1185 (11th Cir. 2021).   That is especially true because voting by local legislators or persuading other legislators to vote in a particular way are quintessential and familiar forms of

official government action.   There was no need for this Court to delve into

the technical legal definition of what constitutes an "official act" or "matter"

under § 201(a)(3).   *Cf. id.* at 1185–86 (recognizing such a need where

government official act theory revolved around corrections officers' donning

their work uniforms outside their place of employment to influence police

officers).

When this Court did use the word "matter" in its jury instructions, it

used that word's ordinary meaning: "a subject under consideration."

Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-

webster.com/dictionary/matter, *accessed Nov. 30, 2021*.   It did not use

"matter" in reference to the *McDonnell* definition of "official act" or "matter":

> The first is a vote on any **matter** that was pending
> or might later come before a local governmental
> entity, including the City Commission, the
> Community Redevelopment Agency, or the
> Planning Commission.   To count as a **matter** that
> might later come before the governmental entity, a
> **matter** need not be identified at the time of the
> payment; it is sufficient if the payment is made in
> exchange for favorable treatment on any not-yet-
> known **matter** that might later come up for a vote.

The subsequent uses of the word "matter" all refer back to this first plain-

meaning understanding, not the *McDonnell* definition, of "matter."   ECF No.

433 at 8.   This Court properly instructed the jury that the three types of acts

described were "official acts" regardless of the *subject matter* of those official acts by former Tallahassee city commission and co-defendant Scott Maddox ("Maddox") or other Tallahassee city officials.

The defendant claims the Court erred by using the word "matter" while failing to "include *McDonnell*'s 'critical' analogy to 'a lawsuit, hearing, or administrative determination.'"   Mot. at 8-9.   That argument fails to acknowledge that this analogy is unnecessary where the only alleged official acts necessarily meet the *McDonnell* definition's requirement of formality. Votes or abstentions by members of city commissions in official meetings plainly satisfy the *McDonnell* standard and require no further explanation of the requisite formality.   This Court's instructions otherwise provided "guidance to the jury by defining the alleged 'official act' at issue." *Mayweath*er, 991 F.3d at 1184-86.   And given that, "references to lawsuits and hearings—formal exercises of governmental power that are not at issue here—would only have confused the jury.   *Id.* at 1184 (affirming the omission of such language when it would only have confused the jury).

That confusion was precisely this Court's concern in declining to give the standard *McDonnell* instruction, which was requested by the government:

> So part of the language you have is: It must be
> similar in nature to a lawsuit before a court, a

> determination before an agency, or a hearing before a committee. That's clear as mud. I mean, it's clear to a lawyer that reads all of these cases and figures out what kind of thing we're talking about.
>
>          \*         \*         \*
>
> I don't think anybody on the Supreme Court thought they were writing a standard jury instruction.
>
> So what I did in the case was take that language -- like I said, I wrote this instruction with [*McDonnell*] open on the computer, but I tried to apply it to the facts of this case.

Following the guidance of the Eleventh Circuit, this Court properly crafted an instruction that fit the facts of the case and was consistent with *McDonnell*.

Insofar as this Court's instructions regarding official acts were correct, there was no error, let alone plain error, *i.e.*, one that is "obvious and is clear under current law." *Dortch*, 696 F.3d at 1104. There are also no questions which are "novel," have "not been decided by controlling precedent," or are "fairly doubtful." *Giancola*, 754 F.2d at 900 (citing *Miller*, 753 F.2d at 23). There is, therefore, no substantial question resulting from this Court's use of the word "matter."

2. <u>There is no substantial question from the Court's instructions on whether the subject matter of the official act had to be specifically identified.</u>

The defendant's other assignment of plain error in the jury instructions also relies on a misstatement of the court's use of the word "matter."   Mot. at 5.   The defendant claims that the court's instruction conflicted with the portion of the *McDonnell* definition of "official act" that the "matter" being acted on "must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official."   *McDonnell*, 136 S. Ct. at 2372.

Because the use of the term "matter" in the jury instructions means the "subject under consideration" with regard to the types of official acts listed by the court, this Court's instruction is correct.   The Court instructed that:

> To count as a **<u>matter</u>** that might later come before the governmental entity, a **<u>matter</u>** need not be identified at the time of the payment; it is sufficient if the payment is made in exchange for favorable treatment on any not-yet known **<u>matter</u>** that might later come up for a vote.

ECF 433 at 7-8 (emphasis added).   Indeed, that instruction is consistent with the retainer theory of bribery liability post-*McDonnell*.   *See Roberson*, 998 F.3d at 1252 (affirming the continued existence of a retainer theory of bribery,

which "occurs when a person bribes an individual or entity in exchange for a continuing course of conduct").

The defendant nevertheless argues that this Court plainly erred, contending that its instructions do not comply with the Second Circuit's decision in *United States* v. *Silver*, 948 F.3d 538, 546 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021).   This argument is without merit because the Eleventh Circuit has not adopted *Silver*, contrary to the defendant's claim, but even if it had, this Court's instruction in this case is consistent with *Silver*. Given this, there is no plain error in this Court's instructions.

> a.   Silver *is Not Binding Precedent in this Circuit.*

At the outset, the Eleventh Circuit has never adopted the reasoning laid out in *Silver*.   *Contra* Mot. at 10.   In *Roberson*, the only Eleventh Circuit case to even cite *Silver*, the court of appeals cited that decision for the sole proposition that "*McDonnell* did not invalidate the 'as the opportunities arise' theory of bribery."   998 F.3d at 1251; *see also* ECF No. 497-1 at 29-30 (government citation to *Roberson* for only this limited proposition).   The Eleventh Circuit did not quote or discuss *Silver* at any length; it certainly never endorsed the portions of *Silver*'s language or reasoning that the defendant relies on in the Motion.   *See* Mot. at 10.

That alone dooms any claim to plain error relief based on *Silver.* "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *Lejarde-Rada*, 319 F.3d at 1291.

Moreover, despite the defendant's suggestion, *McDonnell*, unlike *Silver*, does not explicitly require that "the Government must prove that, at the time the bribe was accepted, [the public official] promised to take official action on a specific and focused question or matter as the opportunities to take such action arose." 948 F.3d at 568. *McDonnell* affirmed instead that, at trial, the government will have to "identify a 'question, matter, cause, suit, proceeding or controversy" that the public official either acted on or agreed to act upon. 136 S. Ct. at 2368. And the underlying "question" or "matter" must be "focused" (or "specific") and "concrete." *Id.* at 2369, 2372. But *McDonnell* says nothing about whether the public official must, at the time he agrees to exercise governmental power over a given "matter," know exactly what that "matter" will be.

> b.   *Even if* Silver *was relevant to a plain error analysis, this Court's instructions would be consistent with that decision.*

In *Silver*, the Second Circuit expressed concern that, under the facts of that case, the jury could have found that the public official accepted things of value to be influenced in performing acts that were not official acts under the *McDonnell* definition.   The core issue was the court's instruction on the *McDonnell* definition of "official act."   In this case, however, unlike in *Silver*, this Court provided the jury with examples of the official acts at issue instead of the *McDonnell* definition of official acts.   Therefore, this Court's instructions required the jury to find that there was an agreement as to a "specific and focused" matter as required by *Silver*—the votes before the Tallahassee city commission.

In *Silver*, the Second Circuit rejected the defendant's argument that bribery requires "a promise to perform a particular official act," explaining that under *McDonnell*, "both extortion under color of right and honest services fraud require that an official promise to 'make a decision or take an action on a question, matter, cause, suit, proceeding or controversy' . . . . but [n]either offense . . . requires that the official "specify the means that he will use to

perform his end of the bargain." 948 F.3d at 553 (citing *McDonnell,* 136 S. Ct. at 2371).

The court reaffirmed the validity of the retainer theory of bribery, citing to its own decision in *United States v. Ganim* for the proposition that "[t]he 'as opportunities arise' theory of bribery . . . requires a promise to 'exercise particular kinds of influence . . . as opportunities arise." 948 F.3d at 553. (citing *Ganim*, 510 F.3d at 144). However, the Second Circuit held that "[e]ven though the particular act of influence need not be identified at the time of the official's promise, the particular question or matter to be influenced must be." 948 F.3d at 553.

The district court provided to the jury the *McDonnell* definition of official act and instructed that the government had to prove that the public official "understood that, as a result of the bribe, he was expected to exercise official influence or take official action for the benefit of the payor and, at the time the bribe was accepted, intended to do so as specific opportunities arose." *Id.* at 558–59.

The Second Circuit held that this instruction was in error because "the jury should have been instructed that, to convict on honest services fraud, the Government must prove that, at the time the bribe was accepted, Silver

promised to take official action on a specific and focused question or matter as the opportunities to take such action arose." *Id.* at 568.   Unlike the Court's instructions here, the instructions in *Silver* did not limit the jury's consideration to specific factual categories of clear official acts and thus, the Second Circuit held that in providing a *generic* official act definition, courts must include the words "specific and focused" before the list of synonyms of "question or matter."   Again, because this Court provided the jury with the specific acts at issue, no clarification of the generic definition was necessary, as the Second Circuit found it was in *Silver*.

The court described the danger of not clarifying that definition under the specific facts at issue in *Silver*, where it found that the evidence established that "the only promise that could be inferred from the evidence presented at trial is that [the public official] promised to keep [the bribe payor] happy as the opportunities to do so arose. . . . .   Keeping someone happy, without more, is not a promise to exercise particular kinds of influence, and it is especially not a promise to perform official acts on an identified, focused, and concrete matter or question that involves the exercise of governmental power." *Id.* at 570 (citing *McDonnell*, 136 S. Ct. at 2370).

Here, there was nothing so nebulous as a promise to simply keep the UCs happy as opportunities arose.   Rather, this court properly instructed the jury on specific official acts that were contemplated by the participants in the scheme.   Therefore, even if *Silver* was binding on this Court, which it is not, the instructions in this case are consistent with *Silver*.   This Court instructed the jury that it could only find the defendant guilty if Maddox had agreed to take action on one of three kinds of official acts, each related to votes by a commissioner before a local government entity—particular kinds of influence, in other words.   Those votes before these various committees were the "specific and focused question or matter" that *Silver* was concerned with.[2] Indeed, such votes are "of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee," and thus in and of themselves are a qualifying "question" or "matter" under § 201(a)(3). *McDonnell*, 136 S. Ct. at 2369 (holding that "a typical meeting, call, or event

---

[2]   Notably, the Second Circuit only remanded the convictions related to one of the two bribery schemes.   With regard to the convictions related to the other bribery scheme, which involved money for legislative acts in an arrangement that the Second Circuit stated more "closely resembles classic bribery-based crimes," 948 F.3d at 562, the court found that although the "question or matter" was not identified in advance, the circumstantial evidence established that the parties understood the "focused and concrete question or matter" on which the payors wanted action.   *Id*. at 571.   The court found that "a rational, properly instructed jury would have found Silver possessed the required *mens rea* at the time he accepted the payment."   *Id*.

arranged by a public official" does not involve a sufficient exercise of formal government power to qualify as a "matter" or "question").

Thus, the jury instructions do not leave open the possibility that the jury could convict on an "open-ended promise"—they could only convict if they found Maddox agreed to perform a "formal exercise of governmental power" in relation to a qualifying "matter." 948 F.3d at 559. As a result, no plain error occurred, and no "substantial question" exists here.

> 3. *Neither Alleged Jury Instruction Error Would Justify Reversal on Appeal.*

Even if this Court's official act instruction was somehow erroneous, there would be no reversible plain error because those errors would not have affected the defendant's substantial rights or the fairness, integrity or public reputation of judicial proceedings. A rational jury would have found the defendant guilty even if instructed as the defendant now wishes.

In this case, the evidence established beyond a reasonable doubt that the defendant and Maddox knew that the UCs expected Maddox to take official acts, namely specific actions as a city commissioner, in relation to at least two specific real estate projects. *See* ECF No. 497-1 (Government's Opposition to Defendant's Renewed Motion for Judgment of Acquittal) at 30-32. During trial, there was no argument from the defense that the actions

23

discussed were not official acts; rather the defendant argued that he did not intend to join a bribery scheme at all. *See id*. at 3138-3211 (closing argument of defense counsel with no mention of official acts at all). A different instruction would have led the jury to the same conclusion.

The defendant argues that he, Maddox, and the UCs did not reach an agreement for Maddox to perform these acts, but this is nothing more than a rehashing of the motion for judgment of acquittal. *See* Mot. at 11-14. The jury found that an agreement was reached and there was substantial, if not overwhelming, evidence that these projects and acts were contemplated in Maddox's acceptance of the bribe payments.

The Second Circuit applied this same reasoning in denying a defendant's challenge to instructions that did not comply with *Silver*. In *United States v. Skelos*, the Second Circuit found that the court's instructions did not comply with *Silver*, but nevertheless refused to overturn the conviction because the evidence demonstrated that the defendant "entered each *quid pro quo* arrangement with the understanding that he was expected to 'to take official action on a specific and focused question or matter as the opportunities to take such action arose.'" 988 F.3d 645, 656–57 (2d Cir. 2021). The court explained that, despite the non-compliant jury instructions, "[c]ircumstantial

evidence demonstrating an understanding between the payor and the official will often be sufficient for the Government to identify a properly focused and concrete question or matter."  *Id.* at 657.

In this case, even if the jury had been instructed exactly as the defendant now suggests it should have been, the verdict would have been the same.   The defendant's own recorded words detailing how to bribe Maddox and why provided the jury more than it needed to convict him.

**C.    This Court's admission of testimony that UC Sweet believed the defendant and Maddox made false exculpatory statements was not erroneous and does not raise substantial questions.**

The defendant contends that this Court erred by allowing UC Sweet to testify four times that he believed that certain statements by the defendant and Maddox were "false exculpatory" statements.  *See* Mot. at 23.   However, when viewing the record as a whole, it is evident that this Court properly admitted that limited testimony for the purpose of explaining UC Sweet's motivations during the investigation, which the defendant placed at issue from the very beginning of the trial.   This court made no error, plain or otherwise, in admitting that testimony so the defendant's appeal does not raise substantial questions with regard to UC Sweet's testimony.

25

1. <u>The defendant placed the UCs' motivations and subjective conclusions at issue.</u>

At the beginning of opening statement, defense counsel announced that the theme of the defense case would be "government overreach."   ECF No. 449 (Trial Tr., Day 1) at 62.   Defense counsel asserted during opening statement that the defendant's statements in which he explicitly explained to the UCs how to bribe Maddox was nothing more than "play acting" meant to assuage UC Sweet's desire to learn the political "inside track" in Tallahassee. *Id*. at 87.   Counsel further told the jury that the evidence would show that UC Sweet pushed the defendant to involve Maddox in a bribery scheme against the defendant's wishes.   *Id.* at 90.   Defense counsel later signaled that he intended to argue that UC Sweet was "always wanting to pay somebody," further placing UC Sweet's subjective motivation at issue.   *Id.* at 99.

The defense's cross examination of UC "Mike Miller" ("UC Miller"), who testified before UC Sweet, focused in large part on trying to establish that the defendant wanted to do economically promising projects but that the UCs—particularly UC Sweet—persisted in their desire to pay bribes to public officials.   For example, defense counsel asked UC Miller several questions about UC Sweet's tactics, suggesting that he used the term "stacked deck" in relation to a story told by the defendant about his purchase of the Doubletree

Hotel—a reference to the McKibbon bribe.   *Id*. at 1375.   The defense asked UC Miller questions to suggest that by asking to hear more about the "stacked deck," UC Sweet was signaling to the defendant that he wanted to talk about bribes.   *Id.* at 1375-76.   The defense asked UC Miller if UC Sweet was "sending [the defendant] a message" and "encouraging [the defendant] to say the same thing" about the "stacked deck" to the UCs.   *Id.* at 1376; *see also id*. at 1395 (defense counsel asking UC Miller whether UC Sweet was always "trying to pay [bribes to] somebody.").

The tenor of the cross examination prompted this Court to ask defense counsel if they intended to assert an entrapment defense, which had not been previously noticed.   *Id.* at 1452.   Defense counsel disclaimed the defense and in response this Court explained that if questions such as those posed to UC Miller persisted, "there will be an instruction that makes clear that this is not a trial about whether they like or don't like the government using undercover agents.   I'll tell [the jury], as clearly as I need to, it's perfectly legal to do that."   *Id.* at 1453.   After that admonishment from the Court, defense counsel continued to ask questions of UC Miller about UC Sweet's investigative tactics.   *See* ECF No. 459 (Trial Tr., Day 8) at 1488 ("So whenever it got to economics, Sweets was, like, blah, blah, blah.   He didn't

want to hear economics, did he?").   It was in the context of the examination of UC Miller that this Court considered the evidentiary objections to the testimony of UC Sweet.

2.   <u>The defendant did not properly preserve the now-asserted objections.</u>

The defendant objects to four instances of testimony by UC Sweet, but defense counsel only objected to two of those instances and neither objection can be understood in context to be the basis now asserted—improper opinion testimony.   *See* Mot. at 23.

During UC Sweet's direct examination, the Court overruled several speculation objections by defense counsel to questions posed to UC Sweet as to his understanding of certain recorded conversations with the defendant. *See, e.g.,* ECF No. 459 at 1570, 1634.   There were no objections to improper lay opinion testimony.   At the end of the day, with UC Sweet still on the stand, the Court explained its rulings were influenced by the cross examination of UC Miller, stating that "[y]ou can't criticize the motivation and then prevent the witness from testifying to the motivation."   *Id*. at 1654.

The next day, the government asked UC Sweet what he thought was "going on" after the December 6 phone call, and defense counsel objected on the basis of speculation, which was overruled.   ECF No. 460 at 1662-63.

UC Sweet responded with the first instance of objected testimony, that he "immediately thought . . . this was what we call a false exculpatory statement." *Id.*; Mot. at 23.  Defense counsel did not object to or move to strike this testimony.

Later that day, defense counsel objected, but not on the basis of improper opinion testimony, to the second instance of now-objected-to testimony: UC Sweet's statement that he believed that Maddox had put the defendant up to making the December 6 call.  *Id.* at 1670-71; *see* Mot. at 23. This objection, which did not state a basis, cannot be understood in context to have been an objection based on improper lay opinion testimony given the long stretch of objections to similar questions based on speculation.  *See Wilson v. Attaway*, 757 F.2d 1227, 1242 (11th Cir. 1985) ("[O]bjections to the admission of evidence . . . are preserved only if they are timely and state the specific ground of objection, if the specific ground was not apparent from the context." (quotations omitted)).   Defense counsel, to that point and thereafter, raised several objections to UC Sweet's testimony, but the vast majority of the stated bases were speculation.   There was not one objection on the basis of improper opinion testimony.

In addition, the defendant now asserts error in regard to the admission of questions and answers to which he did not object at all:

> Q. Mr. Burnette says: 5-0 vote, did not pay a – dollar sign.   And then says: Tallahassee is just about doing the right thing.   Do you know what the vote was he was talking about?
>
> A. I believe it was a vote that pertained to Fallschase, but I'm not 100 percent positive.
>
> Q. What did you understand these texts -- what did you understand him to be telling you in these texts?
>
> A. I think he's trying to, again, make false exculpatory comments to us to basically show that: Hey, listen, everything done in Tallahassee is being done above board.

*Id.* at 1689, *see* Mot. at 23.

In addition to not objecting to this testimony on direct examination, on cross examination, defense counsel asked more than a dozen questions about UC Sweet's "false exculpatory" testimony.   *See id.* at 1787-88, 1793-95, 1806, 1820-23, 1825, 1833-35, 1845.   In response to those questions, on redirect, UC Sweet was asked to explain his answers to the cross-examination questions and he provided testimony that the defendant now claims was in error, but which was not objected to at the time.   *Id.* at 1856-57.

3. <u>This Court's evidentiary rulings were proper, particularly in light of the defendant's trial strategy</u>.

This Court's admission of UC Sweet's testimony was plainly correct. <u>First</u>, the testimony was proper lay opinion testimony. A witness may generally state an opinion if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. This rule allows a witness to testify about his understanding of the substance of a conversation. *See United States v. Rivera*, 780 F.3d 1084, 1095 (11th Cir. 2015). More specifically, a law enforcement agent can properly testify to his understanding of the meaning of a conversation in which he participated. *United States v. Williams*, 718 F. App'x 890, 894 (11th Cir. 2017); *United States v. Jayyousi*, 657 F.3d 1085, 1102–04 (11th Cir. 2011). Here, UC Sweet had personal knowledge of his understanding of the conversation and his lay opinion was helpful to the jury in evaluating UC Sweet's credibility and the propriety of the actions he took, which the defendant placed at issue in opening statement, in his examination of UC Miller, and during his cross examination of UC Sweet.

31

Second, a witness's understanding of another person's statement made to them is admissible to explain the witness' subsequent actions.  *See United States v. Henderson*, 409 F.3d 1293, 1299 (11th Cir. 2005).   The defendant acknowledges this principle, but incorrectly asserts that UC Sweet both *did not testify as to any effect* the false exculpatory statements had on his actions and that *he testified they had no effect* on his actions.   Mot. at 27.   Both cannot be true.

In fact, UC Sweet testified about the December 6 call in intricate detail, explaining his understanding of nearly everything the defendant told him, and how it affected his interactions with the defendant going forward.   He explained that although at the beginning of the conversation the defendant appeared to distance himself from the UCs and the bribery scheme the defendant had hatched, that statement was "completely contradictory . . . to all of the things that he's been telling me before."   ECF No. 460 at 1665. However, UC Sweet testified that based on the remainder of the conversation and his prior experience with the defendant, UC Sweet ultimately understood that the defendant was telling him, "[he]y, you are just trying to go about it the wrong way.   That's what this conversation is about."   *Id.* at 1668.   That

understanding explains why UC Sweet testified that after the phone call, he "thought [he] stood exactly where I stood before."  *Id*. at 1670.

UC Sweet's understanding was important to the jury to understand what the two men were discussing on the many hours of recordings and why the defendant would so willingly discuss deepening his involvement in the bribery scheme just one month later.   UC Sweet explained how the December 6 call prompted the agents to seek out the next in-person meeting with the defendant to "test the waters" with the defendant.  *Id*. at 1672.  In other words, UC Sweet's testimony that he understood Burnette to be telling him "false exculpatory" statements during that phone call prompted him to take specific investigative steps and clearly steered the direction of the UC operation; an issue that—again—the defendant put squarely at issue in his opening statement and throughout the trial.

Similarly, UC Sweet testified that Maddox's suspicions that the UCs were FBI agents affected how he handled the investigation.  *Id*. at 1633-34. As UC Sweet articulated in his testimony, his understanding of what the defendant and Maddox were saying prompted specific operational and investigative steps by the UCs, making his understanding important and

relevant to the jury's evaluation of the defendant's theme that there was "government overreach" by the UCs in this case.

Third, the admission of UC Sweet's testimony was necessary, based on the defense strategy of attacking UC Sweet's motives and tactics, to aid the jury's understanding of the recordings and the interactions of the UCs and the defendant. This Court was well aware of that strategy, suggesting that the defense was attempting to assert a "lawless" entrapment defense despite the defense counsel's repeated disclaiming of that defense. *Id*. at 1726. This Court's admission of UC Sweet's limited opinion testimony was proper given the defendant's strategy and questions.

    4.    <u>The cases cited by the defendant and his arguments that he had no choice but to elicit the same improper testimony is unavailing.</u>

The cases cited by the defendant do not call this Court's ruling into question. *United States v. Hipps* was a case that the presiding judge described, in denying a mid-trial motion for judgment of acquittal, as a "relatively thin" circumstantial case that relied in large part on an "alleged confession." 857 F. App'x 1007, 1008 (11th Cir. 2021). In that case, the court allowed a case agent to testify several times that he did not believe the defendant's explanations of his actions, given during interviews with the

agents.  *Id*. at 1008.   Unlike here, however, where UC Sweet's testimony about his understanding of the defendant's statements was admitted to explain the investigative and operational steps that they prompted, in *Hipps*, the court found no legitimate basis for the testimony.   As the *Hipps* court explained in finding that the district court had plainly erred, "[t]hese statements about Hipps's truthfulness, tacked on at the end of Agent Shores's responses, served no purpose other than to undermine Hipps's credibility."  *Id*.   The court also noted that the "statements that he did not believe Hipps had little relevance to other legitimate lines of testimony, such as explaining his investigative methods."  *Id*.  *Hipps* is therefore inapposite.   This Court allowed UC Sweet's testimony about his understanding of statements made during an investigation as part of "legitimate lines of testimony"—explaining his motivations, which had been repeatedly attacked by the defense, and to explain his investigative methods.

In *United States v. Sanchez-Lima*, also cited by the defendant, the agent was permitted to testify that, "based on his training and experience, Agent Kermes was telling the truth."   161 F.3d 545, 548 (9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (Dec. 11, 1998); Mot. at 25.   No such testimony was admitted in this case.

The defendant's claim that "the defense had no choice but to attempt to undermine the testimony 'to offset the prejudicial effect'" also does not have merit and the cases cited in support of this proposition are inapposite.   Mot. at 29.   In *Brown*, the prosecutor improperly commented on the defendant remaining silent, in violation of his Fifth Amendment right against self-incrimination, despite timely objections from the defense.   *Brown v. Dugger*, 831 F.2d 1547, 1553 (11th Cir. 1987).   Similarly, in *Chase Manhattan Bank v. Rood*, 698 F.2d 435, 439 (11th Cir. 1983), the defendant in a civil action made "vigorous attempts" to exclude the improperly admitted evidence. Here, counsel not only did not make timely objections on the grounds now asserted, defense counsel signaled early on that attacking UC Sweet's motives and tactics was central to the defense case.   Indeed, when the Court asserted that the defense was pursuing a lawless entrapment defense, counsel for the defendant explained that he was "laying some preliminaries . . . which will be evident when our case comes on.   That is the next -- that is where this type of testimony is pertinent to the defense."   ECF No. 460 at 1727.   Counsel did not assert what the defendant claims now—that their hand was forced.

Even if this Court was incorrect in its admission of UC Sweet's testimony, such error did not affect the defendant's substantial rights or the

fairness, integrity or public reputation of judicial proceedings. The government's evidence established far beyond a reasonable doubt that the defendant repeatedly encouraged the UCs to bribe and continue to bribe Maddox. *See* ECF No. 497-1 at 8, 34-36; *see also* ECF No. 507 at 19-20. Furthermore, the defendant admitted on direct and cross examination that he was intentionally trying to give UC Sweet the impression he could bribe Maddox both before and after the December 6 phone call that prompted the now-objected-to testimony. ECF No. 465 at 2918 (admitting his intent to convince the UCs of their ability to bribe Maddox at the Sep. 21, 2016 meeting); *id*. at 2964 (admitting that in the January 9, 2017 meeting that he "wanted [UC Sweet] to believe that the money was a bribe to Scott Maddox for him to take official acts."). A rational jury would have returned the same convictions even without UC Sweet's testimony given this damning evidence. Similarly, UC Sweet's testimony had no bearing on the jury's verdict regarding the defendant's knowingly false statements about his knowledge of the UCs. *See* ECF No. 497-1 at 43-54.

Far from identifying any "substantial questions" the defendant has failed to identify any error whatsoever with regard to this court's rulings on the testimony of UC Sweet.

**D.    The defendant should not be released even if this Court finds that there is a substantial question.**

If this Court found a substantial question on appeal, likely to result in a new trial, the Court should still detain the defendant.   Such an error would only affect the defendant's extortion, mail fraud, and Travel Act counts.   The defendant's remaining false-statement conviction, however, would mean that, at best, he will ultimately receive "a reduced sentence to a term of imprisonment less than the total already served plus the expected duration of the appeal process."   18 U.S.C. § 3143(b)(1)(B)(iv).   In that situation, § 3143(b)(1) requires this Court to order the defendant's detention pending appeal and shall "order [that] detention terminated at the expiration of the likely reduced sentence."   *Id*. § 3143(b)(1).

## V.    <u>CONCLUSION</u>

For the reasons stated herein, the government respectfully submits that the Defendant's motion should be denied.

Respectfully submitted on November 30, 2021,

JASON R. COODY                         COREY R. AMUNDSON
United States Attorney                 Chief, Public Integrity Section

*/s/ Stephen M. Kunz*                  */s/  Peter M. Nothstein*
STEPHEN M. KUNZ                        PETER M. NOTHSTEIN
ANDREW J. GROGAN                       Deputy Chief
Assistant United States Attorney       ROSALEEN T. O'GARA
Florida Bar No. 322415                 Trial Attorney
Florida Bar No. 85932                  Maryland Bar No. 0512140322
111 North Adams St., 4th Floor         Arizona Bar No. 029512
Tallahassee, FL 32301                  Public Integrity Section
(850) 942-8430                         Criminal Division
stephen.kunz@usdoj.gov                 1331 F Street NW
andrew.grogan@usdoj.gov                Washington, D.C. 20005
                                       (202) 514-1412
                                       peter.nothstein@usdoj.gov
                                       rosaleen.o'gara2@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of this motion has been filed via the CM/ECF filing system on this 30th day of November 2021, and thereby has been provided to counsel for defendant Burnette.

*/s/ Peter M. Nothstein*
Peter N. Nothstein
Deputy Chief

## **LOCAL RULE 7.1(F) CERTIFICATE**

I HEREBY CERTIFY that, in accordance with NDFL Local Rule 7.1, this motion contains 8,099 words, but counsel for the defendant have consented to the government's memorandum exceeding the 8,000 word limit. Accordingly, this memorandum is attached as an exhibit to a motion to exceed the word limit.

*/s/Peter M. Nothstein*
Peter M. Nothstein
Deputy Chief