# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 4:18cr76-RH-CAS

JOHN THOMAS BURNETTE.

      Defendant.

_____/

## ORDER DENYING RELEASE PENDING APPEAL

After a full and fair trial, the jury convicted the defendant John Thomas Burnette on five counts and acquitted him on four. The convictions resulted from bribes to a city commissioner and lying to FBI agents. The verdict, with both convictions and acquittals, showed the jury's understanding and conscientious application of the requirement for proof beyond a reasonable doubt. The evidence of guilt on the five counts of conviction was overwhelming.

Mr. Burnette received a below-guideline sentence of 36 months in the Bureau of Prisons. He has appealed and has moved for release pending appeal. The motion is fully briefed and ripe for a decision.

## I.  *The Governing Standards*

The Bail Reform Act sets out the standards governing release pending appeal. Release should be granted only if the court finds:

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community, if released . . .; and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
> > (i) reversal,
> >
> > (ii) an order for a new trial,
> >
> > (iii) a sentence that does not include a term of imprisonment, or
> >
> > (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1).

## II.  *Danger, Flight Risk, and Delay*

The government acknowledges that Mr. Burnette does not pose a danger to any other person or the community as those terms are used in the Bail Reform Act. The government asserts, though, that Mr. Burnette has the financial resources to flee. Indeed he does. But fleeing from this 36-month sentence under these circumstances would require a level of irrationality nobody has attributed to Mr. Burnette.

Like every criminal defendant, Mr. Burnette has a right to appeal. There is no reason to believe he has invoked that right for the purpose of delay.

I find by clear and convincing evidence that Mr. Burnette is not likely to flee or to pose a danger to any other person or the community. I find that the appeal has not been taken for the purpose of delay.

### III.  Substantial Question

The Eleventh Circuit has said "a 'substantial question' is one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." *United States v. Fernandez*, 905 F.2d 350, 354 (11th Cir. 1990) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).

With unlimited time to scour the record of the 15-day trial, Mr. Burnette has identified only three issues he will raise on appeal. Two involve the jury instructions, which were correct and to which Mr. Burnette understandably did not object at the time. The third involves a witness's insignificant, volunteered testimony—testimony to which Mr. Burnette did not object on the grounds he now asserts. None of this had any effect on the outcome. That Mr. Burnette has found so little to complain about in a trial of this length and complexity is itself some indication that this was a full and fair trial.

This order provides an abbreviated factual background before turning to Mr. Burnette's assertions of error.

## IV.  Factual Background

Eight of the nine charges against Mr. Burnette involved bribery of a city commissioner, Scott Charles Maddox. The first bribe was for $100,000 and involved a proposed Hampton Inn. The second was for $40,000, paid in four $10,000 installments, and involved a residential real estate development known as Fallschase.

### A.  The Hampton Inn

The first bribe was Mr. Burnette's payment of $100,000 to Mr. Maddox in exchange for Mr. Maddox's role in killing a Hampton Inn project that required City Commission approval. Mr. Burnette was negotiating to buy a nearby DoubleTree Hotel. As Mr. Burnette explained it, if the Hampton was built, the DoubleTree's value would go down by $5 million or more. This was so because, as Hilton brands, Hampton and DoubleTree both draw customers through the Hilton reservation system. A customer who contacted the system looking for a downtown hotel would find only the DoubleTree—unless there was also a new Hampton.

Mr. Burnette was able to negotiate a favorable price for the DoubleTree in part by touting the risk from the proposed Hampton. And he was able to ensure

that the Hampton would not get the required City Commission approval by paying Mr. Maddox.

To be sure, the $100,000 check was drawn on a company ostensibly controlled by Mr. Burnette's cousin. But the evidence established without dispute that Mr. Burnette controlled the company in relevant respects, caused the payment to be made, and reduced his personal draw from the company dollar for dollar to offset the payment. The check was payable to a lobbying firm that Mr. Maddox claimed to have sold to his business partner—also his romantic partner and now codefendant—Paige Carter-Smith. But the evidence established, again without dispute, that Mr. Maddox still controlled and drew funds from the firm and received the benefit of the $100,000 payment.

According to Mr. Burnette's own testimony, Mr. Maddox demanded the $100,000 payment the day before the vote on whether to extend a deadline for the Hampton developer to meet certain requirements. The other commissioners were split 2 to 2 on the extension. Mr. Burnette testified that he agreed to pay the $100,000, thus ensuring the extension would fail. Mr. Maddox abstained from the next day's vote, exactly as Mr. Burnette wanted. The resulting 2 to 2 tie killed the Hampton project, exactly as Mr. Burnette wanted. Mr. Burnette waited to pay the agreed $100,000 until he was sure he would succeed in buying the DoubleTree—a hotel now without nearby competition from another Hilton hotel.

Both in his testimony and in closing argument, Mr. Burnette asserted Mr. Maddox strong-armed him into paying the $100,000—that on this transaction, Mr. Burnette was a victim. But the person who pays a bribe is not a victim; he is a felon. Mr. Burnette did not assert the bribe was paid only under duress, and any such claim would have been frivolous.

The government did not charge the $100,000 bribe as a stand-alone count because the statute of limitations expired before the government learned of the bribe. Instead, the $100,000 bribe was part of a count charging conspiracy to engage in racketeering activity. The evidence conclusively established the bribe, but the evidence was much weaker on other elements of the racketeering charge. The jury understandably acquitted Mr. Burnette of this charge.

The jury instructions, which of course predated the verdict, still had to address the $100,000 bribe.

### B. Fallschase

The record does not show what brought the Federal Bureau of Investigation to Tallahassee. Perhaps the agency got wind of Mr. Maddox's penchant for taking bribes; he had taken bribes not just from Mr. Burnette but also from various others. Whatever the impetus, the FBI came to town with undercover agents and a fictitious company it called "Southern Pines." The cover story was that Southern Pines was in the business of developing real estate.

The agents, using the names Mike Miller and Mike Sweet, soon met and developed a relationship with Mr. Burnette. The agents were using as bait properties ostensibly available for purchase from a single owner, Joan Fregly. Mr. Burnette told the agents the property was worthless—that he wouldn't accept the property if it was free and he was given $5 million to take it.

Mr. Burnette steered the agents to three other local possibilities. The first was a parcel Mr. Burnette recommended but then bought and developed himself for a local craft beer establishment, Proof Brewing Company. The project was off the table long before the bribes now at issue. The second was a major, long-stalled residential development known as Fallschase. The development was privately owned but was believed to be available for purchase. The third was a parcel owned by the City of Tallahassee adjoining Cascades Park.

Mr. Burnette said the agents should move forward promptly on Fallschase but should do nothing on Cascades Park until after another nearby development was completed. The delay was necessary, Mr. Burnette said, to determine what use of the property would be viable alongside the other development.

The record includes many hours of surreptitiously recorded discussions between the agents and Mr. Burnette. Mr. Burnette was adamant throughout that he had no interest in Fregly, that Fallschase was a winner, and that Cascades Park should be deferred. There were numerous discussions of Mr. Maddox's pivotal role

on the City Commission and his willingness to accept bribes. As Mr. Burnette

explained it, Mr. Maddox was the guy in Tallahassee with his hand out, ready to be

paid off.

Long before November 2016, Mr. Burnette had himself bought the Proof

Brewing property; it was off the table. The only local projects that had been

discussed and were still available to Southern Pines were Fallschase, Cascades

Park, and Fregly. The only one Mr. Burnette was interested in moving on was

Fallschase.

As the Fallschase discussions went forward, Southern Pines agreed to pay

Mr. Maddox $10,000 per month, through his lobbying firm. With Mr. Maddox's

approval, Ms. Carter-Smith sent Southern Pines a contract tying the $10,000

payments directly to the Fallschase development—the only project under

discussion with Mr. Maddox and Ms. Carter-Smith at the time.

Tallahassee is the only city in Leon County, but the City and County have

their own separate commissions. Fallschase was in Leon County but was not

within the city limits. Mr. Burnette asserted at trial that the $10,000 payments were

legitimate—that Ms. Carter-Smith intended to lobby the County Commission, not

the City Commission, for its approval of Fallschase. Mr. Burnette never attempted

to reconcile this with his assertion, in recorded conversations and at trial, that

annexation of Fallschase into the City was a foregone conclusion, so that the City, not the County, would yield the pertinent regulatory authority.

The evidence was overwhelming that the lobbying contract was a pretext. The jury plainly rejected the defendants' contrary assertion. Ms. Carter-Smith never undertook any work on the project and was never even asked to do anything. The recorded conversations made clear, as did the circumstantial evidence, that the $10,000 payments were made for one purpose only: to buy Mr. Maddox's support in his role as City Commissioner. In one respect, though, the contract confirmed what the other evidence established anyway: the $10,000 payments related to Fallschase.

Mr. Burnette told the agents he did not wish to be involved in the day-to-day work on Fallschase; he had other commitments. He originally proposed that he would handle the politics on Fallschase and that he would be paid 20% of the proceeds after the "pref," that is, after the Southern Pines investors received the preferential treatment of recovering their full outlay, plus interest. But later, Mr. Burnette said he would invest $1,000,000 "pari passu," that is, on the same footing as the other Southern Pines investors. This was after the first two $10,000 payments to Mr. Maddox but before the last two. Mr. Burnette attached an important condition: he would be involved in the project only if Southern Pines

continued to make the monthly $10,000 payments to Mr. Maddox; otherwise Mr.

Burnette was out. There was no doubt what this related to: Fallschase.

The jury acquitted Mr. Burnette on the first two $10,000 payments but

convicted him on the last two. This made sense. The evidence that Mr. Burnette

knew about and approved the first two payments was substantial but not

overwhelming. The evidence that he knew about and approved the last two was

overwhelming. Those payments came after Mr. Burnette said he would invest

$1,000,000 of his own money in the project pari passu but only if Southern Pines

continued to make the $10,000 payments. Mr. Burnette's statement—as clear a

statement of joinder in a bribe as could be made—was recorded. The recording is

in evidence.

## V. Bribery

The jury convicted Mr. Burnette of actual or attempted interference with

commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (count

two), honest services mail fraud in connection with the third and fourth $10,000

payments in violation of 18 U.S.C. § 1341 (counts five and six), using a facility of

interstate commerce to facilitate unlawful activity in violation of the Travel Act, 18

U.S.C. § 1952(a)(3) (count eight), and making false statements to FBI agents in

violation of 18 U.S.C. § 1001(a)(2) (count nine).

All but the last of these counts turned on Mr. Burnette's participation in the Southern Pines bribery scheme. And a critical issue on each count involving the bribery scheme was whether the $10,000 payments met the definition of a bribe in the separate federal bribery statute, 18 U.S.C. § 201.

In its simplest form, a bribe is a payment to a public official in exchange for the official's agreement to do some qualifying thing. The Hampton payment, although not charged as a stand-alone bribe because of the statute of limitations, provides a useful illustration. If a commissioner says, "I agree to abstain from voting tomorrow on the Hampton proposal in exchange for $100,000," and a developer pays the $100,000, it is a bribe. Nobody could reasonably contend otherwise.

Mr. Burnette's new-found objections to the jury instructions implicate three questions that arise when the agreement is not as straightforward. First, for the official's agreement to constitute a bribe, what kind of thing must the official agree to do? The term used for a qualifying thing in the bribery statute is "official act," so the question could be rephrased as, "what is an official act?" Second, must the official act itself—a vote on a specific motion, for example—be identified at the time of the agreement? Third, must the project to which the official act relates be identified at the time of the agreement?

### A. Official Act

On the first question—the meaning of official act—the starting point is the bribery statute. It defines "official act" as a decision or action on "any question, matter, cause, suit, proceeding or controversy" that "at any time may be pending" or that "may by law be brought before any public official" in the official's capacity as such. 18 U.S.C. § 201(a)(3). The Supreme Court has said these terms "connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016).

Mr. Burnette says it was mandatory for the jury instructions to use all nine of these terms—"question, matter, cause, suit, proceeding or controversy" as well as "lawsuit, hearing, or administrative determination." That is not so. What was mandatory was only for the jury instructions to explain the elements of the offenses in clear, understandable terms applicable to this case—terms that would ensure the jury could convict Mr. Burnette only if it found beyond a reasonable doubt that Mr. Maddox agreed, in exchange for a payment at issue, to do something constituting the required formal exercise of governmental power. The jury instructions did this, providing a definition of "official act" that was more limited, and thus more favorable to Mr. Burnette, than the definition included in the statute and the quotation from *McDonnell*.

The more-limited instruction was proper because the proof did not include all the possible official acts contemplated by the statute and *McDonnell*. There was no need to tell the jury that acts of a kind not shown by this proof could, if proven in some other case, qualify as official acts. The government objected, asking for a definition as broad as allowed by the statute and *McDonnell*, but Mr. Burnette agreed the more-limited instruction was proper, as indeed it was. I properly ruled for Mr. Burnette on this disagreement.

A fair reading of the jury instructions in context confirms that they were proper. The instructions first said bribery requires a public official's agreement to perform an "official act." The instructions said the only public official alleged to have so agreed here was Mr. Maddox. The instructions continued: "An 'official act' is a decision or action that involves the formal exercise of governmental power. This case involves only three kinds of possible official acts. Unless you find there was an official act of one of these three kinds, you cannot find there was an official act."

The instructions then listed the three kinds of official acts. The first was a vote on a subject coming before the City Commission (or before either of the two related local governmental entities of which the commissioners, including Mr. Maddox, were members). The second was abstaining from such a vote. The third was pressuring another commissioner or staff member on the same kind of act or

advising a commissioner or staff member on the same kind of act, knowing or
intending that the commissioner or staff member would take formal action based
on that advice.

The first two of these—voting or abstaining from voting as a member of a
local governmental entity on an issue brought before the commission for the
formal exercise of governmental power—are quintessential official acts. The
third—pressuring or advising another commissioner as described—closely tracks
*McDonnell*'s treatment of this issue. *See McDonnell*, 136 S. Ct. at 2370 ("using his
official position to exert pressure on another official to perform an 'official act'")
(emphasis in original); *id.* at 2372 ("using his official position to exert pressure on
another official to perform an 'official act,' or to advise another official, knowing
or intending that such advice will form the basis for an 'official act' by another
official"). Mr. Burnette did not contemporaneously object to, and apparently does
not now challenge, the pressuring-or-advising instruction.

The three categories—voting, abstaining, and properly circumscribed
pressuring or advising—covered it, as Mr. Burnette acknowledged at the time.
There was no need to use the untailored series of terms Mr. Burnette now says
should have been used—terms susceptible to improper application.

The statutory terms are "question, matter, cause, suit, proceeding or
controversy." But a vote on a matter coming before the City Commission for the

formal exercise of governmental power is always on a "question" or "matter," if

not also on a "cause" or "controversy." And a Commission meeting might itself be

deemed a "proceeding," at least by a juror. So as to voting, these terms are

redundant and less clear than the instructions as given. The same is true for

abstaining from a vote or pressuring or advising another commissioner or staff

member as described in the instructions. The omitted terms would have added

nothing of relevance on the facts of this case.

Using these terms was unnecessary. If properly understood by the jurors,

they also would have done no harm. But instructions are best when they avoid

terms that *could* be misunderstood. *Unnecessary* terms that could be

misunderstood should be avoided. Jurors could give words like "question" and

"cause" too broad a construction, risking an improper conviction. Advocating

against the Hampton or for approval of Fallschase, for example, might be deemed a

"cause," but such advocacy, even by a commissioner, is not an "official act." The

tailored instructions, limited to a vote or abstention or corresponding pressure or

advice, were accurate, more favorable to Mr. Burnette, and properly given.

The same is true for the terms from *McDonnell* that Mr. Burnette now says

should have been included in the instructions. *McDonnell* said the statutory

definition of "official act" connotes "a formal exercise of governmental power,

*such as* a lawsuit, hearing, or administrative determination." *McDonnell*, 136 S. Ct.

at 2368 (emphasis added). The instructions Mr. Burnette now challenges included *McDonnell*'s requirement for a "formal exercise of governmental power" in precisely those words. But the instructions did not use *McDonnell*'s examples—"a lawsuit, hearing, or administrative determination"—because the instructions defined the qualifying acts, as relevant in this case, much more precisely: a vote on a subject brought before the City Commission for the formal exercise of governmental power, or abstaining from such a vote, or corresponding pressure or advice.

The jury's role was to decide whether the evidence showed Mr. Maddox agreed to do these things in exchange for a payment—not to decide whether a commission vote to formally exercise governmental power is sufficiently similar to a lawsuit, hearing, or administrative determination to qualify as an official act. A commission vote to formally exercise governmental power is an official act as a matter of law.

There thus was no need to include these terms in the jury instructions. And the terms might have been confusing or even misleading. There was evidence that Mr. Burnette filed an unfounded lawsuit—actually an administrative proceeding— to delay the Hampton project. This had little to do with the merits of the bribery charges and had no place in the jury instructions, but a reference to a lawsuit might have seemed a reference to this, the only lawsuit involved in the case. Worse, the

term "administrative determination," while clear enough to attorneys, might be misunderstood by jurors. Is delegating a task to an aide or even the city manager an "administrative determination"? The limitation to "formal exercise of governmental power" might avoid any such misunderstanding, but there was no reason to risk an improper conviction on this basis.

In sum, defining an "official act" as a formal exercise of governmental power, and limiting the term to the three categories pertinent here, was proper and more favorable to Mr. Burnette than a broader official-act definition would have been. Mr. Burnette's belated objection to this part of the instructions is unfounded.

## B. Identifying the Official Act

The second question implicated by Mr. Burnette's new-found objections to the jury instructions is whether the official act the public official agrees to perform must be identified at the time of the agreement. Put in more concrete terms, if a developer says to a commissioner, "I will pay you $10,000 per month starting now if you agree that you will vote in my favor when any issue involving my Fallschase project comes before the commission," and the commissioner agrees, is this a bribe? This is, by the way, precisely what happened here, though without an explicit statement wrapping it up this neatly.

The answer obviously is yes. This has sometimes been referred to as the "retainer" or "as opportunities arise" theory of bribery. *See, e.g.*, *United States v.*

*Roberson*, 998 F.3d 1237, 1251 & 1245 n.10 (11th Cir. 2021) (holding the "retainer" theory valid and treating "as opportunities arise" as an equivalent term); *United States v. Silver*, 948 F.3d 538, 553 n.7 (2d Cir. 2020) (approving the "as opportunities arise" theory); *United States v. Skelos*, 988 F.3d 645, 655-56 (2d Cir. 2021) (same).

Even the cases on which Mr. Burnette places principal reliance—*Silver* and *Roberson*—explicitly approve this theory. *McDonnell* is not to the contrary, as *Roberson*, a post-*McDonnell* Eleventh Circuit decision, makes clear.

Mr. Burnette does not, and could not plausibly, assert the "retainer" or "as opportunities arise" theory is not valid under the law of this circuit. The issue is settled.

### C. *Identifying the Project*

The third question implicated by Mr. Burnette's new-found objections to the jury instructions is whether, to constitute bribery, the project to which an official act relates must be identified at the time of the agreement. Put in more concrete terms, if a developer says to a commissioner, "I will pay you $10,000 per month starting now if you agree that you will vote in my favor when my future projects, whatever they may be, come before the commission," and the commissioner agrees, is this a bribe?

Common sense says yes. Mr. Burnette now says the answer is no—that to constitute bribery, the specific projects must be identified at the time of the agreement. If Mr. Burnette's view were accepted, it would be open season for commissioners with their hands out and for developers willing to pay them.

Nothing in § 201 or *McDonnell* suggests an agreement of this kind is not a bribe. Mr. Burnette did not assert at the charge conference or at any other time before return of the verdict that an agreement of this kind is not a bribe. Mr. Burnette still has suggested no sound analytical basis for his new position. Even more clearly, Mr. Burnette has not shown it was plain error to fail to instruct the jury that an agreement of this kind is not a bribe.

Ultimately, though, this is much ado about nothing. The project that was the subject of the bribe involved in the counts of conviction was well known to Mr. Burnette when he approved the payments and to Mr. Maddox when he accepted them. The project was Fallschase. Mr. Burnette told the agents he would invest $1,000,000 in Fallschase but only if they kept paying Mr. Maddox. This was the only Southern Pines project Mr. Burnette was interested in pursuing at that time and the only one under discussion with Mr. Maddox. It was the project explicitly identified in the proposed contract calling for Southern Pines to make the $10,000 payments—the contract setting out the pretextual explanation for the payments. And the timing of Mr. Burnette's recorded statements about Fallschase is what

explains the jury's verdict acquitting him on the first two $10,000 payments and convicting him on the last two.

If one could nonetheless somehow conclude Mr. Maddox agreed, in exchange for the payments, to take favorable action on one or both of the other projects that had been discussed—Cascades Park or Fregly—this still would make no difference. Even on Mr. Burnette's new view, it would constitute a bribe to pay a commissioner a monthly stipend in exchange for the commissioner's favorable vote on any one of several identified projects that might come before the commission. Mr. Burnette's new position apparently is only that agreeing to vote on *unidentified* projects is not enough.

The jury instructions did not address any unidentified-project issue because there were no unidentified projects. The facts of the case did not implicate any such issue. The project at issue was Fallschase. The other projects that had been discussed were Cascades Park and Fregly. Any assertion the $10,000 payments were made only for other, unidentified projects—not for action on Fallschase or even Cascades Park or Fregly—would have been wholly fanciful.

Note, too, that a payment partly for action on Fallschase and partly for action on some unidentified future project would still constitute a bribe, even on Mr. Burnette's new view that the project at issue must be identified. This is so because a mixed-motive payment—one made partly as a bribe and partly for some other

purpose—is still a bribe. The jury instructions properly said this; Mr. Burnette did

not object; and he still has not asserted the contrary. He could not reasonably do so.

In sum, the instructions properly defined an official act as a formal exercise

of governmental power and limited the kind of act that could qualify on the facts of

this case to three categories that plainly *do* qualify. The instructions did not address

any unidentified-project issue because on the facts of the case, the project at issue

was identified, and everybody knew it.

To be sure, Mr. Burnette asserts the instructions affirmatively addressed this

issue, telling the jury that an agreement to act on an unidentified project would be

sufficient. This would make no difference, even if true, but it is not true. To

support his assertion, Mr. Burnette lifts from context the instructions on a different

question—the second question discussed above, whether the commissioner's future

*act* must be identified, not this third question, whether the *project* must be

identified.

As set out above, the instructions told the jury that an official act must

involve the formal exercise of governmental power and could consist of one of

three things. The first was a vote "on any matter that was pending or might later

come before" one of the relevant governmental entities: the City Commission and

the two other entities of which Mr. Maddox was a member. This closely tracked

the statute, under which official act "means any decision or action on *any* question,

*matter*, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official" in the official's capacity as such. 18 U.S.C. § 201(a)(3) (emphasis added).

The instructions then turned to the second question discussed above: whether, at the time of a public official's agreement to take formal governmental action in exchange for a payment, the action must be identified. As set out above, the law is settled that the answer is no. The instructions properly said so: "To count as a matter that might later come before the governmental entity, a matter need not be identified at the time of the payment; it is sufficient if the payment is made in exchange for favorable treatment on any not-yet-known matter that might later come up for a vote." The instruction used "not-yet-known matter" in parallel with the prior sentence, to mean a vote that might come before the Commission, not the project to which the vote might relate. The vote might be on one issue or another— annexation, density, concurrency, environmental credits, or any number of things that might come before the Commission on a development like Fallschase.

There is zero chance the verdict would have been different had the jury been told the $10,000 payments could constitute a bribe only if Mr. Maddox agreed to take official action on the Fallschase project. Or only on one or more of the Fallschase, Cascades Park, or Fregly projects. This explains the failure of Mr. Burnette's many lawyers to interpose any contemporaneous objection to the

instructions on this basis. The lawyers didn't miss anything; there was no there there.

Even in the Second Circuit, whose *Silver* decision is the basis for Mr. Burnette's assertion that a project must be identified at the time of a bribe, erroneous instructions on this point have been held harmless when, as here, the evidence showed that the bribe related to a known subject. *See United States v. Skelos*, 988 F.3d 645, 655-56 (2d Cir. 2021) (holding error harmless because evidence showed bribes were related to known subjects); *United States v. Silver*, 948 F.3d 538, 570-71 (2d Cir. 2020) (holding error harmless as to bribe on one of the subjects at issue).

### D. The Bottom Line on the Instructions

In sum, the instructions Mr. Burnette belatedly challenges were correct. Even more clearly, there was no plain error. And finally, the alleged error made absolutely no difference. The jury convicted Mr. Burnette on the bribery charges because he agreed to invest $1,000,000 in the Fallschase project only if Southern Pines continued to make monthly $10,000 payments to Mr. Maddox to ensure the success of that project. Mr. Burnette's insistence on continuation of the payments was recorded and leaves no doubt. Indeed, Mr. Burnette still has suggested no viable defense to these counts of conviction, other than his contention that the

payments were for legitimate lobbying services—a contention the jury plainly rejected.

Mr. Burnette's new-found objections to the jury instructions, which will be reviewable only for plain error, do not present a substantial question within the meaning of the Bail Reform Act. They do not present "a 'close' question or one that very well could be decided the other way." *United States v. Fernandez*, 905 F.2d 350, 354 (11th Cir. 1990) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).

## VI. *False Exculpatory Statements*

From start to finish, the defense attempted to make this a trial about the FBI agents' handling of the investigation. In opening statement, the defense asserted time and again that the agents pushed and pushed and pushed before Mr. Burnette bought into the plan to pay Mr. Maddox. Throughout the trial, the defense criticized the agents for continuing to push Mr. Burnette, for raising the subject of paying bribes too many times, and for many other things large and small—for drinking while in character on the job, for buying drinks for others, for taking Mr. Burnette and Mr. Maddox to Las Vegas and to a strip club there, for spending too much government money, and on and on.

During the direct examination of one of the agents—Mr. Sweet—the government asked an innocuous question: after a specific phone call from Mr.

Burnette, "what were you thinking was going on?" Tr. 1662-63. The defense said, "Objection, Your Honor, Speculation." The objection was unfounded, because the question was simply what Mr. Sweet thought, not what was in fact going on. Mr. Sweet of course had personal knowledge of what he thought was going on; he did not need to speculate. The defense did not interpose a relevance objection, perhaps recognizing that where Mr. Sweet thought the investigation stood was relevant both to rebut the defense suggestions about improper continuation of the investigation and to explain what the agents did later.

In response to the question, Mr. Sweet volunteered that he thought Mr. Burnette had made a false exculpatory statement during the call. Tr. 1663. The defense did not object or move to strike. Mr. Sweet explained the testimony: what Mr. Burnette said during the phone call was "completely contradictory" to what Mr. Burnette had said many times before. Tr. 1665. Shortly after that, the government asked whether, after the same call, Mr. Sweet thought "the deal you had was consistent with what you understood back in Nashville"—that is, earlier in the investigation. Tr. 1671. The defense did not object to the question. Mr. Sweet answered yes and again volunteered that he thought the phone call included a false exculpatory statement. *Id*. The defense did not move to strike.

Later in the direct examination of Mr. Sweet, the government turned to a meeting he attended with Mr. Maddox and Ms. Carter-Smith. The government

asked what the discussion with them was like. Mr. Sweet said it wasn't very cordial and then volunteered that Mr. Maddox was making false exculpatory statements. Tr. 1687. The defense did not object or move to strike.

On cross-examination, the defense elicited statements along the same lines. Mr. Burnette now suggests this was an effort to respond to the improper testimony on direct, but the assertion does not survive analysis. On an entirely different subject—texts Mr. Burnette sent about an unrelated real-estate development—the defense asked Mr. Sweet what he understood the texts to be telling him. Asked his understanding, Mr. Sweet provided it: he said he thought the texts were false exculpatory comments. Tr. 1689. It was the answer to a question the defense chose to ask and had nothing to do with the testimony on direct on an entirely different subject.

Similarly, the defense asked Mr. Sweet whether Mr. Maddox said, upon arrival in Las Vegas on the trip paid for by the agents, that he was there to promote Tallahassee. Mr. Sweet acknowledged Mr. Maddox had indeed said that. The defense did not stop there, instead asking Mr. Sweet whether he understood Mr. Maddox was saying he was there "on the premise that this was business trip." Tr. 1787. Asked his understanding, Mr. Sweet again provided it, saying he understood Mr. Maddox was making a false exculpatory statement. *Id*. This had nothing to do with the testimony on direct on an entirely different subject.

From that point forward, the defense used the term "false exculpatory statement" to its advantage—or at least perceived advantage—again and again and again, almost mocking Mr. Sweet. The defense incorporated the term into more than 35 questions, most having nothing to do with the isolated uses of the term on direct. The tactic might have been effective. None of the counts of conviction relied on Mr. Sweet's credibility. The counts of conviction involving bribery were instead those proven by overwhelming evidence in the form of canceled checks and recordings of Mr. Burnette's own unambiguous statement that Southern Pines should keep paying Mr. Maddox. The jury acquitted Mr. Burnette on the other bribery counts.

There is no chance that the two statements Mr. Sweet volunteered without objection on direct had any effect on the guilty verdicts on the counts of conviction. The same is true for the two statements directly responding to questions on cross about Mr. Sweet's understanding. And the dozens of questions referring to false exculpatory statements from that point forward—questions posed by the defense, not answers by Mr. Sweet—may have helped and certainly did not harm Mr. Burnette. The same is true of the two questions on redirect that used the term to elicit an explanation of the testimony given on cross—an explanation the government had every right to elicit.

Mr. Burnette's challenge to this testimony does not present a substantial question within the meaning of the Bail Reform Act: "a 'close' question or one that very well could be decided the other way." *United States v. Fernandez*, 905 F.2d 350, 354 (11th Cir. 1990) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).

## VII.  Effect of an Appellate Ruling for Mr. Burnette

Even if the analysis to this point is incorrect—that is, even if Mr. Burnette has raised a substantial question—the Bail Reform Act allows release pending appeal only if a ruling in his favor on appeal is likely to result in—

(i) reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1)(B).

If the Eleventh Circuit holds that the instructions were plainly erroneous and the error was not harmless, the result will be an order for a new trial on the bribery counts but not on count nine, the false-statement count. The count-nine conviction will remain intact.

The same is almost surely true for the challenge to Mr. Sweet's false-exculpatory-statement testimony. Mr. Burnette says a ruling in his favor on this issue would invalidate the count-nine conviction, too, because Mr. Sweet's testimony went to Mr. Burnette's credibility, and his credibility was at issue on count nine as well as on the bribery counts. This is a bridge too far. Mr. Sweet's false-exculpatory-statement testimony had nothing to do with Mr. Burnette's false statements to different FBI agents at the end of the investigation, after the undercover operation had ended. Mr. Burnette has raised no substantial or even insubstantial issue that casts any real doubt on the count-nine conviction.

Mr. Burnette says, though, that if the bribery convictions are vacated and only count nine remains, the result will be a "reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." *Id*. § 3143(b)(1)(B)(iv). To support this assertion, Mr. Burnette says the guideline range on a stand-alone false-statement conviction would be 0 to 6 months. Note, though, that release on this theory would be appropriate only "at the expiration of the likely reduced sentence." A probationary sentence would be unlikely, as would a sentence as short as six months.

The guideline range would be only one factor in determining the sentence. Even if convicted only on count nine, the facts would still be the facts. It would remain true that Mr. Burnette paid a $100,000 bribe that did not result in a

conviction only because of the statute of limitations. It would remain true that when undercover agents came to town openly touting their willingness to pay bribes, Mr. Burnette did not run or even walk away; instead he spent many hours talking and planning and plotting and eventually insisted that he would invest $1,000,000 in the agents' project only if they continued to pay a commissioner for his support.

The Sentencing Reform Act would still require a sentence sufficient but not greater than necessary to achieve the statutory sentencing purposes. *See* 18 U.S.C. § 3553(a). A new sentencing hearing would be conducted, both sides would be heard, and the issues would be considered de novo. It is likely, though, that the sentence would still be at least 18 months—longer than the appeal is likely to be pending.

This, standing alone, is a sufficient basis to deny release pending appeal.

## VIII.  Conclusion

This was a full and fair trial. The jury convicted Mr. Burnette on five counts because the evidence of his guilt on those counts was overwhelming.

When an official agrees, in exchange for a payment, to take formal governmental action—even, for example, to vote in favor of an unidentified project—it is a bribe. Nobody objected to the jury instructions' failure to address the unidentified-project issue because here the projects were identified and

everybody knew what they were. Mr. Burnette's new-found objections to the instructions are unfounded and had no effect on the verdict.

Mr. Sweet's fleeting, volunteered testimony on direct examination that Mr. Burnette made false exculpatory statements in a telephone call and in a later meeting were a trivial drop in an ocean of evidence. The testimony was insignificant when viewed in the context of the entire trial and even when viewed alongside the defense cross-examination of Mr. Sweet himself. The defense used the phrase "false exculpatory" in dozens of its own questions, most unrelated to Mr. Sweet's use of that language on direct. The defense's use of this phrase to mock Mr. Sweet may have helped Mr. Burnette and surely did him no harm.

Even if Mr. Burnette were to prevail on these issues on appeal, his false-statement conviction on count nine would survive. The sentence on that count standing alone likely would be longer than will be required for the appeal.

Mr. Burnette has not satisfied the Bail Reform Act's prerequisites to release pending appeal. This order thus denies his motion for release. But the order extends the deadline to report for service of the sentence to afford Mr. Burnette an opportunity to present the issue to the Eleventh Circuit.

For these reasons,

IT IS ORDERED:

1. The motion for release pending appeal, ECF No. 517, is denied.

2. The deadline for Mr. Burnette to report for service of his sentence is extended to January 23, 2022.

SO ORDERED on December 18, 2021.

s/Robert L. Hinkle_____
United States District Judge